**ORAL ARGUMENT NOT YET SCHEDULED**

No. 24-5101 (c/w Nos. 24-5156 and 24-5159)

# In the United States Court of Appeals for the District of Columbia Circuit

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,
*Appellees/Cross-Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Appellants/Cross-Appellees*

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Appellants/Cross-Appellees*

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-CV-0119, District Judge Randolph D. Moss

**JOINT APPENDIX—VOLUME 5 (JA.1470–JA.1707)**

*Counsel Listed on Inside Cover*

February 26, 2025

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

Jeffrey DeSousa
*Acting Solicitor General*
Christopher J. Baum
*Senior Deputy Solicitor General*
Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Florida Appellants*

Lisa Lynne Russell
*Deputy Assistant Attorney General*

Brian Toth
Joan Pepin
Rebecca Jaffe
*Attorneys*

Environment and Natural Resources
Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

*Counsel for Federal Appellants*

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
tgalloni@earthjustice.org
creichert@earthjustice.org
(305) 440-5432

Bonnie Malloy
Earthjustice
111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
bmalloy@earthjustice.org
(850) 681-0031

*Counsel for Environmental Appellees*

## TABLE OF CONTENTS

| VOLUME 1 (JA.1–JA.430) | | |
|---|---|---|
| **District Court Docket Number** | **Document** | **Page** |
| Dkt. 1 | Plaintiffs' Complaint | 1 |
| Dkt. 4 | State of Florida and Florida Department of Environmental Protection's Motion to Intervene | 52 |
| Dkt. 73 | Memorandum Opinion and Order | 55 |
| Dkt. 77 | Plaintiffs' Amended Complaint | 117 |
| Dkt. 95-2 | Revised Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program | 176 |
| Dkt. 98 | Plaintiffs' Motion for Summary Judgment | 211 |
| Dkt. 98-1 | Declaration of Amber Crooks | 294 |
| Dkt. 98-3 | Declaration of Elizabeth H. Fleming | 417 |

| VOLUME 2 (JA.431–JA.846) | | |
|---|---|---|
| Dkt. 98-4 | Declaration of Brett Hartl | 431 |
| Dkt. 98-5 | Declaration of Matthew Schwartz | 444 |
| Dkt. 98-6 | Declaration of Lisa Rinaman | 463 |
| Dkt. 98-7 | Declaration of Rachel Silverstein | 510 |
| Dkt. 98-10 | Declaration of Diana Umpierre | 543 |

| | | |
|---|---|---|
| Dkt. 99 | Defendant's Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment | 644 |
| Dkt. 102 | Florida Intervenors' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment | 731 |
| Dkt. 102-1 | Declaration of Justin Wolfe | 793 |

| VOLUME 3 (JA.847–JA.1190) | | |
|---|---|---|
| Dkt. 104 | Plaintiffs' Consolidated Reply in Support for Motion for Summary Judgment and Response in Opposition to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 847 |
| Dkt. 104-1 | Supplemental Declaration of Amber Crooks | 963 |
| Dkt. 107 | Florida Intervenors' Reply in Support of Cross-Motion for Summary Judgment | 1001 |
| Dkt. 113 | Notice of Completion of Biological Evaluation | 1033 |
| Dkt. 123 | Plaintiffs' Sur-Reply in Support of Plaintiffs' Motion for Summary Judgment and Response to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 1036 |
| Dkt. 125 | Plaintiffs' Notice of Filing Addition to Supplemental Joint Appendix | 1063 |
| Dkt. 127-2 | Florida Intervenors' Motion for Leave to File Post-Hearing Memorandum, Attachment 1: Standing Demonstrative | 1066 |
| Dkt. 135 | Motion for a Temporary Restraining Order and Preliminary Injunction by Plaintiffs Center for Biological Diversity and Sierra Club | 1069 |

| Dkt. 149-3 | Exhibit C: Comparison Table of Species Review Process in Corps-Led and Florida-Led Section 404 Programs | 1113 |
| Dkt. 153 | Plaintiffs Center for Biological Diversity and Sierra Club's Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 1119 |
| Dkt. 153-1 | Technical Assistance Process Compared to Endangered Species Act Section 7 Consultation | 1182 |
| Dkt. 156 | Excerpt of Motion Hearing on October 19, 2023 | 1187 |

| **VOLUME 4 (JA.1191–JA.1469)** | | |
| --- | --- | --- |
| Dkt. 158 | Federal Defendants' Post-Hearing Submission on Remedy | 1191 |
| Dkt. 161 | Plaintiffs' Brief on Remedy for Claims Relating to Protection of ESA-listed Species under USFWS' Jurisdiction | 1201 |
| Dkt. 164 | Order | 1218 |
| Dkt. 165 | Federal Defendants' Supplemental Brief Regarding Limited Stay | 1220 |
| Dkt. 166 | Florida Intervenors' Motion for Limited Stay of February 15, 2024 Vacatur Order | 1224 |
| Dkt. 166-1 | Exhibit A: Declaration of Justin Wolfe | 1245 |
| Dkt. 170 | Florida Intervenors' Reply in Support of Limited Stay | 1250 |
| Dkt. 171 | Florida Intervenors' Expedited Motion for Entry of Final Judgment | 1263 |

| Dkt. 182 | Amended Memorandum Opinion | 1284 |
| Dkt. 183 | Memorandum Opinion | 1382 |
| Dkt. 184 | Order | 1409 |
| Dkt. 185 | Florida Intervenors' Notice of Appeal | 1410 |
| Dkt. 189 | Plaintiffs' Response to Florida Intervenors' Motion for Stay Pending Appeal | 1411 |
| Dkt. 190 | Memorandum Opinion and Order | 1451 |
| Dkt. 193 | Plaintiffs' Notice of Appeal | 1465 |
| Dkt. 195 | Federal Defendants' Notice of Appeal | 1468 |

| VOLUME 5 (JA.1470–JA.1707) | | | |
|---|---|---|---|
| **EPA Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| EPA-HQ-OW-2018-0640-0001 | Dkt. 51 at 1-4 | Request to Assume Administration of a Clean Water Act Program: Florida, Notice and Request for Comments, 85 Fed. Reg. 57,853 (Sept. 16, 2020) | 1470 |
| EPA-HQ-OW-2018-0640-0002-A7 | Dkt. 52 at 6-15 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060: Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands, Aug. 20, 2020 | 1474 |

| EPA-HQ-OW-2018-0640-0002-A9 | Dkt. 52 at 21-30 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060 Section C: Supplemental Information for Works or Other Activities In, On, or Over Wetlands and/or Other Surface Waters, Aug. 20, 2020 | 1484 |
| EPA-HQ-OW-2018-0640-0002-A20 | Dkt. 52 at 82-143 | Florida Section 404 Program Application: Florida Admin. Code 62-331.010(5): State 404 Program Applicant's Handbook Aug. 20, 2020 | 1494 |
| EPA-HQ-OW-2018-0640-0016-A2 | Dkt. 55-1 at 120-32 | Appendix j-2: Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, USFWS, and FDEP, Aug. 5, 2020 | 1556 |
| EPA-HQ-OW-2018-0640-0018 | Dkt. 55-1 at 300-13 | Memorandum of Agreement between FDEP and EPA, July 31, 2020 | 1569 |
| EPA-HQ-OW-2018-0640-0019 | Dkt. 55-1 at 314-22 | Memorandum of Agreement Between FDEP and the U.S. Department of the Army, July 31, 2020 | 1583 |
| EPA-HQ-OW-2018-0640-0051 | Dkt. 55-3 at 69-129 | Letter from Bonnie Malloy et al., Earthjustice, to Kelly Laylock, EPA, Oct. 23, 2020 | 1592 |
| EPA-HQ-OW-2018-0640-0386-A1 | Dkt. 56 at 16-70 | Letter from Tania Galloni et al., Earthjustice et al., to Kelly Laylock, EPA, Nov. 2, 2020 | 1653 |

| VOLUME 6 (JA.1708–JA.2060) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0387-A8 | Dkt. 56-1 at 65-364 | Exhibit 58: ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida, July 24, 2020 | 1708 |
| EPA-HQ-OW-2018-0640-0387-A10 | Dkt. 112-1 at 175-76, 207, 259, 275, 306-07 | Excerpts of Exhibit 60: 1998 Endangered Species Consultation Handbook | 2008 |
| EPA-HQ-OW-2018-0640-0388-A2 | Dkt. 95-2 at 18 | Letter from Kristen L. Boyles et al., Earthjustice et al., to Kathy Hurld, EPA, July 6, 2020 | 2015 |
| EPA-HQ-OW-2018-0640-0388-A7 | Dkt. 112-2 at 2-26 | Exhibit 67: FDEP White Paper, ESA Consultation | 2032 |
| EPA-HQ-OW-2018-0640-0564 | Dkt. 56-1 at 433-34 | Approval of Florida's Clean Water Act Section 404 Assumption Request, 85 Fed. Reg. 83,533, Dec. 22, 2020 | 2057 |
| EPA-HQ-OW-2018-0640-0566 | Dkt. 56-1 at 435-36 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, Dec. 17, 2020 | 2059 |

| VOLUME 7 (JA.2061–JA.2199) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0568 | Dkt. 56-1 at 437-549 | EPA, Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program, Dec. 16, 2020 | 2061 |

| | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0617 | Dkt. 112-2 at 351 | Letter from Jeaneanne Gettle, EPA, to Roy Crabtree, NOAA NMFS, on EPA's Section 7 Consultation, Sept. 2, 2020 | 2174 |
| EPA-HQ-OW-2018-0640-0618 | Dkt. 112-2 at 352-53 | Letter from Virginia Fay, NOAA NMFS, to Jeaneanne Gettle, EPA, Oct. 30, 2020 | 2175 |
| EPA-HQ-OW-2018-0640-0623 (same as FWS-006015) | Dkt. 112-2 at 354-66 (same as Dkt. 112-5 at 47-59) | USFWS Biological Opinion Appendix 2: Memorandum of Understanding Between FWC, USFWS, and FDEP, August 5, 2020 | 2177 |
| EPA-HQ-OW-2018-0640-0635 | Dkt. 56-1 at 669 | Letter from David Ross, EPA, to Timothy Gallaudet, NOAA NMFS, and Rob Wallace, USFWS, on FDEP's Non-Federal Representative Designation, Dec. 13, 2019 | 2190 |
| EPA-HQ-OW-2018-0640-0636 | Dkt. 56-1 at 670-71 | Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, on FDEP's Non-Federal Representative Designation, Dec. 12, 2019 | 2191 |
| EPA-HQ-OW-2018-0640-0637 | Dkt. 112-2 at 367-69 | EPA, Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation, 85 Fed. Reg. 30,953, May 21, 2020 | 2193 |

| EPA-HQ-OW-2018-0640-0638 | Dkt. 112-2 at 370-71 | Letter from Cathryn Tortorici, NOAA NMFS, to Heather Mason, FDEP, April 15, 2020 | 2196 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0641 | Dkt. 56-1 at 684-85 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, on EPA's Completeness Determination for Florida's Assumption Request, August 28, 2020 | 2198 |

| VOLUME 8 (JA.2200–JA.2530) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0649 (same as FWS-005610) | Dkt. 112-3 at 2-298 (same as Dkt. 112-4 at 87-383) | USFWS Biological Opinion Appendix 1: EPA's Biological Evaluation | 2200 |
| EPA-HQ-OW-2018-0640-0660-A1 | Dkt. 56-1 at 774-81 | EPA, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Section 404 Program Approvals, Aug. 27, 2020 | 2497 |
| EPA-HQ-OW-2018-0640-0664 | Dkt. 112-3 at 301-02 | Letter from Jeaneanne Gettle, EPA, to Tania Galloni, Earthjustice, Responding to Notice of Intent to Sue, Dec. 20, 2021 | 2505 |
| EPA-HQ-OW-2018-0640-0670 | Dkt. 112-3 at 343 | Email from David Fotouhi, EPA, to Matt Leopold, EPA, et al., transmitting documents for Florida Stakeholder meeting, Sept. 17, 2018 | 2507 |

| EPA-HQ-OW-2018-0640-0670-A3 | Dkt. 112-3 at 344-52 | Potential ESA Compromise Analysis and Proposal | 2506 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0670-A5 | Dkt. 112-3 at 353-59 | Florida Proposal Regarding ESA (SSEC-Doug-P18082810080) | 2517 |
| EPA-HQ-OW-2018-0640-0686 | Dkt. 112-3 at 368-72 | Response to Comments on EPA Consultation under ESA | 2524 |
| EPA-HQ-OW-2018-0640-0690 | Dkt. 112-3 at 375-76 | Letter from Peter S. Silva, EPA, to R. Steven Brown, Environmental Council of the States, et al., re EPA Position on ESA Consultation for 404 Assumption, Dec. 27, 2010 (same as above) | 2529 |

| VOLUME 9 (JA.2531–JA.2700) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-000001 | Dkt. 112-4 at 2-3 | 20191212 Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, re: Designation of FDEP as Non-Federal Representative for Informal Consultation | 2531 |
| FWS-006015 | Dkt. 112-5 at 47-59 | 20201116 Memorandum of Understanding between FWC, USFWS, and FDEP (attached as Appx. 2 to USFWS's Biological Opinion) | 2533 |

| FWS-000749 | Dkt. 112-4 at 9-11 | 20200331 Email from H. Rauschenberger, USFWS, to M. Duncan, FDEP, J. Goff, FWC, et al., re: Comments on Draft Species Coordination Process | 2546 |
| FWS-003386 | Dkt. 112-4 at 43-84 | 20200820 Florida Rules Chapter 62-4, submitted as part of FDEP's application package. | 2549 |
| FWS-006028 (same as EPA-HQ-OW-2018-0640-0642) | Dkt. 112-5 at 60-147 (same as Dkt. 56-1 at 686-773) | 20201117 Programmatic Biological Opinion for EPA's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act | 2591 |
| FWS-006144 | Dkt. 112-5 at 148-69 | 20180625 Memorandum of Agreement between EPA, USFWS, and NJDEP Related to the Protection of Federally-Listed Threatened or Endangered Species and Designated Critical Habitat Under a New Jersey-Assumed Section 404 Program | 2679 |

| VOLUME 10 (JA.2701–JA.3056) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-006432 | Dkt. 93-2 at 4 | 20140519 Final Biological Opinion re EPA Final Rule - Cooling Water Intakes | 2701 |
| **Army Corps Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| CORPS004318 | Dkt. 112-8 at 106 | 20191126 Email from Robert Barron, Corps, to Shawn Zinszer, Corps, et al., re: AAR Retained Water GIS Call: We Need a "Big" Call with FDEP | 3040 |
| CORPS004319 | Dkt. 112-8 at 107-09 | 20191206 Email Dale Beter, Corps, to Shawn Zinszer, Corps, re: 404g_h Assumption Meeting Notes<br><br>Attachment: 20191206 Sec 404g Assumption Mtg Notes.docx | 3041 |
| CORPS004322 | Dkt. 112-8 at 110-22 | 20200805 Memorandum of Agreement between FDEP and U.S. Department of the Army | 3044 |

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 26, 2025, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  All participants in this case registered with CM/ECF will be served by the CM/ECF system.

Dated:  February 26, 2025

  /s/ Aaron M. Streett
Aaron M. Streett
BAKER BOTTS LLP
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855 (phone)
(713) 229-7855 (fax)
aaron.streett@bakerbotts.com

*Counsel for Florida Appellants*

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OW–2018–0640; FRL–10014–54–Region 4]

### Florida's Request To Assume Administration of a Clean Water Act Section 404 Program

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice and request for comments.

**SUMMARY:** The Clean Water Act (CWA) established the Section 404 program, under which the U.S. Army Corps of Engineers (Corps) may issue permits for the discharge of dredged or fill material into "waters of the United States," as identified in the CWA. Section 404(g)(1) of the CWA authorizes states and tribes to administer their own permit program for the discharge of dredged or fill material into navigable waters, other than those waters that the CWA reserves as subject to Corps jurisdiction. On August 20, 2020, the Environmental Protection Agency (EPA) received from the Governor of the State of Florida, a complete program submission for regulating discharges of dredged or fill material into waters within the jurisdiction of the State in accordance with the CWA. Pursuant to CWA Section 404(h) and EPA's implementing regulations, EPA will hold public hearings and is opening a 45-day comment period. EPA is also initiating a programmatic consultation under Section 106 of the National Historic Preservation Act (NHPA) and is soliciting comments pursuant to NHPA implementing regulations during the 45-day comment period.

**DATES:** Comments on EPA's decision to approve or disapprove under CWA Section 404 must be received on or before November 2, 2020. Comments associated with the consultation under section 106 of the NHPA may also be submitted on or before November 2, 2020. EPA intends to approve or disapprove the State of Florida's request to assume administration of a CWA Section 404 program by December 17, 2020.

**ADDRESSES:** You may send comments on both actions (Florida's request to assume a CWA Section 404 program and EPA's consultation under NHPA section 106), identified by Docket ID No. EPA–HQ–OW–2018–0640, by any of the following methods:

• *www.regulations.gov:* Follow the on-line instructions for submitting comments and accessing the docket and materials related to this notice.

• *Email:* 404Assumption-FL@epa.gov.

• *Mail:* Mr. Kelly Laycock, Oceans, Wetlands and Streams Protection Branch, USEPA Region 4, 61 Forsyth St. SW, Atlanta, GA 30303.

*Instructions:* All submissions received must include the Docket ID No. EPA–HQ–OW–2018–0640 for these actions. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided.

Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are open by appointment only, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https://www.regulations.gov/* or email at *404Assumption-FL@epa.gov,* as there may be a delay in processing mail and faxes. Hand deliveries and couriers may be received by scheduled appointment only. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

The virtual hearings will be held on October 21, 2020 and October 27, 2020. The hearing held on October 21, 2020 will convene at 9:00 a.m. and will conclude no later than 12:00 p.m. EDT. The hearing held on October 27, 2020 will convene at 5:00 p.m. EDT and will conclude not later than 8:00 p.m. EDT. For information about registration for these virtual public hearings, please see *https://www.epa.gov/aboutepa/about-epa-region-4-southeast.*

**FOR FURTHER INFORMATION CONTACT:** Mr. Kelly Laycock, Oceans, Wetlands and Streams Protection Branch, USEPA Region 4, 61 Forsyth St. SW, Atlanta, GA 30303; (404) 562–9262; email address: *404Assumption-FL@epa.gov.*

**SUPPLEMENTARY INFORMATION:** The State's submission may be read online through the Federal eRulemaking Portal, Docket No. EPA–HQ–OW–2018–0640, the EPA's Docket Center, available at *https://www.regulations.gov.* The State's submission is also on file and may be inspected and copied (for a per page charge) at the EPA Docket Center Reading Room located at WJC West Building, Room 3334, 1301 Constitution Avenue NW, Washington, DC 20004. Due to COVID–19, access to the EPA Docket Center Reading Room will be allowed by appointment only. Procedures to make an appointment to visit the EPA Docket Center Reading Room can be found at *https://www.epa.gov/dockets/epa-docket-center-reading-room.*

**Table of Contents**

I. General Information
  A. Does this action apply to me?
  B. What should I consider as I prepare my comments?
  C. How can I participate in the virtual public hearing?
II. Background
  A. Clean Water Act Section 404(g)
  B. National Historic Preservation Act Section 106 Consultation
  C. Endangered Species Act Consultation

### I. General Information

*A. Does this action apply to me?*

States and tribes that have assumed or are considering assuming the administration of a CWA Section 404 dredged or fill material permitting program as well as regulated entities and members of the public in the State of Florida may be interested in providing input on the issues described in this document.

Tribal and State Historic Preservation Offices as well as members of the public with knowledge of or interest in the identification (and location) of historic properties in the State of Florida, the effects of discharges from dredged or fill activities into waters of the United States on these historic properties, or ways to mitigate or avoid adverse effects of such discharges may be interested in commenting on EPA's consultation on this action under section 106 of the NHPA.

*B. What should I consider as I prepare my comments?*

Comments may consider whether the state program meets the requirements of Section 404(g) of the CWA and its implementing regulations. Comments may also consider the impacts of EPA's approval or disapproval of Florida's request on historic sites located within the State of Florida in accordance with section 106 of the NHPA.

Submit your comments, identified by Docket ID No. EPA–HQ–OW–2018–0640, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. EPA may publish any comment received to its public docket. Do not submit to EPA's docket any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment

JA.1470

is considered the official comment and should include discussion of all points you wish to make. EPA will generally not consider comments or comment contents located outside of the primary submission (*i.e.* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets.*

The EPA Docket Center and Reading Room are open by appointment only, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https://www.regulations.gov/* as there may be a delay in processing mail and faxes. Hand deliveries or couriers will be received by scheduled appointment only. For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets.*

EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our federal partners so that we can respond rapidly as conditions change regarding COVID–19.

*C. How can I participate in the virtual public hearing?*

EPA is deviating from its typical approach because the President has declared a national emergency. Because of current CDC recommendations, as well as state and local orders for social distancing to limit the spread of COVID–19, EPA cannot hold in-person public meetings at this time.

The virtual hearings will be held on October 21, 2020 and October 27, 2020. The hearing held on October 21, 2020 will convene at 9:00 a.m. and will conclude no later than 12:00 p.m. EDT. The hearing held on October 27, 2020 will convene at 5:00 p.m. EDT and will conclude not later than 8:00 p.m. EDT.

EPA will begin pre-registering speakers and listen-only attendees for the hearings upon publication of this notice in the **Federal Register**. For a link to the on-line registration page, please visit *https://www.epa.gov/aboutepa/about-epa-region-4-southeast.* Immediately following registration, you will receive an email confirming your registration and providing a unique link to the webinar. Speakers will be signed up to speak in the order that their registration is received. The last day to

pre-register to speak at a hearing will be October 9, 2020. On October 20, 2020, EPA will post a general agenda for the hearing that will list the order of pre-registered speakers and their approximate timeslots at: *https://www.epa.gov/aboutepa/about-epa-region-4-southeast.* Please note that timeslots will be estimated and speakers are encouraged to join the webinar at least 15 minutes prior to the start of their estimated speaking time.

EPA will make every effort to follow the schedule as closely as possible on the day of the hearing; however, please plan for the hearings to run either ahead of schedule or behind schedule.

Oral comments shall be limited to no more than five (5) minutes. EPA recommends that commenters prepare their oral statement in advance to ensure it can be completed within five minutes. EPA also recommends that commenters also submit the text of their oral comments (with any relevant supplementary information) as written comments to the rulemaking docket. EPA encourages commenters to provide EPA with a copy of their oral testimony electronically (via email) by emailing it to Mr. Kelly Laycock at *404Assumption-FL@epa.gov.*

EPA may ask clarifying questions during the oral testimony but will not respond to the comments at that time. Written statements and supporting information submitted during the comment period will be considered with the same weight as oral comments and supporting information presented at the public hearing. The proceedings of the hearings will be recorded. After the public hearing, verbatim transcripts of the sessions will be included in the rulemaking docket.

Please note that any updates made to any aspect of the hearing will be posted online at *https://www.epa.gov/aboutepa/about-epa-region-4-southeast.* While EPA expects the hearing to go forward as set forth above, please monitor our website to determine if there are any updates. EPA does not intend to publish a document in the **Federal Register** announcing updates.

To request services for special accommodations, please pre-register for the hearing with Mr. Kelly Laycock at *404Assumption-FL@epa.gov* and describe your needs by October 7, 2020. EPA will seek to arrange special accommodations as needed to support hearing participation if given advanced notice.

## II. Background

*A. Clean Water Act Section 404(g)*

The CWA established the Section 404 program, under which the Secretary of the Army, acting through the Chief of Engineers of the Corps, may issue permits for the discharge of dredged or fill material into waters of the United States as identified in the CWA. Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction.

The regulations establishing the requirements for the approval of state or tribal programs under section 404 of the CWA were published in the **Federal Register**, at 53 FR 20764, (June 6, 1988) (40 CFR parts 232 and 233), and can be accessed at *https://www.epa.gov/cwa404g/statutory-and-regulatory-requirements-assumption-under-cwa-section-404.* ''State regulated waters'' are defined in 40 CFR 232.2 as ''those waters of the United States in which the Corps suspends the issuance of Section 404 permits upon approval of a state's section 404 permit program by the Administrator under section 404(h). The program cannot be transferred for those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to the high tide line, including wetlands adjacent thereto.'' The Corps retains CWA Section 404 permitting authority over waters of the United States within ''Indian country'' as that term is defined at 18 U.S.C. 1151, unless a tribe has assumed the 404 program within Indian country. *See* 40 CFR 233.1(b).

A state application to administer a Section 404 program must include the following: (a) A letter from the Governor of the state requesting program approval; (b) a complete program description as set forth in 40 CFR 233.11; (c) an Attorney General's statement or a statement from the attorney for those state or interstate agencies which have independent legal counsel, as set forth in 40 CFR 233.12; (d) a Memorandum of Agreement with the EPA Regional Administrator, as set forth in 40 CFR 233.13; (e) a Memorandum of Agreement with the Secretary of the Army, as set forth in 40 CFR 233.14; and (f) copies of all applicable state statutes and regulations, including those governing applicable

JA.1471

state administrative procedures. 40 CFR 233.10.

EPA has reviewed the State of Florida's program submission and consistent with 40 CFR 233.15 has determined that it is a complete request for State program approval that meets the submittal requirements of 40 CFR 233.10. The Governor's request proposes that FDEP administer a permit program for regulated activities in waters regulated by the State under section 404(g)(1), as identified in the Memorandum of Agreement with the Secretary of the Army, in accordance with section 404 of the CWA. The main statutory and regulatory authorities to administer and enforce the State 404 program can currently be found in the State's submission to assume the program and are available on FDEP's web page at *https://floridadep.gov/ water/water/content/water-resource-management-rules*.

The State 404 program would provide for the issuance of general permits and individual permits. The State has adopted 38 general permits which are listed in 62–331 F.S. as part of their package submittal. A complete description of the individual permit process and the standards for granting of an individual permit are found at 62–331 F.S. In addition, there are standard requirements for all regulated activities in State-assumed waters. No permit shall be issued in certain specified circumstances, including when the permit does not comply with the requirements of the CWA or implementing regulations, including the CWA Section 404(b)(1) Guidelines. 40 CFR 233.20. Florida's laws outline a number of requirements applicable to State 404 permits, including that "no dredge or fill activity shall be permitted if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences," and an individual permit cannot be issued if it "[c]auses or contributes to violations of any applicable State water quality standard, except when temporarily within a mixing zone proposed by the applicant and approved . . ." by FDEP at 62–331.053 F.S.

Currently, Florida operates the Environmental Resource Permit program (ERP), which regulates the disposal of dredged or fill material into waters of the State under State law. State-regulated activities under ERP that go beyond the purview of the CWA are not subject to EPA approval or oversight under 40 CFR part 233.

The Memorandum of Agreement between FDEP and the Secretary of the Army, available in the docket for this action, identifies procedures for the transfer of all pending permit applications for discharges into the waters assumed by the State. 40 CFR 233.14. Pursuant to the Memorandum of Agreement, existing Section 404 permits already issued by the Corps as of the effective date of State assumption will remain with the Corps during the already approved lifespan of that permit.

The Regional Administrator is required to approve a state request to assume the Section 404 program unless the state program does not meet the requirements of Section 404(h) of the CWA and its implementing regulations. Among other authorities, the state must have: (1) Adequate authority to issue permits which comply with all pertinent requirements of the CWA, including but not limited to, the Section 404(b)(1) Guidelines, and which may be issued for fixed terms not to exceed 5 years; (2) adequate authority, including civil and criminal penalties, to abate violations of the permit or permit program; and (3) authority to ensure that the Administrator, the public, and any other affected state or tribe are given notice of each permit application and that the public and affected states and tribes are provided an opportunity for public hearing before a ruling on each such application. 33 U.S.C. 1344(h)(1).

The procedures for EPA's review and approval or disapproval of a state Section 404 program are outlined in 40 CFR 233.15. In summary, once a state submits an assumption package that is complete, a 120-day statutory review period commences, which may be extended by mutual agreement of the state and EPA. EPA shall provide copies of a complete assumption package within 10 days of receipt to the Corps, the National Marine Fisheries Service (NMFS), and the United States Fish and Wildlife Service (USFWS) for review and comment. Within 90 days of EPA's receipt of a complete program submission, the Corps, FWS, and NMFS shall submit to EPA any comments on the state program. EPA shall publish notice of the state's application in the **Federal Register**, state newspapers, and via mail to interested parties. EPA shall provide for a public comment period of not less than 45 days as well as a public hearing not less than 30 days after such notice is published in the **Federal Register**. EPA shall also provide notice of an opportunity to consult to federally recognized Indian tribes in the state.

Within 120 days of receipt of a complete program submission (unless

EPA and the state extend the statutory review period), EPA shall approve or disapprove the program based on whether the state's program fulfills the requirements of the Act and 40 CFR part 233, taking into consideration all comments received. EPA will prepare a summary of significant comments received and responses to these comments, as well as respond individually to comments received from the Corps, USFWS, and NMFS.

If EPA approves Florida's program, EPA will notify the State and the Corps and publish notice in the **Federal Register**. Transfer of the program to the State is not effective until this notice is published. EPA may only disapprove the State's program if it is inconsistent with the requirements of the CWA and 40 CFR part 233. If EPA disapproves the State's program it shall notify the State of the reasons for the disapproval and of any revisions or modifications to the State's program which are necessary to obtain approval. If the State resubmits a program submission remedying the identified problem areas, the approval procedure and statutory review period shall begin upon receipt of the revised submission. EPA maintains oversight of State-issued permits pursuant to 40 CFR 233.50.

If EPA approves this program, EPA will also codify the approved program in 40 CFR 233 subpart H.

## B. National Historic Preservation Act Section 106 Consultation

In accordance with 36 CFR 800.2(d), EPA is providing information and seeking comment on EPA's potential approval of Florida's request to assume a CWA Section 404 program and any potential effects of such approval on historic properties. The National Historic Preservation Act of 1966, as amended, (NHPA) establishes historic preservation as a federal agency policy and provides for the identification and protection of historic properties and resources. Section 106 of the NHPA requires federal agencies to take into account the effects of their undertakings on historic properties that are listed or eligible for listing on the National Register of Historic Places and provide the Advisory Council on Historic Preservation (ACHP) a reasonable opportunity to comment with regard to such undertakings. The approval of the State of Florida's request to assume the CWA Section 404 program would be an undertaking pursuant to 36 CFR 800.16(y), and therefore, in accordance with Section 106 of the NHPA and the ACHP's implementing regulations at 36 CFR part 800, EPA has initiated consultation regarding this undertaking.

EPA has invited the ACHP, FDEP, the State Historic Preservation Officer (SHPO), and Indian tribes with interests in the State of Florida to participate as consulting parties.

The State's administration of the Section 404 program and its issuance of permits over time has the potential to affect historic properties, including cultural resources or historic properties of religious and cultural significance. FDEP and the SHPO have entered into an Operating Agreement which sets forth a process to identify historic properties that may be impacted by Florida's issuance of Section 404 permits, and to develop recommendations for resolving adverse effects. As discussed in the State's Operating Agreement, such effects could potentially include, but are not limited to, the following:

i. Physical destruction of or damage to all or part of the property, including inundation;

ii. Alteration of a property, including restoration, rehabilitation, repair, maintenance, stabilization, hazardous material remediation, and provision of handicapped access;

iii. Change of the character of the property's use or of physical features within the property's setting, or impacts to the landscape that contribute to its historic significance;

iv. Introduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features; and

v. Neglect of a property which causes its deterioration, except where such neglect and deterioration are recognized qualities of a property of religious and cultural significance to an Indian Tribe.

Pursuant to the Operating Agreement, if the parties cannot reach agreement on the determination or resolution of effects, they may forward any outstanding issues to EPA for decision-making consistent with EPA's permitting review authorities under 40 CFR 233.50. The Operating Agreement provides comprehensive procedures for assessing the effects of Florida's 404 program on historic properties and therefore will considerably inform EPA's Section 106 consultation.

EPA solicits comments on this undertaking and any potential effects on historic properties at the Federal eRulemaking Portal, Docket No. EPA–HQ–OW–2018–0640. The comment period closes November 2, 2020.

*C. Endangered Species Act Consultation*

The Endangered Species Act (ESA) Section 7 directs each federal agency to ensure, in consultation with the USFWS and NMFS, that ''any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of'' listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). EPA views consultation under ESA Section 7 to be required if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat. EPA's position is set forth in a memorandum issued by David P. Ross, Assistant Administrator for the Office of Water, dated August 27, 2020, following the consideration of comments received during a public participation process that is outside of the scope of this notice. Accordingly, EPA is conducting ESA Section 7 consultation during the Agency's review of the State of Florida's request to assume administration of a CWA Section 404 program because EPA has determined that the Agency's potential approval of the program may affect ESA-listed species or designated critical habitat. *See https://www.epa.gov/ cwa404g/consultation-cwa-section-404- program-requests-endangered-species- act-and-national-historic* for more information regarding EPA's position on ESA Section 7 consultation under CWA Section 404(g).

Dated: September 2, 2020.

**Mary Walker,**

*Regional Administrator, EPA Region 4.*

[FR Doc. 2020–19881 Filed 9–15–20; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–OAR–2011–0371; FRL 10014–33–OAR]**

### Proposed Information Collection Request; Comment Request; National Volatile Organic Compounds Emission Standards for Architectural Coatings (Renewal)

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice.

**SUMMARY:** The Environmental Protection Agency (EPA) is planning to submit an information collection request (ICR), titled, National Volatile Organic Compounds Emission Standards for Architectural Coatings to the Office of Management and Budget (OMB) for review and approval in accordance with the Paperwork Reduction Act (PRA). Before doing so, the EPA is soliciting public comments on specific aspects of the proposed information collection as described below. This is a proposed extension of the ICR, which is currently approved through June 30, 2021. An Agency may not conduct or sponsor and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

**DATES:** Comments must be submitted on or before November 16, 2020.

**ADDRESSES:** Submit your comments, referencing Docket ID No. EPA–OAR–2011–0371, online using *https:// www.regulations.gov/* (our preferred method), by email to *a-and-r-docket@ epa,gov,* or by mail to: EPA Docket Center, Environmental Protection Agency, Mail Code 28221T, 1200 Pennsylvania Ave. NW, Washington, DC 20460.

The EPA's policy is that all comments received will be included in the public docket without change including any personal information provided, unless the comment includes profanity, threats, information claimed to be Confidential Business Information, or other information whose disclosure is restricted by statute.

**FOR FURTHER INFORMATION CONTACT:** J. Kaye Whitfield, Sector Policies and Programs Division, Office of Air Quality Planning and Standards, D243–02, Research Triangle Park, North Carolina 27711, telephone number: 919–541–2509; fax number: 919–541–4991; email address: *whitfield.kaye@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Supporting documents which explain in detail the information that the EPA will be collecting are available in the public docket for this ICR. The docket can be viewed online at *https:// www.regulations.gov/.* Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room are closed to the public, with limited exceptions, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https:// www.regulations.gov/* or email, as there may be a delay in processing mail and faxes. Hand deliveries and couriers may be received by scheduled appointment only. For further information on EPA Docket Center services and the current status, please visit us online at *https:// www.epa.gov/dockets.* The telephone number for the Docket Center is 202–566–1744.

Pursuant to section 3506(c)(2)(A) of the PRA, the EPA is soliciting comments and information on National Volatile Organic Compounds Emission Standards for Architectural Coatings

# Application for

# Individual and Conceptual Approval

# Environmental Resource Permit,

# State 404 Program Permit,

# and Authorization to Use State-Owned

# Submerged Lands

Florida Department of Environmental Protection/

Water Management Districts

Effective [date]



**Form 62-330.060(1) -** Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and
Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A,**
Page 1 of 10
JA.1474

**Instructions for Use of This Form:**

This form is designed to assist you in submitting a complete application. All applications must include Section A-General Information for All Activities. Sections B through H list typical information that is needed based on the proposed activities and are only required as applicable. Part 1-C of Section A will guide you to the correct sections needed based on your proposed activities. Applicants are advised to consult Chapter 62-330, F.A.C., and the Environmental Resource Permit Applicant's Handbook Volumes I and II for information regarding the ERP permitting process and requirements while preparing their application. Internet addresses for Chapter 62-330, F.A.C., and the Applicant's Handbook, Agency contact information, and additional instructions for this form can be found in Attachment 1.

# What Sections of the Application Must I Fill Out?

| Type of Activity | Section A | Section B | Section C | Section D | Section E | Section F | Section G | Section H | Section I |
|---|---|---|---|---|---|---|---|---|---|
| Fill in wetlands or waters for a single family residence? | Y | Y | N | N | N | N | N | N | Y, if in assumed waters |
| Docks, shoreline stabilization, seawalls associated with a single family residence? | Y | Y | N | N | N | Y, as needed | N | N | Y, if in assumed waters |
| Wetland impacts (other than association with an individual residence)? | Y | N | Y | N | N | N | N | N | Y, if in assumed waters |
| Boating facilities, a marina, jetty, reef, or dredging? | Y | N | Y | Y | N | Y, as needed | N | N | Y, if in assumed waters |
| Any work on state owned submerged land? | Y | N | Y | N | N | Y | N | N | Y, if in assumed waters |
| Construction of a stormwater management system? | Y | N | Y, as needed | N | Y | N | N | N | N |
| Constructing a mitigation bank? | Y | N | Y | N | Y, as needed | N | Y | N | Y, if in assumed waters |
| Creating a mine? | Y | N | Y, as needed | N | N | N | N | Y | Y, if in assumed waters |

**If you have any questions, or would like assistance completing this form, please contact the staff of the nearest office of either the Florida Department of Environmental Protection (DEP) or a Water Management District (WMD) (see Attachment 2).**

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**, Page 2 of 10

JA. 1475

# Section A:
# General Information for All Activities

## Part 1: Name, Application Type, Location, and Description of Activity

A.   Name of project, including phase if applicable:

B.   This is for (check all that apply):

☐   Construction and operation of **new** works, activities, and/ or a stormwater management system

☐   **Conceptual Approval** of proposed works, activities and/ or a stormwater management system

☐   Modification or alteration of **existing** works, activities, and/or a stormwater management system. Provide the existing DEP or WMD permit #, if known:          Note: Minor modifications do not require completion of this form, and may instead be requested by letter in accordance with section 6.2 of Applicant's Handbook Volume I.

☐   **Maintenance or repair** of works, activities, and/ or a stormwater management system previously permitted by the DEP or WMD. Provide existing permit #, if known:

☐   Abandonment or removal of works, activities, and/ or a stormwater management system.

Provide existing DEP or WMD permit #, if known:

☐   Operation of an **existing unpermitted** work, activity, and/or stormwater management system.

☐   Construction of additional phases of a permitted work, activity, or system.

Provide the existing DEP or WMD permit #, if known:

☐   A State 404 Program authorization:

☐ Exemption   ☐ General Permit   ☐ Individual Permit

If requesting an Exemption or General Permit provide Rule #, if known:

☐   **By checking this box**, I hereby voluntarily waive, in accordance with Rule 62-330.090(8), F.A.C., the agency action deadlines in section 5.5.3 of Volume I in the event my project also requires a State 404 Program authorization (other than an exemption) under Chapter 62-331, F.A.C., and request that the agency actions for the ERP and State 404 Program authorizations be issued at the same time. (This is strongly recommended to ensure consistency, and to reduce the potential need for project modifications to resolve inconsistencies that may occur when the agency actions are issued at different times.) If this box is checked and the Agency(ies) determines that no State 404 Program authorization is required, the Agency will continue to abide by section 5.5.3 of Volume I.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A,**                                                                                           Page 2 of 10

JA 1476

C. **List the type of activities proposed. Check all that apply**, **and provide the supplemental information requested in each of the referenced application sections.** Please also reference Applicant's Handbook Volumes I and II for the type of information that may be needed.

☐   Activities associated with one single-family residence, duplex, triplex, or quadruplex that do not qualify for an exemption or a General Permit: **Provide the information requested in Section B. Do not complete Section C.**

☐   Activities within wetlands or surface waters, or within 25 feet of a wetland or surface water, (not including the activities associated with an individual single-family residence). Examples include dredging, filling, outfall structures, docks, piers, over-water structures, shoreline stabilization, mitigation, reclamation, and restoration/enhancement. **Provide the information requested in Section C.**

☐   Activities within navigable or flowing surface waters such as a multi-slip dock or marina, dry storage facility, dredging, bridge, breakwaters, reefs, or other offshore structures: **In addition to Section C, also provide the information requested in Section D.**

☐   Activities that are (or may be) located within, on, or over state-owned submerged lands (See Chapter 18-21, F.A.C. https://www.flrules.org/gateway/ChapterHome.asp?Chapter=18-21): **In addition to Section B or C, also provide the information requested in Section F.**

☐   Construction or alteration of a stormwater management system serving residential, commercial, transportation, industrial, agricultural, or other land uses, or a solid waste facility (excluding mines that are regulated by DEP). **Provide the information requested in Section E.**

☐   Creation or modification of a Mitigation Bank (refer to Chapter 62-342, F.A.C. https://www.flrules.org/gateway/ChapterHome.asp?Chapter=62-342): **Provide the information requested in Section G.**

☐   Mines (as defined in Section 2.0 of Applicant's Handbook Volume I) that are regulated by the DEP: **Provide the information requested in Section H.**

☐   Other, describe:        Please contact the Agency to determine which additional sections of the application are needed. See Attachment 2 for Agency contacts.

D. Describe in general terms the proposed project, system, works, or other activities. For permit modifications, please briefly describe the changes requested to the permit:

E. Project/Activity Street/Road Address or other location (if applicable):
   City:                          County(ies):                          Zip:

   Note: For utility, road, or ditch/canal activities, provide a starting and ending point using street names and nearest house numbers or provide length of project in miles along named streets or highways.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**, Page 7 of 10

JA 1477

F.  Project location map and Section, Township, and Range information (use additional sheets if needed):

   **Please attach a location map showing the location and boundaries of the proposed activity in relation to major intersections or other landmarks. The map should also contain a north arrow and a graphic scale; show Section(s), Township(s), and Range(s); and must be of sufficient detail to allow a person unfamiliar with the site to find it.**
   Section(s):      Township:        Range:        Land Grant name, if applicable:
   Section(s):      Township:        Range:

   1.  Section(s):      Township:                    Range:

G.  Latitude (DMS) ___ ° ___ ' ___ " Longitude (DMS) ___ ° ___ ' ___ " (Taken from central location of the activity). Explain source for obtaining latitude and longitude (i.e. U.S.G.S. Quadrangle Map, GPS, online resource):

H.  Tax Parcel Identification Number(s):

   [Number may be obtained from property tax bill or from the county property appraiser's office; if on multiple parcels, provide multiple Tax Parcel Identification Numbers]

I.  Directions to Site (from major roads; include distances and landmarks as applicable):          .

J.  Project area or phase area:          acres

K.  Name of waterbody(ies) (if known) in which activities will occur or into which the system will discharge:

**The following questions (M-O) are not applicable to activities related to an individual single-family residence, including a dock, pier, and/or seawall associated with that residence.**

L.  Is it part of a larger plan of development or sale?        ☐ yes  ☐ no

M.  Impervious or semi-impervious area excluding wetlands and other surface waters (if applicable):

        acres or        square feet

N.  Volume of water the system is capable of impounding (if applicable):

   Normal Pool:        acre-feet.  Depth        ft.
   Maximum Pool:          acre-feet.  Depth          ft.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)                                              **Section A**, Page 8 of 10

JA.1478

**Part 2: Supplemental Information, and Permit History**

A.  Is this an application to modify an existing Environmental Resource Permit or to construct or implement part of a multi-phase project, such as a project with a Conceptual Approval permit? ☐ Yes  ☐ No (If you answered "yes", please provide permit numbers below*):*

| Agency | Date | Permit/Application No. | Project Name |
|--------|------|------------------------|--------------|
|        |      |                        |              |
|        |      |                        |              |
|        |      |                        |              |
|        |      |                        |              |
|        |      |                        |              |

B.  Indicate if there have been any **pre-application meeting(s)** with the DEP, WMD, or delegated local government, or other discussions, meetings, or coordination with other stakeholders or agencies about the proposed project, system or activity. If so, please provide the date(s), location(s) of the meeting, and the name(s) of Agency staff that attended the meeting(s):

| Agency | Date | Location | Meeting Attendees |
|--------|------|----------|-------------------|
|        |      |          |                   |
|        |      |          |                   |
|        |      |          |                   |
|        |      |          |                   |

C.  **Attach a depiction (plan and section views), which clearly shows the works or other activities proposed to be constructed.** Use multiple sheets, if necessary, a scale sufficient to show the location and type of works, and include a north arrow and a key to any symbols used. **Specific information to be included in the plans is based on the activities proposed and is further described in Sections B-H**. However, supplemental information may be required based on the specific circumstances or location of the proposed works or other activies.

D.  Processing Fee: **Please submit the application processing fee along with this application form and supplemental information.** Processing fees vary based on the size of the activity, the type of permit applied for, and the reviewing Agency. Please reference Appendix D of Applicant's Handbook Volume I to determine the appropriate fee.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**, Page 6 of 10

JA. 1479

## Part 3:  Applicant and Associated Parties Information

Instructions: Please complete the following sections. For corporations, list a person who is a registered agent or officer of the corporation who has the legal authority to bind the corporation.

### A.  Applicant (Entity Must Have Sufficient Real Property Interest)
☐ **This is a Contact Person for Additional Information**

Last Name:                          First Name:                          Middle Initial:
Title:                              Company:
Address:
City:                               State:                               Zip:
Home Telephone:                     Work Telephone:
Cell Phone:                         E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### B.  Land Owner(S) (If Different or in Addition to Applicant)
☐ **Check here if land owner is also a co-applicant**

Last Name:                          First Name:                          Middle Initial:
Title:                              Company:
Address:
City:                               State:                               Zip:
Home Telephone:                     Work Telephone:
Cell Phone:                         E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### C.  Operation and Maintenance Entity (see Applicant's Handbook I, Section 12.3)

Last Name:                          First Name:                          Middle Initial:
Title:                              Company:
Address:
City:                               State:                               Zip:
Home Telephone:                     Work Telephone:
Cell Phone:                         E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

### D.  Co-Applicant (If Different or In Addition to Applicant and Owner)

Last Name:                          First Name:                          Middle Initial:
Title:                              Company:
Address:
City:                               State:                               Zip:
Home Telephone:                     Work Telephone:
Cell Phone:
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail: ☐

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**,
Page 6 of 10

JA 1480

**E.   Registered Professional Consultant**
☐ **This is a contact person for additional information**

Last Name:                              First Name:                            Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                               Zip:
Home Telephone:                         Work Telephone:
Cell Phone:
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail:  ☐

**F.   Environmental Consultant**
☐ **This is a contact person for additional information**

Last Name:                              First Name:                            Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                               Zip:
Home Telephone:                         Work Telephone:
Cell Phone:
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail:  ☐

**G.  Agent Authorized to Secure Permit (If Different from Consultant)**

Last Name:                              First Name:                            Middle Initial:
Title:                                  Company:
Address:
City:                                   State:                               Zip:
Home Telephone:                         Work Telephone:
Cell Phone:
E-mail Address:

**Correspondence will be sent via email,** unless you check here to receive it via US Mail:  ☐

**If necessary, please add additional pages for other contacts and property owners related to this project.**

**H.   Real Property Interest**

a.   Permits are only issued to entities having sufficient real property interest as described in Section 4.2.3(d) of Applicant's Handbook Volume I. **Please attach evidence of the applicant's real property interest over the land upon which the activities subject to the application will be conducted, including mitigation areas (if applicable).** Refer to Sections 4.2.3(d)-(e) for sufficient real property interest documentation.

b.   For activities that require a recorded notice in accordance with rule 62-330.090(7), F.A.C., please provide either the complete legal description of the property or a copy of the pages of the document recorded in the public records that contains the complete legal description. If the land upon which the proposed activities are to occur is not owned by the applicant, the applicant must also provide copies of any right-of-way, leases, easements, or other legal agreement which authorizes the applicant to perform the activities on those lands.

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**, Page 8 of 10

JA. 1481

## Part 4: Signatures and Authorization to Access Property

Instructions: For multiple applicants please provide a separate Part 4 for each applicant. For corporations, the application must be signed by a person authorized to bind the corporation. A person who has sufficient real property interest (see Section 4.2.3(d) of Applicant's Handbook Volume I) is required in (B) to authorize access to the property, except when the applicant has the power of eminent domain.

**A.**   By signing this application form, I am applying for the permit and any proprietary authorizations identified above, according to the supporting data and other incidental information filed with this application. I am familiar with the information contained in this application and represent that such information is true, complete and accurate. I understand this is an application and not a permit, and that work prior to approval is a violation. I understand that this application and any permit issued or proprietary authorization issued pursuant thereto does not relieve me of any obligation for obtaining any other required federal, state, water management district, or local permit prior to commencement of construction. I agree to operate and maintain the permitted system unless the permitting agency authorizes transfer of the permit to a different responsible operation and maintenance entity. I understand that knowingly making any false statement or representation in this application is a violation of Section 373.430, F.S. and 18 U.S.C. Section 1001.


Typed/Printed Name of Applicant or
Applicant's Authorized Agent

Signature of Applicant or Applicant's
Authorized Agent

Date


(Corporate Title if applicable)


**B.   Certification of Sufficient Real Property Interest And Authorization For Staff To Access The Property:**

**I certify that:**

☐ **I possess sufficient real property interest in or control, as defined in Section 4.2.3 (d) of Applicant's Handbook Volume I,** over the land upon which the activities described in this application are proposed and I have legal authority to grant permission to access those lands. I hereby grant permission, evidenced by my signature below, for staff of the Agency to access, inspect, and sample the lands and waters of the property as necessary for the review of the proposed works and other activities specified in this application, upon advance notice. I authorize these agents or personnel to enter the property as many times as may be necessary to make such review, inspection, and/ or sampling. Further, if a permit is granted, upon advance notice, I agree to provide entry to the project site for such agents or personnel with proper identification to determine compliance with permit conditions and permitted plans and specifications.

**OR**

☐ I represent an entity having **the power of eminent domain and condemnation authority**, and I/we shall make appropriate arrangements to enable staff of the Agency to legally access, inspect, and sample the property as described above.


Typed/Printed Name

Signature

Date


(Corporate Title if applicable)


**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)

**Section A**, Page 9 of 10

JA_1482

**C.  Designation of Authorized Agent (If Applicable):**

I hereby designate and authorize          to act on my behalf, or on behalf of my corporation, as the agent in the processing of this application for the permit and/or proprietary authorization indicated above and to furnish, on request, supplemental information in support of the application. In addition, I authorize the above-listed agent to bind me, or my corporation, to perform any requirements which may be necessary to procure the permit or authorization indicated above. I understand that knowingly making any false statement or representation in this application is a violation of Section 373.430, F.S., and 18 U.S.C. Section 1001.

_____                              _____
Typed/Printed Name of Applicant             Signature of Applicant                    Date


(Corporate Title if applicable)

**Form 62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)
**Section A**, Page 8 of 10
JA.1483

# Section C: Supplemental Information for Works or Other Activities In, On, or Over Wetlands and/or Other Surface Waters

Instructions: **This section is for applications that do not involve activities associated with an individual single-family residence, duplex, triplex, or quadruplex. For those activities, please use Section B.** This form is to be completed if the proposed work or activity will occur in, on, over, or within 25 feet of a wetland or other surface water. The supplemental information required by this section is in addition to the information required by Section A of the application.

## Part 1: Wetland or Other Surface Water Impact Summary

1. Describe the basic purpose of the project or activity:

2. Total area of work (dredging, filling, construction, alteration, or removal) in, on, or over wetlands or other surface waters:          sq. ft.;          ac.

3. Total volume of material to be dredged or filled in wetlands or other surface waters:
   a. to be dredged:          cubic yards,
   b. to be filled:          cubic yards.

4. Identify the seasonal high water level (SHWL) and wetland normal pool elevations for each wetland or surface water within the project site. For tidal wetlands and/or surface waters provide the elevation of mean high and mean low water. Include an aerial photograph showing the location of each sampling location, dates, datum, and methods used to determine these elevations.

5. Name of waterbody(ies) (if applicable & if known) in which work will occur?

6. Is the activity proposed in an Outstanding Florida Water or Aquatic Preserve?
   ☐ yes, name:          ☐ no          ☐ I don't know

7. Has there ever been a formal or informal wetland determination for the project site? If yes, provide the identifying number and/or a copy of the jurisdictional map.

8. Provide a map(s) of the project area and vicinity delineating USDA/NRCS soil types.

9. Provide recent aerials legible for photointerpretation (no photocopies) with a scale of 1" = 400 ft, or more detailed, with project boundaries and wetland boundaries delineated on the aerial.

10. Provide maps accurately portraying the existing and proposed natural vegetative community types and land cover classifications using recognized classification schemes. Suggested sources include: the Florida Natural Areas Inventory Guide to the Natural Communities of Florida (2010) available at http://www.fnai.org/naturalcommguide.cfm, or the Florida Land Use and Cover Classification System (FLUCCS) (FDOT 1999, available at http://www.dot.state.fl.us/surveyingandmapping/documentsandpubs/fluccmanual1999.pdf). For

     

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date)          **Section C, Page 1 of 10**

JA 1484

vegetated areas dominated by exotic vegetation, use the descriptors representative of the native community type that was present prior to exotic infestation.

11. Impact Summary Tables (located at the end of this section):
    a. For all projects, complete Table 1, 2 and 3 as applicable.
    b. For shoreline stabilization projects, provide the information requested in Table 4.

12. If the activity is located on state owned submerged lands and requires a lease or easement, provide a list of names and addresses from the latest county tax assessment roll of all property owners located within a 500 ft. radius of the proposed lease or easement boundary in mailing label format, or you may elect to send notice to those persons by certified mail, with the return-receipt card addressed to the DEP or water management district, as applicable, in accordance with subsection 18-21.005(3), F.A.C., and Section 253.115, F.S. Attach additional sheets if necessary.

   1.  Name:
      Mailing Address:
      City, State, Zip Code:

   2.  Name:
      Mailing Address:
      City, State, Zip Code:

   3.  Name:
      Mailing Address:
      City, State, Zip Code:

   4.  Name:
      Mailing Address:
      City, State, Zip Code:

   5.  Name:
      Mailing Address:
      City, State, Zip Code:

   6.  Name:
      Mailing Address:
      City, State, Zip Code:

**Part 2: Environmental Considerations**

Note: for many questions, a state statute/Applicant's Handbook Volume I (AH I)/State 404 Program Applicant's Handbook section is cited to assist the applicant in addressing these questions.

1. Elimination or Reduction of Impacts (Avoidance and Minimization). Describe measures taken to eliminate or reduce impacts to wetlands and other surface waters (*Refer to AH I Section 10.2.1*).

2. Fish, Wildlife, Listed Species, and their Habitats. Provide results of any wildlife assessments that have been conducted on the project site and provide any comments, biological opinions, formal or informal consultation decisions, or recommended actions you have received pertaining to the project from the Florida Fish and Wildlife Conservation Commission, the U.S. Fish and Wildlife Service, and the National Marine Fisheries Service. (*Refer to AH I Section 10.2.2*).

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )        **Section C**, Page 2 of 10
JA.1485

3.  Water quantity impacts to wetlands and other surface waters (*Refer to AH I Section 10.2.2.4 and AH II*).

   a.  Does the activity include a proposed surface water management system with a control elevation different than the wetland normal pool elevation(s) of existing or proposed created wetlands or other surface waters?

   b.  If yes to (a), provide documentation (e.g. drawdown assessment or other methods) that shows the proposed surface water management system will not change the hydroperiod of the existing or created wetland or other surface water.

4.  Public Interest Test. Please describe how the proposed activity will **not be contrary** to the public interest, OR if such an activity significantly degrades or is located within an Outstanding Florida Water (OFW), that the regulated activity will be **clearly in** the public interest (*Refer to AH I Section 10.2.3*).

   a.  Please describe how the project will be designed to avoid adverse effects to public health, safety, or the welfare or the property of others.

   b.  Please describe how the project will be designed to avoid adverse effects to the conservation of fish and wildlife, including endangered or threatened species, or their habitats.

   c.  Please describe how the project will be designed to avoid adverse effects to navigation or the flow of water or cause harmful erosion or shoaling.

   d.  Please describe how the project will be designed to avoid adverse effects to the fishing or recreational values or marine productivity in the vicinity of the activity.

   e.  Will the project be of a temporary or permanent nature?

   f.  Please describe how the project will be designed to avoid adverse impacts to significant historical and archaeological resources, under the provisions of section 267.061, F.S.

   g.  Please describe how the project will be designed to avoid adverse effects to the current condition and relative value of functions being performed by areas affected by the proposed regulated activity.

5.  Water Quality.
    Provide a description of how water quality will be maintained in wetlands and other surface waters that will be preserved or will remain undisturbed, both on and offsite. Please address both short-term (such as during construction) and long-term water quality considerations (*Refer to AH I Section 10.2.4*).

6.  Class II Waters; Waters approved for shellfish harvesting *(Refer to AH I Section 10.2.5).*

   a.  Will the project occur in Class II that are NOT approved for shellfish harvesting? If yes, please provide a plan or procedure detailing the measures to be taken to meet the requirements of *AH I Section 10.2.5(a)*.

   b.  Is the project located adjacent to or in close proximity to Class II waters? If yes, please provide a plan or procedure detailing the measures to be taken to meet the requirements of *AH I Section 10.2.5(b)*.

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )          **Section C**, Page 3 of 10

JA.1486

    c.  Is the project located in Class II or Class III waters that are classified as "approved", "restricted", "conditionally approved", or "conditionally restricted"? If yes, demonstrate that the project meets the requirements of *AH I Section 10.2.5(c).*

7.  Vertical seawalls. Are vertical seawalls proposed in an estuary or lagoon as part of the project? If yes, please describe how the project meets the requirements of *AH I Section 10.2.6.*

8.  Secondary Impacts (*AH I Section 10.2.7*).

    a.  Will an upland buffer, with a minimum width of 15' and an average width of 25', be provided between the proposed activities and existing wetlands or wetlands to be preserved, enhanced, restored, or created? Provide the location and dimension of all buffers on the plans.     If not, demonstrate that secondary impacts will not occur or describe how they will be offset.

    b.  If listed species are present or may be present, then coordination with wildlife agencies is needed. Have you coordinated with the FFWCC and/or USFWS? If so, please provide correspondence from the wildlife agencies indicating concurrence with the species management plan(s).

    c.  What measures will be taken to avoid impacts to wetland-dependent wildlife and/or listed species that use uplands for nesting or denning?

    d.  Describe whether there are any other relevant activities that are very closely linked and causally related to any proposed dredging or filling in wetlands or other surface waters that have the potential to cause impacts to significant historical and archaeological resources.

    e.  Are there additional future phases or extensions of the proposed activities that are not shown? If yes, please describe.

9.  Cumulative Impacts. Is the proposed mitigation located within the same drainage basin (*Refer to AH I Figures 10.2.8.1 – 10.2.8.5*) as the proposed wetland impacts?    If not, please submit a Cumulative Impact Evaluation in accordance with *AH I Section 10.2.8.*

10.  Mitigation Plan (*Refer to AH I Section 10.3*).

    a.  If a mitigation bank is proposed to offset wetland/other surface water impacts, provide:

        i.  the name of the bank:    . A letter of reservation from the banker will be required once the application has been evaluated.
        ii.  If the mitigation bank was assessed using UMAM, provide UMAM worksheets for impact area(s). If the bank was assessed using a method other than UMAM, then prepare the impact assessment using the same method.

    b.  If mitigation is proposed to offset wetland/other surface water impacts, please provide a mitigation plan that includes, at a minimum, the following:

        i.  ☐ Proposed mitigation narrative:
            (1) ☐ Describe the current and proposed condition for each type of mitigation component (restoration, enhancement, creation, preservation), including:
               (a) ☐ Describe current and proposed vegetation

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )      **Section C**, Page 4 of 10
JA.1487

      (b) ☐ Describe current and proposed hydrologic conditions for the proposed mitigation.

      (c) ☐ Describe the soil types from NRCS maps and confirm if actual soil conditions appear to match.

(2) ☐ Provide details of the proposed construction/mitigation activities including phasing and timing, as appropriate.

(3) ☐ Identify measures that will be implemented during and after construction to avoid adverse impacts related to the proposed activities.

(4) ☐ A mitigation implementation and monitoring schedule with dates.

(5) ☐ Identify the success criteria.

(6) ☐ Describe the anticipated site conditions in and around the mitigation area after the mitigation plan is successfully implemented.

(7) ☐ Provide a comparison of current fish and wildlife habitat to expected habitat after the mitigation plan is successfully implemented.

ii. ☐ Provide a Management Plan that includes, as appropriate, aspects of operation and maintenance, including water management practices, vegetation establishment, exotic and nuisance species control, fire management, and control of access.

iii. ☐ Maps:

(1) ☐ Soil map (include soil names/codes, hydrologic soil groups and hydric soil types).

(2) ☐ Topographic map of the mitigation area and adjacent contributing and receiving areas.

(3) ☐ Hydrologic features map of the mitigation area and adjacent contributing and receiving areas.

(4) ☐ Vegetative communities map (using FLUCCS or other appropriate classification system).

(5) ☐ For all maps, identify source.

iv. Provide the necessary supporting information for the application of sections 62-345.400 - .600 (Uniform Mitigation Assessment Method (UMAM)). To meet this requirement, submittal of UMAM worksheets is acceptable for impact and mitigation areas.

v. If onsite and/or offsite applicant-responsible mitigation is proposed, submit a draft Conservation Easement document or other form of restrictive covenant that provides for protection of the mitigation area in perpetuity. Standard forms, as described in subsection 62-330.301(6), F.A.C., are available from the Agency or on its website.

vi. If onsite and/or offsite applicant-responsible mitigation is proposed, submit a cost estimate for completing the mitigation, including monitoring and maintenance.

vii. If onsite and/or offsite applicant-responsible mitigation is proposed and the proposed mitigation exceeds $25,000, please provide a draft financial assurance document. Standard forms, as described in subsection 62-330.301(5), F.A.C., are available from the agency or on its website.

viii. Identify the entity responsible for monitoring, maintenance, and long-term stewardship of the mitigation area (i.e. the landowner or homeowner association, not the consultant or contractor that will do the work).

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )      **Section C**, Page 5 of 10

JA.1488

> Note: If your project is in retained waters, it is highly recommended that you coordinate the design of any mitigation plan that also may be required for the Corps permit to meet the requirements of both permits. Pre-application meetings with both the applicable Agency and the Corps can help you to choose a mitigation option that is acceptable to both the applicable Agency and the Corps.

**Part 3: Plans**

Plans: The information listed in the checklist below represents the typical information required on the submitted project plans. The Plans checklists in each application section are cumulative unless otherwise noted. Separate plans for each application section are not required.

1. ☐ Include the following on the construction plans and cross sections:

   a. ☐ An Existing Conditions sheet showing the entire project and wetland/other surface water boundaries. Include the following: Acreage and type (herbaceous, forested or other surface water) of each wetland/other surface water.
   b. ☐ A Proposed Conditions sheet showing the entire project and wetland/other surface water boundaries with construction plan overlay.
   c. ☐ A Proposed Wetland Impact sheet that includes the following:
      i. ☐ Acreage and type (herbaceous, forested, or other surface water) of each wetland/other surface water to be impacted.
      ii. ☐ Proposed upland buffers with dimensions.
      iii. ☐ Identify the seasonal high water and wetland normal pool elevations on the plans.
   d. ☐ Include wetland boundaries on all construction plan sheets.

2. ☐ If onsite and/or offsite applicant-responsible mitigation is proposed, submit mitigation plans and cross sections including, at a minimum:

   a. ☐ existing conditions plan sheet identifying upland and wetland communities and acreage of each, topography, drainage patterns, and location of cross-section detail.
   b. ☐ proposed conditions plan sheet identifying proposed improvements by type (restoration, enhancement, creation, preservation), acreage of each, topography, drainage patterns, and location of cross-section detail.
   c. ☐ monitoring plan sheet including proposed improvements, monitoring transects, photostations, and mitigation signage (if applicable).
   d. ☐ cross-section and/or profile detail(s) sheet(s) including representative section of each type of mitigation component. Include existing and proposed conditions and representative elevations.
   e. ☐ planting schedule, plant species including common and scientific names divided into three sections (canopy, shrub, herbaceous) by mitigation component, quantity, spacing, size, and elevation range.

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )      **Section C**, Page 6 of 10
JA.1489

**Table 1 - Project Wetland (WI) And Other Surface Water (SW) And Impact Summary**

| WL & SW ID | UMAM ASSESSMENT AREA NAME(S) | WL & SW TYPE | WL & SW SIZE (acres) | WL & SW NOT IMPACTED (acres) | TEMPORARY WL & SW IMPACT SIZE (acres) | TEMPORARY WL & SW IMPACT TYPE | PERMANENT WL & SW IMPACT SIZE (acres) | PERMANENT WL & SW IMPACT TYPE | MITIGATION ID |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| PROJECT TOTALS: | | | | | | | | | |

Comments:

Codes (multiple entries per cell not allowed):
- Wetland & Surface Water ID: Include ID on submitted wetland and surface water impact maps
- Wetland Type: from an established wetland classification system
- Impact Type:  D=dredge;  F=fill;  H=change hydrology;  S=shading;  C=clearing;  O=other

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )

**Section C,** Page 7 of 10

JA.1490

**Table 2 - Project On-Site Mitigation Summary**

| MITIGATION ID | UMAM ASSESSMENT AREA NAME(S) | TARGET TYPE | CREATION AREA (acres) | RESTORATION AREA (acres) | ENHANCEMENT AREA (acres) | WETLANDS PRESERVE AREA (acres) | UPLAND PRESERVE AREA (acres) | OTHER AREA (acres) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **PROJECT TOTALS:** | | | | | | | | |

COMMENTS:

Codes (multiple entries per cell not allowed):

- Target Type or Type=target or existing habitat type from an established wetland classification system or land use classification for non-wetland mitigation

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )

**Section C,** Page 8 of 10

**Table 3 - Project Off-Site Mitigation Summary**

| MITIGATION ID | UMAM ASSESSMENT AREA NAME(S) | TARGET TYPE | CREATION AREA (acres) | RESTORATION AREA (acres) | ENHANCEMENT AREA (acres) | WETLANDS PRESERVE AREA (acres) | UPLAND PRESERVE AREA (acres) | OTHER AREA (acres) |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| PROJECT TOTALS: | | | | | | | | |

COMMENTS:

Codes (multiple entries per cell not allowed):

- Target Type or Type=target or existing habitat type from an established wetland classification system or land use classification for non-wetland mitigation

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )

JA.1492

**Table 4 - Shoreline Stabilization**

| Stabilization | Linear Ft. New | Linear Ft. Replaced | Linear Ft. Repaired | Linear Ft. Removed | Slope H: V: | Toe Width (Ft.) |
|---|---|---|---|---|---|---|
| Natural Vegetation (living shoreline) | | | | | **N/A** | **N/A** |
| Rip Rap + Vegetation | | | | | | |
| Rip Rap | | | | | | |
| Seawall + Rip Rap | | | | | | |
| Vertical Seawall | | | | | | |
| Other Shoreline Stabilization Type | | | | | | |

Size of Rip Rap

Type of Rip Rap

**Form #62-330.060(1)** - Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands
Incorporated by reference in subsection 62-330.060(1), F.A.C. (effective date )   **Section C**, Page 10 of 10
JA.1493

# STATE 404 PROGRAM
# APPLICANT'S HANDBOOK

**This Handbook, including Appendices A and B only is
incorporated by reference in subsection 62-331.010(5), F.A.C.**

**Effective [date]**

## FOR:



**FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

JA.1494

# Table of Contents

1.0     Introduction ...................................................................................................................... 4
  1.1     State-assumed Waters ................................................................................................ 4
  1.2     Using this Handbook .................................................................................................. 5
  1.3     Other Authorizations and Relationship to Other Governmental Entities ................ 5
  1.3.1   Additional Authorizations from the Corps of Engineers ........................................... 5
  1.3.1.1 Section 408 Authorization ......................................................................................... 6
  1.3.1.2 Authorization Under Section 10 of the Rivers and Harbors Act .............................. 6
  1.3.2   Other Authorizations .................................................................................................. 6
  1.3.3   Endangered Species Authorizations .......................................................................... 6
  1.4     Use of Regulatory Guidance Letters .......................................................................... 7

2.0     Definitions and Terms ....................................................................................................... 7

3.0     Regulated Activities ........................................................................................................ 11
  3.1     Exemptions ................................................................................................................ 11
  3.1.1   Agriculture and Forestry Exemptions ...................................................................... 12
  3.2     Permits Required ....................................................................................................... 12
  3.2.1   General Permits ......................................................................................................... 12
  3.2.1.1 General Permits Not Requiring Notice of Intent to use a General Permit ............... 13
  3.2.1.2 General Permits Requiring a Notice of Intent to Use a General Permit ................... 13
  3.2.1.3 Frac-out Plan ............................................................................................................. 13
  3.2.2   Individual Permits ..................................................................................................... 14

4.0     Preparation and Submittal of Applications and Notices .............................................. 14
  4.1     Determining if a Project is within State-Assumed or Retained Waters .................... 14
  4.2     Pre-application Conferences ...................................................................................... 18
  4.3     Forms and Submittal Instructions ............................................................................ 19
  4.4     Processing Fees .......................................................................................................... 20

5.0     Processing of, and Agency Action on, Applications and Notices ................................. 20
  5.1     General Procedures .................................................................................................... 21
  5.2     Coordination with Other Agencies, States, and Tribes ............................................ 22
  5.2.1   Water Management Districts ...................................................................................... 22
  5.2.2   Florida Division of Historical Resources/State Historic Preservation Office .......... 22
  5.2.3   Florida Fish and Wildlife Conservation Commission, U.S. Fish and Wildlife Service, and
          National Marine Fisheries Service ............................................................................ 23
  5.2.4   United States Army Corps of Engineers .................................................................... 24
  5.2.5   United States Environmental Protection Agency ...................................................... 25
  5.2.6   Federally Recognized Tribes ..................................................................................... 26
  5.2.7   Adjacent States – Alabama and Georgia ................................................................... 26
  5.3     Processing Individual Permit Applications ............................................................... 26
  5.3.1   Public Notice .............................................................................................................. 26
  5.3.2   Long-Term Conceptual Planning for Projects that will Take More Than One Phase to Complete
          .................................................................................................................................... 27
  5.3.3   Continuation of Permits and Review for a New Permit for an Existing Project ........ 29

**6.0      Duration, Modification, and Transfer of Permits**...................................................**30**

**7.0      Determination and Review of the Landward Extent of State-Assumed Waters** ..............**30**
  7.1    Use of ERP Formal Determinations .................................................................. 30
  7.2    Informal Determinations ................................................................................ 30

**8.0      Criteria for Review of State 404 Program Individual Permits**.............................**31**
  8.1    Administratively and Technically Complete Applications.................................. 31
  8.2    Sequence of Review ...................................................................................... 31
  8.3    Review Criteria Unique to State 404 Program Permits ...................................... 32
  8.3.1  Alternatives Analysis .................................................................................... 33
  8.3.2  Aesthetics Review ........................................................................................ 33
  8.3.3  Mitigation hierarchy ..................................................................................... 33
  8.3.4  Permit signatures .......................................................................................... 33
  8.3.5  Cumulative Effects ....................................................................................... 34
  8.3.6  Secondary Effects ........................................................................................ 34
  8.4    ERP Criteria Not Applicable to State 404 Program Permits .............................. 36
  8.5    Compensatory Mitigation .............................................................................. 36
  8.5.1  Compensatory Mitigation Hierarchy .............................................................. 36
  8.5.2  Watershed approach ...................................................................................... 38
  8.5.3  Permit Specific Conditions for Compensatory Mitigation ................................ 40
  8.5.4  Timing of Compensatory Mitigation .............................................................. 40
  8.5.5  Use of Preservation as Compensatory Mitigation ............................................ 41
  8.5.6  Additional Considerations for Permittee-Responsible Compensatory Mitigation Projects........ 41
  8.5.6.1 Monitoring .................................................................................................. 41
  8.5.6.2 Adaptive Management ................................................................................... 41
  8.5.6.3 Long-term Protection and Management ........................................................... 42

**APPENDIX A** ..............................................................................................................**43**

**Retained Waters List** ................................................................................................**43**

**APPENDIX B** ..............................................................................................................**47**

**Excerpts from 40 CFR Part 232** ...............................................................................**47**

**APPENDIX C** ..............................................................................................................**54**

**Guidance for Conducting an Alternatives Analysis**....................................................**54**

**APPENDIX D** ..............................................................................................................**61**

**307(a)(1) List of Toxic Pollutants (Codified in 40 CFR § 401.15)**...............................**61**

JA.1496

## 1.0   Introduction

The Florida Department of Environmental Protection ("Department" or "DEP") developed this Applicant's Handbook to help persons understand the rules, procedures, standards, and criteria that apply to the State 404 Program under Part IV of Chapter 373 of the Florida Statutes (F.S.).

The Department administers and implements the State 404 Program. In the event the Department seeks and receives approval from EPA pursuant to 40 CFR 233.16 to modify the program to delegate implementation of the State 404 Program to Florida's five Water Management Districts ("Districts"), the Districts may then implement the program with Department oversight. The State 404 Program Applicant's Handbook refers to these entities collectively as "Agencies" and also refers to one or more water management districts as "District" or "Districts" (capitalized), respectively. The term "district" (lower case) generally refers to the main or field offices of either the Department or District.

The Districts are:
- Northwest Florida Water Management District (NWFWMD)
- Suwannee River Water Management District (SRWMD)
- St. Johns River Water Management District (SJRWMD)
- Southwest Florida Water Management District (SWFWMD)
- South Florida Water Management District (SFWMD)

The primary State 404 Program rules are adopted by DEP as Chapter 62-331 of the Florida Administrative Code (F.A.C.). This Applicant's Handbook is incorporated by reference in subsection 62-331.010(5), F.A.C., and therefore operates as a rule of the Agencies.

If the Department delegates implementation of the State 404 Program to the Districts, the responsibilities of those Agencies will be divided in accordance with Operating and Delegation Agreements incorporated by reference in Chapter 62-113, F.A.C., accessible at: https://floridadep.gov/ogc/ogc/content/operating-agreements. Until such delegation occurs, the Department will be responsible for reviewing and acting upon requests for verification of exemption from, and notices and applications for, State 404 Program permits.

The State 404 Program is a separate permitting program from the Environmental Resource Permitting program (ERP) under Chapter 62-330, F.A.C., and agency action for State 404 Program verifications, notices, or permits shall be taken independently from ERP agency action. The applicant may choose to have the State 404 Program and ERP agency actions issued concurrently to help ensure consistency and reduce the need for project modifications that may occur when the agency actions are issued at different times.

Chapter 62-331, F.A.C., references Chapter 62-330, F.A.C., ERP Applicant's Handbook Volume I ("Volume I"), and Chapter 62-345, F.A.C., where requirements under Section 404 of the Clean Water Act (CWA) overlap with existing ERP requirements. State 404 Program rules, which include Chapter 62-331, F.A.C., and the 404 Handbook, will control where there is conflict between these and the referenced ERP rules, including Volume I, and other state laws.

## 1.1   State-assumed Waters

Section 404 of the CWA provides that the U.S. Army Corps of Engineers (Corps) is the agency authorized to issue CWA section 404 dredge and fill program permits for activities within waters of the United States. However, the CWA includes provisions that allow a state to assume administration of a 404 program in certain waters (state-assumed waters). The CWA does not define state-assumed

waters; rather, it describes waters that a state cannot assume and for which jurisdiction remains with the Corps (retained waters). State-assumed waters then are all waters of the United States that are not retained waters. Retained waters are defined in section 2.0 of this Handbook and listed in Appendix A. Activities within retained waters will generally still require a state ERP authorization and a separate federal authorization from the Corps.  To provide certainty, streamlining, and efficiency, the State will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C., that are regulated under Part IV of Chapter 373, F.S. could be considered Waters of the United States, and will treat them as if they are, unless the applicant clearly demonstrates otherwise.

See section 4.1 of this Handbook for examples showing how to determine whether a project is in state-assumed or retained waters.

## 1.2      Using this Handbook

Requirements of section 404 of the CWA overlap significantly with the ERP program. To eliminate redundancy and streamline reviews, the State 404 Program rules and this Handbook reference existing ERP rules and Handbook sections wherever possible. Projects within state-assumed waters that are not otherwise exempt from permitting will require both a State 404 Program authorization and an ERP authorization. Processing of both authorizations will begin concurrently upon receipt of an application for a project, except where the activities requiring a State 404 permit are proposed to occur in a later phase of a project that will take more than the maximum permit duration allowed under federal law to complete. In such cases an applicant may apply for the State 404 permit at a later date. Activities that require both an ERP and a State 404 permit shall not commence before both permits are obtained.

This Handbook will assist applicants and staff in conducting the concurrent reviews, outlines the different timeframes for review, and encourages applicants to waive ERP timeframes in favor of State 404 Program timeframes, where applicable, to ensure consistency (see section 5.0). This Handbook also outlines any requirements in addition to those required under the ERP program and identifies those ERP rules that do not apply to State 404 Program permits.

## 1.3      Other Authorizations and Relationship to Other Governmental Entities

Issuance of a permit or verification of qualification for an exemption or general permit under Chapter 62-331, F.A.C., does not:

- Convey or create to the person any property right, or any interest in the real property;
- Authorize any entrance or activities on property that is not owned or controlled by the person; or
- Relieve persons from obtaining all other required licenses, permits, and authorizations under applicable state, federal, or local statute, rule, or ordinance. Persons are advised to obtain all required authorizations prior to commencement of activities required under the State 404 program.

Additional information on the distribution of public notice to, and coordination with, other governmental agencies is discussed in section 5.2 of this Handbook.

## 1.3.1      Additional Authorizations from the Corps of Engineers

Some projects may require an additional authorization from the Corps. More information about these authorizations, briefly described below, may be found online in the Jacksonville District Regulatory Division Sourcebook, or by contacting your local Corps office.

### 1.3.1.1   Section 408 Authorization

The Corps has many civil works projects within the state of Florida. Examples include dams, levies, navigation, and flood control projects. Some of these projects are located within or in proximity to state-assumed waters. Many such projects are located within residential communities. Parties other than the Corps may need to alter or occupy the projects and their associated lands. Reasons for alteration may include project improvements, relocation of part of the project, or installing utilities or other non-project features. In accordance with Section 14 of the Rivers and Harbors Act (RHA) (33 U.S.C. Part 408) (Section 408), the Corps must review requests for modification of federal projects by non-federal interests. If Section 408 authorization is needed, such authorization must be obtained from the Corps prior to project commencement.

### 1.3.1.2   Authorization Under Section 10 of the Rivers and Harbors Act

In accordance with Section 10 of the Rivers and Harbors Act (RHA), the Corps has regulatory jurisdiction over all obstructions and alterations of navigable waters of the United States, the construction of any structures in or over navigable waters of the United States, and any work affecting the course, location, condition, or capacity of navigable waters of the United States, as defined in 33 C.F.R. Part 329. This includes permit authority under Section 10 of the RHA for those waters based solely on historic use (Section 10 historic waters). While the Corps retains authority over Section 10 historic waters, upon the effective date of the State 404 Program, the State assumes authority over Section 404 permitting within Section 10 historic waters. Therefore, discharges of dredged or fill material in Section 10 historic waters may require a separate Section 10 permit from the Corps in addition to the State 404 permit.

Some projects within Section 10 waters may qualify for authorization under the State Programmatic General Permit (SPGP). More information about SPGP is available in the Jacksonville District Regulatory Division Sourcebook or on the Agency website.

### 1.3.2   Other Authorizations

Additional authorizations may be required from the Department, Water Management District, or other federal, state, and local agencies. These include, but are not limited to:

- Environmental Resource Permit (ERP)
- State-owned Submerged Lands Authorization
- National Pollutant Discharge Elimination System (NPDES) Authorization
- Well Construction Permit
- Consumptive Use or Water Use Permit
- Works of the District Permit
- Generic Permit for Discharge of Produced Groundwater
- Coastal Construction Permit
- Local building permits

### 1.3.3   Endangered Species Authorizations

Compliance shall be required, as applicable, with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission (FWC), the US Fish & Wildlife Service, and the National Marine Fisheries Services (NMFS) for permits reviewed under the State 404 Program.

**1.4    Use of Regulatory Guidance Letters**

Regulatory Guidance Letters (RGLs) issued by the Corps and/or EPA to assist with implementation of Section 404 of the CWA may be also be used by the state to assist with implementation of the State 404 Program, when current and applicable. Regulatory Guidance Letters, or sections of letters, that conflict with other applicable state rules, statutes, agreements, or processes shall not be used. Current RGLs can be found in the Corps' Jacksonville District Regulatory Division Sourcebook.

**2.0    Definitions and Terms**

(a) Where the definitions in Chapters 62-330 and 62-345, F.A.C., do not conflict with this section, those definitions shall be used.

(b) The following additional definitions and terms below are used solely for purposes of Chapter 62-331, F.A.C., and this Handbook.

1. "Act" or "CWA" means the Clean Water Act (also known as the Federal Water Pollution Control Act or FWPCA) Pub. L. 92–500, as amended by Pub. L. 95–217, 33 U.S.C. 1251, *et seq.*

2. "Activity" for the purposes of the State 404 Program only, means "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 CFR § 232.2 (see Appendix B). The terms "dredge", "fill", "dredging", and "filling", when used within Chapter 62-331, F.A.C., or this Handbook shall be interchangeable with "activity" as defined herein.

3. "Adaptive Management" means the development of a management strategy that anticipates likely challenges associated with compensatory mitigation projects and provides for the implementation of actions to address those challenges, as well as unforeseen changes to those projects. It requires consideration of the risk, uncertainty, and dynamic nature of compensatory mitigation projects and guides modification of those projects to optimize performance. It includes the selection of appropriate measures that will ensure that the aquatic resource functions are provided and involves analysis of monitoring results to identify potential problems of a compensatory mitigation project and the identification and implementation of measures to rectify those problems.

4. "Adjacent" means bordering, contiguous, or neighboring. Wetlands separated from other state-assumed waters by man-made dikes or barriers, natural river berms, beach dunes, and the like are considered adjacent wetlands.

5. "Administratively complete" means an application that contains all the items required under the public noticing requirements of Rule 62-331.060, F.A.C.

6. "Agency" means the Department of Environmental Protection ("Department"), or the water management districts ("Districts"), where the Districts are delegated authority to implement the State 404 Program by the Department, and such delegation has been approved by EPA in accordance with 40 CFR Part 233.

7. "Aquatic environment" and "aquatic ecosystem" mean state-assumed waters, including wetlands, that serve as habitat for interrelated and interacting communities and populations of plants and animals. (Also see "Natural systems" definition in Volume I, section 2.0)

8. "Best management practices" (BMPs) means schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of wetlands and other surface waters from permitted activities. BMPs include methods, measures, practices, or design and performance standards which facilitate compliance with Chapter 62-331, F.A.C., and prevent violation of state water quality standards. Examples include, but are not limited to, placement of turbidity curtains or silt fence, stabilizing slopes, limiting work to appropriate weather and light conditions, and clearly marking work and staging areas in the field.

9. "Buffer" means an upland, wetland, and/or riparian area that protects and/or enhances aquatic resource functions associated with wetlands, rivers, streams, lakes, marine, and estuarine systems from disturbances associated with adjacent land uses.

10. "Burial Resources" means human remains, meaning all physical remains of a human body of a person of American Indian ancestry, even if in fragmentary form unless it is determined that the human remain had been freely given or naturally shed by the individual from whose body it was obtained, such as hair made into ropes or nets or individual teeth. For the purposes of determining cultural affiliation, human remains incorporated into a funerary object, sacred object, or object of cultural patrimony, are considered as part of that item and as a cultural resource item.

11. "Compensatory Mitigation" means the restoration (re-establishment or rehabilitation), establishment (creation), enhancement, and/or in certain circumstances preservation of aquatic resources for the purposes of offsetting unavoidable adverse impacts which remain after all appropriate and practicable avoidance and minimization has been achieved.

12. "Compensatory Mitigation Project" means compensatory mitigation implemented by the permittee as a requirement of a permit (i.e., permittee-responsible mitigation), or by a mitigation bank or in-lieu fee program.

13. "Condition," as it is used in the mitigation section of this Handbook, means the relative ability of an aquatic resource to support and maintain a community of organisms having a species composition, diversity, and functional organization comparable to reference aquatic resources in the region.

14. "Contaminant" means a chemical or biological substance in a form that can be incorporated into, onto or be ingested by and that harms aquatic organisms, consumers of aquatic organisms, or users of the aquatic environment, and includes but is not limited to the substances on the 307(a)(1) list of toxic pollutants. The list of toxic pollutants is incorporated in paragraph 62-620.100(3)(k), F.A.C., and reproduced in Appendix D of this Handbook.

15. "Functions," as used in the mitigation section of this Handbook, means the physical, chemical, and biological processes that occur in ecosystems.

16. "Historical Resources Assessment Survey" or "Cultural Resources Assessment Survey" means a survey of the project site which meets the requirements set forth in Chapter 1A-46, F.A.C., Archaeological and Historical Report Standards and Guidelines.

17. "Historic Resource," "Historic Property," or "Cultural Resource" means any prehistoric or historic district, site, building, object, or other real or personal property of historical, architectural, or archeological value, and folklife resources. These properties or resources may include, but are not limited to, monuments, memorials, Indian habitations, ceremonial sites, abandoned settlements, sunken or abandoned ships, engineering works, treasure trove, artifacts, or other objects with intrinsic historical or archeological value, or any part thereof, relating to the history, government and culture of the state. (Source Section 267.021(3), F.S.).

18. "Impact" or "Adverse impact", as those terms relate to compensatory mitigation review, means adverse effect.

19. "In-kind" means a resource of a similar structural and functional type to the impacted resource.

20. "In-lieu fee program" means a program involving the restoration, creation, enhancement, and/or preservation of aquatic resources through funds paid to a governmental or non-profit natural resources management entity to satisfy compensatory mitigation requirements for 404 permits. Similar to a mitigation bank, an in-lieu fee program sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the in-lieu fee program sponsor. The operation and use of an in-lieu fee program are governed by an in-lieu fee program instrument.

21. "Interagency Review Team" (IRT) means an interagency group of federal, tribal, state, and/or local regulatory and resource agency representatives that reviews documentation for, and advises the Corps district engineer on, the establishment and management of a mitigation bank or an in-lieu fee program.

22. "Material permit modification" and "material changes in the scope of the project" mean, for the purposes of applying Section 373.4146(5), F.S., only those modifications or changes, including changes to any long-term planning document appended to a permit pursuant to section 5.3.2., that result in a significant increase in the total project environmental impact, including but not limited to wildlife impacts, or a significant increase in the impact to state-assumed or retained waters.

23. "Mean high tide line," for purposes of identifying retained waters, means the line of intersection of the land with the water's surface at the maximum height reached by a rising tide. The high tide line may be determined, in the absence of actual data, by a line of oil or scum along shore objects, a more or less continuous deposit of fine shell or debris on the foreshore or berm, other physical markings or characteristics, vegetation lines, tidal gages, or other suitable means that delineate the general height reached by a rising tide. The line encompasses spring high tides and other high tides that occur with periodic frequency but does not include storm surges in which there is a departure from the normal or predicted reach of the tide due to the piling up of water against a coast by strong winds such as those accompanying a hurricane or other intense storm.

24. "Mitigation Bank," for the purposes of the State 404 Program only, means a site, or suite of sites, where resources (e.g., wetlands, streams, riparian areas) are restored, established, enhanced, and/or preserved for the purpose of providing compensatory mitigation for impacts authorized by State 404 Program permits. In general, a mitigation bank sells compensatory mitigation credits to permittees whose obligation to provide compensatory mitigation is then transferred to the mitigation bank sponsor. The operation and use of a mitigation bank are governed by a mitigation banking instrument.

25. "Mixing zone" means a limited volume of water serving as a zone of initial dilution in the immediate vicinity of a dredge or fill activity where receiving water quality may not meet quality standards or other requirements otherwise applicable to the receiving water.

26. "Off-site," for purposes of the mitigation section of this Handbook, means an area that is neither located on the same parcel of land as the impact site, or on a parcel of land contiguous to the parcel containing the impact site.

27. "On-site," for purposes of the mitigation section of this Handbook, means an area located on the same parcel of land as the impact site, or on a parcel of land contiguous to the impact site.

28. "Ordinary high water mark," for purposes of identifying retained waters, means that line on the shore established by the fluctuations of water and indicated by physical characteristics such as a clear, natural line impressed on the bank, shelving, changes in the character of soil, destruction of terrestrial vegetation, the presence of litter and debris, or other appropriate means that consider the characteristics of the surrounding areas.

29. "Out-of-kind" means a resource of a different structural and functional type from the impacted resource.

30. "Performance standards" are observable or measurable physical (including hydrological), chemical and/or biological attributes that are used to determine if a compensatory mitigation project meets its objectives.

31. "Permittee-responsible mitigation" means an aquatic resource restoration, creation, enhancement, and/or preservation activity undertaken by the permittee (or an authorized agent or contractor) to provide compensatory mitigation for which the permittee retains full responsibility.

32. "Pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials not covered by the Atomic Energy Act, heat, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste discharged into water. The legislative history of the CWA reflects that ''radioactive materials'' as included within the definition of ''pollutant'' in section 502 of the CWA means only radioactive materials which are not encompassed in the definition of source, byproduct, or special nuclear materials as defined by the Atomic Energy Act of 1954, as amended, and regulated under the Atomic Energy Act. Examples of radioactive materials not covered by the Atomic Energy Act and, therefore, included within the term "pollutant", are radium

and accelerator produced isotopes. See Train v. Colorado Public Interest Research Group, Inc., 426 U.S. 1 (1976).

33. "Practicable" means available and capable of being done after taking into consideration cost, existing technology, and logistics considering overall project purposes.

34. "Practicable alternative" means other choices available and capable of being carried out after taking into consideration cost, existing technology, and logistics considering overall project purposes, and may require an area not owned by the applicant which could reasonably have been obtained, utilized, expanded, or managed in order to fulfill the basic purpose of the proposed activity.

35. "Project" means all activities which the applicant plans to undertake pursuant to the entire scope of the project and includes all avoidance, minimization, and mitigation measures proposed by the applicant. To provide for a holistic review of projects that will take more than the maximum permit duration allowed under federal law to complete, the term includes all phases thereof, which phases may be temporal or geographic.

36. "Project area" or "Project site" means that portion of the state-assumed waters where specific dredging or filling activities are permitted and consist of a bottom surface area, any overlying volume of water, and any mixing zones. In the case of wetlands on which surface water is not present, the project area consists of the wetland surface area.

37. "Re-establishment" means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former aquatic resource. Re-establishment results in rebuilding a former aquatic resource and results in a gain in aquatic resource area and functions. (see "Restoration")

38. "Reference aquatic resources" or "Reference site" are a set of aquatic resources that represent the full range of variability exhibited by a regional class of aquatic resources as a result of natural processes and anthropogenic disturbances.

39. "Rehabilitation" means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of repairing natural/historic functions to a degraded aquatic resource. Rehabilitation results in a gain in aquatic resource function but does not result in a gain in aquatic resource area. (see "Restoration")

40. "Restoration," for the purposes of the State 404 Program, means the manipulation of the physical, chemical, or biological characteristics of a site with the goal of returning natural/historic functions to a former or degraded aquatic resource. For the purpose of tracking net gains in aquatic resource area, restoration is divided into two categories: re-establishment and rehabilitation.

41. "Retained Waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

42. "Riparian areas" are lands adjacent to streams, rivers, lakes, and estuarine-marine shorelines. Riparian areas provide a variety of ecological functions and services and help improve or maintain local water quality.

43. "Service Area" means the geographic area within which impacts can be mitigated at a specific mitigation bank or an in-lieu fee program, as designated in its instrument.

44. "Services" mean the benefits that human populations receive from functions that occur in ecosystems.

45. "Special aquatic sites" means sanctuaries and refuges under state and federal laws or local ordinances, wetlands, mud flats, vegetated shallows, coral reefs, and riffle and pool complexes. They are geographic areas, large or small, possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values. These areas are generally recognized as significantly influencing or positively contributing to the general overall environmental health or vitality of the entire ecosystem of a region.

46. "Sponsor" means any public or private entity responsible for establishing, and in most circumstances, operating a mitigation bank or in-lieu fee program.

47. "State-assumed Waters" or "Assumed Waters" means those waters as defined in Section 373.4146(1), F.S.

48. "Technically complete" means an application where each application item is adequate to allow the Agency to determine if the proposed project complies with Chapter 62-331, F.A.C. If a project requires both an ERP and a State 404 Program authorization, the State 404 Program review shall not be considered complete until the ERP review is complete. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met.

49. "Temporal loss" or "time lag" is the time that passes between the loss of aquatic resource functions caused by the permitted impacts and the replacement of aquatic resource functions at the compensatory mitigation site.

50. "Tribe" means any Indian Tribe, band, group, or community recognized by the Secretary of the Interior and exercising governmental authority over a federal Indian reservation.

51. "Watershed approach" means an analytical process for making mitigation decisions that support the sustainability or improvement of aquatic resources in a watershed. It involves consideration of watershed needs, and how locations and types of compensatory mitigation projects address those needs. A landscape perspective is used to identify the types and locations of mitigation projects that will benefit the watershed and offset losses of aquatic resource functions and services caused by activities authorized by Section 404 permits. The watershed approach may involve consideration of landscape scale, historic and potential aquatic resource conditions, past and projected aquatic resource impacts in the watershed, and terrestrial connections between aquatic resources when determining mitigation requirements for Section 404 permits.

52. "Watershed plan" means a plan developed by federal, tribal, state, and/or local government agencies or appropriate non-governmental organizations, in consultation with relevant stakeholders, for the specific goal of aquatic resource restoration, creation, enhancement, and preservation. A watershed plan addresses aquatic resource conditions in the watershed, multiple stakeholder interests, and land uses. Watershed plans may also identify priority sites for aquatic resource restoration and protection. Examples of watershed plans include special area management plans, advance identification programs, and wetland management plans.

## 3.0    Regulated Activities

## 3.1    Exemptions

A permit is not required under Chapter 62-331, F.A.C., for activities listed under 40 CFR § 232.3 (Appendix B), subject to the limitations described therein. Notice to the Agency is not required to conduct an exempt activity, except where the activity also requires an ERP authorization. Activities that qualify for an exemption pursuant to 40 CFR § 232.3 and an ERP exemption that does not require prior notice to the Agency may be conducted without notice.

If a person desires verification that an activity qualifies for an exemption the request shall be submitted in accordance with Rule 62-331.040, F.A.C.

### 3.1.1   Agriculture and Forestry Exemptions

The exemptions applying to agriculture and forestry activities under 40 CFR § 232.3 are different from the exemptions available under ERP. The exemptions for agriculture in Section 373.406(2), F.S., Rules 62-330.051, and 62-330.0511, F.A.C., allow new activities within wetlands and other surface waters, while the State 404 Program exemption under 40 CFR § 232.3 may require a permit for such activities. Please read the requirements of both program's exemptions carefully when deciding if an activity is exempt or needs a permit. If you are unsure, contact your local Agency office or apply for a verification of exemption.

### 3.2   Permits Required

Rule 62-331.020, F.A.C., describes activities that require a permit. The types of permits available are general permits and individual permits. These are described below.

### 3.2.1   General Permits

General permits authorize activities specified in Rules 62-331.200 and subsequently numbered rules in Chapter 62-331, F.A.C.

General permits are available for categories of similar activities which have been determined to cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment.

State 404 Program general permits are reviewed by DEP and EPA for re-authorization every five years. This means that general permits are only valid during that five-year period beginning at the time they are authorized (or re-authorized). If a permittee cannot perform the work in the time before the general permit expires, a new general permit or, if the general permit is not re-authorized, an individual permit will be required.

The Agency reserves the right to require an individual permit for any activity covered by a general permit if the Agency determines that the activity will have more than a minimal adverse effect, either individually or cumulatively, on the environment.

The Agency may administer, upon agreement with the Corps, Corps regional general permits that are still effective upon the date of assumption for projects within assumed waters, where appropriate, until the date that they expire. The Department shall keep a list of any regional general permits administered by the state after the date of assumption.

The same general permit cannot be used more than once for the same "single and complete" project, unless specifically stated within the general permit. "Single and complete", for the purposes of the general permits under Chapter 62-331, F.A.C., is defined below.

**Single and complete linear project:** A linear project is a project constructed for the purpose of getting people, goods, or services from a point of origin to a terminal point, which often involves multiple crossings of one or more waterbodies at separate and distant locations. The term "single and complete project" is defined as that portion of the total linear project proposed or accomplished by one owner/developer or partnership or other association of owners/developers that includes all

crossings of a single state-assumed water (i.e., a single waterbody) at a specific location. For linear projects crossing single or multiple waterbodies several times at separate and distant locations, each crossing is considered a single and complete project for purposes of general permit authorization. However, individual channels in a braided stream or river, or individual arms of a large, irregularly shaped wetland or lake, etc., are not separate waterbodies, and crossings of such features cannot be considered separately. If the Agency determines that multiple "single and complete" projects will cause significant adverse cumulative impacts, an individual permit shall be required for the project(s).

**Single and complete non-linear project:** For non-linear projects, the term ''single and complete project'' is defined as the total project proposed or accomplished by one owner/developer or partnership or other association of owners/developers. A single and complete non-linear project must have independent utility (see below).

**Independent utility:** A project is considered to have independent utility if it would be constructed absent the construction of other projects in the project area. Portions of a multi-phase project that depend upon other phases of the project do not have independent utility. Phases of a project that would be constructed even if the other phases were not built can be considered as separate, single and complete projects with independent utility.

### 3.2.1.1  General Permits Not Requiring Notice of Intent to use a General Permit

Notice to the Agency is not required for those activities covered under a general permit where notice is not specifically required in the language of the general permit, or by Rule 62-331.200, F.A.C. Special attention should be made by the permittee to ensure that all of the conditions for the general permit are met, including any requirements for coordination with other agencies or tribes.

If you are unsure whether your project requires submittal of a notice of intent, it is recommended that you contact your local Agency office for assistance or submit a notice for review in accordance with Rule 62-331.200, F.A.C.

### 3.2.1.2  General Permits Requiring a Notice of Intent to Use a General Permit

General permits requiring notice of intent shall be submitted to the Agency as described in section 4.2 of this Handbook and processed by the Agency in accordance with section 5.3, below.

### 3.2.1.3  Frac-out Plan

A frac-out plan is required for projects involving horizontal directional drilling or jack-and-bore activities under the general permit in Rule 62-331.215, F.A.C. The purpose of the plan is to minimize adverse, unauthorized, impacts to state-assumed waters in case of a drilling fracture. The plan shall contain, at a minimum, the following information:

- Proposed methods to prevent violations of water quality standards (BMPs)
- Measures used to prevent and detect frac-out during the drilling operation
- Release procedures
- A drilling mud containment plan
- Agency notification contact information

**3.2.2**   **Individual Permits**

Regulated activities that are not exempt under subsection 62-331.020(1), F.A.C., (40 CFR § 232.3, Appendix B) and that do not qualify for a State 404 Program general permit will require an individual permit. Individual permits are so named because they require individual, case-by-case review by the Agency. Individual permits are subject to the public notice requirements of Rule 62-331.060, F.A.C., and will be processed in accordance with Rule 62-331.052, F.A.C., and section 5.0 of this Handbook.

**4.0**   **Preparation and Submittal of Applications and Notices**

Applications and notices shall be prepared and submitted as described below.

**4.1**   **Determining if a Project is within State-Assumed or Retained Waters**

Projects within retained waters go to the Corps for processing, and projects within state-assumed waters go to the State Agency for processing.

The definition of retained waters, as stated in section 2.0, above, is:

"Those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

The Corps also retains permitting authority for projects within "Indian country" as that term is defined at 18 U.S.C. § 1151 (provided below):

Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation,

(b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

(c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

A list of "Indian country" can be found online in the Corps' Jacksonville District Regulatory Division Sourcebook.

For the purposes of determining retained or state-assumed waters, the boundary of a mitigation bank, excluding the service area, shall be considered the project boundary, even if only a portion of the bank requires a dredge and fill permit under Section 404 of the CWA.

The following illustrations demonstrate how to determine the administrative boundary of retained waters:

Example 1: Project with dredge and fill activity both waterward and landward of the 300-foot guide line. The 404 permit application would be processed by the Corps.



Example 2: Projects with dredge and fill activity and project boundaries waterward and/or landward of the 300-foot guide line. Projects 1 and 2 are retained and the 404 application will be processed by the Corps. Project 3 does not include any dredge or fill activities waterward of the 300 foot guide line, and therefore is not retained by the Corps, and the 404 application will be processed by the state Agency.



Example 3: A linear project including dredge and fill activities waterward of the 300 foot guide line. Linear projects may sometimes be miles long, but if there are dredge or fill activities waterward of the 300-foot guide line within the project boundary, the project is within retained waters, and the 404 application will be processed by the Corps.



## 4.2    Pre-application Conferences

Applicants are encouraged to have a pre-application phone call, meeting (on-site or in the office), or other conference with the applicable Agency staff, prior to submitting an application or notice. Pre-application conferences may help streamline processing steps and potential time delays by assisting the applicant to understand such things as:

(a)  The need for a permit or potential qualification for an exemption or general permit, including a determination of what combination of ERP/State 404 Program authorizations will be required;

(b)  Which Agency or Agencies will be responsible for the review of the application or notice;

(c) How to prepare the application or notice, including availability of on-line tools that may assist in completing it, and how to use the long-term conceptual planning process in section 5.3.2 of this Handbook;

(d) Information required by the Agency to evaluate an application or notice, including such things as wetland delineations, resources that may be affected, alternatives analysis, surface water data, and other hydrologic, environmental, or water quality data;

(e) Application processing, public notice, and evaluation procedures;

(f) The need for a pre-application on-site meeting;

(g) Avoiding adverse impacts that may prevent the proposed activity from meeting applicable permitting or review standards and criteria;

(h) The existence of available project alternatives;

(i) Measures that can be taken to reduce or eliminate adverse impacts, and the appropriateness of compensatory mitigation to offset any remaining adverse impacts; and

(j) The potential for the project to impact tribal waters or tribal cultural resources (see section 5.2.6 for more information about tribal resources and coordination).

See Appendix A of Volume I for Agency contact information.

**4.3     Forms and Submittal Instructions**

Applicants are encouraged to use the e-Permitting and electronic portals of the Agencies to submit most applications and notices as discussed below. Appendix A of Volume I contains the internet addresses of the Agencies.

Application and notice forms available:
- Form 62-330.050 – Request for Verification of an Exemption
- Form 62-330.402(1) – Notice of Intent to Use an Environmental Resource and/or State 404 Program General Permit
- Form 62-330.060 – Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands

Table 4.3, below, is a matrix identifying which application form should be submitted to the Agency depending on what combination of ERP and State 404 Program authorizations are needed.

JA.1512

| Authorizations Needed | 404 Exemption | 404 General Permit | 404 Individual Permit |
|---|---|---|---|
| No ERP | Use form 62-330.050 | Use form 62-330.402(1) | Use form 62-330.060 |
| ERP Exemption | Use form 62-330.050 | Use form 62-330.402(1) | Use form 62-330.060 |
| ERP General Permit | Use form 62-330.402(1) | Use form 62-330.402(1) | Use form 62-330.060 |
| ERP Individual Permit | Use form 62-330.060 | Use form 62-330.060 | Use form 62-330.060 |
| ERP Conceptual Approval Permit | Use form 62-330.060 | Use form 62-330.060 | Use form 62-330.060 |

*Table 4.3 – Application form matrix.*

## 4.4    Processing Fees

There shall be no processing fees for State 404 Program verifications, notices, applications, or permits.

## 5.0    Processing of, and Agency Action on, Applications and Notices

Where the processing timeframes and agency action procedures in Chapter 62-330, F.A.C., Applicant's Handbook Volume I, and Chapter 120, F.S., do not conflict with the requirements of the State 404 Program, those processing timeframes shall be used, as outlined in this Handbook. Several procedures and rules for agency action are required by Section 404 of the CWA, but not by ERP, causing conflict between some State 404 Program and ERP program processes and timeframes.

For example, when a project requires both an ERP and a State 404 Program permit, some portions of the ERP review are likely to be completed faster than the State 404 Program review because of public notice, EPA review requirements, or the need to coordinate with other state and federal agencies. This means that a project may be permittable under Chapter 62-330, F.A.C., (ERP) after the ERP review, but as a result of comments received during the 404 public notice or other aspects of the 404 review, the project may require modifications under the State 404 Program.

It is the intent of the Agencies to process the State 404 Program and ERP authorizations concurrently as much as possible. For this reason, the applicant is given the choice, in the application form, to waive the timeframes for issuance pertaining to ERP review when the State 404 Program review may take longer to complete. The Agencies **highly recommend** that applicants make this choice for the following reasons:

- **Potential ERP modification fee savings.** If the ERP is issued before the State 404 Program authorization, and during the State 404 Program review process, it is found that modifications to the project are required for a project to be permittable under the State 404 Program, the applicant will be required to apply for, and pay the fee for, a modification of

the issued ERP permit. If the ERP issuance timeframes are waived, the ERP would still be considered in review, and modifications could be made without an additional application or fee.

- **Less paperwork.** Fewer permit documents for staff to draft and fewer for the permittee to track.
- **More consistency.** The Agency or Agencies will be better able to ensure that the conditions of each authorization do not conflict.
- **Streamlined review.** The Agency or Agencies are able to work on the review process until both authorizations are issued. Additional reviews for modification, if needed, and the time required to draft two or more separate agency action documents, would be lessened resulting in a cleaner, simpler process for everyone.

If a project requires both an ERP and a State 404 Program authorization, the State 404 Program review shall not be considered complete until the ERP review is complete, unless the activity is exempt under Chapter 62-330, F.A.C., or qualifies for a general permit under Chapter 62-330, F.A.C. This is to satisfy the requirement for reasonable assurance that State water quality standards and coastal zone consistency requirements will be met.

**5.1    General Procedures**

The Agencies are required to follow procedural statutes and rules to review and act on applications and notices, and to provide rights to the public to object to Agency decisions. These statutes and rules include: Chapter 120, F.S., (Florida Administrative Procedures Act), Chapters 28-101 through 28-110, F.A.C., (Uniform Rules of Procedure), and each Agency's adopted Exceptions to the Uniform Rules of Procedure.

In acknowledgement that procedures required under Section 404 of the CWA may conflict with the above state procedural statutes and rules, Section 373.4146, F.S., provides the following:

- The Department may adopt any federal requirements, criteria, or regulations necessary to obtain assumption;
- Provisions of state law which conflict with the federal requirements do not apply to state administered section 404 permits;
- The Department must grant or deny an application for a state administered section 404 permit within the time allowed for permit review under 40 CFR Part 233, subparts D and F.
- The Department is specifically exempted from the time limitations provided in Sections 120.60 and 373.4141, F.S., for state administered section 404 permits [default provisions and processing timeframes];
- The decision by the Department to approve the reissuance (i.e, the issuance of a new permit) of any state administered section 404 permit issued pursuant to this section is subject to Sections 120.569 and 120.57, F.S., only with respect to any material permit modification or material changes in the scope of the project as originally permitted.

Additional specific provisions for processing applications and notices under Chapter 62-331, F.A.C., are summarized in the sections below.

**5.2      Coordination with Other Agencies, States, and Tribes**

Coordination with other State or federal agencies, other states, and tribes may be required during review of a notice or application for a State 404 Program authorization. These coordination requirements are described in the sections below.

**5.2.1      Water Management Districts**

When a proposed activity includes agricultural activities and the State 404 Program permit or verification of qualification for an exemption is processed by the Department, the Department shall consult with the District within whose boundaries the project lies to determine whether the proposed activity may be considered "normal farming, silviculture or ranching" activities, and whether the activity may be considered "ongoing" for the purposes of the exemption in 40 CFR Part 232.3(c)(1).

Until such time the Department delegates, upon EPA approval, the State 404 Program to the Districts, Department and District staff shall coordinate review of the ERP and State 404 permits to the greatest extent practicable. Such coordination shall include:

- When an application or notice that contains activities within state-assumed waters is received by the District, the District shall forward a copy of the application or notice to the appropriate local office of the Department.
- Department staff shall accompany District staff on the initial site visit to verify the delineation of wetlands and other surface waters for the State 404 Program permit.
- The Department and District shall communicate frequently to streamline the permit reviews and ensure consistency between the ERP and State 404 authorization.

**5.2.2      Florida Division of Historical Resources/State Historic Preservation Office**

The State Historic Preservation Office (SHPO) shall review proposed projects to determine whether the project is likely to have an adverse effect on properties listed, or eligible for listing on the National Register of Historic Places. If the Agency or SHPO determine that the project as proposed may have adverse effects to properties listed or eligible to be listed in the National Register of Historic Places, the Agency, applicant, and SHPO shall consult to resolve the adverse effects prior to the final determination by SHPO. SHPO may provide any of the following determinations for the project:

- Request for additional information, and/or a request for a Cultural Resources Assessment Survey (CRAS);
- No effect to historic properties;
- No adverse effect to historic properties;
- Conditional no adverse effect to historic properties (recommended project modifications and/or special conditions for the permit);
- Adverse effect to historic properties; or
- (For general permit applications) Request that the project be evaluated as an individual permit because of potential historical resources concerns.

If SHPO sends a request for additional information or a CRAS, or recommends project modifications, the information shall be included in an Agency request for additional information. Once the additional information is received by the Agency, the additional information shall be immediately forwarded to SHPO for review and additional determination.

(a) General Permits – Pre-coordination with SHPO is required for those activities that may qualify for a general permit without notice to the Agency (no-notice general permit). Pre-coordination shall be the responsibility of the prospective permittee, and shall be conducted in accordance with paragraph 62-331.200(3)(j+), F.A.C.

If use of a general permit requires notice to the Agency, the Agency shall forward a copy of the notice to SHPO for review. A prospective permittee may choose to pre-coordinate with SHPO, in which case the prospective permittee shall submit a copy of the outcome of such review with the notice.

(b) Individual permits that also require an ERP individual permit – The Agency shall send a copy of the application to SHPO upon receipt and shall include a notice to SHPO that the project also requires a State 404 Program permit. At such time that the Agency publishes the public notice for the project in accordance with Rule 62-331.060, F.A.C., a copy of the public notice shall be sent to SHPO. The notice shall contain the ERP application and/or permit number. SHPO may have additional comments pertaining to the State 404 authorization, or may state that any information sent to the Agency during the ERP review period shall also apply to the State 404 Program review.

(c) Individual permits that do not require an ERP individual permit – The agency shall send SHPO a copy of the public notice in accordance with Rule 62-331.060, F.A.C.

If an agency, such as FDOT, is the applicant and has previously coordinated with SHPO on the project, and there have been no changes to the project following coordination, the agency may submit proof of concurrence or a determination by SHPO for the proposed project with the application for a State 404 permit.

### 5.2.3   Florida Fish and Wildlife Conservation Commission, U.S. Fish and Wildlife Service, and National Marine Fisheries Service

The Florida Fish and Wildlife Conservation Commission (FWC), the U.S. Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS) will be provided an opportunity to review all applications for projects with reasonable potential for affecting endangered or threatened species. Consultation with, or technical assistance by, FWC, FWS, or NMFS shall be required when the Agency determines that the project may have the potential to affect listed species.

To determine whether a project may have the potential to affect listed species, the Agency may use available resources such as scientific literature, species keys, and habitat maps, or it may observe signs that the site is used by listed species during the site visit. If the Agency determines that a listed species may be affected, the Agency shall seek consultation with or technical assistance by FWC, FWS, and NMFS, as applicable, regarding the proposed project. The Agency shall incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or adversely modifying designated or proposed critical habitat.   For individual permits, the Agency shall send a copy of the public notice required by Rule 62-331.060, F.A.C., to EPA for review and comment. If the FWC, FWS, or NMFS concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection measures are available to reduce the risk to an acceptable level,

the Agency shall deny the permit or shall take no action and notify EPA and the applicant of the decision in accordance with sub-subparagraph 62-331.052(3)(b)6.b., F.A.C.

If the applicant for a State 404 permit is the holder of a valid and active biological opinion, or Habitat Conservation Plan Incidental Take Permit (HCP/ITP), or a similar binding agreement that is issued by the FWS or NMFS and the species and activities described in the State 404 permit application are covered in the Biological Opinion, HCP/ITP or similar agreement, then no additional avoidance and minimization measures pertaining to federal listed species shall be required. Upon receipt of such documentation, the Agency shall provide the document to FWS or NMFS for review.

Federal agency applicants that have pre-coordinated with FWS or NMFS, as appropriate, through a National Environmental Policy Act (NEPA) process shall submit the outcome of such coordination as part of the application for a State 404 permit.

**5.2.4   United States Army Corps of Engineers**

The Agency shall coordinate with the Corps as follows:

(a)   Pending Corps Section 404 permit applications upon the date of assumption – on the effective date of the State program, the Corps will transfer all pending applications for permits under section 404 of the CWA within state-assumed waters to the Department for processing.

(b)   Application screening – When an application is received by either the Corps or the Agency, the application will be screened using the Retained Waters List (Appendix A) and corresponding GIS layer to determine if the proposed activity will occur within retained waters. When a proposed activity falls within retained waters, the Agency will, within five calendar days of receipt, refer the applicant to the Corps. Likewise, when a proposed activity falls within state-assumed waters, the Corps will, within five calendar days of receipt, refer the applicant to the Agency.

(c)   Projects requiring Section 408 authorization (see section 1.3.1.1, above) – If a project is likely to affect a Corps Civil Works project, the Agency will, within 5 days of receipt of the application, inform the Corps and instruct the applicant to contact the appropriate Corps Section 408 contact person for information about how to obtain a Section 408 authorization separately from the Corps. The Corps will notify the Agency within 14 days of receipt of the notification about whether the project requires Section 408 authorization. The Agency shall include a special condition in the permit requiring that the permittee obtain Section 408 permission prior to construction.

(d)   Emergency permits – The Agencies shall consult with the Corps as soon as possible after receipt of a request for an emergency permit in state-assumed waters. The purpose of this consultation is to determine whether an emergency project may affect Corps civil works projects, Section 10 waters, navigation, Indian lands, or other Corps concerns.

(e)   Unsatisfied EPA objection or requirement – If the Agency has received an EPA objection or requirement for a permit condition during the public comment period in Rule 62-331.060, F.A.C., and the Agency neither satisfies EPA's objections or requirement for a permit condition, nor denies the permit, the Corps shall process the permit application. In such cases,

JA.1517

the Agency shall provide a copy of the application file to the Corps to facilitate the Corps' review.

### 5.2.5   United States Environmental Protection Agency

The Agency shall coordinate with EPA as follows:

(a)   Waiver of review – EPA has oversight authority over the State 404 Program and may review individual permit applications and draft general permits. Federal law provides that EPA may waive review of certain categories of permits. EPA has waived review of all but the following categories of permits:

1.   Draft general permits. These are drafts of any general permit that the State intends to add to Chapter 62-331, F.A.C. The term "draft general permit" does not mean each project subsequently authorized under an approved general permit.
2.   Projects with reasonable potential for affecting endangered or threatened species as determined by the USFWS/NMFS;
3.   Projects with reasonable potential for adverse impacts on waters of another state or tribe;
4.   Projects that include discharges of dredged or fill material known or suspected to contain toxic pollutants in toxic amounts or hazardous substances in reportable quantities;
5.   Projects located in proximity of a public water supply intake. For the purpose of the State 404 Program, proximity means 1000 feet from the intake;
6.   Projects within critical areas established under state or federal law, including but not limited to national and state parks; fish and wildlife sanctuaries or refuges; national and historical monuments; wilderness areas and preserves; sites identified or proposed under the National Historic Preservation Act; and components of the National Wild and Scenic Rivers System;
7.   Projects impacting compensatory mitigation sites, including mitigation banks, in lieu fee program sites, and permittee responsible mitigation sites;
8.   Projects impacting sites that are owned or managed by federal entities, and activities by an applicant that is a federal entity;

In addition, the following projects shall be reviewed by EPA, even if they would otherwise not require EPA review under 1. Through 8., above:

1.   Any project that EPA requests to review within 30 days of receipt of the public notice under Rule 62-331.060, F.A.C.;
2.   Any project that the Agency requests EPA to review, at the Agency's discretion; and
3.   Any project where the Agency fails to accept the recommendations of an affected state or tribe received during the public comment period.

Review of the above projects occurs upon receipt of the public notice by EPA. EPA may comment on, provide notice to the Agency of its intent to comment on, object to, make recommendations with respect to, or notify the Agency that it is reserving its right to object to, a permit application as described in Rule 62-331.052(3), F.A.C.

**5.2.6    Federally Recognized Tribes**

The Agency shall send a copy of the public notice required in Rule 62-331.060, F.A.C., to a potentially affected tribe for any individual permit applications where the project has the potential to affect tribal waters or resources. The tribes may submit public comments or suggest project modifications or permit conditions to prevent adverse effects to tribal waters and resources. If the Agency chooses not to accept the recommendations of the tribe, the Agency shall submit the recommendations to EPA with an explanation of the Agency's reasons for not accepting the recommendations. EPA shall then review the project in accordance with paragraph 62-331.052(3)(b), F.A.C.

The Agency shall consult with the tribes as necessary for notices of intent to use general permits within tribal areas of concern. The tribes may provide information to assist the Agency in determining whether the project is likely to have more than minimal adverse effect on tribal waters or resources. If the Agency determines, based on information from the tribe, or information from the State Historic Preservation Office or Tribal Historic Preservation Office, that the project is likely to have more than minimal adverse effects on tribal waters or resources, the Agency shall require the applicant to apply for an individual permit for the project.

**5.2.7    Adjacent States – Alabama and Georgia**

The Agency shall send a copy of the public notice required in Rule 62-331.060, F.A.C., for any project that has the potential to affect the waters of an adjacent state. Typically, this would include projects within waters that straddle the border of the adjacent state, where the project is in close proximity to the border. The adjacent state may submit public comments or suggest project modifications or permit conditions to prevent adverse effects to that state's waters. If the Agency chooses not to accept the recommendations of the adjacent state, the Agency shall submit the recommendations to EPA with an explanation of the Agency's reasons for not accepting the recommendations. EPA shall then review the project in accordance with paragraph 62-331.052(3)(b), F.A.C.

**5.3    Processing Individual Permit Applications**

Applications for individual permits shall be processed in accordance with Rule 62-331.052, F.A.C., this section, and section 8.0 of this Handbook.

**5.3.1    Public Notice**

Public notice shall be conducted in accordance with Rule 62-331.060, F.A.C.

(a)  Public notices shall be prepared by the Agency and shall contain:

　　1.　The name and address of the applicant and, if different, the address or location of the activity(ies) regulated by the permit.
　　2.　The name, address, and telephone number of a person to contact for further information.
　　3.　A brief description of the comment procedures and procedures to request a public meeting, including deadlines.
　　4.　A brief description of the proposed activity, its purpose and intended use, so as to provide sufficient information concerning the nature of the activity to generate meaningful comments, including a description of the type of structures, if any, to be

erected on fills, and a description of the type, composition and quantity of materials to be used as fill.

5. A plan and elevation drawing showing the general and specific site location and character of all proposed activities, including the size relationship of the proposed structures to the size of the impacted waterway and depth of water in the area.
6. A paragraph describing the various evaluation factors on which decisions are based.
7. Any other information which would significantly assist interested parties in evaluating the likely impact of the proposed activity.

(b) Notice of public meeting shall also contain the information in (a)1. through 7., above, and the following information:

1. Time, date, and place of meeting.
2. Reference to the date of any previous public notices relating to the permit.
3. Brief description of the nature and purpose of the meeting.

## 5.3.2   Long-Term Conceptual Planning for Projects that will Take More Than One Phase to Complete

State 404 permits are limited in duration under federal law. Larger projects may need to be completed in phases so as not to exceed the maximum per-permit duration. Such projects may include, but are not limited to, residential, governmental, or commercial developments, linear transportation, and mining activities. To provide some regulatory certainty to applicants of these larger projects, subsection 62-331.051(2), F.A.C., provides that all activities reasonably related to the project shall be included in the same permit application, which means that the applicant should provide sufficient information for the Agency to review the entire scope of the project. This will enable the Agency to assess whether the project as a whole meets the requirements of Chapter 62-331, F.A.C., and this Handbook.

The following steps shall be taken to facilitate efficient permitting and planning for larger projects that are expected to be completed in phases:

(a)  Pre-application meeting

The applicant shall schedule a pre-application meeting with agency staff to discuss the entire scope of the project. The agency shall provide information and guidance to the applicant, including, but not limited to, such topics as project purpose and description, project alternatives and the alternatives analysis (see Appendix C), methods to avoid and minimize impacts to state-assumed waters, cumulative impacts, mitigation information, permitting strategy, and materials that should be included with the applications. The agency may provide a non-binding "pre-review" for any material that the applicant has prepared at this stage. The most helpful element to have ready for "pre-review" is the alternatives analysis required by Rule 62-331.053, F.A.C. The alternatives analysis shall be prepared for the entire project and shall be attached as an appendix to the long-term planning document in (b), below.

(b)  Phasing the project

The applicant shall divide the project into phases. Each phase shall contain activities that can reasonably be expected to be completed within no more than the maximum permit duration allowed under federal law. The applicant shall create a long-term planning document that explains how the project is phased, what activities are expected to be completed within each phase, an expected permitting timeframe for each phase, and an assessment of cumulative impacts. The long-term planning document shall be made part of the project file that goes out on public notice and federal review if required under 40 CFR § 233.51. The agency shall provide the applicant with information and guidance, as needed.

(c)  Permitting

The applicant shall apply for one phase at a time. Permits issued under this section shall be for a fixed term not to exceed the maximum permit duration allowed under federal law. During its review of the first phase of the project, the Agency shall analyze and review the entire project, as proposed in the long-term planning document, under all 404 requirements. This analysis and review shall become part of the project file and be a basis of the agency action on the first phase, and the long-term planning document shall be incorporated into the permit.

The Agency shall depend on this analysis and review for subsequent phases of the same project except to the extent:
1.  There are changes to state water quality standards that would be affected by activities described in the long-term planning document that have not already been authorized for construction or operation;
2.  There have been amendments to Florida law governing special basin criteria that would affect future activities described in the long-term planning document that have not already been authorized for construction;
3.  There are substantive changes in the site characteristics that would affect whether the design concepts described in the long-term planning document can continue to be reasonably expected to meet the conditions for authorizing construction of future phases. This shall include such things as changes in the designation of listed species, and changes to nesting, denning, and critical designation status of listed species that exist within the lands served by the project area; and
4.  There have been material changes in the scope of the project, as defined in section 2.0 of this Handbook.

Subsequent review by the Agency shall be limited to those changes enumerated above. In order for the Agency to determine whether there have been any changes in the scope of the project, any changes to the most up-to-date version of the long-term planning document shall be included with the permit application for each subsequent phase with a summary of any changes made to the document since the previous phase was permitted. The most recent version of the long-term planning document shall be attached as an appendix to all subsequent permits issued for the project. The permit shall be clearly labeled with the following caveat:

"This permit authorizes one phase of a multi-phase project. The long term planning document, attached as Appendix [X], does not reflect the scope of activities authorized by this permit. Authorized activities are described in the body of the permit document and depicted in

Appendix [X] (drawings). It is a violation of Part IV of Chapter 373, F.S., and the Clean Water Act to conduct unauthorized dredge and fill activities."

Immediately prior to conclusion of each permit, the Department shall conduct a site inspection to verify site conditions and impacts are as anticipated and permitted. It is highly recommended that the applicant apply for the next phase one year before the permit for the previous phase expires or is projected to be completed – whichever is sooner. This will give the Agency time to process the application for the next phase, including putting the project out on public notice and potential federal agency review. While the Agency shall follow the expedited review procedures in subsection 62-331.052(1) and subparagraph 62-331.060(3)(b)5., F.A.C., allowing one year for processing will help prevent project delays and will help provide a seamless transition between phases. Activities identified in a permit may be administratively continued as described in Section 5.3.3.

### 5.3.3    Continuation of Permits and Review for a New Permit for an Existing Project

State 404 Permits cannot be extended beyond the duration allowed under federal law or renewed. Large projects that are expected to take more than the maximum duration allowed under federal law to complete shall follow the long-term planning provisions in section 5.3.2. However, occasionally projects will take more than the maximum duration allowed under federal law to complete because of unexpected project delays. Unexpected project delays can occur for many reasons such as discreet storm events, labor or supply shortages, unanticipated number of inclement weather days, etc. If this occurs, the permittee shall apply for a new permit. If applicable, the permittee may request that the Agency use the original application for a new permit as described in (a), below.

If the permittee applies for a new permit at least 180 days before expiration of the original permit, the original permit may be administratively continued until the new permit is issued (i.e. the permittee may continue work under the original permit until the new permit is issued).

If the permittee does not apply for a new permit at least 180 days before expiration of the original permit, the permittee shall stop work on or before the original expiration date. A new permit must be obtained prior to commencement of work.

(a)  An applicant may request that the Agency use the original application form and materials for a new permit when:

    1.  There have been no material changes to site conditions, including use of the site by listed species, since the original permit was issued other than activities authorized in the original permit;
    2.  Where the project is in compliance with the original permit; and
    3.  State 404 Program rules applicable to the project have not changed.

Upon receipt of a request to use the original application for a new permit, the Agency shall conduct a site visit to verify that 1. and 2., above, have been met.

(b)  If there are any changes in site conditions, State 404 program rules, proposed modifications, or if the project is found to be out of compliance with the original permit, the applicant shall submit a new application.

(c) Any application for a new permit for an existing project shall provide the following additional information:

    1.  A description of work already completed under the original permit;
    2.  A description of work that has not yet been completed (if requested pursuant to (a), above, the description should be limited to work that was authorized in the original permit);
    3.  The reason for the unexpected delay;
    4.  The amount of time needed to finish the project (no more than the maximum duration allowed under federal law).

An application for a new permit will be processed as a new individual permit, including all public notice requirements. An application that includes unfinished activities authorized in a previously issued State 404 Program permit, where the application is received prior to expiration of the original permit for the activities, shall be subject to the provisions of Subsection 373.4146(5), F.S., as applicable.

## 6.0     Duration, Modification, and Transfer of Permits

(a) Duration of permits shall be in accordance with Rule 62-331.090, F.A.C.

(b) Individual permits become effective when they are signed by the Agency and the applicant. Each State 404 Individual permit, when issued, shall contain a signature page with signature blocks for the person who has authority to sign permits for the district where the permit is issued and for the applicant. The applicant shall sign the page and send it back to the Agency for Agency signature.

(c) Individual permits cannot be extended beyond the duration allowed under federal law but may be administratively continued while an application for a new permit is under review in accordance with section 5.3.3 of this Handbook when unexpected project delays cause a project to require more time to complete.

## 7.0     Determination and Review of the Landward Extent of State-Assumed Waters

Determination and review of the landward extent of state-assumed waters shall be conducted in accordance with subsection 62-331.010(3), F.A.C., and section 7.1 of Volume I.

## 7.1     Use of ERP Formal Determinations

Valid formal determinations conducted in accordance with subsection 62-330.201(2), F.A.C., and section 7.2 of Volume I shall be accepted for State 404 Program permits.

## 7.2     Informal Determinations

Informal determinations may be requested by the applicant in accordance with section 7.3 of Volume I.

JA.1523

**8.0      Criteria for Review of State 404 Program Individual Permits**

State 404 Program permits are processed using ERP criteria, the additional criteria in Chapter 62-331, F.A.C., Volume I, and this Handbook. The ERP review covers most criteria. Those are described in Volume I.  Any additional criteria not described in Volume I, as well as those ERP criteria that conflict with the State 404 Program, are described in this section.

**8.1      Administratively and Technically Complete Applications**

There are two types of "completeness" for applications for a State 404 Program individual permit.

(a)  Administratively complete is defined in section 2.0. Administratively complete means the project is complete enough to go out on public notice but may not have all details worked out. To be complete enough for public notice, the project design should be nearly finalized, and environmental information submitted with the application should be detailed enough to provide a good description of project environmental impacts in the notice. A project shall not be administratively complete if the alternatives analysis required by subsection 62-331.053(1), F.A.C., has not been submitted.

(b)  Technically complete is defined in section 2.0. A technically complete application includes all information required for the Agency to commence review as described in section 8.2, below.

Applicants should strive to submit applications that are as technically complete as possible. Pre-application meetings as described in section 5.0 are important and can assist an applicant in submitting a complete application.

**8.2      Sequence of Review**

Upon receipt of a technically complete application, the Agency will follow the sequence of review for processing applications summarized below. The sequence is simplified for purposes of illustration. The actual process followed may be iterative, with the results of one step leading to a re-examination of the previous steps. The Agency must address all the applicable State 404 Program permitting conditions in reaching a permitting decision for a project.

(a)  Determine whether the activity qualifies for a State 404 Program exemption or general permit. If it is not covered by an exemption or general permit, then:

(b)  Review practicable alternatives to the proposed activity. Alternatives may include not dredging or filling in state-assumed waters (avoidance) or dredging or filling in an alternative aquatic site with potentially less damaging environmental consequences. The applicant shall submit an alternatives analysis as required by Rule 62-331.053, F.A.C. Guidance for completing the alternatives analysis can be found in Appendix C.

(c)  Review the proposed project area boundaries. For the purposes of the State 404 Program only, the project area includes all areas of dredging or filling in state-assumed waters, and any proposed mixing zones, where applicable. Mixing zones shall be reviewed in accordance with Chapter 62-331, F.A.C., and as provided in Rule 62-4.242, and subsection 62-4.244(5), F.A.C.

(d) Evaluate the various physical and chemical components which characterize the non-living environment of the proposed site, the substrate and the water including its dynamic characteristics consistent with Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.

(e) Identify and evaluate any special or critical characteristics of the proposed project site and surrounding areas which might be affected by use of such site, related to their living communities or human uses consistent with Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.

(f) Review the information submitted with the application to determine whether the information provided by the applicant is sufficient to provide reasonable assurance that the applicable provisions of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C., will be met.

(g) Evaluate the material to be dredged or used as fill to determine the possibility of the presence of contaminants, including chemical contamination, that may violate state water quality standards listed in paragraph 62-330.301(1)(e), F.A.C., or any toxic effluent standard or prohibition under section 307 of the CWA. Check for physical incompatibility of the material to be used as fill (examples – 1) muck should not be used as structural fill but may be appropriate for use in a wetland restoration project; 2) if a certain ecological community type is expected to colonize the fill, the fill should be appropriate for the desired species).

(h) If there is a reasonable probability that contaminants are present, including chemical contamination, the Agency shall require the applicant to conduct appropriate sediment, elutriate, and/or water quality tests, as applicable.

(i) Identify appropriate and practicable changes to the project plan to avoid or minimize the environmental impact of the activity, as described in Volume I, section 10.2.1, except 10.2.1.2, which is not applicable to the State 404 Program. Avoidance should be considered first, and then minimization only if avoidance is not practicable.

(j) Complete a Technical Staff Report to document how the project addresses the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C.

(k) Make and document a finding of either compliance or noncompliance with the requirements of Rules 62-330.301, 62-330.302, and 62-331.053, F.A.C. This is a determination of whether the project, including mitigation, is permittable under the State 404 Program.

(l) Prepare a written determination on each application outlining the permitting decision and the rationale for the decision. The determination shall be dated, signed, and included in the official record prior to final action on the application. The Technical Staff Report from step 10 (subsection (j)), above, shall be included in or attached to the determination.

## 8.3   Review Criteria Unique to State 404 Program Permits

The following criteria are unique to the State 404 Program and will need to be considered in addition to the criteria for an ERP in Chapter 62-330, F.A.C., to meet the requirements of the State 404 Program. This list is a summary provided for convenience:

### 8.3.1    Alternatives Analysis

Some aspects of the alternatives analysis are similar to the requirements in Volume I, section 10.2.1 regarding elimination and reduction of impacts. The State 404 Program differs from ERP in that it requires more documentation (see subsection 62-331.053(1), F.A.C.), and allows the "No project alternative" (or "No action alternative") to be considered.

### 8.3.2    Aesthetics Review

Aesthetics shall be considered as part of the evaluation of potential adverse effects on human-use characteristics that may occur as a result of the proposed activities.

Aesthetics associated with the aquatic ecosystem consist of the perception of beauty by one or a combination of the senses of sight, hearing, touch, and smell. Aesthetics of aquatic ecosystems apply to the quality of life enjoyed by the general public and property owners.

Possible loss of values (adverse effects) include: The dredge or fill projects can mar the beauty of natural aquatic ecosystems by degrading water quality, creating distracting project areas, inducing inappropriate development, encouraging unplanned and incompatible human access, and by destroying vital elements that contribute to the compositional harmony or unity, visual distinctiveness, or diversity of an area. Dredging or filling can adversely affect the particular features, traits, or characteristics of an aquatic area which make it valuable to property owners. Activities which degrade water quality, disrupt natural substrate and vegetational characteristics, deny access to or visibility of the resource, or result in changes in odor, air quality, or noise levels may reduce the value of an aquatic area to private property owners.

The Agency shall also consider any comments received during the public comment period that apply to aesthetics.

### 8.3.3    Mitigation hierarchy

Mitigation for State 404 Program permits is generally evaluated in accordance with Volume I, section 10.3, like ERP. However, in addition to those requirements, the federal mitigation hierarchy described in section 8.5.1 of this Handbook, shall apply to any mitigation for State 404 Program permits.

### 8.3.4    Permit signatures

The Permittee, as well as the Agency, must sign an individual permit before it is considered effective.

After making a permitting decision, The Agency will draft the permit, and will send the draft permit to the applicant for review. If the applicant accepts the permit and conditions, the applicant shall sign the signature page and send the document back to the Agency using regular mail services or electronically. The Agency will then sign the permit and send the signed permit to the Permittee. The date that the Agency signs the permit will be the effective date of the permit. The Permittee must receive the fully executed permit before conducting any activity authorized in the permit.

### 8.3.5    Cumulative Effects

Unlike ERP reviews, the CWA does not limit analysis of cumulative effects to the resources within the impacted drainage basin. However, the drainage basin is a good starting point for review and will often be found to be the appropriate scale. Some projects will require cumulative effects reviewed on a larger or smaller scale depending on the size, project purpose, and resources proposed for impact. When reviewing cumulative effects, the Agency shall identify resources of concern and determine the potentially effected resource area(s). Compensatory mitigation for cumulative impacts shall comply with Volume I, section 10.2.8.

Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual dredge or fill activities. Although the impact of a particular activity may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

Cumulative effects attributable to dredge or fill activities in wetlands and other surface waters should be predicted to the extent reasonable and practical. The Agency shall collect information and solicit information from other sources, such as other permitting agencies, governmental agencies, or the public, about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications and monitoring and enforcement of existing permits.

### 8.3.6    Secondary Effects

Secondary effects are effects on an aquatic ecosystem that are associated with a dredge or fill activity, but do not result from the actual placement of the dredged or fill material. Information about secondary effects on aquatic ecosystems shall be considered and documented during the decision-making process concerning the evaluation of individual permit applications.

Some examples of secondary effects on an aquatic ecosystem are fluctuating water levels in an impoundment and downstream associated with the operation of a dam, septic tank leaching and surface runoff from residential or commercial developments on fill, and growth induced by improved access. Activities to be conducted on uplands created by fill activities in wetlands or other surface waters may have secondary impacts within those waters which should be considered in evaluating the impact of creating those uplands.

In addition to the secondary impact analysis categories identified in Volume I, section 10.2.7, the CWA requires secondary impact analysis on the following categories:

(a)    Sanctuaries and refuges
Sanctuaries and refuges consist of areas designated under state and federal laws or local ordinances to be managed principally for the preservation and use of fish and wildlife resources. Sanctuaries and refuges may be affected by dredge or fill activities which will: Disrupt the breeding, spawning, migratory movements or other critical life requirements of resident or transient fish and wildlife resources;

1.    Create unplanned, easy and incompatible human access to remote aquatic areas;
2.    Create the need for frequent maintenance activity;
3.    Result in the establishment of undesirable competitive species of plants and animals; or

4. Change the balance of water and land areas needed to provide cover, food, and other fish and wildlife habitat requirements in a way that modifies sanctuary or refuge management practices;

(b) Human use characteristics
Categories include:

1. Municipal and private water supplies. Activities can affect the quality of water supplies with respect to color, taste, odor, chemical content and suspended particulate concentration, in such a way as to reduce the fitness of the water for consumption. Water can be rendered unpalatable or unhealthy by the addition of suspended particulates, viruses and pathogenic organisms, and dissolved materials. The expense of removing such substances before the water is delivered for consumption can be high. Activities may also affect the quantity of water available for municipal and private water supplies. In addition, certain commonly used water treatment chemicals have the potential for combining with some suspended or dissolved substances from dredged or fill material to form other products that can have a toxic effect on consumers.

2. Recreational and commercial fisheries. Activities can affect the suitability of recreational and commercial fishing grounds as habitat for populations of consumable aquatic organisms. Activities can result in the chemical contamination of recreational or commercial fisheries. They may also interfere with the reproductive success of recreational and commercially important aquatic species through disruption of migration and spawning areas. The introduction of pollutants at critical times in their life cycle may directly reduce populations of commercially important aquatic organisms or indirectly reduce them by reducing organisms upon which they depend for food. Any of these impacts can be of short duration or prolonged, depending upon the physical and chemical impacts of the discharge and the biological availability of contaminants to aquatic organisms.

3. Water-related recreation. Water-related recreation encompasses activities undertaken for amusement and relaxation. Recreational activities encompass two broad categories of use: consumptive, such as harvesting resources by hunting and fishing; and non-consumptive, such as canoeing and sight-seeing. Activities may adversely modify or destroy water use for recreation by changing turbidity, suspended particulates, temperature, dissolved oxygen, dissolved materials, toxic materials, pathogenic organisms, quality of habitat, and the aesthetic qualities of sight, taste, odor, and color.

4. Aesthetics. Aesthetics associated with the aquatic ecosystem consist of the perception of beauty by one or a combination of the senses of sight, hearing, touch, and smell. Aesthetics of aquatic ecosystems apply to the quality of life enjoyed by the general public and property owners. Dredge or fill activities can mar the beauty of natural aquatic ecosystems by degrading water quality, creating distracting disposal sites, inducing inappropriate development, encouraging unplanned and incompatible human access, and by destroying vital elements that contribute to the compositional harmony or unity, visual distinctiveness, or diversity of an area. Dredge or fill activities can adversely affect the particular features, traits, or characteristics of an aquatic area which make it valuable to property owners. Activities which degrade water quality, disrupt natural substrate and vegetational characteristics, deny access to or visibility of the resource, or result in changes in odor, air quality, or noise levels may reduce the value of an aquatic area to private property owners.

5. Parks, national and historical monuments, national seashores, wilderness areas, research sites, and similar preserves. These preserves consist of areas designated under federal and state laws or local ordinances to be managed for their aesthetic, educational, historical, recreational, or scientific value. Dredge or fill activities in such areas may modify the aesthetic, educational, historical, recreational and/or scientific qualities thereby reducing or eliminating the uses for which such sites are set aside and managed.

## 8.4    ERP Criteria Not Applicable to State 404 Program Permits

Section 373.4146, F.S., provides that provisions of state law that conflict with federal requirements pertaining to Section 404 permits do not apply to state administered section 404 permits (State 404 Program permits). The following rules and statutes applicable to ERP are not applicable to State 404 Program Permits. This list may not be exhaustive.

Statutes:

- Section 120.60, F.S., pertaining to default of processing timeframes;
- Section 373.4141, F.S., containing timeframes for review of ERP permits;
- Certain provisions of Section 373.414, F.S., pertaining to mining mitigation;
- Any provision of Chapter 378, F.S., pertaining to "life-of-the-mine" permits;
- Sections 378.212(1)(g), and 378.404(9), F.S., pertaining to variances for certain mining reclamation activities;
- Subsection 378.403(19), F.S., containing a definition of "Wetlands" with special provisions for certain areas included in an approved conceptual reclamation plan or modification application;
- Section 252.363(1)(a)3., F.S., pertaining to the tolling and extension of permits pursuant to part IV of Chapter 373, F.S., when the Governor declares a state of emergency, if the State 404 permit would be extended beyond the duration allowed under federal law.

Rules:

- Paragraph 62-345.600(1)(b), F.A.C., pertaining to time lag for phosphate and heavy minerals mines;
- Volume I, Section 10.2.1.2 providing certain exceptions for reduction or elimination of impacts;
- Rule 62-348.600, F.A.C., pertaining to mitigation for high fiber peat mines.

## 8.5    Compensatory Mitigation

Compensatory mitigation for State 404 Program permits shall be conducted in accordance with Rule 62-331.130, F.A.C., and this section.

### 8.5.1   Compensatory Mitigation Hierarchy

When considering options for successfully providing the required compensatory mitigation, the Agency shall consider the type and location options in the order presented in paragraphs (a) through (e) of this section. It is recognized that flexibility may be needed to address watershed

needs and allow for the consideration of mitigation projects that are environmentally preferable based on a watershed approach, if such projects are consistent with this section.

Subject to the provisions in paragraphs (a) through (e), below, and section 8.5.2 of this Handbook, the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses. When compensating for impacts to marine resources, the location of the compensatory mitigation site should be chosen to replace lost functions and services within the same marine ecological system (e.g., reef complex, littoral drift cell). Compensation for impacts to aquatic resources in coastal watersheds (watersheds that include a tidal water body) should also be located in a coastal watershed where practicable. Compensatory mitigation projects should not be located where they will increase risks to aviation by attracting wildlife to areas where aircraft-wildlife strikes may occur (e.g., near airports).

(a)  Mitigation bank credits. When permitted impacts are located within the service area of an approved mitigation bank, and the bank has the appropriate number and resource type of credits available, the permittee's compensatory mitigation requirements may be met by the purchase of mitigation bank credits.

Since an approved instrument (including an approved mitigation plan and appropriate real estate and financial assurances) for a mitigation bank is required to be in place before its credits can begin to be used to compensate for authorized impacts, use of a mitigation bank can help reduce risk and uncertainty, as well as temporal loss of resource functions and services. Mitigation bank credits are not released for debiting until specific milestones associated with the mitigation bank site's protection and development are achieved, thus use of mitigation bank credits can also help reduce risk that mitigation will not be fully successful.

Mitigation banks typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible mitigation. Also, development of a mitigation bank requires site identification in advance, project-specific planning, and significant investment of financial resources that is often not practicable for many in-lieu fee programs. For these reasons, the Agency shall give preference to the use of mitigation bank credits when these considerations are applicable. However, these same considerations may also be used to override this preference, where appropriate, as, for example, where an in-lieu fee program has released credits available from a specific approved in-lieu fee project, or a permittee-responsible project will restore an outstanding resource based on rigorous scientific and technical analysis.

(b)  Corps authorized in-lieu fee program credits. Where permitted impacts are located within the service area of a Corps authorized in-lieu fee program, and the in-lieu fee program has the appropriate number and resource type of credits available, the permittee's compensatory mitigation requirements may be met by securing those credits from the in-lieu fee program.

In-lieu fee projects typically involve larger, more ecologically valuable parcels, and more rigorous scientific and technical analysis, planning and implementation than permittee-responsible projects. They also devote significant resources to identifying and addressing high-

priority resource needs on a watershed scale, as reflected in their compensation planning framework. For these reasons, the Agency shall give preference to in- lieu fee program credits over permittee-responsible mitigation, where these considerations are applicable. However, as with the preference for mitigation bank credits, these same considerations may be used to override this preference where appropriate. Additionally, in cases where permittee-responsible mitigation is likely to successfully meet performance standards before advance credits secured from an in-lieu fee program are fulfilled, the Agency shall also consider this factor in deciding between in-lieu fee mitigation and permittee-responsible mitigation.

(c) Permittee-responsible mitigation under a watershed approach. Where permitted impacts are not in the service area of an approved mitigation bank or in-lieu fee program that has the appropriate number and resource type of credits available, permittee-responsible mitigation is the only option. Where practicable and likely to be successful and sustainable, the resource type and location for the required permittee-responsible compensatory mitigation shall be determined using the principles of a watershed approach as outlined in section 8.5 of the 404 Handbook.

(d) Permittee-responsible mitigation through on-site and in-kind mitigation. In cases where a watershed approach is not practicable, the Agency shall consider opportunities to offset anticipated aquatic resource impacts by requiring on-site and in-kind compensatory mitigation. The Agency shall also consider the practicability of on-site compensatory mitigation and its compatibility with the proposed project.

(e) Permittee-responsible mitigation through off-site and/or out-of-kind mitigation. If, after considering opportunities for on-site, in-kind compensatory mitigation as provided in paragraph (d), above, the Agency determines that these compensatory mitigation opportunities are not practicable, are unlikely to compensate for the permitted impacts, or will be incompatible with the proposed project, and an alternative, practicable off-site and/or out-of-kind mitigation opportunity is identified that has a greater likelihood of offsetting the permitted impacts or is environmentally preferable to on-site or in-kind mitigation, the Agency shall require that this alternative compensatory mitigation be provided.

**8.5.2    Watershed approach**

The Agency shall use a watershed approach to establish compensatory mitigation requirements in State 404 Program permits to the extent appropriate and practicable. Where a watershed plan is available, the Agency will determine whether the plan is appropriate for use in the watershed approach for mitigation. In cases where the Agency determines that an appropriate watershed plan is available, the watershed approach shall be based on that plan. Where no such plan is available, the watershed approach shall be based on information provided by the applicant or available from other sources. The ultimate goal of a watershed approach is to maintain and improve the quality and quantity of aquatic resources within watersheds through strategic selection of mitigation sites.

(a)  Considerations

1.  A watershed approach to mitigation considers the importance of landscape position and resource type of mitigation projects for the sustainability of aquatic resource functions within the watershed. Such an approach considers how the types and locations of mitigation projects will provide the desired aquatic resource functions and will continue

to function over time in a changing landscape. It also considers the habitat requirements of important species, habitat loss or conversion trends, sources of watershed impairment, and current development trends, as well as the requirements of other regulatory and non-regulatory programs that affect the watershed, such as storm water management or habitat conservation programs. It includes the protection and maintenance of terrestrial resources, such as non-wetland riparian areas and uplands, when those resources contribute to or improve the overall ecological functioning of aquatic resources in the watershed. Mitigation requirements determined through the watershed approach shall not focus exclusively on specific functions (e.g., water quality or habitat for certain species), but shall provide, where practicable, the suite of functions typically provided by the affected aquatic resource.

2.  Locational factors (e.g., hydrology, surrounding land use) are important to the success of mitigation for impacted habitat functions and may lead to siting of such mitigation away from the project area. However, consideration shall also be given to functions and services (e.g., water quality, flood control, shoreline protection) that will likely need to be addressed at or near the impacted areas.

3.  A watershed approach may include on-site mitigation, off-site mitigation (including mitigation banks or in-lieu fee programs), or a combination of on-site and off-site mitigation.

4.  A watershed approach to mitigation shall include, to the extent practicable, inventories of historical and existing aquatic resources, including identification of degraded aquatic resources, and identification of immediate and long-term aquatic resource needs within watersheds that can be met through permittee-responsible mitigation projects, mitigation banks, or in-lieu fee programs. Planning efforts shall identify and prioritize aquatic resource restoration, creation, and enhancement activities, and preservation of existing aquatic resources that are important for maintaining or improving ecological functions of the watershed. The identification and prioritization of resource needs shall be as specific as possible, to enhance the usefulness of the approach in determining mitigation requirements.

(b)  Information Needs

1.  In the absence of a watershed plan determined by the Agency to be appropriate for use in the watershed approach, the Agency shall use a watershed approach based on analysis of information regarding watershed conditions and needs, including potential sites for aquatic resource restoration activities and priorities for aquatic resource restoration and preservation. Such information includes: Current trends in habitat loss or conversion; cumulative impacts of past development activities, current development trends, the presence and needs of sensitive species; site conditions that favor or hinder the success of mitigation projects; and chronic environmental problems such as flooding or poor water quality.

2.  This information may be available from sources such as wetland maps; soil surveys; U.S. Geological Survey topographic and hydrologic maps; aerial photographs; information on rare, endangered and threatened species and critical habitat; local ecological reports or studies; and other information sources that could be used to identify locations for suitable mitigation projects in the watershed.

(c)  Watershed Scale

The cumulative impact basins described in Volume I, section 10.2.8 shall be used when considering watershed scale in mitigation for State 404 Program permits.

### 8.5.3  Permit Specific Conditions for Compensatory Mitigation

(a)  The compensatory mitigation requirements for a permit, including the amount and type of compensatory mitigation, shall be clearly stated in the specific conditions of the individual or general permit verification. The specific conditions must be enforceable.

(b)  For an individual permit that requires permittee-responsible mitigation, the specific conditions shall:

1. Identify the party responsible for providing the compensatory mitigation;

2. Incorporate the final mitigation plan approved by the Agency;

3. State the objectives, performance standards, and monitoring required for the compensatory mitigation project, unless they are provided in the approved final mitigation plan; and

4. Describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan.

(c)  For a general permit activity that requires permittee-responsible mitigation, the specific conditions shall describe the compensatory mitigation proposal, which may be either conceptual or detailed. The general permit verification shall also include a specific condition that states that the permittee cannot commence work until the Agency approves the final mitigation plan, unless the Agency determines that such a specific condition is not practicable and not necessary to ensure timely completion of the required compensatory mitigation. To the extent appropriate and practicable, specific conditions of the general permit verification shall also address the requirements of paragraph (b), above.

(d)  If a mitigation bank or in-lieu fee program is used to provide the required compensatory mitigation, the specific conditions shall indicate whether a mitigation bank or in-lieu fee program will be used and specify the number and resource type of credits the permittee is required to purchase. In the case of an individual permit, the specific condition shall also identify the specific mitigation bank or in-lieu fee program that will be used. For general permit verifications, the specific conditions shall either identify the specific mitigation bank or in-lieu fee program, or state that the specific mitigation bank or in-lieu fee program used to provide the required credits shall be approved by the Agency prior to purchasing credits.

### 8.5.4  Timing of Compensatory Mitigation

Implementation of the compensatory mitigation project shall be, to the maximum extent practicable, in advance of or concurrent with the authorized impacts. Temporal loss shall be compensated for in accordance with appropriate calculations for time lag in accordance with Rule 62-345.600, F.A.C., except paragraph 62-345.600(1)(b), F.A.C., which is not applicable to the State 404 Program.

### 8.5.5    Use of Preservation as Compensatory Mitigation

(a)  Preservation may be used to provide compensatory mitigation when all the following criteria are met:
   1. The resources to be preserved provide important physical, chemical, or biological functions for the watershed;

   2. The resources to be preserved contribute significantly to the ecological sustainability of the watershed. In determining the contribution of those resources to the ecological sustainability of the watershed, the Agency shall use appropriate quantitative assessment tools, where available;

   3. Preservation is determined by the Agency to be appropriate and practicable;

   4. The resources are under threat of destruction or adverse modifications; and

   5. The preserved site will be permanently protected through an appropriate real estate or other legal instrument as described in Volume I, section 10.3.8.

(b)  Where preservation is used to provide compensatory mitigation, to the extent appropriate and practicable the preservation shall be done in conjunction with aquatic resource restoration, establishment, and/or enhancement activities. This requirement may be waived by the Agency where preservation has been identified as a high priority using a watershed approach described in section 8.5.2 of this Handbook, but compensation ratios shall be higher.

### 8.5.6    Additional Considerations for Permittee-Responsible Compensatory Mitigation Projects

### 8.5.6.1  Monitoring

The compensatory mitigation plan shall provide for a monitoring period that is sufficient to demonstrate that the compensatory mitigation project has met performance standards, but not less than five years. A longer monitoring period shall be required for aquatic resources with slow development rates (e.g., forested wetlands, bogs). Following project implementation, the Agency shall reduce or waive the remaining monitoring requirements upon a determination that the compensatory mitigation project has achieved its performance standards. The Agency may also extend the original monitoring period upon a determination that performance standards have not been met or the compensatory mitigation project is not on track to meet them. The Agency shall revise monitoring requirements when remediation or adaptive management is required.

### 8.5.6.2  Adaptive Management

(a)  If the compensatory mitigation project cannot be constructed in accordance with the approved mitigation plans, the permittee shall notify the Agency. Any significant modification of the compensatory mitigation project requires approval from the Agency.

(b)  If monitoring or other information indicates that the compensatory mitigation project is not progressing towards meeting its performance standards as anticipated, the responsible party shall notify the Agency as soon as possible. The Agency shall evaluate and pursue measures to address deficiencies in the compensatory mitigation project. The Agency shall consider

whether the compensatory mitigation project is providing ecological benefits comparable to the original objectives of the compensatory mitigation project.

(c) The Agency, in consultation with the responsible party (and other state, federal, tribal, and local agencies, as appropriate), will determine the appropriate measures. The measures may include, but are not limited to, site modifications, design changes, revisions to maintenance requirements, and revised monitoring requirements. The measures shall be designed to ensure that the modified compensatory mitigation project provides aquatic resource functions comparable to those described in the mitigation plan objectives.

(d) Performance standards shall be revised in accordance with adaptive management to account for measures taken to address deficiencies in the compensatory mitigation project. Performance standards shall also be revised to reflect changes in management strategies and objectives if the new standards provide for ecological benefits that are comparable or superior to the approved compensatory mitigation project. No other revisions to performance standards shall be allowed except in the case of natural disasters.

### 8.5.6.3 Long-term Protection and Management

(a) The real estate instrument, management plan, or other long-term protection mechanism must contain a provision requiring 60-day advance notification to the Agency before any action is taken to void or modify the instrument, management plan, or long-term protection mechanism, including transfer of title to, or establishment of any other legal claims over, the compensatory mitigation site.

(b) The permit conditions shall identify the party responsible for ownership and all long-term management of the compensatory mitigation project. The permit conditions shall, where applicable, contain provisions allowing the permittee to transfer the long-term management responsibilities of the compensatory mitigation project site to a land stewardship entity, such as a public agency, non-governmental organization, or private land manager, after review and approval by the Agency. The land stewardship entity need not be identified in the original permit, as long as the future transfer of long-term management responsibility is approved by the Agency.

(c) A long-term management plan shall include a description of long-term management needs, annual cost estimates for these needs, and identify the funding mechanism that will be used to meet those needs.

(d) Any provisions necessary for long-term financing shall be addressed in the original permit. The Agency shall require provisions to address inflationary adjustments and other contingencies, as appropriate. Appropriate long-term financing mechanisms include non-wasting endowments, trusts, contractual arrangements with future responsible parties, and other appropriate financial instruments. In cases where the long-term management entity is a public authority or government agency, that entity shall provide a plan for the long-term financing of the site.

(e) Any long-term financing mechanisms shall be approved by the Agency in advance of the authorized impacts.

JA.1535

## APPENDIX A

### Retained Waters List

### August 23, 2019

The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (below), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary.

# Rivers and Creeks

Acosta Creek
Alafia River
Alaqua Creek
Alexander Springs Creek
Alligator Creek (Sarasota County)
Alligator Lake-Lake Gentry Canal
Amelia River
Anclote River (Upstream to 7 Springs Blvd)
Apalachicola River
Arlington River
Aucilla River
Axle Creek
Banana River
Barrentine Creek
Barron River
Basin Creek
Bayou Marcus
Bear Creek (Bay County)
Bear Creek (Putnam County)
Belcher Canal
Bells River
Bessy Creek
Big Coldwater Creek (Also East Fork and West Fork)
Big Davis Creek
Big Fishweir Creek
Big Juniper Creek
Big Marco River
Big Muddy Creek
Big Mulberry Branch
Billy Creek
Black Creek
Black Creek (Walton County)
Black Water Creek
Blackwater River (Santa Rosa and Okaloosa Counties)
Blind Creek
Blockhouse Creek
Blounts Branch
Blue Creek (Lake County)
Blue Hole Creek
Blue Springs Run
Bluff Branch

Boathouse Creek
Bogey Branch
Boggy Creek (Orange and Osceola Counties)
Bonnet Creek (Seminole County)
Botts Creek
Bowlees Creek
Box Branch (Duval County)
Boynton Canal
Braden River (Downstream of Ward Lake Dam (Bill Evers Reservoir))
Bradley Creek
Bray Creek
Brick-Alligator Lake Canal
Britt Creek (Martin and St Lucie Counties)
Broad River
Brothers River
Broward Creek
Broward River
Browns Creek
Buck Creek (Charlotte County)
Buckhorn Creek (Hillsborough County)
Bull Creek (Flagler County)
Bulow Creek
Bumblebee Creek
Burnt Mill Creek (Bay County)
Butcher Pen Creek
Butler Creek
C-15 Canal
C-17 Canal
C-18 Canal
C-23 Canal
C-24 Canal
C-51 Canal / West Palm Beach Canal
Cabbage Creek (St Johns County)
Callaway Creek
Caloosahatchee River
Camp Branch (Putnam County)
Caney Branch (Duval County)
Canoe Creek (Osceola County)

Capo Creek
Carpenter Creek
Carrabelle River
Casa Cola Creek
Cat Creek (Franklin County)
Cedar Creek (Putnam County)
Cedar Point Creek (Duval County)
Cedar River
Cemetery Creek
Chassahowitzka River
Chatham River
Chattahoochee River
Chicopit Bay
Chipola River
Choctawhatchee River
Christopher Creek (Duval County)
Clapboard Creek
Clark Creek (Gulf County)
Clarkes Creek
Clear Creek (Escambia County)
Cocohatchee River
Coon Lake-Lake Lizzie Canal
Coral Gables Waterway
Cormorant Branch
Cow Creek (Putnam County)
Cowhead Creek (Duval County)
Cracker Branch (St Johns County, St Johns River)
Cradle Creek
Craig Creek
Crane Creek (Brevard County, Melbourne)
Crooked Creek (Bay County)
Crooked Creek (Martin County)
Crooked River (Franklin County)
Crooked River (Lake County)
Cross Creek (Alachua County)
Cross Florida Barge Canal
Crystal River
Cunningham Creek
Cut Creek
Cypress Creek (Lee County)
Danforth Creek
Dania Cut-off canal

Days Creek
Dead River (Kissimmee River)
Dead River (Lake County, Florida)
Dead River (Wakulla County)
Dean Dead River
DeBlieu Creek
Deep Bottom Creek
Deep Creek (St Johns County)
Deer Creek (Duval County)
Depot Creek
Dillaberry Branch
Dog Branch
Drummond Creek
Dunns Creek
Durbin Creek
East Bay River
East Creek (St Johns County)
East River (Washington and Bay Counties)
Eau Gallie River
Econfina River
Econlockhatchee River
Egans Creek
Eightmile Creek (Escambia County)
Elbow Branch (Putnam County)
Elbow Creek
Elevenmile Creek
Eph Creek
Escambia River
Estero River
Etonia Creek
Fakahatchee River
Fenholloway River
Fish Creek (Putnam County)
Fisheating Creek (Downstream of Fort Center)
Fishing Creek
Fitzpatrick Creek
Fivemile Creek (St Lucie County)
Flora Branch
Forked Creek
Fort George River
Fourmile Creek (Walton County)
Fox Cut
Frazier Creek
Garden Creek
Get Out Creek
Ginhouse Creek (Duval County)
Goodbys Creek
Governors Creek
Graham Creek
Grog Branch
Guana River
Gulley Creek
Haines Creek (a.k.a. Haynes Creek)
Half Creek
Halifax River
Hannah Mills Creek

Harney River
Harrison Creek (Nassau County)
Harrys Creek
Hatchett Creek
Hatchineha Canal
Haulover Creek
Haw Creek (Flagler County)
Henderson Creek
Highland Park Run
Hillsboro Canal
Hillsboro River
Hillsborough River (Downstream of Tampa Water Development Dam)
Hitchens Canal
Hog Creek (Martin County)
Hogan Creek
Hogpen Creek (Duval County)
Holiday Harbor (Duval County)
Holmes Creek (Jackson County)
Hominy Branch
Homosassa River
Honey Creek (Volusia County)
Hontoon Dead River
Hopkins Creek
Horseshoe Creek (Bay and Gulf Counties)
Hospital Creek
Howard Creek (St Lucie County)
Hudson Bayou
Hulett Branch
Huston Creek
Imperial River
Incontanston Creek
Indian Creek (Hernando County)
Indian Creek (St Johns County)
Indian River
Indian River North
Istokpoga Creek
Jackson Canal
Jackson Creek (Nassau County)
Jackson River
Joe River
Johnson Creek (Dixie County)
Johnson Creek (Gulf County)
Johnson Slough (Clay County)
Jolly River
Jones Creek (Duval County)
Jones Swamp Creek
Julington Creek
Juniper Creek (Lake County)
Karen Canal
Kendall Creek
Kentucky Branch
Kestner Creek
Kissimmee River
Krueger Creek
L-40 Canal
L-8 Canal
Lafayette Creek
Lake Ajay-Fells Cove Canal
Lake Apopka-Beauclerc Canal

Lake Ashby Canal (and Deep Creek)
Lake Center-Coon Lake Canal
Lake Griffin-Yale Canal
Lake Hart-Ajay Canal
Lake Joel-Myrtle Canal
Lake Joel-Trout Canal
Lake Lizzie-Alligator Canal
Lake Marion Creek
Lake Mary Jane-Hart Canal
Lake Myrtle-Mary Jane Canal
Lake Okeechobee Rim Canal
Lake Okeechobee Waterway
Lake Preston-Myrtle Canal
Lake Worth
Lanceford Creek
Lehigh Canal
Leitner Creek
Little Black Creek (Clay County)
Little Cedar Creek (Duval County)
Little Clapboard Creek
Little Double Creek
Little Econlockhatchee River
Little Fishweir Creek
Little Juniper Creek (Lake County)
Little Manatee River
Little Mud Creek (St Lucie County)
Little Pottsburg Creek
Little River (Biscayne Bay)
Little Rocky Creek (Walton and Okaloosa Counties)
Little Saint Marys River
Little Trout River
Little Wekiva River
Lofton Creek
Lolly Creek
Long Branch (Duval County)
Long Creek (Flagler County)
Lopez River
Lostmans River
Lower Sister Creek
Loxahatchee River
Lumber Creek
Mainard Branch
Manatee Creek
Manatee River (Downstream of Lake Manatee Dam)
Marshall Creek (St Johns County)
Mason Branch (St Johns County)
Matanzas River
McCoy Creek
McCullough Creek (St Johns County)
McGirts Creek
McQueen Creek
Miami Canal
Miami River

JA.1537

Middle River
Middle River (South and North Fork)
Mill Branch (Putnam County)
Mill Log Creek
Mills Creek (Nassau County)
Moccasin Branch (St Johns County)
Moccasin Slough
Moncrief Creek
Monroe Canal (Seminole County)
Moore's Creek (St Lucie County)
Morrison Creek
Moses Creek
Moultrie Creek
Mud Creek (Putnam County)
Murphy Creek
Myakka River
Myakkahatchee Creek (Sarasota County)
Nassau River
New River (Broward County)
New River (Collier County)
New River (Franklin County)
New Rose Creek
Newcastle Creek
Nichols Creek
Ninemile Creek (Duval County)
NN Creek (Brevard County)
Norris Dead River
North Fork Saint Lucie River
North New River Canal
Ochlockonee River (Portion downstream starting 500 feet south of the ramp at Jack Langston Drive, Sopchoppy, FL.)
Ocklawaha River
Old Channel
Oldfield Creek
Oleta River
Open Creek (Duval County)
Orange Creek
Orange Grove Branch
Orange River
Ortega River
Pablo Creek
Paines Branch
Palatlakaha River
Palm River
Pancho Creek
Pea River
Peace River (Upstream to 0.64 river miles north of old railroad bridge at SW River Street, Ft Ogden, FL)
Pecks Branch
Pellicer Creek
Perdido River
Peters Branch (Clay County)
Peters Creek

Phelps Creek
Philippe Creek
Pine Barren Creek
Pine Log Creek (Bay and Washington Counties)
Pinhook River
Pithlachascotee River (Upstream to the private road bridge that is approximately 2,200 feet upstream of Rowan Road)
Plummer Creek
Polly Creek
Pond Creek (Santa Rosa County)
Poppolton Creek
Porpoise Creek (Dixie County)
Pottsburg Creek
Puckett Creek
Pumpkin Hill Creek
Red House Branch
Reedy Creek (Osceola and Orange Counties)
Ribault River
Rice Creek (Putnam County)(One directly off the St Johns River)
Robinson Creek (St Johns County)
Rock Springs Run
Rocky Creek (Hillsborough County)
Rocky Creek (Okaloosa/Walton)
Rodgers River
Rosalie Creek
Rushing Branch
Saint Francis Dead River
Saint Johns River
Saint Lucie Canal
Saint Lucie River
Saint Marks River (Wakulla, Leon and Jefferson Counties)
Saint Marys River
Saint Sebastian River
Salt Creek (Dixie County)
Salt Creek (Flagler County)
Salt Run
Salt Springs Run (Marion County)
San Carlos Creek
San Julian Creek
San Sebastian River
Sand Beach Branch
Sandy Creek (Bay County)
Sandy Run
Saul Creek (Downstream of Sauls Creek Road)
Sawpit Creek
Scipio Creek
Scoggin Creek
Shad Creek (Brevard County)
Shark River

Shell Creek (Charlotte County) (Downstream of dam for Shell Creek Reservoir)
Shingle Creek (Osceola and Orange Counties)
Shipyard Creek
Shired Creek
Shoal River
Short Canal
Silver Glen Springs Run
Silversmith Creek
Simms Creek
Simpson Creek
Sink Creek (Dixie County)
Sisters Creek
Sixmile Creek
Sixteenmile Creek
Smith Creek (Flagler)
Smith Creek (St. Johns)
Snake Creek (Lake County)
Snell Creek
Soap Creek
Soldier Creek (Escambia County)
Soldier Creek (Seminole County)
Sombrero Creek
Sopchoppy River
South Amelia River
South Fork Black Creek
South Fork Saint Lucie River
South Port Canal
Spring Creek (Wakulla County)
Spring Garden Creek
Spring Warrior Creek
Spruce Creek
St. Cloud Canal
Steinhatchee River
Stokes Creek
Stranahan River
Strawberry Creek
Styles Creek
Summer Haven River (St Johns County)
Suwannee River (Downstream of Purvis Landing and Boat Ramp)
Sweetwater Creek (Hillsborough County)
Swimming Pen Creek
Tarpon River
Taylor Creek (Okeechobee County)
Tenmile Creek (St Lucie County)
Terrapin Creek
Thomas Creek (Nassau and Duval Counties)
Thomas Mill Run
Three Otter Creek
Tiger Creek (Polk County)
Tocoi Creek
Tolomato River
Tomoka River

Trout -Coon Lake Canal
Trout Creek (St Johns County)
Trout River
Turkey Creek (Brevard County)
Turkey Creek (Okaloosa County)
Turner River
Upper Sister Creek
Waccasassa River
Wacissa River
Wakulla River (Up to and
 including Wakulla Springs)
Walker Creek (Nassau County)

Wares Creek (Downstream of
 Bridge for 12th Ave W
 Bradenton FL)
Warner Creek
Weeki Wachee River
Wekiva River (Seminole and
 Lake Counties)
Weohyakapka Creek
West Branch Blockhouse Creek
West Palm Beach Canal
West Run Cracker Branch
Wetappo Creek
Wharf Creek
Whitney River

Whittenhorse Creek
Williamson Creek
Willoughby Creek
Wills Branch
Withlacoochee River
 (Downstream of the Inglis
 Dam and the Inglis Bypass
 Spillway in Citrus County)
Woodruff Creek
Wrights Creek (Homes County)
Ximanies Creek
Yellow River
Zeigler Dead River

## Lakes

Adams Lake (Volusia County)
Ajay Lake
Alligator Lake (Osceola County)
Blue Cypress Lake
Blue Lagoon
Brick Lake
Cherry Lake (Lake County)
Clark Lake (Volusia County)
Clear Lake (Orange County)
Coon Lake
Crescent Lake (Putnam-Flagler
 Counties)
Cypress Lake (Osceola County)
Dead Lakes
Deer Point Lake
Doctors Lake
Dumfoundling Bay
East Lake Tohopekaliga
Fells Cove
Horseshoe Mud Lake
Kimball Lake
Lake Apopka
Lake Ashby
Lake Beauclair
Lake Beresford
Lake Carlton
Lake Center
Lake Cone
Lake Dexter (Volusia County)
Lake Dora
Lake Emma (Lake County)
Lake Eustis
Lake Florence (Brevard County)
Lake Gentry
Lake George (Putnam-Volusia
 Counties)
Lake Griffin (Lake County)
Lake Harney
Lake Harris (Lake County)
Lake Hart (Orange County)
Lake Hatchineha
Lake Hellen Blazes
Lake Ida (Palm Beach County)
Lake Istokpoga

Lake Jackson (Osceola County)
Lake Jesup
Lake Joel
Lake Kissimmee
Lake Lizzie
Lake Louisa (Lake County)
Lake Lucy (Lake County)
Lake Mangonia
Lake Marion (Polk County)
Lake Mary Jane
Lake Minnehaha (Lake County)
Lake Minneola
Lake Monroe
Lake Myrtle (Osceola County)
Lake Nellie
Lake Okeechobee
Lake Ola
Lake Osborne
Lake Poinsett
Lake Preston
Lake Rosalie
Lake Seminole (Gadsden,
 Jackson Counties)
Lake Seminole (Pinellas County)
Lake Susan (Lake County)
Lake Tarpon
Lake Tohopekaliga
Lake Washington (Brevard
 County)
Lake Weohyakapka
Lake Wimico
Lake Winder
Lake Woodruff
Lake Yale
Little Lake George
Little Lake Harris (Lake County)
Little Sawgrass Lake
Lochloosa Lake
Loughman Lake
Marco Lake
Maule Lake
Mud Lake (Lake County)
Orange Lake (Alachua County)

Powell Lake (Bay and Walton
 Counties)
Puzzle Lake (Seminole and
 Volusia Counties)
Rodman Reservoir
Ruth Lake
Salt Lake (Pinellas County)
Sawgrass Lake (Brevard
 County)
Silver Lake (Brevard County)
Spring Garden Lake
Stagger Mud Lake
Tick Island Mud Lake
Tiger Lake
Trout Lake (Osceola County)

## APPENDIX B

### Excerpts from 40 CFR Part 232

### Select Definitions from 40 CFR § 232.2

***Discharge of dredged material.***

(1) Except as provided below in paragraph (2), the term *discharge of dredged material* means any addition of dredged material into, including redeposit of dredged material other than incidental fallback within, the waters of the United States. The term includes, but is not limited to, the following:

    (i) The addition of dredged material to a specified discharge site located in waters of the United States;

    (ii) The runoff or overflow, associated with a dredging operation, from a contained land or water disposal area; and

    (iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation.

(2) The term discharge of dredged material does not include the following:

    (i) Discharges of pollutants into waters of the United States resulting from the onshore subsequent processing of dredged material that is extracted for any commercial use (other than fill). These discharges are subject to section 402 of the Clean Water Act even though the extraction and deposit of such material may require a permit from the Corps or applicable state.

    (ii) Activities that involve only the cutting or removing of vegetation above the ground (e.g., mowing, rotary cutting, and chainsawing) where the activity neither substantially disturbs the root system nor involves mechanized pushing, dragging, or other similar activities that redeposit excavated soil material.

    (iii) Incidental fallback.

(3) Section 404 authorization is not required for the following:

    (i) Any incidental addition, including redeposit, of dredged material associated with any activity that does not have or would not have the effect of destroying or degrading an area of waters of the U.S. as defined in paragraphs (4) and (5) of this definition; however, this exception does not apply to any person preparing to undertake mechanized landclearing, ditching, channelization and other excavation activity in a water of the United States, which would result in a redeposit of dredged material, unless the person demonstrates to the satisfaction of the Corps, or EPA as appropriate, prior to commencing the activity involving the discharge, that the activity would not have the effect of destroying or degrading any area of waters of the United States, as defined in paragraphs (4) and (5) of this definition. The person proposing to undertake mechanized landclearing, ditching, channelization or other excavation activity bears the burden of demonstrating that such activity would not destroy or degrade any area of waters of the United States.

    (ii) Incidental movement of dredged material occurring during normal dredging operations, defined as dredging for navigation in navigable waters of the United States, as that term is defined in 33 CFR part 329, with proper authorization from the Congress or the Corps pursuant

to 33 CFR part 322; however, this exception is not applicable to dredging activities in wetlands, as that term is defined at §232.2(r) of this chapter.

(iii) Certain discharges, such as those associated with normal farming, silviculture, and ranching activities, are not prohibited by or otherwise subject to regulation under Section 404. See 40 CFR 232.3 for discharges that do not require permits.

(4) For purposes of this section, an activity associated with a discharge of dredged material destroys an area of waters of the United States if it alters the area in such a way that it would no longer be a water of the United States.

Note: Unauthorized discharges into waters of the United States do not eliminate Clean Water Act jurisdiction, even where such unauthorized discharges have the effect of destroying waters of the United States.

(5) For purposes of this section, an activity associated with a discharge of dredged material degrades an area of waters of the United States if it has more than a de minimis (i.e., inconsequential) effect on the area by causing an identifiable individual or cumulative adverse effect on any aquatic function.

### *Discharge of fill material.*

(1) The term discharge of fill material means the addition of fill material into waters of the United States. The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses; causeways or road fills; dams and dikes; artificial islands; property protection and/or reclamation devices such as riprap, groins, seawalls, breakwaters, and revetments; beach nourishment; levees; fill for structures such as sewage treatment facilities, intake and outfall pipes associated with power plants and subaqueous utility lines; placement of fill material for construction or maintenance of any liner, berm, or other infrastructure associated with solid waste landfills; placement of overburden, slurry, or tailings or similar mining-related materials;" after the words "utility lines; and artificial reefs.

(2) In addition, placement of pilings in waters of the United States constitutes a discharge of fill material and requires a Section 404 permit when such placement has or would have the effect of a discharge of fill material. Examples of such activities that have the effect of a discharge of fill material include, but are not limited to, the following: Projects where the pilings are so closely spaced that sedimentation rates would be increased; projects in which the pilings themselves effectively would replace the bottom of a waterbody; projects involving the placement of pilings that would reduce the reach or impair the flow or circulation of waters of the United States; and projects involving the placement of pilings which would result in the adverse alteration or elimination of aquatic functions.

(i) Placement of pilings in waters of the United States that does not have or would not have the effect of a discharge of fill material shall not require a Section 404 permit. Placement of pilings for linear projects, such as bridges, elevated walkways, and powerline structures, generally does not have the effect of a discharge of fill material. Furthermore, placement of pilings in waters of the United States for piers, wharves, and an individual house on stilts generally does not have the effect of a discharge of fill material. All pilings, however, placed in the navigable

JA.1541

waters of the United States, as that term is defined in 33 CFR part 329, require authorization under section 10 of the Rivers and Harbors Act of 1899 (see 33 CFR part 322).

**40 CFR § 232.3 Activities not requiring permits.**

Except as specified in paragraphs (a) and (b) of this section, any discharge of dredged or fill material that may result from any of the activities described in paragraph (c) of this section is not prohibited by or otherwise subject to regulation under this part.

(a) If any discharge of dredged or fill material resulting from the activities listed in paragraph (c) of this section contains any toxic pollutant listed under section 307 of the Act, such discharge shall be subject to any applicable toxic effluent standard or prohibition and shall require a section 404 permit.

(b) Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraph (c) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced. Where the proposed discharge will result in significant discernable alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration.

> Note: For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to affect such conversion. A conversion of section 404 wetland to a non-wetland is a change in use of an area of waters of the U.S. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States.

(c) The following activities are exempt from section 404 permit requirements, except as specified in paragraphs (a) and (b) of this section:

(1)(i) Normal farming, silviculture and ranching activities such as plowing, seeding, cultivating, minor drainage, and harvesting for the production of food, fiber, and forest products, or upland soil and water conservation practices, as defined in paragraph (d) of this section.

(ii)(A) To fall under this exemption, the activities specified in paragraph (c)(1) of this section must be part of an established (*i.e.*, ongoing) farming, silviculture, or ranching operation, and must be in accordance with definitions in paragraph (d) of this section. Activities on areas lying fallow as part of a conventional rotational cycle are part of an established operation.

(B) Activities which bring an area into farming, silviculture or ranching use are not part of an established operation. An operation ceases to be established when the area in which it was conducted has been converted to another use or has lain idle so long that modifications to the hydrological regime are necessary to resume operation. If an activity takes place outside the waters of the United States, or if it does not involve a discharge, it does not need a section 404 permit whether or not it was part of an established farming, silviculture or ranching operation.

(2) Maintenance, including emergency reconstruction of recently damaged parts, of currently serviceable structures such as dikes, dams, levees, groins, riprap, breakwaters, causeways, bridge

abutments or approaches, and transportation structures. Maintenance does not include any modification that changes the character, scope, or size of the original fill design. Emergency reconstruction must occur within a reasonable period of time after damage occurs in order to qualify for this exemption.

(3) Construction or maintenance of farm or stock ponds or irrigation ditches or the maintenance (but not construction) of drainage ditches. Discharge associated with siphons, pumps, headgates, wingwalls, wiers, diversion structures, and such other facilities as are appurtenant and functionally related to irrigation ditches are included in this exemption.

(4) Construction of temporary sedimentation basins on a construction site which does not include placement of fill material into waters of the United States. The term "construction site" refers to any site involving the erection of buildings, roads, and other discrete structures and the installation of support facilities necessary for construction and utilization of such structures. The term also includes any other land areas which involve land-disturbing excavation activities, including quarrying or other mining activities, where an increase in the runoff of sediment is controlled through the use of temporary sedimentation basins.

(5) Any activity with respect to which a State has an approved program under section 208(b)(4) of the Act which meets the requirements of section 208(b)(4)(B) and (C).

(6) Construction or maintenance of farm roads, forest roads, or temporary roads for moving mining equipment, where such roads are constructed and maintained in accordance with best management practices (BMPs) to assure that flow and circulation patterns and chemical and biological characteristics of waters of the United States are not impaired, that the reach of the waters of the United States is not reduced, and that any adverse effect on the aquatic environment will be otherwise minimized. The BMPs which must be applied to satisfy this provision include the following baseline provisions:

(i) Permanent roads (for farming or forestry activities), temporary access roads (for mining, forestry, or farm purposes) and skid trails (for logging) in waters of the United States shall be held to the minimum feasible number, width, and total length consistent with the purpose of specific farming, silvicultural or mining operations, and local topographic and climatic conditions;

(ii) All roads, temporary or permanent, shall be located sufficiently far from streams or other water bodies (except for portions of such roads which must cross water bodies) to minimize discharges of dredged or fill material into waters of the United States;

(iii) The road fill shall be bridged, culverted, or otherwise designed to prevent the restriction of expected flood flows;

(iv) The fill shall be properly stabilized and maintained to prevent erosion during and following construction;

(v) Discharges of dredged or fill material into waters of the United States to construct a road fill shall be made in a manner that minimizes the encroachment of trucks, tractors, bulldozers, or other heavy equipment within the waters of the United States (including adjacent wetlands) that lie outside the lateral boundaries of the fill itself;

(vi) In designing, constructing, and maintaining roads, vegetative disturbance in the waters of the United States shall be kept to a minimum;

(vii) The design, construction and maintenance of the road crossing shall not disrupt the migration or other movement of those species of aquatic life inhabiting the water body;

(viii) Borrow material shall be taken from upland sources whenever feasible;

(ix) The discharge shall not take, or jeopardize the continued existence of, a threatened or endangered species as defined under the Endangered Species Act, or adversely modify or destroy the critical habitat of such species;

(x) Discharges into breeding and nesting areas for migratory waterfowl, spawning areas, and wetlands shall be avoided if practical alternatives exist;

(xi) The discharge shall not be located in the proximity of a public water supply intake;

(xii) The discharge shall not occur in areas of concentrated shellfish production;

(xiii) The discharge shall not occur in a component of the National Wild and Scenic Rivers System;

(xiv) The discharge of material shall consist of suitable material free from toxic pollutants in toxic amounts; and

(xv) All temporary fills shall be removed in their entirety and the area restored to its original elevation.

(d) For purpose of paragraph (c)(1) of this section, cultivating, harvesting, minor drainage, plowing, and seeding are defined as follows:

(1) Cultivating means physical methods of soil treatment employed within established farming, ranching and silviculture lands on farm, ranch, or forest crops to aid and improve their growth, quality, or yield.

(2) Harvesting means physical measures employed directly upon farm, forest, or ranch crops within established agricultural and silvicultural lands to bring about their removal from farm, forest, or ranch land, but does not include the construction of farm, forest, or ranch roads.

(3)(i) Minor drainage means:

(A) The discharge of dredged or fill material incidental to connecting upland drainage facilities to waters of the United States, adequate to effect the removal of excess soil moisture from upland croplands. Construction and maintenance of upland (dryland) facilities, such as ditching and tiling, incidental to the planting, cultivating, protecting, or harvesting of crops, involve no discharge of dredged or fill material into waters of the United States, and as such never require a section 404 permit;

(B) The discharge of dredged or fill material for the purpose of installing ditching or other water control facilities incidental to planting, cultivating, protecting, or harvesting of rice, cranberries or other wetland crop species, where these activities and the discharge occur in waters of the United States which are in established use for such agricultural and silvicultural wetland crop production;

(C) The discharge of dredged or fill material for the purpose of manipulating the water levels of, or regulating the flow or distribution of water within, existing impoundments which have been constructed in accordance with applicable requirements of the Act, and which are in established use for the production or rice, cranberries, or other wetland crop species.

Note: The provisions of paragraphs (d)(3)(i) (B) and (C) of this section apply to areas that are in established use exclusively for wetland crop production as well as areas in established use for conventional wetland/non-wetland crop rotation (e.g., the rotations of rice and soybeans) where such rotation results in the cyclical or intermittent temporary dewatering of such areas.

(D) The discharge of dredged or fill material incidental to the emergency removal of sandbars, gravel bars, or other similar blockages which are formed during flood flows or other events, where such blockages close or constrict previously existing drainageways and, if not promptly removed, would result in damage to or loss of existing crops or would impair or prevent the plowing, seeding, harvesting or cultivating of crops on land in established use for crop production. Such removal does not include enlarging or extending the dimensions of, or changing the bottom elevations of, the affected drainageway as it existed prior to the formation of the blockage. Removal must be accomplished within one year after such blockages are discovered in order to be eligible for exemption.

(ii) Minor drainage in waters of the United States is limited to drainage within areas that are part of an established farming or silviculture operation. It does not include drainage associated with the immediate or gradual conversion of a wetland to a non-wetland (e.g., wetland species to upland species not typically adequate to life in saturated soil conditions), or conversion from one wetland use to another (for example, silviculture to farming).

In addition, minor drainage does not include the construction of any canal, ditch, dike or other waterway or structure which drains or otherwise significantly modifies a stream, lake, swamp, bog or any other wetland or aquatic area constituting waters of the United States. Any discharge of dredged or fill material into the waters of the United States incidental to the construction of any such structure or waterway requires a permit.

(4) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, discing, harrowing, and similar physical means used on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops. Plowing does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dryland. For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing. Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing, as described above, will never involve a discharge of dredged or fill material.

(5) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

(e) Federal projects which qualify under the criteria contained in section 404(r) of the Act are exempt from section 404 permit requirements, but may be subject to other State or Federal requirements.



## APPENDIX C

### Guidance for Conducting an Alternatives Analysis

*(Based on guidance issued by the Corps of Engineers Jacksonville District –
"Information for Preparing an Alternatives Analysis Under Section 404", June 2014)*

As part of the individual permit application review process, proposed projects undergo an alternatives analysis using Rule 62-331.053, F.A.C., and this section. A permit cannot be issued if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, as long as the alternative does not have other significant adverse environmental consequences.

The level of detail in an alternatives analysis shall be commensurate with the scale of the adverse environmental effects of the project. Analysis of projects proposing greater adverse environmental effects shall be more detailed and explore a wider range of alternatives than projects proposing lesser effects.

Below are suggested steps to follow in providing the necessary information for the Agency to consider in the alternatives analysis:

Step 1: Define Purpose and Need

At the beginning of an alternatives analysis, the applicant shall clearly state the overall project purpose and need (examples are below). Significant thought shall be applied when developing the project purpose as it will drive much of the alternatives analysis. The overall project purpose must be specific enough to define a permit applicant's needs, but not so restrictive to preclude other alternatives. It shall also not be too wide-ranging without consideration for the applicant's real needs, as the geographic boundaries in the purpose define the scope of the analysis. For example:

1) *To develop a 225-lot single-family residential development at the southeast intersection of Interstate 10 and Toledo Blade Boulevard.*

   This example is too restrictive because there are no alternative sites to consider. It also unnecessarily details the exact number of lots, which can reduce the number of reasonable or practicable alternatives.

2) *To develop a residential development in Northwest Florida.*

   This example is too wide in scope if the applicant is actually focusing on a certain portion of a certain city or county to locate the project. This would also create an unmanageable number of alternatives.

3) *To develop a single-family residential subdivision near Interstate 10 in Crestview, Florida, to meet local demand for this type of housing.*

   This is an appropriate overall project purpose as it narrows the geographic scope to a reasonable and manageable size. It clearly defines what the project involves (single-family residences rather than "housing" that could also mean townhouses or apartments), the actual target market area (near Interstate 10 in Crestview), and the need for the project (local demand).

The applicant's proposed overall project purpose will be carefully considered, but if the Agency cannot concur with it as submitted, the Agency is required to modify it. Once the Agency has placed the project on public notice, the applicant must use the overall project purpose as stated in that public notice or the overall project purpose as provided back to the applicant if the Agency has modified their original project

State 404 Program Handbook                54                This Appendix is not
                                                                      incorporated by reference
                                                                      JA.1547

purpose. If the applicant has already performed an alternatives analysis using a project purpose the Agency cannot concur with, (e.g., it is too restrictive or too broad in geographic scope), the analysis may need to be revised to accurately include reasonable and practicable alternatives.

Additional information about the proposed overall project purpose shall also be provided, including details about the relevant market conditions and area, location, history, and other factors that influence or constrain the intended nature, size, level of quality, price class, or other characteristics of the project. Information that further describes why particular geographic boundaries were chosen also will assist the Agency in its review.

Step 2: Identify Alternatives

The applicant must list and briefly describe alternatives that could meet the overall project purpose. This list, at a minimum, must include the following information:

1)  The applicant's preferred alternative (the project proposed in the permit application)

2)  Alternatives that would involve no dredging or filling in state-assumed waters. This "No-Action" alternative comprises one or more alternatives that would not involve a dredging or filling in state-assumed waters, which could involve reconfiguring the project to avoid all state-assumed waters on the site, siting the project entirely in uplands offsite, or no-action, i.e. not implementing the project. Although the "No-Action" alternative might not seem reasonable initially, it must always be included in the analysis. The no-action alternative can serve several purposes. First, it may be a reasonable alternative, especially for situations where the impacts are great, and the need is relatively minor. Second, it can serve as a benchmark, enabling decision makers to compare the magnitude of the environmental effects of the action alternatives.

3)  Alternative offsite locations, including those that might involve less adverse impact to state-assumed waters.

4)  Onsite alternatives that would involve less adverse impact to state-assumed waters. These include modifications to the alignments, site layouts, or design options in the physical layout and operation of the project to reduce the amount of impacts to state-assumed waters.

5)  Alternatives that would involve greater adverse impact to state-assumed waters but avoid or minimize other significant adverse environmental consequences including offsite and onsite options (Alternatives that meet these criteria are uncommon).

Alternatives that are clearly unreasonable shall be identified and eliminated (not evaluated further). For example, alternative sites that are far too small to accommodate the project or that lie outside the geographic boundaries identified in the overall project purpose can be eliminated. This step of the analysis is not intended to rule out alternatives that are "unreasonable" according to the applicant, but those that would be considered "unreasonable" to an objective third-party. The Agency will verify that the criteria used for screening alternatives are objective and not so restrictive that they eliminate actual reasonable alternatives. The applicant must list the alternatives that were initially considered then eliminated from further study because the applicant feels they failed to pass this first round of screening. The Agency will review this list and determine if elimination of these alternatives is appropriate.

The maximum number of reasonable alternatives to study further will vary and depends on the nature and scope of the proposed project; however, there typically should be multiple alternatives to consider. The number of alternatives listed should be greater for projects involving greater impacts. This is the

State 404 Program Handbook                    55              This Appendix is not
                                                                incorporated by reference
                                                                            JA.1548

preliminary list of reasonable alternatives; alternatives that are not practicable will be eliminated from further consideration in the later stages of the analysis.

In many instances, there will be alternatives determined to be both unreasonable and impracticable, as these terms can be nearly synonymous when used in these analyses. Regardless of whether the applicant identifies an alternative as unreasonable or as impracticable, it is imperative the applicant describe, in the context of the overall project purpose and need for the project, why each non-selected alternative should be eliminated from further analysis. The Agency must be able to independently review and verify this information and each step in the applicant's alternative analysis.


Step 3: Describe and Analyze Alternatives for Practicability

This step also addresses onsite and offsite alternatives and determines which are practicable and which are not. Practicable is defined here as meaning the alternative is available, is able to achieve the overall project purpose, and is feasible considering cost, existing technology, and/or logistics in light of the overall project purpose.

Alternatives shall be clearly listed and numbered for ease of reference and comparison. *At a minimum,* the following information for each alternative site examined shall be provided:

1) *General site information:*

   a) specific parcel information including, but not limited to; parcel ID numbers, aerial photos, location maps, FLUCCS codes and GPS coordinates;

   b) presence, quantity and quality of state-assumed waters;

   c) County/City zoning designation;

   d) the presence of any federally-listed threatened or endangered species or their critical habitat, and/or the presence of any historical properties or resources; and,

   e) site infrastructure (Will the site require new access roads/infrastructure? What are the potential impacts associated with these improvements?).

2) *The practicability of each alternative:*

   a) Practicability: alternatives that are practicable are those that are available and capable of being done by the applicant after considering the following (in light of the project purpose):

      i) Cost (For example, the costs associated with various infrastructure components such as roadways or utilities, including upgrades to existing infrastructure components or the need to establish new infrastructure components, may affect the viability of a particular alternative. A location far from all existing infrastructure (roads, water, sewer, and/or electricity) might not be practicable considering the costs associated with upgrading/establishing the infrastructure necessary to use that site. However, just because one alternative costs more than another, this does not mean that the more expensive alternative is entirely impracticable. Cost is analyzed in the context of the overall cost of the project and whether it is unreasonably expensive or exorbitant. In addition, cost is an objective, industry-neutral inquiry that does not consider an individual applicant's financial standing. The data used for any cost or financial feasibility analysis must be current with respect to the time of the alternatives analysis.);

State 404 Program Handbook                    56                    This Appendix is not
                                                                                incorporated by reference
                                                                                JA.1549

ii)  Existing Technology (The alternatives examined shall consider the limitations of existing technology yet incorporate the most efficient/least-impacting construction methods currently available. For example, alternatives to mining limestone or other minerals may not be practicable considering a lack of technology to allow replacement of that mineral resource in the mass-production of concrete; however, engineered retaining walls can be incorporated into an alternative that substantially minimizes wetland impacts by eliminating fill slopes.); and,

iii)  Logistics (The alternatives examined may incorporate an examination of various logistics associated with the project, i.e., placement of facilities within a required distance, utilization of existing storage or staging areas, and/or safety concerns. Examples of alternatives that may not be practicable considering logistics are a land-locked parcel that cannot be accessed by public roads or a site that is too small to meet the overall project purpose).

b)  Availability: If it is otherwise a practicable alternative, an area not presently owned by the applicant that could reasonably be obtained, utilized, expanded, or managed in order to fulfill the overall purpose of the proposed activity can still be considered a practicable alternative. In other words, if an applicant does not own an alternative parcel, that does not rule that parcel out as a practicable alternative. The applicant shall consider and anticipate alternatives available during the timeframe that the Agency conducts its alternatives analysis. An evaluation of availability for purchase and projected cost of such a purchase may be incorporated into this discussion.

c)  Other information: any other information that conveys the practicability of the alternatives reviewed in consideration of the overall project purpose shall be included.

An alternatives comparison matrix (see example below) is an effective way to present and compare the main parameters that were considered during the evaluation.

To allow for an objective evaluation, the comparison of the plan(s) for the proposed and alternative sites shall be framed for "yes" or "no" answers. A narrative shall accompany the matrix defining the practicability factors chosen and further explaining any "no" answers with objective and verifiable data. Practicability of the "no-action" alternative also must be addressed in this narrative and, if applicable, also included in the matrix. The information shall explain the consequences on the applicant and the public if the project is not implemented. Any remaining alternatives that are found to be practicable will move on to the next and final step.

If an alternative can be easily documented to be a more environmentally damaging alternative and this can be clearly described within the narrative and matrix, then this step and the following step can be combined. This will save the applicant time and expense; however, it is only appropriate for alternatives where this distinction is clear.

State 404 Program Handbook                    57                 This Appendix is not
incorporated by reference
JA.1550

Example Alternative Comparison Matrix for Practicability

| Category | Practicability Factor | Alternative 1 Applicant's Preferred Alternative | Alternative 2 | Alternative 3 | Alternative 4 | Alternative 5 |
|---|---|---|---|---|---|---|
| **Availability - Zoning** | Existing Zoning Appropriate or Potential for Zoning Change? | YES Zoned for this project type | YES Zoned for this project type | YES Zoned for this project type | YES Zoned for agriculture but County has expressed support for the project | YES Zoned for this project type |
| **Availability - Acquisition** | Available for Acquisition? | YES Applicant owns the parcel | YES | YES | YES | YES |
| **Cost – Acquisition** | Reasonable Acquisition Costs? | YES Applicant owns the parcel | YES | YES | YES | NO Seller will only sell all 350 acres without subdividing |
| **Cost – Historic or Cultural Resource Mitigation** | Costs feasible for mitigating impacts to historic and cultural resources found onsite? | YES No historic or cultural resources found onsite | YES No historic or cultural resources found onsite | YES No historic or cultural resources found onsite | NO If impacts to historic resources allowed, costs to mitigate those impacts will increase project costs from $xxxx to $xxxx | YES No historical or cultural resources found onsite |
| **Cost – Other** | Other Costs Feasible? | YES | YES Additional costs for extensive retaining walls | YES | NO Costs to connect to utilities will increase project costs from $xxxx to $xxxx | NO Extensive use of retaining walls and construction of two bridges increase project costs from $xxxx to $xxxx |
| **Existing Technology** | Topography and other Site Conditions Feasible for Construction of Project? | YES | YES With extensive use of engineered retaining walls and drainage systems | YES | YES | YES With extensive use of retaining walls and bridges over Clear Creek |
| **Logistics – Parcel Size** | Sufficient Parcel Size? | YES 40 acres | YES 48 acres | NO 21 acres | NO 17 acres | YES 350 acres |
| **Logistics – Utilities** | Availability of Utilities? | YES | YES | YES | NO 6 miles to existing water, sewer, and power | YES |
| **Logistics – Access** | Availability for Access? | YES County right-of-way on east property boundary | YES County right-of-way to northwest property corner | NO Landlocked by private parcels and request for an easement was denied | NO Landlocked by private parcels and request for an easement was denied | YES County right-of-way to west side of property |

Step 4: Identify the Least Environmentally Damaging Practicable Alternative

1) The Least Environmentally Damaging Practicable Alternative (LEDPA) must be selected. Therefore, using the same numbering system from the step above, identify the environmental impacts for each remaining practicable alternate site. For each remaining site:

   a) describe the impacts (beneficial or adverse) to the aquatic ecosystem associated with each of the remaining alternatives

   b) describe the overall (beneficial or adverse) environmental impacts associated with each of the remaining alternatives

   c) be specific and quantitative in the identification of impacts (Rather than "Alternative A would result in a large impact to low quality wetlands and ditches that are sparsely vegetated and impact some wildlife." use "Alternative A would result in filling over 2.1 acres of fire-suppressed wet pine flatwoods wetland and 1.2 acres of wet ditches that contain scattered emergent wetland vegetation. Using the Uniform Mitigation Assessment Method, the function and value of the flatwoods wetland and ditch system have been calculated at 0.6 and 0.2, respectively. Work affecting 0.7-acre of potential flatwoods salamander habitat would also result from siting the project at this location."

2) If multiple practicable alternatives remain, and/or many environmental/relevant factors are involved, another matrix that contains only environmental/relevant parameters (e.g., wetland functional units, listed species, high value upland habitat, historic properties) can be used to assist in illustrating the proposed LEDPA. Emphasis shall be placed on impacts to the aquatic environment through functional unit loss of wetlands or other state-assumed waters that would be affected or eliminated by each alternative. An example matrix is below.

**Example Environmental Factor Matrix**

| Environmental Factors | Alternative 1 Applicant's Preferred Alternative | Alternative 2 |
|---|---|---|
| Wetland Impacts (Acres) | 2.0 | 6.0 |
| Loss in Wetland Function (UMAM Functional Units) | 1.4 | 3.9 |
| Impacts to Federally Listed Threatened or Endangered Species | No | No |
| LEDPA | Yes | No |

3) Conclude the alternatives analysis with a description of the alternative proposed to be the LEDPA, reiterating the rationale for this determination. Additionally, the rationale shall include statements clearly demonstrating how the following presumptions have been rebutted:

   a) If a project does not need to be in a specific aquatic site, such as a wetland, to meets its basic purpose (i.e., the project is not "water-dependent"), it is presumed that alternatives that do not affect special aquatic sites are available.

State 404 Program Handbook                    59                    This Appendix is not
incorporated by reference
JA.1552

b) If a project involves dredging or filling in a special aquatic site, a practicable alternative located in uplands is presumed to have less adverse impact on the aquatic ecosystem.

This Appendix is not
incorporated by reference

## APPENDIX D

### 307(a)(1) List of Toxic Pollutants (Codified in 40 CFR § 401.15)

**§ 401.15 Toxic pollutants.** The following comprise the list of toxic pollutants designated pursuant to section 307(a)(1) of the Act:

1. Acenaphthene
2. Acrolein
3. Acrylonitrile
4. Aldrin/dieldrin [1] ([1] effluent standard promulgated (40 CFR Part 129).)
5. Antimony and compounds [2] ([2] the term compounds shall include organic and inorganic compounds.)
6. Arsenic and compounds
7. Asbestos
8. Benzene
9. Benzidine
10. Beryllium and compounds
11. Cadmium and compounds
12. Carbon tetrachloride
13. Chlordane (technical mixture and metabolites)
14. Chlorinated benzenes (other than di-chlorobenzenes)
15. Chlorinated ethanes (including 1,2-di-chloroethane, 1,1,1-trichloroethane, and hexachloroethane)
16. Chloroalkyl ethers (chloroethyl and mixed ethers)
17. Chlorinated naphthalene
18. Chlorinated phenols (other than those listed elsewhere; includes trichlorophenols and chlorinated cresols)
19. Chloroform
20. 2-chlorophenol
21. Chromium and compounds
22. Copper and compounds
23. Cyanides
24. Ddt and metabolites [1]
25. Dichlorobenzenes (1,2-, 1,3-, and 1,4-di-chlorobenzenes)
26. Dichlorobenzidine
27. Dichloroethylenes (1,1-, and 1,2-dichloroethylene)
28. 2,4-dichlorophenol
29. Dichloropropane and dichloropropene
30. 2,4-dimethylphenol
31. Dinitrotoluene
32. Diphenylhydrazine
33. Endosulfan and metabolites
34. Endrin and metabolites [1]
35. Ethylbenzene
36. Fluoranthene
37. Haloethers (other than those listed elsewhere; includes chlorophenylphenyl ethers, bromophenylphenyl ether, bis(dichloroisopropyl) ether, bis-(chloroethoxy) methane and polychlorinated diphenyl ethers)
38. Halomethanes (other than those listed elsewhere; includes methylene chloride, methylchloride, methylbromide, bromoform, dichlorobromomethane
39. Heptachlor and metabolites
40. Hexachlorobutadiene
41. Hexachlorocyclohexane
42. Hexachlorocyclopentadiene
43. Isophorone

44. Lead and compounds
45. Mercury and compounds
46. Naphthalene
47. Nickel and compounds
48. Nitrobenzene
49. Nitrophenols (including 2,4-dinitrophenol, dinitrocresol)
50. Nitrosamines
51. Pentachlorophenol
52. Phenol
53. Phthalate esters
54. Polychlorinated biphenyls (pcbs) [1]
55. Polynuclear aromatic hydrocarbons (including benzanthracenes, benzopyrenes, benzofluoranthene, chrysenes, dibenz-anthracenes, and indenopyrenes)
56. Selenium and compounds
57. Silver and compounds
58. 2,3,7,8-tetrachlorodibenzo-p-dioxin (tcdd)
59. Tetrachloroethylene
60. Thallium and compounds
61. Toluene
62. Toxaphene [1]
63. Trichloroethylene
64. Vinyl chloride
65. Zinc and compounds

JA.1555

## MEMORANDUM OF UNDERSTANDING
## BETWEEN THE
## FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION,
## THE UNITED STATES FISH AND WILDLIFE SERVICE AND
## THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
## AUGUST 5, 2020

This Memorandum of Understanding ("Understanding", or "MOU") is entered into by and between the Florida Fish and Wildlife Conservation Commission ("FWC"), the United States Fish and Wildlife Service ("USFWS"), and the Florida Department of Environmental Protection ("FDEP"), to formally memorialize existing coordination and collaborative efforts and to establish future processes and procedures that will ensure that the State of Florida's assumption of the CWA 404 program, as well as other permitting programs executed under FDEP's authority, will 1) fulfill state rule requirements regarding fish and wildlife under Part IV of Chapter 373 Florida Statutes (F.S.), including Chapters 62-330, F.A.C., and 62-331, F.A.C., 2) be compliant with the State of Florida requirements under Article IV, Section 9 of the Florida Constitution, Chapter 253, F.S., Chapter 379, F.S., and Rules Relating to Threatened and Endangered Species under Chapter 68A-27, F.A.C., and 3) comply with the Endangered Species Act (ESA; 16 U.S.C. § 1531 et seq) and the Marine Mammal Protection Act (MMPA; 16 U.S.C. § 1361 et seq.).

I.   PURPOSE

The purpose of this MOU between the FWC, the USFWS, and FDEP is to formalize the existing coordination between these agencies and establish additional coordination processes to ensure the conservation of Florida's federally and State-listed wildlife and their habitats. This MOU is to ensure that FDEP's permitting and lease programs under Part IV of Chapter 373, F.S., and Chapter 253, F.S., are consistent with all applicable requirements of the ESA, the MMPA, 16 U.S.C. § 1531-43, and are in keeping with the State of Florida requirements under Article IV, Section 9 of the Florida Constitution, Chapter 379, F.S., and Chapter 68A-27, F.A.C..

This MOU is focused on FDEP's implementation of the State of Florida's permitting programs under Part IV of Chapter 373, F.S. These programs include the Environmental Resource Permitting program (ERP Program), 62-330, F.A.C., and the anticipated State 404 Permitting Program (State 404 Program), 62-331, F.A.C., contingent upon the Environmental Protection Agency (EPA) approval of Florida's request for State assumption of Section 404 of the Clean Water Act (CWA) under 40 C.F.R. Part 233.

These permitting programs authorize FDEP to regulate proposed activities in surface waters and wetlands.  Alteration of wetlands and other surface waters may have a detrimental impact on the environment. Wetlands produce the basic food material used by many fish and other aquatic life and some also serve as nursery grounds for fish and rookery areas for birds. Many wildlife species, some of which are threatened or endangered, depend on wetlands to complete all or part of their life cycle. Dredging and filling can degrade water quality during and after construction and can impact aquatic invertebrates, fish, and wildlife in that area. It has been estimated that as much as 80 percent of our recreationally and commercially important fish species are dependent

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*     *Page 1*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1556

upon wetlands for at least some portion of their life cycle.

The purpose of this MOU is to:

- Improve the existing framework and develop new processes as needed for meeting responsibilities under the ERP Program, State 404 Program, Chapter 68A-27, F.A.C., Florida's Constitution, MMPA, and the ESA.
- Create a State and Federal Endangered and Threatened Species Technical Team to better assist FDEP's district, regional, and field offices to conserve and protect Florida's aquatic and terrestrial species and their habitats, natural resources and ecosystems through the State permitting processes.
- Develop a coordination process for the State 404 Program that will maximize efficiencies and consistency in order to successfully balance the permitting workload, while minimizing administrative processing for all involved parties. See Attachment 1 for a species coordination process flowchart.
- Develop a coordination plan that will include guidance on how to elevate any conflicts or disagreements between agencies.
- Ensure consistent internal coordination processes between regional offices of the USFWS, FWC, and FDEP Districts.
- Ensure the state permitting processes implemented by FDEP meet the requirements of the rules and statutes governing protection of state imperiled species.

A.  Authorities

1.  Environmental Resource Permitting

The State of Florida's ERP Program regulates activities involving the alteration of surface flows, including new activities in uplands that generate stormwater runoff, as well as dredging and filling in wetlands and other surface waters. Dredging and filling in the surface waters of Florida has been regulated since the early 1970s. Established under Chapter 403, F.S., the "dredge and fill permit" program protected surface waters from degradation caused by the loss of wetlands, and from pollution caused by construction activities.  This program was phased out in 1995, and replaced by the new environmental resource permit program under Part IV of Chapter 373, F.S. The ERP program provides a mechanism for protection for all fish and wildlife and their habitats, particularly federally and State-listed wildlife and plant species, and can provide protection measures in perpetuity.

The FWC is Florida's state wildlife agency established in the State Constitution to exercise the regulatory and executive powers of the state with respect to wild animal life and fresh water aquatic life.  The FWC has permitting authority over species identified in Chapter 68A-27, F.A.C., which include the species identified within FDEP's ERP program.  Permits issued by FDEP cannot authorize impacts, specifically take, of species identified in Chapter 68A-27, F.A.C. As such, the FDEP has historically coordinated protection and conservation of aquatic and terrestrial fish and wildlife species with the FWC.  FWC's permit commenting authority was codified upon the agency's creation in Section 20.331(10), F.S. The FWC provides a list of

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*                    *Page 2*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1557

potentially affected federally and State-listed species to FDEP during ERP application review. It also evaluates potential impacts to State-listed fish and wildlife for ERP Program project applications that are expected to affect species and habitat, and provides recommendations for permit conditions to the FDEP.

    2.   State Lands

The state of Florida acquired title to sovereignty submerged lands on March 3, 1845, by virtue of statehood. Sovereignty submerged lands include all submerged lands, title to which is held by the Board of Trustees (Governor and Cabinet) of the Internal Improvement Trust Fund. FDEP is Florida's lead agency for environmental management and stewardship, serving as staff to the Board of Trustees. As such, the FDEP's role includes acquiring lands for protection, and providing oversight for the management of activities on more than 12 million acres of public lands including lakes, rivers and islands. These public lands include sovereignty submerged lands, which include, but are not limited to, tidal lands, islands, sandbars, shallow banks, lands waterward of the ordinary or mean high water line, and those beneath navigable fresh water or beneath tidally influenced waters. These publicly owned lands are managed under Chapter 253, F.S., and the rules promulgated thereunder, to provide for areas of natural resource-based recreation, to ensure the survival of plant and animal species, and the conservation of finite and renewable natural resources. Section 18-21.004(2)(i), F.A.C. states: "Activities on sovereignty lands shall be designed to minimize or eliminate adverse impacts on fish and wildlife habitat, and other natural or cultural resources. Special attention and consideration shall be given to endangered and threatened species habitat.

    3.   Section 404 of the Clean Water Act

The United States Army Corps of Engineers (USACE) currently regulates proposed activities through a federal permit review process, administering Section 404 of the CWA. The USACE permitting program regulates the discharge of dredged or fill material into waters of the United States, including wetlands. Activities in waters of the United States regulated under this program include fill for development, water resource projects (such as dams and levees), infrastructure development (such as highways and airports), and mining projects. Section 404 requires a permit before dredged or fill material may be discharged into waters of the United States, unless the activity is exempt from Section 404 regulation (e.g., certain farming and forestry activities). An individual permit is required for potentially significant impacts. Individual permit applications under USACE review are evaluated for public interest, as well as the environmental criteria set forth in the CWA Section 404(b)(1).

The USACE consults with the USFWS, the federal agency charged with wildlife protection, to ensure protection of federally listed fish, wildlife and plant species. The USFWS evaluates impacts on federally listed fish, wildlife, and plant species for all federal projects and federally permitted projects expected to affect species and their critical habitat, including projects subject to the requirements of Section 404.

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*     *Page 3*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1558

The State of Florida, through FDEP, is requesting assumption of this permitting authority.  If approved, this program will be referred to as the State 404 Program.

    4.   Section 6 of the Endangered Species Act

Section 6(a) of the ESA directs the USFWS to "cooperate to the maximum extent practicable with the States" to further the conservation of federally threatened and endangered species. The purpose, processes, and procedures described in this MOU are consistent with this mandate. This MOU does not conflict with or limit the longstanding section 6(c) cooperative agreement between the USFWS and FWC, which has been annually renewed since its establishment in 1976.

    B.   Background

In 2020, FDEP will be submitting its application to the EPA seeking to assume authority to administer Section 404 of the CWA for certain waters of the United States (assumption). If approved, the State 404 Program will be a separate permitting program from the ERP Program, with separate authorizations. Assumption of the permitting program is limited to "state-assumed" waters, which is not defined in the CWA but is described as all waters of the United States that are not under the jurisdiction remaining with the USACE (retained waters, such as those waters subject to section 10 of the Rivers and Harbors Act). Retained waters are defined in the State 404 Program Applicant's Handbook, as:

> "Retained Waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only."

Based on a comparison of the last five years of USACE and FDEP reviewed applications, it is anticipated that the majority of future projects will require both a State 404 and an ERP authorization. It is the intent of FDEP to establish a State 404 Program coordination process for protection of federally listed species and designated critical habitat that is similar, and as protective as, the ESA's Section 7 interagency consultation process that currently exists between the USACE and the USFWS for federal Section 404 permits.  As part of the State of Florida's assumption of Section 404, FDEP will continue to utilize FWC's biologists and species

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*     *Page 4*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1559

specialists that are already involved in the review of both 404 applications and ERP applications. Currently, FWC already provides a list of federally and State-listed species to FDEP and the USACE as part of their review. FWC also provides comments and recommendations on State-listed species, provides technical assistance on federally listed species, and currently provides comments and recommendations on aquatic species such as manatees and sea turtles under the Florida Manatee Sanctuary Act and Florida's Marine Turtle Protection Act. FWC also regulates intentional and incidental take of State-listed species under Chapter 68A-27, F.A.C. exclusive of the ERP Program and the State 404 Program. Nothing in this MOU, the ERP Program, nor the State 404 Program supersede nor otherwise affect FWC's permitting programs or authorities. For State 404 Program application reviews, FWC proposes to provide preliminary effect assessments for federally listed species and their critical habitat, as well as provide preliminary impact avoidance and minimization measures that will become permit conditions during the FDEP review of project applications. These project-specific preliminary lists of affected federally listed species, assessment determinations, and proposed impact avoidance and minimization measures may be coordinated with the USFWS during technical assistance review and/or as part of the Public Notice process for concurrence. This will be in addition to FWC's role in reviewing the ERP Program applications for state listed species impacts, which will remain unchanged. The benefits of this MOU, and FWC's involvement with Part IV of Chapter 373, F.S. concern the authorizations as outlined in Section V of this MOU.

## II.  COORDINATION FRAMEWORK

### A.  The Permit Application Review Process Framework

The current ERP species coordination process includes FWC's involvement upon initial receipt of the application, allowing FWC's review to begin early in the process and proceed during the ERP Request for Additional Information and Completeness phases. State 404 permit applications are proposed to be processed in a similar manner, where FWC and USFWS will receive applications from FDEP as soon as possible after receipt. Upon assumption of the Section 404 Program, coordination between the USFWS and FDEP related to the proposed action's effects on species will occur through the technical assistance process, which is anticipated to be outlined in the USFWS's biological opinion based on information included in the biological assessment submitted by EPA. FWC and FDEP will jointly decide which agency will be the species coordination lead to coordinate the federally listed species review with the USFWS for each application. The State species coordination lead is responsible for making a preliminary determination for affected federally listed species, affected action area and critical habitats, and assessing whether, and what type of, adverse impacts to federally endangered or threatened species and their critical habitats is expected. The FDEP and FWC reviewers will work as a team. This coordination between reviewers will ensure that the preliminary information and impact/effect determinations for federally listed species that is to be sent to the USFWS represents all needed aspects of the State review. The designated State species lead will always include the other State agency's reviewer on all correspondence with the USFWS. Disagreements between agencies will be handled in accordance with Section IV of this MOU. Upon receipt of a permit application, the State species lead will coordinate with the USFWS and provide to DEP the preliminary assessment and additional information request within 20 days, so that FDEP may comply with its requirement to submit its request for additional information

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*        *Page 5*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1560

within 30 days of receipt of a permit application (Rule 62-331.052, F.A.C.)

After FDEP/FWC has all the necessary information needed in order to review the permit application, the State species lead for that project can provide preliminary effect determinations and protective measures to USFWS for review and comment.  Comments from the USFWS will be incorporated into FDEP's review of the permit application, including the effects discussion and incorporation of draft permit conditions. Or, in the case where no species will be affected, this information will be officially documented, and the species coordination review will be considered completed. This technical assistance with the USFWS will be accomplished prior to the Public Notice, when possible. The Public Notice will include the types of anticipated impacts to endangered and threatened species as well as their critical habitat, and the proposed protection measures to offset those impacts. After the Public Notice, the State species lead will review any additional information and public concerns that were received and coordinate with the USFWS to address them as appropriate. If there are no additional concerns or modifications that would affect the species review, the conclusions and permit conditions by USFWS will be drafted as final correspondence for the file and recommended conditions incorporated into the permit.

During EPA's review of Florida's application for assumption, FDEP's Submerged Lands and Environmental Resources Coordination Program (SLERC) staff, with assistance from FWC and USFWS, if possible, will provide training to FDEP permit review staff on the species coordination process and performing assessments of effects that different types of projects pose to federally listed species. This will include the use of information and approaches found in section 7 consultation keys, Standard Local Operating Procedures for Endangered Species (SLOPES) and other species effects evaluation tools. These tools will be provided to FWC and FDEP in advance of these trainings and any discrepancies in the species information or use of these tools will be resolved. In addition, information and approaches for how to analyze species-specific data and assess potential effects to species that do not have such tools would be discussed. Additional tools will be adopted as they are developed by the USFWS.

The parties anticipate that FWC's species expertise and current engagement in the ERP review will create efficiencies during the transition from a Federal 404 program to the State 404 permit program, while also providing continuous protection to Florida's fish, wildlife, and plant species and their habitats. The FWC and USFWS staff will be providing expertise to FDEP staff regarding species issues, and the species coordination process will be a joint effort for each application.  Over time, FDEP, FWC, and USFWS will become more proficient and knowledgeable about effects determinations for federally listed species during the State 404 Program permitting process.

> B.  Agency Roles and Responsibilities

This MOU anticipates the following roles and responsibilities for each agency. However, after 404 assumption, a technical team (described in Section III below) should convene and formalize the details of coordination.

FWC
• Attend Technical Team meetings.

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*   *Page 6*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1561

• Participate in training efforts with FDEP and USFWS.
• Provide oversight during the permitting review process, when needed.
• Provide a list of potentially affected species and habitat during the review of permit applications, preliminary determinations of the project's potential effect on federally and State-listed species and habitat (particularly critical habitat) and provide preliminary recommendations for impact avoidance and minimization measures.
• Determine if the project meets any specified criteria identified in any pre-existing biological opinions, USFWS-approved species effect determination keys, or USFWS-issued incidental take permits for federally and State-listed species.
• In coordination with USFWS, develop appropriate, site specific habitat conservation or species conservation measures to be incorporated as permit conditions. When appropriate, the USFWS-approved species lists, and recommended impact avoidance and minimization measures may be finalized by FWC as official correspondence to FDEP.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews. This will provide support for the review of wildlife and habitat impacts when needed.
• Take the lead in resolution of issues regarding State-listed species, including State-listed species that are also designated federally as "at-risk", "candidate" or "proposed" species, as appropriate.
• Work directly with the applicant to resolve issues regarding permitting for take of State-listed species in accordance with FWC's Rules Relating to Threatened and Endangered Species.

USFWS
• Attend Technical Team meetings, when appropriate.
• Participate in training efforts with FDEP and FWC.
• Provide technical assistance during the permitting review process, where there may be effects to federally listed species, proposed species, petitioned species, or candidate species.
• Coordinate compliance with FWC to meet ESA requirements for relevant federally threatened and endangered ("T/E") species.
• Provide section 7 consultation keys, Standard Local Operating Procedures for Endangered Species (SLOPES) and other species effects evaluation tools used to evaluate effect determinations
• Provide technical assistance regarding effects on federally threatened or endangered species and measures to avoid or minimize adverse effects.
• In coordination with FWC, develop appropriate, site-specific habitat conservation or species management opportunities.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews upon request as related to ESA-listed species, proposed species, petitioned species, or candidate species. This will provide support for the review of wildlife and habitat impacts when needed.
• Take the lead in resolution of issues related to federally listed species.
• Incidental take for federally listed species will be handled in accordance with the Biological Assessment and Biological Opinion developed for this assumption.

FDEP

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*   *Page 7*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1562

• Attend Technical Team meetings when appropriate.
• Participate in training efforts with FWC and USFWS.
• Provide oversight during the permitting review process, when needed.
• Provide State 404 Program and ERP program related permit applications as soon as possible for review upon submittal.
• Provide any additional information that may assist in the review, including activity-specific information to FWC and USFWS. Incorporate any additional information requested by FWC and USFWS into the FDEP requests for additional information or completeness requests to the applicant.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews. This provides support for the review of species and habitat impacts when needed.
• Provide notification to FWC regarding timelines for the submittal of FWC questions and comments during the review of submitted applications.  When FWC is actively reviewing a permit, FDEP will not issu the permit without resolution of FWC's review.

## III. ENDANGERED AND THREATENED SPECIES TECHNICAL TEAM

This MOU's framework, processes, and procedures may be reviewed periodically after initiating an Endangered and Threatened Species Technical Team (Technical Team) comprised of FWC, USFWS and FDEP agency staff members. This Technical Team will meet to review the effectiveness of the coordination processes, procedures, training resources, and other areas related to State of Florida permitting under Part IV of Chapter 373 F.S. to ensure compliance with the ESA and State of Florida Rules Relating to Threatened and Endangered Species. Team members would include staff from FWC's Office of Conservation Planning Services (CPS), USFWS's Florida's Ecological Services Office, and FDEP's SLERC. FDEP SLERC's office will take the lead in setting up Technical Team meetings and training meetings. The Technical Team will also act as technical support to FDEP District offices during the permitting process should any issues arise regarding state or federally listed species or habitat conservation measures. Frequent and informal contact between agencies is encouraged regarding the general process, project-specific issues, or emerging issues.

### A.  Guidance/Training

FDEP, FWC and USFWS will hold cross-training sessions, and joint training sessions with district, regional and field staff of all agencies to facilitate mutual understanding and implementation of the MOU. Initially, the goal is completion of basic training to all relevant permit review personnel prior to the approval of assumption, with additional training resources and sessions to continue periodically as needed. The agencies may issue guidance individually or jointly to assist in carrying out this MOU.

### B.  Oversight Review

The Technical Team provides oversight and coordination for all aspects of this MOU. Its functions include, but are not limited to:

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*    *Page 8*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1563

(1) Developing, maintaining, and updating training guidance;
(2) Addressing issues about process implementation to ensure compliance with ESA;
(3) Identifying and addressing workload issues;
(4) Incorporating/identifying improvements and revisions into the process;
(5) Convening interagency scientific/technical reviews, as appropriate;
(6) Reviewing and evaluating, at least on an annual basis, the MOU and its
    implementation;
(7) Facilitating reaching consensus on particular issues at any level upon requests by
    personnel at that level.

## IV. INTERAGENCY ELEVATION PROCESS

FDEP, FWC and USFWS intend to work cooperatively to achieve their mutually shared objectives of protecting the quality of waters of the United States and the species that depend on those waters. Collaboration among Technical Team members, agency district, regional, and field staff when resolving any potential conflicts or disagreements should be performed through a structured, time-sensitive process at the lowest possible level. During the review of State 404 permit applications and these elevation procedures, the following regulations will be followed: 40 CFR § 233.20; 40 CFR § 233.50; the 404(b)(1) Guidelines in 40 CFR § 230; 40 CFR § 230.10(b)(3) and 40 CFR § 230.30(c). The agencies will follow the procedures below to elevate any conflict or disagreement.

Any contentious issues, disagreements or conflicts between agencies, or between agencies and applicants, will be discussed with an attempt to resolve them at the lowest levels within the agencies without elevation (reviewers and their supervisors). If issues cannot be resolved at this level, reviewers and their supervisors will reach out to the Technical Team for assistance (Level 1). If there is no consensus resolution at that level, or if it is deemed prudent, the issues will be elevated to Level 2, which would include the USFWS State Supervisor, FDEP State 404 program Supervisor, FWC Conservation Planning Services Director, and EPA Florida State 404 program Supervisor). While anticipated to be very rare, issues can be elevated to Level 3 if needed, which would include the USFWS Regional Director, Atlanta; EPA Regional Administrator, Atlanta; FWC Executive Director and FDEP Secretary. The supervisory level staff may differ for each agency and may differ depending upon the issue in dispute or conflict that needs resolution. All agencies will be included in resolution discussions, even if the issue only involves two of the three partner agencies.

While decisions by all levels, including decisions to elevate, will be made by consensus to the greatest extent practicable, any one agency can initiate the elevation process or elevate to the next supervisor level. Agencies will jointly prepare a summary document that will contain a statement of facts and succinctly state each agency's position and recommendations for resolution. This summary document will be developed and shared when elevated to Level 2 or Level 3.  If needed, the summary documents may be updated when elevated to Level 3. The overall goal is to jointly develop implementable actions to avoid and/or minimize adverse impacts to listed species to ensure the impacts of any given project are not likely to result in take, or likely to jeopardize the continued existence of any species or adversely modify its critical habitat. With regard to conclusions about the potential effects of a project on ESA-listed species

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*                     *Page 9*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1564

or the effectiveness of proposed protection measures, the final USFWS position is determinative. With regard to conclusions about the potential effects of a project on State listed species or the effectiveness of proposed protection measures, the final FWC position is determinative.

Elevation should be initiated so that all applicable deadlines will be met, considering subsequent levels of review. If FDEP is aware of a dispute, they will resolve the dispute prior to taking final action. This is to ensure consistency with applicable legal deadlines, and to allow the issue to be resolved through the elevation process When determined to be appropriate (e.g., where the results of the elevation would provide useful guidance to agency staff or transparency to the public), the decision on the elevation should be memorialized in writing, placed in the application's official file, and circulated among Agency staff to serve as guidance for future decisions.

## V.  BENEFITS OF THIS MEMORANDUM OF UNDERSTANDING

While there is statutory permit commenting authority for FWC in the ERP Program, no specific, written coordination procedures or agreements have been initiated between FWC and FDEP for the ERP Program. This MOU will improve communication and provide a mechanism to improve ERP processes, resolve emerging issues, and likely increase efficiency and consistency in the ERP Program review for endangered and threatened species.

Once assumed, the implementation of the State 404 Program will result in FWC reviewing potentially affected federally and State-listed species concurrently.  Since similar guilds of species have similar habitat needs or life-history traits, FWC's preliminary determinations of a project's potential adverse effects to species will be more holistic and more efficient than the current process. There are some limited jurisdictional overlap between FWC and USFWS with some species, such as species that are State-listed and federally designated as "at risk", "candidate", and "proposed".  This MOU provides a mechanism for FWC and USFWS to more closely coordinate the review of potential adverse impacts to these types of species during State permit review.  In addition, on rare occasions there can be conflicting conservation needs of species located within the same action area of a project.  This MOU provides a mechanism for FDEP, FWC and USFWS to better resolve such issues.

This MOU formally memorializes partnerships that are mutually beneficial to all parties:

- Benefit to FDEP: The FWC and USFWS partnerships and involvement in both permitting processes ensures fulfillment of the ERP Program, State 404 Program, Chapter 253 F.S. and all other laws requiring protection of federally and State-listed species and their habitats. The FDEP/FWC partnership will ease the transition of the State 404 Program, providing faster and more accurate project reviews and effect determinations as compared to FDEP staff alone.

- Benefit to FWC: The FDEP partnership provides a mechanism for fulfillment of the requirements of Article IV, Section 9 of the Florida Constitution, and FWC's Chapter

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*   *Page 10*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1565

68A-27 of the Florida Administrative Code (F.A.C.).

- <u>Benefit to USFWS:</u> The FWC and FDEP partnerships increase collaboration on development projects that previously may have been reviewed and permitted separately but will now be reviewed by one permitting agency (FDEP) and one wildlife agency (FWC).  FDEP and FWC may assist USFWS during the technical assistance process by providing preliminary reviews when possible, in order to ensure the fulfillment of ESA requirements.

## VI. OBLIGATION OF FUNDS, COMMITMENT OF RESOURCES

Nothing in this MOU shall be construed as obligating any of the parties to the expenditure of funds in excess of appropriations already authorized by law, or otherwise commit any of the agencies to actions for which it lacks authority. It is understood that the level of resources to be expended under this MOU will be consistent with the level of resources available to the agencies to support such efforts.

## VII.  NATURE OF THE MEMORANDUM OF UNDERSTANDING

This Memorandum is intended only to improve the interagency coordination between FWC, USFWS and FDEP. It is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the State of Florida or the United States, its agencies or instrumentalities, its officers or employees, or any other person. FWC, USFWS, and the FDEP may jointly revise this document. No party to this MOU waives any administrative claims, positions, or interpretations it may have with respect to the applicability or the enforceability of the ESA or the CWA.

(1)  Nothing in this MOU shall be construed to restrict in any way EPA's authority to fulfill its oversight and enforcement responsibilities under the CWA, nor shall it restrict the enforcement responsibilities of FDEP and FWC under Florida law or USFWS under Federal law.

(2)  This MOU, and procedures established in conformance with it, shall be reviewed periodically by FDEP, FWC, and USFWS. Any party may request in writing an amendment or modification to the MOU.

(3)  This MOU, and any amendments and modifications, shall remain in effect until the State 404 Program authorization is modified in a manner that would affect this MOU.

## VIII. EFFECTIVE DATE; TERMINATION

This Memorandum will become effective upon signature by each of the parties.  If the State 404 Program is not yet approved, this Memorandum will only become effective for the ERP program and requirements under Chapter 253, F.S.. Once the application for assumption is approved by EPA, this Memorandum will become effective for both the ERP program and the State 404 Program. Any of the parties may withdraw from this MOU upon 60 days written notice to the other parties, provided that any coordination covered by the terms of this MOU that are pending

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*      *Page 11*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1566

at the time notice of withdrawal is identified by the parties, and those activities covered by this MOU that begin the process prior to and within the 60-day notice period, will continue to be covered by the terms of this MOU.

## IX.  SIGNATURES

**Florida Department of Environmental Protection**

Date: _____          By: _____

Noah Valenstein, Secretary

**Florida Fish and Wildlife Conservation Commission**

Date: _____          By: _____

Eric Sutton, Executive Director

**United States Fish and Wildlife Service**

Date: _____          By: _____

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*          *Page 12*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1567

Attachment 1: Species Coordination Process Flowchart



*Memorandum of Understanding Between the Florida Department of Environmental Protection,*     *Page 13*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.1568

**MEMORANDUM OF AGREEMENT BETWEEN
THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
AND THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**

I.  GENERAL

A.  Purpose

This Memorandum of Agreement (MOA or Agreement) is entered into by and between the Florida Department of Environmental Protection (FDEP) and Region IV of the United States Environmental Protection Agency (EPA) for the purpose of defining the federal and state roles in carrying out the policies, regulations, and procedures necessary to administer the State of Florida permit program established pursuant to Section 404 of the Clean Water Act (CWA), Title 33 of the United States Code (U.S.C.), § 1251 *et seq.* (hereinafter "State 404 Permit Program"), and to facilitate program coordination between FDEP and EPA. FDEP does not exercise jurisdiction over Indian country, as that term is defined in 18 U.S.C. § 1151 and does not seek such authority through this Agreement. This Agreement does not create any substantive standards relating to any aspect of the 404 Permit Program or impose any legal obligations on the public.

B.  Authorities

(1) The legal basis for the State's assumption of the 404 program is provided by Section 404(g)(1) of the CWA. The regulations implementing Section 404(g)(1) and assumption of the 404 program under the CWA are found at 40 C.F.R. Parts 230, 231, 232 and 233.

(2) FDEP shall administer and enforce the State 404 Permit Program in accordance with those state laws and administrative rules that are components of the federally authorized State 404 Permit Program in the State of Florida (40 C.F.R. § 233.72), and in accordance with Section 404 State Program Regulations (40 C.F.R. Part 233), the CWA, Section 404(b)(1) Guidelines (40 C.F.R. Part 230, Section 404(b)(1) Guidelines for Specifications of Disposal Sites for Dredged or Fill Material) (hereinafter "404(b)(1) Guidelines"), and provisions contained in this Agreement and the Memorandum of Agreement between FDEP and the United States Army Corps of Engineers (Corps). The State 404 Permit Program will operate in accordance with any applicable biological opinion issued in accordance with the Endangered Species Act of 1973 (ESA). FDEP will not administer or enforce authority over Indian country, as that term is defined in 18 U.S.C. § 1151. In the event a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA. Such information shall be considered by EPA in exercising its CWA authority

*Memorandum of Agreement Between the Florida Department of Environmental Protection*      *Page 1*
*and the United States Environmental Protection Agency*

JA.1569

to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit.[1]

C.   Effective Date and Revisions

(1) This Agreement shall be executed by FDEP and EPA and shall take effect at the time of EPA approval of the State 404 Permit Program, which shall be the effective date published in the Federal Register.

(2) FDEP and EPA agree to maintain a high level of cooperation and coordination and to work in partnership to assure successful and effective administration of the State 404 Permit Program.

(3) Nothing in this Agreement shall be construed to restrict in any way EPA's authority to fulfill its oversight and enforcement responsibilities under the CWA, nor shall it restrict FDEP's enforcement responsibilities under Florida law.

(4) This Agreement, and procedures established in conformance with it, shall be reviewed periodically by FDEP and EPA. Either party may request in writing an amendment or modification to the Agreement. Amendments and modifications to this Agreement shall be in writing and shall be effective upon completion of the process outlined in 40 C.F.R. § 233.16 and upon signature of both parties. If the State 404 Permit Program authorization is amended or modified in a manner that would affect this Agreement, this Agreement shall be amended or modified as appropriate.

(5) This Agreement shall remain in effect until it is amended, modified, or replaced; EPA withdraws authorization pursuant to 40 C.F.R. § 233.53(b); or FDEP voluntarily transfers the program to the Corps according to the criteria and procedures established in 40 C.F.R. § 233.53(a).

D.   Confidentiality

(1) All of the information EPA transfers to FDEP will be provided subject to the procedures and limitations of 40 C.F.R. § 233.3 and Florida will handle this information pursuant to applicable Florida law.

(2) Any information obtained or used in the administration of the State 404 Permit Program shall be available to EPA and EPA will manage this information in accordance with any

---

[1] Title 18 U.S.C. § 1151 defines "Indian country" as: (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same. Under this definition, Indian reservations include lands held in trust by the United States for an Indian tribe even if such lands have not been formally designated as an Indian reservation.

*Memorandum of Agreement Between the Florida Department of Environmental Protection and the United States Environmental Protection Agency*      *Page 2*

JA.1570

rights and privileges under applicable laws and regulations. If information has been submitted to FDEP under a claim of confidentiality, FDEP must inform EPA of such a claim. All information submitted by FDEP subject to a claim of confidentiality shall be treated in accordance with the procedures of 40 C.F.R. Part 2, 40 C.F.R. § 233.3(c), and applicable law.

E.   Computing Time Periods

In computing any period of time prescribed by this Agreement, the day on which the designated period of time begins shall not be included. Saturdays, Sundays, and state and federal holidays shall be included. When a stated time expires on a Saturday, Sunday, or legal holiday, the stated time period shall be extended to include the next business day.

F.   Florida DEP Agreement with Corps

(1) Prior to the assumption of the 404 Permit Program by FDEP, the Jacksonville District of the Corps administered the 404 Permit Program in Florida. The District Engineer of the Jacksonville District has been delegated the authority to enter into a Memorandum of Agreement which will identify procedures to facilitate the transfer of the 404 Permit Program to FDEP as laid out in the regulations at 40 C.F.R. Part 233 and pursuant to CWA requirements.

(2) FDEP's Memorandum of Agreement with the Corps stipulates permit processing responsibilities for activities which involve non-assumable waters, as well as transfer of permitting authority from the Corps to FDEP. The Memorandum of Agreement identifies the state waters to be regulated, coordination procedures, general permit procedures, transfer of records, protection of navigation or anchorage, permitting for Corps water resource projects, mitigation and instrument approval, and permitting for emergency work. The legal effect of the Memorandum of Agreement between FDEP and the Corps is conditioned upon approval of the State 404 Permit Program.

G.   Florida Memorandum of Understanding with the United States Fish and Wildlife Service and the Florida Fish and Wildlife Conservation Commission (FWC)

(1) In the event that a programmatic biological opinion and incidental take statement are issued by the USFWS, and that biological opinion's conclusion or reasonable and prudent alternatives or measures relies on the establishment of a technical assistance process with FDEP, FDEP will engage in a technical assistance process with the USFWS for State 404 Permits. The roles and responsibilities of each agency in the technical assistance process will be established in the Memorandum of Understanding between FDEP, FWC, and the USFWS.

(2) Given the existing relationship between FDEP and FWC regarding the protection of fish and wildlife resources for the FDEP Environmental Resource Permitting Program, and the existing relationship between FWC and the USFWS established in the ESA Section 6 Coordination Agreement, the FWC may engage with the USFWS on behalf of FDEP for the species coordination reviews in the State 404 Permit Program. The roles and responsibility for

*Memorandum of Agreement Between the Florida Department of Environmental Protection and the United States Environmental Protection Agency*                    *Page 3*

JA.1571

each agency will be established in the Memorandum of Understanding between FDEP, FWC, and the USFWS.

H.    Operating Agreement with the Florida Division of Historical Resources – State Historic Preservation Officer (SHPO)

The Operating Agreement between FDEP and SHPO sets forth a consultation process, called the "historic properties review," for assessing the potential effects a State 404 Program permit application may have on historic properties and for avoiding, minimizing, or mitigating any adverse effects on historic properties. The historic properties review includes consultation with tribes, local governments, applicants and the public and is designed to complement established procedures for permit processing and public notice under the State 404 Program.

I.    Florida Memorandum of Understanding with Other Agencies

FDEP may enter into agreements with other agencies. To the extent any of these agreements, understandings, or parts of these agreements or understandings conflict with the requirements of the CWA, implementing regulations, or other assumption related statutes or implementing regulations, the agreement or that part of the agreement will not become part of the assumed program. Any revisions to the State 404 Permit Program must comply with the procedures established in 40 C.F.R. § 233.16.

II.  PERMIT APPLICATION REVIEW AND PERMIT ISSUANCE

A.  Lead Agency Responsibility for State 404 Permit Program

(1) FDEP will be the lead agency in Florida for administering the State 404 Permit Program in State-assumed waters, as defined in section 373.4146(1), F.S. FDEP shall administer the State 404 Permit Program as approved by EPA using this Agreement, applicable state and federal laws, and any separate working agreements entered into by FDEP and included as part of the EPA approved state program. EPA shall review the State 404 Permit Program established by FDEP in order to ensure consistency with the program reporting requirements of 40 C.F.R. § 233.52. FDEP shall also allow EPA to routinely review State records, reports, and files relevant to the administration and enforcement of the approved program consistent with 40 C.F.R. § 233.13(b). This does not preclude EPA from initiating independent or parallel enforcement actions in accordance with Sections 309 and 404(n) of the CWA.

(2) FDEP is responsible for making final permit decisions pursuant to Rule 62-331, F.A.C., including final determinations of compliance with FDEP State 404 permit regulations and protective measures recommended by the USFWS during project technical assistance. FDEP acts as the project manager for the evaluation of all permit applications and is responsible for requesting and evaluating information concerning all permit applications. FDEP will obtain and utilize this information in a manner that moves the regulatory process towards a final permit decision as rapidly as practicable. FDEP will not evaluate applications as a project opponent or advocate – but

*Memorandum of Agreement Between the Florida Department of Environmental Protection*                    *Page 4*
*and the United States Environmental Protection Agency*

JA.1572

instead will maintain an objective evaluation, fully considering all relevant factors. FDEP will fully consider and address EPA's views, permit conditions, and objections when determining whether to issue the permit, to issue the permit with conditions and/or mitigation, or to deny the permit. Pursuant to its authority under Section 404(b)(1) of the CWA, EPA may provide comments identifying its views regarding compliance with the Section 404(b)(1) Guidelines and as authorized under Section 404(c) of the CWA. The comments will be submitted within the time frames established in this agreement and applicable statutes and regulations.

(3) FDEP may delegate the State 404 Permit Program to other State governmental regulatory agencies in Florida but will maintain oversight and will retain the ability to revise or rescind permits issued by the delegated entities. If FDEP proposes to delegate all or part of the State 404 Permit Program, such delegation is not effective until the EPA Regional Administrator approves the delegation pursuant to 40 C.F.R. § 233.16.

B. Waiver of EPA Review

(1) Pursuant to Section 404(k) of the CWA and 40 C.F.R. § 233.51, EPA waives the requirements of Section 404(j) and the regulations adopted thereunder regarding federal review of FDEP permit applications for all but the following categories of permits:

a.   Draft general permits;

b.   Discharges with reasonable potential for affecting endangered or threatened species as determined by USFWS;[2]

c.   Discharges with reasonable potential for adverse impacts on waters of another state or tribe;

d.   Discharges known or suspected to contain toxic pollutants in toxic amounts (Section 101(a)(3) of the CWA) or hazardous substances in reportable quantities (Section 311 of the CWA);

e.   Discharges located in proximity of a public water supply intake;

f.   Discharges within critical areas established under state or federal law, including but not limited to national and state parks; fish and wildlife sanctuaries or refuges; national and historical monuments; wilderness areas and preserves; sites identified or proposed under the National Historic Preservation Act; and components of the National Wild and Scenic Rivers System;

---

[2] For the purposes of the State 404 Program, a project has a reasonable potential for affecting endangered or threatened species (40 C.F.R. § 233.51(b)(2)) if it has been determined during the technical assistance process described in the anticipated biological opinion and MOU referenced in Section I.G, above, that the project may affect federally listed species or their critical habitat.

---

*Memorandum of Agreement Between the Florida Department of Environmental Protection*                    *Page 5*
*and the United States Environmental Protection Agency*

g.   Discharges impacting compensatory mitigation sites, including mitigation banks, in lieu fee program sites, and permittee responsible mitigation sites; and

h.   Discharges impacting sites that are owned or managed by federal entities, and activities by an applicant that is a federal entity.

(2) EPA may terminate waiver of the review of categories of permit applications outlined in this Agreement pursuant to 40 C.F.R. § 233.51(a).

(3) FDEP shall supply the EPA Regional Administrator with copies of public notices for permit applications for which permit review has been waived whenever requested by EPA, pursuant to 40 C.F.R. § 233.50(a)(1).

(4) FDEP or the applicant may request EPA review of specific projects that would otherwise not require EPA oversight.

(5) When FDEP receives a new permit application for continued work on a long term project for which a permit with a long term planning document attached for reference had been previously issued, pursuant to subsection 62-331.051(2), F.A.C., or receives an application for a permit to complete a project that a permittee is unable to complete within the original duration of the permit, pursuant to subsection 62-331.051(3), F.A.C., FDEP will identify fundamentally new factual information included in the new permit application that was not in the prior permit application. In such instances, EPA intends to focus its review on matters related to such new factual information.

C.   Coordination with Other States and Tribes

(1) Whenever FDEP receives an application for a permit that has a reasonable potential to impact the waters of the states of Alabama or Georgia, or waters within "Indian country," as that term is defined at 18 U.S.C. § 1151, FDEP shall transmit a copy of the public notice to the potentially impacted state or federally recognized tribe (per the list published annually by the Secretary of the Interior pursuant to Section 104 of the Federally Recognized Indian Tribe List Act of 1994 (Pub. L. No. 103-454, 108 Stat. 4791, 4792)) and to EPA. EPA and FDEP shall work together to identify regulatory contacts in these other states and tribes.

a.   FDEP shall provide the potentially impacted state or tribe the opportunity to submit written comments within the public comment period and suggest permit conditions regarding the potential impact of the proposed project. In addition to the comment period, tribes may, to the extent desired, engage with FDEP during its initial review of an application, as set forth in the FDEP/SHPO Operating Agreement described in Section I.H above.

b.   FDEP shall consider the comments and concerns of the potentially impacted state or tribe when making a decision on the application and shall provide a copy of the final permit decision to a state or tribe that provides comments. If FDEP does not accept these

*Memorandum of Agreement Between the Florida Department of Environmental Protection
and the United States Environmental Protection Agency*                    *Page 6*

JA.1574

recommendations, FDEP shall provide written notification to the affected state or tribe and the EPA Regional Administrator prior to permit issuance of FDEP's decision not to accept the recommendations together with supporting rationale. The EPA Regional Administrator shall then have the time provided for in 40 C.F.R. § 233.50(d) to comment upon, object to, or make recommendations with respect to a permit application.

c.   Pursuant to 40 C.F.R. § 233.50, EPA may object to the issuance of a State 404 permit by FDEP if it finds that the proposed project would fail to comply with the 404(b)(1) Guidelines due to the impact on waters of another state or waters within "Indian country," as that term is defined at 18 U.S.C. § 1151. In this instance, FDEP shall proceed as specified in Section 404(j) of the CWA and Section D of this Agreement.

(2) Both EPA and FDEP agree that this Agreement does not determine what constitutes "Indian country" as that term is defined in 18 U.S.C. § 1151.

D.   Permit Processing and Federal Comment

(1) Federal oversight of State permits shall proceed in accordance with the requirements of Section 404(j) of the CWA and 40 C.F.R. Part 233, Subpart F. The subsequent paragraphs in this section highlight certain aspects of that oversight process for the sake of clarity for the agencies and members of the public, but do not override or replace the comprehensive applicable statutory and regulatory requirements.

(2) FDEP shall promptly submit public notices, via weblink, providing EPA access to complete permit applications in the categories identified in Section II.B.(1) of this Agreement for review and coordination in accordance with Section 404(j) of the CWA and 40 C.F.R. Part 233, Subpart F.

(3) In addition to the information required by 40 C.F.R. § 233.32(d), the public notice shall include: (1) a determination of the effect the proposed activity will have on listed species and/or their critical habitat and proposed protection measures resulting from the species coordination process; and (2) a determination of the effect the proposed activity will have on historic properties and any recommendations to avoid, minimize, or mitigate adverse effects on historic properties resulting from the historic properties review process.

(4) Material submitted to EPA, which may be forwarded by electronic means, shall include:

a.   A copy of the public notice for any complete permit application received by FDEP, except those for which permit review has been waived under this Agreement. Any supplemental or additional materials submitted to FDEP, including but not limited to information on project alternatives, environmental assessment, or mitigation plans, shall also be forwarded promptly to EPA. Whenever requested by EPA, FDEP shall supply copies of public notices for

*Memorandum of Agreement Between the Florida Department of Environmental Protection and the United States Environmental Protection Agency*          *Page 7*

JA.1575

permit applications, or supplemental materials, even for projects for which permit review has been waived.

b.   A copy of each draft general permit whenever FDEP intends to issue a general permit that affects State-assumed waters, including minor project categories defined under State law.

c.   For permit applications that are subject to federal review, and for draft general permits, notification of when FDEP takes a significant action pursuant to 40 C.F.R. § 233.50(a)(3).

d.   A copy of every permit issued and a copy of any denial of a permit.

e.   A copy of FDEP's response to comments or recommendations made by another state or tribe if FDEP does not accept such recommendations.

(5)   EPA shall, within 30 calendar days from the date of receipt of a permit application or draft general permit from FDEP, notify FDEP if EPA intends to review the permit application or draft general permit. EPA reserves the right to object within 90 days based upon information received during the public comment period. If FDEP has been so notified, the permit shall not be issued until after the receipt of such comments or 90 days of the Regional Administrator's receipt of the public notice, draft general permit or FDEP's response (40 C.F.R. § 233.31(a)), whichever comes first. The Regional Administrator may notify FDEP within 30 days of receipt that there is no comment but that EPA reserves the right to object within 90 days of receipt, based on any new information identified by the public during the comment period or at a hearing. 40 C.F.R. § 233.50(d).

(6)   EPA shall provide a copy of each public notice, each draft general permit, and other information needed for review of the application to the Corps, USFWS, and National Marine Fisheries Service (NMFS) within 10 days of receipt, pursuant to 40 C.F.R. § 233.50(b). The final decision to comment, object, or make recommendations with respect to permit conditions shall be made by EPA. EPA shall submit a written statement of its comments, objections or recommendations to FDEP in accordance with the requirements of, and in the timeframes specified in, Section 404(j) of the CWA and 40 C.F.R. § 233.50. EPA will endeavor to provide comments, objections, or recommendations within the timeframe specified in Florida law, to the extent that the timeframe does not conflict with federal law. FDEP shall notify EPA of FDEP's decision deadlines for each application or draft general permit.

(7)   FDEP shall respond to any such comments or objections received from EPA in the manner specified in Section 404(j) of the CWA and 40 C.F.R. Part 233. FDEP shall provide a copy of a draft permit that satisfies the EPA Regional Administrator's objection or requirement for a permit condition, or FDEP shall provide its intent to deny the permit application to EPA as provided by Section 404(j) of the CWA and 40 C.F.R. Part 233.

---

*Memorandum of Agreement Between the Florida Department of Environmental Protection*     *Page 8*
*and the United States Environmental Protection Agency*

JA.1576

(8)  FDEP also administers a State Environmental Resource Permit (ERP) program, which is a separate permitting program from the State 404 Program and may cover similar or the same projects as those permitted under the State 404 Program. If FDEP does not resolve an objection or requirement for a Section 404 permit condition for which there is a State ERP Permit, the State ERP permit does not provide authorization under Section 404 of the CWA, and the applicant shall be notified of this fact in writing.

(9)  FDEP shall contact EPA, the Corps, USFWS, and NMFS to solicit comments pertaining to issuance of an emergency permit as soon as possible after the emergency permit is requested, but no later than the day of issuance of the emergency permit. FDEP shall send a copy of the written emergency permit to the EPA.

(10)  FDEP may administratively continue expiring Corps-issued or State-issued permits until the effective date of a new permit, if any, consistent with 40 C.F.R. § 233.38, or a decision is made not to issue a new permit.

E.  Coordination of Mitigation Banking

FDEP and EPA agree that mitigation banking projects shall be subject to review according to procedures established in 40 C.F.R. Part 230, Subpart J. Mitigation banking instruments and in-lieu fee program instruments shall be processed by the Corps in accordance with 40 C.F.R. Part 230, Subpart J. FDEP may co-chair any applicable interagency coordination effort and EPA may participate at its discretion.

III. COMPLIANCE MONITORING AND ENFORCEMENT

A.  EPA will continue to directly implement its authority for the 404 Permit Program in "Indian country," as that term is defined at 18 U.S.C. § 1151, including conducting necessary compliance monitoring and enforcement actions for activities and sites located on Indian country.

B.  EPA will retain responsibility for any pending enforcement actions undertaken by EPA prior to the date of EPA's approval of the State 404 Permit Program. FDEP shall have primary responsibility for compliance monitoring and enforcement of the State 404 Permit Program. FDEP will take timely and appropriate enforcement action against persons in violation of permit conditions of permits issued pursuant to the State 404 Permit Program and against persons conducting unauthorized discharges of dredged or fill material into waters of the United States over which FDEP has assumed jurisdiction under the State 404 Permit Program.

C.  FDEP shall notify EPA of the status of compliance and enforcement actions through submission of an annual report described in Section IV.B. of this Agreement.

D.  EPA may request the opportunity to review any compliance and enforcement record. FDEP shall provide to EPA a copy of the file when requested. Claims of confidentiality for such information shall be governed by 40 C.F.R. § 233.3.

*Memorandum of Agreement Between the Florida Department of Environmental Protection and the United States Environmental Protection Agency*                    *Page 9*

JA.1577

E.   FDEP shall coordinate with EPA when a violation is identified that is within the permit and discharge categories in Section II.B.(1) of this Agreement. FDEP shall provide a summary of the unauthorized activity and inform EPA of the status of the file as enforcement actions are taken, including any decision to accept an after-the-fact permit application. In the event that an after-the-fact permit application is accepted, FDEP shall follow the permit review procedures set forth in this Agreement, the CWA and its implementing regulations.

F.   FDEP may refer information regarding possible or alleged violations to EPA and may request that EPA consider initiating a parallel or independent enforcement action. Such circumstances include, but are not limited to:

(1) Violations that have or have a reasonable potential to have direct impacts on waters of a tribe or another state;

(2) Major or repeat offenses; and

(3) Violations that have, or will potentially have, major adverse resource impacts or impacts on special federal resources, such as federally listed threatened or endangered species.

G.   EPA may initiate independent or parallel enforcement actions in accordance with Sections 309 and 404(n) of the CWA.

H.   If FDEP proposes to resolve a compliance or enforcement issue through a consent agreement (administrative or judicial), and where the impact of the violation is such that federal review would not be waived as described in Section II.B.(1) of this Agreement, FDEP shall provide EPA 30 days to review and comment on the draft consent agreement prior to signature. If EPA objects to a provision of the draft consent agreement, the executed consent agreement implementing that provision shall not constitute authorization under Section 404 of the CWA. FDEP shall provide a copy of the executed consent agreement and any after-the-fact State 404 permits to EPA.

I.   FDEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2).

J.   Prior to proceeding with federal enforcement action against a possible or alleged State 404 Permit Program permit violator or unauthorized discharge, and for purposes of providing notice only, EPA shall inform FDEP (specifically to the Secretary of FDEP or his/her designee) that federal enforcement action is to be initiated. It is expected that preliminary staff discussions will take place between EPA and FDEP representatives before initiation of federal enforcement actions.

K.   When a violation is identified that may affect the waters of tribes and/or other states, FDEP shall provide a summary of the violation and inform the tribes and/or other states of the

*Memorandum of Agreement Between the Florida Department of Environmental Protection and the United States Environmental Protection Agency*                                                                     *Page 10*

JA.1578

status of the file as enforcement actions are taken, including any decision to accept an after-the-fact permit application.

IV. PROGRAM MAINTENANCE

    A.  Program Review and Oversight

    EPA may conduct periodic evaluations of the State 404 Permit Program in accordance with Section 404(i) of the CWA.

    B.  Reporting

    (4) FDEP shall submit to EPA, and make available for public inspection, an annual report evaluating Florida's administration of the State 404 Permit Program, providing a summary of any significant changes in program operations or procedures and identifying problems encountered in administration of its program and recommendations for resolving those problems. The report shall include the elements required by 40 C.F.R. § 233.52(b).

    (5) Within 60 days of receipt of the draft annual report, EPA will complete review of the report and transmit comments, questions, or requests for additional evaluation and/or information to FDEP.

    (6) Within 30 days of receipt of EPA's comments, FDEP will finalize the annual report, incorporating and/or responding to EPA's comments and will transmit the final report to EPA. EPA will publish notice of availability of the final annual report upon acceptance.

    (7) The period for the annual report shall be the State fiscal year ending June 30th, and the report shall be submitted to EPA by September 30th of each year.

    C.  State 404 Permit Program Modifications

    (1) FDEP shall promptly notify EPA of any proposed or actual change to FDEP's statutory or regulatory authority or any other modifications which are significant to administration of the State 404 Permit Program, including, but not limited to:

    a.  An action by the State Legislature to strike down or limit State authorities, or that contemplates cessation of the administration of the Section 404 Permit Program by the State of Florida.

    b.  An action by a State court striking down or limiting State authorities.

    c.  Revision of the State's legal authorities needed to maintain consistency with changes to applicable federal regulations.

    d.  Proposed transfer of the program in whole or in part to another State agency.

*Memorandum of Agreement Between the Florida Department of Environmental Protection and the United States Environmental Protection Agency*    *Page 11*

JA.1579

(2) In response to notification of a change in the State 404 Permit Program in accordance with paragraph (1), EPA shall inform FDEP in writing of any specific concerns regarding State authority and shall provide the State an opportunity to make any necessary program revisions in accordance with 40 C.F.R. § 233.16(d).

a.   If the proposed revisions are not substantial, notice of approval may be given by letter to the Governor or designee, per 40 C.F.R. § 233.16(d)(2).

b.   If EPA determines that the proposed revisions are substantial, EPA shall publish notice of the proposed revisions, provide opportunity for a public hearing, consult with the Corps, USFWS, and NMFS, and review the proposed modification in accordance with 40 C.F.R. § 233.16(d)(3). Such changes shall not be effective until review and approval by EPA and publication of notice in the Federal Register.

(3) Whenever EPA has reason to believe that circumstances have changed with respect to the State 404 Permit Program, EPA may request, and FDEP shall provide, a supplemental Attorney General's statement, program description, or other documents or information necessary to evaluate the State 404 Permit Program's compliance with the requirements of the CWA and regulations at 40 C.F.R. Part 233.

(4) If FDEP determines that it will no longer administer the State 404 Permit Program, FDEP shall provide notice to EPA and the Corps not less than 180 days prior to cessation of program operation, and shall arrange for transfer of all program materials to the Corps.

(5) Pursuant to 40 C.F.R. § 233.16(b), FDEP shall revise the State 404 Permit Program as necessary because of a modification to 40 C.F.R. Part 233 or any other applicable Federal statute or regulation. The program shall be revised within one year of the date of promulgation of such regulation, except if the State must amend or enact a statute in order to make the required revision, the revision shall take place within two years.

(6) Any program modifications that necessitate modifications to this Agreement shall not be effective until the modified agreement is signed by FDEP and EPA, and EPA gives notice of approval of program modifications.

V.  GENERAL PROVISIONS

A.     The Parties are entering into this Agreement based solely on the representations and warranties herein and not based on any promises, representations, and/or warranties not found herein.

B.     This MOA does not create any right or benefit, substantive or procedural, enforceable by law or equity, by any persons, their officers or employees, or any other person. This MOA does not apply to any person outside of FDEP and EPA.

*Memorandum of Agreement Between the Florida Department of Environmental Protection*     *Page 12*
*and the United States Environmental Protection Agency*

JA.1580

C.     The signatory agencies do not waive any administrative claims, positions, or interpretations they may have with respect to the applicability or enforceability of the CWA, the ESA, the NHPA, Florida laws, or implementing regulations.

D.     Nothing in this MOA shall be interpreted as obligating the signatory agencies for the expenditure of funds in excess of appropriations authorized by law, or otherwise commit the signatory agencies to actions for which they lack statutory authority.

E.     The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

F.     If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction, such provision shall be deemed to be severed and deleted, and neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions.

*Memorandum of Agreement Between the Florida Department of Environmental Protection*                    *Page 13*
*and the United States Environmental Protection Agency*

JA.1581

## VI.    SIGNATURES

**Florida Department of Environmental Protection**

7/31/2020

Noah Valenstein                    (Date)
Secretary

**United States Environmental Protection Agency Region IV**

7/31/2020

Mary S. Walker                    (Date)
Regional Administrator

*Memorandum of Agreement Between the Florida Department of Environmental Protection*
*and the United States Environmental Protection Agency*                    *Page 14*

JA.1582

**MEMORANDUM OF AGREEMENT BETWEEN
THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
AND THE DEPARTMENT OF THE ARMY**

I.    GENERAL

    A.    Purpose and Authority

        (1)    Section 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to regulate the discharge of dredged or fill material into waters of the United States. The U.S. Army Corps of Engineers, Jacksonville District (Corps), currently administers the Section 404 program in the State of Florida.

        (2)    Section 404(g) of the CWA, 33 U.S.C. § 1344(g), authorizes a state, with approval from the United States Environmental Protection Agency (EPA), to administer its own permit program for the discharge of dredged or fill material into certain waters of the United States (State 404 Program) in lieu of the permitting program implemented by the Corps. The EPA has promulgated regulations at 40 C.F.R. Part 233 outlining, among other things, its requirements for approving a state program.

        (3)    The State of Florida (State) is submitting its program to regulate the discharge of dredged or fill material in compliance with the above-cited authorities. This Memorandum of Agreement (Agreement) between the State and the Corps fulfills the requirements of 40 C.F.R. § 233.14.

        (4)    The Florida Department of Environmental Protection (DEP), pursuant to Part IV of Chapter 373, Florida Statutes, is authorized to issue permits for regulated activities conducted in State regulated waters, including the discharge of dredged and fill material. The Secretary of DEP is given the authority to issue permits pursuant to Part IV of Chapter 373, Florida Statutes, and is the State official charged with administering the State 404 Program when the program is approved in accordance with 40 C.F.R. Part 233.

    B.    Effective Date and Revisions

        (1)    This Agreement shall be executed by DEP and the Corps and shall take effect at the time of EPA approval of the State 404 Program, which shall be the effective date published in the Federal Register.

        (2)    DEP and the Corps agree to maintain a high level of cooperation and coordination and to work in partnership to assure successful and effective implementation of the programs regulating the discharge of dredged or fill material into waters of the United States.

        (3)    This Agreement, and any procedures established in conformance with it, shall be reviewed periodically, or at least once every 12 months, by DEP and the Corps, except as otherwise provided herein. Either party may request in writing an amendment or modification to

the Agreement. Amendments and modifications shall be in writing and shall be effective upon the signature of both parties and approval by EPA.

(4)    This Agreement shall remain in effect until the State 404 Program authorization is modified by EPA, pursuant to 40 C.F.R. § 233.16, in a manner that would affect this Agreement, until EPA's approval is withdrawn pursuant to 40 C.F.R. § 233.53(b), or until DEP voluntarily transfers program responsibilities to the Corps according to the criteria and procedures established in 40 C.F.R. § 233.53(a).

(5)    In the event DEP proposes to transfer all or part of the State 404 Program to another State agency in accordance with 40 C.F.R. § 233.16, either this Agreement will be modified to add that other State agency or a new Memorandum of Agreement between the Corps and that State agency will be required.

II.    WATERS TO BE RETAINED

A.    Pursuant to 404(g) of the CWA, the Corps will retain permitting authority under Section 404 of the CWA for those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto.[1]   The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Attachment A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. For purposes of this Agreement, the administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water.  In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only. All waters of the United States not retained by the Corps will be assumed by DEP as part of its State 404 Program (State assumed waters). The Corps will provide Retained Waters GIS layers to DEP, and will update the GIS layers as necessary, in accordance with II.C. and III.B, below.

B.    The Corps shall retain responsibility for permitting the discharge of dredged and fill material in waters of the United States within "Indian country," as that term is defined at 18 U.S.C. § 1151. Title 18 U.S.C. §1151 defines "Indian country" as: (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original

---

[1] Section 404(g) of the CWA, 33 U.S.C. § 1344(g), is interpreted and implemented in accordance with Assistant Secretary of the Army for Civil Works, Memorandum dated July 30, 2018, Subject: *Clean Water Act Section 404(g)-Non-Assumable Waters*.

2

or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.  Indian reservations include lands held in trust by the United States for an Indian tribe even if such lands have not been formally designated as an Indian reservation.

C.     Modifications to the Retained Waters List and Retained Waters List GIS layers, including identification of the head of navigation, will be made in the following circumstances: when the Corps makes a navigability determination;[2] a Federal court makes a navigability determination; the United States Congress makes a navigability determination; there are applicable rule changes; or pursuant to Section III.B., below. Any modifications to the Retained Waters List which affect the area of jurisdiction are subject to EPA approval pursuant to 40 C.F.R. § 233.16(d). Nothing in this Agreement affects the authority of the Corps to make determinations of navigability pursuant to 33 C.F.R. Part 329.

III.     JOINT COORDINATION PROCEDURES

A.     When an application or verification request is received by either party, the application will be screened using the Retained Waters List and GIS layers to determine if the proposed activity will occur within Corps retained waters, as identified in Section II, above. When a proposed activity falls within retained waters, DEP will, within five calendar days of receipt, refer the applicant to the Corps. Likewise, when a proposed activity falls within State assumed waters, the Corps will, within five calendar days of receipt, refer the applicant to DEP.

B.     If DEP has reason to believe a proposed activity is within the Corps' jurisdiction as defined in Section II.A., above, but is not within the Retained Waters List or depicted in the retained waters GIS layers, DEP will request the Corps determine whether the project falls within retained waters. The Corps shall provide its determination within seven calendar days of receipt of DEP's request. In the event the Corps determines the proposed activity falls within its jurisdiction, DEP will refer the applicant to the Corps. Within 30 calendar days, the Corps will update its GIS layer and Retained Waters List accordingly.

C.     In accordance with Section 10 of the Rivers and Harbors Act of 1899 (RHA), the Corps has regulatory jurisdiction over all obstructions and alterations of navigable waters of the United States, the construction of any structures in or over navigable waters of the United States, and any work affecting the course, location, condition, or capacity of navigable waters of the United States, as defined in 33 C.F.R. Part 329. This includes permit authority under Section 10 of the RHA for those waters that are jurisdictional based solely on historic use (Section 10 historic waters). While the Corps retains authority over Section 10 historic waters, upon the effective date of this Agreement, the State assumes responsibility for permitting the discharge of dredged or fill material within Section 10 historic waters. Therefore, discharges of dredged or fill material in Section 10 historic waters will require a Section 10 permit from the Corps and a 404 permit from

---

[2] 33 C.F.R. § 329.14

DEP. Nothing in this Agreement affects the authority of the Corps in implementing regulatory programs pursuant to the RHA.

IV.   EXISTING PERMITS AND PENDING PERMIT APPLICATIONS

    A.   Individual Permits

        (1)   The time limit for completing work authorized under a Department of the Army (DA) individual permit issued prior to the effective date of assumption for the discharge of dredged or fill material in State assumed waters will remain the expiration date stated in the permit instrument. After the effective date of assumption, an applicant must apply for a new permit from DEP for any work that remains incomplete by the expiration date. The Corps will not review requests for extension of time and will refer the applicant to DEP to apply for a new permit under the State 404 Program.  DEP may administratively continue an expiring Corps permit until the effective date of a new permit, if any, consistent with 40 C.F.R. § 233.38, or a decision is made not to issue a new permit.

        (2)   The Corps retains authority to make minor modifications to DA permits in State assumed waters.  Minor modifications are generally ministerial in nature, and shall include the following: a) to correct errors or typographical mistakes; b) to incorporate changes requested by the Corps; c) to change due dates for reporting or performance deadlines; d) to transfer a permit upon a change in ownership or control; and e) to make minor technical changes. Minor modifications may include other minor changes; however, in no case will a minor modification expand the volume or amount, enlarge the footprint, change the location, or extend the duration of the authorized discharge. The Corps will refer modifications that it determines, in its sole discretion, to fall outside the scope of a minor modification to DEP for evaluation of a permit under the State 404 Program.

    B.   General Permits

        (1)   The time limit for completing the work under a DA general permit verified prior to the effective date of assumption for the discharge of dredged or fill material in State assumed waters will remain the expiration date stated in the verification letter, to include 12 months after expiration if work has commenced or is under contract to commence. After the effective date of assumption, any work that remains incomplete by the expiration date must receive a new permit from DEP under the State 404 Program. Requests for modifications of verifications under a DA general permit within State assumed waters shall be made to DEP. After the effective date of assumption, no new verifications under general permits will be issued by the Corps within State assumed waters.

        (2)   Upon EPA approval of the State 404 Program, the FDEP will assume

4

administration of the following Regional General Permits in State assumed waters: SAJ-13 (Aerial Transmission Lines in Florida); SAJ-14 (Sub-aqueous Utility and Transmission Lines in Florida); SAJ-86 (Residential, Commercial, Recreational and Institutional Fill in the Choctawhatchee Bay, Lake Powell, and West Bay Basins, Bay and Walton Counties, Florida); SAJ-90 (Residential, Commercial & Institutional Developments in Northeast Florida); SAJ-103 (Residential Fill in Holley By The Sea, a Subdivision in Santa Rosa County); SAJ-105 (Residential, Commercial, Recreational and Institutional Fill in the West Bay Watershed of Bay County, Florida); and SAJ-114 (Residential, Commercial, Recreational and Institutional Fill in the Choctawhatchee Bay and St. Andrew's Bay Watersheds located in Bay County and Walton County, Florida). The Corps will transfer relevant information, files, and records to DEP, pursuant to 40 C.F.R. § 233.14(b)(3).

C.     Records Transfer

Upon notification of program approval from EPA, the Corps will transfer to DEP any pending Section 404 program permit application files, including requests for verifications of Regional General Permits identified in Section IV.B(2) above, within State assumed waters. Upon request by DEP, the Corps will provide copies of specific permits for purposes of DEP issuing a new permit. Transfer methods shall be mutually agreed upon by the Corps and DEP.

V.     REVIEW OF APPLICATIONS FOR STATE PROGRAM PERMITS

A.     Anchorage and Navigation

DEP shall not issue a permit if notified that the Corps has determined, in accordance with 40 C.F.R. § 233.20(d), that anchorage and navigation of any navigable waters would be substantially impaired.

B.     Corps Civil Works Projects

(1)     Section 14 of the RHA (33 U.S.C. § 408) (Section 408) mandates that any use or alteration of a Corps Civil Works project by another party is subject to the approval of the Corps.  Within five calendar days of receipt of a permit application or verification request, DEP agrees to inform the Corps and instruct the applicant to contact the appropriate Corps Section 408 contact person for any activities that may use or alter an existing Corps Civil Works project. Existing Corps Civil Works projects are found in the Jacksonville District Regulatory Source Book, which the Corps will update as necessary. Within 14 calendar days of receipt of the notification from DEP, the Corps will notify DEP if the Corps' approval is required pursuant to Section 408, in which case the State agrees to delay any final State actions until Section 408 review is complete or include a special condition in the permit requiring Section 408 permission prior to construction that will include the Corps' Section 408 contact information. However, where DEP is processing a

verification of a general permit identified in Section IV.B(2), the State agrees that it cannot verify coverage under the general permit until the Corps issues an authorization pursuant to Section 408.

(2)   Corps Civil Works projects involving the discharge of dredged or fill material into waters of the United States must be developed in accordance with the guidelines promulgated under Section 404(b)(1) of the CWA, as amended, unless exempted by Section 404(f) of the CWA.  For Corps Civil Works projects in State assumed waters, other than projects specifically authorized by Congress for which the Corps has applied or will apply Section 404(r) of the CWA, the Corps and DEP will develop and follow, as practicable, mutually agreed upon procedures for submission of information necessary for DEP to process an application for a permit under the State 404 Program.

C.   Emergency Permits

In accordance with 40 C.F.R. § 233.22(d), DEP shall consult in an expeditious manner with the Corps about issuance of an emergency permit in State assumed waters.

D.   State 404 Permits

In accordance with 40 C.F.R. § 233.50(j), if DEP has received an EPA objection or requirement for a permit condition to a permit application or draft general permit in State assumed waters, and in the event that DEP neither satisfies EPA's objections or requirement for a permit condition nor denies the permit, the Corps shall process the permit application.  DEP will provide a copy of the administrative record to the Corps using an agreed upon method to facilitate the Corps' review.

E.   Designation of a Non-Federal Representative

If DEP receives an EPA objection or requirement for a permit condition and neither satisfies EPA's objection or requirement for a permit condition nor denies the permit, and, pursuant to the process in 40 C.F.R. § 233.50(j), responsibility for permitting has shifted to the Corps, under Endangered Species Act (ESA) implementing regulations, the Corps may designate a non-federal representative, such as DEP, the Florida Fish and Wildlife Conservation Commission, or the permit applicant to conduct informal ESA consultation or prepare a biological assessment, pursuant to 50 C.F.R. § 402.08. Upon receipt of a permit application package from DEP for a project that has the reasonable potential for affecting endangered or threatened species, the Corps may in its sole discretion, designate the State or the applicant as a non-federal representative for purposes of conducting informal ESA consultation or preparing a biological assessment by giving written notice to designated non-Federal representative. If a permit applicant is involved that is not the designated non-Federal representative, then the applicant and Corps must agree on the choice of the designated non-Federal representative. If a biological assessment is prepared by the designated non-Federal representative, the Corps shall furnish guidance and supervision and shall independently review and evaluate the scope and contents of the biological assessment.

JA.1588

VI.    COORDINATION OF MITIGATION BANKING

  A.    Mitigation Bank Instruments and In-Lieu Fee Program Agreements

Mitigation banking instruments and in-lieu fee program instruments shall be processed by the Corps in accordance with 33 C.F.R. Part 332. DEP may co-chair any applicable interagency coordination effort.

  B.    Permits for Mitigation Bank and In-Lieu Fee Projects

With respect to permits for mitigation banks and in-lieu fee projects issued after the effective date of assumption, the boundary of the mitigation bank or of a project under an in-lieu fee program (as distinct from the service area) will be the project boundary for purposes of Section II.A., above, for authorization of discharge of dredged or fill material.

  C.    Use of Credits from Corps Approved Mitigation Banks for State 404 Permits

DEP may approve the use of credits from a Corps-approved mitigation bank or in-lieu fee program to provide compensatory mitigation for permits issued under the State 404 Program, as long as the use of credits is consistent with the approved mitigation banking instrument or in-lieu fee instrument.

VII.   ENFORCEMENT

  A.    After the effective date of State assumption, the Corps will continue to monitor compliance and enforce the terms and conditions of all DA individual and general permits issued or verified in State assumed waters prior to the effective date of assumption. For general permits previously issued by the Corps but administered by the State after the effective date of assumption, DEP will monitor compliance and enforce the terms of any verifications it issues.

  B.    The Corps will not be responsible for enforcing against unauthorized discharges of dredged or fill material in violation of the CWA which occur in State assumed waters after the effective date of assumption.  Unauthorized discharges include discharges that exceed the volume or amount of discharge authorized under a permit, that occur outside of the areas authorized for discharge under a permit, or that occur outside the period specified in a permit.

  C.    Except as provided in Section D, DEP will be responsible for enforcing against unauthorized discharges of dredged or fill material in violation of the CWA which occurred in State assumed waters prior to the effective date of State assumption.

  D.    The Corps will remain the lead agency for ongoing enforcement actions against unauthorized discharges of dredged or fill material in violation of the CWA or against noncompliance with the terms and conditions of a DA permit in State assumed waters that have not been resolved prior to the effective date of State assumption (hereinafter Ongoing Enforcement Action).  If there is an unusual circumstance concerning an Ongoing Enforcement Action, the

7

parties to this Agreement may discuss DEP taking the lead. For those instances where the Corps, on its own or in coordination with EPA or the United States Department of Justice, resolves an Ongoing Enforcement Action, the Corps will consult with DEP as practicable, and will provide DEP a copy of any consent decree or settlement agreement. DEP will be responsible for issuing any after-the-fact permit for the discharge of dredged or fill material.

## VIII.   COMMUNICATION BETWEEN PARTIES

A.    Communication and record sharing between the parties of this Agreement may be accomplished through electronic means.

B.    Following execution of this Agreement, DEP and the Corps will meet as necessary to discuss issues related to State assumption. Following the effective date of State assumption, the Corps and DEP shall meet on a biweekly basis during the first six months of State assumption in order for the Corps and DEP to ensure effective coordination in the implementation of this Agreement.

## IX.   GENERAL PROVISIONS

A.    The Parties are entering into this Agreement based solely on the representations and warranties herein and not based on any promises, representations, and/or warranties not found herein.

B.    This Agreement does not create any right or benefit, substantive or procedural, enforceable by law or equity, by any persons, their officers or employees, or any other person. This Agreement does not apply to any person outside of the Corps and DEP.

C.    The signatory agencies do not waive any administrative claims, positions, or interpretations they may have with respect to the applicability or enforceability of the CWA, the ESA, the National Historic Preservation Act, or any other applicable federal or State laws or regulations.

D.    Nothing in this Agreement shall be interpreted as obligating the signatory agencies for the expenditure of funds in excess of appropriations authorized by law, or otherwise commit the signatory agencies to actions for which they lack statutory authority.

E.    Nothing in this Agreement shall affect any of the Corps' tribal trust responsibilities.

F.    The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

G.    If any provision of this Agreement is held to be illegal or invalid by a court of competent jurisdiction, such provision shall be deemed to be severed and deleted; and neither such provision, nor its severance and deletion, shall affect the validity of the remaining provisions.

JA.1590

X.    SIGNATURES

**Florida Department of Environmental Protection**

**07/31/2020**

_____
Noah Valenstein            (Date)
Secretary

**Department of the Army**

**08/05/2020**

_____
R.D. James                 (Date)
Assistant Secretary of the Army
(Civil Works)

9

JA.1591



October 23, 2020

Mr. Kelly Laycock
Oceans, Wetlands and Streams Protection Branch
USEPA Region 4
61 Forsyth St., SW
Atlanta, GA 30303

*Via:* 404Assumption-FL@epa.gov & regulations.gov

> **Re:** **Request to Reconsider Completeness Determination Regarding
> State of Florida's Application to Assume Administration of a Clean
> Water Act Program (Docket # EPA-HQ-OW-2018-0640-0001; EPA-
> HQ-OW-2018-0640)**

Dear Mr. Laycock:

We write to urge the U.S. Environmental Protection Agency ("EPA") to reconsider its
determination that the State of Florida has submitted a "complete" application to assume
jurisdiction over the Clean Water Act Section 404 program.[1]  As demonstrated below, Florida's
application was not, and is not, complete regarding at least three issues: protection of listed
species, identification of assumed waters, and staffing.  EPA should suspend the public comment
period and review of Florida's application until the State cures these deficiencies and submits a
complete program proposal to the agency.  See 40 C.F.R. § 233.15(a) (statutory review period
shall not begin if EPA finds that a State's submission is incomplete).

On September 16, 2020, EPA published a Federal Register notice stating that it had received "a
complete program submission" for 404 assumption from the State of Florida on August 20, 2020.
See Florida's Request to Assume Administration of a Clean Water Act Section 404 Program, 85
Fed. Reg. 57,853 (Sept. 16, 2020).  Based on its determination that the submission was complete,
EPA initiated a 45-day public comment period that concludes on November 2, 2020, as required
by the Clean Water Act and the Administrative Procedure Act ("APA"), 40 C.F.R. § 233.15(e)
and 5 U.S.C. § 553, and is set to make a decision on the application by December 18, 2020.  See
33 U.S.C. § 1344(h)(1) (providing for decision on application within 120 days of receipt); 40

---

[1] We previously made this request in oral comments at EPA's October 21, 2020, virtual public
hearing on Florida's application.

FLORIDA OFFICES
111 SOUTH MARTIN LUTHER KING JR. BLVD.                                    4500 BISCAYNE BLVD., SUITE 201
TALLAHASSEE, FL 32301                                                                    MIAMI, FL 33137
T: 850.681.0031                                                                            T: 305.440.5232

FLOFFICE@EARTHJUSTICE.ORG    WWW.EARTHJUSTICE.ORG

JA.1592

C.F.R. § 233.15(a) (120-day statutory review period begins when EPA receives complete State program submission as set out in 40 C.F.R. § 233.10).

Public notice requirements under the APA are (1) intended to improve the quality of agency rulemaking by ensuring that regulations are tested by exposure to diverse public comment; (2) an essential component of fairness to affected parties; and (3) an opportunity for parties to develop evidence in the record to support their objections to a rule, which in turn enhances the quality of judicial review.  5 U.S.C. § 553; Small Refiner Lead Phase-Down Task Force v. U.S. Env't Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983) (internal citations and quotation marks omitted).

In this case, the State of Florida has failed to provide a complete program submission to EPA, and EPA should reverse its determination otherwise.  Permitting the public only to comment on an incomplete application undermines the agency's rulemaking by precluding meaningful testing, denies fairness to affected parties, and precludes the opportunity to develop evidence in the record that will prove necessary to judicial review, should EPA grant the application, as the State and industry supporters of the program have indicated they fully expect will happen.

**Incomplete Submission Regarding Endangered Species Act Protections**

First, the State has not demonstrated how it will ensure no jeopardy to listed species to comply with the Section 404(b)(1) Guidelines' no-jeopardy provision.  33 U.S.C. § 1344(h)(1)(a) (state must demonstrate it has authority to issue permits which "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title"); 40 C.F.R. § 230.10(b)(3) (prohibits issuance of permits that will "[j]eopardize[] the continued existence of species listed as endangered or threatened under the [ESA], or result[] in likelihood of the destruction or adverse modification … [of] critical habitat" unless an exemption is granted by the Endangered Species Committee).  See also 40 C.F.R. § 233.11(a)–(c) (requiring that State assumption application include description of scope and structure of State's proposed program, description of State's permitting procedures, and description of structure and organization of all State agencies that will be involved, including the responsibilities of each and how they will coordinate administration of the program).

Instead, the State has indicated that it will rely on an anticipated programmatic biological opinion and an anticipated, associated incidental take statement it expects will result from a Section 7 consultation that is apparently underway between EPA and U.S. Fish and Wildlife Services and the National Marine Fisheries Services.  See Memorandum of Agreement between Florida Department of Environmental Protection and the United States Environmental Protection Agency, Jul. 31, 2020; Memorandum of Understanding between Florida Fish and Wildlife Conservation Commission, United States Fish and Wildlife Services, and the Department of Environmental Protection, Aug. 5, 2020.  As this information was not submitted with the State's August 20, 2020, application, the program submission was not complete.  Further, without the

ability to review this critical information, affected parties are unable to provide informed comments on whether Florida will be able to meet the no-jeopardy requirements.

Indeed, it was not until August 27, 2020, that EPA agreed with Florida's novel premise that the agency is required to consult with the Services if a decision to approve a 404 assumption application may affect listed species or designated critical habitat (reversing EPA's prior, longstanding position on this issue).  U.S. Env't Prot. Agency, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals (2020) (Exhibit 1).  EPA indicated that it would henceforth engage in a one-time Section 7 programmatic consultation which would allow the Services to issue "a programmatic biological opinion and programmatic incidental take statement for the state or tribal permitting program."

EPA further stated that:

> The [programmatic] biological opinion and incidental take statement could establish additional procedural requirements and permitting conditions or measures *that help ensure the state or tribal permitting program and individual permits issued pursuant to that program*, as well as EPA's approval of that program, *do not result in jeopardy to any listed species.  This process*, assuming compliance with any applicable permit conditions or measures, *would* extend ESA Section 9 liability protections to individual permits issued pursuant to the state or tribal program and *place state and tribal CWA Section 404 permitting on equal footing with the Corps' permitting program.*

Id. at 7 (emphasis added).

Taken together, EPA and Florida's positions demonstrate that the yet-to-be-completed consultation, and the yet-to-be-completed biological opinion and incidental take statement that are expected to result from consultation, are an essential component of Florida's assumption application.  As a result, Florida's program submission too is not complete, and EPA's determination to the contrary is in error.

As things stand, Florida cannot possibly establish that its program, and any permits that would issue under the program, comply with federal law.  See, e.g., 33 U.S.C. § 1344(h)(1)(A)(i) (a state plan to assume dredge and fill permitting must comply with the guidelines issued under § 404(b)(1)); 40 C.F.R. § 233.23 (requiring that "[f]or each permit the [state] Director shall establish conditions which assure compliance with all applicable statutory and regulatory requirements, including the 404(b)(1) Guidelines").  And affected parties cannot possibly provide meaningful comment on whether Florida will ensure no jeopardy to listed species, a matter of fundamental fairness to which they are entitled under the APA.

**Incomplete Identification of Assumed Waters**

Second, Florida has failed to identify the waters that would be assumed under its proposed program.  EPA regulations require an assumption application to include "[a] description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program" and a description of the waters within the state over which the U.S. Army Corps of Engineers retains jurisdiction if the program is approved.  40 C.F.R. § 233.11(h).

To start, Florida has created an unnecessary labyrinth for anyone to try to understand the waters that are implicated in its assumption application.  In fact, none of the program-related definitions are provided by statute or in the State's implementing regulations, but rather appear in an applicant handbook.  See Fla. Admin. Code Ann. r. 62-331.030 (providing that "Terms used in this Chapter are defined in section 2.0 of the 404 Handbook").
The 404 Handbook, in turn, defines "State-assumed Waters" or "Assumed Waters" by reference to the Florida legislation that authorized (but did not require) the Florida Department of Environmental Protection to pursue assumption.  See Fla. Dep't of Env't Prot., State 404 Program Applicant's Handbook § 2.0(b)(47) [hereinafter "404 Handbook"] ("'State-assumed Waters' or 'Assumed Waters' means those waters as defined in Section 373.4146(1), F.S.").  Florida Statutes Section 373.4146(1) provides no further clarity, stating simply that "the term 'state assumed waters' means waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material."  In other words, Florida defines state-assumed waters as those waters over which the state assumes jurisdiction.

The 404 Handbook does provide an actual definition for the opposite of state-assumed waters, which are the "Retained Waters."  404 Handbook § 2.0(b)(41).  Although Florida's definition does not explain this to the reading public, retained waters are navigable waters over which the U.S. Army Corps of Engineers would retain exclusive permitting jurisdiction under Section 10 of the Rivers and Harbors Act of 1899 if state assumption is granted.  33 U.S.C. § 403. Among other things, Florida explicitly defines "Retained Waters" as including those "identified in the Retained Waters List (Appendix A).  404 Handbook § 2.0(b)(41).  Appendix A, in turn, consists of a 4-page list of rivers and creeks, mostly by name only), dated August 23, 2019.

The "Retained Waters List" maintained by the U.S. Army Corps of Engineers ("Corps") for Florida has been the subject of substantial controversy and change since Florida began its efforts to assume the 404 program in 2018.  On March 19, 2018, the Corps initiated a 30-day public comment period to end on April 20, 2018, "regarding use of waters in the state of Florida for navigation … [including] identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities" for purposes

4

of navigability analyses to determine "which waters are subject to permitting authority under Section 10" and "determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption."  U.S. Dep't of the Army, Public Notice: Determination of Navigable Waters, Mar. 19, 2018 (Exhibit 2).  On April 5, 2018, the Corps posted its solicitation for public comment on this matter on the website for the Jacksonville District.  Press Release, U.S. Army Corps of Eng'rs, Corps Seeks Public Comment Regarding Water Use for Navigation (Apr. 5, 2018), https://www.saj.usace.army.mil/Media/News-Releases/Article/1485269/corps-seeks-public-comment-regarding-water-use-for-navigation (Exhibit 3).

On April 10, 2018, the Corps issued an "Updated Public Notice" summarily terminating the comment period effective immediately, deeming "the comment period originally set to expire on April 20, 2018 . . . closed until further notice."  U.S. Dep't of the Army, Updated Public Notice: Cessation of Public Comment Period, Apr. 10, 2018 (Exhibit 4).  More than two years later, there has been no "further notice," and no further opportunity for the public to comment on this matter of exceptional public importance, even now that Florida has submitted its 404 application to EPA.

Notably, however, the Corps' list of Retained Waters that appears to be part of Florida's submission to EPA (4 pages long) is drastically reduced as compared to the Retained Waters list supplement produced by the Corps in October 2017 (17 pages long).

Notwithstanding the Corps' abrupt and unexplained change of course in soliciting public comment in 2018, we, and several other members of the public, submitted comments in line with the original deadline of April 18, 2018.  This included comments by Senator Bob Graham, on behalf of the Florida Conservation Coalition, as well as the Sierra Club, Audubon Florida, The Conservancy of Southwest Florida, and Florida's Water and River Keepers.

In our letter, we reminded the Corps about Florida's extensive water resources and unique hydrology, and that any navigability study would require a thorough analysis of numerous waterways to determine which waters may be assumable.  This undertaking would require special attention to the rivers, streams and adjacent wetlands located throughout the State.  We further noted that determining the adjacency of wetlands in particular will require time, investigation and evidence and will be of critical importance to Florida's residents and economies.  These determinations must be based on technical information, hydrology and science.  By necessity, adjacency determinations must be made case by case, based on site-specific characteristics of the area's hydrology, topography and vegetation, among other factors.  To perform such studies, it will be imperative to solicit information from the public, as there are entities and individuals with relevant expertise located throughout the State.

Other commenters echoed similar concerns.  The Sierra Club demonstrated that even at the time, the Corps' lists of navigable waters was incomplete and inadequate.  Letter from Frank Jackalone, Sierra Club Fla. Chapter, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 16, 2018 (Exhibit 5).  The Corps' list identified 492 rivers and creeks and 110 lakes.  A supplement to the list totaled 1,767 rivers and creeks and 1,186 lakes.  The text prefacing that supplement stated that "[t]he District makes no claim that these lists are complete or completely accurate."

The Conservancy of Southwest Florida submitted scores and scores of additional waterways that it urge the Corps to consider as navigable as well for Section 10 purposes.  Letter from Amber Crooks, Conservancy of Sw. Fla., to the Dep't of the Army, Apr. 18, 2018 (Exhibit 6).  Audubon Florida urged the Corps to use the October 2017 list as a baseline and to supplement that list with additional navigable waterways subject to Section 10 Rivers and Harbors Act jurisdiction.  Letter from Julie Wraithmell, Audubon Fla., to Donald W. Kinard, U.S. Army Corps of Eng'rs, Apr. 17, 2018 (Exhibit 7).  Florida's Water and River Keepers emphasized the critical importance of the Corps properly identifying all Section 10 waters in the State.  Letter from Rachel Silverstein, Miami Waterkeeper, et al. to Colonel Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 18, 2018 (Exhibit 8).

Florida's 404 program submission to EPA, however, contends with none of this.  It purports to limit the "Retained Waters" to an anemic 4-page list that is vague, incomplete and has not been subject to notice and comment.  Indeed, the list is grossly lacking as it reflects a far more restrictive view of retained waters than the Corps possessed in 2017, and the Corps has failed to engage the public in performing an adequate navigability study that would accurately reflect the scope of exclusive federal jurisdiction.

Moreover, Florida has failed to provide the public with GIS or other mapping that would in fact demonstrate the scope of the jurisdiction it intends to claim if its 404 assumption application is granted.  Without this information, members of the public across the state are unable to evaluate and comment on the impact this proposal will have on the waters that are of ecological and economic benefit to them.  By failing to adequately and accurately identify those waters over which the state would assume jurisdiction, Florida's application is incomplete.

**Incomplete Description of Available Funding and Staffing**

Third, Florida has failed to provide EPA and the public with complete information regarding how it would implement, operate and enforce a Section 404 program, particularly given the substantial impact the COVID-19 pandemic has had on State coffers.  See 40 C.F.R. § 233.11(d) (program description must include "[a] description of the funding and manpower which will be available for program administration").

As a preliminary matter, the Florida Department of Environment Protection has stated that its 404 program would also rely on staff and resources from two other state agencies, namely the

JA.1597

Florida Fish and Wildlife Commission and the State Historic Preservation Office, to ensure protection of listed species and cultural resources.  Memorandum of Understanding between Florida Fish and Wildlife Conservation Commission, United States Fish and Wildlife Services, and the Department of Environmental Protection, Aug. 5, 2020; Operating Agreement between Florida Department of Environmental Protection and the Florida Division of Historical Resources-State Historic Preservation Officer Regarding the State 404 Program, Aug. 6, 2020. However, Florida's description of funding and manpower contains no information regarding the funding and manpower, if any, available at either of those state agencies to meet the obligations of an assumed 404 program.

Instead, Florida relies solely on resources purportedly available at the Department of Environmental Protection.  In doing so, however, Florida completely fails to disclose to EPA that state coffers are under severe strain as a result of the COVID-19 pandemic that since March 2020 has infected more than 750,000 Floridians, and resulted in the deaths of another 16,267 Floridians.  Fla. Dep't of Health, Florida COVID-19 Dashboard, https://fdoh.maps.arcgis.com/apps/opsdashboard/index.html#/8d0de33f260d444c852a615dc7837 c86 (last visited Oct. 23, 2020) (Exhibit 9).

Tax revenues for the state plummeted in April, May and June 2020 as a result of the pandemic. In July 2020, Governor DeSantis vetoed $1 billion in spending from the 2020-2021 budget in response to the crisis.  In August 2020, Florida agencies were asked to cut 8.5% of their budgets to adjust for budget shortfalls resulting from the pandemic.  See Christine Sexton, *Florida Agencies Asked to Cut 8.5 Percent to Adjust for COVID-19*, Tampa Bay Times, Aug. 12, 2020, https://www.tampabay.com/florida-politics/buzz/2020/08/12/florida-agencies-asked-to-cut-85-percent-to-adjust-for-covid-19. (last visited Oct. 23, 2020) (Exhibit 10).

Florida has not acknowledged these important facts, much less addressed how its state agencies can be expected to do more—namely implement, operate and enforce a Section 404 program— with so much less.  Indeed, as several commenters noted during EPA's October 21, 2020, public hearing on the application, the Department already is unable to meet its obligations to operate and enforce programs already under its purview.  This fact is amply demonstrated in the widespread impaired waters throughout the State, as well as the recurring toxic algae crisis that has made national headlines and the Department's grossly inadequate record of enforcing its existing programs.

The fact is that resources at the Department have been gutted in recent years.  *Editorial: The Rick Scott Record: An Environmental Disaster*, Tampa Bay Times, Sept. 5, 2014, https://www.tampabay.com/opinion/editorials/editorial-the-rick-scott-record-an-environmental-disaster/2196359/ (observing that the Rick Scott administration had reduced water management budgets, rushed through permitting, weakened enforcement, caused widespread layoffs,

JA.1598

provoked a brain drain of experts in the field, and replaced experts with political appointees focused on advancing business interests rather than environmental stewardship). (last visited Oct. 23, 2020) (Exhibit 11).

The unprecedented budget strains the state is facing will make it impossible to recover any semblance of staffing and funding that would make assumption of a Section 404 program feasible any time soon.

The Department's claim that it will be able to operate a Section 404 program without any additional funding from the State—a fundamentally flawed premise that the legislature relied on when granting the authority for the state agency to pursue assumption—is untenable.  It either reflects the Department's erroneous belief that Section 404 is merely "duplicative" of state regulations (it is not), demonstrates the Department's intention to treat its pre-existing regulations and Section 404 as one and the same (it may not), or suggests that the Department simply will not adequately implement, operate or enforce a Section 404 program (it cannot).

**Conclusion**

As demonstrated above, Florida has failed to provide EPA with a complete program submission in at least three, critical respects.  EPA should therefore suspend the public comment period and review of Florida's application until the State cures these deficiencies and submits a complete program proposal to the agency.  See 40 C.F.R. § 233.15(a) (providing that statutory review period shall not begin if EPA finds that a State's submission is incomplete).

In the alternative, we request that EPA extend the review period pursuant to 40 C.F.R. § 233.15(g) and the public comment period until all materials are provided and the public is given adequate notice and opportunity to comment in accordance with federal law. See also Clean Water Section 404 Program Definition and Permit Exemptions; Section 404 State Program Regulations, 53 Fed. Reg. 20,764, 20,767 (June 6, 1988).

Sincerely,

Bonnie Malloy
Fla. Bar No. 86109
Earthjustice
111 S. Martin Luther King Jr. Blvd
Tallahassee, FL 32301
T: 850-681-0031
F: 850-681-0020
bmalloy@earthjustice.org

8

Tania Galloni
Fla. Bar No. 619221
Christina I. Reichert
Fla. Bar No. 0114257
Earthjustice
4500 Biscayne Blvd., Ste 201
Miami, FL 33137
T: 305-440-5432
F: 850-681-0020
tgalloni@earthjustice.org
creichert@earthjustice.org

JA.1600

# Exhibit 1



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

OFFICE OF WATER

## Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals

Pursuant to Section 404 of the Clean Water Act (CWA), 33 U.S.C. 1344, the U.S. Army Corps of Engineers (Corps) is authorized to permit the discharge of dredged or fill material into "waters of the United States." States and federally recognized tribes may assume authority to implement the CWA Section 404 permitting program within their respective jurisdictions from the Corps by submitting a request to the U.S. Environmental Protection Agency (EPA or Agency), as Congress authorized the EPA Administrator to approve program transfers from the Corps to the states and tribes. In the past, EPA has taken the position that such program transfer decisions do not involve an exercise of discretion warranting consultation under Section 7 of the Endangered Species Act (ESA), 16 U.S.C. 1536, meaning EPA would not need to consult with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (hereafter referred to as "the Services") when acting on an assumption application from a state or tribe. EPA has reconsidered its prior position, articulated in 2010, that the decision to approve a state or tribal CWA Section 404 program does not trigger ESA Section 7 consultation. Going forward, EPA has determined that it should consult with the Services under Section 7 of the ESA if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat.

## I. Background

To assume the CWA Section 404 permitting program, states and tribes must develop permit programs for discharges of dredged or fill material consistent with the requirements of the CWA and implementing regulations at 40 C.F.R. part 233 and submit a request to assume any such program to EPA. States and tribes must administer and implement programs that are consistent with and no less stringent than the requirements of the CWA and implementing regulations. 40 C.F.R. 233.1(d). The Administrator "shall approve" an assumption request if the state or tribal program satisfies the requirements of the CWA Section 404(h)(1). 33 U.S.C. 1344(h)(2)(A). If the Administrator fails to make a determination within 120 days of receiving the request, the program shall be deemed approved. 33 U.S.C. 1344(h)(3).

Section 7 of the ESA directs each federal agency to ensure, in consultation with one or both of the Services, as appropriate, that "any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence" of listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). ESA Section 7 consultation is not required if the agency determines that an action will not affect listed species or designated critical habitat. ESA Section 7 applies to "all actions in which there is discretionary Federal involvement or control." 50 C.F.R. 402.03.

JA.1602

In December 2010, EPA articulated its position that ESA Section 7 consultation is not applicable to CWA Section 404 program transfer decisions. EPA stated at that time that a 2007 U.S. Supreme Court decision from another context, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ("*NAHB*"), controlled the inquiry. In *NAHB*, the Supreme Court held that because the transfer of CWA National Pollutant Discharge Elimination System (NPDES) permitting authority to a state "is not discretionary, but rather is mandated once a State has met the criteria set forth in Section 402(b) of the CWA, it follows that a transfer of NPDES permitting authority does not trigger Section 7(a)(2)'s consultation and no-jeopardy requirements." 551 U.S. at 673. The Supreme Court held that "[w]hile EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out Section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add an entirely separate prerequisite to the list. Nothing in the text of Section 402(b) authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application." *Id.* at 671.

EPA evaluated this decision in response to a December 6, 2010 letter sent to the Agency by the Environmental Council of the States (ECOS) and the Association of State Wetland Managers (ASWM) asking whether EPA must conduct an ESA Section 7 consultation prior to approving or disapproving a Section 404 program request. The Agency responded to ECOS and ASWM in a December 27, 2010 letter ("2010 Letter"), see Docket ID No. EPA–HQ–OW–2020–0008, stating that, as in the CWA Section 402(b) context, when considering a CWA Section 404 program transfer request, EPA is only permitted to evaluate the specified criteria in CWA Section 404(h) and does not have discretion to add requirements to the list in CWA Section 404(h), including considerations of potential impacts to endangered and threatened species through ESA Section 7 consultation with the Services.

EPA stated in the 2010 Letter that although there are some differences between CWA Sections 402 and 404, the Supreme Court's reasoning in *NAHB* applies to EPA's approval of a CWA Section 404(g) permitting program. Section 404(h)(2) of the CWA states that if the Administrator determines that a state program submitted under CWA Section 404(g)(1) has the authority set forth in CWA Section 404(h)(1), then the Administrator "shall approve" the state's application to transfer the CWA Section 404 permitting program. The 2010 Letter acknowledged that "there are some differences between § 402(b) and § 404(h)," but concluded that those differences did not render EPA's action approving a state CWA Section 404 program a "discretionary federal action." The letter did not address the specific differences between the approval requirements of the CWA Section 402 and 404 programs that EPA now recognizes are relevant to the applicability of ESA Section 7. The 2010 Letter concluded that EPA's decision as to whether to approve a state CWA Section 404 program action is non-discretionary and ESA consultation is not required.

In July 2019, EPA received a request from the Florida Department of Environmental Protection (FDEP) asking EPA to engage in an ESA Section 7 consultation with the Services in connection with EPA's initial review of Florida's request to assume the CWA Section 404 program. FDEP provided a white paper asserting that ESA Section 7 consultation is required in the CWA Section 404 assumption context based on the unique statutory text of CWA Section 404 and its associated legislative history, which, in FDEP's view, differs in critical respects from other state delegation programs administered by EPA to which ESA Section 7 does not apply. FDEP stated that EPA's position was articulated in a two-page letter a few weeks after receiving the ECOS and ASWM letter and failed to acknowledge the critical distinctions between the statutory text of CWA Section 404 and the Section 402 program at issue in *NAHB*. FDEP also questioned the 2010 Letter's reliance on the legislative history of CWA Section 404

2

JA.1603

to support the non-discretionary nature of a state assumption decision, arguing that the legislative history supports the opposite conclusion.

The white paper explained that when a state or tribe administers the CWA Section 404 program, permittees must avoid adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10, which involves a burdensome process for both permit applicants and government agencies. The white paper characterized the lack of incidental take coverage in state- or tribe-assumed programs as a significant hurdle to establishing an effective and efficient CWA Section 404 program in Florida and estimated that approximately ten percent of CWA Section 404 permits issued in Florida require some form of incidental take coverage.

The white paper viewed a one-time ESA Section 7 programmatic consultation in connection with EPA's initial review of an assumption application as an efficient and legally-defensible approach to resolving the lack of incidental take coverage for permittees and permitting agencies. An ESA Section 7 consultation on EPA's potential approval of Florida's program would allow the Services to issue a programmatic biological opinion and a programmatic incidental take statement, which could identify procedural requirements for state permitting under CWA Section 404 needed to support the Services' determination that assumption would not result in jeopardy to any listed species. Subject to the Services' incidental take statement and provided these requirements are followed, FDEP stated that this process would bring state CWA Section 404 permits within the ESA Section 7(o)(2) exemption from take liability.

## II. Public Comment

On May 21, 2020, EPA initiated a 45-day public comment period through an announcement in the Federal Register titled "Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Nondiscretionary for Purposes of Endangered Species Act Section 7 Consultation" (Docket ID No. EPA-HQ-OW-2020-0008). EPA sought public comment regarding whether to reconsider its position that it lacks discretionary involvement or control within the meaning of 50 C.F.R. 402.03 when acting on a state or tribal application to administer the CWA Section 404 program sufficient to trigger ESA Section 7 consultation requirements. EPA identified the positions articulated in the FDEP white paper, as well as other considerations that may be relevant to this issue, and requested comment on whether EPA can and should engage in an ESA Section 7 consultation with the Services in connection with EPA's initial review of a state or tribal request to assume the CWA Section 404 program. The public comment period closed on July 6, 2020, and EPA received comments from a variety of stakeholders.

Several commenters stated that EPA's decision regarding a request to assume the CWA Section 404 permit program involves an exercise of discretion warranting consultation under ESA Section 7. These commenters recommended that EPA engage in a single ESA Section 7 programmatic consultation with the Services in connection with EPA's initial review of an assumption application. The commenters said that this process would enable the Services to issue a programmatic biological opinion and a programmatic incidental take statement, which could identify procedural requirements for state and tribal CWA Section 404 permits. They indicated that this approach could support a determination on the part of the Services that assumption would not result in jeopardy to any listed species and would ensure that activities authorized under state- or tribal CWA Section 404 permits would not be liable for incidental take as long as the terms and conditions of permitting are met.

3

Other commenters agreed that EPA's approval of a state or tribal CWA Section 404 permitting program is discretionary and thus triggers the requirements for consultation under Section 7 of the ESA. However, the commenters expressed concern about how states or tribes would ensure that the ESA's requirements are being applied at the project-specific level. These commenters said that EPA's consultation regarding whether to approve or disapprove an assumption request does not alleviate ESA liability concerns related to actions authorized by future state or tribal CWA Section 404 permits.

Certain commenters asserted that the Supreme Court's decision in *NAHB* applies to EPA's approval of CWA Section 404 programs, in addition to its approval of CWA Section 402 programs, and therefore EPA lacks discretion to consult under ESA Section 7 in approving state or tribal requests to assume permitting authority under CWA Section 404. These commenters argued that EPA's role under both the CWA Section 402 and 404 programs is limited to determining whether states and tribes have the legal authority Congress has specified; if the criteria are satisfied, EPA lacks the discretion to deny an application. The commenters also expressed concern that, as a practical matter, the agencies will spend significant time and resources collecting data and conducting analyses for a consultation but may not ultimately provide states and private landowners with incidental take protection under the ESA.

### III. ESA Section 7 Applies to CWA Section 404 Program Assumption Decisions

Following the release of the May 2020 Federal Register Notice and its review of public comments, EPA has reconsidered the position articulated in the 2010 Letter to ECOS and ASWM. EPA concludes that the Agency's decision as to whether to approve a state or tribal request to assume the CWA Section 404 permit program involves an exercise of discretion warranting consultation under ESA Section 7 if EPA determines that such an approval action may affect a listed species or designated critical habitat. EPA's current view is that the *NAHB* decision, while informative, does not control in the CWA Section 404 program assumption context because Congress established a framework in which ESA concerns could be addressed when delegating authority to the Agency to transfer permitting responsibility from the Corps to individual states and tribes. That ability is absent in the list of factors Congress instructed EPA to consider when authorizing states to take on NPDES permitting authority.

For example, CWA Section 404(h)(1)(A) requires the Administrator to determine whether a state or tribe seeking CWA Section 404 program assumption has the authority to issue permits which apply and assure compliance with the CWA Section 404(b)(1) Guidelines. Those Guidelines include a provision that prohibits the permitting of a discharge if it jeopardizes the continued existence of endangered or threatened species or results in the likelihood of the destruction or adverse modification of designated critical habitat. 40 C.F.R. 230.10(b)(3). EPA's regulations state that in determining compliance with the CWA Section 404(b)(1) Guidelines, where ESA Section 7 consultation occurs, the Services' conclusions "concerning the impact of the discharge on threatened and endangered species and habitat shall be considered final." 40 C.F.R. 230.30(c). The CWA Section 404(b)(1) Guidelines were first promulgated in 1975, including the current prohibition on issuing permits jeopardizing threatened or endangered species, *before* Congress enacted CWA Section 404(g). 40 Fed. Reg. 41,292, 41,296 (Sept. 5, 1975). Thus, Congress was aware when requiring state or tribal program compliance with the CWA Section 404(b)(1) Guidelines that the no jeopardy mandate would apply to all permits issued by states and tribes.

Unlike the statutory construct governing EPA's delegation of NPDES program authority under CWA Section 402, EPA is required to seek and consider comments from the Services when deciding whether to approve a state or tribal request to assume the CWA Section 404 permitting program. Under CWA Section 404(g)(2), EPA must provide the Services with an opportunity to comment on a state or tribal

4

program submission. CWA Section 404(g)(2) provides that within ten days after receipt of a program assumption submission, EPA shall provide copies of the program application to the Corps and FWS. EPA extended that statutory direction to NMFS by regulation. 40 C.F.R. 233.15(d). CWA Section 404(h)(1) directs EPA to consider comments submitted by the Corps and FWS when determining whether a state or tribe has the requisite authority and meets the CWA statutory requirements with respect to implementing the CWA Section 404 program. EPA's regulations make clear that EPA should provide heightened attention to comments from the Services, providing that in issuing its approval or disapproval of a state or tribal program, EPA shall provide a responsiveness summary of significant comments received and its responses. EPA "shall respond individually to comments received from the Corps, FWS, and NMFS." 40 C.F.R. 233.15(g).

By requiring EPA to consider the Services' comments before deciding to approve an assumption request, and requiring states and tribes to comply with the CWA Section 404(b)(1) Guidelines when issuing permits under an assumed program, the CWA provides EPA with discretionary involvement and control that triggers the need for ESA Section 7 consultation when EPA's action may affect listed species. EPA has discretion regarding *the extent to which* it takes into account the Services' comments and can do so with an eye towards ensuring compliance with the CWA Section 404(b)(1) Guidelines. States and tribes are not required to consult on their individual permitting decisions, see 16 U.S.C. 1536(a)(2), so the program approval stage provides the most reasonable and efficient point in which to help ensure a process is in place to consider potential adverse impacts to species resulting from those permitting decisions. EPA has discretionary authority at that stage to shape program implementation to ensure compliance with the CWA Section 404(b)(1) Guidelines. This discretionary authority is unique to the transfer of CWA Section 404 permitting authority. There is no requirement in CWA Section 402 for EPA to take into consideration the views of the Services, and there is no corollary in the CWA Section 402 program to the CWA Section 404(b)(1) Guidelines. These provisions in CWA Section 404 provide discretion to EPA that is not present in the Section 402 context.

The legislative history of CWA Section 404 supports the argument for consultation. According to the Senate Report accompanying enactment of the assumption authority:

> The committee amendments relating to the Fish and Wildlife Service are designed to (1) recognize the particular expertise of that agency and the relationship between its goals for fish and wildlife protection and the goals of the Water Act, and (2) encourage the exercise of its capabilities in the early stages of planning. By soliciting the views of the principal Federal agencies involved in the review of these programs at an early stage, objections can be resolved that might otherwise surface later and impede the operation of a State program approved by the Administrator. This consultation preserves the Administrator's discretion in addressing the concerns of these agencies, yet affords them reasonable and early participation which can both strengthen the State program and avoid delays in implementation. That is, early participation in the development and design of programs, guidelines, and regulations should serve to reduce the emphasis now placed on the review by the Fish and Wildlife Service of individual applications for permits under the Water Act.

S. Rep. 95-370, at 78 (1977). The report expresses a preference for early engagement with FWS at the program approval stage with the goal of reducing engagement at the individual permitting stage while preventing comments at the permitting stage that might lead to a permit objection.

JA.1606

While the legislative history does not specifically mention ESA Section 7 consultation, Congress used the phrase "consultation" at the developmental stage of state programs while recognizing EPA's "discretion" in considering the FWS's comments and ensuring efficient and effective program implementation following approval. Ensuring that federal decisions contemplate, where appropriate, potential impacts to listed species at a stage where those impacts can be most efficiently addressed is one of the hallmarks of the ESA Section 7 consultation process. The legislative history therefore supports programmatic consultation more so than suggesting that formal consultation is not required.

In *NAHB*, the Supreme Court held that ESA Section 7 consultation on an NPDES program transfer could impose conditions beyond those found in Section 402(b). 551 U.S. at 663-664. The Court stated that "[w]hile EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out Section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list." *Id.* at 671. In the CWA Section 404 context, however, an ESA consultation will not impose an entirely separate condition. Instead, ESA consultation will fulfill Congress's statutory directive that the Services provide input on a state program prior to EPA's approval. By allowing for consideration of the views of the Services through their comments and incorporation of the no jeopardy requirement from the CWA Section 404(b)(1) Guidelines, the statute provides authority for EPA to consult and consider protection of listed species in the approval decision.

In *NAHB*, the Supreme Court found that the canon against implied repeals supports the interpretation that the transfer of CWA Section 402 programs was a non-discretionary agency action. This reasoning is not applicable in the CWA Section 404 assumption context. The Court stated: "An agency cannot simultaneously obey the differing mandates set forth in Section 7(a)(2) of the ESA and the Section 402(b) of the CWA, and consequently the statutory language – read in light of the canon against implied repeals – does not itself provide clear guidance as to which command must give way." 551 U.S. at 666. In the CWA Section 402 context, the Court found that approval of the state's permitting authority was non-discretionary and "comports with the canon against implied repeals because it stays Section 7(a)(2)'s mandate where it would effectively override otherwise mandatory statutory duties." *Id*. at 670. CWA Section 404 is distinguishable from CWA Section 402 because Congress required EPA to solicit comment from the FWS at the program approval stage and because the statute incorporates the jeopardy prohibition by reference to the CWA Section 404(b)(1) Guidelines. Here, ESA Section 7(a)(2)'s mandate does not override EPA's statutory duties but instead fits into the existing statutory structure.

## IV. Implementation

On August 20, 2020, EPA received a request from the State of Florida to assume administration of the CWA Section 404 program. For Florida and other states and tribes seeking to assume the CWA Section 404 program, EPA intends to engage in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption request if a

JA.1607

decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat. To initiate consultation, the Agency will submit a biological evaluation to the Services, which evaluates the potential effects of EPA's potential approval of an assumption request on ESA-listed species, proposed species, designated critical habitat, and proposed critical habitat (50 C.F.R. 402.12). A biological evaluation also considers whether EPA's approval of an assumption request is likely to adversely affect any species or habitat.

For Florida and other states and tribes seeking to assume administration of the CWA Section 404 permitting program, EPA's engagement in a one-time ESA Section 7 programmatic consultation with the Services in connection with the initial review of an assumption application would allow one or both of the Services, as appropriate, to issue a programmatic biological opinion and programmatic incidental take statement for the state or tribal permitting program. The biological opinion and incidental take statement could establish additional procedural requirements and permitting conditions or measures that help ensure the state or tribal permitting program and individual permits issued pursuant to that program, as well as EPA's approval of that program, do not result in jeopardy to any listed species. This process, assuming compliance with any applicable permit conditions or measures, would extend ESA Section 9 liability protections to individual permits issued pursuant to the state or tribal program and place state and tribal CWA Section 404 permitting on equal footing with the Corps' permitting program. This streamlined permitting process would reduce costs and duplication of effort by state or tribal and federal authorities and facilitate more effective and efficient state and tribal CWA Section 404 programs. This programmatic consultation approach will ensure that listed species are protected while avoiding additional ESA Section 10 processes to obtain similar liability protections.

EPA disagrees with the comments stating that EPA's consultation regarding whether to approve or disapprove a request to assume the CWA Section 404 program does not alleviate existing ESA liability related to actions authorized by future state or tribal CWA Section 404 permits. The Services are required, as part of formal consultation, to prepare an incidental take statement if such take is reasonably certain to occur and will not violate ESA Section 7(a)(2). 50 C.F.R. 402.14(g)-(i). If, pursuant to the ESA regulations, the Services provide an incidental take statement, then "any taking which is subject to a statement as specified in [50 C.F.R. 402.14(i)(1)] and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the [ESA], and no other authorization or permit under the [ESA] is required." 50 C.F.R. 402.14(i)(5).

At the individual permit level, the CWA Section 404(b)(1) Guidelines prohibit discharges that will likely jeopardize the continued existence of endangered or threatened species, or result in the likely destruction or adverse modification of habitat designated as critical for these species as determined by the Services. See 40 C.F.R. 233.20; 40 C.F.R. 230.10(b)(3). EPA anticipates that states and tribes may develop different program structures and coordination mechanisms to meet these requirements and any conditions of a programmatic incidental take statement, depending on factors such as the structure and expertise of the state and tribal agencies, provisions of state and tribal law, previous coordination among state or tribal and federal agencies, the number of ESA-considered species and extent of critical habitat, and other factors. States and tribes maintain the existing flexibilities in developing their CWA Section 404 programs to meet these requirements.

EPA's determination that CWA Section 404 provides the requisite discretionary involvement or control for the ESA to apply to EPA's approval of a state or tribal CWA Section 404 program does not modify or alter the application of the ESA to other EPA actions not analyzed here, such as actions under the CWA (other than state assumption of CWA Section 404 programs), Safe Drinking Water Act, the

Resource Conservation and Recovery Act, or other statutes implemented by EPA. For example, there are significant differences in how the CWA Section 402 and 404 programs operate, legally and procedurally, and nothing in this memorandum modifies established precedent and procedures for the NPDES permitting program. Likewise, EPA's determination that EPA has the discretion to consult on CWA Section 404 program approvals does not apply to actions by other federal agencies. EPA and other federal agencies must evaluate each federal activity considering the relevant implementing statute and the relevant factual situations to determine if the ESA consultation requirement attaches.


DAVID ROSS    Digitally signed by DAVID
              ROSS
              Date: 2020.08.27 13:35:21
              -05'00'
_____
David P. Ross,                      Date
Assistant Administrator

# Exhibit 2

**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
POST OFFICE BOX 4970
JACKSONVILLE, FLORIDA  32232-0019

REPLY TO
ATTENTION OF

March 19, 2018

Regulatory Division

# *PUBLIC NOTICE*

# *Determination of Navigable Waters*

<u>TO WHOM IT MAY CONCERN</u>:  The Jacksonville District, U.S. Army Corps of Engineers (Corps), seeks input from the public regarding the use of waters within the State of Florida for navigation.

<u>BACKGROUND:</u>  Pursuant to 33 C.F.R. § 329.4, navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.  A determination of navigability, once made, applies laterally over the entire surface of the waterbody, and is not extinguished by later actions or events which impede or destroy navigable capacity.

Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403) (Section 10) requires a Department of the Army (DA) permit for certain activities in, over, or under navigable waters of the United States.  A determination whether a waterbody is a navigable water of the United States is made by the division engineer and is based on a report of findings prepared at the district level according to specific criteria (33 C.F.R. § 329.14(b)).

In an effort to provide clarity to the regulated public regarding which waters are subject to permitting authority under Section 10, the Corps is performing an analysis of waterways in the state of Florida to determine the extent of navigability and identify the limits of Section 10 jurisdiction.

These navigability studies are required by regulation to be conducted and updated whenever a question arises regarding the navigability of a waterbody.  Where no determination has been made, a report of findings will be prepared and forwarded to the Division engineer for approval (33 C.F.R. § 329.15(a)).  Tabulated lists of final determinations of navigability are to be maintained in each district office, and be updated as necessitated by court decisions, jurisdictional inquiries, or other changed conditions (33 C.F.R. § 329.16(a)).

Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue DA permits for

the discharge of dredged or fill material into waters of the United States (Section 404 Program). Pursuant to Section 404(g) of the CWA, the Florida Department of Environmental Protection (DEP) is pursuing approval from the United States Environmental Protection Agency (EPA) to assume the Section 404 Program and administer its own individual and general permit program.  State assumption of the Section 404 Program would be limited to certain waters and does not include navigable waters of the United States.  The navigability studies will also assist with determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption.  The Regulations governing the assumption process can be found at 40 C.F.R. §233.

**To assist with completion of the navigability studies, the Corps is seeking comments from the public regarding use of waters in the state of Florida for navigation.  This includes identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities.**

COMMENTS:  Comments should be submitted in writing to the District Engineer or sent via email to the below addresses within 30 days from the date of this notice.  Please include mapping, figures, coordinates, etc. that clearly identify the reach of the associated waterbody and documentation relating to navigation, commerce, and recreation.

DEPARTMENT OF THE ARMY
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
REGULATORY DIVISION
ATTN: DETERMINATION OF NAVIGABLE WATERS
P. O. BOX 4970
JACKSONVILLE, FLORIDA 32232-0019


Navigability_Determination@usace.army.mil




for

Donald W. Kinard
Chief, Regulatory Division

# Exhibit 3

Case 1:21-cv-00119-RDM   Document 55-3   Filed 06/22/21   Page 91 of 129
USCA Case #24-5101        Document #2102936        Filed: 02/26/2025        Page 159 of 252

JACKSONVILLE DISTRICT

**US Army Corps of Engineers**

Search Jacksonville District

ABOUT   BUSINESS WITH US   MISSIONS   LOCATIONS   CAREERS   MEDIA   LIBRARY   CONTACT

HOME > MEDIA > NEWS RELEASES

## News Release Archive

| |
|---|
| 2018 (16) |
| 2017 (80) |
| 2016 (92) |
| 2015 (107) |
| 2014 (75) |
| 2013 (92) |
| 2012 (95) |
| 2011 (67) |

# Corps seeks public comment regarding water use for navigation

SHARE    Email   Print

*Posted 4/5/2018*
Release no. 18-022

**Contact**
Nakeir Nobles

The U.S. Army Corps of Engineers, Jacksonville District is seeking public comment regarding the use of waters within the State of Florida for navigation. The comment period closes April 18.

Section 10 of the Rivers and Harbors Act of 1899 requires a Department of the Army permit for certain activities in, over, or under navigable waters of the United States.  Navigable waters of the United States are those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce.

To provide clarity to the public regarding which waters are subject to permitting authority under Section 10, the Corps is performing an analysis of waterways in the State of Florida to determine the extent of navigability and identify the limits of Section 10 jurisdiction.

To assist with completion of the navigability studies, the Corps is seeking comments from the public regarding use of waters in the state of Florida for navigation.  This includes identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities.

Comments should be submitted in writing to the District Engineer or sent via email to the below addresses:


DEPARTMENT OF THE ARMY

JACKSONVILLE DISTRICT CORPS OF ENGINEERS

REGULATORY DIVISION

ATTN: DETERMINATION OF NAVIGABLE WATERS

P. O. BOX 4970

JACKSONVILLE, FLORIDA 32232-0019

Navigability_Determination@usace.army.mil

The complete public notice can be found on the Jacksonville District's Regulatory Public Notice web page at:

http://www.saj.usace.army.mil/Missions/Regulatory/Public-Notices/Article/1468709/navigability-determination/

-30-

environmental   Jacksonville District   regulatory   U.S. Army Corps of Engineers (USACE)   waters of the United States

      

Accessibility        Link Disclaimer      Site Map
Contact Us          No Fear Act          USA.gov
FOIA                Privacy & Security
Information Quality Act   Public Inquiries

JA.1614

# Exhibit 4

**DEPARTMENT OF THE ARMY**
JACKSONVILLE DISTRICT CORPS OF ENGINEERS
POST OFFICE BOX 4970
JACKSONVILLE, FLORIDA  32232-0019

REPLY TO
ATTENTION OF

April 10, 2018

Regulatory Division

# *UPDATED PUBLIC NOTICE*

# *Cessation of Public Comment Period*

<u>TO WHOM IT MAY CONCERN</u>:  The Jacksonville District, U.S. Army Corps of Engineers (Corps), is terminating the comment period for a previously issued public notice titled "Determination of Navigable Waters" and dated March 19, 2018.  As of today, the comment period originally set to expire on April 20, 2018, is considered closed until further notice.

for

Donald W. Kinard
Chief, Regulatory Division

JA.1616

# Exhibit 5



April 16, 2018

To: Jason A. Kirk, District Commander;
Copy: Donald W. Kinard, Chief, Regulatory Div.
Department of the Army
Jacksonville District Corps of Engineers
ATTN: Determination of Navigable Waters
P.O. Box 4970
Jacksonville, FL 32232-0019

**Re:  Proposed Florida Department of Environmental Protection's assumption of delegation of Section 404 Dredge and Fill Permitting authority; Jacksonville District Corps of Engineers Public Notice dated March 19, 2018 seeking public comment regarding Determination of Navigable Waters; Jacksonville District Corps of Engineers Public Notice dated April 10, 2018 titled Cessation of Public Comment Period**

Dear Colonel Kirk:

Sierra Club Florida demands that the Corps completely rectify its inventory of Florida's navigable waters before any actions take place with regard to the assumption of delegation of Section 404 dredge and fill permitting authority by Florida's Department of Environmental Protection (FDEP).  In the penultimate paragraph of the Public Notice dated March 19, 2018 (appendix A) the phrase "To assist with completion of the navigability studies,"  makes it clear that the Corps does not have a complete inventory of the navigable waters of the state. Sierra relied on the information in the public notice dated March 19, 2018 specifying the close of the public commment as April 18, 2018 as the deadline for submitting the requested information. In the Public Notice dated April 10, 2018 (Appendix B), the public comment period was peremptorily closed leaving us no clear official avenue to participate as requested in the original Public Notice.  If the Corps had disclosed in advance that the time limit for submission of additional information was April 10, comments and additional information would have been filed by that date.

Discussion:

Allowing the FDEP assumption of delegation process to move forward in the absence of an accurate inventory of Florida's navigable waters threatens the destruction of even more of our state's posterity by potentially opening vast swaths of protected wetlands to be  drained to make way for new development, including open pit mining.  Proponents of such destructive large scale projects have considerable influence in state elections and policy, and their interests are not congruent with those of the state or nation, or the intent of the Clean Water Act.  The Corps in

discharging its duty to the federal interest in protecting the nation's waters specified in Section 404 (g)(1) must retain its authority over *all* of those specified waters.  In order to fulfill that responsibility, the Corps must know which waters fall into the (g)(1) category.  Florida has lost over 9.3 million acres  of its original wetland areas[1]   to development and must not lose any more.  Florida has managed without section 404 permitting authority for forty-six years; a delay of another six months or a year to acquire essential information will not cause lasting damage.

The Corps' lists of navigable waters are incomplete and inadequate.  They total 492 Rivers and Creeks and 110 Lakes.  The Supplement to those lists totals 1767 Rivers and Creeks and 1186 Lakes and the text prefacing the Supplement's lists includes this sentence, "The District makes no claim that these lists are complete or completely accurate." Thousands of acres of Florida's most important environmental lands could be effectively destroyed if the Government doesn't get the right list of what has to be protected.  These lists were done in a rush and the Corps needs to go back and fix them.

Among the numerous resources listing Florida's water bodies are:
- the FDEP 2016 Integrated Water Quality Assessment for Florida, June 2016 (https://floridadep.gov/sites/default/files/2016-Integrated-Report.pdf) in Table 2.1. Florida atlas (p. 34) lists:
  - Total number of rivers and streams:  More than 1,700 / 27,561 linear miles
  - Total number of ditch and canal miles:  47,708 linear miles
  - Number of lakes, reservoirs, and ponds:  7,748 (area greater than or equal to 10 acres)
  - Number of known springs:  1,089
- The USF Water Institute's Florida Atlas of Lakes lists 5466 lakes (http://www.wateratlas.usf.edu/atlasoflakes/florida/)
- The 1982 Gazetteer of Florida Lakes refers to 7318 lakes, 3191 named. 624 are over 100 acres; 1483 over 25 acres  (http://ufdc.ufl.edu/AA00001540/00001)

These partial and uncertain lists require USACE  to go back to the drawing board and contact the officials of each water management district, county, municipality, soil and water conservation district, and the like to find out from the people on the ground where navigable waters are.  The Corps should also preserve the ability of waterways to provide a means of transportation for commerce by recognizing the historic use  of small Florida streams for commerce during the navigation era of the 19th and early 20th century, when waterways were the only practical avenues of communication.  See 'Short summary of the use of Florida waters for small scale commerce during the navigation era.' (Appendix C).

Determination of Navigability Public Notices from the Jacksonville District:
Despite the assertion in the Public Notice of March 19, 2018 that the Corps is performing an analysis of waterways in the state of Florida "in an effort to provide clarity to the regulated public," it is clear that the determination of navigability is a fundamental responsibility of the Corps, especially in light of FDEP's pursuit of assumption of delegation. Section 329 of the Code of Federal Regulations makes this clear:

---

[1] See report of the University of Florida Institute of Food and Agriculture Sciences Florida Wetlands Report (2015) available at https://soils.ifas.ufl.edu/wetlandextension/threats.htm

§ 329.14 Determination of navigability.
https://www.law.cornell.edu/cfr/text/33/329.14

**(a) *Effect on determinations.*** Although conclusive determinations of navigability can be made only by federal Courts, those made by federal agencies are nevertheless accorded substantial weight by the courts. **It is therefore necessary that when jurisdictional questions arise, district personnel carefully investigate those waters which may be subject to Federal regulatory jurisdiction under guidelines set out above, as the resulting determination may have substantial impact upon a judicial body**. Official determinations by an agency made in the past can be revised or reversed as necessary to reflect changed rules or interpretations of the law. *(emphases added)*

The langauge of 329.14 (a), "when jurisdictional questions arise", applies. In this case the question is whether the USACE or FDEP will have authority over waters and wetlands that may or may not fall within Section 404 (g)(1). This is not a discretionary activity for the Corps, it is necessary. The Draft Memorandum of Agreement between FDEP and the Corps (Appendix D) contains the following paragraph:

> III. WATERS TO BE ASSUMED A. All waters of the United States, as defined at 40 C.F.R. 232.2, within the State will be assumed by DEP as part of its State 404 Program, with the exception of those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement, as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto as described in Section III.B., below. **For purposes of this agreement, the Corps shall retain permitting authority over those Section 10, Rivers and Harbors Act of 1899 waters, which have been included, as of the effective date of this MOA, on the Jacksonville District Navigable Waters List for the State of Florida in Attachment A,** except those waters included on the list based solely on their historical use. This is consistent with the majority recommendations in the May 2017 Final Report of the Assumable Waters Subcommittee. *(emphases added)*

As of the date of this writing, the Jacksonville District Navigable Waters Lists (http://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/ Jacksonville%20District%20Section%2010%20Waters.pdf) (Appendix E) lists 492 Rivers and Creeks and 110 Lakes. The third sentence of the text preceding the lists reads, **"However, complete lists of all rivers, creeks, ponds, and lakes subject to Corps section 10 authority are not available."** The Supplement to those lists dated October 5, 2017 (http://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting_factors/ 20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=2017-10-05-123156-363) (Appendix F) as noted above is prefaced by the caveat that "The District makes no claim that these lists are complete or completely accurate." The process of delegating assumption of permitting authority to FDEP must not continue until complete lists are available. The MOA excerpted above in bolded text would, if adopted today, usurp USACE's appropriate jurisdiction over (g)(1) waters simply because no complete list exists. The underlined text in the excerpt

Sierra Club Florida ● 1990 Central Avenue ● St. Petersburg, FL 33712 ● florida.sierraclub.org

takes as determinative the majority recommendations of the 2017 Final Report of the Assumable Waters Subcommittee (Appendix G) which is contrary to the USACE's Minority Recommendation.

### § 329.15 Inquiries regarding determinations.
https://www.law.cornell.edu/cfr/text/33/329.15

(c) Specific inquiries regarding the ***jurisdiction*** of the Corps of Engineers can be answered only after a determination whether (1) the waters are navigable waters of the United States or

(2) If not navigable, whether the proposed type of activity may nevertheless so affect the navigable waters of the United States that the assertion of regulatory jurisdiction is deemed necessary.

Since the MOA between FDEP and USACE will set the parameters of Corps and state jurisdictions, it is essential that a complete and accurate list of (g)(1) waters be available.

### § 329.16 Use and maintenance of lists of determinations.
https://www.law.cornell.edu/cfr/text/33/329.16

(a) Tabulated lists of final determinations of navigability are to be maintained in each district office, and be updated as necessitated by court decisions, jurisdictional inquiries, or other changed conditions.

(b) It should be noted that the lists represent only those waterbodies for which determinations have been made; absence from that list should not be taken as an indication that the waterbody is not navigable.

(c) Deletions from the list are not authorized. If a change in status of a waterbody from navigable to non-navigable is deemed necessary, an updated finding should be forwarded to the division engineer; changes are not considered final until a determination has been made by the division engineer.

Section 329.16 (a) requires the maintenance of tabulated lists of final determinations of navigability. That responsibility is not satisfied by the current lists of waters that have been determined to be navigable if the supplemental lists are included as they are, by the USACE's admission, possibly incomplete and/or inaccurate. At best, those lists are necessary but not sufficient as 329.16 (b) makes crystal clear. Finally, 329.16 (c) says "Deletions from the list are not authorized." The elimination of "waters included on the list based solely on their historical use" cited in the Draft MOA between USACE and FDEP would effectively remove these waters from the lists of waters that have been determined to be navigable without following the required procedures of subsection (c).

The Public Notice dated April 10, 2018 titled Cessation of Public Comment Period effectively denies Sierra and others of the opportunity to provide important information to USACE and weakens the ability of the Corps to fulfill its responsibility to determine the navigability of all the waters of the state that may come into question during the assumption of delegation process. The peremptory denial of an official conduit for comment on this important issue belies

recognition by USACE that the existing lists of Florida's navigable waters are inadequate and insufficient to meet regulatory and legal requirements.  Additionally, the April 10 notice incorrectly identifies the public comment deadline as April 20 instead of April 18.  Whether this is a typographical error or a cynical effort to convince members of the public who still wanted to submit their comments to do so after the actual deadline passed so it could be ignored is impossible to know.

Under these circumstances, the USACE must reopen the comment period, and comply with its rules and governing law by correcting the errors in its lists of navigable waters.

Thank you for your prompt attention to this matter.

Sincerely,


Frank Jackalone
Florida Chapter Director
Sierra Club
1990 Central Avenue
St. Petersburg, FL 33712
727-824-8813, Extension 302


**ATTACHMENTS (7)**

**LIST OF APPENDICES**

Appendix A - Public Notice dated March 19, 2018
Appendix B - Public Notice dated April 10, 2018
Appendix C - Short summary of the use of Florida waters for small scale commerce during the
            navigation era
Appendix D - Draft Memorandum of Agreement between FDEP and the Corps
Appendix E - Jacksonville District Navigable Waters Lists
            (http://www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_perm
            itting_factors/Jacksonville%20District%20Section%2010%20Waters.pdf)
Appendix F – Supplement to Jacksonville District Navigable Waters Lists
            (www.saj.usace.army.mil/Portals/44/docs/regulatory/sourcebook/other_permitting
            _factors/20171005SupplementToJacksonvilleDistrictSection10Waters.pdf?ver=20
            17-10-05-123156-363)
Appendix G - 2017 Final Report of the Assumable Waters Subcommittee

# Exhibit 6

CONSERVANCY
of Southwest Florida
OUR WATER, LAND, WILDLIFE, FUTURE.

*Protecting Southwest Florida's unique natural environment and quality of life ... now and forever.*

April 18, 2018                                             *Sent via email*

Department of the Army
Jacksonville District Corps of Engineers
Regulatory Division
Attn: Determination of Navigable Waters
PO Box 4970
Jacksonville, FL 32232-0019

The Conservancy of Southwest Florida is writing on behalf of our over 6,000 supporters, in regards to the navigability of waters in southwest Florida. The Conservancy strongly opposes the state of Florida assuming Clean Water Act Section 404 permitting authority.

This letter and its attachments should be considered as a response to the Army Corps of Engineers (ACOE) Public Notice dated March 19, 2018, entitled "Determination of Navigable Waters,'[1] along with additional forthcoming comments from the Conservancy and our partners. These comments should be used to provide clarity regarding which waters should be considered as subject to retained ACOE permitting authority under Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. § 403). Additional information-gathering by the ACOE and other stakeholders will be needed to ensure that these determinations are made utilizing a transparent process and complete best available scientific information.

We are very concerned with the original limited public commenting window that the ACOE issued, and even more concerned with the updated public notice dated April 10, 2018[2] that stated the public comment period was closed in advance of the.original published deadline.

In preparation of these comments, the Conservancy has reviewed a document entitled "Jacksonville District Navigable Waters List" (a 6 page document that has been attached to the draft Memorandum of Agreement between the Florida Department of Environmental Protection and the Department of the Army that will be referred to in this letter as the "old list") and a document called "Supplement to the Jacksonville District Navigable Waters List" dated October 5, 2017 (a 17 page document that will be referred to in this letter as the "new list"), both enclosed.

ACOE should use the new 17-page list as their starting point with the inclusion of 139 waters that appear to be removed from the old 6-page list (see Attachment A). It is unclear why these waters dropped off the list, so again we ask that ACOE adopt the most expansive list of retained *waters;* including all waters that have previously been identified as navigable.

---

[1] Army Corps of Engineers, 2018. Public Notice. Determination of Navigable Waters. March 19, 2018.
[2] Army Corps of Engineers, 2018. Updated Public Notice; Cessation of Public Comment Period. April 10, 2018.



Conservancy of Southwest Florida has **been** awarded Charity Navigator's prestigious 4-Star top rating for good governance, sound fiscal management and commitment to accountability and transparency. Charity Navigator is America's largest and most respected independent evaluator of charities.

JA.1624

Case 1:21-cv-00119-RDM   Document 55-3   Filed 06/22/21   Page 102 of 129
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 170 of 252

Conservancy of Southwest Florida   12
Navigability of waters in southwest Florida

Further, the waters identified below :-while not an exhaustive list and not a complete description of past, current or potential future commerce, commercial,or recreational activity- may also meet the definition of navigable and should be considered for retention under ACOE purview under Section 10 of Rivers and Harbors[3]:

Charlotte County area

- Alligator Creek (on both lists): has recreational activity including paddling
- Bear Branch (on new list)
- Big Dead Creek (missing from both lists)
- Buck Creek (on both lists)
- Charlotte Harbor (missing from both lists): has recreational activity including paddling
- Charlie Creek (on new list): has recreational activity including paddling
- Coral Creek (on new list)
- Curry Creek (on new list)
- Deer Prairie Creek (on new list)
- Horse Creek (on new list)
- Howard Creek (on both lists)
- Jacks Branch (on new list)
- Joshua Creek (on new list)
- Lee Branch (on new list)
- Lewis Creek (missing from both lists)
- Little Alligator Creek (on new list)
- Myakka River (on both lists): has recreational activity including paddling
- North Fork Alligator Creek (on new list)
- Oyster Creek (on new list)
- Paynes Creek (missing from both lists)
- Peace River (on both lists): has commercial and recreational activity including sightseeing operators and paddling
- Rock Creek (on new list)[4]
- Sam Knight Creek (on new list)
- Shell Creek (on both lists): has recreational activity including paddling
- South Fork Alligator Creek[5] (missing from both lists)
- West Branch Coral Creek (on new list)
- Whidden Creek (on new list)

---

[3] Decades of administrative action and case law relating to the CWA and RHA have established that use in "interstate or foreign commerce" can also include use for recreational commerce activities such as fishing, swimming and boating. *See, e.g., State of Utah By* & *Through Div. of Parks* & *Recreation v. Marsh,* 740 F.2d 799, 803-04 (10th Cir. 1984) (interstate commerce included recreational use of lake by interstate travelers for fishing, hunting, boating, camping,wildlife viewing and other activities).
[4] There is a Rock Creek in Charlotte County area, as well as in the Collier County area. It is unclear which Rock Creek is listed on the new Supplemental list.
[5] The new Supplemental list includes a "South Prong Alligator Creek."

Conservancy of Southwest Florida 13
Navigability of waters in southwest Florida

Collier County area
- Barron River (on both lists): has recreational activity including paddling and boating
- Barron Canal (missing from both lists)
- Blackwater River (on both lists): has recreational activity including paddling
- Camp Keais Strand (missing from both lists)
- City of Marco area canals
- Clam Bay/Pass (missing from both lists): has recreational activity including paddling
- Cocohatchee River (on both lists): has recreational activity including paddling
- Cocohatchee Canal (missing from both lists): has recreational activity including boating
- Cow Slough (missing from both lists)
- East River (on both lists)
- Fakahatchee Bay (missing from both lists)
- Fakahatchee River (on both lists)
- Fakahatchee Strand (missing from both lists): has recreational activity including paddling
- Faka Union River (on new list)
- Faka Union Bay (missing from both lists)
- Faka Union Canal (missing from both lists): has recreational activity including paddling and boating
- Ferguson River (on new list)
- Haldeman Creek (missing from both lists): has recreational activity including paddling and boating
- Golden Gate Canal (missing from both lists): has recreational activity including Conservancy of Southwest Florida boat tour and kayaking
- Gordon River (on new list): has recreational activity including Conservancy of Southwest Florida boat tour and kayaking
- Henderson Creek (on both lists): has recreational activity including paddling and boating
- Lake Trafford (missing from both lists): has commercial and recreational activity including fishing, airboat operators, sightseeing operators, and marina
- Little Hickory Bay (missing from both lists)
- Naples Bay (missing from both lists)
- New River (on both lists)
- Okaloacoochee Slough (missing from both lists)
- Pumpkin Bay (missing from both lists) - paddling
- Silver Strand (missing from both lists)
- Rock Creek (on new list): has recreational activity including boating
- Rookery Bay (missing from both lists): has recreational activity including paddling
- Turner River (on both lists): has commercial and recreational activity including sightseeing operators and paddling
- Water Turkey Bay (missing from both lists)
- Whitney River (on both lists)
- Wiggins Pass (missing from both lists): has recreational_activity including paddling

Lee, Hendry, and Glades County areas
- Bedman Creek (on new list): has recreational activity including paddling
- Bee Branch (on new list)
- Billy Creek (on both lists): has recreational activity including paddling

Conservancy of Southwest Florida 14
Navigability of waters in southwest Florida

- Caloosa Creek (missing from both lists): has recreational activity including paddling
- Caloosahatchee River (on both lists): has recreational activity including paddling
- Caloosahatchee Canal (on new list)
- Catfish Creek (on new list)
- City of Cape Coral canals (missing from both lists): has recreational activity including paddling, fishing, and boating
- Cypress Branch (on new list)
- Cypress Creek (on both lists): has recreational activity including paddling
- Daugherty Creek (missing from both lists): has recreational activity including paddling
- Deadmans Branch (on new list)
- Deep Lagoon Canal (missing from both lists): has recreational activity including paddling
- Estero River (on both lists): has commercial and recreational activity including paddling
- Estero Bay (missing from both lists): has recreational activity including paddling and boating
- Fisheating Creek (on both lists): has commercial and recreational activity including sightseeing operators and paddling
- Fitcher's Creek (missing from both lists): has recreational activity including paddling
- Fort Simmons Branch (on new list)
- Four Mile Cove[6] (missing from both lists): has recreational activity including paddling
- Gasparilla Sou.nd (missing from both lists): has commercial and recreational activity including, paddling, boating, sightseeing operators
- Gator Slough (on the new list) : has recreational activity including paddling
- Goodno Canal (missing from both lists)
- Hancock Creek (on new list): has recreational activity including paddling
- Hendry Creek (on new list)
- Hickey Creek (on new list): has recreational activity including paddling
- Imperial River (on both lists):  has commercial and recreational activity including paddling and sightseeing operators
- Jewfish Creek (on new list): has recreational activity including paddling
- Jug Creek (missing from both lists): has recreational activity including paddling, fishing, boating
- Lake Hicpochee (missing from both lists): ha recreational activity including paddling
- Lake Okeechobee (missing from new list): has commercial and recreational activity including paddling, marina, resort
- Lake Okeechobee Rim Canal (missing from new list)
- Lake Okeechobee Waterway (missing from new list): has commercial and recreational activity including boating
- Long Hammock Creek (missing from both lists)
- Manuel Branch (on new list): has recreational activity including paddling
- Marsh Point Creek (missing from both lists): has recreational activity including paddling
- Matlacha Pass (missing from both lists): has commercial and recreational activity including paddling, boating, and shellfish harvesting
- Mullock Creek (on new list): has recreational activity including paddling
- Nine Mile Canal (missing from both lists)
- Oak Creek (on new list): has recreational activity including paddling
- Orange River (on both lists): has commercial and recreational activity including paddling

---

[6] The new Supplemental list includes a "Four Mile Branch" and "Four Mile Creek."

Conservancy of Southwest Florida 1 S
Navigability of waters in southwest Florida

- Otter Creek (on new list): has recreational activity including paddling
- Owl Creek (on new list): has recreational activity including paddling
- Palm Creek (missing from both lists)
- Pine Island Creek (on new list)
- Pine Island Sound (missing from both lists): has commercial and recreational activity including paddling and boating
- Pollywog Creek (on new list)
- Popash Creek (on new list): has recreational activity including paddling
- Powell Creek (on new list)
- Roberts Canal (missing from both lists)
- San Carlos Bay (missing from both lists): has recreational activity including paddling and boating
- Sanibel River (missing from both lists): has recreational activity including paddling
- Shell Creek[7] (on both lists): has recreational activity including· paddling
- Six Mile Cypress Slough (missing from both lists)
- Spanish Creek (on new list): has recreational activity including paddling
- Spring Creek (on both lists): has recreational activity including paddling
- St. James Creek (missing from both lists): has recreational activity including paddling
- Stroud Creek (on new list):-has recreational activity including paddling
- Telegraph Creek (on new list): has recreational activity including paddling
- Ten Mile Canal (missing from both lists): has recreational activity including paddling
- Townsend Canal (missing from both lists)
- Trout Creek (on both lists): has recreational activity including paddling
- Whiskey Creek (on new list): has recreational activity including paddling
- Yellow Fever Creek (on new list): has recreational activity including paddling
- Yucca Pen Creek

If you have any questions about our letter, please contact me at (239) 262-0304, ext. 286. Thank you for considering our comments.

Sincerely,

Amber Crooks
Environmental Policy Manager

ENCLOSURES: Navigable Waters List (6 pages)
Supplement to the Jacksonville District Navigable Waters List dated October 5, 2017
(17 pages)

---

[7] There is a Shell Creek in Charlotte County area, as well as in the Lee County area. It is unclear which Shell Creek is listed.

Conservancy of Southwest Florida  1 6
Navigability of waters in southwest Florida

Attachment A

Waters that were on the 6-page document but not included in the 17-page update (2017):

Rivers and Creeks

1. Alligator Lake - Lake Gentry
2. Barrentine Creek
3. Big Marco River
4. Big Mud Creek
5. Black Creek (Walton County)
6. Blue Hole Creek
7. Blue Springs Run
8. Bonnet Creek
9. Boynton Canal
10. Brick-Alligator Lake Canal
11. Broward Creek
12. C-15 Canal
13. C-17 Canal
14. C-18 Canal
15. C-23 Canal
16. C-24 Canal
17. C-51 Canal
18. Chicopit Bay
19. Co"ldwater Creek
20. Coon Lake-Lake Lizzie Canal
21. Coral Gables Waterway
22. Cormorant Creek
23. Cowhead Creek
24. Dania Cut-Off Canal
25. Deblieu Canal
26. Doctors Lake
27. Gulley Creek
28. Haines Creek
29. Hatchett Creek
30. Hatchineha Canal
31. Hillsboro Canal
32. Hillsboro River
33. Hitchens Creek
34. Holiday Harbor
35. Hudson Bayou

Conservancy of Southwest Florida 17

Navigability of waters in southwest Florida

36. Indian River North
37. Jackson Canal
38. Johnson Creek (Gulf County}
39. Jones Swamp Creek
40. Kentner Creek
41. L-40 Canal
42. L-8 Canal
43. Lafayette Creek
44. Lake Ajay-Fells Cove Canal
45. Lake Apopka-Beauclerc Canal
46. Lake Ashby Canal
47. Lake Center-Coon Canal
48. Lake Griffin-Lake Canal
49. Lake Hart-Ajay Canal
50. Lake Joel-Myrtle Canal
51. Lake Joel-Trout Canal
52. Lake Lizzie-Alligator Canal
53. Lake Mary Jane-Hart Canal
54. Lake Myrtle-Mary Jane Canal
55. Lake Okeechobee Rim Canal
56. Lake Okeechobee Waterway
57. Lake Preston-Myrtle Canal
58. Lake Worth Lagoon
59. Lehigh Central
60. Little Clapboard Creek
61. Little Double Creek
62. Little Mud Creek
63. Lopez River
64. Moore's Creek (Martin County)
65. Morris Dead River
66. Morrison Creek
67. Murphy Creek
68. Myakkahatchee Creek
69. NN Creek
70. North New River Canal
71. Old Channel
72. Pea River
73. Phelps Creek
74. Poncho Creek
75. Rocky Creek
76. Salt Creek

Conservancy of Southwest Florida 18
Navigability of waters in southwest Florida

77. Short Canal

78. Snell Creek

79. South Port Canal

80. Stranahan River

81. Summer Haven River

82. Tarpon River

83. Trout-Coon Lake Canal

84. Turkey Creek

85. Warf Creek

86. West Branch*[8]

87. West Palm Beach' Canal

88. Woodruff Creek

89. Wrights Creek (Walton County)


1. Blue Cypress Lake

2. Blue Lagoon

3. Brick Lake

4. Cherry Lake

5. Coon Lake

6. Dumbfoundling Bay

7. Fells Cove

8. Lake Ajay

9. Lake Apopka

10. Lake Ashby

11. Lake Beauciair

12. Lake Carlton

13. Lake Center

14. Lake Dora

15. Lake Gentry

16. Lake Hatchineha

17. Lake Hell 'n Blazes

18. Lake Isokpoga

19. Lake Jackson

20. Lake Jessup

21. Lake Joel

22. Lake Kissimmee

---

[8] West Branch Blockhouse Creek, Coral Creek, Lightwood Knot Creek, Mare Creek, & South Prong Alafia River included in the update.

Conservancy of Southwest Florida | 9
Navigability of waters in southwest Florida

23. Lake Lizzie
24. Lake Manatee
25. Lake Mary Jane
26. Lake Minnehaha
27. Lake Minneola
28. Lake Nellie
29. Lake Okeechobee
30. Lake Ola
31. Lake Powel
32. Lake Preston
33. Lake Rosalie
34. Lake Santa Fe
35. Lake Talquin
36. Lake Tarpon
37. Lake Thonotosassa
38. Lake Tohopekaliga
39. Lake Washington
40. Lake Weohyakapka
41. Lake Winder
42. Lake Yale
43. Little Lake Harris
44. Little Lake Santa Fe
45. Lochloosa Lake
46. Loughman Lake
47. Rodman Reservoir
48. Spring Garden Lake
49. Tsala Apopka Lake
50. Ward Lake (Manatee County)

# Exhibit 7

JA.1633

Audubon FLORIDA

April 17, 2018

Mr. Donald W. Kinard
Chief, Regulatory Division
Jacksonville District Corps of Engineers
P. O. Box 4970
Jacksonville, FL 32232-0019

RE: Comments regarding the Determination of Navigable Waters in Florida

Dear Mr. Kinard,

As the State of Florida moves toward assumption of the Section 404 Program of the Clean Water Act (CWA), a determination must be made regarding which waters are to remain within federal jurisdiction. Audubon Florida appreciates the importance of this effort and thanks the Corps for soliciting input from the public. We also support and anticipate a public process leading to the creation of the related Memoranda of Agreement between the state and federal agencies.

We offer the following comments on the creation of the navigable waters list. In general, Audubon supports the positions put forth by the Corps in the Final Report of the Assumable Waters Subcommittee in 2017 and believes this reasoning should be the basis for the current effort. Listed below are the steps we feel the Corps should take to create the list of the waters and wetlands to remain within their administrative authority.

1. **Begin with the waters listed on the "Supplement to the Jacksonville District Navigable Waters Lists" dated October 5, 2017.**

The October 5, 2017 list should represent the baseline from which to build the complete list of retained waters. This list should be augmented with additions based on the suggestions that follow.

2. **Add waters on Indian lands that are assumable by tribes under the CWA section 404.**

Since tribes could request assumption of waters on their lands at a future date they should remain under the authority of the Corps.

3. **The Corps should retain wetlands adjacent to navigable waters according to the guidance and process that has been in place for many years.**

Wetlands considered adjacent to a navigable water are those that contribute to its continued navigability. Changes in the conditions of these wetlands will have direct impacts on navigable waters and should be included in the list of retained waters under authority of the Corps. Given Florida's unique, highly transmissive karst geology, the identification of adjacent waters should go beyond a simple examination of distance from a navigable water and should consider groundwater flow.

4. **The Corps should add waters and wetlands that are connected to recreation and tourism, Florida's primary industry and chief source of interstate and international commerce.**

JA.1634

The EPA defines "Waters of the U.S." in part by their use for interstate and international commerce, including recreation and travel tourism (emphasis added):

> *40 CFR 230.3(s) The term waters of the United States means:*
> 1. *All waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;*
> 2. *All interstate waters including interstate wetlands;*
> 3. *All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce including any such waters:*
>     a. ***Which are or could be used by interstate or foreign travelers for recreational or other purposes; or***
>     b. *From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or*
>     c. *Which are used or could be used for industrial purposes by industries in interstate commerce;*

Accordingly, the Corps' Section 10 criteria must ensure that navigable waters and their adjacent wetlands which support tourism and recreational use are not assumable by the state. These uses, especially throughout Florida, clearly involve interstate and international commerce.

Thank you for considering our comments. Florida's assumption of Section 404 permitting will be very complex and will require careful development to ensure state implementation will be no less protective than existing federal standards. A public process to develop this assumed program will be essential. Please keep Audubon Florida apprised of continued work on this issue as it of great importance to our organization and our members throughout the state.

Sincerely,

Julie Wraithmell
Interim Executive Director

JA.1635

# Exhibit 8



Colonel Jason A. Kirk, District Commander
Jacksonville District Corps of Engineers
Regulatory Division
Att'n: Determination of Navigable Waters
P.O. Box 4970
Jacksonville, Florida  32232-0019

April 18, 2018
*Via Email* Jason.a.kirk@usace.army.mil, Navigability_Determination@usace.army.mil

Dear Colonel Kirk:

On behalf of our respective organizations, we are writing to request that the U.S. Army Corps of Engineers adopt the broadest interpretation of navigable waters under the Clean Water Act (CWA). Florida's waterways are uniquely connected and thus should be comprehensively and collectively protected under the Clean Water Act. We oppose any attempt to undermine these protections through unnecessary reclassification of waterways and we sincerely urge the Corps to maintain permitting authority over these important resources.

CWA Section 404 requires permits for the discharge of dredge and fill material into Waters of the United States, including wetlands. Florida has particularly fragile and critical areas that are regulated by Section 404 dredge and fill permits, and which require the highest level of review and scrutiny. We believe that the federal government is best able to conduct this review given their historic jurisdiction and agency expertise in this area. The federal authority to govern our waters has its origins in the Commerce Clause of the Constitution due to the central role our waterways and seas play in interstate commerce. Traditionally, wetlands have been subject to federal jurisdiction as well due to their critical role in providing watershed connectivity. As such, we strongly believe that CWA authority should remain with the federal government and any delegation to the state would be inappropriate and incongruous with the spirit of the law. Our organizations vehemently oppose the state of Florida's attempt to assume this jurisdiction.

JA.1637

Due to the value of these resources to our state, we urge the Corps to apply a broad interpretation to navigable waters in order to maintain federal control of these waterways. We request the Corps fully assess Florida's water bodies to ensure the Florida Navigable Waters List is complete and completely accurate. In addition, we urge the Corps to provide adequate public involvement and transparency during the process to update Florida's Navigable Waters.

In addition, we fully support comments submitted by Earthjustice regarding the navigability of waters in the State of Florida within the meaning of Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403, for purposes of determining the Corps' jurisdiction should the U.S. Environmental Protection Agency (EPA) grant Florida's anticipated request to administer its own permitting program under Section 404(a) of the Clean Water Act of 1972 (CWA), 33 U.S.C. § 1344, in waters of the United States.

Each signatory is an independent organization and member of Waterkeeper Alliance, a global movement of on-the-water advocates who patrol and protect over 100,000 miles of rivers, streams and coastlines in North and South America, Europe, Australia, Asia and Africa. More than 300 Waterkeeper Organizations worldwide combine firsthand knowledge of their waterways with an unwavering commitment to the rights of their communities and to the rule of law.

Sincerely,
Rachel Silverstein                          Lisa Rinaman
Miami Waterkeeper                           St. Johns Riverkeeper

Georgia Ackerman                            Andrew Hayslip
Apalachicola Riverkeeper                     Tampa Bay Waterkeeper

Marty Baum                                  Andy Mele & Justin Bloom
Indian Riverkeeper                           Suncoast Waterkeeper

Jen Lomberk                                 John Quarterman
Matanzas Riverkeeper                         Suwannee Riverkeeper

Rick Frey                                   Reinaldo Diaz
St. Marys Riverkeeper                        Lake Worth Waterkeeper

Harrison Langley                            Laurie Murphy
Collier County Waterkeeper                   Emerald Coastkeeper

John Cassani
Calusa Waterkeeper

# Exhibit 9



Florida Department of Health, Division of Disease Control and Health Protection

# Total Cases
## 771,780

**Cumulative Data for Florida Residents:**

# Positive Residents
## 761,924

**Resident Hospitalizations**
## 47,953

| Florida Resident Deaths | Non-Resident Deaths |
|---|---|
| 16,340 | 204 |

Comparison of counties is not possible because case data are not adjusted by population.

Data is updated every day at approximately 11 A.M. ET.

| Florida Cases | Florida Testing | Cases by County | Rates Map | Case Maps | Cases by Zip Code | Health Metrics | USA and World |

University of South Florida, FDEP, Esri, HERE, Garmin, FA...

# Exhibit 10



NEWS / FLORIDA POLITICS / THE BUZZ

# Florida agencies asked to cut 8.5 percent to adjust for COVID-19

The directive came after the pandemic caused tax revenues to plummet in April, May and June and after DeSantis vetoed $1 billion in spending from the 2020-2021 budget.

   



The Florida Legislature is facing steep budget cuts for the state budget, but has so far refused to hold a special session.

By **Christine Sexton**



# Tampa Bay Times

TALLAHASSEE — Getting ready for the possibility of a special legislative session to balance Florida's budget, Gov. Ron DeSantis' administration and top House and Senate appropriations staff have called on state agencies to draw up ways to slice 8.5 percent from their current budgets to address "the expected shortfall" as a result of the COVID-19 pandemic.

The direction to look for reductions does not mean such cuts will be made in the fiscal year 2020-2021 budget, which took effect July 1. It was included in annual budget instructions sent to state agencies in mid-July.

But it came after the pandemic caused tax revenues to plummet in April, May and June and after DeSantis vetoed $1 billion in spending from the 2020-2021 budget. DeSantis made the vetoes in hopes of conserving cash and aligning the budget, which lawmakers passed in March as the pandemic was starting to hit, with the economic realities stemming from business shutdowns and job losses.

ADVERTISEMENT



Despite frequent requests from Democrats, DeSantis and Republican legislative leaders have shown no willingness to hold a special session before the November elections. But with the fiscal year running through June 30, they could be faced with making budget cuts at some point.

While DeSantis vetoed $1 billion, he signed a $92.2 billion budget into law that included high-profile issues such as $500 million to increase teacher pay, $625

≡   *Tampa Bay Times*                                 🔲 ∨

...ies and other water-related projects and $100 million for the Florida Forever conservation program. He also approved 3 percent pay raises for state workers.

When he signed the budget in June, DeSantis said he was convinced "we'll be able to weather the storm and do it right," noting that the state had bolstered its reserves and had received money through a federal-stimulus law known as the CARES Act.



SPONSORED CONTENT

*HOW TO CLEAN by adidas* ⬈

*By adidas*

But DeSantis said on a radio show Monday that the pandemic will "loom" over every budget and policy debate during the 2021 legislative session, which starts in March.

"We are using intelligently the CARES Act money in a way that I think will keep us whole," DeSantis said during an appearance on the Preston Scott show on WFLA radio in Tallahassee. "So, as we go into the legislative session, from a budget perspective, I think we'll probably be OK for this fiscal year. I think the question is, is how robust is the recovery from the coronavirus shutdown? And if it's robust, that gives us more options. If it's not, then we may have to make some more tough decisions."

ADVERTISEMENT

JA.1644

10/23/2020
Case 1:21-cv-00119-RDM Document 55-3 Filed 06/22/21 Page 122 of 129
Florida agencies asked to cut 8.5 percent to adjust for COVID-19
USCA Case #24-5101    Document #2102936    Filed: 02/26/2025    Page 190 of 252

## Tampa Bay Times

A panel of economists will meet Friday to revise estimates of state general revenue, which plays a critical role in funding schools, health programs and prisons.

But economists recently said the state finished the 2019-2020 fiscal year on June 30 with $1.88 billion less in revenues than what was previously anticipated.

The declining revenues also come at a time when more Floridians have enrolled in Medicaid. Enrollment in the health-care program for poor, elderly and disabled people is expected to balloon by more than 14 percent during the current fiscal year, with economists predicting an average monthly enrollment of 4.36 million people.

DeSantis' office did not immediately respond to requests for comments about the memo directing agencies to look at possible budget cuts. But Senate spokeswoman Katie Betta called the reduction exercise prudent.

### Become a Florida politics expert by signing up for The Buzz with Steve Contorno

Steve's free, weekly newsletter brings top political news and analysis right to your inbox.



# Tampa Bay Times

TYPE YOUR EMAIL ADDRESS HERE

**SIGN UP**

Find all our newsletters

"It is common for (a legislative budget request) instructions to include an exercise evaluating current year cuts during times when there are significant unknown and unpredictable factors impacting the state budget," Betta said.

Betta added that another "data point will be available later in the week" when the panel of economists update the general revenue estimates.

The July 15 budget memo also requires state agencies to compile recommendations on 10 percent worth of reductions for the 2021-2022 fiscal year, which will start July 1.



ADVERTISEMENT

Ad removed. Details

The 10 percent reduction is part of a routine budget exercise. The governor's office and legislative budget officials made "optional" a portion of that exercise that allows agencies to make a priority listing of the programs or services targeted for potential reductions.

**UP NEXT:** Amendment 3 would suppress Black representation in Florida, new report says

# Exhibit 11


Case 1:21-cv-00119-RDM Document 55-3 Filed 06/22/21 Page 125 of 129

TSCA Case #2475101     Document #2102936     Filed: 02/26/2025     Page 193 of 252

*Tampa Bay Times*

A D V E R T I S E M E N T

**OPINION**

# Editorial: The Rick Scott record: an environmental disaster

   



Diver Josh Lunsford uses a vacuum pump to pull out nitrate-rich sediment from Chassahowitzka Springs as a part of a springs restoration project. Gov. Rick Scott ended a springs restoration initiative launched by Gov. Jeb Bush, and did nothing to push a bipartisan bill in the Senate that would have spent hundreds of millions of dollars to clean up springs.

Published Sep. 5, 2014

For the last 50 years, Florida's governors have been reasonably responsible stewards of the state's fragile environment. They initiated efforts to clean up rivers and bays, buy and preserve millions of acres of sensitive land, manage

cleaner and more land is protected from development than a generation or two ago. In just four years, Gov. Rick Scott has put those accomplishments at risk.

Scott has bulldozed a record of environmental protection that his Republican and Democratic predecessors spent decades building. He weakened the enforcement of environmental laws and cut support for clean water, conservation and other programs. He simultaneously made it easier for the biggest polluters and private industries to degrade the state's natural resources. While the first-term Republican attempts to transform himself into an environmentalist during his re-election campaign, his record reflects a callous disregard for the state's natural resources and no understanding of how deeply Floridians care about their state's beauty and treasures.

A D V E R T I S E M E N T



Scott changed the direction of environmental policy from the start, appointing a Jacksonville shipping executive with "insights on the challenges businesses face in the permitting process" as the secretary of the Department of Environmental Protection. He asked the Legislature for smaller budgets for DEP every year except for this election year. But the governor's stinginess is only part of the problem. He also triggered a brain drain among regulators, sided with polluters and developers over public health, refused to acknowledge the impact of man-made climate change and stalled any serious attempt to address water quality, land conservation or growth management.

Enforcement

In his first year, Scott forced the state's five regional water management districts to reduce their budgets by $700 million and filled their appointed boards with

9/24/2020
Case 1:21-cv-00119-RDM Document 55-3 Filed 06/22/21 Page 127 of 129
Editorial: The Rick Scott record: An environmental disaster

TSCA Case #2475101     Document #2102936     Filed: 02/26/2025     Page 195 of 252

*Tampa Bay Times*

and led to widespread layoffs at the water management districts that turned them into shells of their former selves. The Scott administration undercut enforcement and dampened public input on development as it eliminated the state's growth management agency. DEP offered bonuses to employees to speed up permitting, and its departing regulatory chief boasted this year that the agency cut wait times for permits by two-thirds.

ADVERTISEMENT

Scott's political appointees created a chilling culture at the DEP. The former deputy secretary ordered the agency's top wetlands expert to approve a permit that she said would violate state law. After Connie Bersok refused, she was suspended and investigated by the agency. She was later vindicated, and the project was dropped.

Water

In what was a priority for big polluters, Scott waged a protracted fight with the federal government over long-delayed clean water standards. The Environmental Protection Agency eventually caved to the pressure and gave the state too much discretion, a transparent attempt by the Obama administration to boost the president's popularity in Florida during his re-election campaign. In 2012, Scott killed a statewide septic tank inspection program that would have been key to reducing water pollution. He ended a springs restoration initiative launched by Gov. Jeb Bush. This year, he did nothing to push a bipartisan bill in the Senate that would have spent hundreds of millions of dollars cleaning up the springs. He did ask for $55 million in his budget for springs, but instead the Legislature agreed to only $30 million.

Conservation

The economic meltdown caused spending for the Florida Forever land conservation program to drop by nearly two-thirds by the time Scott took office from its high-water mark years ago. But spending in Scott's first three years dropped significantly, from $100 million the year he came into office, to $27 million in 2012 and $17 million in 2013. Most of the money committed in the last two years has not been cash but permission to use money from the sale of surplus

administration scrapped the effort without selling a single acre.



ADVERTISEMENT

Now Scott wants to pave over his record with a campaign plan that calls for more than $1 billion in spending over the next decade. He would commit $500 million each for springs restoration and alternative water supply projects. His proposal far exceeds what he budgeted for springs and conservation land during his first term, and he offers no suggestions for how to raise the money. The governor also calls for tougher legislation to punish polluters, which would be another major shift in direction.

It is difficult to imagine Scott increasing environmental enforcement when the number of such cases dropped by nearly two-thirds after his first year. Or pursuing a more robust effort to buy endangered land when the land-buying office has been decimated. Or following through on ambitious promises to emphasize restoration of the Everglades after he signed legislation that caps the sugar industry's financial liability for the cleanup. Scott also made it easier for private companies to tap the state's supply of reclaimed water even as he made it much harder for the public to challenge water and mining permit applications. He even signed legislation that fast-tracked the permitting process for gas pipelines and restricted how many times local officials may ask developers questions about their permit applications.


The governor won't even say whether he supports the land and water conservation measure, Amendment 1, that will appear on the November ballot. If that measure passes, the state would lock in funding for conservation by dedicating revenue from the tax on property sales. Advocates say the amendment, which could raise $19 billion over 20 years, is needed to protect environmental funding from the annual whims of state lawmakers. It's also needed to protect Florida from governors like the incumbent, who has no sense of Florida and its values.

Scott wants voters to believe he has turned green. His record shows he has been the least environmentally sensitive governor in the last half-century, and there is no reason to expect there would be a sudden transformation in a second term.

---

**UP NEXT:**   Column: When more of a good thing is bad

---

## YOU MIGHT ALSO LIKE

**Pinellas County's final $2.6 billion budget prioritizes the rainy day fund**

Yesterday

`PINELLAS`  `NEWS`

**Federal aid for Florida's unemployed has run out. What's next?**

Sep. 20



November 2, 2020

Mr. Kelly Laycock
Oceans, Wetlands and Streams Protection Branch
USEPA Region 4
61 Forsyth St., SW
Atlanta, GA 30303

*Via:* 404Assumption-FL@epa.gov & regulations.gov

Re:   **Comments in Opposition to State of Florida's Application to Assume
      Administration of a Clean Water Act Program (Docket # EPA-HQ-
      OW-2018-0640-0001; EPA-HQ-OW-2018-0640)**

Dear Mr. Laycock:

We write on behalf of several local, state and national conservation organizations devoted to
protecting Florida's lands, water and wildlife to urge the U.S. Environmental Protection Agency
("EPA") to deny Florida's request for authorization to assume jurisdiction over permitting under
Section 404(a) of the Clean Water Act of 1972 ("CWA"), 33 U.S.C. § 1344, in waters of the
United States.[1]  *See* State of Florida's Program Submission to Assume the Clean Water Act
Section 404 Permitting Program (Aug. 20, 2020) [hereinafter "Assumption Application"];
Florida's Request to Assume Administration of a Clean Water Act Section 404 Program, 85 Fed.
Reg. 57,853 (Sept. 16, 2020).  The environmental community, which is comprised of countless
Florida families, has steadfastly opposed Florida's effort to assume a Section 404 program
because this would jeopardize vital natural resources at a time of unprecedented population
growth combined with striking environmental degradation.  These concerns have been echoed by
the public, which also has consistently voiced opposition to Florida's proposal.

---

[1] These comments are filed on behalf of Center for Biological Diversity, Conservancy of Southwest
Florida, Florida Wildlife Federation, Miami Waterkeeper and St. Johns' Riverkeeper.  The comments
are also endorsed by Environmental Confederation of Southwest Florida, Friends of the Everglades,
the National Parks Conservation Association, Natural Resources Defense Council and Sierra Club.

FLORIDA OFFICES

111 SOUTH MARTIN LUTHER KING JR. BLVD.                    4500 BISCAYNE BLVD., SUITE 201
TALLAHASSEE, FL 32301                                              MIAMI, FL 33137
T: 850.681.0031                                                  T: 305.440.5232

FLOFFICE@EARTHJUSTICE.ORG   WWW.EARTHJUSTICE.ORG

JA.1653

**Introduction**

Under the Clean Water Act, the purpose of Section 404 includes restoring and maintaining "the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredge and fill material," recognizing that the degradation and destruction of wetlands is "among the most severe environmental impacts." See 40 C.F.R. § 230.1(a). The Clean Water Act, and the rules promulgated thereunder, create an important, and deservedly complex regulatory framework aimed at achieving these goals.

Florida's proposed program claims no such lofty goals. To the contrary, the State has repeatedly articulated its objectives as streamlining the permit process in order to approve permits more quickly, and at less cost, to developers. To achieve this goal, Florida has proposed a program full of gaps and shortcuts that are not consistent with federal law.

Of particular concern, Florida proposes to take on the consequential responsibility of a Section 404 program without devoting an additional cent of resources to the undertaking. The proposal comes at a time when the State has consistently failed to meet its existing obligations regarding environmental protection, and when it faces severe budget shortfalls as a result of dramatic revenue losses related to the COVID-19 pandemic.

Florida's application must be denied for at least three reasons: (1) the submission is not complete, (2) the proposed program is not as stringent as federal law, and (3) Florida is not equipped to administer and enforce Section 404. Approving Florida's application would jeopardize the State's vital wetlands and the species and communities that rely on them.

For ease of reference and review, these comments are organized into five main sections. Part I addresses Florida's failure to protect the environment, and its disastrous environmental record even as the State proceeded to pursue assumption. Part II describes Florida's move to enact legislation authorizing assumption, the extensive public opposition to that legislation, and the authorizing legislation's language.

Part III addresses the complex and highly contested matter of identifying assumable versus retained waters in Florida, including the U.S. Army Corps of Engineers' ("Corps") 2018 public notice and comment period that was begun as a result of Florida's intention to pursue assumption, but then abruptly terminated without explanation. Part IV describes the Florida Department of Environmental Protection's ("FDEP") rule-making process for purposes of developing an assumption program, including a highly flawed rule development phase, the publication of incomplete proposed rules, and the limitation of public comment to a time in Florida when the public was most distracted by the emerging coronavirus crisis, and its impact on health, jobs, child care, food security and safety.

In Part V, we outline the gross deficiencies in Florida's application to the EPA, beginning in Section A with the incompleteness of the application.  In Part V. B. we provide a comprehensive review of deficiencies in the application on the merits.

Part V. B.1. includes a detailed review of Florida's failures to demonstrate adequate authority to carry out a Section 404 program, as well as many areas in which the state program is not as stringent as federal law.  The topics addressed include the failure to adopt and comply with all 404(b)(1) Guidelines; unlawful rules related to general permits, emergency permits, permit conditions and permit application processes; the failure to meet coordination requirements, provide for adequate public notice, and ensure adequate process for decisions on permit applications; the failure to meet requirements for compliance evaluation programs; inadequate enforcement authority, including less stringent state criminal liability and inadequate opportunities for public participation in enforcement; and the failure to address the effect of state takings law on implementation of the program.

Part V.B.2. addresses how Florida's scheme fails to ensure protection of listed species under the Endangered Species Act ("ESA").  Part V.B.3. discusses the insufficiency of resources available to FDEP to adequately implement a Section 404 program.  Part V.B.4. outlines the on-going failures in FDEP's enforcement record, demonstrating FDEP's incapacity to adequately enforce existing programs, much less adopt a new one.  Part V.B.5. addresses differences between state and federal access to the courts for purposes of challenging 404 permits and pursuing citizen suits.

Part V.B.6. describes the on-going failure to adequately define assumable versus retained waters in Florida, and provides additional information that must be considered to ensure that the full breadth of retained waters is identified.  Part V.B.7. demonstrates how Florida's waterways, and the public, cannot afford to lose existing federal safeguards under federal law.

Taken separately, and collectively, the gross deficiencies in Florida's submission require that the application be denied.

## I. Florida's Failure to Protect the Environment

Florida enjoys some of the most vast, and valuable, wetlands in the United States. These wetlands provide essential services to support clean water, resilience, and biodiversity. They also provide economic value because of the critical interstate industries, such as tourism, that rely heavily on visitors' attraction to Florida's natural environment.

Yet in recent years, FDEP has been gutted, resulting in devastating harm to Florida's wetlands and water quality.  FDEP has regularly failed to meet its obligations to adequately enforce

3

environmental protections already under its purview.  It cannot possibly establish that it is capable of doing more, with less, today.

## A. Florida's Exceptional Waterways

Florida's water resources are stunning and uniquely complex.  The State's distinctive peninsular shape, flat topography and karst terrain create prolific coastlines, rivers, springs and lakes.  With almost 1,200 miles of coastline, more than 7,500 lakes (greater than 10 acres), 33 first-magnitude springs, and approximately 27,561 linear miles of rivers and streams, water is one of Florida's most prominent features.  See Elizabeth Purdum, Florida Waters:  A Water Resources Manual from Florida's Water Management District 49 (2002) (Exhibit 1).

Countless valuable wetlands are widely distributed throughout the State, including the renowned Everglades and Big Cypress Swamp.  See, e.g., Albert Hine, Geology of Florida, 17–18 (2009) (Exhibit 2).  With approximately 11 million acres of wetlands, Florida has more wetlands than any of the other conterminous states.  U.S. Geologic Surv., National Water Summary on Wetland Resources: Water Supply Paper 2425 (1996) (Exhibit 3).  These often shallow wetlands are vast and diverse and include rare habitats such as mangrove swamps and hydric hammocks.  See Purdum, supra, at 49.  In addition to these expansive surface waters, Florida has more groundwater than any other state.  See id.

Florida's waters help sustain some of the world's most diverse species.  Florida lies within the North American Coastal Plan, the World's 36th Biodiversity Hotspot, and is considered the richest area biologically for endemic species.  Zenaida Kotala, Florida Declared a Global Biodiversity Hotspot, UCF Today, Feb. 26, 2016 (Exhibit 4).  Freshwater resources in Florida provide nesting, foraging, wintering and migrating habitats for numerous species of fish and wildlife.  Fla. Fish & Wildlife Conservation Comm'n, Florida's Freshwater Priority Resources: A Guide for Future Management 1 (2018) (Exhibit 5).

These resources are relied on by high numbers of threatened and endangered plants (26% of them rely on wetlands) and animals (45% of them rely on wetlands) and, as such, are designated as critical habitat under the Endangered Species Act.  Id.  Due to having one of the highest rates of habitat loss, Florida's water resources and the species that depend on them are some of the most threatened.  See Denise Rocus & Frank Mazzotti, Threats to Florida's Biodiversity, University of Florida/IFAS Extension (1996) (Exhibit 6); Kotala, supra.

In addition, Florida's waters are critical to several multi-billion dollar industries, including agriculture and tourism, affecting interstate commerce.  See, e.g., Tourism Fast Facts, Visit Florida (last visited Nov. 1, 2020) (Exhibit 7); Florida Agriculture Overview and Statistics, Fla. Dep't of Agric. & Consumer Servs. (last visited Nov. 1, 2020) (Exhibit 8).

4

**B. Florida's Disastrous Environmental Record**

In recent years, FDEP has grossly failed to meet its existing obligations.  A 2014 Editorial in
Florida's leading paper, the Tampa Bay Times, decried FDEP's recent record as "an
environmental disaster."  Editorial, <u>The Rick Scott Record: An Environmental Disaster</u>, Tampa
Bay Times, Sept. 5, 2014 (Exhibit 9).  FDEP's failures stem from reduced water management
budgets, rushed permitting, weakened enforcement, widespread layoffs provoking a brain drain
of experts in the field, and the replacement of experts with political appointees focused on
advancing business interests rather than environmental stewardship.

A 2016 analysis released by Public Employees for Environmental Responsibility ("PEER")
found that FDEP had opened 81% fewer enforcement cases, collected the lowest number of fines
in 28 years, and assessed no penalties in a third of the cases.  Press Release, PEER, Scott's
Undeclared Polluters' Holiday Stains Florida (Aug. 17, 2016) (Exhibit 10); PEER, <u>Report on
Enforcement Efforts by the Florida Department of Environmental Protection Calendar Year 2015</u>
(2016) (Exhibit 11).  <u>See</u> <u>also</u> Jimmy Orth, <u>State Failing to Protect Our Waterways</u>, St. Johns
Riverkeeper, Feb. 1, 2013 (compilation of newspaper articles describing the State's
environmental record) (Exhibit 12).

**II. Florida's Assumption Legislation**

It was against this backdrop of demonstrably inadequate environmental protection that, in 2017,
FDEP sought authorization from the state legislature to pursue assumption of the Section 404
program.  <u>See</u> State Assumption of Federal Section 404 Dredge and Fill Permitting Authority,
S.B. 1402, 2017 Leg. (Fla. 2018) (Exhibit 13).  A similar effort had been considered, but
rejected, in 2005, after FDEP concluded that the complexity of Florida's extensive waterways
weighed against assumption, and that for assumption in Florida to be feasible, several changes to
state and federal law would be required. <u>See</u> Fla. Dep't of Env't Prot., <u>Consolidation of State and
Federal Wetland Permitting Programs Implementation of House Bill 759 (Chapter 2005-273,
Laws of Florida)</u> 2–5 (Sept. 30, 2005) (Exhibit 14).  At that time, FDEP also recognized that
assumption would require "substantial staff resources" in order for the State to be able to take on
the additional responsibilities and workload required under federal law. <u>Id.</u> at 3–4, 6–7.

A January 19, 2018, bill analysis recognized that FDEP would have to undertake a number of
activities that might generate costs to the agency, including those related to rulemaking,
modifications to its existing applications, databases and permit tracking systems, program
administration, and permit processing.  FDEP assured legislators, however, that it did "not
anticipate an increase in permitting administration expenditures" with assumption, and that it
"believe[d] that, upon assumption, the processing of state 404 permits, as well as enforcement
activities for state 404 permits, can be absorbed without an increase in staffing or administrative

JA.1657

costs." Bill Analysis and Fiscal Impact Statement: S.B. 1402, 2017 Leg., at 16 (Fla. Feb. 13, 2018) (Exhibit 15).

FDEP therefore sought no resources from the legislature to develop, implement, operate and enforce Section 404.  FDEP advised legislators it would not even charge permittees a fee for Section 404 permits.  Id.

## A.  Floridians Object to Legislation Authorizing Pursuit of Assumption

On January 22, 2018, Waterkeepers from across Florida urged legislators to reject the proposed legislation, citing concerns about FDEP taking on an additional program without additional resources.  In particular, the Waterkeepers pointed out how FDEP "already woefully under-regulates" stormwater permits delegated to the State by the federal government under the Clean Water Act.  Letter from Rachel Silverstein, Miami Waterkeeper, et al., to Senate Environmental Preservation and Conservation Committee Members, Jan. 22, 2018 (Exhibit 16).

On January 29, 2018, the State's leading paper urged against allowing Florida to undertake assumption in light of FDEP's inadequate resources and performance.  Editorial, Don't Let Florida Take Over Wetlands Permitting, Tampa Bay Times, Feb. 4, 2018 (Exhibit 17) (raising concerns about the reductions in FDEP's workforce and funding for environmental programs; "There is no reason to have confidence that the state agency is prepared to take on this obligation ... The wetlands are too important to Florida's economy and to public safety in a coastal state to put the interests of developers ahead of the general good.").

In February 2018, the Everglades Coalition issued a resolution opposing the legislation. Everglades Coal., Resolution Opposing SB1402 and HB7043: State Assumption of Federal State 404 Dredge and Fill Permitting Authority (Feb. 2018) (Exhibit 18).  On behalf of its more than 60 member organizations, the Everglades Coalition identified a number of concerns regarding state assumption and the risk to Florida's remaining wetlands, which are critical to cleansing water, recharging groundwater, providing fish and wildlife habitat and storm resiliency. The Coalition concluded that "in the face of increased growth and development, the protection and restoration of the Greater Everglades—an ecosystem largely comprised of wetland habitats—is better accomplished by maintaining the existing oversight from federal agencies."  Id.

On March 9, 2018, former FDEP Secretary Victoria Tschinkel urged the Governor to veto the bill, which she observed had been rushed on behalf of those who seek "fast and simple permitting" rather than in the best interests of the State.  Victoria Tschinkel, Florida's Treasured Wetlands on the Eve of Destruction—We Cannot Allow It, Orlando Sentinel, Mar. 9, 2018 (Exhibit 19).  Former Secretary Tschinkel noted, among other things, that "Florida has already

JA.1658

lost half its wetlands, with great negative effects on water quality, fish nurseries, wildlife habitat and flood control."  Id.

On March 23, 2018, Governor Scott signed the bill into law.  The Governor's signing statement approving the legislation stated that it granted FDEP "the authority *to explore whether the state should* issue 404 permits."  Letter from Gov. Rick Scott to Sec. Kenneth W. Detzner, Mar. 23, 2018 (Exhibit 20) (emphasis added).  Nothing in the legislation required FDEP to proceed with assumption.

### B.  Florida's Statutory Authorization to Pursue Assumption

Florida Statutes § 373.4146 codified the legislation authorizing FDEP to pursue Section 404 assumption.  Id.  Among other things, the statute authorizes FDEP to "adopt any federal requirements, criteria, or regulations necessary to obtain assumption," including "the guidelines specified in 40 C.F.R. part 230 and the public interest review criteria in 33 C.F.R. s. 320.4(a)." Fla. Stat. § 373.4146(2).

The statute provides that "[p]rovisions of state law which conflict with federal requirements identified in subsection (2) do not apply to state administered section 404 permits."  Id. § 373.4146(3).  The statute does not specify, however, what those conflicts are, nor does it enact any changes to state law to resolve state and federal law conflicts.

As set forth in detail below, Florida law conflicts with federal law in several critical respects. Moreover, Florida's proposal does not create a Section 404 program that is as stringent as that which exists under federal law.  The program submission must therefore be denied.

### III. Florida's Assumable Waters, Federal Retained Waters

Florida Statutes § 373.4146 failed to grapple with one of the most critical questions regarding assumption: the question of which waters will be assumed.  Instead, the provision tautologically defines "state assumed waters" as those "waters of the United States that the state assumes permitting authority over pursuant to [Section 404]."  Id. § 373.4146(1).

The question of which waters the State intends to assume jurisdiction over, however, is central to an evaluation of the program.  See 40 C.F.R. § 233.11(h) (state submission must include a "[d]escription of the waters of the United States over which the State assumes jurisdiction [and a] description of the waters over which the federal government retains jurisdiction.").

In light of the centrality of this question for purposes of Florida's interest in assumption, on March 19, 2018, the Corps initiated a 30-day public comment period to end on April 20, 2018,

"regarding use of waters in the state of Florida for navigation … [including] identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities" for purposes of navigability analyses to determine "which waters are subject to permitting authority under Section 10" and "determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 Program assumption."  U.S. Dep't of the Army, Public Notice: Determination of Navigable Waters, Mar. 19, 2018 (Exhibit 21).[2]

As a result of the Corps' notice, a number of stakeholders across Florida prepared to submit comments on the \question of assumable versus retained waters.  As evidenced by the FDEP's 2005 Report describing the complexity of Florida's waterways, properly identifying the scope of retained waters is essential both to those who seek maximum protection for those vital resources, and for the regulated community that seeks clarity when it comes to permit requirements.

On April 10, 2018, however, the Corps issued an "Updated Public Notice" summarily terminating the comment period effective immediately, deeming "the comment period originally set to expire on April 20, 2018 ... closed until further notice."  U.S. Dep't of the Army, Updated Public Notice: Cessation of Public Comment Period, Apr. 10, 2018 (Exhibit 23).  The Corps provided no explanation for its sudden reversal.

Notwithstanding the Corps' abrupt and unexplained change of course, many stakeholders proceeded to submit comments in accordance with the original deadline of April 18, 2018.  This included comments by Senator Bob Graham on behalf of the Florida Conservation Coalition, which is comprised of more than 80 organizations, Letter from Bob Graham, Fla. Conservation Coal., to U.S. Dep't of the Army, Apr. 18, 2018 (Exhibit 24), as well as comments by the Sierra Club, Audubon Florida, Conservancy of Southwest Florida, and Florida's Water and River Keepers.  Letter from Amber Crooks, Conservancy of Sw. Fla., to U.S. Dep't of the Army, Apr. 18, 2018 (Exhibit 25); Letter from Rachel Silverstein, Miami Waterkeeper, et al., to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 17, 2018 (Exhibit 26); Letter from Julie Wraithmell, Audubon Fla., to Donald W. Kinard, U.S. Army Corps of Eng'rs (Exhibit 27); Letter from Frank Jackalone, Sierra Club Fla. Chapter, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 16, 2018 (Exhibit 28).

In a letter we submitted, we reminded the Corps about Florida's extensive water resources and unique hydrology, and that any navigability study would require a thorough analysis of numerous waterways to determine which waters may be assumable.  This undertaking would

---

[2] On April 5, 2018, the Corps posted its solicitation for public comment on this matter on the website for the Jacksonville District. Press Release, U.S. Army Corps of Eng'rs, Corps Seeks Public Comment Regarding Water Use for Navigation (Apr. 5, 2018) (Exhibit 22).

require special attention to the rivers, streams and adjacent wetlands located throughout the State.  We further noted that determining the adjacency of wetlands in particular will require time, investigation and evidence and will be of critical importance to Florida's residents and economies.  These determinations would have to be based on technical information, hydrology and science.  By necessity, adjacency determinations would have to be made case by case, based on site-specific characteristics of the area's hydrology, topography and vegetation, among other factors.  To perform such studies, it would be imperative to solicit information from the public, as there are entities and individuals with relevant expertise located throughout the State.  Letter from Tania Galloni, Earthjustice, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 18, 2018 (Exhibit 29).

Other commenters echoed similar concerns.  The Sierra Club demonstrated that even at the time, the Corps' lists of navigable waters was incomplete and inadequate.  Letter from Frank Jackalone, Sierra Club Fla. Chapter, to Jason A. Kirk, U.S. Army Corps of Eng'rs, supra.  The Corps' list identified 492 rivers and creeks and 110 lakes.  A supplement to the list totaled 1,767 rivers and creeks and 1,186 lakes.  The text prefacing that supplement included the disclaimer that "[t]he District makes no claim that these lists are complete or completely accurate."  U.S. Army Corps of Eng'rs, Supplement to the Jacksonville District Navigable Waters Lists (Oct. 5, 2017) (Exhibit 30).

The Conservancy of Southwest Florida submitted scores and scores of additional waterways that it urged the Corps to consider as navigable as well for Section 10 purposes.  Letter from Amber Crooks, Conservancy of Sw. Fla., to the U.S. Dep't of the Army, supra.  Audubon Florida urged the Corps to use the October 2017 list as a baseline and to supplement that list with additional navigable waterways subject to Section 10 Rivers and Harbors Act jurisdiction. Letter from Julie Wraithmell, Audubon Fla., to Donald W. Kinard, U.S. Army Corps of Eng'rs, supra.  Florida's Water and River Keepers emphasized the critical importance of the Corps properly identifying all Section 10 waters in the State.  Letter from Rachel Silverstein, Miami Waterkeeper, et al. to Colonel Jason A. Kirk, U.S. Army Corps of Eng'rs, supra.

The Corps provided no response to any of these public comments.  And, more than two years later, there has been no "further notice" and no further solicitation for comment on the Corps' determinations regarding Florida's retained waters.

## IV. Florida's Section 404 Rule-Making

Meanwhile, Florida proceeded to initiate rule-making to develop its Section 404 program.  Florida's rule-making process was marred by a number of deficiencies throughout.  Those problems have resulted in the State's grossly inadequate program submission now under review.

### A. Florida's Rule Development

On May 11, 2018, FDEP initiated rule development for the purposes of developing its Section 404 program.  FDEP described the purpose and effect of its undertaking as:

> Section 404 of the Clean Water Act (404) provides states the option of assuming administration of the federal dredge and fill permit program in certain waters. By obtaining 404 assumption, Florida will be able to provide a streamlined permitting procedure where an applicant will come to the state to obtain both the Environmental Resource Permitting and 404 authorizations. This will avoid duplication, provide greater certainty to the regulated community, conserve resources, and will afford the state greater control over its natural resources while complying with federal law.

44 Fla. Admin. Reg. 2321 (May 11, 2018).  Notably, FDEP's stated objectives did *not* include enhancing protection of Florida's waterways, ecosystems or communities.  To the contrary, FDEP's objectives were identified as streamlining permitting, avoiding duplication, providing greater certainty to the regulated community, conserving resources and exerting greater "control over [the State's] natural resources."  Id.

FDEP held rule development workshops in Tallahassee on May 30, 2018, in Orlando on May 31, 2018, and in Ft. Myers on June 1, 2018. Although Florida law requires that agencies holding public workshops make available staff who can respond to questions and comments on a rule in development, Fla. Stat. § 120.54(2)(c), members of the public who attended these workshops raised a number of concerns that were left unanswered.  Letter from Tania Galloni, Earthjustice, to Noah Valenstein, Fla. Dep't of Env't Prot., Jul. 9, 2018 (Exhibit 31).

These included questions about how listed species would be protected, which waters would remain under federal jurisdiction, and how FDEP would assume the 404 program without any funding when the state agency is already under-resourced.  Members of the public also expressed concerns about FDEP's reliance on memoranda of agreement that had not been completed or made available to the public for comment.  FDEP responded that the MOAs would be made available for public comment, but they never were.

On October 1, 2018, FDEP issued a Statement of Estimated Regulatory Costs ("SERC").  Fla. Dep't Env't Prot., Statement of Estimated Regulatory Cost, 62-331 (Oct. 1, 2018) (Exhibit 32) [hereinafter "404 Assumption SERC"].  In Florida, a SERC is required whenever a proposed rule is "likely to directly or indirectly increase regulatory costs in excess of $200,000 in the aggregate in this state within 1 year after the implementation of the rule."  Fla. Stat. § 120.54(3)(b)(1)(b). In estimating regulatory costs, a SERC "shall include," among other things, "[a]n economic analysis showing whether the rule directly or indirectly … [i]s likely to increase regulatory costs,

JA.1662

including any transactional costs,[3] in excess of $1 million in the aggregate within 5 years after the implementation of the rule."  Id. § 120.541(2)(a)(3).

In the SERC for its Section 404 program, FDEP estimated that there are an average of 723 permits currently issued by the Corps under Section 404, and that this would total about 3,615 permits over 5 years.  FDEP, however, provided *no estimate* of the resources it would take for the State to review, issue, monitor, and enforce those permits.

FDEP omitted any reference to additional, related tasks that would require resources, such as determining whether the State has jurisdiction over a proposed project under a state-assumed program, providing guidance to applicants on the new requirements and processes, making exemption determinations, reviewing applications that are ultimately not granted, conducting investigations, meeting monitoring and reporting requirements, reviewing and issuing permit modifications and revocation, and public notice and public hearing requirements.

Under Florida law, a SERC must include "[a] good faith estimate of the number of individuals and entities likely to be required to comply with the rule, together with a general description of the types of individuals likely to be affected by the rule."  Id. § 120.541(2)(b).  While FDEP's SERC acknowledged the more than 3,600 additional permits the State would now have jurisdiction over, that number answers only part of the question.  See 404 Assumption SERC at 2–3.  The number of individuals and entities likely to be "required to comply with the rule" includes not only those who are granted permits, but anyone who may seek to discharge dredged or fill material into waters of the United States, and those who make such discharges without authorization.

Similarly, FDEP stated that the only persons likely to be affected are those who are "currently subject to a 404 permit" issued by the Corps.  This response demonstrates that FDEP takes an unduly narrow view of operating a 404 program, and as a consequence, has taken an unreasonably limited view of the number of individuals and entities likely to be affected.  FDEP wholly failed to provide a general description of those who are likely to be affected, other than existing permittees.

A SERC must also include "[a] good faith estimate of the cost to the agency, and to any other state and local government entities, of implementing and enforcing the proposed rule, and any anticipated effect on state or local revenues."  Fla. Stat. § 120.541(2)(c).  FDEP responded to this

---

[3] "Transactional costs" are defined as "direct costs that are readily ascertainable based upon standard business practices, and include filing fees, the cost of obtaining a license, the cost of equipment required to be installed or used or procedures required to be employed in complying with the rule, additional operating costs incurred, the cost of monitoring and reporting, and any other costs necessary to comply with the rule."  Fla. Stat. § 120.541(2)(d).

JA.1663

question by claiming "none."  FDEP's response failed to account for costs to other state agencies it intends to rely on to operate a 404 program, including Florida's Fish and Wildlife Commission and the State Historic Preservation Office.  404 Assumption SERC at 3, E.1, E.3; Assumption Application B, app. c–d, j.

FDEP stated that it "intends to implement the proposed rule with existing resources" and "intends to enforce the proposed rule with existing resources."  404 Assumption SERC at 3, E.1, E.3.  FDEP's response provides no good faith estimate *of the cost* and therefore no reasonable basis to support the conclusion that this cost can be borne by "existing resources."  FDEP's response also begs the question of why the agency has existing resources that are not being used to serve its existing duties under state law, and whether appropriations for existing programs may lawfully be used for other purposes.

In response to the requirement to provide "[a] good faith estimate of the transactional costs likely to be incurred by individuals and entities, including local government entities," Fla. Stat. § 120.541(2)(d), FDEP again stated "none," asserting that "[t]his proposed rule will only affect the department."  404 Assumption SERC at 3-4, E.2, E.4.  Here, FDEP again failed to acknowledge and account for the other state agencies that would incur costs related to a 404 program.

The only costs that FDEP estimated were those related to "multiple 5-year permit applications for large projects that will take more than 5 years to complete," which FDEP estimated would cost $600,000 per year.  But even the bases for this calculation remain unclear.  FDEP did not specify who is expected to bear these costs, and for what exactly.  FDEP did not include in this estimate the cost of the initial permit on the basis that it would be the same as a permit from the Corps, see 404 Assumption SERC at 3, at n. 1, but did not explain whether or why the subsequent permit cost would be any different.  FDEP also averred that these estimated costs would be offset by savings, but again did not specify what those savings would be and to whose benefit they would inure.

FDEP failed to identify the costs it would incur to process each individual 404 permit, or to manage all the general permits over which it seeks to assume jurisdiction, much less to perform all of the additional duties that operating a 404 Program would require.  Yet even if one were to use FDEP's estimate of $5,000 for a long-term project permit renewal as a baseline, that cost alone for the more than 700 permit actions FDEP expects to take would cost $3,500,000 per year.

FDEP summarily added that "[t]here will be an overall cost savings to the regulated public," but did not in any way quantify that statement, provide an estimate of the costs to FDEP and thus to Florida taxpayers, or account for the loss of environmental review necessary to protect Florida's wetlands and the communities and industries that rely on Florida's natural environment.

JA.1664

Indeed, the benefits of the proposed program were touted as including costs savings related to *avoiding* review under the National Environmental Policy Act ("NEPA"), the reduction in time to process permits, and "allow[ing] the permittee to access the value of [large] projects sooner than if the permit was issued under the federal 404 program." 404 Assumption SERC at F., G.

## B. Florida's Proposed Rules, Coronavirus Comment Period

On February 19, 2020, FDEP published the totality of its proposed rules, including proposed revisions to Chapter 62-330, the proposed promulgation of Chapter 62-331, the Draft 404 Handbook, and the same SERC. Fla. Dep't of Env't Prot., Notice of Proposed Rule, 62-330 (Feb. 19, 2020) (Exhibit 33). In response to the notice, many affected persons requested that FDEP hold a public hearing, in accordance with Florida law, see Fla. Stat. § 120.54(3)(c)1, which FDEP ultimately set for April 2, 2020. See, e.g., Letter and Resolution from Everglades Coalition to Heather Mason, Fla. Dep't of Env't Prot., Mar. 9, 2020 (Exhibit 34); Fla. Dep't of Env't Prot., Notice of Hearing, 62-330 (Mar. 11, 2020) (Exhibit 35).

On March 1, 2020, however, Governor Ron DeSantis issued an executive order directing the declaration of a public health emergency in the State arising from the novel coronavirus, COVID-19. See Exec. Order No. 20-51 (Fla. 2020) (Exhibit 36). On March 9, 2020, the Governor declared a state of emergency, finding that COVID-19 posed a risk to the entire state of Florida. See Exec. Order No. 20-52 (Fla. 2020) (Exhibit 37).

On March 17, 2020, Governor DeSantis announced that all schools would remain closed until April 15, 2020. See Orlando Sentinel Staff, Florida Coronavirus Update for Tuesday: Three Field Hospitals Slated to Open; K-12 Schools to Close through April 15; State Announces 7th Death, 216 Positive Tests, Orlando Sentinel, Mar. 17, 2020 (Exhibit 38). Governor DeSantis also imposed drastic restrictions on certain service industries, including restaurants and bars, to reduce the spread of the virus. See Exec. Order No. 20-68 (Fla. 2020) (Exhibit 39).

On March 19, 2020, we requested that FDEP postpone the hearing until no earlier than May 15, 2020, in light of the emergency conditions facing Floridians and the health, economic and child care hardships Florida families and small businesses suddenly found themselves facing. Letter from Tania Galloni, Earthjustice, to Heather Mason, Fla. Dep't of Env't Prot., Mar. 19, 2020 (Exhibit 40).

On March 23, 2020, FDEP issued a superseding notice of hearing, announcing that the public hearing related to this rulemaking would take place via three separate video conferences on April 2, 6, and 10th and that the public comment period for the rulemaking was extended until

JA.1665

midnight on April 17, 2020.  Fla. Dep't of Env't Prot., Notice of Hearing, 62-330 (as revised Mar. 23, 2020) (Exhibit 41).

On March 30, 2020, the Florida Conservation Coalition ("FCC") urged FDEP to suspend its rule-making in light of the public health emergency, and to resume at a time when the public could meaningfully participate.  Letter from Bob Graham & Lee Constantine, Fla. Conservation Coal., to Noah Valenstein, Fla. Dep't of Env't Prot., Mar. 30, 2020 (Exhibit 42).  FCC observed that proceeding with rulemaking at this exceptionally difficult time for a struggling public was not "an essential government function or statutorily mandated" and "not necessary to protect the public or the environment."  On March 31, 2020, the Everglades Coalition raised similar concerns.  Letter from Mark Perry & Marisa Carrozzo, Everglades Coal., to Heather Mason, Fla. Dep't of Env't Prot., Mar. 31, 2020 (Exhibit 43).  On April 1, 2020, Governor DeSantis extended the stay at home order until April 30, 2020.  Exec. Order 20-91 (Fla. 2020) (Exhibit 44).

On April 17, 2020, FDEP again notified interested parties that "due to these extenuating circumstances" related to COVID-19, FDEP would hold two additional telephonic hearings on April 24 and April 27, 2020.  FDEP also extended the public comment period for this rulemaking to midnight on April 30, 2020.

On April 20, 2020, as COVID-19 cases in Florida continued to grow exponentially, and Florida families experienced growing unemployment with little relief in sight, Florida's Waterkeepers urged FDEP to suspend rulemaking so the public could meaningfully participate.  Letter from Lisa Rinaman, Waterkeepers Fla., to Heather Mason, Fla. Dep't of Env't Prot., Apr. 20, 2020 (Exhibit 45).  The Waterkeepers again highlighted that proceeding with 404 program rulemaking was far from an essential activity.

FDEP did not heed any of these calls, and ended the opportunity for public comment on April 30, 2020.  This was a time of great uncertainty, especially in parts of the State then hit the hardest with cases of COVID-19, and was well before American society had begun to come to terms with extensive community spread of the coronavirus, and settle into some form of a "new normal."

FDEP's proposal remained fundamentally flawed in several respects, including: (1) FDEP's decision to remove references to memoranda of agreement ("MOA") with federal agencies from the proposed rules, and not to disclose the content of those MOAs so as to allow for public comment before the State submits an application to the EPA, despite having told the public that it would; (2) a lack of clarity around the definition of waters of the United States, retained waters and assumed waters; (3) the failure to properly define administrative boundaries; (4) the risk to Tribes of loss of consultation rights and protections for impacts to adjacent lands; (5) differences between state and federal wetlands delineation methodologies, and the impacts of those

14

differences; (6) the failure to adopt all Section 404(b)(1) Guidelines; (7) questions around the role of water management districts and FDEP's intentions regarding further delegation; (8) the rationale for proposing the less protective 300 foot buffer, and its lack of basis in science; (9) inadequate consideration of secondary and cumulative impacts; (10) the failure to assess the impacts of proposed general permits and provide those analyses for public input; and (11) the failure to articulate how endangered species would be protected.  Letter from Tania Galloni, Earthjustice, to Heather Mason, Fla. Dep't of Env't Prot., Apr. 30, 2020 (Exhibit 46).

In response to some of the concerns raised, FDEP acknowledged that key issues were not resolved (including those relating to protection of listed species, which the public was told was part of an MOA process "still in its infancy"), claimed that certain critical topics such as staffing and resources were "outside the scope" of the public comment opportunity, and advised that the public should direct their concerns to the EPA rather than to their state agency crafting the plan that would ultimately be submitted. Id.[4]  FDEP then proceeded to finalize its rules.

That FDEP limited the information available to the public, and then further confined the public comment period to the very time period when Floridians were most focused on their health, jobs and families as a result of statewide public health emergency was a disservice to the public.  It resulted in a grossly inadequate program.  It also deprived the public of a meaningful opportunity to comment and be heard.  It further undermined public confidence in FDEP's responsiveness to the community.  It is emblematic of why the EPA should not entrust administration of the federal Clean Water Act Section 404 program to the State.

**V. Florida's Submission to the EPA**

Florida's application must be denied for at least three reasons: (1) the submission is not complete, (2) the proposed program is not as stringent as federal law, and (3) Florida is not equipped to administer and enforce Section 404.  Approving the State's application would jeopardize the State's vital wetlands and the species and communities that rely on them.

---

[4] See also Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 2, 2020) (Exhibit 47); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 6, 2020) (Exhibit 48); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 10, 2020) (Exhibit 49); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 24, 2020) (Exhibit 50); Transcript of Public Hearing, Florida Department of Environmental Protection's February 19, 2020, Notice of Proposed Rules for Florida Administrative Code Chapters 62-330 and 62-331 (Apr. 27, 2020) (Exhibit 51).

JA.1667

**A. EPA Should Reverse Completeness Determination As Florida's Application Fails to Satisfy 40 C.F.R. §233.11**

On August 20, 2020, Florida submitted its application package to the EPA.  On August 28, 2020, the EPA acknowledged receipt and deemed the application complete.  Letter from Mary S. Walker, U.S. Env't Prot. Agency, to Gov. Ron DeSantis, Aug. 28, 2020 (Exhibit 52).  On September 16, 2020, EPA published a Federal Register notice stating that it had received "a complete program submission" for 404 assumption from the State of Florida on August 20, 2020.  See 85 Fed. Reg. 57,853.

Based on its determination that the submission was complete, the EPA initiated a 45-day public comment period that concludes on November 2, 2020, as required by the Clean Water Act and the Administrative Procedure Act ("APA"), 40 C.F.R. § 233.15(e) and 5 U.S.C. § 553, and is set to make a decision on the application by December 18, 2020.  See 33 U.S.C. § 1344(h)(1) (providing for decision on application within 120 days of receipt); 40 C.F.R. § 233.15(a) (120-day statutory review period begins when the  EPA receives complete State program submission as set out in 40 C.F.R. § 233.10).

Florida's submission, however, is incomplete in at least three critical respects: (1) failing to demonstrate how the State will ensure no jeopardy to listed species to comply with the Section 404(b)(1) Guidelines' no-jeopardy provision, 33 U.S.C. § 1344(h)(1)(a), 40 C.F.R. §§ 230.10(b)(3), 233.11(a)–(c), given that the State is relying on processes and procedures that have yet to be developed; (2) failing to adequately identify the waters that would be assumed under its proposed program, id. § 233.11(h); (3) failing to provide complete information regarding how it would implement, operate and enforce a Section 404 program, particularly given the substantial impact the COVID-19 pandemic has had on State coffers, id. § 233.11(d).

At the October 21, 2020, the EPA public hearing on Florida's submission, we urged the EPA to reverse its completeness determination in light of critical omissions in Florida's application.  We reiterated and elaborated on those concerns in our October 23, 2020, again requesting reconsideration of the completeness determination, and suspension of the public comment period until the deficiencies are cured.  See id. § 233.15(a) (providing that statutory review period shall not begin if the EPA finds that a State's submission is incomplete).

Permitting the public only to comment on an incomplete application undermines the agency's rulemaking by precluding meaningful testing, denies fairness to affected parties, and precludes the opportunity to develop evidence in the record that will prove necessary to judicial review, should the EPA grant the application, as the State and industry supporters of the program have indicated they fully expect will happen.  5 U.S.C. § 553; Small Refiner Lead Phase-Down Task

JA.1668

Force v. U.S. Env't Prot. Agency, 705 F.2d 506, 547 (D.C. Cir. 1983) (internal citations and quotation marks omitted).

We fully adopt and incorporate herein the issues raised in the hearing and in our letter.  Letter from Bonnie Malloy, Earthjustice, to Kelly Laycock, U.S. Env't Prot. Agency, Oct. 23, 2020 (Exhibit 53); Transcript of Public Comment Hearing, Application by the State of Florida to Assume Administration of the Clean Water Act Section 404 Permitting (Oct. 21, 2020) (Exhibit 54) [hereinafter "Oct. 21, 2020, Hearing Transcript"]; Transcript of Public Comment Hearing, Application by the State of Florida to Assume Administration of the Clean Water Act Section 404 Permitting (Oct. 27, 2020) (Exhibit 55) [hereinafter "Oct. 27, 2020, Hearing Transcript"].

And we again urge the EPA to reverse its determination that the application is complete or to extend the review period pursuant to 40 C.F.R. § 233.15(g) and the public comment period until all materials are provided and the public is given adequate notice and opportunity to comment in accordance with federal law.  See also Clean Water Section 404 Program Definition and Permit Exemptions; Section 404 State Program Regulations, 53 Fed. Reg. 20,764, 20,767 (Jun. 6, 1988).  Alternatively, the EPA should deny the application for incompleteness.

Notwithstanding the fatal deficiencies in Florida's application, stakeholders from across Florida participated in the EPA's hearings on the program submission, which were held virtually on October 21 and October 27, 2020.  Aside from a handful of representatives from industries with a financial interest in accelerated and cheaper permits, the overwhelming view expressed by commenters, including Florida legislators and the Florida Department of Agriculture and Consumer Services, was to oppose Florida's request to assume.  Oct. 21, 2020, Hearing Transcript; Oct. 27, 2020, Hearing Transcript.

## B.  EPA Should Deny Florida's Submission on the Merits

As demonstrated below, Florida's application must also be denied on the merits.  Florida's submission fails to provide all components of a complete program submission as required under 40 C.F.R. §§ 233.10(b), 233.11.  It fails to fully describe the State's permitting, administrative, judicial review, and other procedures, id. § 233.11(b), particularly insofar as these are less stringent than, or conflict with, federal law.  It fails to adequately describe all agencies with responsibilities to administer the program, and fails to provide a reasonable accounting of the resources that would be required of each of these agencies to properly implement, operate and enforce a 404 program.  Id. § 233.11(c)-(e).

Florida's submission fails to adequately describe the State's compliance evaluation and enforcement programs, particularly with regard to areas where the State's programs are less stringent than, or conflict with, federal law.  Id. § 233.11(g).  Florida also fails to address how

the State will coordinate enforcement strategy with the Corps and EPA, as required under 40 C.F.R. § 233.11(g).

Florida's description of the waters of the United States over which the State hopes to assume jurisdiction, id. § 233.11(h), is grossly lacking.  The same is true of the State's description of the waters over which the federal government retains jurisdiction, a list that has been unreasonably and unduly reduced by the Corps since the State initiated rulemaking to develop an assumption program.

At its core, Florida's submission fails to demonstrate that the State has adequate legal authority to carry out the program and meet all requirements under the Clean Water Act.  id. § 233.12(a). The application must therefore be denied.

1.  **Florida's Scheme Does Not Grant Adequate Authority to Carry Out Section 404, And is not As Stringent As Federal Law**

To apply for approval to assume the Section 404 program, Florida was required to submit a statement demonstrating "that the laws and regulations of the State … provide adequate authority to carry out the program and meet the applicable requirements of this part."  Id.  The statement must also address the effect of State law regarding the prohibition against takings.  Id. § 233.12(c).  Where more than one agency will have "responsibility for administering" the program, the statement must include certification "that each agency has full authority to administer the program within its category of jurisdiction[.]"  Id.

To meet this requirement, FDEP has submitted a statement by its General Counsel.  Assumption Application C.  The General Counsel's statement, however, fails to establish adequate authority to carry out the program and meet Section 404 requirements.  This includes failures regarding general permits, emergency permits, permit conditions, coordination requirements, public notice, permit review and determinations, compliance evaluation and enforcement.  Permeating many of these areas, FDEP has also failed to adopt and failed to establish compliance with all Section 404(b)(1) Guidelines.  We begin with those issues first.

a. **Failure to Adopt and Comply with 404(b)(1) Guidelines**

The General Counsel's statement avers broadly that no permit shall issue unless in compliance with the Clean Water Act and Section 404(b)(1) Guidelines, Assumption Application C at 4, but fails to establish that this is in fact the case.  It is evident from Florida's submission that the State declined to adopt the 404(b)(1) Guidelines.  Instead, the State relies on a patchwork of State rules and regulations that, even when cobbled together, fail to satisfy 404(b)(1).  Even when appearing to adopt some of the language in the Guidelines, the State adds qualifications and caveats that

JA.1670

result in a less stringent standard than under federal law.  These failures permeate a number of regulatory requirements, rendering them individually and collectively inadequate under federal law.

The 404(b)(1) Guidelines are intended to "restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material."  40 C.F.R. § 230.1(a).  The federal program also creates a presumption against granting a 404 permit by incorporating a "fundamental principle":  "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."  Id. § 230.1(c).  The State's purpose, by contrast, is "to provide a streamlined permitting procedure" for ERP and 404 permits.

Rather than incorporating the guiding principles of the 404 program, the State's regulation titled "Intent, Purpose, and Implementation" merely covers methods to be used, conflicts of laws, and coordination between the ERP and 404 permitting programs.  Fla. Dep't of Env't Prot., Notice of Proposed Rule, 62-330 (Feb. 19, 2020); Fla. Admin. Code 62-331.010.  Through these omissions, the State has failed to satisfy the requirements of the 404(b)(1) Guidelines.

> (1) Failure to Adopt 404(b)(1) Definitions

As to the terms used in the State's program, 40 C.F.R. § 230.3, FDEP omits or alters consequential definitions from the 404(b)(1) Guidelines in a manner that limits the breadth and scope of the State's program.  First, the State's program fails to define the following terms that appear in 40 C.F.R. § 230.3:  "carrier of contaminant," "discharge point," "disposal site," "extraction site," "territorial sea," "waters of the United States," and "wetlands."  Without established definitions, neither the public nor the regulated community can have any clear indication as to how the State may interpret and apply those terms.  Moreover, the State's omission of these terms raises the question of whether FDEP's applications will be consistent with 404(b)(1).

Particularly troubling is that the State's definition of "pollution" is much narrower than the federal definition in that it only covers pollution that is at a high enough level or amount to be potentially harmful.  The federal guideline defines "pollution" as "the man-made or man-induced alteration of the chemical, physical, biological or radiological integrity of an aquatic ecosystem."  Id. § 230.3(k).  The Florida definition, by contrast, states that pollution §means alterations "in quantities or at levels which are or may be potentially harmful or injurious to human health or welfare, animal or plant life, or property or which unreasonably interfere with the enjoyment of life or property."  Fla. Stat. § 403.031(7).  Tacking these qualifiers onto what constitutes

"pollution" means that the State would include fewer activities under that definition than would fall under the federal regulation's definition.

The State's proposal also does not adopt, reference, or mention the federal definition of waters of the United States. Instead, the proposed program uses the term "state-assumed waters," which it defines as "all waters of the United States that are not retained waters." Fla. Dep't of Env't Prot., State 404 Program Applicants' Handbook § 1.1 [hereinafter "404 Handbook"].[5] Florida's authorizing legislation similarly defines "state-assumed waters" as "waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act … and rules promulgated thereunder." Fla. Stat. § 373.4146(1). This definition has no substance and does not reflect the federal definition of waters of the United States.

The State's definition of "mixing zone" omits important clarifying language that it "should not be considered as a place where wastes and water mix and not as a place where effluents are treated." Compare 40 C.F.R. § 230.3(h) with 404 Handbook § 2.0(25). Without this added description, the FDEP's provision would allow a broader definition of a "mixing zone" that would result in a less stringent State program.

The federal guidelines have separate definitions for dredged material and fill material. 40 C.F.R. § 232.2. "Dredged material" means "material that is excavated or dredged from waters of the United States." Id. And "fill material" means "(1) Except as specified in paragraph (3) of this definition, … material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States. (2) Examples of such fill material include, but are not limited to: rock, sand, soil, clay, plastics, construction debris, wood chips, overburden from mining or other excavation activities, and materials used to create any structure or infrastructure in the waters of the United States. (3) The term fill material does not include trash or garbage." Id.

The State proposes to cover both definitions in the term "material," Assumption Application B, app. j-3, at 8–9, which is defined as "matter of any kind, such as sand, clay, silt, rock, dredged material, construction debris, solid waste, pilings or other structures, ash, and residue from industrial and domestic processes. The term does not include the temporary use and placement of lobster pots, crab traps, or similar devices or the placement of oyster clutch." Environmental Resource Permit Applicant's Handbook, vo. 1 [hereinafter "ERP Handbook"]. It is difficult to understand how the State's definition could explain what "dredge material" is when it is used as

---

[5] Florida's rules and regulations are obtuse, having relegated key aspects to applicant handbooks rather than providing for them in the rules, which will create confusion for regulators, the regulated community, affected parties, the public and the courts.

JA.1672

an example of "material."  Moreover, the State definition does not include the specifics outlined in the definition of "fill material," which is defined based on the function it performs rather than its physical state.

(2) Failure to Adopt 404(b)(1) Procedures

As to General Procedures to be Followed, 40 C.F.R. § 230.5, the State largely incorporated this guideline into the 404 Handbook, but then added qualifying language that restricts the permitting conditions that FDEP must address when issuing a state 404 permit.  For example, the federal rule provides that the agency must evaluate dredge and fill material to "determine the possibility of chemical contamination or physical incompatibility of the material to be discharged."  Id.  The State, however, limited this requirement only to situations where chemical contamination may violate state water quality standards or toxic effluent standards or prohibitions.  404 Handbook § 8.2(g).  By restraining its consideration of chemical contamination, the State's program is less restrictive than the federal program.

As to General Permits ("GP"), 40 C.F.R. § 230.7, the State failed to incorporate the full set of requirements for issuance of a GP.  The 404(b)(1) Guidelines state that a GP complies with the guidelines if the permitting authority determines that: (1) "The activity in such category are similar in nature and similar in their impact upon water quality and the aquatic environment"; (2) "The activities in such category will have only minimal adverse effects when performed separately"; and (3) "The activities in such category will have only minimal cumulative adverse effects on water quality and the aquatic environment.  Id. § 230.7(a).  The State's program, however, omits the requirement that GPs may only be issued if "[t]he activities in such category are similar in nature and similar in their impact upon water quality and in the aquatic environment."  See Fla. Admin. Code 62-331.200–01.

The State also failed to incorporate the requirements that FDEP must follow when issuing GPs.  The 404(b)(1) Guidelines require the permitting authority to "set forth in writing an evaluation of the potential individual and cumulative impacts of the category of activities to be regulated under the General Permit."  40 C.F.R. § 230.7(b).  Moreover, the 404(b)(1) Guidelines require that the State complete this evaluation before the GP is issued and must publish the results with the final permit.  Id.  The State, by contrast, has not adopted any procedures for it to follow when considering and issuing GPs.  See Fla. Admin. Code. 62-331.200–01, 62-330.401.  Instead, it takes the position that the State must follow the requirements of 40 C.F.R. pt. 233 when creating a GP, "but this information is not presented in the rule."  Assumption Application B, app. j-3, at 58.  However, 40 C.F.R. § 233.21 requires compliance with the 404(b)(1) Guidelines, and it is unclear how the State could ensure compliance with the guidelines without incorporating them into the State's program.  Notably, and as discussed further below, the State also seeks to issue

GPs with the program submitted, even though it has failed to take any of the required steps to do so lawfully.

As to Restrictions on Discharge, 40 C.F.R. § 230.10, federal regulations prohibit any discharge that "causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard." Id. Rather than adopting this language, the State has proposed an alternative prohibition that would prohibit discharges that "[c]auses or contributes to violations of any applicable State water quality standard, *except when temporarily within a mixing zone proposed by the applicant and approved by the Agency.*" Fla. Admin. Code 62-331.053(2) (emphasis added). Where the 404(b)(1) Guidelines require the permitting authority to "consider" dilution areas when determining whether violations would occur, the State program creates an exemption for temporary violations in those areas.

The State program also fails to incorporate the requirement that a determination of whether a discharge would cause or contribute to significant degradation of wetlands or other surface waters be based on factual determinations, evaluations, and tests required by the 404(b)(1) Guidelines "subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts." 40 C.F.R. § 230.10(c). However, as described in these comments, the State has failed to fully incorporate the provisions that appear in those subparts. The State also fails to include the requirement to put "special emphasis on the persistence and permanence of the effects" outlined in those subparts.

Regarding the requirement that discharges not jeopardize the continued existence of endangered or threatened species, or result in the likelihood of the destruction or adverse modification of critical habitat, id. § 230.10(b)(3), the State has promulgated language to say that "compliance with any requirements resulting from consultation with, or technical assistance by, the Florida Fish & Wildlife Conservation Commission, the U.S. Fish & Wildlife Service, and the National Marine Fisheries Service for purposes of the State 404 Program, and review, as it pertains to endangered or threatened species, by the U.S. Environmental Protection Agency" "shall be determinative for purposes of evaluating violations of this subparagraph." Fla. Admin. Code 62-331.053(3)(a)(4). As discussed below in Section V.B.2, however, the technical assistance process is still being developed, and depends on other agencies who lack the resources necessary to carry out review of all State 404 permits. FDEP has failed to even submit information related to the available resources of those agencies, much less establish that those resources exist and are adequate.

As to Factual Determinations, 40 C.F.R. § 230.11, the 404(b)(1) Guidelines lay out specific, factual determinations that permitting authorities must use to determine the individual, cumulative, and secondary effects of a proposed discharge of dredged or fill material on physical substrate; water circulation, fluctuation, and salinity; suspended particulate/turbidity;

contaminants; aquatic ecosystem and organism; and the proposed disposal site.  Id.  The State's regulations do not incorporate or apply the guideline's defined set of factual determinations. And they do not require FDEP to make the requisite factual determinations when considering whether to issue a 404 permit.

Although Fla. Admin. Code 62-331.053(6) contains broad categories of effects considered to determine whether a permit will cause or contribute to significant degradation of wetlands or other surface waters, that section fails to incorporate the specific effects identified in 40 C.F.R. § 230.11, and leaves broad discretion for FDEP to interpret what effects it will consider.  It also omits consideration of effects on physical substrate, water circulation, fluctuation, salinity, and suspended particulate/turbidity, and only includes vague descriptions of the other potential effects of a proposed project that must be considered.

FDEP also relies on Fla. Admin. Code 62-330.301, but that provision only places obligations on permit applicants to provide "reasonable assurances" that their proposed projects will not cause adverse effects.[6]  The federal guidelines, importantly, obligate *the permitting authority* to make factual findings on those effects, rather than relying whole cloth on assurances submitted by permit applicants.  40 C.F.R. § 230.11.  FDEP has not adopted such a requirement for itself. This regulation also fails to include the full swath of identified effects from Section 230.11.[7]

As to Findings of Compliance or Noncompliance with the Restrictions on Discharge, 40 C.F.R. § 230.12, the 404(b)(1) Guidelines require that the permitting authority, after deciding whether to issue or deny a permit, must make findings that "include the factual determinations required by § 230.11, and a brief explanation of any adaptation of these Guidelines to the activity under consideration."  40 C.F.R. § 230.12(b).  The state regulations do not require the agency to make the factual determinations laid out in 40 C.F.R. § 230.11, and therefore do not require that the agency include those factual determinations in any final permit decisions.

### (3) Failure to Adopt 404(b)(1) Consideration of Impacts

Subparts C–F identify a whole host of impacts that must be considered when reviewing a permit and identify the significance of each for purposes of meeting the Clean Water Act's objectives. Florida fails to adopt or implement these considerations for Section 404 permits.  Subpart C requires the permitting authority to consider potential impacts to substrate, suspended particulates/turbidity, water, current patterns and water circulation, normal water fluctuations, ad

---

[6] ERP Handbook § 5.5.4.1 says that the agency makes permitting decisions based on a determination of whether the permit applicant provided these reasonable assurances.  However, determining whether an applicant's assurances are reasonable is a far cry from making the factual determination whether a proposed project will cause adverse effects.

[7] These same flaws are present in the ERP Handbook §§ 10.2.7, 10.2.8, and 11.0.

JA.1675

salinity gradients.  40 C.F.R. §§ 230.20–25.  Subpart D requires the permitting authority to consider potential impacts to endangered species, fish, crustaceans, mollusks, other aquatic organisms, and wildlife.  Id. §§ 230.30–32.  Subpart E requires the permitting authority to consider potential impacts to sanctuaries and refuges, wetlands, mud flats, vegetated shallows, coral reefs, and riffle and pool complexes.  Id. §§ 230.40–45.  Subpart F requires the permitting authority to consider the potential impacts to water supplies, fisheries, recreation, aesthetics, and parks by defining these categories of effects and outlining specific adverse effects that could occur within each of these categories.  Id. §§ 230.50–54.

Rather than adopt these criteria, the State's submission cites to a patchwork of complicated, piecemeal elements of ERP and state 404 regulations and applicant handbooks in an effort to claim that these constitute an equivalent program.  Assumption Application B, app. j-3, at 79– 100.  But they do not add up.

For example, 40 C.F.R. § 230.31 defines "aquatic organisms in the food web," and then describes the possible loss of environmental characteristics and values that could result from dredge and fill activities:

> The discharge of dredged or fill material can variously affect populations of fish, crustaceans, mollusks and other food web organisms through the release of contaminants which adversely affect adults, juveniles, larvae, or eggs, or result in the establishment or proliferation of an undesirable competitive species of plant or animal at the expense of the desired resident species. Suspended particulates settling on attached or buried eggs can smother the eggs by limiting or sealing off their exposure to oxygenated water. Discharge of dredged and fill material may result in the debilitation or death of sedentary organisms by smothering, exposure to chemical contaminants in dissolved or suspended form, exposure to high levels of suspended particulates, reduction in food supply, or alteration of the substrate upon which they are dependent. Mollusks are particularly sensitive to the discharge of material during periods of reproduction and growth and development due primarily to their limited mobility. They can be rendered unfit for human consumption by tainting, by production and accumulation of toxins, or by ingestion and retention of pathogenic organisms, viruses, heavy metals or persistent synthetic organic chemicals. The discharge of dredged or fill material can redirect, delay, or stop the reproductive and feeding movements of some species of fish and crustacea, thus preventing their aggregation in accustomed places such as spawning or nursery grounds and potentially leading to reduced populations. Reduction of detrital feeding species or other representatives of lower trophic levels can impair the flow of energy from primary consumers to higher trophic levels. The reduction or potential elimination of food chain organism populations decreases the overall productivity and nutrient export capability of the ecosystem.

JA.1676

Id.  The provisions cited by the State fail to incorporate either the definition or the potential
effects laid out in this 404(b)(1) Guideline.  See Fla. Admin. Code 62-330.301(1)(d)–(e)
(creating broad conditions for permit issuance that activities not adversely affect functions that
serve fish and wildlife or affect the quality of receiving waters such that the state water quality
standards are not met); id. 62-330.302(1)(a)(1), (2), (4) (requiring permittees to provide
reasonable assurances about broadly defined effects of the proposed activity to the public health,
safety, or welfare or the property of others; the conservation of fish and wildlife, including
endangered or threatened species and their habitats; fishing, recreational values or marine
productivity); ERP Handbook § 10.2.3.1(a)–(b) (generally requiring evaluation of public health
and impacts to shellfish harvesting); id. § 10.2.3.4(a)–(b) (generally requiring consideration of
effects to sport or commercial fisheries or marine productivity; existing recreational uses of
wetlands); id. § 10.2.5 (generally requiring consideration of effects to waters used for shellfish
harvesting).

The same omissions are evident for substrate, 40 C.F.R. § 230.20, suspended particulates/
turbidity, id. § 230.21, water, id. § 230.22, current patterns and water circulation, id. § 230.23,
normal water fluctuations, id. § 230.24, salinity gradients, id. § 230.25, threatened and
endangered species, id. § 230.30, fish, crustaceans, mollusks and other aquatic organisms in the
food web, id. § 230.31, wildlife, id. § 230.32, sanctuaries and refuges, id. § 230.40, wetlands, id.
§ 230.41, mud flats, id. § 230.42, vegetated shallows, id. § 230.43, coral reefs, id. § 230.44, riffle
and pool complexes, id. § 230.45, municipal and private water supplies, id. § 230.50, recreational
and commercial fisheries, id. § 230.51, water-related recreation, id. § 230.52, and parks, national
and historical monuments, national seashores, wilderness areas, research sites and similar
preserves, id. § 230.54.

The only provision in Subparts C–F that the State incorporated into its program was for
aesthetics.  Compare id. § 230.53 with 404 Handbook § 8.3.2.  For aesthetics, the State
incorporated the federal provision word-for-word.  404 Handbook § 8.3.2.  This demonstrates
that the State knew how to appropriately adopt the Guidelines, but that it chose not to do so for
any of the other categories in Subparts C–F.

### (4) Failure to Adopt 404(b)(1) Compensatory Mitigation

Subpart J outlines the compensatory mitigation program for losses of aquatic resources
associated with dredge and fill activities.  Again, here, the State attempts to use a grab bag of
ERP and state 404 program regulations and guidelines to cobble together what it identifies as
equivalent to the lengthy provisions of Subpart J.  However, the rules contain meaningful
omissions and differences so that the State program fails to maintain the stringency of these
404(b)(1) Guidelines.  Many of these issues arise in the failure to use the federal definitions of
terms relevant to mitigation.  40 C.F.R. § 230.92.

25

For example, the 404 Handbook does not include the definitions from § 230.92 for "advance credits," "credit," "days," "debit," "fulfillment of advance credit sales of an in-lieu fee program," "in-lieu fee program instrument," "instrument," "mitigation banking instrument" and "release of credits."  Compare 40 C.F.R. § 230.92 with 404 Handbook § 2.0(b).

There are also meaningful changes to the definitions the State did incorporate.  For the definition of "preservation" in the 404 Handbook, the State omits the following language from 40 C.F.R. § 230.92:  "Preservation does not result in a gain of aquatic resource area or functions." Compare 40 C.F.R. § 230.92 with 404 Handbook § 2.0(b).

The State's definition of "creation," which is intended to incorporate the federal definition of "establishment," omits a vital clarification in the federal definition:  "Establishment results in a gain in aquatic resource area and functions."  Compare 40 C.F.R. § 230.92 with ERP Handbook vo. 1.  This change means that under the State's definition, creation of wetlands could occur even if there is no "gain" in environmental resource functions.

For the definition of "functional capacity," the State points to its definition of "ecological value." The federal guidelines define "functional capacity" as the degree to which an area performs a specific function.  40 C.F.R. § 230.92.  The State's definition of "ecological value," by contrast, is much more restrictive and is couched in "values" as compared to "functions."  Fla. Stat. 373.403(18).  Instead, "ecological value" means the "value of functions performed by uplands, wetlands, and other surface waters to the abundance, diversity, and habitats of fish, wildlife, and listed species.  These functions include, but are not limited to, providing cover and refuge; breeding, nesting, denning, and nursery areas; corridors for wildlife movement; food chain support; and natural water storage, natural flow attenuation, and water quality improvement, which enhances fish, wildlife, and listed species utilization."  Id.  These terms are not equivalent.

The State's definition of "temporal loss" omits the following from the federal guideline: "[H]igher compensation ratios may be required to compensate for temporal loss.  When the compensatory mitigation project is initiated prior to, or concurrent with, the permitted impacts, the district engineer may determine that compensation for temporal loss is not necessary, unless the resource has a long development time."  Compare 40 C.F.R. § 230.92 with 404 Handbook § 2.0(49).  This additional language creates substantive requirements for permit writers, and the State program fails to incorporate it.

As to General Compensatory Mitigation Requirements, 40 C.F.R. § 230.93, the State alters or omits vital portions of this Section, thereby creating less stringent requirements for its mitigation program.

The State's tepid incorporation of the watershed approach to compensatory mitigation falls short of the Federal requirements.  The State does not incorporate the federal provision that a watershed approach is "not appropriate in areas where watershed boundaries do not exist, such as marine areas."  Compare 40 C.F.R. § 230.93(c)(2)(v) with 404 Handbook § 8.5.2(a)(4).  The State omits requirements on the amount of information that a permittee must provide to support a watershed approach.  40 C.F.R. § 230.93(c)(3)(iii).  The State program also fails to incorporate the size restrictions for the watershed to be used in a watershed approach intended to ensure that the aquatic resources provided through compensation activities will effectively compensate for adverse environmental impacts resulting from activities authorized by dredge and fill permits.  Id. § 230.93(c)(4).

Regarding site selection criteria, the State ignored the federal factors that must be considered when selecting a mitigation site to ensure that the compensatory mitigation project site is "ecologically suitable for providing the desired aquatic resource functions."  Id. § 230.93(d)(vi).

The State's program does not adopt requirements that would apply to permit writers as they consider different types of mitigation.  The federal rule requires permit writers to document specific findings before permitting out-of-kind compensatory mitigation, a provision absent from the State's program.  Id. § 230.93(e)(2)–(3).  The State's program also omits the requirement that the permit writer "require a mitigation ratio greater than one-to-one where necessary."  Id. § 230.93(f)(2).

Lastly, the State's requirements for demonstrating financial responsibility are not as strict as those required under 40 C.F.R. § 230.93(n)(1).  Federal regulations require financial assurances to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, a standard not incorporated into the State program.  Compare id. with ERP Handbook § 10.3.7.  The State creates an exemption for projects that have a mitigation cost estimate less than $25,000, but the federal rules do not have a threshold below which a financial responsibility demonstration is no longer required.  Compare ERP Handbook § 10.3.7.1 with 40 C.F.R. § 230.93(n)(1).  Rather than giving permit writers the ability to determine the necessary amount of required financial assurances, 40 C.F.R. § 230.93(n)(2), the State instead creates a blanket amount of 110% of the cost estimate.  ERP Handbook § 10.3.7.2.

### b. Unlawful Promulgation of General Permits, 40 C.F.R. §233.21

The General Counsel states that FDEP intends to administer a limited number of regional permits until they expire and that the State "has promulgated a series of general permits."  Assumption Application C at 4.  The State's rules developed for the 404 program submission purport to include dozens of general permits.  Fla. Admin. Code 62-331.210–48.  The State, however, has failed to lawfully promulgate any general permit.

JA.1679

As to a state assumed program, federal regulations provide that "[t]he Director  may issue a general permit for categories of similar activities if he determines that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment."  40 C.F.R. § 233.21(b).  The terms "State Director" and "Director" are defined as "the chief administrative officer of any State … operating an approved program[.]"  Id. § 233.2.

The Director of Florida's proposed program, however, has not made *any* determinations that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment.  When FDEP proposed to promulgate dozens of general permits modeled after general permits previously developed by the Corps on a national level, the agency provided *zero* evidence of any analysis or study to warrant such a determination.

Instead, FDEP seems to believe that it can simply parrot the language of general permits developed at a national, rather than state, level, and promulgate those for operation at the state level without any process.  But the language of the federal regulation governing general permits is clear:  "[t]he Director may issue a general permit for categories of similar activities *if he determines* that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment."  Id. § 233.21(b) (emphasis added).  FDEP did not subject these purported general permits to any study, did not notify the public of any basis to support the propriety of such general permits, did not provide an opportunity for the public to comment on the intention to make any determination under this regulation, and has not provided affirmative evidence of having made an independent, fact-based determination.

FDEP cites no legal authority to disregard the plain language of 40 C.F.R. § 233.21(b).  Moreover, FDEP's approach, which purports to give effect to "its" general permits for a duration of five years from the date of the State program's approval, is contrary to five-year limitation on general permits.  FDEP's approach therefore not only fails to rely on a proper determination necessary to support the issuance of general permits.  It also would unlawfully extend general permits issued initially by the Corps beyond their statutorily limited five-year duration.   33 U.S.C. § 1344(e)(2).  This outcome is also unreasonable.  Federal law requires the Corps to review its general permits, and the determinations underlying them, every five years.  To allow Florida to extend the Corps' underlying rationale beyond the five-year statutory limitation to support continued issuance of general permits for years thereafter conflicts with federal law.  Id.

FDEP's proposed program is also less restrictive than 40 C.F.R. § 233.21.  The State's regulation unreasonably restricts its ability to require notice of intent of coverage under a GP, omitting the

federal catchall that the agency can require notice "as appropriate."  <u>Compare</u> Fla. Admin. Code
62-331.200(3) <u>with</u> 40 C.F.R. § 233.21(d).  The State regulation restricts the notice requirement
to specifically identified circumstances and limits FDEP's authority to require notice whenever
appropriate.

The State has limited its authority by only allowing FDEP to require an individual permit where
"sufficient cause exists," which is then defined as a "likelihood that the project will cause more
than minimal adverse environmental effects."  Fla. Admin. Code 62-331.200(6).  The federal
rules, by contrast, allow the Director to do so "based on concerns for the aquatic environment,"
including compliance with the requirement for GPs to have only minimal individual and
cumulative adverse environmental effects.  40 C.F.R § 233.21(e).  Further, the State's rules omit
the automatic revocation of GP coverage once the agency requires an individual permit.
<u>Compare</u> Fla. Admin. Code 62-331.200(6) <u>with</u> 40 C.F.R. § 233.21(e).

### c. Unlawful Expansion of Emergency Permits, 40 C.F.R. §233.22

The General Counsel Statement avers that Fla. Admin. Code 62-331.110 implements the
emergency permit requirements of 40 C.F.R. § 233.22, citing only to subsections (b)(3)–(7).
Assumption Application C at 5.  Importantly, however, the State creates a much broader set of
situations when an emergency permit may be granted than what is authorized under federal law.

Under federal regulations, an emergency permit may only be given "if unacceptable harm to life
or severe loss of physical property is likely to occur before a permit could be issued or modified
under procedures normally required."  40 C.F.R. § 233.22(a).  The State, instead, would allow
for the issuance of emergency permits to abate emergency conditions which "pose and imminent
or existing serious threat or danger and require immediate action to protect public health, safety,
or welfare, or the water resources of the Agency, including the health of aquatic and wetland-
dependent species; a public water supply; or recreational, commercial, industrial, agricultural, or
other reasonable uses."  Fla. Admin. Code 62-331.110(1).

The State's grant of broader authority to issue emergency permits than what is allowed under
federal law reflects a less stringent program than the federal program because emergency permits
are granted more quickly and with less opportunity for process and review than regular permits.
<u>Compare</u> Fla. Admin. Code 62-331.110 with <u>id.</u> 62-331.050–60.

### d. Unlawful Limitation of Permit Conditions, 40 C.F.R. §233.23

The General Counsel Statement summarily declares that FDEP satisfies the requirements to
comply with federal guidelines, even though many of the 404(b)(1) Guidelines are absent from
the State rules, <u>see</u> Section V.B.1.a.

JA.1681

Additionally, the State's regulations omit important requirements outlined in 40 C.F.R. § 233.23:
The State omits "minimize" from the federal requirement that permittees "take all reasonable
steps to minimize or prevent any discharge in violation of this permit." Compare Fla. Admin.
Code 62-331.054(2)(b) with 40 C.F.R. § 233.23(c)(4). The State's regulation omits minimum
requirements for individual permits specifying that at least monitoring, reporting, and
recordkeeping requirements must include "monitoring and reporting of any expected leachates,
reporting of noncompliance, planned changes or transfer of the permit." Compare Fla. Admin.
Code 62-331.054(d) with 40 C.F.R. § 233.23(c)(7). FDEP's regulations failed to include the
requirement that discharges minimize adverse impacts through *restoration*, and instead only
includes minimization through mitigation. Compare Fla. Admin. Code with 40 C.F.R.
§ 233.23(c)(9). The State's proposed program also omits the requirement for a specific
identification and complete description of the authorized activity, instead relying on permit
templates that are not incorporated by regulation and do not operate with the force of law. 40
C.F.R. § 233.23(c)(1).

### e. Unlawful Permit Application Process, 40 C.F.R. § 233.30

The General Counsel Statement avers that Fla. Admin. Code 62-331.060(1) implements the
requirements of 40 C.F.R § 233.30(b)(1)–(4). Assumption Application C at 6. However, the
State uses different terms that would restrict the information that must be included in a permit
application as compared to federal law. For example, the federal regulations require a
description of "methods of discharge" whereas the State uses the term "construction methods,"
which is not defined by either the State regulations or the 404 Handbook. Compare Fla. Admin.
Code 62-331.060(1)(e) with 40 C.F.R. § 233.30(b)(3). The plain meanings of the words
"construction" and "discharge" are not equivalent.

The State also fails to incorporate the federal requirement regarding how much detail permit
applications must include. Pursuant to 40 C.F.R. § 233.30(d), "[t]he level of detail shall be
reasonably commensurate with the type and size of discharge, proximity to critical areas,
likelihood of long-lived toxic chemical substances, and potential level of environmental
degradation." Id. This language appears only in Appendix C of the 404 Handbook, which is
described as guidance for conducting an alternatives analysis based on guidance from the Army
Corps Jacksonville District. 404 Handbook, app. C. It is not included as a requirement for
permit applications generally and is not incorporated into the rules themselves.

### f. Failure to Meet Coordination Requirements, 40 C.F.R. § 233.3

The federal rules require that permits "shall be coordinated with federal and federal-state water
related planning and review processes." 40 C.F.R. § 233.3. The General Counsel Statement

fails to provide any information or citation to demonstrate that the State has satisfied this requirement.  Assumption Application C at 6.  Instead, in the Comparison referenced by the General Counsel and added in Florida's assumption package, FDEP admits that they "did not add this [requirement] to the rule," but states that they "plan to engage in this kind of coordination whenever possible."  Assumption Application B, app. j-3, at 32.  FDEP has thus failed to ensure compliance with federal coordination requirements.  That FDEP may "plan" to coordinate "whenever possible" falls far short of the requirement that permits "shall" be coordinated.  Because the State failed to incorporate this requirement into its regulatory program, its program is less stringent than the federal program and must be denied.

### g. Inadequate Public Notice, 40 C.F.R. § 233.32

The General Counsel Statement avers that Fla. Admin. Code 62-331.060(2)–(3) fully satisfies the public notice requirements of 40 C.F.R. § 233.32(a)–(c), (e).  Assumption Application C at 6–7.  However, that is not the case.  The federal rules require that public notice be given whenever the following actions occur: (1) receipt of a permit application, (2) preparation of a draft general permit, (3) consideration of a major modification to an issued permit, (4) scheduling of a public hearing, and (5) issuance of an emergency permit.  40 C.F.R. § 233.32(a).  Florida's regulations, on the other hand, do not require public notice for receipt of a permit application.  Fla. Admin. Code 62-331.060(2)–(3).

### h. Inadequate Process for Decision on Permit Application, 40 C.F.R. § 233.34

The General Counsel Statement rightfully explains that the permit decision-making process requires that permit decisions be reviewed for compliance with 404(b)(1) Guidelines.  Assumption Application C at 7.  However, as we explain in Section V.B.1.a, the State has not adopted or incorporated all of the 404(b)(1) Guidelines.

### i. Failure to Meet Requirements for Compliance Evaluation Programs, 40 C.F.R. § 233.40

The General Counsel Statement claims that the State "has authority to enforce rules and regulations" for the State 404 Program.  Assumption Application C at 9.  However, that statement falls short of the federal requirement that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions."  40 C.F.R. § 233.40(a).  As explained in Section V.B.1.k.5, however, the State does not maintain a program to identify violations in its current programs and has not shown how it would be able to do so for a Section 404 program.  Having authority and actually using that authority to identify and enforce against violations are two very different things.

JA.1683

Although the State's regulations may provide authority, the State has categorically failed to show it has the resources to "maintain" such a program. <u>See</u> Section V.B.1.k.4.

### j. Inadequate Enforcement Authority, 40 C.F.R. § 233.41

The General Counsel claims that Florida law is consistent with and no less stringent than the Clean Water Act enforcement requirements. Assumption Application C at 10. A vital aspect of administering a 404 enforcement program, however, is having adequate staffing and resources. As demonstrated further below, FDEP has not established that it has acquired the resources that would be required to administer and enforce a 404 program. In addition, in light of FDEP's grossly inadequate enforcement record, the EPA cannot reasonably conclude that FDEP would adequately enforce a 404 program when it cannot even adequately enforce the programs currently under its supervision. <u>See</u> SectionV.B.1.k.4.

#### (1) State Criminal Liability Less Stringent Than Federal Criminal Liability

Significantly, Florida law regarding criminal enforcement is not as stringent as federal law. Under 40 C.F.R. § 233.41(a)(3)(ii), for example, a criminal violation is established by showing (1) a discharge of dredged or filled material, (2) without a required permit or in violation of a permit condition, (3) that is committed willfully or with criminal negligence. <u>Id.</u>

Under Fla. Stat. § 373.430(1)(a), on the other hand, a criminal violation would require proof of an additional element, namely that the pollution (discharge) "caused actual harm or injury to human health or welfare, animal, plant, or aquatic life or property." <u>See, e.g.</u>, <u>State v. Hamilton</u>, 388 So. 2d 561 (Fla. 1980) (interpreting identical provision to require proof of actual harm or injury to sustain a criminal conviction).

By requiring an additional element of proof, the state law fails to provide as stringent criminal liability as exists under federal law for unlawful discharges of dredged and fill material.

Moreover, Section 309(c) of the Clean Water Act makes it a crime to *negligently* violate "any permit condition […] in a permit issued under section 404 of this title," or to *negligently* "introduce into a sewer system or into a publicly owned treatment works any pollutant or hazardous substance which such person knew or reasonably should have known could cause personal injury or property damage [or] causes such treatment works to violate any effluent limitation or condition in any permit." 33 U.S.C. § 1319(c)(1)(A), (B). The penalty for such a violation is a fine between $2,500 and $25,000 per day, per violation and/or imprisonment of up to one year; this penalty is doubled for a second violation. <u>Id.</u>

JA.1684

Four circuits have held that this provision requires only proof of simple negligence:  the Courts of Appeal for the Third, Fifth, Ninth, and Tenth Circuits.[8]  This creates a conflict between the Clean Water Act and both the federal regulation and the state statute at issue in this matter.

Under Florida law, it is unconstitutional to criminally penalize "mere negligent conduct" since that fails to provide "clearly ascertainable standards of guilt by which a citizen may gauge his conduct."  State v. Hamilton, 388 So. 2d 561, 563-64 (Fla. 1980).  Florida law therefore is not as stringent as to criminal enforcement as is the Clean Water Act.  Moreover, this conflict is a matter of Florida constitutional law, and so it cannot be resolved by mere amendment of Florida statutes or regulations.

40 C.F.R. § 233.41(b)(2) states that "*the burden of proof and degree of knowledge or intent required under State law for establishing violations under […] this section shall be no greater than the burden of proof or degree of knowledge or intent EPA must bear when it brings an action under the Act*."  Id. (emphasis added).  Because criminal negligence in the state statute is a higher level of intent that simple negligence in the Clean Water Act, the Florida Statute conflicts with federal law, and does not provide as stringent criminal enforcement as does federal law.  See also Idaho Conservation League, Petitioner, v. U.S. Environmental Protection Agency, Case No. 18-72684 (9th Cir. Sep. 10, 2020) (Exhibit 56) (the EPA abused its discretion in approving a state delegated program with a *mens rea* standard greater than the burden of proof required of the EPA).

Lastly, Florida law provides shorter statutes of limitation for enforcement of environmental crimes.  Under federal law, criminal enforcement actions brought under 33 U.S.C. § 1319(c) are generally subject to a five-year statute of limitations.  See United States v. Ursitti, 543 F. Supp. 2d 971, 974 (C.D. Ill. 2008) (in case involving a criminal violation of the CWA, citing to § 3282(a) and stating "[t]here is a five-year statute of limitations for criminal offenses, which is applicable to the offenses charged in this case"); see also Joseph J. Lisa, Negligence-Based Environmental Crimes:  Failing to Exercise Due Care Can Be Criminal, 18 Vill. Envtl. L.J. 1, 43 n. 109 (2007) (citing 33 U.S.C. § 3282(a) as the applicable statute of limitations provision for criminal enforcement actions under Section 1319(c)).

The statutes of limitation applicable to violations under state law, however, are between one year and three years, depending on the severity of the offense.  Fla. Stat. § 373.430(1)(a)–(c) (identifying crimes relating to pollution, failure to comply with permit requirements, and fraud);

---

[8]   United States v. Maury, 695 F.3d 227, 259 (3d Cir. 2012); United States v. Pruett, 681 F.3d 232, 243 (5th Cir. 2012); United States v. Ortiz, 427 F.3d 1278, 1283 (10th Cir. 2005); United States v. Hanousek, 176 F.3d at 1120 (9th Cir. 1999).

id. § 373.430(3)–(5) (setting degree of offense depending on the crime); id. § 775.15 (setting for statute of limitations depending on the severity of the offense).

State law regarding criminal enforcement is therefore deficient also in this regard, making its program less stringent than the federal one.

Although 40 C.F.R. § 233.41(d)(1) authorizes the EPA to approve a state program that has less stringent *penalties* than available under federal law,[9] there is nothing in the Clean Water Act that authorizes the EPA to approve a state program with an enforcement scheme that is less stringent than the federal one in terms of criminal culpability, burden of proof and statutes of limitations. To the contrary, these failures render the program non-approvable.

(2) Public Participation (Enforcement), 40 C.F.R. § 233.41(b)(1)

In addition, pursuant to 40 C.F.R. § 233.41(b)(1), the State "shall provide for public participation in the State enforcement process through either a right of citizen intervention or an assurance that the State will (1) investigate citizen complaints, (2) not oppose citizen intervention, and (3) provide public notice and comment on any proposed settlement of a State enforcement action."  Id. § 230.41(e).  The General Counsel provides a blanket statement that the State has "authority" to comply with these requirements without citing any law or regulation providing that authority.  Assumption Application C at 11.

The General Counsel also relies on the MOA with the EPA to say it has provided assurance that it will comply with 40 C.F.R. § 233.41(e)(2).  Assumption Application C at 11.  The MOA merely states, "FDEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2)."  Memorandum of Agreement between Fla. Dep't of Env't Prot. & U.S. Env't Prot. Agency at III.I (Jul. 31, 2020).  FDEP, however, has failed to identify any requirement in the state law or regulations to ensure compliance with the requirements of 40 C.F.R. § 233.41(e)(2).  Although assurances to the EPA may be helpful, when they are not incorporated into state law, there is a question regarding the extent to which the public is able to enforce those obligations.

**k. Failure to Address Effect of State Takings Law on Successful Implementation of Program, 40 C.F.R. § 233.12**

The General Counsel Statement must contain a legal analysis of the effect of State law regarding the prohibition on taking private property without just compensation on the successful

---

[9] Note that the State has claimed that this regulatory provision was "not applicable" to the State's application.  Assumption Application B, app. j-3, at 54.

implementation of the State's program.  40 C.F.R. § 233.12(c).  Rather than providing this analysis, the Statement focuses on the notion that no matter how broadly Florida courts interpret regulatory takings law, their decisions would be subject to review by the Supreme Court of the United States.  Assumption Application C at 12.  This reductionist position completely dodges the requirement to provide an actual analysis of the effect of Florida law on the prohibition against takings, since the blanket statement that takings law is ultimately subject to U.S Supreme Court review would apply to any state's submission or statutory scheme.  The claim also ignores that the U.S. Supreme Court is a court of limited review, which only grants a select number of petitions for certiorari each year.  See *Supreme Court: The Statistics*, 131 Harv. L. Rev. 403, 410 tbl. II(B) (2017) (1.2% of petitions for certiorari were granted review in the 2016 Term).  "Review on a writ of certiorari is not a matter of right, but of judicial discretion" and it "will be granted only for compelling reasons."  Sup. Ct. R. 10.

In addition to relying on a theoretical U.S. Supreme Court backstop, the General Counsel emphasizes that under Florida law, even when a private property owner brings an as-applied challenge to a regulation, that challenge can proceed without invalidating the underlying regulation.  Assumption Application C at 12.  This analysis appears to suggest that as long as the underlying regulatory program remains valid, takings law does not inhibit successful implementation of Florida's program.  However, the real question is whether it is easier for private property owners to bring regulatory takings cases pursuant to Florida law such that less 404 permit mitigation would occur under a State program as compared to a federal program.  The State has not answered that question.

Importantly, the General Counsel Statement completely fails to address the Bert J. Harris, Jr., Private Property Rights Protection Act, Fla. Stat. 70.001 et seq. ("Harris Act"), which Florida's legislature enacted "to provide a remedy for private landowners where their property has been inordinately burdened by government action, but the government action does not amount to a constitutional taking."  *Cascar, LLC v. City of Coral Gables*, 274 So. 3d 1231, 1234 (Fla. Dist. Ct. App. 2019) (citing Fla. Stat. 70.001(1)) (emphasis added).  The General Counsel failed to flag, much less address, how this Act would not interfere with operation of a 404 program.  Without this explanation, the State has failed to meet the requirements of 40 C.F.R. § 233.12.

## 2.  Florida's Scheme Does Not Ensure Protection of Species Listed Under the Endangered Species Act

Of particular consequence in Florida, the State's assumption application does not comply with the Clean Water Act's 404(b)(1)'s no jeopardy requirement.  The State wholly fails to demonstrate how the state program would ensure no jeopardy to listed species.  FDEP instead relies on an anticipated, future programmatic biological opinion hoped to be produced from the EPA's ESA Section 7 consultation that would improperly punt all ESA determinations to state

35

agencies.  <u>See</u> Assumption Application B, app. j-2, at 5 (stating "coordination between the
USFWS and FDEP related to the proposed action's effects on species will occur through the
technical assistance process, which is anticipated to be outlined in the USFWS's biological
opinion based on information included in the biological assessment submitted by EPA");
Memorandum of Understanding between Fla. Fish & Wildlife Conservation Comm'n, U.S. Fish
& Wildlife Servs., & the Fla. Dep't of Env't Prot., Aug. 5, 2020 (Exhibit 57).

Under a programmatic Section 7 consultation, the EPA must review Florida's proposed criteria
and process for ensuring state issued permits will not cause jeopardy to listed species.  More
importantly, the EPA may only approve Florida's program if it determines the program fulfills
the no jeopardy requirement.  40 C.F.R. § 233.15(g).  According to FDEP, "[b]ecause of the
terms and conditions anticipated in the Program assumption BiOp and its [Incidental Take
Statement ("ITS")], the State 404 program would not issue a permit that would jeopardize the
continued existence of a species or adversely modify designated critical habitats."  Fla. Dep't
Env't Prot., ESA Biological Assessment for Clean Water Act Section 404 Assumption by the
State of Florida iv (Jul. 24, 2020) (Exhibit 58) [hereinafter "BA"].  FDEP's application however
does not contain any such criteria or even the Biological Assessment.  Without the criteria in
FDEP's application of how it will achieve this requirement, the EPA cannot (1) determine
Florida's application is complete, (2) determine whether Florida can fulfill the guidelines' no
jeopardy mandate or (3) approve Florida's assumption.  <u>See</u> 40 C.F.R. §§ 233.1(a), 233.15(g);
Letter from Bonnie Malloy, <u>supra</u>.

Even if a programmatic biological opinion were produced prior to the EPA's assumption
decision deadline, it was not part of FDEP's application and has not been part of the
administrative review process or subject to notice and comment.  40 C.F.R. § 233.15(a), (e)
(requiring the EPA to provide a comment period of not less than 45 days on a state's complete
application and provide a copy to U.S. Fish & Wildlife Service ("USFWS") and National Marine
Fisheries Service ("NMFS") to review and comment).  The EPA would be ignoring its own
procedural regulations, and basic tenets of administrative law, to allow Florida to retroactively
complete its application and circumvent notice and comment requirements.  The EPA simply
cannot approve Florida's assumption application based on a biological opinion outside the

public's scrutiny, when the State is relying on that opinion to claim compliance with requirements to assume jurisdiction over the 404 program.[10]

Tellingly, in anticipation of Florida's application, the EPA sought public comment on whether consultation under ESA Section 7 is required when the EPA reviews a state or tribal request to assume CWA § 404 duties. 85 Fed. Reg. 30,953 (May 21, 2020). The EPA's former position was that this was a non-discretionary decision and thus did not trigger ESA Section 7 consultation. Letter from Peter S. Silva, U.S. Env't Prot. Agency, to Steven Brown, Env't Council of the States, Dec. 27, 2010 (Exhibit 59). Florida, however, urged the EPA to reverse course, and it did.

While we agree that consultation should take place,[11] Florida's proposal (now adopted by the EPA) for how a programmatic biological opinion would be treated as ensuring no jeopardy is gravely flawed. Moreover, the actual process Florida claims it will follow to ensure no jeopardy has not been finalized, much less submitted for public review and comment. As a result, two flaws fatal to Florida's application emerge: (1) Florida has not demonstrated that its program will ensure no jeopardy, and (2) the public has been deprived of an opportunity to review Florida's plan and so be able to comment on whether Florida's proposal will ensure no jeopardy.

With over 130 listed species, more than 7,700 lakes (greater than 10 acres), 33 first-magnitude springs, 11 million acres of wetlands, almost 1,200 miles of coastline, and approximately 27,561 linear miles of rivers and streams, water and biodiversity are two of Florida's most prominent features.[12] Section 7 consultation in Florida therefore will involve analyzing limitless projects blanketing most of the State to determine their potential impacts on numerous listed species. FDEP admits in its Biological Assessment that "[b]ecause of the statewide nature of this request, the numerous covered species and diverse habitats, as well as lack of knowledge with respect to

---

[10] Moreover, similar to pesticide registrations, 404 program assumption has broad geographical effects making ESA Section 7 consultation one of the most complex which should generate national consultation procedures like public comment. See U.S. Fish & Wildlife Servs. & Nat'l Marine Fisheries Serv., Endangered Species Consultation Handbook 5-3 to 5-4 (Mar. 1998) (Exhibit 60) (Comparing 404 program assumption to pesticides registrations which generates national consultation requests); U.S. Env't Prot. Agency, et al, Enhancing Stakeholder Input in the Pesticide Registration Review and ESA Consultation Processes and Development of Economically and Technologically Feasible Reasonable and Prudent Alternatives, Doc. Id. EPA-HQ-OPP-2012-0442-0038 (Mar. 19, 2013) (Exhibit 61) (providing pesticide registrations with public comment because of ensuring protection of the species will benefit from the general public's input).
[11] See Letter from Kristen L. Boyles, Earthjustice, to Kathy Hurld, U.S. Env't Prot. Agency, Jul. 6, 2020 (Exhibit 62).
[12] See Fla. Fish & Wildlife Conservation Comm'n, Florida's Official Endangered And Threatened Species List, 4 (2018) (Exhibit 63); Purdum, supra; Fla. Dep't of State, Quick Facts (Exhibit 64); U.S. Geologic Survey, supra; Fla. Dep't of Env't Prot., 2016 Integrated Water Quality Assessment for Florida 34 (2016) (Exhibit 65).

JA.1689

where and what type of future permits may be requested, a meaningful site-specific and species-specific analysis is not possible this BA." Fla. Dep't of Env't Prot., ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida iv (Jul. 24, 2020) (Exhibit 58); see also Letter from James Murphy, Nat'l Wildlife Fed'n, to Kathy Hurld, U.S. Env't Prot. Agency, Jul. 6, 2020 (Exhibit 66). FDEP, however, expects a programmatic biological opinion to be completed in only a few months' time to allow the EPA to meet its assumption decision deadline (which stems from the erroneous determination that Florida's application was complete when submitted).

ESA Section 7 consultation on whether the EPA's approval of Florida's assumption application will jeopardize listed species is a complex, fact intensive analysis. ESA Section 7(a)(2) first places a procedural obligation on the EPA to initiate consultation with FWS and NMFS "at the earliest possible time" to determine what effects a state's assumption of the Section 404 program may have on endangered and threatened species and their critical habitats. ESA § 7(a)(2) next places a substantive obligation on the EPA to ensure its actions will not jeopardize the continued existence of endangered and threatened species or destroy or adversely modify their critical habitats. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

The ESA's implementing regulations dictate the precise requirements for satisfying this substantive obligation. Letter from Kristen L. Boyles, supra. To fulfill the ESA Section 7 consultation requirement, USFWS and NMFS must use the best scientific and commercial data available. 16 U.S.C. § 1536(a)(2), (b)(4). Note that even mixed programmatic actions require incidental take statements at the programmatic level if the actions are "reasonably certain to cause take and are not subject to further section 7 consultation." 50 C.F.R. § 402.14(i)(6). The agency cannot merely list a state's threatened and endangered species, dismiss further analysis as requiring too much speculation, or punt all meaningful analysis to the state at some future time.

Florida, however, has proposed that USFWS and NMFS engage in a one-time consultation that would only identify procedural requirements for state permitting under Section 404 needed to support the USFWS' determination that assumption would not result in jeopardy to any listed species. Fla. Dep't of Env't Prot., EPA Approval of State Assumption of Clean Water Act Section 404 Program: Streamlined Approach to Address Endangered Species Act Incidental Take Coverage 1–2 (Exhibit 67). FDEP even provided a Biological Assessment to the EPA in hopes to achieve this goal. FDEP's Biological Assessment was never subject to notice and comment during the State's rulemaking process, nor has it been during the EPA's consideration of the State's 404 program application.

Although referenced in Florida's application, the Biological Assessment has proceeded in a parallel process outside the public eye. Like the anticipated programmatic biological opinion, the Biological Assessment is not part of FDEP's application and therefore cannot be relied on to

38

satisfy the no jeopardy mandate.  Moreover, the Biological Assessment suffers numerous flaws
that render it inadequate to support a programmatic biological opinion.

At its core, the Biological Assessment fails to be as protective as the current federal process.
First, the Biological Assessment fails to provide site-specific information, thereby preventing the
intended state implementing agencies (FDEP and the Florida Fish and Wildlife Conservation
Commission ("FWCC")) from even determining the effect of various specific permitting actions.
Without site-specific information, FDEP's jeopardy analysis will be flawed.  For example, the
Biological Assessment includes only about half a page on the state mammal, the critically
endangered Florida Panther, even though it is estimated that the current remaining population is
only 120–230 adult individuals[13] and is in danger of extinction.[14]  With such little information,
how can FDEP which has no expertise in the subject be able, even at the project level, to conduct
the necessary analysis to ensure no jeopardy?

Additionally, the Biological Assessment provides very limited—almost nonexistent—
information about the cumulative impacts of the State's assumption program.  The Biological
Assessment fails to adequately address the environmental baseline, status of the species, effects
of the action, or reasonable and prudent measures designed to reduce any take identified.
Instead, these are all punted to the state agencies to decide at the project level.  There are other
flaws contained in the Biological Assessment  as well, including but limited to, lack of
information on what constitutes "suitable habitat;" unreasonably short timeframe for USFWS to
decide if it will comment; FDEP and FWCC will make effect determinations and assume no
comment from USFWS if there is silence (no duty to check); designation of the key deer and red
cockaded woodpecker as not regularly utilizing wetlands despite their state or county wetland
dependent designations.  BA at 87, tbl. 3-1, 23.

While programmatic consultation allows consultation on an agency's multiple actions on a
program, including a proposed program or regulation that provides a framework for future
proposed actions, 50 C.F.R. § 402.02, under Florida's proposal, the truncated consultation would
essentially give the EPA wholesale approval from the USFWS and NMFS for specified and
foreseeable actions without any analysis of the effects of the whole action, jeopardy
determinations, or take limits, all in direct contravention to the ESA's mandate, implementing
regulations, and numerous court holdings.  See, e.g., Conner v. Burford, 848 F.2d 1441, 1453–54
(9th Cir. 1988); N. Slope Borough v. Andrus, 642 F.2d 589, 608 (D.C. Cir. 1980); Wild Fish
Conservancy v. Salazar, 628 F.3d 513, 521 (9th Cir. 2010); Forest Serv. Empls. for Env't Ethics
v. U.S. Forest Serv., 726 F. Supp. 2d 1195, 1225–26 (D. Mont. 2010).  Under such an approach,

---

[13] See U.S. Fish and Wildlife Serv., Florida Panther Population Estimate Updated, Feb. 22, 2017
(Exhibit 69); U.S. Fish and Wildlife Serv., Florida Panther Recovery Plan, 3rd rev. at viii (2008)
(Exhibit 69).
[14] See U.S. Fish and Wildlife Serv., Florida Panther 5-Year Review 19 (2009) (Exhibit 70).

the USFWS and NMFS will have failed to fully consult on the action and the EPA will not satisfy its burden to ensure that the proposed action is not likely to jeopardize listed species or destroy or adversely modify critical habitat.

Indeed, even under a programmatic consultation, if assumption is approved, the jeopardy analysis cannot end there. States like Florida must *still* ensure there will be no jeopardy to listed species prior to the issuance of permits for the discharge of dredged or fill material pursuant to the Clean Water Act's 404(b)(1) guidelines. A state's program must be at least as stringent as the federal program, which expressly requires that both individual and general permits comply with the ESA. Overarching programmatic consultation does not relieve the State of its responsibility to determine at the site-specific permit level whether there will be no jeopardy to listed species prior to the issuance of permits for the discharge of dredged or fill material pursuant to the Clean Water Act's 404(b)(1) guidelines. FDEP's application however is silent on how this will be accomplished.

What is known about the EPA's Section 7 consultation process demonstrates that it is flawed in other respects as well, rendering any potential resulting programmatic biological opinion insufficient. First, NMFS made a critical error when failing to consider the entire area that will be affected by Florida's assumption. See 16 U.S.C. 1536(a)(2); 50 C.F.R. § 402.02. Accordingly, NMFS is not engaging in the Section 7 consultation on Florida's 404 assumption, and the EPA will not satisfy its consultation duty. NMFS instead is merely "assum[ing] that the EPA will make a 'no effect' determination for NMFS' ESA-listed species that were originally identified as part of this proposed assumption." Id. This notion is based on NMFS' recent determination that "Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state." See Letter from Cathryne Tortorici, Nat'l Marine Fisheries Serv., to Heather Mason, Fla. Dep't of Env't Prot., Apr. 15, 2020 (Exhibit 71).[15] NMFS' jurisdictional determination however is inconsistent with federal law.

Section 7 consultation must occur for species and critical habitat that are in the "action area" and "action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. 402.02(d). NMFS holds that all of the species under its jurisdiction occur in waters that will be retained under the Corps' jurisdiction and thus the agency need not consult. To the contrary, the "action area" isn't limited to the assumed waters, it also includes areas that would experience downstream impacts. Without consulting NMFS, there will be no consideration of whether the no-jeopardy mandate in

---

[15] Based on NMFS' determination, FDEP's Memorandum of Understanding (MOU) with USFWS and FWCC outlining their plan for state agencies' technical assistance and limited federal oversight excludes NMFS all together.

the Clean Water Act's 404(b)(1) Guidelines is achievable for NMFS' species experiencing downstream impacts.

Next, Florida's proposal is also asking the EPA to delegate its obligations under ESA Section 7(a)(2) to non-federal parties.  FDEP's application and MOU with USFWS and FWCC lay out a process whereby the EPA will rely on a future, abridged programmatic biological opinion that merely instructs FDEP and FWCC to determine at the project level if an activity may affect listed species or critical habitat, determine whether there will be jeopardy, and determine what conditions may be necessary to ensure no jeopardy.  FDEP's proposal unlawfully delegates the initial effects determination to FDEP (and likely the applicant who will be asked to identify whether species are affected).  These determinations must be made by a federal agency.  See 16 U.S.C. § 1536(a)(2); Selkirk Conservation All. v. Forsgren, 336 F.3d 944, 955 (9th Cir. 2003) ("[F]ederal agencies cannot delegate the protection of the environment to public-private accords."); Gerber v. Norton, 294 F.3d 173, 184–86 (D.C. Cir. 2002) (USFWS may not delegate species protection obligations to a private permit applicant).

Yet FDEP's application relies on FWCC's assistance to determine impacts to listed species to justify FDEP's ability to adequately ensure no jeopardy to species and to satisfy the Clean Water Act's 404(b)(1) guidelines.  See, e.g., Assumption Application B, app. (a)-1.  FDEP's application and MOU with USFWS and FWCC creates a procedure for FDEP and FWCC to conduct the necessary species analyses and in fact perform more functions than the Corps currently does under the Federal 404 program.  FDEP and FWCC will do initial determinations, determine the adequacy of avoidance measures, and determine the effect of the project.  FDEP is relying on FWCC to "ease the transition of the State 404 Program, providing faster and more accurate project reviews and effect determinations as compared to FDEP staff alone."  Assumption Application B, app. j-2, at 9–10.  While the MOU states USFWS' position is "determinative," there is nothing requiring USFWS to act nor is the MOU incorporated by law.  Id.  Moreover, USFWS' oversight on future permits is limited and highly dependent on their ability—and desire—to respond within the anticipated insanely tight timeclock restrictions.  BA at 77.  Indeed, nothing in state law prevents FDEP from ignoring USFWS's recommendations.[16]

Lastly, the Florida Constitution grants FWCC only the power to regulate wildlife and freshwater and marine life.  Fla. Const, art. IV, § 9.  FDEP has not demonstrated that it has the authority to regulate species under state law that it now claims it would exercise in a state-assumed program.  In addition, under Florida law, FWCC is constitutionally barred from regulating water pollution.  "Unless provided by general law, [FWCC] shall have no authority to regulate matters relating to air and water pollution."  Id.  FWCC therefore cannot lawfully exercise its authority over species

---

[16] Indeed, the fact that some of FDEP's, USFWS', and FWCC's duties and requirements only appear in the MOU raises questions as to their enforceability by affected private citizens.

regulation to act as an essential decision-maker in Section 404, which is a water pollution program.

### 3.  FDEP Does Not Have Sufficient Resources to Adequately Implement a State 404 Program

FDEP lacks the necessary the resources to properly implement, operate and enforce a State 404 program, particularly when FDEP has been unable to adequately resource its existing obligations.  The substantial impact the COVID-19 pandemic has had on state coffers only strains FDEP's resources further, undermining its baseless claim that it can take on a 404 program without a cent in additional resources.[17]

FDEP's application summarily asserts it can rely on existing resources to administer and enforce a 404 program while failing to disclose, among other things:  (1) FDEP's failure to meet existing regulatory obligations; (2) the significant budget cuts brought on by the global pandemic; and (3) the resource status and needs of other state agencies on which FDEP expects to rely to fulfill obligations under Section 404.

To determine the adequacy of Florida's authority and ability to administer the Clean Water Act Section 404 program, the EPA must assess the funding and manpower available for program administration and the estimated workload.  40 C.F.R. § 233.1(a); 40 C.F.R. § 233.11.  As raised already to the EPA, the holes in FDEP's application alone require the EPA to deny Florida's application or determine that FDEP's application is incomplete and require an adequate funding and staffing plan before resuming review of its application.  See 40 C.F.R. § 233.11(d) (program description must include "[a] description of the funding and manpower which will be available for program administration"); Letter from Bonnie Malloy, supra.

FDEP's fanciful plan entails "reallocat[ing] existing positions and staff time from elsewhere in [FDEP]" (without demonstrating that FDEP has no competing duty to meet its "elsewhere" obligations) and offset the workforce losses to existing programs with new "efficiencies throughout [FDEP]" (without articulating what those efficiencies would be). Assumption Application B, app. e., at 8.  FDEP however only vaguely addresses these supposed "efficiencies" in its application—with a few potential examples like online applications—but fails to identify or quantify the workload or positions these basic efforts would eliminate or quantify gains that might be realized.

---

[17] FDEP has also recently been given more new duties to complete with limited staff and resources. Ryan Dailey, Florida DEP Gets New Duties, Including Septic Systems Oversight, Under New Law, WFSU, Jun. 30, 2020 (Exhibit 72).  The Florida legislature recently transferred authority of septic tank inspection from the Florida Department of Health to FDEP.  FDEP was also directed to update its regulations that apply to storm water systems.  Id.

In short, FDEP asks the EPA to take its word that the agency will figure its way out of having to allocate a single cent to operate and enforce an entire federal wetlands permitting program that has cost other states millions of dollars to undertake.[18]   This fails to demonstrate FDEP's ability to competently administer a state program, and calls into question the adequacy of any program that would not require a penny more to run.

FDEP's 404 Assumption Application likewise does not fully address or disclose all costs that will necessarily be associated with administering a 404 Program.   For example, FDEP fails to address: initial resources needed to process all pending (160) applications at the time of assumption, resource needs and costs required for compliance and enforcement of the pending applications that are approved, sufficient staffing, an adequate audit process, costs associated with reissuing general permits, the large area of permits where the claimed "85%" overlap of work with the ERP Program will not be achieved, and several costs associated with implementation.   See Doug Fry Aff. (Nov. 2, 2020) (Exhibit 73).

More specifically, FDEP will have to take over an estimated 160 pending 404 permit applications but has failed to even identify how many *trained* staff it has or will be needed to address this sudden influx and the necessary compliance and enforcement which will automatically follow.   Id. at 5–8.   FDEP has also not substantiated how they arrived at this 85% overlap figure which would not apply to FDEP's new workload of processing 404 permits for activities permitted under the ERP Program by the Water Management Districts and delegated local governments.   Id. at 15.   For these 404 permits, FDEP would not be processing the ERP permit nor does it have the in-house expertise to do so.   Id. at 15–17.   The projects processed under the ERP program by the Water Management Districts, for instance, are typically much larger in size and scope (i.e., seawall versus 10,000 acre commercial development), require in depth engineering review, involve hydrology expertise, and are more often located in inland freshwater systems (opposed to FDEP's experience with ERP in mainly coastal systems).   Id.

The staffing numbers that FDEP has provided are unrealistically low, id. at 8–10, and have not been supported with the underlying data necessary to evaluate them.   See Assumption Application B, app. e (tables are missing underlying data and limited methodology is unclear).   These estimates also failed to account for the time spent reviewing permits that were denied or withdrawn.   Id. at 8.

FDEP's proposal also includes reliance on other state agencies, FWCC and the State Historic Preservation Office ("SHPO"), to ensure protection of listed species and cultural resources.

---

[18] Compare 404 Assumption SERC with Fla. Dep't of Env't Prot., Statement of Estimated Regulatory Cost, 62-330 (2012) (Exhibit 74).

Memorandum of Understanding between Fla. Fish & Wildlife Conservation Comm'n, U.S. Fish & Wildlife Servs., & the Fla. Dep't of Env't Prot., Aug. 5, 2020; Operating Agreement between Fla. Dep't of Env't Prot. & the Fla. Div. of Hist. Ress.-State Hist. Pres. Officer Regarding the State 404 Program, Aug. 6, 2020.  However, Florida's description of funding and manpower contains no information regarding the funding and manpower, if any, available at either of those state agencies to meet the obligations of an assumed 404 program.  FDEP's memorandums also do not commit these agencies to increasing their budgets to implement the Florida Program. Assumption Application B, app. j-1, j-2.

Interestingly, staff at both of those agencies have even expressed concern with FDEP's plan and their ability to administer the 404 program.  See Email from Lisa Gregg, Special Activity License Program, Fla. Fish & Wildlife Comm'n, to Jennifer Goff, Conservation Planning Services, Fla. Fish & Wildlife Comm'n, Jan. 14, 2020, 11:26 EST ("FDEP permit processors can't keep up with their current workload now and appropriately consider the impacts of proposed actions to fish and wildlife resources even if you hand it to them on a platter, much less if you added to their workload."); Operating Agreement between Fla. Dep't of Env't Prot. & the Fla. Div. of Hist. Ress.-State Hist. Pres. Officer Regarding the State 404 Program at 9 (draft) (rev'd May 29, 2020) (Exhibit 75) (in response to a 15-day response deadline for a permittee' pre-review request SHPO employee stated "Providing consistent comments within 15 days may not be feasible for our Compliance Section.").

The unprecedented budget strains the State is now facing will make it impossible to recover any semblance of staffing and funding that would make assumption of a Section 404 program feasible any time soon.  Tax revenues for the State plummeted in April, May and June 2020 as a result of the pandemic.  In July 2020, Governor DeSantis vetoed $1 billion in spending from the 2020–2021 budget in response to the crisis.  In August 2020, Florida agencies were asked to cut 8.5% of their budgets to adjust for the anticipated $3.4 billion loss for Fiscal year 2020–2021 resulting from the pandemic.  See Christine Sexton, Florida Agencies Asked to Cut 8.5 Percent to Adjust for COVID-19, Tampa Bay Times, Aug. 12, 2020 (Exhibit 76); Fla. Off. of Econ. & Demographic Rsch., Executive Summary:  Revenue Estimating Conference for the General Revenue Fund & Financial Outlook Statement (Aug. 14, 2020) (Exhibit 77).

Florida has not acknowledged these important facts, much less addressed how its state agencies can be expected to do more—namely administer a new, complex Section 404 program—with so much less.  See, e.g., Doug Fry Aff.  FDEP's claim that it will be able to operate a Section 404 program without any additional funding from the State is untenable as further evidenced by the millions of dollars (ranging from 2–3 million to as much as 18 million) other states pursuing

JA.1696

assumption have estimated it to cost.[19]  FDEP's position can only mean it would treat a 404 program the same as its existing ERP program or suggests that FDEP simply will not adequately implement, operate or enforce a Section 404 program.  Both are indefensible and require the EPA to deny FDEP's assumption application.

4.  **FDEP's Enforcement Record Continues to Demonstrate an Incapacity to Adequately Enforce Existing Programs, Much Less Adopt New Ones**

As was described above, FDEP was gutted in recent years.  Editorial: The Rick Scott Record: An Environmental Disaster, Tampa Bay Times, supra (observing that the Rick Scott administration had reduced water management budgets, rushed through permitting, weakened enforcement, caused widespread layoffs, provoked a brain drain of experts in the field, and replaced experts with political appointees focused on advancing business interests rather than environmental stewardship).

As a result, FDEP has been unable to meet its existing obligations to operate and enforce programs already under its purview.  This fact is amply demonstrated in the widespread impaired waters throughout the State, as well as the recurring toxic algae crisis that has made national headlines and FDEP's grossly inadequate record of enforcing its existing programs.  See, e.g., Doug Fry Aff. (Exhibit 73); PEER, Report on Enforcement Efforts by the Florida Department of Environmental Protection: Calendar Year 2019 6 (2020) (Exhibit 81).

Year after year, analyses of FDEP's enforcement record have demonstrated an inability or unwillingness to meet enforcement obligations, ensure compliance with existing programs, and ultimately provide requisite protection to the State's valuable natural resources.  See Press Release, PEER, Florida Eco-Noncompliance Rises as Enforcement Wanes, Jun. 22, 2020 (Exhibit 82); PEER, Report on Enforcement Efforts By the Florida Department of Environmental Protection Calendar Year 2019 (2020) (Exhibit 81); Press Release, PEER, Fewer Florida Eco-Inspections Equals Less Compliance, Sept. 17, 2019 (Exhibit 83); PEER, Report on Enforcement Efforts By the Florida Department of Environmental Protection Calendar Year 2018 (2019) (Exhibit 84); Press Release, PEER, Florida Racks up Second Worst Eco-Enforcement in 30+ Years, Jul. 17, 2018 (Exhibit 85); PEER, Report on Enforcement Efforts By

---

[19] See, e.g., Va. Dept. of Env't Quality, Study of Costs and Benefits of State Assumption of the Federal § 404 Clean Water Act Permitting Program 2 (Dec. 2012), (Exhibit 78) (estimating assumption to cost $18 million over the first 5 years and $3.4 million annually thereafter); Minnesota Federal Clean Water Act Section 404 Permit Program Feasibility Study ix (Jan. 2017), (Exhibit 79) (estimated cost increase for state agencies is 4.796 million per year plus a one-time $3 million cost for developing online permitting systems); Az. Dep't of Env't Quality, Clean Water Act § 404 Assumption Roadmap Review Meeting 22 (Exhibit 80) (estimating assumption to cost $2.5 million annually and to be funded by application fees).

JA.1697

the Florida Department of Environmental Protection Calendar Year 2017 (2018) (Exhibit 86);
Press Release, PEER Florida Eco-Enforcement Still Scraping Bottom, Aug. 29, 2017 (Exhibit
87); PEER, Report on Enforcement Efforts By the Florida Department of Environmental
Protection Calendar Year 2016 (2017) (Exhibit 88).

FDEP's own performance audits and employee testing show that it has failed in many respects to
effectively administer its existing ERP Program, the same program the state now touts as the
reason why it can so easily assume a 404 program without any additional resources.  Internal
audit records and employee testing provided to Earthjustice in response to public records
requests demonstrate that FDEP has failed to adequately administer the ERP program and show
FDEP's consistent inability to properly review permit applications and monitor and enforce
issued permits.

For example, in 2013, FDEP staff were tested along with staff from Water Management Districts
and specific counties in Florida to assess their skills in delineating wetlands.  2013 Training Test
Module Result Summary and Analysis (Exhibit 89)  "Though each [FDEP] district tended to
have a few relatively high scores, the rest fell across a very wide range, often with the majority
being below the statewide average."  Id.

The same issues arise when reviewing the audit reports of FDEP staff's ERP permits.  For
example, the ERP Individual Permit Review for 2015 found that FDEP staff completed site
inspections when required in less than half of reviewed examples, most documentation of
wetlands impacts was "minimal," and only 24% of projects reviewed that required mitigation
provided appropriate mitigation.  Allyson Minick & Heather Mason, Submerged Lands & Env't
Res. Coordination, Fla. Dep't of Env't Prot., 2015 ERP Individual Permit Reviews 13–14 (as
edited 2017) (Exhibit 90).  More recent audits of individual permits continue this pattern: few
site inspections when required, inadequate mitigation required, and documentation of wetlands
impacts missing.  See (Exhibit 91) (compilation of individual permit audits provided to
Earthjustice in response to public records requests).

Individual audits of compliance and enforcement activities for FDEP's existing ERP program
that were provided to Earthjustice in response to public records requests are similarly littered
with examples of inadequate documentation, assessment of insufficient or inaccurate penalties,
requiring inappropriate or insufficient corrective actions.  See (Exhibit 92) (compilation of
compliance and enforcement audits provided to Earthjustice in response to public records
requests)

Testimony during EPA's public hearings on Florida's assumption application also revealed
extensive concerns over FDEP's failure to competently administer many of its other programs as
well, such as its Total Maximum Daily Loads Program, Basin Management Action Plans, and

JA.1698

National Pollutant Discharge Elimination System Stormwater Program.  Oct. 21, 2020, Hearing Transcript; Oct. 27, 2020, Hearing Transcript.

The consequences of allowing an ill-equipped FDEP to administer the proposed Section 404 program are made all the more stark by the EPA's decision to waive almost all oversight of Florida's program otherwise available under the Clean Water Act, see 33 U.S.C. § 1344(j)-(k), that is not required to be retained under 40 C.F.R. § 233.51(b).  Memorandum of Agreement between Fla. Dep't of Env't Prot. & U.S. Env't Prot. Agency at III(b) (Jul. 31, 2020).  EPA has not approved an assumption program in decades, and much has changed in the law and wetlands science since the early 1990s.  Never has a state with the vast waterways, wetlands and listed species that Florida enjoys assumed the 404 program.  For EPA to ensure this high-stakes assumption program complies with Section 404, EPA would have to retain the maximum monitoring and oversight possible for a minimum of two years before relinquishing its Section 404(j) authority.

In any event, the fundamental flaws in Florida's proposed program, combined with its utter lack of resources and capacity to undertake a Section 404 program, demonstrate that the application must be denied.

## 5.   Florida Does Not Afford Comparable Access to the Courts As That Available Under Federal Law

Critical to citizen enforcement of a Section 404 program, Florida's access to the courts is far more restrictive than that allowed under federal law.  In its description of the "Administrative and Judicial Review" procedures available in Florida, FDEP fails to mention any of the State's several features that make Florida's administrative and judicial review procedures far more restrictive those available under federal law.  Assumption Application B, app. b.

For example, Florida's "Environmental Protection Act" only authorizes "a citizen *of the state*" to maintain an action for injunctive relief to compel government enforcement of environmental laws or against a person or non-governmental entity for violating our environmental laws.  Fla. Stat. § 403.412(2)(a) (emphasis added).  Paragraph (7) similarly states that "[i]n a matter pertaining to a federally delegated or approved program, *a citizen of the state* may initiate an administrative proceeding under this subsection if the citizen meets the standing requirements for judicial review of a case or controversy pursuant to Article III of the United States Constitution."  Id. § 403.412(7) (emphasis added).  The ability to intervene in proceedings brought under this statute is also limited to "citizens of the state."  Id. § 403.412(5).

Federal law, on the other hand, authorizes citizen suits under the Clean Water Act by "any citizen," 33 U.S.C. § 1365(a) (authorizing suit alleging violation of limitations under the chapter

JA.1699

or against EPA for failure to perform non-discretionary duty or act).  The term "citizen" is defined as "a person or persons having an interest which is or may be adversely affected."  33 U.S.C. § 1365(g).  Unlike the State's law, federal law does not require the adversely affected person to be a citizen of the state where the interest lies.

In addition, a litigant bringing an action under Fla. Stat. § 403.412 is subject to a mandatory fee-shifting provision that has no analog under the Clean Water Act.  Under Fla. Stat. § 403.412(2)(f), attorneys' fees must be imposed in favor of any prevailing party and against the losing party, notwithstanding the good faith or merit of the litigant's position.  While the State's statute exempts actions involving a state-issued National Pollution Discharge Elimination System permit from this mandatory fee-shifting provision, there is no such exemption for actions involving a Section 404 permit.  Id. § 403.412(2)(f).  Mandatory fee shifting under Fla. Stat. § 403.412 operates as a barrier to court access for litigants unwilling or unable to risk an adverse fee award no matter the strength of their case.

The Clean Water Act's citizen suit provisions, by contrast, do not require mandatory fee shifting to the prevailing party.  Rather, the court "*may* award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party" as the court deems appropriate.  33 U.S.C. § 1365(d) (emphasis added).

Florida's Administrative Procedure Act also restricts access to courts as compared to federal law, by severely limiting the ability to establish standing.  To establish associational standing, for example, organizations must demonstrate that a "substantial number" of their members "are substantially affected" by the challenged conduct.  See Florida Home Builders Ass'n v. U.S. Dep't of Labor, 412 So.2d 351 (Fla. 1982); Farmworker Rights Org., Inc. v. Dep't of Health & Rehab. Servs., 417 So.2d 753, 754–55 (Fla. 1st Dist. Ct. App. 1982) (to establish associational standing under section 120.57(1) organization must demonstrate that "a substantial number of its members, although not necessarily a majority, are substantially affected by the challenged rule," that "the subject matter of the challenged rule is within the association's general scope of interest and activity," and that "the relief requested is of a type appropriate for a trade association to receive on behalf of its members."); St. Johns Riverkeeper, Inc. v. St. Johns River Water Mgmt., 54 So. 3d 1051, 1054 (Fla. Dist. Ct. App. 2011) (under Florida APA, associational standing requires showing of harm to substantial interests of a substantial number of members; finding standing under sections 120.569 and 120.57 where organization had 1,500 members, including 50 in the relevant county, and that there had been more than 1,100 member participant ecological boat trips to the area); Friends of the Everglades, Inc. v. Bd. of Trustees of Int'l Imp. Tr. Fund, 595 So. 2d 186, 188 (Fla. Dist. Ct. App. 1992).

Under federal law, on the other hand, associational standing may be established on the basis of a single member's harms resulting from the challenged conduct.  See Sierra Club v. Johnson, 436

F.3d 1269, 1279 (11th Cir. 2006) (associational standing of Sierra Club satisfied by affidavit of one member who suffered injury in fact).

Florida's more restrictive access to the courts would deprive affected parties of the ability to vindicate rights and ensure citizen enforcement of Section 404.  This further demonstrates that the State should not be permitted to assume the program.

### 6.   Florida Has Not Adequately Defined Assumable Waters vs. Retained Waters

As demonstrated above, the issue of identifying Florida's assumable, versus retained, waters is a contentious issue with enormous consequences for the protections that will be afforded to Florida's waterways.  The Corps' sudden retreat to an exceedingly restrictive view of retained waters is unreasonable, and not based in fact.  We object to Florida's unduly expansive view of assumable waters—and to the Corps' unduly restrictive view of retained waters—and fully incorporate the comments raised in our letter to the Corps on April 18, 2018, as well as in our October 23, 2020, letter to EPA.  Letter from Tania Galloni, Earthjustice, to Jason A. Kirk, U.S. Army Corps of Eng'rs, Apr. 18, 2018, supra; Letter from Bonnie Malloy, supra.

The Corps' failure to follow through on its 2018 notice and comment opportunity for stakeholders to weigh in on this critical question, and the Corps' failure to perform the requisite navigability assessments contemplated with that public notice, undermines the validity of its current view that so few waters belong on its retained list.  To the contrary, federal law requires that the Corps retain jurisdiction over many more important waterways in Florida.  The Corps' ceding jurisdiction over those waters to Florida for purposes of 404 assumption violates the Rivers and Harbors Act and renders EPA approval of such a program untenable.

In addition, the Corps has advised in the MOA between FDEP and the Corps, 40 C.F.R. §233.14, to provide a retained waters GIS layer to the FDEP.  However, this information has not been provided to the public, despite multiple requests, nor, to the undersigned's knowledge, has it been provided to the State.

The Corps has not indicated whether that GIS layer will simply identify retained waters, whether it will actually depict their mean high water lines (MHWL)/ordinary high water marks (OHWM), or the actual pre-determined location of the administrative boundary.  It can be quite difficult for staff and applicants to determine such lines, marks, and boundaries, particularly if an applicant's property is not located directly abutting the MHWL/OHWM (where those lines might be discernable by an applicant without a survey), and can be costly where the lines/marks need to be determined by a registered professional.

JA.1701

The only information provided to the public and the EPA is a list of waters provided in FDEP's application.  404 Handbook B, app. A.  This list however fails to list numerous waterbodies that were previously on the Corps Retained Waters List in 2017 and that were submitted to the Corps during its comment period in 2018 discussed above in section III.  The Conservancy of Southwest Florida and Waterkeepers Florida both submit comments addressing these missing waters which are incorporated herein.  Letter from Amber Crooks, Conservancy of Sw. Fla., to Kelly Laycock, U.S. Env't Prot. Agency, Nov. 2, 2020 (Exhibit 93); Letter from Rachel Silverstein, Miami Waterkeeper, et al., to Kelly Laycock, U.S. Env't Prot. Agency, Nov. 2, 2020 (Exhibit 94).

Lastly, Florida's adoption of an only 300-foot buffer zone is unreasonable and inadequate.  The only other states to have assumed a 404 program have utilized the more protective 1,000 foot buffer, and no less should be required of Florida in order to satisfy the Clean Water Act.

### 7.  Florida's Waterways, Public Cannot Afford to Lose Existing Federal Safeguards

Florida's unique, and exceptionally valuable, waterways require the maximum protection available under federal law, not a reduction in protections that would follow from FDEP's assumption of Section 404.  History has taught that the availability of NEPA review, and the involvement of the Corps in wetlands permitting, have been essential to safeguarding precious resources in Florida.

#### a.  NEPA Safeguards Are Essential Protecting Florida's Wetlands

As stated above, Florida has touted the loss of NEPA review under an assumed state program as a "benefit" and "cost-saving" measure for permit applicants.  It is a massive net loss, however, to the public and to protection of Florida's waterways.

Enacted in response to mounting crises across the nation, NEPA promised to correct the blind eye that American policymakers had long turned to environmental impacts of federal agency actions.  See S. Rep. No. 91-296, at 4–5 (1969) ("As a result of this failure to formulate a comprehensive national policy, environmental decisionmaking largely continues to proceed as it has in the past.  Policy is established by default and inaction. Environmental problems are only dealt with when they reach crisis proportions. Public desires and aspirations are seldom consulted. Important decisions concerning the use and the shape of man's future environment continue to be made in small but steady increments which perpetuate rather than avoid the recognized mistakes of previous decades.").  Congress recognized that "[t]raditional policies were primarily designed to enhance the production of goods and to increase the gross national product .... [b]ut [that], as a nation, we have paid a price for our material well-being."  Id.  With the understanding that "the Nation cannot continue to pay the price of past abuse," id., Section

101 of NEPA imposes on the national government an obligation "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  NEPA § 101(a), codified at 42 U.S.C. § 4331(a).  The government thus had the "continuing responsibility" to, among other things, "assure for all Americans, safe, healthful, productive, and esthetically and culturally pleasing surroundings."  Id. § 101(b)(2).

NEPA also looked to the future:  Congress committed the federal government to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations."  Id. § 101(b)(1).  Prior to NEPA, federal policymaking did not systematically consider long-term environmental degradation.  Instead, the "pursuit of narrower, more immediate goals" had fostered increasing "threats to the environment and the Nation's life support system."  See S. Rep. No. 91-296, at 8–9 ("The challenge of environmental management is, in essence, a challenge of modern man to himself. The principal threats to the environment and the Nation's life support system are those that man has himself induced in the pursuit of material wealth, greater productivity, and other important values. These threats—whether in the form of pollution, crowding, ugliness, or in some other form—were not achieved intentionally. They were the spinoff, the fallout, and the unanticipated consequences which resulted from the pursuit of narrower, more immediate goals.").  NEPA was enacted as a change in course, forcing policymakers to consider "the long-range implications of many of the critical environmental problems" facing the nation.  See id. at 8.

To fulfill its promises, NEPA mandated that federal agencies consider the environmental impacts of their decisions.  NEPA § 102.  Congress directed federal agencies to meet three goals: First, federal decisions must be informed by detailed environmental analyses.  Second, decision makers must develop, study, and consider alternative courses of actions allowing a comparison of the potential environmental impacts of such alternatives.  Id. § 102(2)(C)(iii), (E); see Pub. L. No. 94-83 (1975) (amending section 102(2) of NEPA).  And third, agencies must involve the public in this evaluation and decisionmaking process.

To this end, NEPA requires that the government:

> utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment[.]

NEPA § 102(2)(A).  Agencies must also provide a "detailed statement" on the environmental impacts of proposed decisions "significantly affecting the quality of the human environment" (known as an environmental impact statement or EIS). Id. § 102(2)(C).  Within that detailed statement, agencies must disclose "any" unavoidable adverse environmental effects of the

JA.1703

decision.  Id. § 102(2)(C)(ii).  And they must disclose "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."  Id. § 102(2)(C)(v).  Moreover, NEPA does not allow agencies to ignore analytic gaps: agencies must find ways to properly weigh "unquantified environmental amenities and values."  See id. § 102(2)(b).

NEPA directs federal decisionmakers to study and consider alternatives to their decisions, allowing comparisons the environmental impacts of such alternatives.  See id. § 102(2)(C)(iii), (E); Pub. L. No. 94-83 (1975) (amending section 102(2) of NEPA).  In particular, federal agencies must "study, develop, and describe appropriate alternatives to recommended courses of action" in "any proposal which involves unresolved conflicts concerning alternative uses of available resources," even if its impacts do not rise to the level requiring an EIS.  NEPA § 102(2)(E).  See Pub. L. No. 94-83 (1975) (amending section 102(2) of NEPA).

NEPA mandates inclusion of and disclosure to the public and other governmental entities of environmental impact analyses.  The statute broadly directs agencies to act "in cooperation" with governmental entities and the public in the decision-making process.  NEPA § 101(a).  Further, agencies must make available "advice and information useful in restoring, maintaining, and enhancing the quality of the environment" to "States, counties, municipalities, institutions, and individuals."  Id. § 102(2)(G).

Unfortunately, as explored in more detail herein, Florida's proposed assumption of the Section 404 program conflicts with NEPA's mandate.  The proposal, if accepted, would lead Florida's agencies to make decisions with significant, and sometimes devastating, environmental impacts without ever considering those impacts in advance.  It would raise barriers to public participation.  And at the end of the day, it would lead to poor decisions, increased litigation, and less transparency.

There are many examples where the NEPA process has been essential to improving proposed projects that would otherwise have had devastating impacts in Florida.  The 2005 draft EIS for the Everglades Agricultural Area Reservoir, for example, was the document that first raised issues related to water quality highlighting the need for additional stormwater treatment acreage as part of the project.  The approach to water quality has improved in the most recent iteration of the project earlier this year as environmental groups and agencies acknowledged the importance of adequately addressing this important issue.  The Corps' initial 2018 NEPA analyses helped further refine areas of uncertainty associated with the project that once addressed will improve its final design and performance.  Letter from S. Ansley Samson, Everglades Law Ctr., & Shannon Estenoz, Everglades Found, to Mary B. Neumayr, Council on Env't Quality, Aug. 20, 2018 (Exhibit 95).

JA.1704

The Combined Operations Plan for the southern portion of the Central and Southern Florida (C&SF) Project involved three increments of changes to operations in the southern portion of the C&SF Project (over 3+ years). Through the associated NEPA processes, environmental and economic stakeholders in South Florida and the Florida Keys were able to articulate proposed operational changes to improve environmental conditions in Florida Bay, relying in part on the information made available in draft EISs and environmental assessments describing the proposed changes. Stakeholders continue to raise these issues in ongoing discussions of a final operations plan for recently constructed restoration infrastructure. Because of NEPA, agencies were fully informed of the broad range of stakeholder perspectives and of uncertainties related to the extent to which these projects will deliver the return on taxpayer investment they are intended to produce when operated under certain conditions. Id.

Florida has no state statutory counterpart to NEPA. Approving a state 404 program in Florida therefore deprives the public of the procedural protections and opportunity to participate that are available under federal law through NEPA.

State-issued permits would not be held to NEPA standards, or be subject to challenge in federal court for failing to comply with NEPA. The public would thus be deprived of necessary safeguards to ensure vital protections.

NEPA safeguards under federal law have been vital to protecting wetlands in Florida when federal agencies have fallen short of their obligations. In Florida Wildlife Federation v. United States Army Corps of Engineers, 401 F. Supp. 2d 1298 (S.D. Fla. 2005), for example, deficiencies in complying with the NEPA process for a major development with significant impacts on wetlands planned for Palm Beach County ultimately resulted in modification and re-location of the project to avoid those impacts. There are many such examples where, when the federal government failed to meet NEPA obligations, the agency was held to account under NEPA, resulting in better process and outcomes for Florida's environment. (Exhibit 96) (compilation of articles from Florida, Protect NEPA, https://protectnepa.org/success-stories/florida (last visited Nov. 2, 2020)).

### b. The Corps Has Served As Essential Backstop to Harmful FDEP Permit Approvals

As testimony throughout EPA's public hearings illuminated, the Corps has acted as a backstop for FDEP decisions that were not sufficiently protective of the environment. Oct. 21, 2020, Hearing Transcript; Oct. 27, 2020, Hearing Transcript. Whether it is the reduced potential for local political pressure or application of the NEPA process, the Corps does not always agree with FDEP on what is permittable activities. For example, in 2016, FDEP issued a permit for a mitigation bank known as Long Bar Pointe for 260.8 acres along 2 miles of coastline fronting on

Sarasota Bay to Long Bar Pointe.  Fla. Dep't of Env't Prot., Notice of Intent to Issue Environmental Resource/Mitigation Bank Permit, No. 338349-001, Apr. 28, 2016 (Exhibit 97). This was a highly controversial project that resulted in the demotion and firing of two FDEP employees who raised concerns over the permit application.  Bruce Ritchie, <u>DEP Employee Suspended in 2012 Speaks Out About Her Experience—and the Future</u>, Politico, Mar. 3, 2017 (Exhibit 98) (Former FDEP employee discussing her demotion and the permittee's ability to pressure FDEP); Kathy Prucnell, <u>Environmentalist Appeals Long Bar-DEP Mitigation Permit</u>, Islander (last visited Oct. 31, 2020) (Exhibit 99); Kathy Prucnell, <u>Trio of FISH, Waterkeeper, McClash Challenge Long Bar Permit</u>, FISH Blog, May 24, 2016 (Exhibit 100).  Months after FDEP's permit approval, the Corps refused to permit the Long Bar Pointe Mitigation Bank finding it did not have the potential to provide sufficient compensatory mitigation to compensate for unavoidable impacts to waters of the United States.  Letter from Donald K. Kinard, Army Corps, to Pete Logan, Long Bar Pointe, Sept. 14, 2016 (Exhibit 101).  The Corps denied the mitigation bank application a second time on May 5, 2017.  Letter from Donald K. Kinard, Army Corps, to Pete Logan, Long Bar Pointe, May 5, 2017 (Exhibit 102); Hannah Morse, *Corps Denies Long Bar Pointe's Second Mitigation Bank Proposal*, Bradenton Herald, May 5, 2017 (Exhibit 103).  In other words, the Corps did not think it could actually operate as a mitigation bank.

**<u>Conclusion</u>**

Based on the foregoing, we respectfully urge EPA to deny Florida's application.

Sincerely,

| Tania Galloni | Bonnie Malloy | Christina I. Reichert |
|---|---|---|
| Fla. Bar No. 619221 | Fla. Bar No. 86109 | Fla. Bar No. 0114257 |
| Earthjustice | Earthjustice | Earthjustice |
| 4500 Biscayne Blvd. | 111 S. Martin Luther King Jr. Blvd | 4500 Biscayne Blvd. |
| Ste 201 | Tallahassee, FL 32301 | Ste 201 |
| Miami, FL 33137 | T: 850-681-0031 | Miami, FL 33137 |
| T: 305-440-5432 | F: 850-681-0020 | T: 305-440-5432 |
| F: 850-681-0020 | bmalloy@earthjustice.org | F: 850-681-0020 |
| tgalloni@earthjustice.org | | creichert@earthjustice.org |

54

Copies to:

Colonel Andrew Kelly, District Commander
Department of the Army
Jacksonville District Corps of Engineers
P.O. Box 4970
Jacksonville, Florida 32232-0019
Via Email Andrew.d.kelly@usace.army.mil; CESAJ-OC@usace.army.mil

Leopoldo Miranda, Regional Director
U.S. Fish and Wildlife Services
Regional Director's Office-R4
1875 CENTURY BOULEVARD, SUITE 400
Atlanta, Georgia 30345-3319
Via Email Leopoldo_miranda@fws.gov

Roy E. Crabtree, Ph.D., Regional Administrator
National Marine Fisheries Service
Southeast Regional Office
263 13th Avenue South
St. Petersburg, FL, 33701
Via Email Roy.Crabtree@noaa.gov

JA.1707