**ORAL ARGUMENT NOT YET SCHEDULED**

**No. 24-5101 (c/w Nos. 24-5156 and 24-5159)**

# In the United States Court of Appeals for the District of Columbia Circuit

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,
*Appellees/Cross-Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Appellants/Cross-Appellees*

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Appellants/Cross-Appellees*

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-CV-0119, District Judge Randolph D. Moss

**JOINT APPENDIX—VOLUME 7 (JA.2061–JA.2199)**

*Counsel Listed on Inside Cover*

February 26, 2025

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

Jeffrey DeSousa
*Acting Solicitor General*
Christopher J. Baum
*Senior Deputy Solicitor General*
Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Florida Appellants*

Lisa Lynne Russell
*Deputy Assistant Attorney General*

Brian Toth
Joan Pepin
Rebecca Jaffe
*Attorneys*

Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

*Counsel for Federal Appellants*

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd., Ste. 201
Miami, FL 33137
tgalloni@earthjustice.org
creichert@earthjustice.org
(305) 440-5432

Bonnie Malloy
Earthjustice
111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
bmalloy@earthjustice.org
(850) 681-0031

*Counsel for Environmental Appellees*

## TABLE OF CONTENTS

| | VOLUME 1 (JA.1–JA.430) | |
|---|---|---|
| **District Court Docket Number** | **Document** | **Page** |
| Dkt. 1 | Plaintiffs' Complaint | 1 |
| Dkt. 4 | State of Florida and Florida Department of Environmental Protection's Motion to Intervene | 52 |
| Dkt. 73 | Memorandum Opinion and Order | 55 |
| Dkt. 77 | Plaintiffs' Amended Complaint | 117 |
| Dkt. 95-2 | Revised Administrative Record Index for EPA's Approval of Florida's Clean Water Act Section 404 Program | 176 |
| Dkt. 98 | Plaintiffs' Motion for Summary Judgment | 211 |
| Dkt. 98-1 | Declaration of Amber Crooks | 294 |
| Dkt. 98-3 | Declaration of Elizabeth H. Fleming | 417 |

| | VOLUME 2 (JA.431–JA.846) | |
|---|---|---|
| Dkt. 98-4 | Declaration of Brett Hartl | 431 |
| Dkt. 98-5 | Declaration of Matthew Schwartz | 444 |
| Dkt. 98-6 | Declaration of Lisa Rinaman | 463 |
| Dkt. 98-7 | Declaration of Rachel Silverstein | 510 |
| Dkt. 98-10 | Declaration of Diana Umpierre | 543 |

| | | |
|---|---|---|
| Dkt. 99 | Defendant's Combined Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment | 644 |
| Dkt. 102 | Florida Intervenors' Opposition to Plaintiffs' Motion for Summary Judgment and Cross-Motion for Summary Judgment | 731 |
| Dkt. 102-1 | Declaration of Justin Wolfe | 793 |

| **VOLUME 3 (JA.847–JA.1190)** | | |
|---|---|---|
| Dkt. 104 | Plaintiffs' Consolidated Reply in Support for Motion for Summary Judgment and Response in Opposition to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 847 |
| Dkt. 104-1 | Supplemental Declaration of Amber Crooks | 963 |
| Dkt. 107 | Florida Intervenors' Reply in Support of Cross-Motion for Summary Judgment | 1001 |
| Dkt. 113 | Notice of Completion of Biological Evaluation | 1033 |
| Dkt. 123 | Plaintiffs' Sur-Reply in Support of Plaintiffs' Motion for Summary Judgment and Response to Defendants' and Intervenors' Cross-Motions for Summary Judgment | 1036 |
| Dkt. 125 | Plaintiffs' Notice of Filing Addition to Supplemental Joint Appendix | 1063 |
| Dkt. 127-2 | Florida Intervenors' Motion for Leave to File Post-Hearing Memorandum, Attachment 1: Standing Demonstrative | 1066 |
| Dkt. 135 | Motion for a Temporary Restraining Order and Preliminary Injunction by Plaintiffs Center for Biological Diversity and Sierra Club | 1069 |

| Dkt. 149-3 | Exhibit C: Comparison Table of Species Review Process in Corps-Led and Florida-Led Section 404 Programs | 1113 |
|---|---|---|
| Dkt. 153 | Plaintiffs Center for Biological Diversity and Sierra Club's Reply in Support of Motion for Temporary Restraining Order and Preliminary Injunction | 1119 |
| Dkt. 153-1 | Technical Assistance Process Compared to Endangered Species Act Section 7 Consultation | 1182 |
| Dkt. 156 | Excerpt of Motion Hearing on October 19, 2023 | 1187 |

| **VOLUME 4 (JA.1191–JA.1469)** | | |
|---|---|---|
| Dkt. 158 | Federal Defendants' Post-Hearing Submission on Remedy | 1191 |
| Dkt. 161 | Plaintiffs' Brief on Remedy for Claims Relating to Protection of ESA-listed Species under USFWS' Jurisdiction | 1201 |
| Dkt. 164 | Order | 1218 |
| Dkt. 165 | Federal Defendants' Supplemental Brief Regarding Limited Stay | 1220 |
| Dkt. 166 | Florida Intervenors' Motion for Limited Stay of February 15, 2024 Vacatur Order | 1224 |
| Dkt. 166-1 | Exhibit A: Declaration of Justin Wolfe | 1245 |
| Dkt. 170 | Florida Intervenors' Reply in Support of Limited Stay | 1250 |
| Dkt. 171 | Florida Intervenors' Expedited Motion for Entry of Final Judgment | 1263 |

| Dkt. 182 | Amended Memorandum Opinion | 1284 |
|---|---|---|
| Dkt. 183 | Memorandum Opinion | 1382 |
| Dkt. 184 | Order | 1409 |
| Dkt. 185 | Florida Intervenors' Notice of Appeal | 1410 |
| Dkt. 189 | Plaintiffs' Response to Florida Intervenors' Motion for Stay Pending Appeal | 1411 |
| Dkt. 190 | Memorandum Opinion and Order | 1451 |
| Dkt. 193 | Plaintiffs' Notice of Appeal | 1465 |
| Dkt. 195 | Federal Defendants' Notice of Appeal | 1468 |

| VOLUME 5 (JA.1470–JA.1707) | | | |
|---|---|---|---|
| **EPA Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| EPA-HQ-OW-2018-0640-0001 | Dkt. 51 at 1-4 | Request to Assume Administration of a Clean Water Act Program: Florida, Notice and Request for Comments, 85 Fed. Reg. 57,853 (Sept. 16, 2020) | 1470 |
| EPA-HQ-OW-2018-0640-0002-A7 | Dkt. 52 at 6-15 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060: Application for Individual and Conceptual Approval Environmental Resource Permit, State 404 Program Permit, and Authorization to Use State-Owned Submerged Lands, Aug. 20, 2020 | 1474 |

| EPA-HQ-OW-2018-0640-0002-A9 | Dkt. 52 at 21-30 | Florida Section 404 Program Application: Florida Admin. Code 62-330.060 Section C: Supplemental Information for Works or Other Activities In, On, or Over Wetlands and/or Other Surface Waters, Aug. 20, 2020 | 1484 |
| EPA-HQ-OW-2018-0640-0002-A20 | Dkt. 52 at 82-143 | Florida Section 404 Program Application: Florida Admin. Code 62-331.010(5): State 404 Program Applicant's Handbook Aug. 20, 2020 | 1494 |
| EPA-HQ-OW-2018-0640-0016-A2 | Dkt. 55-1 at 120-32 | Appendix j-2: Memorandum of Understanding Between the Florida Fish and Wildlife Conservation Commission, USFWS, and FDEP, Aug. 5, 2020 | 1556 |
| EPA-HQ-OW-2018-0640-0018 | Dkt. 55-1 at 300-13 | Memorandum of Agreement between FDEP and EPA, July 31, 2020 | 1569 |
| EPA-HQ-OW-2018-0640-0019 | Dkt. 55-1 at 314-22 | Memorandum of Agreement Between FDEP and the U.S. Department of the Army, July 31, 2020 | 1583 |
| EPA-HQ-OW-2018-0640-0051 | Dkt. 55-3 at 69-129 | Letter from Bonnie Malloy et al., Earthjustice, to Kelly Laylock, EPA, Oct. 23, 2020 | 1592 |
| EPA-HQ-OW-2018-0640-0386-A1 | Dkt. 56 at 16-70 | Letter from Tania Galloni et al., Earthjustice et al., to Kelly Laylock, EPA, Nov. 2, 2020 | 1653 |

| VOLUME 6 (JA.1708–JA.2060) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0387-A8 | Dkt. 56-1 at 65-364 | Exhibit 58: ESA Biological Assessment for Clean Water Act Section 404 Assumption by the State of Florida, July 24, 2020 | 1708 |
| EPA-HQ-OW-2018-0640-0387-A10 | Dkt. 112-1 at 175-76, 207, 259, 275, 306-07 | Excerpts of Exhibit 60: 1998 Endangered Species Consultation Handbook | 2008 |
| EPA-HQ-OW-2018-0640-0388-A2 | Dkt. 95-2 at 18 | Letter from Kristen L. Boyles et al., Earthjustice et al., to Kathy Hurld, EPA, July 6, 2020 | 2015 |
| EPA-HQ-OW-2018-0640-0388-A7 | Dkt. 112-2 at 2-26 | Exhibit 67: FDEP White Paper, ESA Consultation | 2032 |
| EPA-HQ-OW-2018-0640-0564 | Dkt. 56-1 at 433-34 | Approval of Florida's Clean Water Act Section 404 Assumption Request, 85 Fed. Reg. 83,533, Dec. 22, 2020 | 2057 |
| EPA-HQ-OW-2018-0640-0566 | Dkt. 56-1 at 435-36 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, Dec. 17, 2020 | 2059 |

| VOLUME 7 (JA.2061–JA.2199) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0568 | Dkt. 56-1 at 437-549 | EPA, Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program, Dec. 16, 2020 | 2061 |

| EPA-HQ-OW-2018-0640-0617 | Dkt. 112-2 at 351 | Letter from Jeaneanne Gettle, EPA, to Roy Crabtree, NOAA NMFS, on EPA's Section 7 Consultation, Sept. 2, 2020 | 2174 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0618 | Dkt. 112-2 at 352-53 | Letter from Virginia Fay, NOAA NMFS, to Jeaneanne Gettle, EPA, Oct. 30, 2020 | 2175 |
| EPA-HQ-OW-2018-0640-0623 (same as FWS-006015) | Dkt. 112-2 at 354-66 (same as Dkt. 112-5 at 47-59) | USFWS Biological Opinion Appendix 2: Memorandum of Understanding Between FWC, USFWS, and FDEP, August 5, 2020 | 2177 |
| EPA-HQ-OW-2018-0640-0635 | Dkt. 56-1 at 669 | Letter from David Ross, EPA, to Timothy Gallaudet, NOAA NMFS, and Rob Wallace, USFWS, on FDEP's Non-Federal Representative Designation, Dec. 13, 2019 | 2190 |
| EPA-HQ-OW-2018-0640-0636 | Dkt. 56-1 at 670-71 | Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, on FDEP's Non-Federal Representative Designation, Dec. 12, 2019 | 2191 |
| EPA-HQ-OW-2018-0640-0637 | Dkt. 112-2 at 367-69 | EPA, Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation, 85 Fed. Reg. 30,953, May 21, 2020 | 2193 |

| EPA-HQ-OW-2018-0640-0638 | Dkt. 112-2 at 370-71 | Letter from Cathryn Tortorici, NOAA NMFS, to Heather Mason, FDEP, April 15, 2020 | 2196 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0641 | Dkt. 56-1 at 684-85 | Letter from Mary Walker, EPA, to Governor Ron DeSantis, Florida, on EPA's Completeness Determination for Florida's Assumption Request, August 28, 2020 | 2198 |

| VOLUME 8 (JA.2200–JA.2530) | | | |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0649 (same as FWS-005610) | Dkt. 112-3 at 2-298 (same as Dkt. 112-4 at 87-383) | USFWS Biological Opinion Appendix 1: EPA's Biological Evaluation | 2200 |
| EPA-HQ-OW-2018-0640-0660-A1 | Dkt. 56-1 at 774-81 | EPA, Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Section 404 Program Approvals, Aug. 27, 2020 | 2497 |
| EPA-HQ-OW-2018-0640-0664 | Dkt. 112-3 at 301-02 | Letter from Jeaneanne Gettle, EPA, to Tania Galloni, Earthjustice, Responding to Notice of Intent to Sue, Dec. 20, 2021 | 2505 |
| EPA-HQ-OW-2018-0640-0670 | Dkt. 112-3 at 343 | Email from David Fotouhi, EPA, to Matt Leopold, EPA, et al., transmitting documents for Florida Stakeholder meeting, Sept. 17, 2018 | 2507 |

| EPA-HQ-OW-2018-0640-0670-A3 | Dkt. 112-3 at 344-52 | Potential ESA Compromise Analysis and Proposal | 2506 |
|---|---|---|---|
| EPA-HQ-OW-2018-0640-0670-A5 | Dkt. 112-3 at 353-59 | Florida Proposal Regarding ESA (SSEC-Doug-P18082810080) | 2517 |
| EPA-HQ-OW-2018-0640-0686 | Dkt. 112-3 at 368-72 | Response to Comments on EPA Consultation under ESA | 2524 |
| EPA-HQ-OW-2018-0640-0690 | Dkt. 112-3 at 375-76 | Letter from Peter S. Silva, EPA, to R. Steven Brown, Environmental Council of the States, et al., re EPA Position on ESA Consultation for 404 Assumption, Dec. 27, 2010 (same as above) | 2529 |

| VOLUME 9 (JA.2531–JA.2700) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-000001 | Dkt. 112-4 at 2-3 | 20191212 Letter from Mary Walker, EPA, to Noah Valenstein, FDEP, re: Designation of FDEP as Non-Federal Representative for Informal Consultation | 2531 |
| FWS-006015 | Dkt. 112-5 at 47-59 | 20201116 Memorandum of Understanding between FWC, USFWS, and FDEP (attached as Appx. 2 to USFWS's Biological Opinion) | 2533 |

| FWS-000749 | Dkt. 112-4 at 9-11 | 20200331 Email from H. Rauschenberger, USFWS, to M. Duncan, FDEP, J. Goff, FWC, et al., re: Comments on Draft Species Coordination Process | 2546 |
|---|---|---|---|
| FWS-003386 | Dkt. 112-4 at 43-84 | 20200820 Florida Rules Chapter 62-4, submitted as part of FDEP's application package. | 2549 |
| FWS-006028 (same as EPA-HQ-OW-2018-0640-0642) | Dkt. 112-5 at 60-147 (same as Dkt. 56-1 at 686-773) | 20201117 Programmatic Biological Opinion for EPA's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act | 2591 |
| FWS-006144 | Dkt. 112-5 at 148-69 | 20180625 Memorandum of Agreement between EPA, USFWS, and NJDEP Related to the Protection of Federally-Listed Threatened or Endangered Species and Designated Critical Habitat Under a New Jersey-Assumed Section 404 Program | 2679 |

| VOLUME 10 (JA.2701–JA.3056) | | | |
|---|---|---|---|
| **FWS Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| FWS-006432 | Dkt. 93-2 at 4 | 20140519 Final Biological Opinion re EPA Final Rule - Cooling Water Intakes | 2701 |
| **Army Corps Docket Number** | **Dist. Ct. Docket Number** | **Document** | **Page** |
| CORPS004318 | Dkt. 112-8 at 106 | 20191126 Email from Robert Barron, Corps, to Shawn Zinszer, Corps, et al., re: AAR Retained Water GIS Call: We Need a "Big" Call with FDEP | 3040 |
| CORPS004319 | Dkt. 112-8 at 107-09 | 20191206 Email Dale Beter, Corps, to Shawn Zinszer, Corps, re: 404g_h Assumption Meeting Notes<br><br>Attachment: 20191206 Sec 404g Assumption Mtg Notes.docx | 3041 |
| CORPS004322 | Dkt. 112-8 at 110-22 | 20200805 Memorandum of Agreement between FDEP and U.S. Department of the Army | 3044 |

## CERTIFICATE OF SERVICE

I hereby certify that, on February 26, 2025, I electronically filed this document with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system.  All participants in this case registered with CM/ECF will be served by the CM/ECF system.

Dated:  February 26, 2025

  */s/ Aaron M. Streett*
Aaron M. Streett
BAKER BOTTS LLP
910 Louisiana St.
Houston, Texas 77002
(713) 229-1855 (phone)
(713) 229-7855 (fax)
aaron.streett@bakerbotts.com

*Counsel for Florida Appellants*

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

On August 20, 2020, the U.S. Environmental Protection Agency (EPA) received from the
Governor of the State of Florida a program submission requesting to assume regulating
discharges of dredged or fill material into waters within the jurisdiction of the State in
accordance with Clean Water Act (CWA) Section 404(g-l). EPA reviewed Florida's program
submission and consistent with 40 C.F.R. § 233.15 determined that it was a complete request for
State program approval that meets the submittal requirements of 40 C.F.R. § 233.10. Receipt of
the complete package initiated a review period that included opportunity for public comment and
two virtual public hearings. EPA received and reviewed over 3,000 comments submitted during
the comment period and public hearings. EPA considered these comments in reaching its
determination that the State program has the necessary authority to operate a CWA Section 404
program in accordance with the requirements found in CWA Section 404(g-*l*) and in 40 C.F.R.
Part 233. Letters received from tribes via the federal docket are summarized and included in this
document. Input from tribes received during consultation, other input received during
consultation under Section 106 of the National Historic Preservation Act (NHPA), input from
federal agencies pursuant to 40 C.F.R. § 233.15(f), and input from the U.S. Fish and Wildlife
Service (USFWS) under Endangered Species Act (ESA) Section 7 consultation were considered
and addressed separately from this response to public comments.

EPA has prepared a summary of significant public comments received and responses to these
comments, consistent with 40 C.F.R. § 233.15(g). This responsiveness summary, or response to
comments (RTC) document, is organized into nineteen topics. In this RTC, the Agency's
responses appear in **bold text**.

**Table of Contents**

A.  General support for Florida's assumption of a CWA Section 404 program...........................4

    EPA Response:...........................................................................................................................4

B.  General opposition to Florida's assumption of a CWA Section 404 program .......................5

    EPA Response:...........................................................................................................................8

C.  Public participation in review of Florida's submission and requests for extension ................9

   Adequacy of public notice and opportunity to provide meaningful input ..............................9

    EPA Response:.........................................................................................................................10

   Public access to Florida's application....................................................................................11

    EPA Response:.........................................................................................................................12

D.  Completeness and sufficiency of Florida's program submission .........................................13

   General comments on program submission elements.............................................................13

    EPA Response:.........................................................................................................................17

   Annual review of Florida Section 404 permits by EPA and USACE....................................21

    EPA Response:.........................................................................................................................22

JA.2061

Florida's statutes and regulations, Stringency of Florida's Section 404 program .................. 22

    EPA Response: ............................................................................................................ 24

    Completeness of FDEP's General Counsel Statement ........................................... 28

        EPA Response: ........................................................................................................ 30

E.  General permits and conditions ................................................................................. 33

    EPA Response: ............................................................................................................ 34

F.  Delineation methodology ........................................................................................... 35

    EPA Response: ............................................................................................................ 35

G.  Compensatory mitigation ......................................................................................... 37

    Compensatory mitigation MOA ............................................................................... 37

        EPA Response: ........................................................................................................ 37

    Permits issued by the State are subject to administrative challenge ........................ 38

        EPA Response: ........................................................................................................ 38

    Alignment of the State Section 404 program and the Section 404(b)(1) Guidelines regarding
compensatory mitigation ............................................................................................ 38

        EPA Response: ........................................................................................................ 40

    Differences between the State and federal program re: consistency of reviews .................... 42

        EPA Response: ........................................................................................................ 42

    Compensatory mitigation in Florida under current programs ................................... 43

        EPA Response: ........................................................................................................ 43

H.  Funding and staffing of Florida's 404 program ........................................................ 44

    EPA Response: ............................................................................................................ 51

I.  Streamlining of permitting ......................................................................................... 55

    Support for streamlining ............................................................................................ 55

        EPA Response: ........................................................................................................ 57

    Opposition to streamlining ........................................................................................ 57

        EPA Response: ........................................................................................................ 59

J.  Jurisdiction of Florida's program .............................................................................. 61

    Army Corps of Engineers versus State jurisdiction ................................................. 61

        EPA Response: ........................................................................................................ 65

    Effect of New Navigable Waters Protection Rule (NWPR) ..................................... 66

        EPA Response: ........................................................................................................ 67

    Project Boundary and 300' Guideline ....................................................................... 68

EPA Response: ................................................................................................... 69

K. Compliance evaluation and enforcement ............................................................. 69

Florida's ability to address the compliance and enforcement responsibilities of the Section
404 program ......................................................................................................... 69

EPA Response: ................................................................................................... 71

FDEP's enforcement program compared to the existing federal standard ............................. 73

EPA Response: ................................................................................................... 74

L. EPA oversight of state permitting ..................................................................... 76

EPA Response: ................................................................................................... 77

M. NEPA and public participation ........................................................................ 79

EPA Response: ................................................................................................... 80

N. Endangered Species Act (ESA) ........................................................................ 83

EPA's policy on ESA consultation ..................................................................... 83

Florida assumption of the Section 404 program and adequacy of protecting endangered
species ................................................................................................................ 87

Permits with potential ESA species .................................................................... 89

ESA coordination process during permit review (other than EPA oversight matters) ........... 90

EPA Response: ................................................................................................... 90

O. State conflict of interest ............................................................................... 103

EPA Response: ................................................................................................. 107

P. Protection of historic and cultural resources ...................................................... 108

NHPA Section 106 consultation ........................................................................ 108

EPA Response: ................................................................................................. 108

Adequacy of protection of historic and cultural resources ................................... 109

EPA Response: ................................................................................................. 109

Operating Agreement between FDEP and the Florida State Historic Preservation Officer . 109

EPA Response: ................................................................................................. 110

Q. Comments on consultation with tribes ............................................................. 110

EPA Response: ................................................................................................. 111

R. Comments outside the scope of this review ....................................................... 113

EPA Response: ................................................................................................. 113

JA.2063

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 440 of 785
USCA Case #24-5101      Document #2102936           Filed: 02/26/2025      Page 18 of 153
*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program* December 16, 2020

## A.  General support for Florida's assumption of a CWA Section 404 program

Some commenters supported Florida's assumption as an important step in fulfilling the intent of Congress in the CWA's cooperative federalism structure where states manage their own water resources while achieving the goal of improved water quality.

In addition, several commenters anticipated that Florida's assumption would provide an example for other states to assume the Section 404 program in a way that matches the state's specific needs. Several commenters asserted that the State government would serve the people of Florida better than the federal government, and one commenter noted that the Florida Department of Environmental Protection (FDEP) is much more accessible to citizens with questions and concerns than federal agencies.

Some commenters noted the ability of FDEP and other State and local agencies to manage the Section 404 program efficiently and in a manner that protects the environment. These commenters asserted that Florida has developed a comprehensive permitting program that carefully and completely protects Florida's natural resources. The commenters stressed that the State's assumption of the Section 404 permit program will not undermine existing environmental protection and likely will improve protections. The commenters pointed out the professionalism and expertise of Florida staff and their concern for the environment in which they live, and commenters noted that Florida's staff are the first line of defense for Florida's environment. A commenter asserted that Florida's assumption of a Section 404 program will grant more localized control over ecological communities, which they stated will allow the FDEP's capable and passionate staff to administer a program that will be as stringent as if not more stringent than the existing program.

Some commenters who supported Florida's assumption stated that high staff turnover, increased workloads, and cumbersome processes on the part of federal permitting authorities, as well as legal challenges to draft federally issued permits, unnecessarily delay the federal government's issuance of Section 404 permits. These commenters assert that the delays add to the cost of housing in Florida. The commenters also noted that these delays do not occur when FDEP issues permits.

**EPA Response:**

**The Agency acknowledges these comments supporting Florida's assumption of a CWA Section 404 program. EPA agrees with commenters that assumption of the CWA Section 404 program by Florida supports the cooperative federalism framework of the CWA. EPA also agrees with commenters that Florida has the necessary resources and expertise to assume a Section 404 program. Additionally, EPA has reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the Section 404(b)(1) Guidelines. (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). See Response to Comments Section H for a response to comments on workload, resources, and the expertise of FDEP. See Response to Comments Section I for a response to comments on streamlining.**

JA.2064

*EPA Responses to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                     *December 16, 2020*

## B. General opposition to Florida's assumption of a CWA Section 404 program

Many of the commenters opposing Florida's assumption of a Section 404 program stated that it
will negatively impact Florida's environment, public health, safety, and economy. Commenters
noted that Florida has the largest wetland ecosystem in the lower 48 states. Commenters
expressed concern at the ongoing trend in wetland loss in the State and noted that Florida has
already lost substantial amounts of historic wetlands and that the remaining wetlands are at
increased risk from the projected human population increase as well as climate change.

Commenters emphasized the critical role of wetlands in Florida. Commenters listed a variety of
important wetland benefits that have been compromised by wetland loss, and which they asserted
are endangered by further wetland loss that Florida's assumption would exacerbate, including:

- Commenters asserted that wetlands provide natural water treatment and are critical to
  clean water and recharging the groundwater supply that Floridians depend on for their
  drinking water. A commenter also specifically noted that wetlands treat agricultural and
  stormwater runoff, stripping away nutrients that fuel toxic algae blooms. A commenter
  asserted that potable water is going to become a problem in Florida in the next 10 years
  and another commenter noted the problem of saltwater intrusion.

- Commenters asserted that wetlands provide crucial fish and wildlife habitat that supports
  Florida's biodiversity, including for federally listed endangered species.

- Commenters asserted that wetland biodiversity and beauty support Florida's important
  tourism industry (fishing, boating, bird watching and other ecologically based industries)
  that bring in billions of dollars to business and State and federal revenue. Commenters
  stated that Everglades National Park alone generates more than $100 million annually in
  tourism revenue. Commenters also stated that the outdoor recreation industry generates
  $58.6 billion annually and Florida is widely recognized as the Sport Fishing Capital of
  the World. Commenters maintained that Florida waterways support billions of dollars in
  commerce each year and create tens of thousands of jobs for Floridians.

- Commenters asserted that wetlands provide natural infrastructure that helps store and
  buffer floodwaters from storm events including hurricanes, preventing property damage
  and the loss of human life. One commenter stated that according to the National Oceanic
  and Atmospheric Administration (NOAA), we face a warmer, wetter climate with more
  storms and excessive rain.

- Commenters asserted that wetlands also provide dry season wildfire resilience.

Several commenters stated that the wetland services listed above provide "free ecosystem
services" in the billions of dollars. The commenters asserted that any risk posed to these
waterways is a direct risk to Floridians' economy and livelihoods. One commenter expressed
concern for how Florida's control of Section 404 permitting will affect regional areas closest to
wetlands.

Many commenters opposed Florida's assumption because they feared it would result in a loss of
federal oversight and resources that would hinder wetland protection and result in greater loss of

JA.2065

wetland than under the current federal program. Some commenters did not think the current process should be changed at this time of wetland loss by eliminating federal agency involvement, but rather that this is the time for intense scrutiny that requires federal involvement. Many commenters opposed to assumption argued that the permitting process needs multiple agencies, and the federal agencies such as the Army Corps of Engineers (Corps), U.S. Fish and Wildlife Service (USFWS), the National Marine Fisheries Service (NMFS), and EPA should have a role in this process that the commenters see as reduced by Florida's assumption. These commenters argued that the multi-agency process provides more resources and expertise and better ability to coordinate elements of a thorough Section 404 program than the State could achieve alone. Some commenters also said that a federal oversight role is necessary to ensure the necessary objectivity and independence from local politics and private economic interests.

One commenter predicted that Florida's interpretation of "waters of the United States" could lead to destruction of the wetlands and the destruction of vitally important species in the State. The commenter noted that Florida has around 11.4 million acres of wetlands, with freshwater wetlands making up about 90 percent of the State's wetlands, and these wetlands are home to many different species, including endangered species.

Some commenters asserted that retaining responsibility at the federal level ensures consistency and uniformity in oversight and application of legal standards in Florida relative to similar activities across the country. Commenters noted that Florida wetlands include federal lands and represent a trust and investment for all U.S. citizens regardless of State boundaries.

Multiple commenters also pointed out that a state-assumed Section 404 program does not have the benefit of a National Environmental Policy Act (NEPA) analysis, and the much broader review performed for federally issued permit applications. A commenter indicated that NEPA helps ensure the highest level of public engagement and environmental analysis.

A commenter said that it was grateful that NEPA was followed for the proposed South Florida Water Management District Everglades Agricultural Area reservoir and stormwater treatment area, which allowed for additional time for an environmental impact statement (EIS), for federal review of the proposed alternative, and for more meaningful public input for the massive and costly project that both the State and local agencies have been rushing despite many valid concerns. The commenter stated that as a result, the Section 404 permit includes special conditions that FDEP may not have required, such as additional monitoring to verify water quality requirements are met, before water is delivered to the water conservation areas of the Everglades.

Some commenters provided specific examples that they said indicate that the current federal role is critical for permitting in the Everglades with its interlocking mosaic of wetlands managed by federal, State, and local agencies. Several commenters pointed out the need for continued federal oversight over the Greater Everglades ecosystem and over Florida's national parks and surrounding interconnected ecosystems. A commenter noted that the federal government is a partner to the world's largest ecosystem restoration project, Everglades restoration, authorized by Congress under the Comprehensive Everglades Restoration Plan (CERP). The commenter asserted that the federal government has made extraordinary investments in Everglades

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 443 of 785

USCA Case #24-5101      Document #2102936         Filed: 02/26/2025      Page 21 of 153

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*      December 16, 2020
*a Clean Water Act Section 404 Program*

restoration and has authorized Section 404 permits only after undertaking all necessary NEPA analysis. The commenter explained that there is a need to ensure that the many benefits of Everglades restoration and the extensive investments already made are not undermined by inadequate oversight of permits impacting wetlands and waters across the region. The commenter noted that to date federal oversight of the CWA Section 404 Program has ensured robust stakeholder engagement in many decisions and plans affecting Florida's wetlands and thus the national parks that anchor the Greater Everglades ecosystem. The commenter asserted it is unlikely that this level of public engagement will continue with State assumption.

One commenter expressed concern that Florida is unable to administer appropriate oversight to current environmental responsibilities and stated that the State should not be given more responsibilities. The commenter noted EPA and the Corps offer too much latitude to the State, and vague statutory requirements create a concern that administrators, legislators, and developers may take advantage of well-meaning personnel. Another commenter believed that Florida's assumption of CWA Section 404 authority would not be well organized, and the commenter expressed concern that future project applications would be similarly hidden from public view.

Some commenters expressed concern that FDEP and local agencies were not prepared to assume responsibility for a Section 404 program. Commenters asserted that Florida has a bad track record for protecting the environment and managing natural lands for the benefit for all who depend on the wetlands. Commenters stated that Florida needs to improve current wetland programs before assuming new ones, and pointed out that both federal and state wetland regulatory programs require "no net loss of wetlands." The commenters asserted that this objective has not been met by either federal or Florida programs on either preserving functions or acres based on Audubon, NOAA, National Academy of Sciences, and USFWS analyses and data.

Some commenters asserted that Florida has a poor track record in enforcing the CWA, specifically that FDEP is behind in establishing the TMDLs in most watersheds in the State, does not provide the oversight for best management practices (BMPs) as pledged, and does not properly manage the Basin Management Action Plans to get waterways off the impaired listing. A commenter continued that research has proven that BMPs for stormwater and agriculture are not meeting their intended pollution reduction goals, and there are sites across the State that have not had consistent water quality testing in years. One commenter recommended that the State concentrate on improving the existing ERP program, per the governor's Executive Order 19-12, rather than take on another wetland regulatory program.

One commenter added that legislation has been passed to make it more difficult for citizens to pass a ballot initiative to provide environmental protections, and recent court decisions have made it virtually impossible to file legal objections to massive developments and toxic waste disposal into State waters.

Some commenters suggested that approving Florida's assumption request would signify EPA's abandonment of its statutory responsibilities under the CWA.

JA.2067

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 444 of 785

USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 22 of 153

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                                      *December 16, 2020*

**EPA Response:**

EPA acknowledges that some commenters have concerns that Florida's assumption of a Section 404 program could lead to degradation of aquatic resources including wetlands, as well as concerns about the value of wetlands and ecosystem services in Florida as well as the wetland loss, habitat loss, and other environmental degradation that has already occurred in Florida. EPA also recognizes commenter concerns about the timing of the assumption process, given rapidly occurring environmental changes. The Agency disagrees that Florida's Section 404 program will decrease the environmental protections in the State because an assumed program must be consistent with and no less stringent than the requirements of the CWA and its implementing regulations. EPA has thoroughly reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the CWA Section 404(b)(1) Guidelines (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). See also Response to Comments Section O regarding conflicts of interest.

EPA acknowledges the commenter's concern regarding future legislation; however, this is beyond the scope of this action. EPA has reviewed Florida's request and determined that it will result in the issuance of permits that comply with the Section 404(b)(1) Guidelines.

EPA understands that some commenters may prefer federal administration of the CWA Section 404 program for a variety of stated reasons. EPA also acknowledges commenters who benefitted from federal involvement in permitted restoration projects and notes that the federal government will maintain permitting authority in retained waters. However, cooperative federalism must be implemented consistent with the statutory framework under the CWA. Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction. Consistent with the overall cooperative federalism construct established by the CWA, it is EPA's responsibility to review a state or tribal request and approve or disapprove it based on the requirements of the CWA and implementing regulations and therefore EPA disagrees with the commenter who asserted that an approval signifies EPA's abandonment of its responsibilities under the CWA. EPA has reviewed Florida's submittal for assumption of a CWA Section 404 program and has determined that the state has met the statutory and regulatory requirements necessary to demonstrate their ability to assume a CWA Section 404 program. EPA disagrees that Florida's assumption of the CWA Section 404 program will necessarily reduce the amount of public engagement on decisions and plans affecting Florida's wetlands.

EPA acknowledges commenters concerns that NEPA-related analysis would not be conducted on assumed waters. However, state Section 404 permitting actions are not federal actions and are therefore not subject to NEPA review. See also Response to Comments Section M for responses to comments regarding NEPA analysis for a more thorough discussion.

EPA acknowledges the concern regarding Florida's interpretation of "waters of the United States." EPA disagrees that Florida's interpretation of "waters of the United States" will

JA.2068

lead to destruction of state resources. Please see Response to Comments Section J regarding jurisdiction of Florida's program.

EPA acknowledges commenter concerns about the availability of staff and resources to appropriately administer Florida's Section 404 permitting program EPA finds that FDEP has committed sufficient resources and staffing to address anticipated workload. See Response to Comments Section H (Funding and staffing) for further discussion.

EPA disagrees with the commenter who expressed concern that future project applications would be hidden from public view as the State Section 404 program requires public notice, opportunity for a hearing, and availability of the permit application. See the State 404 Program Applicant's Handbook sections 5.3.1(a) and 5.3.1(b) for requirements for public hearings on permits and  State regulations 62-331.060(1), F.A.C., 62-331.060(2), F.A.C., 62-331.060(3), F.A.C., and 62-331.060(4), F.A.C., for the requirements and timing governing public notice of and comment on permit applications.

## C.  Public participation in review of Florida's submission and requests for extension

*Adequacy of public notice and opportunity to provide meaningful input*

Some commenters stated that the public was given enough time to appropriately respond and provide feedback on Florida's program. These commenters maintained that EPA gave public notice regarding the hearings and that EPA allowed for extensive public comment and engagement during the process.

Other commenters said that the public was not given enough notice that EPA would be hosting hearings on Florida's assumption, and another commenter asserted that they only found out about the hearings at the last minute. These commenters stated that there was not enough information available to the public and they believe that many people missed the hearings due to a lack of publicity. One commenter stated that increased public awareness would lead to better environmental protections because more people would have the opportunity to comment on the proposal. One commenter stated that there has been significant public opposition to Florida assuming Section 404 authority, and that—because of this opposition—it would be inappropriate to move forward with such limited public feedback.

Some commenters expressed opposition to only holding virtual public hearings, stating that virtual public hearings are not an appropriate substitute for in-person hearings, and that hearings should be postponed until they can either fully or partially be held in person. Some commenters stated that this "rulemaking" process has not been inclusive for public participation because webinars and phone conferences are inadequate compared to in-person hearings. Some commenters specifically requested that EPA hold in-person hearings to supplement the virtual public hearings once in-person hearings could be held safely. Other commenters believed that high levels of public participation are necessary to move forward with the proposal. One commenter specified that moving forward with such low public participation would be unjust.

Some commenters expressed concern that people without access to technology would be unable to participate in hearings conducted entirely online. Some commenters were worried that holding virtual hearings alone was exclusionary of those without the privilege of internet access. These commenters contended that FDEP should wait until the pandemic is over to hold hearings.

Some commenters believed that hearings should not take place until the COVID-19 pandemic is more under control. Commenters indicated that it was inappropriate to hold the hearings during a public health crisis. Multiple commenters said that due to the stressors of the COVID-19 pandemic, more time is needed in order to fully comment on the State's proposal. Commenters specified that the public could not meaningfully contribute during the height of the pandemic because issues of higher priority, such as the health and wellness of themselves and their families, were taking up too much of their focus, stated that moving forward during this time of international crisis due to COVID-19 is inappropriate. Commenters specifically requested a minimum extension of 180 days due to the current public health crisis. One of those commenters also cited the November 2020 general election as a reason to extend the opportunity for public feedback, noting that the State took two years to write the proposal, and that delaying the process by a few more months in order to hold additional webinar hearings would be justified. A few commenters stated that the State's assumption of Section 404 authority could have long-term consequences for the public, and that EPA must hold hearings in person to ensure that the public has an opportunity to discuss these consequences.

While other commenters suggested that hearings could be held during the COVID-19 pandemic, they contended that more advertising, transparency and time were necessary to ensure meaningful public participation.

**EPA Response:**

**EPA agrees with the commenters who asserted that sufficient public notice regarding the hearings and opportunity for public comment and engagement were provided during the review process. EPA disagrees with commenters asserting that the Agency provided insufficient public notice regarding hearings and opportunity for public comment and engagement. CWA Section 404(h)(1) provides EPA 120 days to make a decision on a program request, and the Agency complied with the procedures for approving programs which are found at 40 C.F.R. § 233.15. On September 16, 2020, EPA published in the Federal Register notice of EPA's receipt of a complete program request package (85 FR 57853), opened a 47-day public comment period, and scheduled virtual public hearings. EPA published notice of the State's submission in enough of the largest newspapers in Florida to attract statewide attention (Miami Herald, Orlando Sentinel, Palm Beach Post, Tallahassee Democrat, Tampa Bay Times). Additionally, EPA mailed notice to persons known to be interested in such matters. Existing mailing lists from Florida, the Corps, and USFWS as well as EPA's own mailing lists were used as a basis for this mailing. EPA posted notice of the State's submission and the public hearings on its webpage. EPA held virtual public hearings on October 21, 2020, and October 27, 2020, and received over 3,000 public comments submitted to Docket ID No. EPA-HQ-OW-2018-0640. The public hearings were attended by 137 and 186 participants, respectively, representing a variety of**

*EPA Response to Comments on Florida's 404 Program Submission Requesting to Assume Administration of
a Clean Water Act Section 404 Program*                                    *December 16, 2020*

stakeholders. EPA disagrees with assertions that more advertising, transparency, and time
were necessary to ensure meaningful public participation and that there was low public
participation with respect to EPA's action on Florida's request for assumption. EPA
acknowledges commenter concerns about the opportunity for the public to participate in
and respond to the public hearings and provide meaningful comments on Florida's
submission, including concerns regarding virtual hearings due to COVID-19 and events
such as the November 2020 election. EPA notes that consideration of such external factors
are not criteria described in 40 C.F.R. Part 233 as a mechanism to halt EPA's statutory
deadline once it receives for review a state program submission. Further, EPA's
implementing regulations at 40 C.F.R. § 233.15 require only one public hearing and
a comment period of not less than 45 days. EPA provided two public hearings and
a public comment period of over 45 days. These virtual public hearings were also consistent
with the memo issued by EPA's General Counsel titled, "Virtual Public Hearings and
Meetings,"[1] which explains the Agency's position on the use of virtual public hearings to
balance "actively working to combat the spread of the COVID-19 virus during the
pandemic, while continuing [EPA's] mission." These two hearings provided commenters
the opportunity to provide verbal comment in addition to or in lieu of written comments on
Florida's program request package while protecting public health. For these reasons EPA
does not agree that an extension of 180 days was necessary

EPA disagrees with commenters who asserted that virtual hearings are not an adequate
substitute for in person hearings. In person hearings require participants to drive
potentially long distances to participate in person, often requiring more time away from
jobs and family than virtual hearings require for participation. EPA notes that virtual
public hearings may allow for more people to participate who would otherwise not be able
to attend in person.

EPA disagrees with commenters who raised equity issues regarding virtual hearings, as
well as commenters who contended that virtual hearings are exclusionary of those without
the privilege of internet access. EPA solicited, but received no requests for accommodation
to ensure accessibility to the public hearings. EPA also provided the opportunity for the
public to comment via letter or to call into the hearings. In addition, the public hearings
were not the only opportunity to participate in this action. As noted above, EPA opened a
public docket to receive written public comments on EPA's review of Florida's proposed
program.

*Public access to Florida's application*

Some commenters stated that the public was not given full access to Florida's application
materials, and that the public should be allowed to see the full application. More specifically,
commenters said that EPA should give the public a minimum of 45 days to comment on
the State's application, including on the Biological Opinion and the Incidental Take Statement. One
of these commenters asserted that EPA should either suspend public comment to ensure that the

---

[1] https://www.epa.gov/sites/production/files/2020-04/documents/ogc_virtual_hearing_memo_4-16-2020.pdf

JA.2071

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 448 of 785

USCA Case #24-5101    Document #2102936         Filed: 02/26/2025    Page 26 of 153

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

State's proposal is complete or extend the public review period until all the application materials are provided to the public by the State. Another of these commenters concluded that the current application is therefore incomplete and recommended that EPA deny the application unless more time is given for public review. One commenter specifically requested that the Biological Opinion and Incidental Take Statement be made public because they are critical aspects of the State's proposal that impact at-risk species in the state. Some commenters noted that FDEP's application has failed to explain how endangered species (under the Endangered Species Act) will be adequately protected under their proposed assumption of a Section 404 program. Some commenters noted that the application was lacking, and therefore the public could not consider the programmatic biological opinion and incidental take statement from USFWS and NMFS that will dictate the procedures to be followed at the permit review level to ensure jeopardy will be avoided. Some commenters expressed concern that EPA and FDEP stated that FDEP would rely on these documents to ensure that the State can comply with the no-jeopardy mandate in the Section 404(b)(1) Guidelines. A commenter also stated that the application doesn't include the Biological Assessment mentioned in the application, which would support programmatic determinations with the USFWS and NMFS. A commenter stated that denying the public a meaningful opportunity to comment on the State's complete application was in violation of CWA regulations, and that EPA needs to provide more information on how the application will impact the State's wildlife.

A commenter stated that FDEP limited the public comment period to the very time when the public was most struggling with the COVID-19 pandemic. The commenter stated that this action, combined with the incomplete application materials provided to the public, has further eroded the public's trust in FDEP.

**EPA Response:**

**EPA disagrees with commenters who asserted that the public was not given full or adequate access to Florida's application materials or that the Agency violated CWA regulations by denying the public a meaningful opportunity to review and comment on Florida's CWA Section 404 assumption request submittal. On September 16, 2020, EPA published in the Federal Register notice of EPA's receipt of a complete program request submittal. The State's submission was made publicly available online through the Federal eRulemaking Portal, Docket No. EPA-HQ-OW-2018-0640, the EPA's Docket Center, available at https://www.regulations.gov. EPA posted all materials submitted by Florida to EPA and opened a public comment period of 47 days for review of Florida's submittal. See Response to Comments Section C for further discussion of EPA's public involvement process. The Biological Opinion and Incidental Take Statement prepared by the USFWS in response to the EPA's initiation of ESA Section 7 consultation are not required elements of a state request to assume administration of a Section 404 program and do not require public comment under either the CWA implementing regulations at 40 C.F.R. Part 233 (governing state 404 programs) nor the ESA implementing regulations at 50 C.F.R. Part 402. For these reasons EPA disagrees with assertions that Florida's submittal was hidden from public view and that the public should be given a minimum of 45 days to comment on**

JA.2072

the Biological Opinion and Incidental Take Statement. See Response to Comments Section
D for a response regarding why Florida's program submission request is not incomplete
based on a lack of ESA-related documentation.

EPA acknowledges the commenters who expressed concern regarding FDEP's public input
process during the development of their program; however, public engagement in FDEP's
development of its program is outside the scope of this action. EPA's obligation is to ensure
compliance with 40 C.F.R. Part 233.

## D.  Completeness and sufficiency of Florida's program submission

*General comments on program submission elements*

Some commenters asserted that the Florida application to assume a CWA Section 404 program is
complete. One of these commenters reasoned that if EPA determines that the State has the
required authority to issue permits and administer the program, then EPA is required to approve
the State's assumption of the program.

A commenter noted that a state Section 404 assumption application must provide the items listed
at 40 C.F.R. § 233.10 (e.g., letter from the Governor, Attorney General's statement, agencies
agreements, etc.); additional requirements for a state program are set forth in the rest of Part 233,
including Subpart C (Permit Requirements); Subpart D (Program Operation); and Subpart E
(Compliance Evaluation and Enforcement). The commenter asserted that Florida's application
contained each of these required items along with sufficient detail and explanation to allow for
EPA to review.

Many commenters opposed Florida's assumption of a Section 404 program claiming that
FDEP's rush to take over wetlands permitting has created a proposal that is incomplete, full of
uncertainty, does not provide the public with the information that was promised during the State
rulemaking phase, and will create additional chaos in Florida. Multiple commenters argued that
the State has failed to specifically identify which waters and wetlands will be assumed under
State jurisdiction and which will be retained under the jurisdiction of the Corps. A commenter
stated that the maps that were provided in the application are low resolution and nearly
impossible to read with any specificity, adding that the list of waters is similarly vague, with no
clarification about where these waterways are located. The commenter also argued that the list of
waters that was provided was vague, with no specification about where the waterways are
located. The commenter noted that many waterways across the State share the same name, so
listing a waterway like "Deep Creek," for example, with no description of location is confusing
and insufficient to notify the public and to inform the program. Some commenters questioned the
history, accuracy, and completeness of the list of retained waters in the State 404 Handbook and
argued that because the State's application does not contain a list or map of the assumable and
retained waters, the application should be considered incomplete.

A commenter stated that the Corps has advised in the MOA between FDEP and the Corps to
provide a retained waters GIS layer to the FDEP. The commenter pointed out that this
information has not been provided to the public or to the State, and additionally, that the Corps

has not indicated whether that GIS layer will simply identify retained waters, whether it will actually depict their mean high water lines (MHWL)/ordinary high water marks (OHWM), or the actual pre-determined location of the administrative boundary. The commenter urged that the only information provided to the public and the EPA is a list of waters provided in FDEP's application. 404 Handbook B, app. A; the commenter argued this list fails to list numerous waterbodies that were previously on the Corps Retained Waters List in 2017 and that were submitted to the Corps during its comment period in 2018.

One commenter argued that Florida has failed to provide the public with GIS or other mapping that would demonstrate the scope of Florida's jurisdiction if the State assumes a CWA Section 404 program. The commenters argued that such a list would allow the public to evaluate and comment on the impact this proposal will have on the waters that are of ecological and economic benefit to them. The commenter concluded that as a result, Florida's application is incomplete.

One commenter representing the Seminole Tribe stated that no information has been provided to the Seminole Tribe as to the exact waters of the State which will remain under Corps jurisdiction and which waters will be assumed by the State. The commenter stated that the Seminole Tribe recognizes that FDEP is not seeking to assume the Section 404 program in Indian Country, and reiterated prior requests for GIS Layers of the retained waters to ensure that Indian Country remains under the jurisdiction of the Corps Section 404 program and to better understand what waters adjacent to Indian Country will be assumed by the State.

One commenter noted that the State is crossed by many waterways, some of which are navigable under State law and others under federal law by various court decisions, and all have adjacent wetlands. The commenter predicted that the lack of clarity would lead to unnecessary litigation and confusion in the permitting process for future developments that impact waterways.

One commenter noted that some commenters have argued that Florida's program lacks an adequate description of the waters covered by the State 404 program and responded that this concern is incorrect. The commenter stated that the application clearly explains the waters for which Florida would assume permitting responsibility and those which would remain under the regulatory purview of the Corps. The commenter stated that this is also described in the memorandum of understanding entered between Florida and the Corps on page 2, section II, A-C. The commenter added that more information can be found in the State 404 Program Applicant's Handbook sections 2.0(b)41 and 4.1, and in the Retained Waters List in Appendix A of the State 404 Program Applicant's Handbook.

Several commenters contended that lack of key information in the State's application makes meaningful public comment and participation impossible. A commenter noted that critical aspects of the program are not present in sufficient detail, which makes it difficult for EPA and the public to assess the sufficiency of the program. Some commenters noted that missing documents from Florida's package (e.g., the Biological Assessment and a digital map of retained waters) restrict the public's ability to determine how projects in Florida might be affected by the rule change and the public's ability to form questions to both the FDEP and EPA. A commenter suggested that EPA suspend the public comment period and review of Florida's application until the State cures deficiencies and submits a complete program proposal to the Agency. A

commenter urged the EPA to reverse its determination that the application is complete, deny the
application for incompleteness, or extend the review period pursuant to 40 C.F.R. § 233.15(g)
and the public comment period until all materials are provided and the public is given adequate
notice and opportunity to comment in accordance with federal law. A commenter suggested that
EPA should ask the State to resubmit a complete package after addressing their concerns.

A commenter asserted that FDEP's proposal is fundamentally flawed in several respects,
including: the failure to adopt all Section 404(b)(1) Guidelines; failure to satisfy 40 C.F.R. §
233.11; failure to provide all components of a complete program submission as required under
40 C.F.R. § 233.10(b); and failure to meet all the requirements under 40 C.F.R. § 233.12(a). The
commenter concluded that the application must therefore be denied.

Some commenters indicated that the State's incomplete application package does nothing to
guarantee that the State's protections will be as stringent as those provided under federal
regulation. A commenter stated that EPA must reject the Department's attempt to speed through
this process with a partial application when assumption implicates the future protection of vital
State wetlands. A commenter specifically mentioned the lack of information for proper
enforcement, insufficient list of retained waters, and no demonstration that sufficient resources
will be available to State agencies to execute the work. A commenter noted that the State does
not sufficiently describe how it will replace the important protections of federal laws that apply
to federal actions (i.e., when the Corps issues a permit) that will no longer be relevant to State
actions (i.e. regarding NEPA and Section 7 of ESA). A commenter noted that as part of any
delegation, FDEP should be required to ensure that cumulative impacts are properly incorporated
and considered as part of any impact analysis.

Some commenters asserted that the program faces significant outstanding legal concerns that
could work against the goal of streamlining permitting in the State. The commenters offered as
an example that the State's Section 404 Applicant's Handbook says the Department of
Environmental Protection may use various resources to determine a project's potential impact on
listed species, but noted that it does not specify a minimum level of due diligence that will be
completed. Additionally, the commenters contended that it is unclear, based on the handbook,
whether the Florida Fish and Wildlife Conservation Commission (FWC) or the FDEP will be
making the initial listed species determinations. One commenter said the process has changed
since the Handbook was developed and that the FWC will be making initial listed species
determinations. A commenter specifically noted their concern for the iconic Florida panther,
Florida manatees, loggerhead sea turtles, the Saint Andrew beach mouse, and piping plovers,
stating that their predicaments are made all the more dire by impacts of climate change. This
same commenter questioned the State's ability to ensure the safety of these and dozens of other
species that are on the brink of extinction.

A commenter stated that Florida's application is incomplete because it lacks the memoranda of
agreement that explain how FDEP would implement the program. A commenter expressed
concern about FDEP's reliance on memoranda of agreement (MOA) that had not been completed
or made available to the public for comment. The commenter asserted that FDEP's proposal
remains fundamentally flawed in several respects, including: (1) FDEP's decision to remove

references to MOA with federal agencies from the proposed rules, and (2) the decision not to disclose the content of those MOAs so as to allow for public comment before the state submits an application to the EPA, despite having told the public that it would. One commenter pointed to statements from the August 27, 2020, EPA memorandum, "Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals," which specifies that the Section 7 consultation, programmatic biological opinion, and incidental intake statement are essential components of the application that must be considered prior to determining the program submission is complete. One commenter requested that EPA suspend consideration of the assumption package until commenters may weigh in on the full application, including the biological opinion and incidental take statement (ITS), and whether or not Florida will be able to achieve the no-jeopardy mandate.

A commenter noted that the memorandum of understanding between FDEP, FWC, and USFWS had not been signed by USFWS at the time the State submitting their assumption request. Therefore, the commenter asserted that EPA cannot consider the application complete without sufficient details that accurately reflect current thinking and a signed memorandum of understanding.

A commenter stated that EPA cannot waive review of certain categories of applications, including applications whose discharges have a reasonable potential for adverse impacts on waters of another state or tribe. The commenter noted that language was added to the State's two MOAs—one with EPA and the other with the Corps. This commenter stressed that this language is to ensure that EPA is involved in any disputes over what constitutes Indian country under the Section 404 program. Additionally, the commenter pointed out that FDEP in the Section 404 Applicant's Handbook at section 5.2.5 has committed to include EPA in the review of any project where FDEP fails to accept the recommendations of an affected state or tribe received during the public comment period. The commenter stated that the Operating Agreement between FDEP and the State Historic Preservation Office also affirmed EPA's role in review of and participation in resolution of cultural resource-related disputes.

One commenter claimed that Florida statutes unlawfully expand the use of emergency permits and provided examples of how the State requirements allow a broader set of situations in which an emergency permit may be granted, making them less stringent due to being granted more quickly with less time for process and review. The commenter also explained that the State's regulations omit requirements that appear in federal regulations. As an example, the commenter pointed out that FDEP's regulations failed to include the requirement that discharges minimize adverse impacts through restoration, and instead only includes minimization through mitigation. The commenter also stated that Florida fails to incorporate the federal requirement regarding how much detail permit applications must include.

A commenter noted that FDEP stated in its submission that the only persons likely to be affected by Florida's assumption are those who are "currently subject to a 404 permit" issued by the Corps. The commenter argued that this response demonstrates that FDEP takes an unduly narrow view of operating a Section 404 program, and as a consequence, has taken an unreasonably limited view of the number of individuals and entities likely to be affected. The commenter

*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                               *December 16, 2020*

concluded that FDEP wholly failed to provide a general description of those who are likely to be affected other than existing permittees.

**EPA Response:**

**EPA agrees with commenters who stated that Florida submitted a complete request for assumption of a CWA Section 404 program. EPA disagrees with commenters who asserted that Florida's request was incomplete because it did not include the required elements of 40 C.F.R. § 233.10, 40 C.F.R. § 233.11, 40 C.F.R. § 233.12, or because it did not include other specific documents, elements, or a sufficient level of detail. EPA issued a letter to Governor DeSantis on August 28, 2020, noting that EPA received the State's request on August 20, 2020, and that all program submission elements required by 40 C.F.R. § 233.10 were included as follows:**

- **Governor's Letter**

- **Program Description**

- **Statement from Justin G. Wolfe, General Counsel for the Florida Department of Environmental Protection**

- **Memorandum of Agreement with the EPA Region 4 Administrator**

- **Memorandum of Agreement with the Secretary of the Army**

- **Applicable State Statutes and Regulations**

**In making this determination, EPA concluded that the State's request included the program description elements required in 40 C.F.R. § 233.11. EPA subsequently issued a Federal Register notice seeking comment on Florida's program submission request, and the Agency made Florida's request publicly available (see Docket ID No. EPA-HQ-OW-2018-0640). The Agency disagrees that the application should be deemed incomplete or denied, or that the public comment period should be suspended or extended until documents identified by commenters are made publicly available.**

**EPA disagrees that Florida included insufficient detail in the State's program submission request regarding waters that would be retained by the Corps and waters that would be assumed by the State. The regulations at 40 C.F.R. § 233.11(h) require the program description to include "[a] description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program; a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval." Florida's Program Description, section h at 2, meets this requirement by providing a description of retained waters and noting that retained waters are also defined in section 2.0 of the State 404 Program Applicant's Handbook and listed in Appendix A of the Handbook. Some listed waters in Appendix A of the Handbook include the county name or a brief location description. Further, Section 6.1 of the Handbook as well as the Program Description, section j, make clear that the Corps retains permitting authority for projects within "Indian country" as that term is defined in 18 U.S.C. § 1151.**

JA.2077

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 454 of 785

USCA Case #24-5101   Document #2102936   Filed 02/26/2025   Page 32 of 153

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                              *December 16, 2020*

EPA recognizes commenter concerns that the Corps' GIS layers identifying retained waters were not available to the public during the public comment period. The FDEP-Corps MOA commits that the Corps will provide the GIS layers to FDEP. The GIS layers are intended to serve as a tool supporting identification of retained waters, but are not a requirement for a submittal to assume the CWA Section 404 program. EPA also recognizes that a GIS layer cannot depict a pre-determined administrative boundary, as this is dependent in part upon project-specific characteristics: "In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only." (FDEP-Corps MOA, Section II.A.)

FDEP has also addressed cumulative impacts in the 404 Handbook section 8.3.5 Cumulative Effects which states:

> [U]nlike ERP reviews, the CWA does not limit analysis of cumulative effects to the resources within the impacted drainage basin. However, the drainage basin is a good starting point for review and will often be found to be the appropriate scale. Some projects will require cumulative effects reviewed on a larger or smaller scale depending on the size, project purpose, and resources proposed for impact. When reviewing cumulative effects, the Agency shall identify resources of concern and determine the potentially effected resource area(s). Compensatory mitigation for cumulative impacts shall comply with Volume I, section 10.2.8.

> Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual dredge or fill activities. Although the impact of a particular activity may constitute a minor change in itself, the cumulative effect of numerous such piecemeal changes can result in a major impairment of the water resources and interfere with the productivity and water quality of existing aquatic ecosystems.

> Cumulative effects attributable to dredge or fill activities in wetlands and other surface waters should be predicted to the extent reasonable and practical. The Agency shall collect information and solicit information from other sources, such as other permitting agencies, governmental agencies, or the public, about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications and monitoring and enforcement of existing permits.

EPA recognizes commenter concerns that the Corps Retained Waters List submitted as Attachment A to the FDEP-Corps MOA differs from previous Retained Waters Lists. The regulations describing the required elements of a state MOA with the Secretary of the Army in 40 C.F.R. § 233.14 do not specify a format or level of detail for identification of retained waters. The regulations only provide that the MOA shall include a "description of waters of the United States within the State over which the Secretary retains jurisdiction, as identified by the Secretary."

JA.2078

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                                      *December 16, 2020*

In response to the commenter who asserted that Florida did not sufficiently describe how it
will replace the protection of federal laws that apply to federal actions, EPA notes that state
Section 404 permitting actions are not federal actions and are administered under state
authorities. The federal laws are not implemented by the State. However, EPA disagrees
that Florida's program will lead to the degradation of wetlands and other waters of the
United States. An assumed program must be consistent with and no less stringent than the
requirements of the CWA and implementing regulations. EPA has reviewed Florida's
permit review criteria and has determined that the State's program will result in the
issuance of permits that comply with the CWA Section 404(b)(1) Guidelines. (33 U.S.C. §
1344(h)(1)(A); 40 C.F.R. § 233.20(a)). In response to a commenter who noted that the State
did not adopt all of the Section 404(b)(1) Guidelines, EPA notes that state Section 404
programs are not required to adopt the Section 404(b)(1) Guidelines verbatim, but rather
must be consistent with and no less stringent than the requirements of the CWA and
regulations.

EPA disagrees with the commenter's statement that FDEP's proposal is also flawed
because memoranda of agreement were incomplete, not signed by USFWS, or not made
available for public comment. Both the MOA between FDEP and EPA and the MOA
between the Corps and FDEP, which are elements of a program submission in accordance
with 40 C.F.R. § 233.10, were fully executed when Florida submitted them to EPA as part
of its request to administer a Section 404 program. Both MOAs were made available to the
public for review and comment via the federal docket during the full public comment
period, as required by 40 C.F.R. Part 233; the regulations do not require that the MOAs be
subject to public notice and comment prior to the date of FDEP's submission.

EPA acknowledges the commenter who noted that EPA does not waive federal review of
activities that fall into certain categories, including those with reasonable potential for
adverse impacts on waters of another state or tribe; that FDEP is required to involve EPA
if the State does not accept recommendations of an affected state or tribe; and that the
FDEP-SHPO Operating Agreement recognizes EPA's role in review of activities with
potential to affect sites identified or proposed under the National Historic Preservation Act.

EPA disagrees with commenters who asserted that Florida's request was incomplete
because it did not include a biological opinion, biological assessment, or an incidental take
statement, or provide details about how the state agencies would handle threatened and
endangered species. Neither a biological opinion, biological assessment, nor an incidental
take statement are required elements of Section 404 program submissions, as set forth in 40
C.F.R. § 233.10. Neither the CWA implementing regulations at 40 C.F.R. Part 233 nor the
ESA implementing regulations at 50 C.F.R. Part 402 provide for public comment on
biological assessments, biological opinions, or incidental take statements. Thus, Florida was
not required to submit the ESA-related documents with their package.

With respect to how details about how FDEP will handle threatened and endangered
species, EPA determined that Florida's rules, Program Description, and other documents
provide sufficient details for the public to assess how the state plans to handle listed species

JA.2079

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 456 of 785
USCA Case #24-5101    Document #2102936         Filed: 02/26/2025    Page 34 of 153
*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                      *December 16, 2020*

issues. For example, the Program Description states: If the Department determines a project has potential to impact listed species or their habitat, the Department will coordinate with USFWS and/or FWC to provide recommendations for project design modifications or permit conditions that will avoid or minimize impacts to the listed species or their habitats. Program Description, Section (b), at 5. The Program Description also states that the MOU between FWC, and USFWS, and FDEP outlines coordination procedures for listed species reviews. Program Description, Section (j) – Additional Information at 2. The draft MOU between FWC, USFWS, and FDEP was included in the Appendix of the Program Description. Thus, the public had sufficient information about how the State planned to address issues pertaining to listed species and designated critical habitat in its program to evaluate the State's procedures and comment.

EPA disagrees with the commenter's assertion that the August 27, 2020 EPA memorandum entitled "Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404 Program Approvals" states that the Section 7 consultation, programmatic biological opinion, and incidental intake statement are essential components of the application that must be considered prior to determining the program submission is complete. The August 27, 2020, memorandum does not make any statement to that effect. See Response to Comments Section N for responses to these and other concerns about species protection under Florida's program. See also Response to Comments Section D for a response regarding why Florida's program submission request is not incomplete based on a lack of ESA-related documentation.

In response to commenter questions about whether FDEP or FWC will be making initial species determinations if Florida assumes a Section 404 program, EPA notes that both the FDEP-FWC-FWS MOU and the Biological Opinion state that FWC and FDEP will jointly decide which agency will be the species coordination lead to coordinate the federally listed species review with the FWS for each application, and that FDEP and FWC will work as a team. EPA is confident this species review will be effective and disagrees with the commenter questioning whether Florida will be able to ensure the safety of species on the brink of extinction. This coordination process is further described in Response to Comments Section N.

EPA disagrees that Florida's emergency permit authorization is materially different from the federal emergency permit authorization and notes that incorporation by reference of federal requirements is not a requirement for assumption of the CWA Section 404 program. Under federal regulations, an emergency permit may only be given "if unacceptable harm to life or severe loss of physical property is likely to occur before a permit could be issued or modified under procedures normally required." 40 C.F.R. § 233.22(a). The State allows for the issuance of emergency permits to abate emergency conditions which pose an "imminent or existing serious threat or danger and require immediate action to protect public health, safety, or welfare, or the water resources of the Agency, including the health of aquatic and wetland-dependent species; a public water supply; or recreational, commercial, industrial, agricultural, or other reasonable uses." Fla. Admin. Code 62-331.110(1). While Florida's regulation lists the types of uses that

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

might warrant issuance of an emergency permit in greater detail than the more general regulation, the two authorities are not inconsistent. EPA's regulation addresses harm to life or severe loss of physical property, and it is reasonable to interpret those categories of harm as encompassing serious threat or danger to "the health of aquatic and wetland-dependent species; a public water supply; or recreational, commercial, industrial, agricultural, or other reasonable uses." EPA therefore finds that Florida meets the federal regulatory requirements addressing the authority of states and tribes to issue emergency permits.

EPA disagrees that FDEP takes an unreasonably narrow view of operating a Section 404 program or the number of individuals and entities likely to be affected.  FDEP explained in its program description that it published a Notice of Rule Development for the State 404 Program rules on May 11, 2018. As part of the rule development process the Department held three rulemaking workshops throughout the state. Workshops were held in Tallahassee and online via webinar on May 30, 2018; in Orlando on May 31, 2018; and in Fort Myers on June 1, 2018. The public comment period ran from May 11, 2018 until July 31, 2018. All comments and public input were reviewed and incorporated into the draft rule as appropriate. The Department then published the Notice of Proposed Rule on February 19, 2020. Five public hearings were held via webinar and public comments and input were reviewed and incorporated as appropriate. Notices of Change were published on June 8, and June 11, 2020.  Participants in FDEP's workshops and hearings and commenters reflected many sectors, including representatives from environmental organizations, prospective permit holders, and private citizens. FDEP therefore recognizes the wide range of stakeholders interested in its assumption request, but regardless, FDEP's view of the scope of stakeholders is not a requirement for EPA evaluation in determining whether FDEP's submittal to request assumption of a CWA Section 404 program is complete.

*Annual review of Florida Section 404 permits by EPA and USACE*

A commenter suggested that a certain percentage of the permits issued under the State 404 program be reviewed for consistency with the criteria and conditions of the project's permit. This could also include a check of the project's consistency with state and federal policy and water quality standards.

Another commenter recommended that a regular review of Section 404 permits issued by the State be specifically included as a part of the agreement between Florida and federal agencies in addition to any other programmatic review as required by federal regulations. The commenter recommended that at least 10 percent of the projects that have been issued a permit be reviewed by the EPA and Corps annually for consistency with state and federal policy and standards concerning the Section 404 program. The commenter suggested that the findings of each review be made available to the FDEP and the public.

JA.2081

**EPA Response:**

**EPA acknowledges the suggestion made by the commenter, and notes that the MOA between FDEP and EPA states that "EPA shall review the State 404 Permit Program established by FDEP in order to ensure consistency with the program reporting requirements of 40 C.F.R. § 233.52. FDEP shall also allow EPA to routinely review State records, reports, and files relevant to the administration and enforcement of the approved program consistent with 40 C.F.R. § 233.13(b). This does not preclude EPA from initiating independent or parallel enforcement actions in accordance with Sections 309 and 404(n) of the CWA." FDEP and EPA MOA, at p. 4.**

**Although EPA does waive the requirements of Section 404(j) and the regulations adopted thereunder regarding federal review of FDEP permit applications for certain categories of permits, in accordance with 40 C.F.R. § 233.51(a), FDEP still must supply EPA with copies of public notices for permit applications for which permit review has been waived, upon EPA's request. FDEP and EPA MOA, at p. 6. CWA Section 404(j) and the regulations at 40 C.F.R. § 233.50(b) require EPA to provide copies of permits for which review has not been waived to the Corps, USFWS, and NMFS for comment.**

**EPA has determined that these provisions of the MOA as well as the cited provisions of the CWA and implementing regulations which authorize EPA's review of FDEP's program are sufficient authorities to ensure the Agency can carry out its oversight role under the CWA, and disagrees that a specific percentage of projects issued by a permit must be reviewed annually.**

*Florida's statutes and regulations, Stringency of Florida's Section 404 program*

Some commenters opposed Florida's assumption of a Section 404 program claiming that Florida's program is not as stringent as federal law. One commenter stated that the FDEP's rule-making process for developing a Section 404 program, including the development phase and publication of incomplete proposed rules, is highly flawed. The commenter pointed to examples, such as the statutory section that states that provisions of State law that conflict with federal law do not apply to State permitting. The commenter asserted that Florida's proposal neither specifies the conflicts nor enacts any changes to resolve conflicts or create a program as stringent as federal law. The commenter alleged that FDEP's proposal does not include rationale for proposing the less protective 300-foot buffer, and it does not fully describe the State's permitting, administrative, judicial review, and other procedures. Instead, the commenter said that the State's regulations cover methods to be used, conflicts of laws, and coordination between the ERP and Section 404 permitting programs.

One commenter argued that the State's program does not adopt or establish compliance with all of the Section 404(b)(1) Guidelines, but relies on a patchwork of State rules and regulations that have additional qualifications and caveats that result in less stringency. The commenter added that the State's program fails to define terms that appear in 40 C.F.R. § 230.3 such as "waters of the United States." Without clear definition, the commenter stated that it is unclear how the State will choose to define such terms. In particular, the commenter noted that the word "pollution"

covers only pollution that is at a high enough concentration to be potentially harmful, which could limit the number activities that fall under federal regulation. The commenter explained that the State's definition of "mixing zone" allows for a broad definition that would result in a less stringent State program. A commenter asserted that Florida's definitions of "dredge material" and "fill material" are unclear, and the latter is based on the function it performs rather than its physical state.

A commenter contended that although Florida's program largely incorporates the General Procedures to be followed from 40 C.F.R. § 230.5 into the State 404 Program Applicant's Handbook, the State has limited the General Procedures to be followed by adding qualifying language and provides the example that the State would only evaluate dredged and fill material to determine the possibility of chemical contamination in situations where the chemical contamination may violate State water quality standards or toxic effluent standards or prohibitions. (State 404 Program Applicant's Handbook section 8.2(g)). The commenter contended by restraining its consideration of chemical contamination, the State's program is less stringent than the federal program.

One commenter noted that the federal regulations require the permitting authority to "consider" dilution areas when determining whether violations would occur, but the State program creates an exemption for temporary violations in those areas if discharges occur temporarily within a mixing zone proposed by the applicant and approved by the agency.

A commenter stated that the State program fails to incorporate the requirement that a determination of whether a discharge would cause or contribute to significant degradation of wetlands or other surface waters be based on factual determinations, evaluations, and tests as required by the Section 404(b)(1) Guidelines. The commenter also pointed out that Florida has failed to include the requirement to put "special emphasis on the persistence and permanence of the effects" outlined in those subparts. The commenter stated that guidelines do not incorporate the federally defined set of factual determinations, nor do they require FDEP to make the requisite factual determinations when considering whether to issue a Section 404 permit. The commenter continued to argue that the Fla. Admin. Code R. 62-331.053(6) fails to incorporate the specific effects identified in 40 C.F.R. § 230.11 regarding contribution to significant degradation of wetlands or other surface waters and raises concerns the State's code omits consideration of or vaguely describes potential effects on physical substrate, water circulation, fluctuation, salinity, and suspended particulate/turbidity.

The commenter argued that the State program does not obligate FDEP to make factual findings to prove that proposed projects will not cause adverse effects. The commenter stated that the regulation fails to include the full effects from 40 C.F.R. § 230.11. The commenter asserted that the State regulations do not require the agency to make factual determinations laid out in 40 C.F.R. § 230.11, and, therefore, do not require that the agency include those factual determinations in any final permit decision. The commenter stated that instead, the ERP Handbook section 5.5.4.1 says that the agency must determine whether an applicant's assurances are reasonable, which is less of a factual determination than federal requirements. The commenter stated that these flaws are also present in the ERP Handbook sections 10.2.7, 10.2.8,

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 460 of 785

USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 38 of 153

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                                 *December 16, 2020*

and 11.0, and are additionally present for substrate, 40 C.F.R. §§ 230.20-230.25, 230.30-230.32, 230.40-230.45, 230.50-230.52, and 230.54. The commenter further asserted that the State did decide to include all the federal requirements for 40 C.F.R. § 230.53, aesthetics, and the commenter believed that this demonstrates Florida's recognition of the importance of adopting federal requirements, but the failure to do so consistently.

Two commenters stated that Florida cannot afford to lose the protection of federal laws that the Section 404 program under federal agencies provides. Another commenter mirrored this sentiment by observing that State assumption of the Section 404 program would mean losing the federal protections triggered by current Corps review.

A commenter stated that Florida law does not provide for access to the courts that federal law has, therefore making the State unfit to assume permitting responsibility. The commenter explained that FDEP fails to address any of the features that make Florida's administrative and judicial review procedures more restrictive than federal law. The commenter pointed out that the Florida statutes allow only citizens of the State that are adversely affected to intervene during proceedings brought under this statute, in contrast to federal law that authorizes any citizen to intervene during proceedings. This commenter further stated that mandatory fee shifting under Fla. Stat. § 403.412 is a barrier to court access for litigants unwilling or unable to risk an adverse fee award. Federal law does not provide for mandatory fee shifting. The commenter added that Florida's Administrative Procedure Act restricts access to courts by limiting the ability to establish standing to those who show harm to substantial interests of a substantial number of members. Under federal law, associational standing may be established on the basis of a single member's harms from the challenged conduct. The commenter opposed approval of Florida's assumption on the basis that Florida's more restrictive access to the courts would deprive affected parties of the ability to vindicate rights and ensure citizen enforcement.

**EPA Response:**

**EPA acknowledges the commenters that oppose Florida's assumption of the Section 404 program, asserting that it is not as stringent as the requirements of the CWA and regulations. In accordance with 40 C.F.R. Part 233, an assumed program must be consistent with and no less stringent than the requirements of the CWA and its implementing regulations. EPA has determined that Florida's program is consistent with and no less stringent than the federal program. EPA does not make a determination, and Florida is not required to provide information on whether Florida's program will go above and beyond the requirements of federal law.**

**In accordance with 40 C.F.R. § 233.10(f), one of the elements of a program submission that a state must submit if it seeks to administer a Section 404 program is copies of all applicable state statutes and regulations, including those governing applicable state administrative procedures. The General Counsel's Statement notes that "[p]rovisions of state law that conflict with federal requirements do not apply to state 404 permits. See § 373.4146(3), Fla. Stat." The statement also provides specific examples, such as exemptions to ERP permitting established in §§ 373.406, 373.4145, and 404.813, Fla. Stat., indicating these exemptions do not apply to State 404 permits, citing to § 373.4146(4), Fla. Stat. The**

JA.2084

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 461 of 785
USCA Case #24-5101    Document #2102936         Filed: 02/26/2025    Page 39 of 153
*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                        *December 16, 2020*

General Counsel certifies that "the state has the authority to regulate all discharges of dredged or fill material into waters regulated by the state under Sections 404 (g)-(l), subject only to the exemptions provided in 33 U.S.C. § 404(f) and 40 C.F.R. § 232.3" and notes that "[t]he State has promulgated Chapter 62-331, F.A.C., to bridge the gap between existing state and federal law, thus ensuring that the State 404 Program is at least as stringent as, and meets the requirements of, the CWA and 40 C.F.R. Part 230." See Florida's General Counsel's Statement.

With respect to the commenter who alleged that FDEP's proposal does not include a rationale for proposing a 300-foot buffer, EPA notes that the State and the Corps negotiated this administrative line consistent with the July 30, 2018, Army Memorandum on CWA Section 404(g) – Non-Assumable Waters from Assistant Secretary of the Army for Civil Works R.D. James to the U.S. Army Corps of Engineers. In this memorandum, the Assistant Secretary found the apportionment of permitting authority, between the Corps and a state or tribe seeking to assume a Section 404 program, as recommended by the National Advisory Council for Environmental Policy and Technology (NACEPT), adheres to the language of the CWA and intent of Congress. NACEPT recommended a default of a 300-foot administrative line if another distance was not negotiated. Florida and the Corps negotiated a 300-foot administrative line except in cases where the project footprint crosses the administrative line. Where the project footprint crosses the administrative line, the Corps will retain permitting authority for the entire project. See the definition of "retained waters" in the State's Program Description, section a; see also the State 404 Program Applicant's Handbook section 2.0 (b) 41. EPA disagrees that a 300-foot line demarcating who is the permitting authority, the State or the Corps, is less protective. All Section 404 permits, whether issued by the State or the Corps, must comply with the Section 404(b)(1) Guidelines.

EPA acknowledges commenters who expressed concern about Florida's program complying with the Section 404(b)(1) Guidelines. Section 404(h) of the CWA states that EPA may approve a state or tribal request for assumption only if EPA determines, among other things, that the state or tribe has authority to issue permits which "apply, and assure compliance with, any applicable requirements of this section, including, but not limited to, the guidelines established under subsection (b)(1) . . . ." 33 U.S.C. 1344(h). States and tribes are not required to adopt or incorporate the Section 404(b)(1) Guidelines verbatim; however, implementation of state and tribal environmental review criteria must result in a permit that is as consistent with the Section 404(b)(1) Guidelines as would be a permit issued for the same discharge by the Corps. EPA has reviewed Florida's environmental review criteria and found them to be consistent with the Section 404(b)(1) Guidelines.

EPA acknowledges the commenter who alleged that the State's program does not define terms that appear in 40 C.F.R. § 230.3, such as "waters of the United States" and, therefore, it is unclear how the State will choose to define such terms. However, it is not the role of the State to define "waters of the United States" or other terms that appear in 40 C.F.R. § 230.3. The State is responsible for describing the waters of the United States within Florida over which it will assume jurisdiction under the approved program.

Similarly, definitions of other terms that appear in 40 C.F.R. § 230.3 are not required if the State program description ensures consistency with the CWA and its implementing regulations. Nonetheless, EPA disagrees that the State has not provided a definition for terms such as "waters of the United States." Appendix j-3 of the Program Submission provides a cross walk of many federal and State terms utilized in their Section 404 program, and the State defines many terms in the program description of its submission package and the State 404 Program Applicant's Handbook and ERP Applicant Handbook.

In its Program Description, Florida indicates that the State's 404 program will apply to "state-assumed waters of the United States (WOTUS) as defined at 40 C.F.R. Part 120." See State Program Description section a, at p. 3. Further, "[t]o provide certainty, streamlining, and efficiency, the Department will consider that any wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C., that are regulated under Part IV of Chapter 373, F.S. could be considered waters of the United States, and will treat them as if they are, unless the applicant requests a WOTUS jurisdictional determination, and provides documentation that clearly demonstrates a water is not a WOTUS, subject to Department verification and agreement." *Id.*

The State utilizes and defines the term "activity" for the purposes of Florida's Section 404 program to mean "discharge of dredged material" and/or "discharge of fill material" as those terms are defined in 40 C.F.R. § 232.2" (see Appendix B of the State 404 Program Applicant's Handbook). The State further explains that the terms "dredge", "fill", "dredging", and "filling", shall be interchangeable with "activity" as defined in Florida's Section 404 program, when used within Chapter 62-331, F.A.C., or the State 404 Program Applicant's Handbook. (See Program Description, Appendix j-3).

The State defines "Mixing zone" in the State 404 Program Applicant's Handbook as "a limited volume of water serving as a zone of initial dilution in the immediate vicinity of a dredge or fill activity where receiving water quality may not meet quality standards or other requirements otherwise applicable to the receiving water."

EPA disagrees that the State program will be less restrictive and, therefore, inconsistent with the Section 404(b)(1) Guidelines. Section 8.2(g) of the State 404 Program Applicant's Handbook states that the State must "[e]valuate the material to be dredged or used as fill to determine the possibility of the presence of contaminants, including chemical contamination, that may violate state water quality standards listed in paragraph 62-330.301(1)(e), F.A.C., or any toxic effluent standard or prohibition under section 307 of the CWA"; "[c]heck for physical incompatibility of the material to be used as fill (examples – 1) muck should not be used as structural fill but may be appropriate for use in a wetland restoration project; 2) if a certain ecological community type is expected to colonize the fill, the fill should be appropriate for the desired species)." As structured, section 8.2 requires the State to evaluate the material to see if chemicals are present in concentrations that would result in violations of water quality standards or toxic effluent standards if discharged into WOTUS. The State regulations look at the impacts of the discharge, including impacts on water quality, both individually and cumulatively when considering

whether to issue, deny or condition a permit. Section 62-331.053(3), F.A.C. states that no permit shall be issued if it "causes or contributes to significant degradation of wetlands or other surface waters". A state permit may not be issued if such discharge will result in a violation of 40 C.F.R. § 230.10(b)(2). 40 C.F.R. § 233.20(a). Additionally, proposed permits with discharges that may contain toxic substances must be sent to the EPA for review pursuant to the non-waiver categories found in the State-EPA MOA and 40 C.F.R. § 233.51(4). Specifically, section 10.1.1 of the ERP Handbook (Appendix D) requires that applicants assure "(c) A regulated activity will not adversely affect the quality of receiving waters such that the water quality standards set forth in Chapters 62-4, 62-302, 62-520, and 62-550, F.A.C., including any antidegradation provisions of paragraphs 62-4.242(1)(a) and (b), subsections 62-4.242(2) and (3), and Rule 62-302.300, F.A.C., and any special standards for Outstanding Florida Waters and Outstanding National Resource Waters set forth in subsections 62-4.242(2) and (3), F.A.C., will be violated [paragraph 62-330.301(1)(e), F.A.C.]. EPA has determined that the evaluation required by section 8.2 of the 404 Handbook will not result in issuance of a permit inconsistent with the Section 404(b)(1) Guidelines.

EPA disagrees with commenters who asserted that Florida's program would be inconsistent with the Section 404(b)(1) Guidelines based on the State's regulatory requirements regarding mixing zones and consideration of dilution and dispersion. 40 C.F.R. § 230.10(b) states that "No discharge of dredged or fill material shall be permitted if it (1) Causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard." According to 62-331.053(3), F.A.C., "No permit shall be issued for the following: (a) When the project is inconsistent with the requirements of this Chapter and the 404 Handbook, including when the project: (1) Causes or contributes to violations of any applicable State water quality standard, except when temporarily within a mixing zone proposed by the applicant and approved by the Agency." EPA notes that although Florida's regulations do not include the exact same language as 40 C.F.R. § 230.10(b), which is not the standard for approval, the Agency has considered the State's regulatory language and determined that Florida's program will result in the issuance of permits that are consistent with and no less stringent than the requirements in the Section 404(b)(1) Guidelines.

EPA acknowledges commenters who expressed concern that Florida's program does not include the same language as the Section 404(b)(1) Guidelines regarding factual determinations, evaluations, and tests. EPA also acknowledges commenters who believed that Florida's regulations are not as detailed as the Section 404(b)(1) Guidelines. However, EPA disagrees with commenters who concluded that Florida's program is inconsistent with the Section 404(b)(1) Guidelines. Program Description Appendix j-3 compares the federal and State regulatory requirements regarding factual determinations, evaluations, and tests included in the Section 404(b)(1) Guidelines. EPA has carefully evaluated the State's requirements and has determined that they are consistent with and no less stringent than the Section 404(b)(1) Guidelines. EPA disagrees with the commenter who asserted that Florida's inclusion of "reasonable assurance" language in the Environmental Resource

JA.2087

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 464 of 785
USCA Case #24-5101   Document #2102936        Filed 02/26/2025   Page 42 of 153
*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                              *December 16, 2020*

**Permit Applicant's Handbook means that the State program is not consistent with federal requirements.**

**EPA disagrees with the commenter who asserted that Florida's program is inconsistent with 40 C.F.R. § 233.10(c) because Florida's regulations do not require FDEP to put "special emphasis on the persistence and permanence of the effects." Florida's Environmental Resource Permit Applicant's Handbook Volume 1, section 10.2.4, requires that "Reasonable assurances regarding water quality must be provided both for the short term and the long term, addressing the proposed construction, alteration, operation, maintenance, removal and abandonment of the project." Additionally, section 10.2.4.2 includes a list of "Long Term Water Quality Considerations." EPA determines that "special emphasis on the persistence and permanence of the effects" is captured in FDEP's consideration of both short-term and long-term water quality effects.**

**Florida's Section 404 program is not inconsistent with any federal requirements regarding access to a particular venue to pursue legal challenges. EPA acknowledges commenters who expressed concern with venue for where state permitting issues would be resolved on a judicial level. EPA's regulations do not require particular procedures or access to a federal venue for judicial review of state-issued permits, and nothing in Florida's judicial review procedures is inconsistent with federal requirements. Challenges to actions of a state in issuing or denying a permit pursuant to a state-assumed CWA program are typically heard in state court, and EPA recognizes that different states have different procedures for judicial review, and that those procedures may also differ from federal procedures. As the Seventh Circuit Court of Appeals explained in addressing EPA's and the Corps' failure to exercise jurisdiction over a Section 404 permit application where Michigan had assumed the Section 404 program, "[i]t is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act."** *Menominee Indian Tribe of Wisconsin v. EPA*, 947 F.3d 1065, 1071 (7th Cir. 2020).

*Completeness of FDEP's General Counsel Statement*

One commenter noted FDEP submitted a statement by its General Counsel, but fails to establish adequate authority to carry out the program and meet Section 404 requirements, including failures regarding general permits, emergency permits, permit conditions, coordination requirements, public notice, permit review and determinations, compliance evaluation and enforcement. The commenter alleged that the General Counsel's statement "avers broadly" that no permit shall issue unless in compliance with the CWA and Section 404(b)(1) Guidelines, but fails to establish that this is in fact the case. The commenter added that the General Counsel's Statement summarily declares that FDEP satisfies the requirements to comply with federal guidelines, even though many of the CWA Section 404(b)(1) Guidelines are absent from the state rules. The commenter provided multiple concerns and requested clarifications within the document, as follows.

The commenter took issue with the General Counsel's statement that F.A.C. 62-331.060(1) implements the requirements of 40 C.F.R. § 233.30(b)(1)–(4). Assumption Application C at 6.

JA.2088

The commenter explained that the State uses different terms that would restrict the information that must be included in a permit application as compared to federal law. The commenter provided, as an example, the federal regulations require a description of "methods of discharge," whereas the State uses the term "construction methods," which is not defined by either the State regulations or the 404 Handbook (referencing F.A.C. 62-331.060(1)(e) and  40 C.F.R. § 233.30(b)(3)). The commenter urged that the plain meanings of the words "construction" and "discharge" are not equivalent.

The commenter stated that federal rules require that permits "shall be coordinated with federal and federal-state water related planning and review processes," however, the General Counsel's Statement fails to provide any information or citation to demonstrate that the State has satisfied this requirement. The commenter expressed that FDEP admits that they "did not add this [requirement] to the rule," but states that they "plan to engage in this kind of coordination whenever possible." Assumption Application B, app. j-3, at 32. The commenter stated that FDEP has thus failed to ensure compliance with federal coordination requirements.

The commenter disagreed with the General Counsel's Statement premise that F.A.C. 62-331.060(2)–(3) fully satisfies the public notice requirements of 40 C.F.R. § 233.32(a)–(c), (e). The commenter argued that federal rules require that public notice be given whenever the following actions occur: (1) receipt of a permit application, (2) preparation of a draft general permit, (3) consideration of a major modification to an issued permit, (4) scheduling of a public hearing, and (5) issuance of an emergency permit. 40 C.F.R. § 233.32(a). The commenter pointed out that Florida's regulations, on the other hand, do not require public notice for receipt of a permit application. F.A.C. 62-331.060(2)–(3).

The commenter expressed concern with the General Counsel's Statement claim that the State "has authority to enforce rules and regulations" for the State 404 program (Assumption Application, section C at 9). The commenter stated that the statement falls short of the federal requirement that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions." 40 C.F.R. § 233.40(a). The commenter added that the State does not maintain a program to identify violations in its current programs and has not shown how it would be able to do so for a Section 404 program.

The commenter added that the General Counsel's Statement must contain a legal analysis of the effect of State law regarding the prohibition on taking private property without just compensation on the successful implementation of the State's program. Rather than providing this analysis, the commenter alleged the Statement focuses "on the notion that no matter how broadly Florida courts interpret regulatory takings law, their decisions would be subject to review by the Supreme Court of the United States." The commenter argued that this position "completely dodges the requirement" to provide an actual analysis of the effect of Florida law on the prohibition against takings, noting that a blanket statement that takings law is ultimately subject to U.S Supreme Court review would apply to any state's submission or statutory scheme. The commenter urged that this claim also ignores that the U.S. Supreme Court is a court of limited review. The commenter further contended that the General Counsel emphasizes that

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

under Florida law, even when a private property owner brings an as-applied challenge to a regulation, that challenge can proceed without invalidating the underlying regulation. The commenter explained that this analysis appears to suggest that as long as the underlying regulatory program remains valid, takings law does not inhibit successful implementation of Florida's program. However, the commenter asserted that the State has not answered the question of whether it is easier for private property owners to bring regulatory takings cases pursuant to Florida law, such that less Section 404 permit mitigation would occur under a State program as compared to a federal program. The commenter added that the General Counsel's Statement completely fails to address the Bert J. Harris, Jr., Private Property Rights Protection Act, Fla. Stat. 70.001 et seq. ("Harris Act"), which Florida's legislature enacted "to provide a remedy for private landowners where their property has been inordinately burdened by government action, but the government action does not amount to a constitutional taking." The commenter urged that the General Counsel failed to flag, much less address, how this Act would not interfere with operation of a 404 program. Without this explanation, the commenter stressed that the State has failed to meet the requirements of 40 C.F.R. § 233.12.

**EPA Response:**

**EPA disagrees with the commenter's statements that the General Counsel's Statement fails to establish adequate authority to carry out and enforce the program and meet CWA Section 404 requirements. Please see Response to Comment Sections C, D, E, and K addressing Florida's requirements and procedures related to general permits, emergency permits, permit conditions, coordination requirements, public notice, permit review and determinations, compliance evaluation and enforcement. In particular, see Response to Comments Section K regarding enforcement for EPA's explanation as to why it concluded that Florida meets the federal requirement that a state "shall maintain a program designed to identify persons subject to regulation who have failed to obtain a permit or to comply with permit conditions." 40 C.F.R. § 233.40(a).**

**EPA disagrees with the commenter's statement that the General Counsel's Statement fails to establish that Florida's program incorporates all of the requirements in the Section 404(b)(1) Guidelines. The General Counsel's Statement relies in part on Florida's comparison of federal and state law requirements, included as Appendix j-3 to the Program Description at 54-151, which lays out in precise detail Florida's requirements that reflect the federal Section 404(b)(1) Guidelines. Appendix j-3 makes clear that Florida's requirements implement the Section 404(b)(1) Guidelines; the requirements are codified at 62-4 and 62-330 (F.A.C.), and the Applicant's Handbook Volume I. Please see Response to Comment Section D addressing Florida's statutes and regulations and stringency of Florida's Section 404 program.**

**EPA disagrees with the commenter's statement that the General Counsel's Statement fails to demonstrate that Fla. Admin. Code 62-331.060(1) implements the requirements of 40 C.F.R. § 233.30(b)(1)–(4). As the commenter notes, federal regulations at 40 C.F.R. § 233.30(b)(3) provide that permit applications include "a description of the type, composition, source and quantity of the material to be discharged, the method of discharge,**

JA.2090

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

and the site and plans for disposal of the dredged or fill material." Florida's regulations
require that permit applications list "[a] description of the type, composition, source, and
quantity of the material to be dredged or used as fill; construction methods; and the site
and plans for disposal of any dredged material including a description of spoil cells,
dredged material management areas (DMMAs), and final disposal plans if the dredged
material is not proposed to remain onsite." 62-331.060(1) (F.A.C.). Though Florida's rule
does not explicitly require that the permit application describe the "method of discharge,"
EPA has concluded that the information in Florida's application, specifically the language
in 62-331.060(1) (F.A.C.),which requires a "description of the type, composition, source,
and quantity of material to be discharged; construction methods; and the site and plans for
disposal of any dredged material" will ultimately provide the "method of discharge" to the
permitting authority. The Attorney General's Statement was therefore accurate in
concluding that Fla. Admin. Code 62-331.060(1) implements the requirements of 40 C.F.R.
§ 233.30(b)(1)–(4).

EPA disagrees with the commenter's statement that FDEP fails to ensure compliance with
federal coordination requirements because its regulations do not codify the federal
requirement that State Section 404 permits shall be coordinated with "Federal and
Federal-State water related planning and review processes," *citing* 40 C.F.R. § 233.31(b).
Florida's program description provides that "[t]he state plans to engage in this kind of
coordination whenever possible." Program Description, app. j-3 at 11. In addition,
Florida's program description and other assumption documents make clear that Florida
will coordinate with federal and federal-State water-related planning and review processes.
For example, the program description states that when both an ERP and State Section 404
permit is required, the ERP authorization will ensure that the project complies with state
water quality standards and the Coastal Zone Management Program (Rule 62-331.070,
F.A.C.). Program Description section b at 3. The program description also states that
FDEP will coordinate with the State Historical Preservation Office (SHPO) and Tribal
Historical Preservation Office (THPO), FWC, USFWS), NMFS, Water Management
Districts (WMDs), and EPA following the procedures described in their respective
operating agreements. See Program Description section b at 3, citing Program Description
sections D (DEP/EPA MOA) and E (DEP/USACE MOA) and section (j) (DEP/FWC/FWS
MOU and DEP/SHPO OA) and section 5.2 of the 404 Handbook. Given the open-ended
nature of the regulatory exhortation to coordinate with "Federal and Federal-State water
related planning and review processes," and the many commitments Florida has made to
do so, Florida has amply documented its adherence to this regulatory requirement.

EPA disagrees with the commenter's statement that Florida's program does not satisfy the
public notice requirements of 40 C.F.R. § 233.32(a)–(c), (e). EPA's regulations require that
public notice be given whenever the following actions occur: (1) receipt of a permit
application, (2) preparation of a draft general permit, (3) consideration of a major
modification to an issued permit, (4) scheduling of a public hearing, and (5) issuance of an
emergency permit. 40 C.F.R. § 233.32(a). While the language in Florida's regulations is not
identical to the language in EPA's public notice requirements, Florida's approach is

JA.2091

similar to EPA's, will have the same practical effect as EPA's requirements, and satisfies public notice requirements of 40 C.F.R. § 233.32. Florida requires FDEP to provide public notice within 10 days of the following: an agency determination that an application for an individual permit or major modification is administratively complete; an agency notification to a permittee of revocation or suspension of a permit; and issuance of an emergency field authorization. F.A.C. 62-331.060 (Florida addresses general permits separately). Requiring public notice within 10 days of receipt of a complete permit application or major modification is not materially different, as a practical matter, from requiring public notice upon "receipt of a permit application" or "consideration of a major modification." EPA therefore concludes that Florida's public notice requirements are consistent with federal public notice requirements.

EPA disagrees with the commenter's contention that the General Counsel's Statement fails to analyze the effect of State law regarding the prohibition on taking private property without just compensation on the successful implementation of the State's program, and that instead it focuses "on the notion that no matter how broadly Florida courts interpret regulatory takings law, their decisions would be subject to review by the Supreme Court of the United States." This comment distorts Florida's analysis. In fact, the General Counsel's Statement explained that a Florida court has held that the standard for a "taking" under the Florida Constitution is identical to the standard under the Fifth Amendment (at least for res judicata purposes), and it is unlikely that Florida courts would expand liability for regulatory takings beyond the U.S. Supreme Court's standard. General Counsel's Statement at 12.

Moreover, EPA does not view the regulatory requirement that the General Counsel's Statement provide an analysis of takings law as necessarily requiring a state or tribe to show that under its legal regime, private property owners would face the identical hurdles that they face under federal law. The General Counsel's Statement that a potential taking does not invalidate an agency action under Florida law is simply helpful to demonstrate that takings law in Florida will not inhibit the successful implementation of Florida's program.  In response to the commenter's statement that the General Counsel's Statement fails to address the Bert J. Harris, Jr., Private Property Rights Protection Act, Fla. Stat. 70.001 et seq., EPA's regulatory requirements do not require Florida to address this statute. First, the Private Property Rights Protection Act is limited to "as-applied" challenges and does not provide for facial challenges to statutes or regulations.  *See M & H Profit, Inc. v. City of Panama City*, App. 1 Dist., 28 So.3d 71 (2009), *rehearing denied*, *review denied* 41 So.3d 218. The statute would therefore not affect Florida's authority to administer the Section 404 program. In addition, while Florida currently regulates dredging and filling into wetlands and other waters pursuant to its Environmental Resource Permit program, EPA's research has not found any cases in which FDEP's actions under that permitting program were challenged successfully pursuant to the Private Property Rights Protection Act. EPA therefore has no reason to think that this statute would impede the functioning of Florida's Section 404 program.

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 469 of 785
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 47 of 153
*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                          *December 16, 2020*

## E.  General permits and conditions

A commenter noted that the State failed to incorporate the full set of requirements for issuance of general permits. The commenter asserted that the State's program omits the requirement that general permits may only be issued if "[t]he activities in such category are similar in nature and similar in their impact upon water quality and in the aquatic environment" (referencing Fla. Admin. Code 62-331.200–01).

The commenter stressed that the State also failed to incorporate the requirements that FDEP must follow when issuing general permits, asserting that the State has not adopted any procedures for it to follow when considering and issuing general permits, but rather, takes the position that the State must follow the requirements of 40 C.F.R. Part 233 when creating a general permit, "but this information is not presented in the rule" (referencing Assumption Application B, app. j-3, at 58). The commenter remarked that it is unclear how the State could ensure compliance with Section 404(b)(1) Guidelines without incorporating them into the State's program. The commenter added that the State seeks to issue general permits with the program submitted, even though it has failed to take any of the required steps to do so lawfully.

The commenter remarked that FDEP's proposed program is also less restrictive than 40 C.F.R. § 233.21, asserting that the State's regulation unreasonably restricts its ability to require notice of intent of coverage under a general permits, omitting the federal language that the agency can require notice "as appropriate" (comparing Fla. Admin. Code 62-331.200(3) with 40 C.F.R. § 233.21(d)). The commenter asserted that the State regulation restricts the notice requirement to specifically identified circumstances and therefore limits FDEP's authority to require notice whenever appropriate.

The commenter said that the State has further limited its authority by only allowing FDEP to require an individual permit where "sufficient cause exists," which is then defined as a "likelihood that the project will cause more than minimal adverse environmental effects." The commenter pointed out that federal rules, by contrast, allow the Director to do so "based on concerns for the aquatic environment," including compliance with the requirement for general permits to have only minimal individual and cumulative adverse environmental effects. The commenter added that the State's rules omit the automatic revocation of general permits coverage once the agency requires an individual permit (comparing Fla. Admin. Code 62-331.200(6) with 40 C.F.R. § 233.21(e)).

One commenter considered the proposal flawed in several respects and pointed out the failure to assess the impacts of proposed general permits and provide the analyses for public review. The commenter quoted federal regulatory language that "[t]he Director may issue a general permit for categories of similar activities if he determines that the regulated activities will cause only minimal adverse environmental effects when performed separately and will have only minimal cumulative adverse effects on the environment" 40 C.F.R. § 233.21(b). The commenter stated that FDEP seems to believe that it can use language from general permits developed by the Corps at a national level without any process to adapt them to state use, without providing evidence of analysis to support this decision.

One commenter asserted that FDEP's approach, which purports to give effect to its general permits for a duration of five years from the date of the State program's approval, is contrary to the five-year limitation on general permits. The commenter stated that FDEP's approach therefore fails to rely on a proper determination necessary to support the issuance of general permits and would unlawfully extend general permits issued initially by the Corps beyond their statutorily limited five-year duration. The commenter asserted that federal law requires the Corps to review its general permits and the determinations underlying them every five years, and allowing Florida to extend the Corps' underlying rationale beyond the five-year statutory limitation conflicts with federal law.

A commenter suggested that Florida lacks expertise, staff, resources, and enforcement capabilities needed to implement its own Section 404 program and should instead work with the Corps to expand the scope of its state programmatic general permit.

**EPA Response:**

**EPA disagrees with the commenter that FDEP failed to incorporate the full requirements for issuance of general permits from the Section 404(b)(1) Guidelines. EPA acknowledges the commenter's concern of FDEP adopting general permits developed by the Corps. As stated in the General Counsel's Statement submitted by FDEP as part of its assumption request package, "the state intends to administer and enforce a limited number of regional general permits issued by the Corps until they expire. Pursuant to 40 C.F.R. § 233.14(b)(3), these general permits, and the procedures whereby the Department and Corps will exchange relevant information, are identified in the Memorandum of Agreement (MOA) between the State of Florida Department of Environmental Protection (DEP) and the U.S. Army Corps of Engineers (Corps). In addition, the State has promulgated a series of general permits in Chapter 62-331, F.A.C., which authorize activities that meet the conditions specified in 40 C.F.R. § 233.21. They comply with the federal regulations, describe the authorized activity and area, contain any appropriate pre-discharge notification requirements, and allow for the issuance of an individual permit after the issuance of a general permit. The permit conditions for general permits are provided in Rule 62-330.405, except subsections (7) and (10), and Rule 62-331.201, F.A.C. The conditions in Chapter 62-331 are specific to the 404(b)(1) Guidelines, applicable Section 303 water quality standards, applicable Section 307 effluent standards and prohibitions, and the criteria set forth in 40 C.F.R. § 233.23. Subsection 62-331.200(6), F.A.C., provides the circumstances under which an individual permit may be required after a general permit is issued."**

**EPA also disagrees with the commenter's statement that FDEP's proposed program is less restrictive than 40 C.F.R. § 233.21 on the grounds that the State's regulation restricts its ability to require notice of intent of coverage under general permits. Florida's regulations require any person constructing, operating, or otherwise engaging in projects under a general permit to provide notice at least thirty days prior to initiating the authorized activity. 62-330.402 (F.A.C.). Florida's regulations also specify the contents of these advance notices and processing procedures.** *Id.* **Florida's broad requirements for notices**

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program                                                        December 16, 2020*

of intent of coverage under general permits satisfy and exceed the federal regulatory
requirements for such notices.

EPA disagrees with the commenter who asserted that FDEP's general permits extend the
Corps general permits beyond their statutory limitation of five years in duration. As the
State program description appendix (a)-1 states on page 30, nationwide permits and the
State's programmatic general permits "will no longer be applicable within assumed
waters," and thus there is no extension of the Corps general permits in assumed waters.
The State's program does include general permits which it incorporated into regulations at
Florida Administrative Code Chapters 62-330 and 62-331. To provide consistency between
the State and federal 404 programs, FDEP modeled many of the State's programmatic
general permits after nationwide permits. These State general permits will be issued on the
date the State program comes into effect and will have a five-year term. In crafting its
programmatic general permits, FDEP did not simply incorporate by reference or copy
existing Corps permits; it modified these permits including additional requirements, as
appropriate, to ensure these permits comply with the Section 404(b)(1) Guidelines and
State requirements including but not limited to the State's Environmental Resource
Program permits, water quality standards, protection of listed species, and compliance
with the State's Coastal Zone Management Plan. These general permits were available for
comment as part of the program package approval and EPA has reviewed them as part of
the program request. (See Section 3.2.1 of the State 404 Program Applicant's Handbook).

EPA disagrees with commenters who asserted that FDEP lacks the expertise, staff,
resources, and enforcement capabilities needed to implement its own Section 404 program.
EPA finds that FDEP has committed sufficient resources and staffing to address
anticipated workload. See Response to Comments Section H for further discussion and
responses to comments on this topic.


F.  Delineation methodology

A commenter noted that there are differences between the State and federal wetlands delineation
methodologies and the impacts of those differences is one of the reasons why the proposal is
flawed.

A commenter observed that FDEP has developed a 92-page document and associated checklist
for wetland delineation in lieu of site visits. The commenter maintains the current system in
which the Water Management Districts and the Corps work cooperatively to ensure fair and
equitable wetland assessments is appropriate. Another commenter says that there are few people
in FDEP prepared to handle wetland delineation so there is no assurance of minimum protection
under the statute.

EPA Response:

Florida's Program Description contains a comparison of federal and State delineation
methodologies. A delineation implementation strategy has been developed to ensure

JA.2095

consistent application of state wetland delineation methodology and is rooted in Florida Statute (373.4131, F.S.) and Rule (62-340.100(2), F.A.C.). This implementation strategy consists of: 1) regular trainings conducted annually by FDEP subject matter experts; 2) development and required use of the F.A.C. 62-340 Data Form; 3) desktop audits and field verifications; and 4) additional reporting of audits and verifications.

State and federal wetland delineation methodologies may differ, in part, because the definitions of "wetlands" under the CWA (*see* 33 C.F.R. § 328.3(c)(16) and 40 C.F.R. § 120.2(3)(xvi)) and state law may not be the same. *See* Appendices to the Resource and Programmatic Assessment for the Navigable Waters Protection Rule: Definition of "Waters of the United States." Indeed, the definition of "wetlands" under the CWA and the definition of "wetlands" under Florida law are different.[2] The appropriate analysis in the context of this rulemaking is Florida's ability to properly delineate "waters of the United States," including "adjacent wetlands." *See* 33 C.F.R. § 328.3(c)(1) and 40 C.F.R. § 120.2(3)(i). If properly implemented, the State methodology is no less stringent than the federal methodology and will produce the same wetland delineation and determination for purposes of the CWA. Federal wetland delineation methodology requires that hydrophytic vegetation, wetland hydrology and hydric soil indicators be present. *See* 1987 Corps of Engineers Wetlands Delineation Manual at 9–10. Florida's wetland delineation methodology only requires two of the three indicators be met. (See Chapter 62-340 F.A.C.) Historically, inconsistent application of the State and federal methodologies and differences in wetland plant ratings and hydric soil indicators have led to wetland boundary differences. Federal adoption of Natural Resource Conservation Service Hydric soil indicators in 2012 aligned hydric soil indicators with those used by the State and proper application of F.A.C. 62-340 in conjunction with the data form ensure that the tests required for a delineation under the CWA are utilized.

By way of background, FDEP, EPA, and Corps subject matter experts, as a test, applied the federal methodology and State methodology and then develop the implementation strategies. When applying F.A.C. 62-340, experts noted that with the development and use of the F.A.C. 62-340 data form and consistent application of F.A.C. 62-340 criteria

---

[2] For purposes of the Clean Water Act, "wetlands" means "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(c)(16) and 40 C.F.R. § 120.2(3)(xvi). Under Florida law, "wetlands" means "those areas that are inundated or saturated by surface water or groundwater at a frequency and a duration sufficient to support, and under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soils. Soils present in wetlands generally are classified as hydric or alluvial, or possess characteristics that are associated with reducing soil conditions. The prevalent vegetation in wetlands generally consists of facultative or obligate hydrophytic macrophytes that are typically adapted to areas having soil conditions described above. These species, due to morphological, physiological, or reproductive adaptations, have the ability to grow, reproduce, or persist in aquatic environments or anaerobic soil conditions. Florida wetlands generally include swamps, marshes, bayheads, bogs, cypress domes and strands, sloughs, wet prairies, riverine swamps and marshes, hydric seepage slopes, tidal marshes, mangrove swamps and other similar areas. Florida wetlands generally do not include longleaf or slash pine flatwoods with an understory dominated by saw palmetto." *See* Fla. Stat. section 373.019(27)).

(wetland definition, A Test, B Test, C Test, and D Test), the State methodology is no less stringent than the federal methodology.

EPA disagrees with the commenter that a 92-page document and checklist will be used in lieu of site visits. FDEP has developed the Data Form Guide to assist staff in the field to implement Chapter 62-340, F.A.C. The content of this guide was compiled by FDEP's Submerged Lands and Environmental Resources Coordination group and the Wetland Evaluation and Training Team. The express purpose of this document is to provide guidance to regulatory staff in order to maintain consistency in the applied field methodologies for wetland delineation pursuant to Chapter 62-340, F.A.C.

## G. Compensatory mitigation

### Compensatory mitigation MOA

Some commenters asserted that the compensatory mitigation memorandum of agreement provides that a federal mitigation bank located entirely in assumed waters would need to submit its implementation plans to FDEP for a State Section 404 program permit rather than receiving a permit from the Corps, often issued as a Nationwide 27 after receiving a Mitigation Banking Instrument (MBI) from the Corps. Commenters asserted this extra review step is burdensome, unnecessary, and contrary to the goal of greater review efficiency. Further, some commenters emphasized that mitigation bank applications submitted to the Corps for an MBI are subject to change during review and then those changes would need to be considered for the Section 404 dredged and fill permit review by FDEP. To prevent such delays, commenters requested that the Corps retain permitting authority for all the federal mitigation banks it authorizes. Another commenter contended that the agency reviewing the mitigation bank proposal should also be responsible for the associated authorization.

EPA Response:

EPA acknowledges that the memorandum of agreement between the Corps and FDEP states that mitigation banking instruments and in-lieu fee program instruments shall be processed by the Corps in accordance with 33 C.F.R. Part 332 and that mitigation banks wholly in assumed waters would be permitted by FDEP. However, FDEP would continue to be a part of the Interagency Review Team [62-331.140(3) F.A.C.] that reviews mitigation banks and the memorandum of agreement allows FDEP to co-chair any applicable interagency coordination effort. Further, FDEP has adopted the language from the Corps' Nationwide Permit 27 as a general permit pursuant to 62-331.225 F.A.C., allowing the State to continue permitting mitigation banks much the same way as the current federal process. EPA acknowledges that mitigation bank applications submitted to the Corps for an MBI are subject to change during review and then those changes would need to be considered for Florida's 404 Program; however, this is no more burdensome that the current process for banks currently receiving Section 404 dredged and fill permits from the Corps.

*EPA Response to Comments on the Draft Florida 404 Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                   *December 16, 2020*

## *Permits issued by the State are subject to administrative challenge*

Some commenters noted that because the State Section 404 permit program and the Section 404(b)(1) Guidelines do not align, any administrative challenge to a State Section 404 program permit would be adjudicated under Florida law, which could result in a permit denial or modification of the Mitigation Banking Instrument. One commenter asserted that State Section 404 permits will be subject to challenge by affected parties under Florida's Administrative Procedure Act and provided examples of how such challenges have effectively delayed state mitigation bank permits through "legal maneuvering." To prevent such denial or modification of the MBI due to differences between the state and federal program, the commenter requested that the Corps retain permitting authority for all the federal mitigation banks it authorizes.

**EPA Response:**

**FDEP's comparison of federal and State law requirements lays out in precise detail Florida's requirements that reflect the federal Section 404(b)(1) Guidelines. Program Description Appendix j-3 at 54-151. The comparison makes clear that Florida's requirements implement the Section 404(b)(1) Guidelines; the requirements are codified at 62-4 and 62-330 F.A.C., the Applicant's Handbook Volume I, and a number of other locations. Florida's Section 404 program is consistent with the public participation requirements in EPA's implementing regulations at 40 C.F.R. Part 233. EPA's regulations do not require particular procedures for judicial review of state-issued permits. Challenges to actions of a state in issuing or denying a permit pursuant to a state-assumed Section 404 program are typically heard in state court under that state's laws, and state laws, in turn, are not required to have language identical to federal regulations so long as the actual requirements are the same. As the Seventh Circuit Court of Appeals explained in reviewing EPA's and the Corps' decision to decline to exercise jurisdiction over a Section 404 permit application where Michigan had assumed the Section 404 program, "[i]t is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act."** *Menominee Indian Tribe of Wisconsin v. EPA,* **947 F.3d 1065, 1071 (7th Cir. 2020);** *citing In re Freshwater Wetlands Prot. Act Rules,* **351 N.J.Super. 362, 798 A.2d 634, 643 (Ct. App. Div. 2002) (evaluating whether state 404 permit met federal standards);** *see also Sierra Club Mackinac Chapter v. Dep't of Envtl. Quality,* **277 Mich.App. 531, 747 N.W.2d 321, 331–32, 335 (2008) (concluding that pollution-discharge permit violated the CWA).**

## *Alignment of the State Section 404 program and the Section 404(b)(1) Guidelines regarding compensatory mitigation*

A commenter asserted that the State regulations have omissions and differences that arise from Florida's failure to use federal definitions of terms relevant to mitigation. For example, the commenter pointed out that the Section 404 Handbook does not include the definitions from 40 C.F.R. § 230.92 for "advance credits," "credit," "days," "debit," "fulfillment of advance credit sales of an in-lieu fee program," "in-lieu fee program instrument," "instrument," "mitigation banking instrument" and "release of credits" (compare 40 C.F.R. § 230.92 with Section 404

Handbook section 2.0(b)). The commenter emphasized that the State also alters or omits vital portions of the General Compensatory Mitigation Requirements. The commenter asserted that these omissions and differences result in a failure of the state to meet the stringency requirements of the Section 404(b)(1) Guidelines.

A commenter stated that as part of any delegation, FDEP should be required to demonstrate that existing State programs adequately explore practicable alternatives to impacts as part of the permitting process prior to allowing for compensatory mitigation.

A commenter also contended that the State's incorporation of the watershed approach to compensatory mitigation falls short of federal requirements. The commenter pointed out that the State does not incorporate the federal provision that a watershed approach is "not appropriate in areas where watershed boundaries do not exist, such as marine areas," omits requirements on the amount of information a permittee must provide to support a watershed approach, and fails to incorporate size restrictions for the watershed to be used.

In addition, the commenter asserted the State has ignored mitigation site selection criteria, possibly resulting in inadequate compensatory mitigation. The commenter contended the State ignores federal factors that must be considered when selecting a mitigation site. The commenter specifically pointed out that the state program does not adopt the requirement for permit writers to document specific findings before permitting out-of-kind mitigation or the option for a greater than one-to-one mitigation ratio.

Some commenters stated that requirements for demonstrating financial security are not as strict as those required under the federal statute. Commenters emphasized that federal regulations require financial assurances that provide a high level of confidence that a compensatory mitigation project will be successfully completed - a standard that is not incorporated into the State program. A commenter disagreed with a State exemption for projects with a mitigation cost estimate less than $25,000, which is also not in the federal rules. In addition, the commenter objected to the State's creation of a blanket amount of 110% of the cost estimate, rather than giving permit writers the ability to determine the amount.

A commenter contended that lack of equivalency between State 404 regulations and federal mitigation requirements - with respect to financial assurances and long-term management for permittee-responsible mitigation - will create market disincentives to the detriment of the Section 404 program's environmental goals. The commenter stated that permittees will logically seek out the lowest cost option for compliance and challenge any requirements that go beyond the regulatory minimum. The commenter added that national experience and studies confirm that financial assurances and long-term management planning are essential to durable mitigation offsets that maintain ecological success and last "in perpetuity." To address the issue, the commenter recommended that Florida adopt mitigation requirements equivalent to those in the 2008 Compensatory Mitigation Rule, emphasizing that equivalency supports a robust mitigation market by ensuring that all forms of mitigation are held to the same standards. Specifically, the commenter requested that FDEP revise the State 404 regulations to add two requirements: 1) financial assurances, and 2) a long-term management plan as necessary elements for any mitigation project.

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 476 of 785

USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 54 of 153

*EPA Response to Comments on the Florida 404 Program Submission Requesting to Assume Administration of
a Clean Water Act Section 404 Program*                                    *December 16, 2020*

A commenter concurred with Florida's approach to leave administration of the mitigation banking and in-lieu fee programs of the Section 404 program with the Jacksonville Corps District as currently proposed. However, the commenter recommended that Florida seek best practices in active, competitive Section 404 markets. The commenter cited the following best practices: comprehensive state regulations, clear understanding between state and federal regulators on respective authorities, use of project management tools and transparent meetings, strong adherence to a mitigation hierarchy, and, critically, dedicated and disciplined staff leading the State's program.

In addition, a commenter urged FDEP to outline more specific measures and commitments to ensure proficient permitting operations and administration of the assumed Section 404 program; including funding for additional staff hiring, training, public meeting engagements, and a publicly available information/resource database.

**EPA Response:**

**The memorandum of agreement between the Corps and FDEP states that mitigation banking instruments and in-lieu fee program instruments shall be processed by the Corps in accordance with 33 C.F.R. Part 332. As a result, Florida does not include in its State 404 program definitions pertaining strictly to the processing of mitigation banking and in-lieu fee instruments.**

**Regarding demonstration of exploring alternatives before considering compensatory mitigation, EPA notes that Florida provides for alternative analysis in F.A.C. 62-331.053(1) which states, "[N]o dredge or fill activity shall be permitted if there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."**

**EPA notes that Florida addresses the watershed approach in the State 404 Program Applicant's Handbook 8.5.1 Compensatory Mitigation Hierarchy stating, "the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services, taking into account such watershed scale features as aquatic habitat diversity, habitat connectivity, relationships to hydrologic sources (including the availability of water rights), trends in land use, ecological benefits, and compatibility with adjacent land uses. When compensating for impacts to marine resources, the location of the compensatory mitigation site should be chosen to replace lost functions and services within the same marine ecological system (e.g., reef complex, littoral drift cell). Compensation for impacts to aquatic resources in coastal watersheds (watersheds that include a tidal water body) should also be located in a coastal watershed where practicable."**

**EPA points to FDEP providing for consideration of other mitigation prior to permitting out-of-kind mitigation in the State 404 Program Applicant's Handbook 8.5.1 Compensatory Mitigation Hierarchy stating, "[I]f, after considering opportunities for on-site, in-kind compensatory mitigation as provided in paragraph (d), above, the Agency**

JA.2100

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 477 of 785
USCA Case #24-5101     Document #2102936          Filed: 02/26/2025     Page 55 of 153
*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                        *December 16, 2020*

determines that these compensatory mitigation opportunities are not practicable, are
unlikely to compensate for the permitted impacts, or will be incompatible with the
proposed project, and an alternative, practicable off-site and/or out-of-kind mitigation
opportunity is identified that has a greater likelihood of offsetting the permitted impacts or
is environmentally preferable to on-site or in-kind mitigation, the Agency shall require that
this alternative compensatory mitigation be provided." EPA also notes FDEP provides for
higher than one-to-one ratios in the State 404 Permit Applicant's Handbook 8.5.5 Use of
Preservation for Compensatory Mitigation, stating "where preservation is used to provide
compensatory mitigation, to the extent appropriate and practicable the preservation shall
be done in conjunction with aquatic resource restoration, establishment, and/or
enhancement activities. This requirement may be waived by the Agency where
preservation has been identified as a high priority using a watershed approach described in
section 8.5.2 of this Handbook, but compensation ratios shall be higher."

EPA acknowledges the commenters' concern that federal regulations requiring financial
assurances and long-term management plans are not incorporated into the State program.
However, Florida indicates in the ERP Handbook 10.3.7 Financial Responsibility for
Mitigation that financial assurances must be sufficient to: (a) Conduct the mitigation
activities; (b) Conduct any necessary management of the mitigation site; (c) Conduct
monitoring of the mitigation; (d) Prepare and submit monitoring reports to the Agency;
and (e) Conduct any necessary corrective action indicated by the monitoring. Florida also
provides requirements for long-term management plans in the State 404 Program
Applicant's Handbook 8.5.6.3 stating:

> (a) The real estate instrument, management plan, or other long-term protection
> mechanism must contain a provision requiring 60-day advance notification to the
> Agency before any action is taken to void or modify the instrument, management
> plan, or long-term protection mechanism, including transfer of title to, or
> establishment of any other legal claims over, the compensatory mitigation site;

> (b) The permit conditions shall identify the party responsible for ownership and all
> long-term management of the compensatory mitigation project. The permit
> conditions shall, where applicable, contain provisions allowing the permittee to
> transfer the long-term management responsibilities of the compensatory mitigation
> project site to a land stewardship entity, such as a public agency, non-governmental
> organization, or private land manager, after review and approval by the Agency.
> The land stewardship entity need not be identified in the original permit, as long as
> the future transfer of long-term management responsibility is approved by the
> Agency;

> (c) A long-term management plan shall include a description of long-term
> management needs, annual cost estimates for these needs, and identify the funding
> mechanism that will be used to meet those needs;

> (d) Any provisions necessary for long-term financing shall be addressed in the
> original permit. The Agency shall require provisions to address inflationary

adjustments and other contingencies, as appropriate. Appropriate long-term financing mechanisms include non-wasting endowments, trusts, contractual arrangements with future responsible parties, and other appropriate financial instruments. In cases where the long-term management entity is a public authority or government agency, that entity shall provide a plan for the long-term financing of the site; and

(e) Any long-term financing mechanisms shall be approved by the Agency in advance of the authorized impacts.

EPA acknowledges commenter concerns about the availability of funding for additional staff hiring, training, public meeting engagements, and a publicly available information/resource database. CWA Section 404(h) requires that the Administrator determine whether a state has the authority to "issue permits" that assure compliance with applicable requirements of the CWA, to ensure public participation in the permitting process, to abate permit violations, and to coordinate with other states, EPA, or other federal agencies as appropriate. EPA's implementing regulations, in turn, require the state's program description to include "[a] description of the funding and manpower which will be available for program administration," along with an estimate of the anticipated workload, e.g., number of discharges. 40 C.F.R. § 233.11(d). Florida's Program Description, Section (d), meets this requirement by providing a description of the funding and manpower that FDEP will dedicate to the program.

Neither the CWA nor the implementing regulations establish a particular threshold of staff or resources that states must commit to the Section 404 program. EPA views FDEP's commitment of resources and staffing sufficient to address anticipated workload. See also Response to Comments Section H regarding funding and staffing.

*Differences between the State and federal program re: consistency of reviews*

A commenter identified differences between the State and federal programs regarding mitigation, assessment of the impacts and associated mitigation, and mitigation banks. The commenter asserted that the Uniform Mitigation Assessment Method (F.A.C. Rule 62-345) was developed in close coordination with Corps staff, but the rule has not been adopted by the Corps. The commenter stated that it is not clear how different key aspects of project review and assessment will be addressed under the Florida assumption. The commenter noted that differences between the State and federal program, such as wetland delineation, wetland classifications (which are the basis of ecological assessment), mitigation prioritization, and time lag determination for wetland mitigation, will not result in more cohesive reviews or similar authorization. The commenter recommended that Florida's assumption of the CWA Section 404 program not be approved.

EPA Response:

EPA acknowledges the commenter's concern that the Uniform Mitigation Assessment Method used by FDEP and developed in close coordination with Corps staff has not been adopted by the Corps. However, under 40 C.F.R. § 230.93(f) the amount of compensatory

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 479 of 785

USCA Case #24-5101    Document #2102936         Filed: 02/26/2025    Page 57 of 153

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                           *December 16, 2020*

**mitigation does not require a specific functional or condition assessment method, instead stating, "[I]f the district engineer determines that compensatory mitigation is necessary to offset unavoidable impacts to aquatic resources, the amount of required compensatory mitigation must be, to the extent practicable, sufficient to replace lost aquatic resource functions. In cases where appropriate functional or condition assessment methods or other suitable metrics are available, these methods should be used where practicable to determine how much compensatory mitigation is required. If a functional or condition assessment or other suitable metric is not used, a minimum one-to-one acreage or linear foot compensation ratio must be used." FDEP will meet the standard outlined under 40 C.F.R. § 230.93(f) in the implementation of the program.**

*Compensatory mitigation in Florida under current programs*

One commenter asserted that many mitigation banks in Florida have been incorrectly handled and as a result, there is much destruction of wetlands around developed areas. Another commenter proclaimed that mitigation in Florida has not worked well and that the State continues to see a significant loss of wetlands. The commenter continued by stating that turning the permitting program over to FDEP will only increase this loss because FDEP does not have the resources to evaluate these permits.

A commenter contended that FDEP often permits applicants to lead with mitigation plans rather than demonstrate avoidance and minimization from the beginning. The commenter stated this practice is completely contrary to the first two steps in the mitigation sequence of federal dredged and fill permitting - avoidance and minimization. The commenter asserted that any de-emphasis of avoidance and minimization as the highest priority will not provide adequate protection of Florida's wetlands.

A commenter stated that there is a difference between the State and the Corps of Engineers' implementation of the two different wetland programs, noting that the Corps regulatory process is much more stringent and drives a much harder bargain and focuses much more on reducing wetland impacts of projects, minimization, avoidance. However, the commenter argued that the State program—the ERP, is very good regarding private mitigation, resulting in very little minimization or avoidance. The commenter claimed that developers with resources can essentially buy their permit.

**EPA Response:**

**Mitigation banking instruments and in-lieu fee program instruments will continue to be processed by the Corps in accordance with 33 C.F.R. Part 332. FDEP would continue to be a part of the Interagency Review Team [62-331.140(3)] which reviews mitigation banks, as well as the memorandum of agreement between the Corps and FDEP which allows FDEP to co-chair any applicable interagency coordination effort. EPA acknowledges commenters' concerns that avoidance and minimization be considered prior to compensatory mitigation. 62-331.130 F.A.C. specifies that "[C]ompensatory mitigation shall be considered only after the requirements of Rule 62-331.053(1), F.A.C., have been met." Rule 62-331.053(1) F.A.C. states, "[N]o dredge or fill activity shall be permitted if**

JA.2103

there is a practicable alternative to the proposed activity which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." EPA therefore concludes that Florida's approach to compensatory mitigation banking requirements is consistent with and no less stringent than the requirements of the CWA and its implementing regulations.

## H.  Funding and staffing of Florida's 404 program

Some commenters who supported Florida's assumption of a Section 404 program contended that Florida will provide the adequate resources, FDEP has the necessary experience, and FDEP staff have the expertise for processing wetlands permits more efficiently than the Corps while maintaining the same level of environmental protection for wetlands. Some commenters specifically noted FDEP's staff of over 200 wetland scientists and professionals, FDEP's knowledge of state aquatic resources, and the proven success of FDEP's own wetland permitting program. One commenter stated that FDEP is staffed with experts in Florida's unique environmental features, while the Corps does not have such a broad array of subject matter experts. One commenter also stated that FDEP and its counterpart at the Fish and Wildlife Conservation Commission (FWC)  have extensive knowledge and understanding of Florida's endangered and threatened species and their habitats, they care specifically about Florida's natural resources, and their multiple offices around the state will ensure that resource specific issues are addressed, adding localized protections. A commenter further stated that FDEP's ability to assume the Section 404 program is supported by Florida's handling of other federally delegated programs, such as the CWA Section 402 permit program, as well as its existing state dredge and fill regulatory program, which is expected to overlap with the requirements under Section 404 by approximately 85%.

Many commenters opposed Florida's assumption of a Section 404 program expressing concern that FDEP lacks adequate resources, is underfunded, understaffed, and/or inexperienced, and is therefore unable to effectively manage the additional responsibility of a Section 404 program. One commenter suggested that Florida should instead work with the Corps to expand the scope of its state programmatic general permit program. Commenters opposing Florida's assumption stated that undertaking the additional responsibility of the assumption is not feasible for the state of Florida at this time, arguing that the state does not have the capacity to handle the additional workload. Some commenters argued that adequate evidence has not been provided to demonstrate that FDEP has the resources to handle the additional workload that will be required to run a Section 404 program. Other commenters concurred and specified further that Florida's application does not demonstrate adequate staffing, despite Florida's statement that its staff is sufficient and will not require additional resources or funding. Many commenters contended that Florida's assumption would add more regulatory burden to FDEP, and that the application does not explain how additional work under an assumed program would be funded. A commenter further added that FDEP has limited experience in this field and questionable ability to assume the volume of requests under the Section 404 program.

One commenter opposed to Florida's assumption stated that the permitting of such resources should never be given to a single agency, as no one agency has the necessary resources or manpower.

One commenter expressed that relying on the state's existing Environmental Resource Permitting (ERP) program, water management district staff, FWC staff, and State Historic Preservation Office (SHPO) staff is not a viable approach to a Section 404 program. The commenter added that FDEP's proposed approach depends heavily on other agencies without justifying that those agencies have the resources to implement the program. Another commenter also noted that Florida did not address the availability of funding and staff from FWC and the SHPO, which it plans to rely on for protection of species and cultural resources. A commenter maintained that staff at both of the agencies have expressed concern with the plan and their ability to administer the program. A commenter also noted that the application does not discuss FWC's financial commitments and workloads, despite the memorandum of agreement stating that FDEP will be relying on FWC to help with implementation. Another commenter stated that a successful program would require significant additional resources within FDEP and likely FWC as well and that Florida has not indicated intent to collect fees for the program and has not considered increasing the budget for either agency. A commenter asked if there are comprehensive workload estimates for water management districts, FDEP, FWC; whether there is a roadmap for where and when actions will occur; whether there is a way for the public to communicate with personnel informally; and whether there is a funded training program for all participants.

One commenter expressed concern that wetland systems will become fragmented by linear projects under FDEP's management. Some commenters stated that due to the value of the water resources and wetlands to the citizens of Florida, any delegation to FDEP must contain assurances that existing levels of protection will be preserved and that sufficient resources are available for FDEP. Some commenters stated that Florida's environment generates billions of dollars for the economy, and its water resources deserve the highest level of protection, which FDEP is not well-equipped to provide.

Some commenters contended that FDEP is already overwhelmed with the ERP program and the state wetland permitting program, and maintained that it is unclear how FDEP will staff the Section 404 program or train existing staff for the additional regulatory and financial burden when they are already overworked. Other commenters added that Florida's promise to hire additional low-paid staff for the Section 404 program will not hold true and that FDEP will continue to be a stepping-stone for higher paying agencies and private enterprise. Some commenters argued that Florida does not anticipate additional financial resources will be needed, but reviewers would need to be trained on the CWA and would be responsible for reviewing permits with different regulations than exist under the state wetland regulatory program.

A commenter contended that there has not been an independent assessment that the proposed staffing is reasonable or plausible and that there is no requirement for the state to maintain sufficient staffing moving forward. A commenter argued that FDEP's staffing estimates are unreasonably low and have not been supported with the data needed to evaluate them. A

*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

commenter argued that the application does not provide a detailed economic analysis on the burdens for FDEP and taxpayers. The commenter continued that the provided analysis appears inadequate and underestimates the time and funding needed to complete a permit application, adding that FDEP did not address how it would handle the added workload, particularly in light of layoffs that were never filled and recent budget shortages.

Some commenters contended that previous decreases in staffing, including a cut of 600 positions (many of them scientists and wetland experts) under the administration of former Governor Scott, has left FDEP unprepared to take on additional duties. A commenter opposed Florida's assumption because they asserted FDEP staff has been shrinking over the past decade. Some commenters stated that budgetary resources devoted to environmental protection have been significantly cut, resulting in vacant job positions that have remained vacant. A commenter provided a table posted to the web showing a decrease of 450 staff in the past nine years. Some commenters noted that Florida's transparency website has indicated a high vacancy rate (279 vacancies when they prepared their comments) for FDEP for several years, which has led the commenter to believe that FDEP does not intend to fill those positions and will continue to face a lack of resources. One commenter noted inconsistencies in the number of staffers that FDEP claims to have and inquired about the actual number of FDEP staff.

A commenter further discussed the lack of skills among FDEP staff to delineate wetlands, the shortcomings of FDEP's implementation of the ERP program, and the extensive concerns expressed during EPA's public hearings over FDEP's failure to administer many of its programs. A commenter added that, due to these staffing cuts, staff members have said that they do not have the staff, time, or budget to perform proper analysis and research for permitting. Many commenters asserted that the state of Florida does not have the capacity to handle the additional permit processing workload and that delegation of these responsibilities would result in less protection of Florida's wetlands and reduced water quality. Another commenter stated that because staffing of the FDEP has been cut while increasing permit review workload over the past years, it is unrealistic to expect this program assumption to be handled properly without a substantial increase in appropriately trained and experienced staff resources, yet FDEP intends to carry out the program with existing resources. The commenter stated that the presented analyses likely do not reflect the reality of current and expected workloads, and that existing staff and the natural resources of Florida deserve better. A commenter noted that fines have decreased over the past decade from an average of about $12 million a year to less than $4 million, stating this decrease in fines is evidence of FDEP's decline in enforcement and that the lesser fines do not seem to be a result of increased compliance with regulations.

Some commenters opposed Florida's assumption of a CWA Section 404 program, asserting that Florida is operating under a flawed premise that there is substantial overlap between state and federal wetland regulations that would result in more efficient and consistent regulatory decisions. One commenter stated that FDEP's claim that it can operate the program without any additional funding is flawed, indicating that FDEP either believes wrongly that Section 404 is duplicative of state regulations, that it plans to treat its pre-existing regulations and Section 404 as one and the same, or that FDEP will not adequately implement, operate, or enforce the program. A commenter contended that FDEP has not substantiated how they arrived at their

figure of 85% overlap with the existing ERP Program. A commenter further stated that the state and federal programs are distinctive, not duplicative, and that FDEP staff would need to be trained on implementing the new guidelines and coordinating endangered species cases that they are not familiar with.

Some commenters expressed concern that the State of Florida does not have the means to administer a Section 404 program without federal assistance. A commenter opposed Florida's assumption of a Section 404 program because they asserted that FDEP is not well-qualified to administer the program and the commenter instead prefers the EPA administer the program. Commenters contended that the current, federally run Section 404 program has professional staff at the Corps ensuring that comments on every relevant issue are investigated by appropriate agencies. A commenter also noted that the Corps is currently responsible for directing functions related to wetland permitting to appropriate state agencies and warned that this would end if the state assumes control. A commenter argued that FDEP is depleted, unqualified, and not equipped to conduct proper Environmental Impact Statements for wetlands and to adequately protect them from development. As a result, the commenter requested that the Corps maintain authority.

Some commenters maintained that EPA, the Corps, and various other federal agencies such as the USFWS and the NMFS have the qualified staff and sufficient resources to properly manage the Section 404 program. Similarly, another commenter stated that the federal agencies are better equipped, are more thorough and impartial, and have the funding needed to oversee the program. One commenter stated that FDEP's Section 404 program would require more resources to match the work of the Corps and that this is beyond the capability of FDEP, as demonstrated by its pattern of decrease in resources. Another commenter noted that the Jacksonville District of the Corps delivered more than 11,000 actions in 2016, and even if FDEP were able to streamline the process, it would involve a significant investment of staff and training. According to the same commenter, the Jacksonville District of the Corps had a budget of $16 million in 2015, and FDEP would need to find comparable funds. Two commenters noted that this need for funds was one reason Florida chose not to assume the program in 2006, in addition to the fact that FDEP did not have enough staff. A commenter also argued that assumption of Section 404 authority is not in the public interest because it will create a multi-million-dollar taxpayer burden. The commenter noted that FDEP would need resources to generate comparable analyses to the EA and EIS reports currently produced by federal agencies. The commenter maintained that it was unlikely that the state could replace the value and level of protection offered by the current federal program without any additional resources.

Some commenters expressed concerns about how Section 404 program assumption would affect coordination with and resources of water management districts. One commenter asked how FDEP's enforcement responsibilities and permitting with the water management districts would be organized under memoranda of agreement. The commenter further noted that the South Florida Water Management District handles most of the larger wetland permits and enforcement under the ERP program, pursuant to an operating agreement with FDEP, and asked if most of this responsibility would go to the water management districts and whether they have the necessary resources.

Some commenters contended that the State of Florida does not have the staff capability to assume the 404 wetland permitting responsibilities and that program assumption would shift resources away from existing regulatory programs that further protect Florida's natural resources. A commenter expressed concern that the Section 404 program would create both an additional regulatory burden and a financial burden because FDEP would have to divert money from other responsibilities. Another commenter expressed concern with what will happen to other programs if FDEP moves staff to support the Section 404 program as they say they will. Some commenters claimed that Florida has not leveraged existing resources to support existing State programs that protect and improve wetlands and other waters, and these commenters asserted that the State has failed to show how it could effectively protect resources by administering the Section 404 program.

Some commenters asserted that FDEP is already failing in its responsibilities to protect waters via existing programs, which would be compounded with the additional burden of managing a Section 404 permitting program. Many of these same commenters also stressed that there is no commitment for additional federal funding to support the assumption and that resources may be diverted from critical FDEP duties to support an assumed program. A commenter opposed Florida's assumption because it would require significant additional resources within FDEP and likely FWC as well. The commenter expressed concern that section 62-331.120, Florida Administrative Code, states that no fees will be collected for the Section 404 program, and yet the state is not increasing the budget of either agency to accommodate new responsibilities. The commenter asserted that the State's suggestion of redirecting the existing workforce is not sufficient, especially since FDEP needs resources in its other efforts such as improving water quality sampling and assessment activities and the completion of TMDL reports and BMAPs. One commenter noted that FDEP is already unable to meet its current obligations, as evidenced by impaired waters across the state and the recurring toxic algae crisis. Some commenters stated that there are sites across the State that have not had consistent water quality testing in years. A commenter was concerned that Florida has already lost over half of its wetlands, with negative effects on water quality, fish nurseries, wildlife habitat, and flood control. A commenter added that the impaired waterbodies in Florida are extensive, citing the FDEP website, and stated that they have been impaired for many years.

Some commenters stated that Florida's assumption would add even more regulatory burden to FDEP, which is already under-resourced. These commenters reference the TMDLs and BMAPs for impaired waterbodies across the state for which FDEP already lacks progress, the BMPs for stormwater and agriculture that do not meet their intended pollution reduction goals, and the sites across the state that have not had consistent water quality testing in years. Some commenters suggested that Florida should demonstrate that it has the capacity to make a significant positive impact on current issues of stormwater and agricultural runoff before trying to assume new environmental regulations.

A commenter asserted that FDEP has failed at implementing NPDES standards in South Florida and has already had the responsibility of the Water Compliance Enforcement Program and that there has been increased wetland degradation in the areas they are managing. Some commenters noted that FDEP is already behind on TMDL development and on enforcement actions related to

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 485 of 785

USCA Case #24-5101      Document #2102936          Filed: 02/26/2025      Page 63 of 153

*FDEP Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                    *December 16, 2020*

the NPDES permit program. Nonprofit Waterkeeper organizations across the State have initiated an independent NPDES permit program to help bridge the gap, which the commenters stated should not be tasked to a nonprofit.

Commenters further noted that Governor DeSantis recently gave FDEP oversight of the entire State's 2,700,000 septic systems, a huge project for an underfunded agency. Another commenter pointed out that the State is already challenged with providing enough clean water for drinking and other personal use, springs that are at dangerously low levels, salt water intrusion into the Floridan Aquifer, and a growing population, and stated that it would be a mistake to allow FDEP to assume more permitting. A commenter added that FDEP has failed to protect or restore wetlands and water since Florida Forever funding was drastically reduced.

Some commenters opposed Florida's assumption of a Section 404 program because they asserted FDEP was "gutted" by the administration of former Governor Scott and does not have the resources to take on the additional Section 404 permitting. A commenter contended that under the Scott administration, the State's water management districts had to reduce their budgets by $700 million and that appointed boards were packed with people whose interests were in granting permits, not preservation of resources. One commenter was concerned that FDEP is now reduced in capacity and overwhelmed with permitting applications, so would be unable to take on the Section 404 program.

Some commenters said that FDEP has had severe budget cuts over several years and one commenter asserted that the State legislature, which controls the budget, really does not care about wetlands. Several commenters were concerned about the increased costs to State government due to the funding need to implement the Section 404 program. Commenters observed that governors have eliminated budgets for buying land to keep it natural and preserve ecosystems.

Some commenters opposed Florida's assumption of a Section 404 program because they expect that the ongoing COVID-19 pandemic will further limit FDEP's resources. One commenter specifically opposed Florida's assumption because they maintained that the State of Florida cannot manage its own unemployment program or the COVID pandemic. Another commenter declared that the state was already providing insufficient resources prior to the pandemic, with an estimated $2.7 billion shortfall that has only worsened, and this could impact FDEP and FWC's ability to take on the program. One commenter noted that, even during the pandemic, real estate demands for additional land have continued to grow especially near water and that once waters are destroyed, they are nearly impossible to restore. Two commenters noted that tax revenues are plummeting as a result of COVID-19. Another commenter noted that Florida's revenue losses over the next two years due to the COVID-19 pandemic are projected to be $5.4 billion and the Governor has directed all State agencies to cut their current budgets by 8.5 percent. These commenters stated that the extra financial strain of assuming Section 404 permitting would have a significantly negative impact on FDEP and would put ecosystems in further risk of exploitation. One commenter opposed Florida's assumption because the COVID-19 pandemic has suddenly increased recreational use of natural resources and it is not yet known what impact this will continue to have.

JA.2109

Some commenters expressed concern that FDEP's assumption of a Section 404 program would increase destruction of Florida's wetlands due to development. A commenter stated that FDEP is in disarray under Governor DeSantis and the commenter expressed concern that developers would be able to push through any projects they would like, resulting in negative environmental consequences. A commenter stated that Florida's assumption of a Section 404 program would make it much easier for developers to obtain permits and would result in loss of wetlands, which the commenter asserted are crucial to the health of Florida's fragile waterways and wildlife. A commenter opposed Florida's assumption because they believe State agencies may not have the power, resources, or will to resist developers with financial interests. A commenter contended that FDEP is not equipped for the additional responsibility and noted that Florida is losing wetlands at a rate of more than 8,500 acres per year. One commenter also noted that some communities depend on aquifers for potable water and those aquifers are recharged by wetlands that are being filled by developers.

Many commenters stated that giving regulatory control to an overburdened department will result in yielding to political pressure from developers with financial motives and disregard for conservation. Some commenters opposed Florida's assumption of a Section 404 program because FDEP does not have sufficient staffing and the agency is tied too closely to commercial interests to ensure that wetlands are protected and prioritized above rapid development. One commenter stated that this attempt by FDEP to assume authority was at the request of developers and that this does not sit well with the citizens of Florida. Another commenter also stated that many of the appointments to Florida's water management boards were made based on politics rather than experience or expertise in environmental management. The commenter further stated that FDEP cannot properly handle the program while it remains understaffed and operates under the direction of politically appointed senior staff.

A commenter contended that FDEP would likely overlook the needs of the environment in favor of development, noting that FDEP has cut funding from the Florida Forever program and from state land management. One commenter noted that FDEP looked into assuming a Section 404 program in 2006 but dropped the idea because builders were requesting so many permits that taking over the workload would overwhelm the agency. A commenter stated that population growth has not slowed in Florida, yet growth management initiatives have been repealed and the FDEP and water management districts have cut many scientific positions. A commenter stated that budgeting compromises will have to be made in funding education and the health system, and that the continuation of rampant development is unsustainable. Along a similar vein, commenters expressed concern that the decreased staff of FDEP has resulted in rapid approval of permits. One commenter further noted that this is especially important now, as the State's lawmakers enact legislation not supported by the majority, and State funds dwindle due to the economic downturn. A commenter added that although the staff works hard, they should not be asked to take on more work without more funding and protections from political retaliation.

One commenter stated that FDEP struggles to protect wetlands now and will be unable to protect the additional wetlands under the Section 404 program, noting a 60% loss of Florida's wetlands to date and a loss of more than 144,000 non-federal acres of rural lands between 2012 and 2017. A commenter opposed Florida's assumption stated that Florida's ERP program has been largely

ineffective in protecting wetlands. A commenter recommended that FDEP focus its resources on implementing the priorities in the Governor's Executive Order 19-12 (restoration and protection of wetlands and watersheds) and improving wetland protection outcomes in its ERP program before assuming another wetland regulatory program. The commenter stated that the state needs to improve current wetland programs before assuming new ones, and that the required objective of "no net loss of wetlands" for both federal and state programs has not been met, citing data from Audubon, NOAA, National Academy of Sciences, and USFWS analyses. The commenter stated that wetland losses have compromised Florida's water quality, flood protection, dry season wildfire resilience, water supply, and economic and environmental health.

Some commenters asserted that the two states that have assumed Section 404 permitting authority—Michigan and New Jersey—have had major issues with their 404 programs, and they were concerned that FDEP would also experience program challenges. One commenter added that Michigan and New Jersey have spent millions of dollars on their programs, and the commenter stated that Florida has considerably more wetlands and higher biodiversity than those states. A commenter stated that FDEP's plan to assume the program without any additional resources is unrealistic given other states have spent millions of dollars to undertake the program and provided a list of costs associated with the program that FDEP has failed to address. Similarly, a commenter asked how Florida would ensure protection of wetlands and ecosystems of the state, and the commenter recommended that Florida not assume the program because the state has so much water to regulate, which they asserted would lead to a very expensive program.

Some commenters indicated that attempts to assume the program in other states have proven too costly, time-consuming, and problematic, even having led to legal disputes. Two commenters noted that other states chose not to assume the program given the burden it would impose on taxpayers, pointing out that no state with coastlines, wetlands, and biodiversity as extensive as Florida's has assumed the program. One commenter pointed out that assuming the responsibilities of wetland permitting is very costly and the current system in which state of Florida has a shared rather than sole responsibility is a more efficient use of the Florida's limited resources of staff and funding.

**EPA Response:**

**EPA acknowledges the comments that support Florida's assumption of a Section 404 program based on FDEP's resource commitments, staff commitments, staff expertise, and demonstrated ability to administer statewide CWA and dredge and fill regulatory programs. EPA agrees that FDEP has met the statutory and regulatory requirements necessary to demonstrate their ability to assume the Section 404 program.**

**EPA acknowledges commenter concerns about the availability of staff, resources, and expertise to appropriately administer the State's Section 404 permitting program, including specific commenter concerns about previous FDEP staff cuts and department vacancies. EPA also acknowledges commenters who requested specific additional pieces of information, such as comprehensive workload estimates for water management districts, a roadmap for where and when actions will occur, and whether there is a funded training**

program for all participants. EPA also acknowledges some commenters requested FDEP make additional commitments regarding resources.

CWA Section 404(h) requires that the Administrator determine whether a state has the authority to "issue permits" that assure compliance with applicable requirements of the CWA, to ensure public participation in the permitting process, to abate permit violations, and to coordinate with other states, EPA, or other federal agencies as appropriate. EPA's implementing regulations, in turn, require the state's program description to include "[a] description of the funding and manpower which will be available for program administration," along with an estimate of the anticipated workload, e.g., number of discharges. 40 C.F.R. § 233.11(d). EPA has determined that Florida's program description, section (d), meets this requirement by providing a description of the funding and manpower that FDEP will dedicate to the program.

Importantly, neither the CWA nor the implementing regulations establish a particular threshold of staff or resources that states must commit to the Section 404 program. EPA has found FDEP's commitment of resources and staffing sufficient to address anticipated workload associated with a Section 404 program. Florida estimated the anticipated workload by considering Corps permitting data for the previous five years and overlap with ERP permitting, in part using a Corps GIS analysis to compare retained versus assumed waters. Based on this analysis, FDEP found an 85% overlap between ERP and Section 404 program review requirements (Program Description, section e, at 9). Additionally, FDEP would only assume a portion of the Corps permitting load because the Corps retains jurisdiction over most Section 10 Rivers and Harbors Act waters and permitting in Indian country, and because the State already reviews permits per the State Programmatic General Permit issued by the Corps. The State then estimated processing time for permits based on their type (e.g., general permits versus individual permits; small, medium, or large projects; permitting or compliance activities), accounted for quality control auditing, determined staff hours required for such activities, and calculated staffing needs.

EPA agrees that the State currently operates a wetlands regulatory program as part of the ERP, which includes functional roles and staff with technical areas of expertise overlapping those of a CWA Section 404 program. "The ERP program is staffed with permit processors, compliance processors, and support professionals that are experts in or familiar with the subject matter required for effective review of applications under Section 404 of the Clean Water Act." (Program Description, section d, at 2).  Florida has described their intention to redirect the current staff of 211 employees working in the state's ERP program to cover both ERP and the State 404 program, with an additional 18 positions reallocated for the state 404 program for a total of 229 positions (Program Description, section d, at 3). Annual salary and benefits would come to approximately $15,182,822, funded through various trust funds listed in the program description (Program Description, section d, at 2). Florida has provided a detailed breakdown of the ample permitting and compliance staff and managers that will be working in each of its districts. In total, the Districts will have 8 compliance managers and 7 compliance/permitting

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 489 of 785
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 67 of 153

*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of a Clean Water Act Section 404 Program*                                                *December 16, 2020*

managers; and 33 compliance staff and 32 permitting/compliance staff (Program Description, section d, at 6-9).

Based on the information provided by FDEP, EPA finds that FDEP has provided the information necessary to demonstrate the agency has committed sufficient resources and staffing to address anticipated workload.

In response to commenters requesting additional information about the role of water management districts (WMDs) in Florida's Section 404 program, EPA notes that WMDs are not authorized to administer the Section 404 permitting program under Florida's current program structure. WMDs may administer components of the ERP program under state law, and as such, FDEP may coordinate with the WMDs when administering the Section 404 program. In Florida's Program Description Section (e) (p. 9), FDEP notes that, "[A]dditional coordination between DEP and WMDs and commenting agency coordination will add time to the process, so it is estimated that a State 404 Program authorization, on average, will add 50% to the staff time required to process a similarly-sized ERP (15% non-overlapping requirements, 35% WMD and commenting agency coordination)." EPA finds that FDEP appropriately accounted for workload in terms of coordinating with WMDs and other commenting agencies in the Section 404 permitting process.

EPA acknowledges commenters who noted that Florida's Section 404 permitting program may be expensive, given the many aquatic features in the state of Florida. EPA also acknowledges commenters who mentioned the costs to states who have assumed administration of a Section 404 program (i.e., New Jersey and Michigan), and the estimated costs to states who have considered assuming administration of a Section 404 program. Although states seeking to assume a Section 404 program must describe the funding available to administer the Section 404 program, as explained above, there is not a threshold cost that must be demonstrated for a state's program among the criteria in 40 C.F.R. Part 233 that EPA will apply in approving state programs under Section 404 of the Act. EPA determined that FDEP described the funding available to administer a Section 404 program and satisfied the associated regulatory criteria in doing so.

EPA recognizes that commenters may prefer federal administration of the CWA Section 404 program for a variety of stated reasons or may feel that permitting of wetland resources should never be managed by only one agency. However, Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction. EPA disagrees that Florida's program will lead to the degradation of wetlands and other waters due to the lack of staff, resources, or expertise, or for any other reason. EPA also disagrees that Florida's Section 404 program will be less environmentally protective than a program that is administered by the Corps. An assumed program is to be consistent with and no less stringent than the requirements of the CWA and its implementing regulations. EPA has reviewed Florida's permit review criteria and has determined that the state's program will result in the issuance of permits that comply with

JA.2113

the CWA Section 404(b)(1) Guidelines. (33 U.S.C 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). In response to a commenter noting that FDEP would need to dedicate resources to produce EA or EIS reports, EPA notes that state Section 404 permitting actions are not federal actions and are therefore not subject to NEPA review.

EPA recognizes commenter concerns about the lack of resources dedicated to other state programs, including CWA programs such as the NPDES and TMDL programs. EPA also acknowledges commenter opinions about FDEP's current implementation of State programs and where the State of Florida should prioritize environmental protection resources, including commenter concerns that the state should focus their attention on existing programs rather than assuming a Section 404 program. The resources of other state programs are not one of the statutory or regulatory criteria that EPA is required to apply in reviewing state or tribal program requests. 33 U.S.C. 1344; 40 C.F.R. Part 233. Although these are not criteria included in the evaluation of a state's ability to assume the CWA Section 404 program, stakeholders can raise any concerns they may have with Florida's implementation of the NPDES, TMDL, or other programs in the context of EPA's oversight of Florida's administration of these programs.  In addition, EPA retains an oversight role in the administration of the Section 404 program.  See 33 U.S.C. § 1344(i), (j); 40 C.F.R. part 233, Subpart F.

EPA recognizes commenter concerns about the potential for political influences on environmental resource decisions, including Section 404 permitting decisions in an assumed program. However, EPA disagrees with commenters who asserted that Florida would be unable to protect wetlands and other waters in a State-assumed 404 program, or that political influences will result in a disregard for conservation or protection of wetland resources. EPA also disagrees that wetlands would be more susceptible to development in a State-assumed 404 program. An assumed program must be consistent with and no less stringent than the requirements of the CWA and its implementing regulations. EPA has reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the Section 404(b)(1) Guidelines. (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). Please see also Response to Comments Section L regarding EPA's oversight of State permitting.

EPA acknowledges commenters who reference FDEP's inquiry into assuming the Section 404 program in 2006. Additionally, EPA acknowledges commenters who referenced other states who have chosen not to assume a Section 404 program, or legal disputes that have arisen in other attempts to assume a Section 404 program. Neither FDEP's 2006 consideration or other states' rational for choosing not to apply to assume the Section 404 program are under review in determining whether FDEP has satisfied the necessary statutory and regulatory criteria in this application.

Finally, EPA acknowledges commenter concerns about staffing and resources given the COVID pandemic. However, EPA has found that Florida has committed sufficient resources to administer a Section 404 program.

JA.2114

## I. Streamlining of permitting

*Support for streamlining*

Some commenters provided general support for streamlining the state and federal permitting processes, as they asserted that it would make permitting more efficient and expedite permit review for a range of private and public projects and still protect the environment. Several commenters asserted that streamlining of the permit process will make it more efficient by reducing the current unnecessary duplication of effort, time, and expense, given that the substantive requirements of the State's Environmental Resource Permit (ERP) program and the Section 404 program overlap by approximately 85%. Two commenters said that the single State permit would be able to satisfy both federal and state requirements and provide permit applicants greater certainty, prevent conflicts, and avoid unnecessary delays and expenses that result from the current dual-permit program.

Some commenters stated that Florida ERPs are often received prior to their federal counterparts because of unnecessary federal delays, and that despite the time difference, the permits are often indistinguishable. A commenter provided the example of six general conditions that are required to be included in every individual Section 404 permit, while 18 general conditions must be included in individual ERPs (citing 33 C.F.R. Part 325, Appendix A; cf Rule 62-330.350, F.A.C.). Furthermore, some commenters said that federal review often introduces new issues of concern in the final hours, further delaying the process and increasing cost. The same commenters claimed that the unnecessary delays are costly, and that such delays increase the cost of Florida housing, preventing families from buying a home. These commenters contended that by allowing Florida to assume Section 404 permitting, families seeking home ownership will be relieved from at least one price pressure point. Several commenters also claimed that the delays and increased costs do not add any meaningful environmental protection. These commenters claimed that Florida is prepared to launch a program that protects Florida's wetlands while avoiding costly delays.

A commenter supported Florida's assumption because they asserted it would eliminate the need for an additional layer of bureaucracy and permitting costs. The commenter also noted that state control would likely reduce the review timeframes significantly, benefitting Florida businesses and agricultural entities.

Some commenters highlighted issues with the federal process that streamlining would address. One commenter stated that at the federal level, high staff turnover, workloads, inefficient and untimely review processes, and open-ended timeframes for legal challenges lead to frequent and significant delays in the processing of Section 404 permit applications. The commenter provided the example, which they say is not uncommon, of the Corps assigning new reviewers mid-project because of staffing changes, which leads to delays.

One commenter urged EPA to continue to remove obstacles to Section 404 state assumption and work with other states to make the CWA more efficient for permittees and effective in environmental protection. A commenter noted that approval of Florida's application would also demonstrate a workable pathway for states interested in administering their own Section 404

programs while also providing valuable flexibility for EPA and individual states to develop programs that match state-specific needs.

Some comments focused on the positive impact of faster permit issuance on restoration efforts in the Everglades. These commenters expect that the Everglades restoration efforts will benefit from expedited permit delivery timelines, allowing state and federal agencies to move forward with construction of key infrastructure more quickly than they are able to do today. A commenter noted that expedited construction of the Central Everglades Planning Project, the Everglades Agricultural Area Reservoir, and other projects around Lake Okeechobee are essential to improving the health of the Everglades ecosystem and enhancing the resilience of the communities that live, work, and recreate there as well. This commenter noted that while important restoration progress has been made in recent years, the overall program has been plagued by design, permitting, and construction delays under the Corps. The same commenter further stated that on several occasions, the state of Florida and the South Florida Water Management District have had to assume responsibility for certain project elements from the Corps to expedite project delivery at lower cost. The commenter concluded that with so much at stake, unwarranted delays in permitting for ecosystem restoration projects are no longer acceptable, and they believe that the FDEP would accomplish the task of permitting these critical projects in a significantly more timely and responsive manner than the Corps.

Some commenters noted the expertise of the FDEP that they asserted would support streamlining and result in environmental protection. A commenter also noted that FDEP reviewers are accustomed to following strict timeclocks for processing ERPs and requesting additional information necessary to render a final permitting decision (citing § 373.4141, Fla. Stat., and Rule 62-4.055, F.A.C.). This commenter asserted that lengthy delays in state application reviews are uncommon, as the Florida permitting process is designed to winnow issues until all questions are resolved and a permit is either issued or denied. Id. Some commenters contrasted this with the Section 404 permitting process which they asserted provides no meaningful time constraints for agency decisions.

Some commenters pointed out that unlike the Section 404 program, the State ERP program regulates not only activities in connected wetlands and surface waters, but also most alterations of land that change the flow of water, even if the activity is in uplands (citing §§ 373.413, 373.414, Fla. Stat.). Some commenters stated that the State's proposed program will boost the protection of Florida's wetlands and water resources by having the same statewide team of experts who already administer the state-level ERP program also administer the substantially similar federal Section 404 program.

Some commenters pointed out that Floridians care deeply about their environment and unique natural resources, and can deliver the benefits of streamlining while sustaining protections for wetlands and endangered species that are no less rigorous than today under federal 404 program administration. These commenters pointed to the FDEP as best positioned to utilize local knowledge, scientific expertise, and robust stakeholder engagement to assess the potential impacts of permitted activities, delineate protective conditions for permitted activities, and set suitable compensatory mitigation requirements. They also asserted that the FDEP would

accomplish the task of permitting these critical projects in a significantly more timely and responsive manner than the Corps.

**EPA Response:**

**EPA acknowledges the commenters who pointed out the multiple potential benefits of having a streamlined state and federal permit program, including reduced delays, increased efficiencies, and reduced costs that can benefit different stakeholders such as homeowners, agricultural industries, developers, and proponents of restoration projects. In response to these comments, the Agency notes that the extent to which a state's Section 404 program results in streamlined procedures, saving time, or saving money is not among the criteria in 40 C.F.R. Part 233 that EPA applies in approving state programs under Section 404 of the Act.**

**EPA acknowledges commenters who noted FDEP's expertise in Florida's aquatic resources, including FDEP's ability to quickly and efficiently evaluate permit applications without sacrificing environmental quality. EPA agrees that FDEP is well suited to understand and manage Florida's aquatic resources. EPA agrees with commenters who asserted that Florida's assumption of the Section 404 program, including any streamlining that may occur as a result, will maintain protections of aquatic resources including wetlands. EPA has reviewed Florida's permit review criteria and has determined that the state's program will result in the issuance of permits that comply with the Section 404(b)(1) Guidelines (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)).**

**EPA acknowledges commenters who noted that Florida's assumption could provide an example for other states interested in administering their own Section 404 programs. The Agency recognizes the benefits of assumed programs and will continue to use the criteria in 40 C.F.R. Part 233 to evaluate applications for assumption of state programs under Section 404 of the Act.**

*Opposition to streamlining*

Some commenters asserted that streamlining will weaken the permit review process with negative environmental results. One commenter stated that an ERP permit application processing timeclock leads to default issuance of an ERP permit, while the federal Section 404 permit application review process has no such default issuance mechanism.

A commenter expressed concern that the emphasis of the state's commitment to "streamline" the wetland permitting process for the sake of continued development exhibits a lack of commitment to properly review the impact of wetland loss. They noted that the state of Florida has already lost over 50% of its historical wetlands and the state's assumption to speed through the permitting process will exacerbate this loss. Many commenters stated that streamlining the wetland permitting process without a more complete understanding of the cumulative impacts of wetland loss would be catastrophic for Florida's ecosystems that are already struggling. A commenter expressed concern that streamlining wetlands permits will destroy water resources that serve as home for many endangered species in Florida, over 130 listed species.

*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

A commenter also maintained that the current Section 404 permit process allows for a comprehensive review by federal agencies, including EPA, USFWS, NMFS, and the Corps, who have extensive experience and expertise in federal threatened and endangered species. They disagreed with the state's suggestion that this federal expertise would still be available, as they believe that the planned permit "streamlining" will not allow for the appropriate time for these important consultations to take place.

A commenter noted concerns expressed by Florida assumption proponents that the Corps' permitting slows down completion of much-needed restoration projects and therefore there is a need to streamline processes. The commenter asserted that Audubon Florida, which is responsible for a few Gulf restoration projects in Florida that required Corps Section 404 permits, did not find Corps' procedures to be a barrier, nor did they face any unnecessary delays in the permitting and review process. The commenter stated that Audubon Florida valued the Corps' participation in permitting their projects. Another commenter also commented that Audubon Western Everglades objects to any wetland regulatory streamlining, combining a federal program with the state program, when both programs have resulted in over 30,000 acres of wetland losses since 1996 in Lee and Collier Counties alone. The commenter asserted that those wetland losses speak to the ill preparation and the unready nature of FDEP and the Corps to combine their programs in the state of Florida.

One commenter expressed concern that special interests, state budget constraints, lack of expertise, and potential outsourcing will lead to cutting corners and rubber stamping in the name of streamlining permits. A commenter expressed concern about political motivations or monetary drivers that could fast-track development at the expense of the environment. A commenter noted that wetlands protection in Florida has been eroded by governing administrations as the permitting process has been "fast-tracked," accelerating deadlines for review and decisions. This commenter went on to assert: acreage sites of wetlands to be considered for permitting has been increased; water management district staff and scientists have been dismissed or had their opinions stifled; district governing boards have been stacked with development interests; qualified technical advisers had testimony disqualified; constitutional amendments protecting natural resources that have been passed by ballot elections have been stalled, subverted, and ignored; legislation has been passed requiring public opinion statements to come from "stakeholders," as defined by the state. The commenter stated that while disturbance of designated wetland soils is regulated, every year tens of thousands of cypress trees are chipped to be sold as mulch. The commenter concluded that Florida governing administrations have been motivated by money, and as a result, Florida's coastal development has not been adequately protected.

Several commenters opposing Florida's assumption expressed concern that approval of Florida's assumption would fast-track development permits. Some commenters asserted that the state favors developers, often at the expense of Florida waterways, and these commenters believe that Florida's assumption will fast-track development permits for powerful special interests. A commenter asserted that if Florida's program is approved, development permits for powerful special interests that want to exploit Florida's wetlands for profit will be "fast-tracked," despite the objections of Floridians whose livelihoods and recreation rely on wetland conservation.

JA.2118

A commenter stated that the State WMDs process over 70% of the ERP permit actions. The commenter noted that due to the existing political and policy influences on the State ERP program, the FDEP/WMD permitting staff see the permit applicants, not the natural environment and the wetland/water resources of Florida, as their clients. The commenter maintained that the FDEP and the WMD ERP permitting programs hardly ever actually deny ERP permits, authorizing destruction of wetlands for development projects.

A commenter contended that what Florida needs is more scrutiny and review of permit applications that threaten wetlands, not less. The commenter stated that in Florida, FDEP considers permit applicants to be their constituency, rather than the public and the state's natural resources. The commenter noted that in the October 21, 2020, EPA public hearing, only industry interest supported assumption with claims of delay at the federal level. The commenter contended that what developers see as delay reflects things such as vital NEPA review, public participation, analysis of listed species issues, and other elements intended to ensure protection of Florida's environment.

A commenter asserted that the Corps does not deny applications, as a rule, but they do take their time. The commenter stated that the Corps does due diligence, goes through NEPA, when necessary, and relies on the USFWS. The commenter contended that the developers want to minimize delay and process, and that the FDEP is very willing to do that.

A commenter also raised concerns about streamlining in the context of the M-CORES project, which they stated is 320 miles of new highway from Collier to the Florida-Georgia border that will go through wetlands and cross streams and rivers. The commenter noted that the M-CORES project will need multiple wetland permits which normally would go through the Corps. The commenter stated that now is not the time to streamline the process for this project.

A commenter noted that with sustainability plans set forth by counties and cities to prepare for sea level rise and climate change, now is the wrong time to streamline the destruction of what few natural resources Florida has left. The commenter also noted that climate change is impacting Florida, and that wetlands are one of the tools to reduce these impacts. The commenter believes this is the wrong time to make destruction of wetlands more streamlined and easier on developers.

**EPA Response:**

**EPA disagrees that FDEP will fast-track or streamline permits without appropriate environmental review and that FDEP's assumption of the Section 404 program will result in negative environmental impacts. EPA notes that FDEP's proposed Section 404 program complies with the timelines and procedures that are required by federal law. Please also see Response to Comments Sections N and P for descriptions of review processes related to the ESA and NHPA, and Response to Comments Section O regarding conflict of interest comments. Florida's State 404 Program Applicant's Handbook (pages 20-21) notes that:**

> **"Several procedures and rules for agency action are required by Section 404 of the CWA, but not by ERP, causing conflict between some State 404 Program and ERP program processes and timeframes.**

> For example, when a project requires both an ERP and a State 404 Program permit, some portions of the ERP review are likely to be completed faster than the State 404 Program review because of public notice, EPA review requirements, or the need to coordinate with other state and federal agencies. This means that a project may be permittable under Chapter 62-330, F.A.C., (ERP) after the ERP review, but as a result of comments received during the 404 public notice or other aspects of the 404 review, the project may require modifications under the State 404 Program.

> It is the intent of the Agencies to process the State 404 Program and ERP authorizations concurrently as much as possible. For this reason, the applicant is given the choice, in the application form, to waive the timeframes for issuance pertaining to ERP review when the State 404 Program review may take longer to complete."

EPA recognizes that commenters may prefer federal administration of the Section 404 program for a variety of stated reasons and recognizes those commenters who stated they had not experienced delays when working with a federal agency administering the Section 404 program. EPA also recognizes commenters who expressed concern about major infrastructure projects affecting assumed waters that may be permitted under a newly assumed program. However, Section 404(g)(1) of the CWA authorizes states and tribes to submit to EPA a request to assume administration of a Section 404 program in certain waters within state or tribal jurisdiction. Importantly, EPA has determined that FDEP has met the statutory and regulatory requirements necessary to demonstrate their ability to assume the Section 404 program. Additionally, nothing in the assumption of a Section 404 program precludes a state from obtaining federal expertise in making a permitting decision. Further, EPA acknowledges commenters who benefited from federal involvement in permitted restoration projects and notes that the federal government will maintain permitting authority in retained waters.

One commenter asserted concerns with the readiness of FDEP and the Corps to "combine" their programs. With respect to the actual assumption procedures, 40 C.F.R. § 233.14 states that the Corps-FDEP MOA should explicitly outline procedures whereby the Secretary will, upon program approval, transfer to the State pending 404 permit applications for discharges in State regulated waters. This information can be found in the Corps-FDEP MOA submitted as part of Florida's program assumption package.

EPA acknowledges commenters who were concerned that Florida's assumption of the Section 404 program could lead to degradation of aquatic resources including wetlands, as well as commenters who expressed concern about wetland loss, habitat loss, and other environmental degradation that has already occurred in the state of Florida. EPA also recognizes commenter concerns about the timing of Florida's program assumption, given rapidly occurring environmental changes. However, EPA disagrees that Florida's Section 404 program will decrease the environmental protections in the State or will result in destruction of Florida's natural resources because an assumed program must be consistent with and no less stringent than the requirements of the CWA and its implementing

**regulations. EPA has reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the CWA Section 404(b)(1) Guidelines (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)). EPA acknowledges commenters who expressed concern about cumulative impacts to wetlands, and EPA notes that the Section 404(b)(1) Guidelines require consideration of both individual and cumulative impacts.**

**EPA also recognizes commenters who expressed concern about political motivations or monetary drivers that could fast-track development at the expense of the environment. In response to commenter concerns about FDEP or the WMDs fast-tracking ERP permits, the Agency notes that Section 404 permits have different timelines and federal regulatory requirements. Additionally, EPA notes that WMDs are not authorized to administer the Section 404 permitting program under Florida's currently proposed program structure. EPA has reviewed Florida's permit review criteria and determined that resulting permits will comply with the Section 404(b)(1) Guidelines. See also Response to Comments Section O on conflicts of interest.**

## J.  Jurisdiction of Florida's program

*Army Corps of Engineers versus State jurisdiction*

Two commenters argued that identifying the waters the State intends to assume jurisdiction over is central to an evaluation of the program and noted that 40 C.F.R. § 233.11(h) requires that a state submission must include a "[d]escription of the waters of the United States over which the state assumes jurisdiction [and a] description of the waters over which the federal government retains jurisdiction." One commenter argued that Florida Statutes § 373.4146 failed to address the question of which waters will be assumed, and instead, only tautologically defines "state assumed waters" as those "waters of the United States that the state assumes permitting authority over pursuant to [Section 404]." Id. § 373.4146(1). The commenter argued that this definition has no substance and does not reflect the federal definition of waters of the United States. The commenter noted that the State's proposal also does not adopt, reference, or mention the federal definition of waters of the United States; instead, the proposed program uses the term "state-assumed waters," which it defines as "all waters of the United States that are not retained waters." Florida's 404 Handbook section 1.1. Florida's authorizing legislation similarly defines "state-assumed waters" as "waters of the United States that the state assumes permitting authority over pursuant to Section 404 of the Clean Water Act … and rules promulgated thereunder." Fla. Stat. § 373.4146(1).

One commenter noted that Florida's 404 Handbook section 2.0(b)(41) provides a definition for the opposite of State-assumed waters, which are the "Retained Waters," which are navigable waters over which the Corps would retain exclusive permitting jurisdiction under Section 10 of the Rivers and Harbors Act of 1899 if State assumption is granted. (See 33 U.S.C. § 403). The commenter further noted that Florida explicitly defines "Retained Waters" as including those "identified in the Retained Waters List (Appendix A)" (see 404 Handbook section 2.0(b)(41)).

JA.2121

The commenter asserted that Appendix A, in turn, consists of a four-page list of rivers and creeks, mostly by name only, dated August 23, 2019.

One commenter noted that none of the program-related definitions are provided by Florida's statute or in the State's implementing regulations, but rather appear in an applicant handbook. The commenter noted that § 62-331.030, F.A.C. states that "Terms used in this Chapter are defined in section 2.0 of the 404 Handbook." The commenter further noted that the FDEP's State 404 Program Applicant's Handbook k at four 2.0(b)(47), in turn, defines "State-assumed Waters" or "Assumed Waters" to mean "those waters as defined in Section 373.4146(1), F.S." and that Florida Statutes Section 373.4146(1) provides no further clarity and simply states that "the term 'state assumed waters' means waters of the United States that the State assumes permitting authority pursuant to Section 404 of the Clean Water Act, , and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material." The commenter concluded that Florida defines State-assumed waters as those waters over which the State assumes jurisdiction.

Several commenters noted that the list of waters that would be "Retained Waters" in FDEP's Section 404 Handbook (see section 2.0(b)(41) and Appendix A), is substantially shorter than the list of Retained Waters produced by the Corps' in October 2017. A commenter noted that the "Retained Waters List" maintained by the Corps for Florida has been the subject of substantial change since Florida began its efforts to assume the Section 404 program in 2018. One commenter specifically noted that the Corps' list of Retained Waters that appears to be part of Florida's submission to EPA is only four pages compared to the 17 page Retained Waters list supplement produced by the Corps in October 2017. Two commenters argued that neither the State nor the Corps has provided a compelling justification for the large differences between the proposed list of retained waters and the original list provided by the Corps in October 2017 when the State began the assumption process. The commenters cited, as an example, that it is not clear why a lake like Lake Trafford is no longer on the list when it has important recreational bass fishing, a marina, and has seen a significant investment of funds from the Corps to restore water quality.

A commenter noted that on March 19, 2018, the Corps initiated a 30-day public comment period to end on April 20, 2018, "regarding use of waters in the state of Florida for navigation … [including] identification of those rivers, streams, lakes, etc. associated with past, current, or potential future commerce, commercial traffic, or recreational activities" for purposes of navigability analyses to determine "which waters are subject to permitting authority under Section 10" and "determining the waters that would be retained by the Corps if the EPA approves the State's application for Section 404 program assumption."[3] The commenter noted that on April 5, 2018, the Corps posted its solicitation for public comment on this matter on the website for the Jacksonville District,[4] but on April 10, 2018, the Corps issued an "Updated

---

[3] Commenter's reference: U.S. Dep't of the Army, Public Notice: Determination of Navigable Waters, Mar. 19, 2018 (Exhibit 2. See DCN EPA-HQ-OW-2018-0640-0052-A1).

[4] Commenter's reference: Press Release, U.S. Army Corps of Eng'rs, Corps Seeks Public Comment Regarding Water Use for Navigation (Apr. 5, 2018),https://www.saj.usace.army.mil/Media/News-

Public Notice" summarily terminating the comment period effective immediately, deeming "the comment period originally set to expire on April 20, 2018 . . . closed until further notice."[5] The commenter stated after more than two years, there has been no "further notice," and no further opportunity for the public to comment, even now that Florida has submitted its Section 404 program application to EPA.

A commenter reported that in comments submitted by the original deadline of April 18, 2018, they reminded the Corps about Florida's extensive water resources and unique hydrology, and that any navigability study would require a thorough analysis of numerous waterways and site-specific hydrology and other factors to determine which waters may be assumable and the adjacency of wetlands located throughout the State. Two commenters noted that other commenters in 2018 echoed similar concerns and submitted lists of additional waterways that the Corps should consider navigable, but Florida's 404 program submission to EPA accounts for none of these additional submissions and purports to limit the "Retained Waters" to a four-page list that is vague, incomplete and has not been subject to notice and comment. The commenters argued that the current list is grossly lacking because it reflects a far more restrictive view of retained waters than the Corps possessed in 2017, and the Corps has failed to engage the public in performing an adequate navigability study that would accurately reflect the scope of exclusive federal jurisdiction. As a result, according to the commenters, the Corps' ceding jurisdiction over those waters to Florida for purposes of 404 assumption violates the Rivers and Harbors Act and renders EPA approval of such a program untenable.

One commenter compared the list found at Appendix A of Florida's 404 Handbook and the list of navigable waters that the Jacksonville District of the Corps has on its website, accessed on October 28, 2020. The commenter documented differences between the two lists in their comment letter and noted that some waterways have been added to the August 23, 2019 list, but about 29 waterways are on the navigable waters list currently on the Corps' website that are not found on the list of retained waters provided by FDEP in their 404 Handbook. The commenter also expressed concern that neither the list contained in the FDEP 404 Handbook nor the list on the Corps' website are complete because on October 5, 2017, the Corps provided a supplemental list of navigable waters for public comment that was 17-pages long. The commenter stated that this longer list of waters was intended to supplement the navigable waters list, and that many navigable Florida waterbodies appear to be missing from the list used by FDEP in its assumption package submittal. The commenter provided a copy of the 17-page supplement and a copy of an earlier letter describing additional waters that may be considered for inclusion on the list. The commenter argued that it is evident that the requirement to provide a description of the assumed versus retained waters is incomplete and, thus, FDEP's program description is invalid.

One commenter provided a list of waters that it contends should remain under the Corps' jurisdiction (see Docket ID No. EPA–HQ–OW–2018–0640-0425). The commenter formally

---

Releases/Article/1485269/corps-seeks-public-comment-regarding-water-use-for-navigation (Exhibit 3. See DCN EPA-HQ-OW-2018-0640-0052-A1).

[5] Commenter's reference: U.S. Dep't of the Army, Updated Public Notice: Cessation of Public Comment Period, Apr. 10, 2018 (Exhibit 4. See DCN EPA-HQ-OW-2018-0640-0052-A1).

requested that these waters be included in the list of waters retained under the Corps' Section 404 permitting authority should this application package move forward.

Several commenters argued that an obvious example of waters of the United States that should be retained by the Corps are the waters of the Greater Everglades Ecosystem, including the waters of the Kissimmee Valley, Lake Okeechobee, the Water Conservation Areas, Shark River Slough, Big Cypress Swamp, the Ten Thousand Islands, Biscayne Bay, Rookery Bay, and Florida Bay. A commenter stated that these waters are commercially vital, attracting significant interstate and international fishing and tourism uses. The commenter argued that retention would reinforce the shared responsibilities of State and federal partners and provide consistency for the ongoing permitting, construction, and implementation of the Comprehensive Everglades Restoration Plan (CERP), ensuring all CERP projects will be subject to the same review process. Finally, the commenter asserted that the highly connected nature of waters in the "River of Grass" that flow across the surface and through the porous limestone of the aquifers as they supply drinking water to millions of Floridians and fresh water to Biscayne Bay and Florida Bay makes it difficult to separate any individual water from those subject to Section 10.

One commenter provided an example of how the State's plan to assume Section 404 permitting responsibilities provides little clarity on which jurisdiction would be responsible for permit approval that impacts large swaths of wetlands in Lee County. The commenter stated that they had been working to oppose a proposed development in mangrove wetlands in a Lee County zoned Coastal High Hazard Area that would eliminate 36 acres of mangrove habitat by dredging and filling new canals for 55 home sites with docks and a new boat basin with several adverse environmental effects. The commenter stated questions regarding this development have not been addressed by the FDEP's application to the EPA, specifically, which waters will be assumed by the State of Florida and how will Florida address federally listed and endangered species. The commenter argued that the issues associated with this proposed residential development cannot be properly addressed when both the public and the applicant cannot verify exactly who is the permit authority. The commenter argued that clarity on these issues must be included in the State's application to the EPA before approval is considered.

A commenter disagreed with other commenters who stated that the State 404 program would not protect as many different types of wetlands as the federal regulations do, pointing out that State jurisdiction over wetlands is not limited to waters of the United States (WOTUS). The commenter stated that under the current ERP Program, all wetlands and other surface waters that are jurisdictional under Chapter 62-340, F.A.C., Florida's delineation rule, are protected, including isolated wetlands that are not considered WOTUS. The commenter stated that, for efficiency's sake, all wetlands and other surface waters that are jurisdictional under Chapter 62-340, F.A.C. should be treated as WOTUS under the State 404 Program unless the applicant provides documentation that a water is not a WOTUS. The commenter added that even if FDEP agrees the water is not a WOTUS for 404 purposes, that wetland or other surface water should still be protected under the ERP program, which will remain in place after assumption.

The commenter also argued that other commenters incorrectly asserted that FDEP's rules fail to regulate the list of "Special Aquatic Sites" in Subpart E of the Section 404(b)(1) Guidelines. The

commenter stated these sites are clearly included in FDEP's regulations at "Special Aquatic
Sites" in section 2.0 of the State 404 Handbook and Florida Administrative Code Rule 62-
331.053.

**EPA Response:**

**EPA disagrees with the commenter who alleged that the State's proposal does not adopt,
reference, or mention the federal definition of "waters of the United States." In its Program
Description, Florida indicates that the State's 404 program will apply to "state-assumed
waters of the United States (WOTUS) as defined at 40 C.F.R. Part 120." Further, "[t]o
provide certainty, streamlining, and efficiency, the Department will consider that any
wetlands or other surface waters delineated in accordance with Chapter 62-340, F.A.C.,
that are regulated under Part IV of Chapter 373, F.S. could be considered waters of the
United States, and will treat them as if they are, unless the applicant requests a WOTUS
jurisdictional determination, and provides documentation that clearly demonstrates a
water is not a WOTUS, subject to Department verification and agreement."**

**Florida's Program Description, section (h) at 2, notes that state assumed waters are all
waters of the United States that are not retained waters. EPA disagrees with commenter
assertions that this definition of assumed waters is inappropriate, confusing, or does not
meet the requirements of 40 C.F.R. § 233.11(h).**

**EPA disagrees with commenters who asserted that the permitting process will lack clarity
about which waters are retained or assumed, including commenters who provided specific
geographic examples. The Corps-FDEP MOA includes specific information about how
retained waters will be identified and how the Corps and FDEP will coordinate to ensure
applications are being processed by the appropriate permitting authority.**

**EPA disagrees with the commenter who alleged that none of the program-related
definitions are provided by Florida's statute or in the State's implementing regulations, but
rather appear in an applicant handbook. The State 404 Program Applicant's Handbook,
which includes definitions and terms in Section 2.0, is incorporated by reference into 63-
331.010(5), F.A.C., and, therefore, is set forth as a regulation.**

**EPA acknowledges commenter concerns about changes to the retained waters list that have
occurred over time, as well as those commenters who stated that they should have been
previously afforded the ability to comment on the retained waters list, and commenters
who believe their previous comments should have been incorporated into the retained
waters list. However, as described above, the Agency has determined that the State
provided the program description information on retained and assumed waters that is
required by 40 C.F.R. § 233.11(h). Further, the retained waters list, itself, is a part of
Florida's package and has been subject to notice and comment as part of EPA's decision-
making process. EPA reviewed the retained waters list that was submitted to it with
Florida's package. EPA disagrees with commenter assertions that historical events or
changing perspectives on retained and assumed waters should affect whether Florida's
program submission is complete or should affect the Agency's approval or disapproval of**

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 502 of 785
USCA Case #24-5101   Document #2102936   Filed 02/26/2025   Page 80 of 153
*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                          *December 16, 2020*

**Florida's program. The note at 40 C.F.R. § 233.11(h) directs states to obtain from the Corps an identification of waters of the United States over which the Corps will retain permitting jurisdiction. The Corps undertook a multiyear effort to identify which waters for which they would retain Section 404 permitting authority. The retained waters list has not changed since package submission. Should the retained waters list be amended in the future, it will be subject to EPA approval of a program revision for use in Florida's program.**

**EPA acknowledges commenters who believe certain waters should have been included or excluded from the retained waters list, and commenters who believe that a different methodology should have been used to develop the list. Additionally, EPA notes commenter concerns regarding potential differences between Corps navigable waters lists and the retained waters list in Florida's program submission request. EPA disagrees that Florida and the Corps used an inappropriate methodology to determine retained and assumed waters. Consistent with CWA Section 404(g)(1) and as described in Florida's program submission request, the Corps will retain permitting authority under Section 404 of the CWA for those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The approach for identifying the waters assumed by Florida and waters retained by the Corps is consistent with recommendations included in the July 30, 2018, Memorandum from the Assistant Secretary of the Army to the Corps regarding how to identify retained waters.**

**Section 10 waters under the Rivers and Harbors Act, 33 U.S.C. § 403, are different from retained waters because Section 404(g)(1) of the CWA, 33 U.S.C. § 1344(g)(1), allows states to assume navigable waters that are navigable based on historic use only whereas Section 10 waters under the Rivers and Harbors Act include all navigable waters as defined by the Rivers and Harbors Act. CWA jurisdiction is separate and defined at 33 C.F.R. 328.3; 40 C.F.R. § 120.2. In addition, the MOA between FDEP and the Corps addresses how modifications are made to the retained waters list.**

*Effect of New Navigable Waters Protection Rule (NWPR)*

One commenter stated that the recently completed Navigable Waters Protection Rule in conjunction with the proposed program will greatly improve the overall environmental permitting process in Florida, which already regulates activities impacting wetlands under State law. The commenter asserted that by moving quickly to approve Florida's assumption submission, the EPA will improve the CWA and establish a model for other states to follow as they pursue CWA Section 404 assumption in future years.

Two commenters opposed ceding of the authority of the EPA and the Corps through Florida's assumption because many wetland areas in the State of Florida are ephemeral streams and isolated wetlands, and these are no longer considered "waters of the United States" under the

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                           *December 16, 2020*

Navigable Waters Protection Rule. One commenter predicted that the Navigable Waters
Protection Rule eliminates many of the provisions for wetland protections that were once present
and that this would encourage more rapid development of wetlands in Florida. The commenter
noted that developers must no longer go to the Corps and can obtain permits within 30 days, and
there is no more review of large multi-acre projects, unless the Corps gets a hold of them and
does their scrutiny. The commenter stated that, based on firsthand knowledge, over 600 acres of
wetlands have gone without mitigation in the months since the promulgation of the Navigable
Waters Protection Rule.

One commenter recommended that the State recognize and apply the status of waters of the
United States as classified under existing/valid Corps approved jurisdictional determinations.
Specifically, the commenter recommended that Florida should consider waters to be waters of
the United States unless applicants provide Corps-approved jurisdictional determinations that
conclude waters are not waters of the United States.

**EPA Response:**

**The definition of "waters of the United States" that was recently revised by the Navigable
Waters Protection Rule,** *see* **85 Fed. Reg. at 22,250 (April 21, 2020), cannot be, and is not,
redefined in this action. However, EPA disagrees with commenters who expressed concern
that Florida's assumption of a CWA Section 404 program could exacerbate environmental
degradation in conjunction with the revised definition of waters of the United States. The
Navigable Waters Protection Rule became effective on June 22, 2020. Presently, the rule is
being implemented by EPA and the Corps in Florida and throughout the rest of the
country except in the State of Colorado.[6] In the Program Description that Florida
submitted as part of its assumption package, the State indicates that its Section 404
program will apply to "state-assumed waters of the United States as defined at 40 C.F.R.
Part 120." Assumption does not reduce the scope of CWA jurisdiction but, instead, shifts
responsibility for administering the Section 404 program for certain waters of the United
States from the federal government to authorized states and tribes.**

**As described above, EPA has determined that the State's program will result in the
issuance of permits that comply with the CWA Section 404(b)(1) Guidelines. (33 U.S.C. §
1344(h)(1)(A); 40 C.F.R. § 233.20(a)).**

**EPA disagrees with commenters who recommended that a Corps approved jurisdictional
determination should be required to identify waters that are not waters of the United
States. While applicants may provide such determinations, the State is not required to rely
on and has not proposed to rely on Corps approved jurisdictional determinations as the
only source of information that can be used to identify waters that are not waters of the
United States. EPA has determined that Florida's program will be consistent with and no
less stringent than the requirements of the CWA and federal regulations. Additionally,**

---

[6] On June 19, 2020, the U.S. District Court for the District of Colorado stayed the effective date of the Navigable
Waters Protection Rule in the State of Colorado; an appeal of that injunction is currently under review by the U.S.
Court of Appeals for the 10th Circuit.

JA.2127

neither EPA nor the Corps have a role under the CWA in determining what waters are
"waters of the states," as those waters are defined according to state law. See Appendices to
the Resource and Programmatic Assessment for the Navigable Waters Protection Rule:
Definition of "Waters of the United States."

*Project Boundary and 300' Guideline*

Several commenters opposed the State's recommended 300-foot administrative boundary around
navigable waters to determine additional wetland projects to be reviewed by the Corps because
they argued that this boundary is too narrow given Florida's unique geology and hydrology.

Commenters noted that the sub-surface connection among waterbodies is much greater in
Florida's highly transmissive karst environment and requires a boundary that more accurately
reflects the extent to which neighboring wetlands impact navigable waters. These commenters
recommended that the guideline should be based on a scientific evaluation of Florida's
geophysical characteristics rather than the 300-foot default guideline proposed in the Final
Report of the Assumable Waters Subcommittee. These commenters noted that the Final Report
stated the buffer could be determined at the State level to consider natural features. Some
commenters asserted that the 300-foot lateral/adjacent FDEP determination is entirely a political
determination that should disqualify FDEP from assuming the federal Section 404 program.

Some commenters asserted that the only other states to have assumed a Section 404 program
have utilized a more protective 1,000-foot buffer, and no less should be required of Florida in
order to satisfy the CWA. One commenter asserted that the ERP program is arbitrary and
inconsistent with the fact that when a similar determination was made by the State of New Jersey
in cooperation with EPA and the Corps, a buffer of 1,000 feet was implemented.

One commenter responded to other commenters that the 300-foot buffer is not arbitrary and is
based on a reasonable delineation as agreed upon by FDEP and the Corps. The commenter stated
that this approach was also reflected in the Final Report of the Assumable Waters Subcommittee
(Final Report dated May 10, 2017; available for review on EPA's website at
https://www.epa.gov/cwa404g/nacept-assumable-waters-subcommittee-final-report-may-10-
2017). The commenter stated that the Assumable Waters Subcommittee recommended an
approach labeled "Wetlands Alternative C3," where the Corps retains all wetlands landward to a
default 300-foot administrative boundary that is adjustable to accommodate the unique
regulatory, typographical, and hydrological needs of the state. In recommending this approach,
according to the commenter, the Subcommittee agreed that a 300-foot distance is "fully adequate
to protect federal navigation interests" and allows the state to protect wetlands and water quality
as required by the CWA. See Final Report at p. 27 and 33. According to the commenter, the
Subcommittee favored Alternative C3 over the two other implementation strategies (Alternatives
C1 and C2) because it retained the strengths of the previous two strategies, while also allowing
the local resource needs and existing programs from states and tribes to effectively incorporate
Section 404 requirements into their existing framework. *Id.* at 28. The commenter stated that, to
further determine the efficacy of Wetlands Alternative C3, the Subcommittee measured the
strategy against eight criteria that ranged from whether C3 was, as a whole, consistent with

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 505 of 785

USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 83 of 153

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                      *December 16, 2020*

Section 404(g) and the CWA, to whether it provides clarity and efficiency in determining retained and assumable wetlands even outside 404 jurisdiction. The commenter stated that the Subcommittee found C3 met all eight independent criteria and provided the level of effectiveness and regulatory certainty the Subcommittee determined was necessary for 404 permitting. *Id.* at 33. The commenter reported that on July 30, 2018, the Assistant Secretary of the Army (Civil Works), R.D. James, accepted the Subcommittee's recommendation via a memorandum (available on the Corps' website at https://api.army.mil/e2/c/downloads/525981.pdf).

**EPA Response:**

**EPA disagrees with commenters who asserted that the 300-foot administrative boundary is arbitrary or that the 300-foot administrative boundary is not environmentally protective. EPA notes that the boundary was based on a reasonable delineation that was agreed upon by FDEP and the Corps. Furthermore, the Final Report of the Assumable Water Subcommittee recommended that retained adjacent wetlands be established using an administrative boundary, with a default of 300 feet. EPA agrees with commenters who noted that the Final Report provides states and tribes with the flexibility to adjust the boundary based on their unique circumstances, including but not limited to regulatory authority, topography, and hydrology. However, EPA disagrees with commenters who asserted that Florida must justify or reconsider the administrative boundary based on such factors. EPA also disagrees with commenters who asserted that Florida should broaden its administrative boundary based on the administrative boundaries of other states that have assumed a CWA Section 404 program.**

**EPA also notes that the commenter assertion that the only other states to have assumed a Section 404 program have utilized a more protective 1,000-foot buffer is not accurate. The State of Michigan does not have a 1,000-foot administrative line. The extent of adjacent wetlands over which the Corps retains authority in the Michigan is determined by the Corps on a case-by-case basis, generally including wetlands in close proximity to retained waters, and having a direct surface water connection to and within the influence of the ordinary high water mark of those waters. Regardless, the distance limits of the administrative boundary do not determine the degree of "protectiveness" over jurisdictional wetlands; in all cases, wetlands meeting the definition of "waters of the United States" pursuant to 33 C.F.R. § 328.3 and 40 C.F.R. § 120.2 are jurisdictional and regulated under the CWA. The distance limit of the administrative boundary simply establishes whether those jurisdictional wetlands are regulated by the Corps as retained waters or regulated by the state as assumed waters.**

**K.  Compliance evaluation and enforcement**

*Florida's ability to address the compliance and enforcement responsibilities of the Section 404 program*

A commenter expressed support for Florida's assumption of Section 404 program responsibilities, asserting that Florida meets the legal requirements under 40 C.F.R. § 233.41 and

JA.2129

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 506 of 785

USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 84 of 153

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

is "well-prepared to address the compliance and enforcement responsibilities of the program."
This commenter noted that FDEP already has proven compliance and enforcement protocols in
place as it has been enforcing Florida's dredged and fill regulations since the early 1970s. This
commenter also remarked that Florida's legislature has "recently instituted measures that will
enhance Florida's compliance and enforcement efforts."

Some commenters voiced support for FDEP's ability to adequately enforce the laws necessary to
implement Florida's Section 404 program. One commenter argued that Florida has demonstrated
in its application that it can fulfill the enforcement requirements of 40 C.F.R. Part 233, saying
that FDEP has the "authority to stop unauthorized activity; enjoin threatened or continuing
violations; assess civil penalties for 404 violations of at least $5,000 per day of violation; assess
criminal remedies for instances of willful violations or criminally negligent violations of at least
$10,000 per day of violation as well as power to seek criminal fines for knowing false statements
and other similar criminal conduct in an amount of at least $5,000 for each instance of violation."
Likewise, the commenter claimed that Florida meets the 40 C.F.R. § 233.41 requirements for
burden of proof and *mens rea* under state law and is well-prepared to address the compliance and
enforcement responsibilities of the program. The commenter added that FDEP has been
enforcing Florida's dredged and fill regulations for nearly 50 years and has proven compliance
and enforcement protocols in place.

Commenters also explained that the recently enacted Environmental Accountability legislation
has increased the civil penalty for Section 404 violations to three times the amount allowable
under 40 C.F.R. § 233.41. One commenter highlighted FDEP's independent Environmental
Crimes Unit, consisting of 18 sworn law enforcement officers who are deployed throughout the
State to investigate and enforce criminal violations of Florida's environmental laws. The
commenter added that these officers work closely with Florida's many other law enforcement
agencies, such as county Sheriff's departments and the State Fish and Wildlife Conservation
Commission officers, and with FDEP's dedicated staff of scientists, engineers, and
environmental professionals that will administer Florida's Section 404 program. The commenter
also stated that when arrests are made, one of Florida's 20 State Attorney's offices coordinate
with FDEP's district offices and Office of General Counsel to prosecute the case in criminal
court.

Some commenters expressed opposition to Florida's assumption of Section 404 program
responsibilities, asserting that FDEP's record shows an inability and/or unwillingness to enforce
the law under Florida's Section 404 program. A commenter expressed concern that the State
could not be expected to ensure compliance with new Section 404 permits, because it has not
met its responsibilities for the programs already under its jurisdiction. One commenter stated that
FDEP "does not currently do meaningful enforcement of its own permits and programs,
including the Environmental Resource Permit program" and questioned how it would enforce
Section 404 requirements. The commenter noted that FDEP was enforcing fewer cases than in
the past. A commenter pointed out that, "last year, only 65% of the FDEP-regulated facilities
inspected by the agency were actually in compliance with the terms of their authorizations." This
commenter provided data from the public record (EPA-HQ-OW-2018-0640-0346) to support its
claim, observing that FDEP took action against only 12.4% of the cases on noncompliance. A

JA.2130

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                     *December 16, 2020*

commenter observed that "FDEP's own performance audits and employee testing show that it
has failed in many respects to effectively administer its existing ERP Program" and "show
FDEP's consistent inability to properly review permit applications and monitor and enforce
issued permits." This commenter also provided data (EPA-HQ-OW-2018-0640-0386) from
public records indicating that "audits of compliance and enforcement activities for FDEP's
existing ERP program" were "littered with examples of inadequate documentation, assessment of
insufficient or inaccurate penalties, [and] requiring inappropriate or insufficient corrective
actions."

Another commenter claimed that FDEP's enforcement efforts were ineffective and that FDEP
has done nothing to enforce clean water requirements. The commenter noted that, instead of
cleaning up impaired waters, FDEP merely adds areas to the Section 303(d) list required under
the Clean Waterways Act. One commenter reported that "the number of enforcement cases
opened by Florida's existing dredge and fill program dropped by 36% from 2018 to 2019" and
that "FDEP only assessed penalties in 342 of the 3,774 instances of noncompliance and only
collected 44% of the penalties assessed." This commenter concluded that "FDEP is not
adequately enforcing its current programs and thus should not be granted the power to oversee
yet another program." Another commenter affirmed this sentiment, stating that FDEP has failed
to adequately enforce current environmental regulations. This commenter observed that
"according to DEP's own reporting, 80% of the state of Florida waterways are considered
degraded," noting also that: "FDEP is sorely behind in the development of TMDLs and BMAPs
for impaired waterbodies across the state, [and that] FDEP-established BMPs for stormwater and
agriculture are not meeting their intended pollution reduction goals." This commenter agreed
with other commenters in concluding that "additional responsibilities will divert resources away
from these critical pre-existing duties." Another commenter echoed these concerns, stating that
Florida removed almost all enforcement of their ERP permits since 2011. Some commenters
observed that FDEP's ability to enforce of Florida's environmental laws has been weakened by
recent Florida legislative and administrative actions, and that, under former Governor Rick Scott,
"senior staff of the FDEP were dismissed, enforcement was restrained, and prosecutions and
fines reduced."

Some commenters stated that "FDEP's enforcement record continues to demonstrate an
incapacity to adequately enforce existing programs, much less adopt new ones." One commenter
concluded that "analyses of FDEP's enforcement record have demonstrated an inability or
unwillingness to meet enforcement obligations, ensure compliance with existing programs, and
ultimately provide requisite protection to the State's valuable natural resources."

**EPA Response:**

**EPA acknowledges the comment supporting Florida's ability to carry out compliance and
enforcement responsibilities of its Section 404 program, including the State's legal
authorities and history of implementing and enforcing a similar program in the State. EPA
also acknowledges commenters' concerns regarding ensuring compliance with the Section
404 program. CWA Section 404(h)(1)(G) requires states to have authority "[t]o abate
violations of the permit or the permit program, including civil and criminal penalties and**

JA.2131

*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                              *December 16, 2020*

other ways and means of enforcement" in order to assume the Section 404 program. EPA's regulations further elaborate that a state must have the authority (1) to restrain immediately and effectively any person from engaging in any unauthorized activity; (2) to sue to enjoin any threatened or continuing violation of any program requirement; and (3) to assess or sue to recover civil penalties in the requisite amounts prescribed in the federal regulations and to seek criminal remedies as prescribed. 40 C.F.R. §§ 233.40, 233.41. EPA finds that Florida satisfies these regulatory requirements.

In its submission, Florida described its compliance evaluation and enforcement programs in detail in section (g) of its Program Description: "Description of the State's Compliance Evaluation and Enforcement Programs (Required by 40 C.F.R. §233.11(g)). Florida's comparison of federal and state law requirements also lays out in detail Florida's requirements that reflect the federal compliance evaluation programs. Program Description Appendix j-3 at 40-46. The comparison makes clear that Florida has the requisite authority required in the federal regulatory requirements governing compliance; Florida's requirements are codified at Fla. Stat.  §§ 373.129, 373.423, 373.430, 403.091, and 403.161; 62-330.350, 330.405 (F.A.C.); and 62-331.054, 62-331.201 (F.A.C.); the OGC Enforcement Manual, Chapter 4, and a number of other locations.

EPA's evaluation of a state's request to assume a Section 404 program does not require an analysis of the state's prior implementation and enforcement of a separate program. The way in which a state has implemented similar, existing programs (including the enforcement rate for existing violations, degree of documentation, amount of penalties, and extent of corrective actions) that fall within its enforcement discretion, may depend on the availability of information and resources. Further, EPA acknowledges that there are a variety of mechanisms, beyond formal enforcement actions, that a regulatory agency may employ to maintain and achieve compliance among regulated entities. These informal approaches may include compliance assistance and notices of noncompliance. Finally, EPA notes that under CWA Section 309 and Section 404(n), EPA retains independent civil and criminal enforcement authority relating to both unpermitted discharges under CWA Section 301 and conditions or limitations in permits issued by a State under CWA Section 404.

EPA has determined that FDEP has demonstrated the ability to ensure compliance with the Section 404 program. Importantly, FDEP is not required to have the same criminal negligence standard as EPA with respect to assessing criminal penalties pursuant to FDEP's assumed CWA Section 404 program. See the response to comments immediately below for additional discussion on the required standard of negligence in an assumed CWA Section 404 program. EPA agrees with commenters who asserted that FDEP has demonstrated in its application that it has the necessary mechanisms to fulfill the enforcement requirements of 40 C.F.R. Part 233.  EPA finds that Florida has the requisite enforcement authorities to abate violations, as required by the CWA and its implementing regulations, adequate documentation procedures, and adequate resources to carry out the compliance evaluation and enforcement responsibilities involved in the assumption of a Section 404 program.

JA.2132

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                           *December 16, 2020*

*FDEP's enforcement program compared to the existing federal standard*

One commenter pointed out multiple examples of what they saw as deficiencies in FDEP's ability to properly enforce the Section 404 program in a manner equivalent to the existing federal standard, including: the ongoing failures in FDEP's enforcement record, inadequate enforcement authority, less stringent state criminal liability, and inadequate opportunities for public participation in enforcement, concluding that these examples demonstrate FDEP's "incapacity to adequately enforce existing programs, much less adopt a new one." The commenter provided an example of a 2016 analysis by the group "PEER" showing how enforcement actions during the previous year decreased. This commenter also noted that Florida's submission "fails to adequately describe the state's compliance evaluation and enforcement programs" and that "Florida also fails to address how the state will coordinate enforcement strategy with the Corps and EPA, as required under 40 C.F.R. § 233.11(g)."

A commenter observed that, although the "General Counsel claims that Florida law is consistent with and no less stringent than the Clean Water Act enforcement requirements," FDEP may lack adequate staffing and resources to properly administer and enforce a Section 404 program. This commenter called attention to the fact that Florida law regarding criminal enforcement is not as stringent as federal law, in that Florida law requires proof that the discharge "caused actual harm or injury to human health or welfare, animal, plant, or aquatic life or property." This commenter further noted that, "under Florida law, it is unconstitutional to criminally penalize "mere negligent conduct" because that fails to provide "clearly ascertainable standards of guilt by which a citizen may gauge his conduct."" A commenter observed that, "because criminal negligence in the state statute is a higher level of intent that simple negligence in the Clean Water Act, the Florida Statute conflicts with federal law, and does not provide as stringent criminal enforcement as does federal law." A commenter also pointed out that Florida law provides for shorter statutes of limitation (1 to 3 years) for enforcement of environmental crimes than the 5-year period under federal law, making its program less stringent than the federal one. A commenter concluded by stating that "there is nothing in the Clean Water Act that authorizes the EPA to approve a state program with an enforcement scheme that is less stringent than the federal one in terms of criminal culpability, burden of proof and statutes of limitations. To the contrary, these failures render the program non-approvable."

A commenter also noted that Florida's program was deficient in public participation. The commenter indicated that, while 40 C.F.R. § 233.41(e)(1) requires the State provide for public participation, the General Counsel provides a blanket statement that the state has "authority" to comply with these requirements without citing any law or regulation providing that authority. A commenter also observed that, while the MOA between EPA and FDEP states that "FDEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2)," FDEP "has failed to identify any requirement in the state law or regulations to ensure compliance with the requirements of 40 C.F.R. § 233.41(e)(2)." This commenter questioned the extent to which the public is able to enforce the public participation obligations when such obligations are not incorporated into State law.

JA.2133

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 510 of 785

USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 88 of 153

*EPA Response to Comments on Florida's Clean Water Act Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

**EPA Response:**

**EPA acknowledges commenters' concerns about FDEP's ability to properly enforce the Section 404 program. EPA disagrees with these concerns. In its submission, Florida described its compliance evaluation and enforcement programs in detail in section (g) of its Program Description: "Description of the State's Compliance Evaluation and Enforcement Programs (Required by 40 C.F.R. §233.11(g))," including a description of how the State will coordinate its enforcement strategy with that of the Corps and EPA. Florida has also addressed the way in which it intends to coordinate its enforcement strategy with the Corps and EPA, respectively, in its Memorandum of Agreement with the Corps at Section VII and its Memorandum of Agreement with EPA at Section III. EPA finds that Florida has adequate staffing and resources to ensure compliance and enforce violations of an assumed Section 404 program.**

**EPA also disagrees with commenters who asserted that Florida's program is deficient in public participation. EPA notes that Florida's MOA with the Agency states that "FDEP shall provide for public participation in the State 404 Permit Program enforcement process pursuant to 40 C.F.R. § 233.41(e)(2)" and that Florida has authority to provide for such participation. The federal regulations at 40 C.F.R. § 233.41(e)(2) require that states must provide for public participation in the enforcement process through, among another option, "(2) Assurance that the State agency or enforcement authority will: (i) Investigate and provide written responses to all citizen complaints submitted pursuant to State procedures; (ii) Not oppose intervention by any citizen when permissive intervention may be authorized by statute, rule, or regulation; and (iii) Publish notice of and provide at least 30 days for public comment on any proposed settlement of a State enforcement action" (emphasis added). Florida has provided such assurance, as required, in its MOA with EPA, and EPA is not aware of anything in Florida's laws or regulations that is inconsistent with Florida's assurance. EPA's regulations codifying its approval of Florida's 404 Program will make clear that the MOA is part of the State-administered program, as is the General Counsel's Statement. EPA may withdraw program approval if the State's enforcement program fails to comply with the federal regulatory requirements, as well as if the State program fails to comply with the terms of the MOA with EPA. 40 C.F.R. §§ 233.53(b)(3) and (4). EPA's approval of Florida's 404 program may therefore rely in part on the State's commitment to adhere to certain federal regulatory requirements in the MOA with EPA and the General Counsel's Statement.**

**EPA disagrees with the commenter's statement that Florida's law requires "actual harm or injury to human health or welfare, animal, plant, or aquatic life or property" to establish a negligent violation. Florida recently changed its statute to provide that "fail[ure] to obtain any permit required by this part or by rule or regulation adopted pursuant thereto, [] violat[ion] or fail[ure] to comply with any rule, regulation, order, or permit adopted or issued by a water management district, the department, or local government pursuant to their lawful authority under this part," due to "reckless indifference or gross careless disregard," may be punishable by a fine of up to $10,000 or 60 days in jail, or by both, for each offense. Fl. Stat. 373.430(1)(a), (4). EPA interprets "reckless indifference or gross**

JA.2134

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 511 of 785
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 89 of 153
*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                                *December 16, 2020*

careless disregard" to constitute a negligence standard and therefore finds that Florida satisfies the federal requirement to allow for prosecution of negligent permitting violations.

In response to the concern that Florida's program does not include the identical simple negligence standards and statutes of limitations as the federal program, EPA notes that the CWA does not require total uniformity between federal and state enforcement authorities. The CWA requires that EPA "shall approve" a state's application if it determines that the state has the authority to "abate violations of the permit or the permit program, including civil and criminal penalties and other ways and means of enforcement." See 33 U.S.C. 1344(h)(1)(G). In addressing the enforcement requirements for state programs, Congress did not use the words "all applicable," "same," or any phrase specific to any mens rea standard, let alone the Federal standard, as it did in other parts of CWA Sections 404(h). See 33 U.S.C. 1344(h). Indeed, when "Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Sebelius v. Cloer*, 569 U.S. 369, 378 (2013) (internal quotations omitted). In contrast to the broad authority that CWA Section 404(h)(1)(G) provides to determine whether states and tribes have demonstrated adequate authority to abate violations, other aspects of state and tribal programs are explicitly required to have authority that is equivalent to or more stringent than EPA's authority. For example, states must have the authority "[t]o inspect, monitor, enter, and require reports to *at least the same extent* as required in section 1318 of this chapter," 33 U.S.C. 1344(h)(1)(B) (emphasis added). Similarly CWA Section 404(h)(1)(B) requires state-issued permits to "apply, and assure compliance with, *any applicable requirements of this section*, including, but not limited to, the guidelines established under subsection (b)(1) of this section, and sections 1317 and 1343 of this title…" 33 U.S.C. 1344(h)(1)(A)(i) (emphasis added). The more general language used to address required state and tribe authorities to abate violations, and the absence of any citation to CWA Section 309, indicates that Congress allowed for variability between state or tribal approaches to certain aspects of enforcement.

EPA interprets the Agency's implementing regulations for CWA Section 404 to allow for approved state and tribal programs to have different approaches to criminal enforcement than the Federal government's approach. EPA's interpretation is consistent with the D.C. Circuit's decision in *NRDC v. U.S. EPA*, 859 F.2d 156, 180-181 (D.C. Cir. 1988). There, the petitioner challenged the validity of 40 C.F.R. §123.27(a)(3) on the theory that it did not require states to have the same maximum criminal penalties as the federal program. *NRDC*, 859 F.2d at 180. The court reasoned that the petitioner's argument involved a "logical infirmity" because it "presume[d] an unexpressed congressional intent that state requirements must mirror the federal ones," which is "inconsistent with the elements of the statutory scheme limiting operation of the provisions to enforcement efforts at the national level and explicitly empowering the Administrator to set the prerequisites for state plans." *Id.* at 180 (discussing 33 U.S.C. 1314(i)(2)(C)). The D.C. Circuit recognized EPA's "broad[] discretion to respect state autonomy in the criminal sector" and that the regulations "reflect the balancing of uniformity and state autonomy contemplated by the Act." *Id.* at

180-81. The court therefore declined "to divest the Administrator of this authority" in the face of congressional silence. *Id.*

EPA's interpretation is also consistent with the Ninth Circuit's decision in *Akiak Native Community v. EPA*, in which the Ninth Circuit declined to require that states have authority to impose administrative penalties identical to federal authority. See *Akiak Native Community*, 625 F.3d 1162, 1171–72 (9th Cir. 2010). In that case, the petitioner argued that the State of Alaska did not have adequate authority to abate violations because Alaska had to initiate a legal proceeding to assess civil penalties, whereas EPA could do so administratively. *Id.* at 1171. The Court held that because "[t]here is no requirement in the CWA . . . that state officials have the authority to impose an administrative penalty" and "[t]he language of the statute says nothing about administrative penalties," "there is no reason to conclude that Alaska lacks adequate enforcement authorities." *Id.* 1171–72.

Specifically with respect to the comments about ordinary negligence, EPA's longstanding interpretation that CWA Section 404 does not require states and tribes to have identical authorities to EPA's under CWA Section 309 is consistent with the Ninth Circuit's acknowledgement in *Idaho Conservation League v. EPA* that "a state program need not mirror the burden of proof and degree of knowledge or intent EPA must meet to bring an enforcement action." *Slip op.* at 3, *citing* Consolidated Permit Regulations, 45 Fed. Reg. at 33,382. While the Ninth Circuit held in an unpublished and non-binding decision outside the specific case before it that the plain language of the federal regulations requires states to incorporate the same criminal intent standards as EPA, EPA has proposed modifying its regulations to make them more clearly consistent with EPA's longstanding interpretation that the statute allows for greater flexibility. *See* 85 Fed. Reg. 80,713 (December 14, 2020). EPA's proposal is based on the interpretation of the CWA outlined here, that the CWA does not require total uniformity between federal and state enforcement authorities. *See id.*

EPA finds that Florida's 404 program meets the statutory and regulatory standards governing approval of state programs, as EPA interprets these requirements.


## L.  EPA oversight of state permitting

Several commenters stated that EPA should retain oversight responsibilities of permitting in Florida. One commenter considered it necessary, especially given the rate of climate change, that Florida's waters be protected by EPA, stating that EPA is the regulatory body that will hold the highest standard of scrutiny. A commenter considered it necessary to ensure consistency and uniformity in oversight and application of legal standards. Another commenter noted that more destruction will occur if EPA and the Corps relinquish oversight. One commenter stated that the current dual permitting system between federal and state agencies provides oversight that the Florida regulatory system cannot provide alone. Some commenters felt EPA and the Corps are better equipped to handle permits associated with wetlands because FDEP is not able to handle the responsibility.

A commenter objected to EPA's decision to waive almost all oversight of Florida's program otherwise available under the CWA, especially since Florida has vast waterways, wetlands, and listed species. The commenter requested EPA retain the maximum monitoring and oversight possible for a minimum of two years before relinquishing its Section 404(j) authority. Some commenters worried that the amount of oversight and public review would be limited if the proposal was accepted.

A commenter noted that federal review has proved invaluable in stopping or modifying Florida programs that would have further endangered water resources, such as the Basin Management Action Plans that were deficient in strategy and funding to accomplish what the State legislature had demanded. A commenter suggested that EPA needs to continue its role in these permitting decisions.

A commenter discussed problems Saint Augustine and Saint Johns County have with flooding on regular, sunny days and devastating floods during storm events. The commenter explained that the state is losing a few acres of wetlands every week over the course of years, so the current system is not protective enough, and the proposed change offers even less protection. One commenter stated that with increased development statewide, the protection and restoration of Florida's wetlands and water resources must be given the greatest possible attention, rather than removing federal oversight. One commenter argued that federal review and protections are necessary to protect resources from local political pressure and special interest, given the rapid population growth and development.

A commenter recognized that federal Section 404 permits and Florida Environmental Resource Permits overlap. However, the commenter asserted that the additional federal oversight is critical for adequate protection of water resources, providing important checks and balances. The commenter gave an example wherein a local Water Management District approved a permit that would have allowed the developer to destroy high-quality urban wetlands, but the Corps denied the developer's application to destroy these acres of federally defined wetlands, largely due to their value.

One commenter was concerned that staffing levels in the EPA Region 4 office in Atlanta are insufficient to provide adequate oversight if a Section 404 program is assumed by Florida. The commenter mentioned that he had worked for the EPA Region 4 wetlands program for 30 years and said that only a small number of people were available to review the Corps' public notices. The commenter questioned how EPA could do a legitimate job of overseeing the program with the current level of staffing. The commenter was specifically concerned that EPA Region 4 wetlands program staff would be inadequate for reviewing the 1,000-2,000 Section 404 individual permit applications that would be processed annually and asked what commitments EPA Region 4 management would make to hire and train a sufficient number of wetland staffers needed for meaningful oversight.

**EPA Response:**

**EPA acknowledges some commenters' desire that it retain oversight of Section 404 permitting in Florida. As discussed above, Congress provided the option for states and**

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 514 of 785

USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 92 of 153

*CWA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                    *December 16, 2020*

tribes to request assumption of the CWA Section 404 permit program. Consistent with the overall cooperative federalism construct established by the CWA, it is EPA's responsibility to review assumption requests consistent with the statute and its implementing regulations, and where the agency finds that a state or tribe has met its statutory and regulatory obligations demonstrating their ability to implement a CWA Section 404 program, to approve the assumption of that CWA Section 404 program by the state or tribe. EPA agrees with commenters that pointed out that the state assumption process is not a delegation of the Section 404 program to states and tribes. Congress has provided states and tribes the opportunity to assume primary responsibility for implementing a Section 404 program pursuant to state authorities. Additionally, EPA acknowledges commenters asserting that EPA should retain oversight authorities in Florida and notes that EPA maintains its role as the oversight agency, even following FDEP's assumption of a CWA Section 404 program.

EPA disagrees with comments suggesting that once Florida assumes a Section 404 program, it has sole jurisdiction of the CWA Section 404 program. The Corps will continue to administer the Section 404 program in retained waters within Florida, and EPA will oversee Florida's administration of the State 404 program. See 40 C.F.R. Part 233, Subpart F—Federal Oversight.

EPA disagrees with commenter's assertion that it has waived almost all oversight. In exerting its continued oversight responsibilities under the CWA, EPA will continue to review permits for:

- discharges with reasonable potential for affecting endangered or threatened species as determined by USFWS;

- discharges with reasonable potential for adverse impacts on waters of another state or tribe; discharges known or suspected to contain toxic pollutants in toxic amounts (Section 101(a)(3) of the CWA) or hazardous substances in reportable quantities (Section 311 of the CWA);

- discharges located in proximity of a public water supply intake;

- discharges within critical areas established under state or federal law, including but not limited to national and state parks, fish and wildlife sanctuaries or refuges, national and historical monuments, wilderness areas and preserves, sites identified or proposed under the NHPA, and components of the National Wild and Scenic Rivers System;

- discharges impacting compensatory mitigation sites, including mitigation banks, in lieu fee program sites, and permittee responsible mitigation sites; and

- discharges impacting sites that are owned or managed by federal entities, and activities by an applicant that is a federal entity.

JA.2138

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 515 of 785

USCA Case #24-5101   Document #2102936   Filed 02/26/2025   Page 93 of 153

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                    *December 16, 2020*

**Further, FDEP must provide the EPA Regional Administrator with copies of public notices for permit applications for which permit review has been waived whenever requested by EPA, pursuant to 40 C.F.R. § 233.50(a)(1).**

**EPA disagrees with the commenter assertion that staffing levels in EPA's Region 4 office are insufficient to provide adequate oversight if Florida's Section 404 program is approved. EPA has sufficient staffing resources to fully implement all of its regulatory obligations under Section 404(g) and the provisions set forth in the MOA between EPA and FDEP. EPA has significant discretion under Section 404 as to how and where to utilize its staffing resources and has sufficient resources to conduct reviews of public notices for proposed projects in the Southeast both inside and outside of the scope of waters that are assumed by Florida.**

**EPA also disagrees with commenters asserting that FDEP is not equipped to handle permits associated with wetlands. EPA has reviewed FDEP's submittal and determined that FDEP has met all statutory and regulatory requirements necessary to demonstrate the State's ability to implement the CWA Section 404 program. Please see Section H for further discussion on FDEP's staffing and resources to assume the CWA Section 404 program.**

**EPA disagrees with commenters asserting that federal review and protections are necessary to protect resources from outside pressures. *See* the State 404 Program Applicant's Handbook (incorporated by reference in subsection 62-331.010(5) F.A.C.) for a description of the rules, procedures, standards, and criteria that apply to the State 404 program under Part IV of Chapter 373 of the Florida Statutes (F.S.).**

**EPA disagrees that FDEP will fast-track permits or provide permits because of outside pressures without providing the appropriate environmental review. *See* Response to Comments Section I for additional responses regarding streamlining of permitting.**

**M. NEPA and public participation**

One commenter indicated support for avoiding NEPA review, stating that the transfer of authority to Florida will have the benefit of avoiding duplicative environmental reviews. The commenter stated that even with recent streamlining, compliance with NEPA delays the development of mining and other economically beneficial projects.

Several other commenters objected to Florida being granted authority for implementation of the Section 404 program, and asserted that the Florida program will not require the same level of data collection, in-depth analysis, and rigorous balancing of economic and environmental impacts of wetland projects because Florida has not made the statutory changes to set State law to be equivalent to the CWA, the ESA, the NHPA, and the NEPA. Some commenters stated that adequate replacements for tools related to NEPA are missing. Some commenters added that removal of the Corps as a federal regulator creates uncertainty in how other federal laws will be complied with, including the NEPA, Magnuson-Stevens Act, and NHPA.

JA.2139

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                        *December 16, 2020*

Some commenters pointed out that this lack of parallel legal authority means that the proposed action is not a delegation, but an alternative program in which Florida has sole jurisdiction. Commenters stated that this parallel program would mean that a comprehensive scientific and economic review, as required by NEPA, will no longer apply. One commenter contended that if finalized, the proposal would lead Florida's agencies to make decisions with significant environmental impacts without ever considering those impacts in advance. Some commenters stated that Florida has a poor record of protecting wetlands from strip mining compared to the preservation achieved by NEPA review. Some commenters pointed out that Florida has touted the loss of NEPA review as a benefit and cost savings for permit applicants.

Many commenters asserted that Florida has not described how it will replace the important features of current federal law to provide commensurate protections. One commenter stated that Florida has not made the same statutory changes made by the states of New Jersey and Michigan when those states were granted Section 404 permitting responsibility. One commenter expressed concern that this departure from federal procedures would fast-track development that would pose threats to wildlife and unique Florida ecosystems. Some commenters stated that converting permitting from a federal to a state program would eliminate the checks and balances between federal and state agencies that occur under federal review. Several commenters stated that Section 404 program assumption would eliminate expert federal review and interactions between state and federal agencies that result in development of environmental impact statements and effective public participation opportunities.

Some commenters stated that without NEPA the public would not have the same opportunities to provide meaningful input on environmentally destructive plans by builders and resource exploiters. Some commenters stated that public review of proposed permits in Florida will be inadequate because the Florida process is less accessible to the public, does not provide access to information in a timely manner, and requires a costly administrative process for the public to challenge details of a proposed permit. Some commenters explained that the Florida process allows input only at the beginning of the process where there is little information about the proposed action and at the end via an often-costly challenge as part of a State administrative hearing. The commenters stated that meaningful public participation requires clear points where the public gets access to detailed environmental information about a proposed action, along with the agency's tentatively selected plan of action.

Some commenters were concerned that the public would lose the ability to challenge in federal court any permits that fail to comply with NEPA. Some commenters pointed out that because Florida has no statutory counterpart to NEPA, the public would be deprived of procedural protections and the opportunity to challenge permits in federal court. The commenters gave examples of the benefits of federal court review, including a case in which a federal court determined that NEPA did not allow the Corps to "segment" the project.

**EPA Response:**

**EPA acknowledges the comment that without a requirement for NEPA review under a state-assumed Section 404 program, duplication of some federal and state environmental review would be avoided.**

JA.2140

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 517 of 785
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 95 of 153
*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                December 16, 2020

EPA also acknowledges that NEPA does not apply to permits issued under Florida's Section 404 program, nor does it apply to EPA's decision to approve or deny Florida's request to assume the Section 404 program. The NEPA process begins when a federal agency develops a proposal to take a major federal action, as defined at 40 C.F.R. § 1508.1. State permitting actions are not federal actions. With regard to the comment that Florida has not passed laws or regulations equivalent to NEPA, EPA has determined that Florida's Section 404 program, including its statute and regulations, fulfills the requirements of the CWA and the regulations at 40 C.F.R. Part 233. EPA acknowledges commenters assertions that Florida has not made the same statutory changes as Michigan or New Jersey in response to their request to assume the CWA Section 404 program. However, nothing in the CWA or implementing regulations requires Florida to make the same statutory changes that other states who have assumed the CWA Section 404 program have made. EPA disagrees with commenters that the absence of State laws that parallel NEPA and other federal laws means that Section 404 permit decisions would be made with far less data, without rigorous review of the environmental impacts, and without the same level of review as federal review of project benefits versus environmental losses. Florida has chosen a different approach, using its other authorities to ensure sufficient disclosure of environmental impacts associated with permits proposed under its State 404 program, and EPA has determined that these processes and associated state authorities have satisfied the statutory and regulatory obligations for Florida to assume the CWA Section 404 program.

EPA acknowledges commenters who asserted that the act of assuming the CWA Section 404 program is not a delegation, but an alternative program in which Florida has sole jurisdiction. The state assumption process is not a delegation of the Section 404 program to states and tribes. Congress has provided states and tribes the opportunity to assume primary responsibility for implementing a Section 404 program pursuant to state authorities. EPA disagrees with comments suggesting that once Florida assumes the Section 404 program, it has sole jurisdiction of the CWA Section 404 program. The Corps will continue to administer the Section 404 program in retained waters within Florida, and EPA will maintain its oversight authority pursuant to the CWA and will oversee Florida's administration of the State 404 program.

EPA acknowledges commenters' concerns regarding the level of federal review and interaction on the state's permits under an assumed program, but EPA disagrees with the assertion that this interaction would be eliminate under Florida's 404 program. Florida's 404 program provides for significant state and federal interaction and review. As stated in Section (b) of Florida's Program Description: "Interagency coordination with the State Historical Preservation Office (SHPO) and Tribal Historical Preservation Office (THPO), Florida Fish and Wildlife Conservation Commission (FWC), U.S. Fish and Wildlife Service (FWS), National Marine Fisheries Service (NMFS), Water Management Districts (WMDs), and Environmental Protection Agency (EPA) will be conducted, as required, following the procedures described in their respective operating agreements (See sections D (DEP/EPA MOA) and E (DEP/USACE MOA) of the package and section (j) (DEP/FWC/FWS MOU and DEP/SHPO OA) of the program description) and section 5.2 of the 404 Handbook. A

JA.2141

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 518 of 785
USCA Case #24-5101    Document #2102936         Filed: 02/26/2025    Page 96 of 153
EPA's Response to Comments on Florida's 404 Program Submission Requesting to Assume Administration of
a Clean Water Act Section 404 Program                                  December 16, 2020

commenting agency may submit questions or comments for the Department to include in the [Request for Additional Information (RAI)]. A commenting agency may also provide comments to EPA and request EPA object to a proposed activity. The Department will forward the applicant's response to the RAI to each commenting agency for review, if applicable. Additional conditions may be included in the final authorization based upon the recommendation of a commenting agency to avoid or minimize potential adverse effects due to the project."

The 404(b)(1) Guidelines are the substantive environmental review criteria for evaluating impacts of potential dredged or fill activities. While states and tribes are not required to adopt or incorporate the Section 404(b)(1) Guidelines verbatim, implementation of state and tribal environmental review criteria must result in a permit that is as consistent with the Section 404(b)(1) Guidelines as would be a permit issued for the same discharge by the Corps. EPA has reviewed Florida's State 404 program and found that administration of the program as proposed will result in permit reviews that will take into account the environmental effects of the permit action and that Florida's 404 program is consistent with and no less stringent than the requirements of the Section 404(b)(1) Guidelines. Permits issued under Florida's Section 404 program will be evaluated against the same environmental review criteria applicable to Corps-issued Section 404 permits.

With regard to the commenter who raised the "segmentation" issue, "subsection 62-331.051(2), F.A.C., provides that all activities reasonably related to a project shall be included in the same permit application, which means that the applicant should provide sufficient information for the Agency to review the entire scope of the project. This will enable the Agency to assess whether the project as a whole meets the requirements of Chapter 62-331, F.A.C., and [the State 404 Program Applicant's Handbook]." Section 5.3.2 of the State 404 Handbook states that for large projects that cannot be completed within the maximum five-year permit duration, "[t]he applicant shall create a long-term planning document that explains how the project is phased, what activities are expected to be completed within each phase, an expected permitting timeframe for each phase, and an assessment of cumulative impacts. The long-term planning document shall be made part of the project file that goes out on public notice and federal review if required under 40 C.F.R. § 233.51." See section 5.3.2 of the State 404 Program Applicant's Handbook. The State 404 Program Applicant's Handbook further provides that "[d]uring its review of the first phase of the project, the Agency shall analyze and review the entire project, as proposed in the long-term planning document, under all 404 requirements. This analysis and review shall become part of the project file and be a basis of the agency action on the first phase, and the long-term planning document shall be incorporated into the permit." See *id*.

EPA has determined that the public participation process set forth in Florida's Section 404 program is consistent with and no less stringent than the public participation requirements of 40 C.F.R. Part 233. Specifically, Florida's Section 404 program provides for public notice of proposed permits consistent with 40 C.F.R. § 233.32, including the information requirements of 40 C.F.R. § 233.32(d), and for public hearings consistent with 40 C.F.R. §

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 519 of 785
USCA Case #24-5101   Document #2102936        Filed: 02/26/2025   Page 97 of 153
*EPA's Response to Comments on the State of Florida's 404 Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                          *December 16, 2020*

**233.33. EPA has also determined that the administrative procedures applicable to Florida's Section 404 program constitute sufficient due process for those wishing to contest a permitting decision under Florida's Section 404 program. The comparison between EPA's and Florida's regulations in the Program Description, Appendix j-3, makes clear that Florida's regulations and its State 404 Program Applicant's Handbook include all of the same public participation requirements that federal law requires. See Program Description, Appendix j-3 at 28-32; 62-331.060, F.A.C.; and the State 404 Program Applicant's Handbook section 5.3.1.**

**EPA acknowledges that NEPA does not apply to permits issued under Florida's 404 program and thus a NEPA-related challenge in federal court is unavailable. However, EPA's regulations do not require particular procedures for judicial review or access to particular venues, such as that of federal court, for state-issued permits, and nothing in Florida's judicial review procedures is inconsistent with federal requirements. Challenges to actions of a state in issuing or denying a permit pursuant to a state-assumed Section 404 program are typically heard in state court, and EPA recognizes that different states have different procedures for judicial review, and that those procedures may also differ from federal procedures. As the Seventh Circuit Court of Appeals explained, "[i]t is not the unique province of the federal courts to adjudicate administrative law challenges related to the Clean Water Act." *Menominee Indian Tribe of Wisconsin v. EPA*, 947 F.3d 1065, 1071 (7th Cir. 2020) (upholding the district court's dismissal of a challenge to EPA's and the Corps' alleged failure to exercise jurisdiction over a Section 404 permit application where Michigan administers the Section 404 program.)**

**See Response to Comments Section N for EPA's response regarding ESA. See Response to Comments Section P for EPA's response regarding NHPA. See EPA's December 16, 2020 memorandum regarding its no effects determination to Essential Fish Habitat pursuant to the Magnuson-Stevens Act.**

## N.  Endangered Species Act (ESA)

*EPA's policy on ESA consultation*

A number of commenters supported Florida's assumption of the CWA Section 404 program. Specifically, one commenter voiced their support for EPA's decision to engage in programmatic consultation with the USFWS and agreed "that a programmatic biological opinion and incidental take statement, as contemplated in the Memorandum of Agreement between FDEP and USFWS, can be applied successfully in the State of Florida." Another commenter stated that the "resultant streamlined permitting process will reduce costs and duplication of effort by state and federal authorities."

One commenter refuted several objections that other commenters had made. This commenter stated that comments suggesting that Florida's application was incomplete or lacks adequate information "misunderstands the requirements of Section 7 consultation and how it relates to EPA's determination on an assumption application." This commenter noted that, "As the

JA.2143

Eleventh Circuit has explained: Section 7(a)(2) of the ESA does not require that consultation under the Act take place in any particular manner. Section 7(a)(2) simply directs the federal agency to "insure" in consultation with the [Services] that its actions are not likely to jeopardize the existence of listed species or their critical habitat. See 16 U.S.C. § 1536(a)(2). It is for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate."

This commenter also asserted that "Florida's approach does not "bypass" species protection, as some commenters suggest," insisting that Florida's program "will go above and beyond the requirements of federal law and ensure more robust protections for threatened or endangered species." This commenter also refuted other commenters' suggestions that "programmatic consultation will place the state's 404 program under an 'interminable' consultation situation where programmatic consultation is 'reinitiated every time there's a regulatory change'", stating that "nothing in the ESA would require re-initiation of formal consultation in this manner." The commenter further stated that coordination between FDEP and USFWS—which would include FDEP sending copies of all permit applications and preliminary site-specific determinations to the USFWS for review and comment, considering any information that USFWS provides as technical assistance, and either including all species protection measures that the USFWS may recommend or denying the request for a permit—falls within the broad scope of "technical assistance" as described in the ESA's implementing regulations and the USFWS' Interagency Consultation Handbook. This commenter also contradicted the argument that "the programmatic approach will not provide state 404 permittees with take liability protection," stating that: "Under Florida's proposed programmatic consultation approach, liability protection under ESA Section 7 should extend to state 404 permittees who comply with the terms and conditions of the technical assistance process set forth in an applicable biological opinion with incidental take system."

One commenter who voiced support for Florida's assumption expressed their concern over "EPA's decision to change its longstanding interpretation of the applicability of the Section 7 Consultation Process to its decisions whether to approve a state assumption request."  One commenter contended that the programmatic consultation for assumption that would cover all permits the State issues is an incredibly controversial legal position that has not been given sufficient time for review, particularly in light of EPA's position for the past 10 years that programmatic consultations were not even part of the assumption process.

Some commenters noted that the Memorandum of Understanding between FDEP, the USFWS and the (FWC was incomplete as it was not signed and "it does not include any completed programmatic biological opinion or incidental take statement for the Florida 404 Program." Some of these commenters pointed out that the public could not evaluate the State's plans for assumption without knowing all the parties committed to the actions described in the MOU. One of these commenters observed that, without a signed MOA and any completed programmatic biological opinion or incidental take statement, there is "no way to assess the actual effectiveness of the proposed consultation process for federally protected species." One of these commenters insisted that "a final signed MOU should be available for review before EPA acts on the state's application so that it is clear what the final process between the FDEP, the Service, FDEP and [FWC] will be and what EPA's role will be." Another of these commenters asserted that the

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 521 of 785
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 99 of 153
*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

proposal does not sufficiently describe how Florida will replace the important protections afforded by federal laws (NEPA, ESA) and federal agencies (USFWS), noting that "an adequate method for replacing Section 7 consultation has not been secured." The commenter explained that assumption removes the mandated involvement of USFWS and the National Marine Fisheries Service (NMFS) and their formal review process.

The commenter explained that assumption removes the mandated involvement of USFWS and the National Marine Fisheries Service (NMFS) and their formal review process. The commenter contended that the programmatic consultation for assumption that would cover all permits the state issues is an incredibly controversial legal position that has not been given sufficient time for review, particularly in light of EPA's position for the past 10 years that programmatic consultations were not even part of the assumption process. One commenter who voiced support for the proposal expressed their concern over "EPA's decision to change its longstanding interpretation of the applicability of the Section 7 Consultation Process to its decisions whether to approve a state assumption request."

Some commenters questioned whether Florida's assumption of CWA 404 responsibilities, including Section 7 consultations, would result in lesser protection for endangered species than if these responsibilities remained with the federal government agencies currently responsible for their enforcement. One of these commenters noted that the "truncated one-size-fits-all approach proposed by FDEP would constitute a vast stripping of protection to the many threatened and endangered species that live only in Florida waterways." Two commenters declared that "If the FDEP takes over this process, it would eliminate additional scrutiny of federal laws that apply to federal permits actions," including compliance with Section 7 of the ESA. Some commenters stated that the one-time programmatic opinion is not an adequate way to meet the requirements of the ESA due to the amount of listed species in Florida.

Some commenters expressed concern that the "ESA consultation process outlined in the MOU does not address an important collaborative strategy for protecting federally listed species called Habitat Conservation Planning (HCP) under ESA Section 10." These commenters noted that, although HCPs can achieve regional, multi-species, multi-applicant, and long-term mutual benefits compared to single-project reviews and Section 7 consultation," the state's proposed ESA consultation process would conflict with or undermine HCP regional collaboration efforts. These commenters support collaborative strategies for species protection.

One commenter questioned the USFWS' issuance of a "statewide incidental take statement (ITS) that would exempt Florida from the ESA's take prohibition when administering its Section 404 program," claiming that it violates the ESA because it was made "without an understanding of the impacts that the millions of combinations of possible covered activities would have on listed species and it was made based on unenforceable promises of future action." This same commenter contended there were several legal and technical deficiencies with the proposal, including a lack of consultation with NMFS as part of the process, and failure of EPA's Technical Assistance memorandum to outline the actual substance of the assistance process. The commenter stated that it would be impossible for any evaluation of future take resulting from Florida's assumption of Section 404 permitting to sufficiently establish procedural requirements

and permitting conditions or measures that would address all possible statewide permitting scenarios. The commenter stressed that the number of habitats and possible acres that would be affected by state assumption is far too vast to be adequately addressed in a one-size-fits-all statewide ITP, and the categories of potential projects and the potential sizes of projects are similarly too numerous to anticipate.

At least one commenter argued that the design of the Florida program precludes any meaningful oversight, even though the ITS would be directly issued to the EPA, as EPA appears to have no ongoing obligation to ensure that FDEP complies with the ESA after it has completed consultation on the assumption application. The commenter also noted that the conditions provided for in the MOU are not incorporated into law, and that FDEP's regulations also do not appear to commit the agency to incorporate recommendations made by the Service during technical assistance, and instead only appear to commit permittees to abiding by the recommendations resulting from the technical assistance process that FDEP chooses to incorporate.

One commenter argued that a truncated programmatic consultation would essentially give the EPA wholesale approval from the USFWS and NMFS for specified and foreseeable actions without any analysis of the effects of the whole action, jeopardy determinations, or take limits, all in direct contravention to the ESA's mandate, implementing regulations, and numerous court holdings. The commenter noted that, although the proposal insists that the State has promulgated language necessary for ensuring compliance, the technical assistance process is still being developed, and depends on other agencies who lack the resources necessary to carry out review of all state Section 404 permits. This commenter further noted that a programmatic biological opinion was not included in FDEP's application and stated that, "even if a programmatic biological opinion were produced prior to the EPA's assumption decision deadline, it was not part of FDEP's application and has not been part of the administrative review process or subject to notice and comment. The commenter stated that EPA cannot approve Florida's assumption application based on a biological opinion outside the public's scrutiny, when the State is relying on that opinion to claim compliance with requirements to assume jurisdiction over the Section 404 program. The commenter also reiterated that, like the anticipated programmatic biological opinion, the Biological Assessment is not part of FDEP's application. The commenter argued that the Biological Assessment suffers numerous flaws that render it inadequate to support a programmatic biological opinion. Finally, the commenter also pointed out that Florida's proposal asks EPA to delegate its obligations under ESA Section 7(a)(2) to non-federal parties, stating that "FDEP's proposal unlawfully delegates the initial effects determination to FDEP (and likely the applicant who will be asked to identify whether species are affected). These determinations must be made by a federal agency."

Another commenter argued that FDEP does not have the expertise to evaluate impacts on listed species, and the Florida Constitution designates FWC as the primary agency in matters related to wildlife. The commenter pointed out that although the FDEP states that it will rely partially on FWC for determinations related to listed species, they also state that they will rely on USFWS for final determination, but the commenter noted that nothing in the law prevents FDEP from ignoring USFWS's recommendations.

*Florida assumption of the Section 404 program and adequacy of protecting endangered species*

Some commenters stated their support for Florida's assumption of the Section 404 program, asserting that it will be protective of the State's fish and wildlife species and the environment. Commenters expressed that Florida's approach, and the threatened and endangered species and their habitats, would benefit from ESA consultations at the front end of the process, which does not bypass species protection. Another commenter emphasized that the FWC is committed to working with FDEP to ensure Florida's Section 404 program is successful and protective of Florida's wildlife and that the comprehensive process embodied in the anticipated programmatic biological opinion provides for meaningful engagement among the federal and state agencies and protection of federally listed species and their designated critical habitats. Another commenter noted that FDEP's agreements with the Corps, EPA, the USFWS, and FWC ensure a robust program that provides full protection for our state's wetlands and species. This commenter concluded by affirming that Florida's program will go above and beyond the requirements of federal law and ensure more robust protections for our state's threatened or endangered species.

Other commenters expressed opposition to Florida's assumption of a Section 404 Program, citing both general and specific concerns about how State assumption would impact compliance with the ESA. Some commenters expressed their opposition to the Florida assumption based on the proposal's lack of necessary details, insufficient requirements for interagency consultations, and expressed a general concern that Florida would not meet the requirements of the ESA. Multiple commenters submitted a form letter asserting that Florida's application does not provide complete details about how State agencies would handle threatened and endangered species under the Florida Section 404 program. In a different form letter, commenters emphasized that Florida's wetlands deserve protection, and that a transfer of oversight to Florida without clear assurance on how wildlife impacts will be addressed jeopardizes protections currently in place.

Commenters noted that Florida is home to more endangered species than New Jersey and Michigan, the only other states that have assumed Section 404 programs, and expressed concern that the State's assumption of responsibilities for a Section 404 program would impact compliance with the ESA and be likely to "result in less time and expertise involved in the analysis of project impacts on vulnerable wildlife." Commenters also opposed the State's proposed rules to assume jurisdiction over the federal wetlands permitting authority, stating that Florida has not adequately addressed how it will ensure protection of endangered species and maintain the stringent levels of review that are provided by the ESA. One commenter asserted that the proposed program would illegitimately circumvent the requirements of the ESA, including duty to consult with FWS and NMFS.

Commenters asserted that the Florida Section 404 program does not demonstrate that it can achieve the CWA's no-jeopardy mandate with respect to listed species. These commenters stated that the proposal does not provide reviewers enough information to make a decision regarding FDEP's ability to comply with the Section 404(b)(1) Guidelines' no-jeopardy provision with respect to the engagement process and protection of species under the ESA. Two of these commenters also noted that, "to the extent that FDEP limits its consideration of Section 404 permit authorizations to the Assumed Waters, the agency cannot ensure that it would be capable

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 524 of 785
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 102 of 153
*EPA's Response to Comments on Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                      *December 16, 2020*

of achieving the no-jeopardy mandate with respect to species and critical habitat in Retained Waters that are in the action area downstream from the permitted activity."

Some commenters expressed that a statewide "one-size-fits-all" ITS that provides FDEP with "near blanket authorization" to exempt Section 404 permit applicants from the ESA's take prohibition would violate the ESA. The commenter stated that an ITS of this nature would likely provide no limits on take or provide woefully inadequate limits to trigger re-initiation of consultation.

One commenter contended that the Biological Assessment "fails to be as protective as the current federal process," noting that "the Biological Assessment fails to provide site-specific information, thereby preventing the intended state implementing agencies (FDEP and the FWC) from even determining the effect of various specific permitting actions" and "the Biological Assessment provides very limited—almost nonexistent—information about the cumulative impacts of the State's assumption program." The commenter asserted that the Biological Assessment fails to adequately address the environmental baseline, status of the species, effects of the action, or reasonable and prudent measures designed to reduce any take identified, and contains other flaws, including lack of information on what constitutes "suitable habitat;" an unreasonably short timeframe for USFWS to decide if it will comment; FDEP and FWC will make effect determinations and assume no comment from USFWS if there is silence (no duty to check); and designation of the key deer and red cockaded woodpecker as not regularly utilizing wetlands despite their state or county wetland dependent designations. The commenter stated that the overarching programmatic consultation, particularly with these flaws, does not relieve the state of its responsibility to determine at the site-specific permit level whether there will be no jeopardy to listed species prior to the issuance of permits. Another commenter expressed concern that that "use of a Programmatic Biological Opinion between FDEP and the FWS and between FDEP and the NMFS is wholly inadequate to protect vulnerable ESA threatened and endangered plant and animal species from Section 404 authorized developmental impacts." This commenter concluded that this alone should disqualify FDEP from Section 404 program assumption.

One commenter added that flaws in EPA's Section 7 consultation process render any potential resulting Programmatic Biological Opinion insufficient. The commenter argued that the NMFS erred in failing to consider the entire area that will be affected by Florida's assumption and not engaging in the Section 7 consultation. The commenter contended that NMFS is merely "assum[ing] that EPA will make a 'no effect' determination for NMFS' ESA-listed species that were originally identified as part of this proposed assumption," based on NMFS' recent determination that "Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in waters that are assumable by the state." The commenter urged that Section 7 consultation must occur for species and critical habitat that are in the "action area" and "action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." The commenter stated that without consulting NMFS, there will be no consideration of whether the no-jeopardy mandate in the CWA's Section 404(b)(1) Guidelines is achievable for NMFS' species experiencing downstream impacts.

One commenter asserted that "the state has failed to demonstrate that its program would conform to the CWA's 404 permitting regulations, "the 404(b)(1) Guidelines," with respect to matters involving ESA-listed species." This commenter warned that improper management of the program and failure to consider the entire action area affected by state assumption during ESA consultation would endanger the Florida Panther, the Florida bonneted bat, and the Everglades snail kite due to habitat loss and fragmentation.

Some commenters warned that Florida's assumption of CWA Section 404 program would result in reduced protection for endangered species, stressing that Florida's endangered species "cannot afford to lose the protection of federal laws that are triggered when federal agencies operate the 404 program." These commenters noted that the federal operation of the Section 404 program triggers a myriad of other federal protections, including: the ESA, the Magnuson-Stevens Act that protects the essential fish habitat in our world-class fisheries, the NEPA, and the NHPA, which protects our historical and cultural resources.

Some commenters observed that Florida contains many unique environments that provide critical habitat for hundreds of species that, although not endangered, could become endangered if development is allowed to proceed as a result of Florida's taking over regulation of the CWA and the ESA.

One commenter expressed concern that, if the federal Fish and Wildlife Coordination Act were replaced with a patchwork of memoranda of understanding between federal and state agencies, this would remove accountability for this vital public responsibility.

One commenter emphasized the original intent of the ESA was to protect endangered species, regardless of the practicality or convenience. Finally, one commenter asserted that compliance with the ESA was in itself inadequate.

### *Permits with potential ESA species*

Some commenters expressed concern about whether the State program would conform to the Section 404(b)(1) Guidelines to protect specific species and questioned the legal liability of a programmatic consultation for assumption that would cover all permits the State issues.

A commenter asked that the State take more time to consider the liability for take of listed species from projects with State permits. This commenter questioned the suggestion by the State that a programmatic consultation for assumption would cover all permits the State issues, asserting that "This is an incredibly controversial legal statement and has not been given sufficient time for a review, and it would most certainly be tested in court." This commenter noted that EPA has never considered programmatic consultations to be part of the assumption process until a few months ago, and that, in cases where they were used by USFWS, they "were used to facilitate the permitting of repeated actions that have similar and predictable impacts." This commenter observed that the "404 program deals with an incredibly wide variety of projects and potential impacts, ones that cannot be captured in a programmatic fashion" and concluded that legal actions could be taken against permittees for incidental take if "the legal argument that a programmatic review protects all permits falls through," which could lead to a regulatory program more burdensome than the existing federal program. One commenter questioned

whether an incidental take statement from a programmatic consultation could cover the permits issued by FDEP and withstand legal challenge.

*ESA coordination process during permit review (other than EPA oversight matters)*

Some commenters expressed concerns about the coordination between agencies during the permit review process. One commenter observed that the requirements of the Fish and Wildlife Coordination Act will be split among multiple agencies. The commenter contends that the State program's numerous Memoranda of Understanding prepared between the EPA, Corps, FDEP, USFWS, FL Water Management Districts, and the FWC only serve to obscure the accountability for protection of listed species. This commenter also noted that the Florida Legislature gave no additional authority to state agencies to protect endangered and threatened species.

Another commenter stated that FDEP's proposed technical assistance process is not modeled on the structured Section 7 consultation process that is legally required by the ESA, and further "fails to provide specific information about how and to what extent the [US Fish and Wildlife] Service will review permits that FDEP and FWC choose to share with it." The commenter observed that, instead of delineating specific mandatory actions, the proposal asserts that the USFWS will provide 'comments' on permit applications, that FDEP will 'coordinate' with other agencies regarding concerns raised at public hearings, and that it is 'anticipated' that the FDEP will participate in 'unspecified trainings,' create 'unspecified evaluation tools,' 'assisting' with determining species impacts, and developing habitat conservation or species management 'opportunities.'

One commenter expressed opposition to Florida's assumption, stating that the Florida Constitution grants the FWC power to regulate only wildlife and freshwater and marine life, and not pollution. The commenter asserted that FDEP has not demonstrated that it has the authority to regulate species under state law. The commenter concludes that the FWC cannot lawfully exercise its authority over species regulation to act as an essential decision-maker in Section 404, which is a water pollution program.

**EPA Response:**

**EPA acknowledges the comments in support of EPA's decision to undergo programmatic ESA consultation with the FWS. EPA agrees that a biological opinion and incidental take statement can be implemented in the State of Florida.**

**EPA notes the concern raised by a commenter regarding EPA's change in position on the applicability of ESA Section 7 consultation when EPA reviews whether to approve a state assumption request. EPA's determination that it should consult with the Services under Section 7 of the ESA if a decision to approve a state or tribal CWA Section 404 program may affect ESA-listed species or designated critical habitat is outside of the scope of the comment period on Florida's program submission as set forth in 40 C.F.R. § 233.15. This determination was discussed in an August 27, 2020 memorandum from David Ross, Assistant Administrator for the Office of Water, and titled "Memorandum on Endangered Species Act Section 7(a)(2) Consultation for State and Tribal Clean Water Act Section 404**

Program Approvals." In the memorandum, EPA explained that on May 21, 2020, the Agency initiated a 45-day public comment period (which ended up being a total of 47 days) through an announcement in the Federal Register titled "Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Nondiscretionary for Purposes of Endangered Species Act Section 7 Consultation." That public comment period closed on July 6, 2020, and EPA received comments from a variety of stakeholders.

In its August 27, 2020, memorandum, EPA determined that ESA Section 7 applies to EPA's decision as to whether to approve a state or tribal request to assume a CWA Section 404 program. That determination triggered the requirement for EPA to consult under ESA Section 7 if EPA determined that approval of Florida's CWA 404 program may affect a listed species or designated critical habitat. The analysis in a Section 7 consultation is whether the action is likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. EPA is not required to make a determination whether Florida's program goes above and beyond that requirement of the federal ESA or other law. EPA has met its requirements to ensure no likely jeopardy to listed species or likely destruction or adverse modification to designated critical habitat under ESA Section 7(a)(2) by completing ESA consultation and receiving a "no jeopardy" Biological Opinion (BiOp) from the Service. EPA agrees with commenters that it is up to EPA and USFWS to structure the consultation and fulfill the Section 7(a)(2) requirement for the federal agency to insure that the federal agency action is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. EPA and USFWS concluded ESA consultation on November 17, 2020, with a "no jeopardy" finding in the Biological Opinion, therefore no additional action for ESA consultation is required.

In response to a commenter asserting that a truncated programmatic consultation does not analyze effects of EPA's whole action, jeopardy determinations, or take limits, ESA implementing regulations set forth at 50 C.F.R. § 402.02 describe a programmatic consultation as a consultation that is addressing an agency's multiple actions on a program, region, or other basis. Programmatic consultations allow the Services to consult on the effects of programmatic actions such as . . . [a] proposed program, plan, policy, or regulation providing a framework for future proposed actions. In its Biological Opinion, USFWS noted that "the scope of EPA's approval of FDEP's request to administer the CWA 404 program in assumable waters is essentially statewide, covering an array of operations that may affect a wide variety of ESA-proposed and -listed species and proposed and designated critical habitat" and that "[b]ecause this is a consultation on a programmatic action, it is not feasible, nor is it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp." *U.S. Fish and Wildlife Service, Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program Under Section 404 of the Clean Water Act (November 17, 2020)* at 54 ("Biological Opinion").

EPA disagrees with the commenter who stated that the biological assessment suffers numerous flaws and that the programmatic consultation process unlawfully delegates

federal responsibilities to FDEP. EPA has engaged in an ESA Section 7 consultation for purposes of its proposed action, which is EPA's potential approval of the State of Florida's request for the assumption of the administration and permitting of a CWA Section 404 program. In accordance with 50 C.F.R. § 402.08, "the ultimate responsibility for compliance with section 7 remains with the Federal agency." EPA utilized FDEP's biological assessment in order to prepare its biological evaluation, which included an effects determination and which the EPA transmitted to the USFWS on September 2, 2020, to request formal consultation. As indicated in the Biological Opinion issued on November 17, 2020, by USFWS, "[t]he implementation of the State's program in evaluating permit applications, issuing or denying permits, compliance and enforcement of permit conditions, and all the ensuing execution of permitted activities by permittees are considered program activities emanating from the action and have been considered under this programmatic consultation and BiOp." Biological Opinion at 10.

EPA acknowledges the comments stating that neither the Biological Opinion, the Biological Assessment, an incidental take statement, or final MOU among FWC, FDEP, and USFWS were included as part of FDEP's application. However, EPA disagrees that FDEP is required to include these documents as part of its application, which, in turn, is subject to notice and comment. A biological assessment, biological opinion, or incidental take statement are not required elements of Section 404 program submissions, as set forth in 40 C.F.R. § 233.10. Further, the regulations set forth at 40 C.F.R. Part 233 describe the public participation procedures for approving state programs. Neither the CWA implementing regulations at 40 C.F.R. Part 233 (governing state 404 programs) nor the ESA implementing regulations at 50 C.F.R. Part 402 (interpreting and implementing ESA Section 7) require public comment on biological assessments, biological opinions, or incidental take statements. Additionally, although FDEP submitted a copy of the Memorandum of Understanding Between the FWC, the USFWS, and the FDEP, dated August 5, 2020, which was made available for public review as part of Florida's submission, this was not required by the CWA implementing regulations. See Response to Comments Section D regarding completeness of program submission.

EPA disagrees with assertions that Florida's assumption of a Section 404 program would result in lesser protection for endangered species. The USFWS Biological Opinion finds that the process developed by Florida in partnership with the USFWS and EPA is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. Biological Opinion at 68. EPA makes no determination about whether Florida's program or protection of species "goes above and beyond the requirements of federal law."

EPA disagrees with the commenters stating that programmatic consultation will not provide incidental take coverage to permittees. The Services are required, as part of formal consultation, to prepare an incidental take statement if such take is reasonably certain to occur and will not violate ESA Section 7(a)(2). 50 C.F.R. 402.14(g)-(i). Pursuant to the ESA regulations, the USFWS provided an incidental take statement in the November 17, 2020 Biological Opinion. Thus, under the ESA regulations, "any taking which is subject to a

statement as specified in [50 C.F.R. 402.14(i)(1)] and which is in compliance with the terms and conditions of that statement is not a prohibited taking under the [ESA], and no other authorization or permit under the [ESA] is required." 50 C.F.R. 402.14(i)(5). In the present approval of Florida's CWA 404 program, the USFWS programmatic Biological Opinion and ITS states: "any take incidental to the execution of activities permitted by a State 404 permit issued through the implementation process described in this BiOp will be exempt from Section 9 and Section 4(d) prohibitions if the permittee implements all permit conditions such as effect minimization measures, monitoring, and reporting as agreed upon by the State, and the USFWS." Biological Opinion at 70.

USFWS' incidental take statement provides take protection to the State of Florida, but it does not provide take protection without an understanding of the impacts of permits on listed species. In addition, the take statement does not rely on unenforceable promises of future action and is not a one-size-fits all approach. The approach provides a process for assessing impacts to species on a project-level giving Florida's species consideration when projects are being considered. The USFWS' incidental take statement recognizes that project-specific information about impacts to listed species and designated critical habitat will be provided through implementation of the state program, EPA's oversight of the Section 404 program, and coordination of the federal review of the state-issued permits. USFWS will then have the opportunity to review the state permit applications and evaluate those projects, and coordinate and provide technical assistance to the state in order to minimize impacts to listed species and designated critical habitat. The Biological Opinion goes on to state:

> If it is determined, through technical assistance on permit reviews with State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified, at that time by the appropriate Field Office of the USFWS, in coordination with FDEP/FWC. FDEP/FWC and USFWS will review reports and track the levels of take estimated through the technical assistance process and exempted by this Incidental Take Statement. Biological Opinion at 70.

Therefore, EPA disagrees with the commenters' assertion that the incidental take statement does not take into account an understanding of impacts to listed species and designated critical habitat. As established in the FWC-USFWS-FDEP MOU, USFWS has the ability to evaluate the impacts on a project-specific basis. In addition, EPA disagrees that incidental take coverage is provided by USFWS based on unenforceable promises of future action. In fact, USFWS' Biological Opinion provides incidental take coverage for permitting actions only if the permittee implements all permit conditions agreed upon by the State and USFWS. See Biological Opinion at 70. Consequently, the application of incidental take coverage is enforceable and will not be provided if the permittee does not implement the permit conditions.

EPA disagrees with commenter assertions that in approving Florida's Section 404 program, EPA and the State are required to "replace" ESA Section 7 consultation for the

State permitting program. ESA Section 7 applies only to federal agency actions, not state actions. Regardless, as a result of the ESA consultation between EPA and USFWS on EPA's approval of Florida's CWA Section 404 program, FDEP and USFWS will coordinate on state-issued permits and FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat. Biological Opinion at 68. See Response to Comments Section M regarding comments concerning replacement of NEPA protections.

EPA acknowledges the comment that HCPs can achieve certain benefits for species protection. However, EPA disagrees that the ESA consultation process would conflict with or undermine HCP collaboration efforts. EPA also disagrees with comments asserting that Florida has not ensured protection of listed species or maintained the levels of review provided by ESA. First, a programmatic consultation approach will ensure that species are protected similar to a case-specific application of ESA Section 10. Second, as the USFWS Biological Opinion recognizes:

> USFWS will be conducting the [USFWS commitments] through the technical assistance process, and not through section 7 or section 10 of the ESA. To clarify that USFWS coordination through a technical assistance process, USFWS will not "concur" with any effect determinations made by the State of Florida, but rather may provide comments and conditions that must be implemented in order for the permit to be issued. This process of USFWS coordination and technical assistance operates similarly to a section 7 consultation because it has a similar objectives of 1) ensuring a State 404 permit action is not likely to jeopardize a species or adversely modify or destroy critical habitat, and 2) minimizing and tracking the amount of incidental take if take is reasonably certain to occur. Biological Opinion at 20.

In addition, if FDEP chooses not to follow, or is unable to implement the Reasonable and Prudent Measures and associated Terms and Conditions of the Incidental Take Statement, project applicants may seek protections from the take prohibitions of the ESA by obtaining take authorization pursuant to section 10(a)(1)(A) and 10(a)(1)(B) of the ESA or exemption through a separate ESA Section 7(a)(2) consultation if another federal nexus exists. Biological Opinion at 70.

In response to a comment asserting that EPA appears to have no ongoing obligation to ensure that FDEP complies with the ESA after it has completed consultation on the assumption application, EPA notes that it maintains its role as the oversight agency following FDEP's assumption of the Section 404 program. EPA disagrees with the comment that FDEP's regulations do not appear to commit the Agency to incorporate recommendations made by the Service during technical assistance. Section 7.2.3 of the 404 Handbook requires FDEP to "incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the FWC, FWS, or NMFS under their respective authorities, to avoid jeopardizing listed species or

adversely modifying designated or proposed critical habitat." Failure to include the
protection measures as permit conditions that are designed to avoid jeopardy or adverse
modification of designated critical habitat could ultimately result in the State either
denying the permit or the State informing the EPA that it will neither issue nor deny the
permit, which would result in the EPA transferring the permit to the Corps for processing
in accordance with 40 C.F.R. § 233.50(j).

EPA disagrees with commenter assertions that it did not consult with NMFS, and that
there was thus a legal or technical deficiency. In a letter dated April 15, 2020, NMFS
responded to a request for input on a draft species list sent to it by FDEP, which was
designated to serve as the EPA's non-federal representative for purposes of conducting
informal consultation under Section 7 of the ESA. In the letter, NMFS concluded that ESA-
listed species under NMFS' jurisdiction do not occur in waters that are assumable by the
state. In accordance with 62-331.053, F.A.C., no permit shall be issued by the state when
the project causes or contributes to violations of any applicable state water quality
standard or to significant degradation of wetlands or other surface waters. Thus, where a
species subject to jurisdiction under NMFS occurs in waters retained by the Corps that are
located downstream from permitted activities in state-assumed waters, upstream
protections provided by the state-issued permits would ensure that all action areas,
including downstream areas that are indirectly affected by the action, have been
considered.

FDEP's process for evaluating impacts to listed species and designated critical habitat
involves FWC and USFWS (both state and federal agencies with expertise in impacts to
listed species and designated critical habitat). The USFWS Biological Opinion recognizes
the role of FWC:

> FDEP cannot authorize impacts, specifically incidental take, of State-listed species
> identified in Chapter 68A-27, F.A.C. Therefore, FDEP has historically coordinated
> protection and conservation of aquatic and terrestrial fish and wildlife species with
> the FWC. FWC's permit commenting authority was codified upon the agency's
> creation of Section 20.331(10), Fla. Stat. The FWC provides a list of potentially
> affected federally and State-listed species to FDEP during ERP application review.
> It also evaluates potential impacts to State-listed fish and wildlife for ERP Program
> project applications that are expected to affect species and habitat, and provides
> recommendations for permit conditions to the FDEP to minimize such effects. As
> described in the BE (Appendix A), FWC will continue to comment on ERP permits
> and will be commenting on State 404 permits should EPA approve FDEP's
> assumption of the 404 program, per the State 404 Program Rule (62-331, F.A.C.),
> the State ERP Rule (62-330, F.A.C), and the FDEP-FWC-USFWS MOU. Biological
> Opinion at 11.

EPA disagrees with the comment that nothing in the law prevents FDEP from ignoring
USFWS's recommendation because the CWA Section 404(b)(1) Guidelines provide that no
discharge of dredged or fill material shall be permitted if it jeopardizes the continued

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 532 of 785
USCA Case #24-5101    Document #2102936         Filed: 02/26/2025    Page 110 of 153
*EPA's Responses to Comments on Florida's State 404 Program Submission Requesting to Assume*
*a Clean Water Act Section 404 Program*                                    *December 16, 2020*

existence of listed species or results in the likelihood of the destruction or adverse modification of designated critical habitat. 40 C.F.R. § 230.10(b)(3). USFWS' Biological Opinion also states:

> The USFWS will receive all permit applications and public notices directly from FDEP in accordance with the FDEP-FWC-FWS MOU and 62-331, F.A.C. USFWS will also receive species effect assessments from FWC or FDEP. USFWS will review all permit applications and effects assessments received from FDEP and FWC. USFWS will submit questions, information and comments or measures necessary to minimize effects to ESA-listed species as needed. FDEP, in coordination with FWC, will receive, review, and incorporate any impact minimization measures received from USFWS into its permit actions pursuant to the FDEP, FWC, USFWS MOU and FDEP's State 404 program rule (62-331, F.A.C.). Biological Opinion at 12.

The Biological Opinion goes on to state:

> The State's lead for species coordination may be FWC staff, or the permit processor with FDEP, depending on the complexity of the request and the workload. Regardless of the designated staff to be the point person for coordinating with the USFWS, both State agencies will work together as a team for all projects with listed species issues. For each State 404 permit application review, staff with FWC and FDEP will determine who will take the lead to coordinate with the USFWS and will copy the other reviewer on all correspondence. The State species lead will provide, and/or validate the applicant's submittal of a preliminary list of species anticipated to be affected, identification of project areas, preliminary impact/effect determinations, and preliminary proposed impact avoidance and minimization measures (protection measures) for federally listed and State-listed endangered or threatened species (and species proposed to be listed) and their critical habitats. *Upon coordination with the USFWS on appropriate protection measures for federally listed species and their critical habitats, FDEP will incorporate the USFWS-recommended measures as permit conditions, or will issue a Notice of Intent to Deny the permit.* Biological Opinion at 16 (emphasis added).

Thus, FDEP is required to incorporate USFWS' recommendations into state-issued permits, ensuring that USFWS' recommendations will not be ignored, as the commenter asserts.

EPA acknowledges the comments stating that reinitiation of ESA consultation would not be required or "interminable." EPA recognizes that the ESA regulations state that, "[r]einitiation of consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and: (1) if the amount or extent of taking species in the incidental take statement is exceeded; (2) if new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) if the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological

opinion or written concurrence; or (4) if a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. 402.16. Reinitiation of ESA consultation may be required if one of the reinitiation triggers under the ESA regulations are met or if a state's CWA Section 404 program is revised.  The question of whether reinitiation is required in a circumstance must be assessed in light of the legal requirements and facts at that time. The Biological Opinion's section on reinitiation states:

> For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9. Additionally, the listing of a new species or critical habitat shall not trigger reinitiation of consultation on this action (approval of Florida's assumption of the CWA 404 program). Since the State would administer the CWA 404 program, the USFWS has no obligation to conduct section 7 consultation on individual permits because the issuance of such a permit is not a Federal action. However, the State's regulations require that the State comply with the technical assistance process with USFWS for ESA listed species and critical habitat. Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed." Biological Opinion at 68.

EPA submitted a biological evaluation to the USFWS when it requested initiation of formal consultation under Section 7(a)(2) of the ESA. A biological evaluation is a similar document to a "biological assessment" except unlike biological assessments, a biological evaluation is prepared for non-construction activities. The purpose of a biological evaluation is to assess the potential effects of the federal agency action on listed species and designated critical habitat and determine whether the federal agency action is likely to adversely affect any such species or habitat. Biological assessments or evaluations are not intended to provide protections. The biological evaluation is part of the ESA consultation initiation request to the USFWS and is not a part of the State Section 404 program submission. EPA's biological evaluation contained the required analyses to initiate ESA Section 7 consultation, including an evaluation of the environmental baseline, status of the species, cumulative effects, and other analyses. See "ESA Biological Evaluation for Clean Water Act Section 404 Assumption by the State of Florida" August 2020. Biological evaluations are not required to include reasonable and prudent measures (reasonable and prudent measures are elements of a Biological Opinion issued by the USFWS or NMFS).

EPA initiated ESA consultation with the USFWS, and the USFWS issued a Biological Opinion on November 17, 2020, and found that the process developed by Florida in partnership with the USFWS and EPA is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat. The Biological Opinion contains the required analyses, including evaluation of the environmental baseline, an effects analysis, reasonable and prudent measures, and other elements required by USFWS's ESA implementing regulations. The CWA Section 404(b)(1) Guidelines prohibit the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the destruction or adverse modification of designated critical habitat.

*EPA's Response to Comments on Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                          *December 16, 2020*

The State's process and rules and the USFWS Biological Opinion recognize this
prohibition. See Biological Opinion at 30. In addition, the Biological Opinion states:

> EPA's approval of the State's 404 program activates the FDEP-FWC-USFWS MOU
> which establishes a process whereby the USFWS will be provided an opportunity to
> review all State 404 permit applications, and analyze impacts to ESA-listed species
> and designated critical habitat that may result from activities permitted by the State
> 404 program and provide technical assistance to FDEP with respect to avoiding and
> minimizing effects on ESA-listed species and their critical habitats. During this
> review, the USFWS will have an opportunity to provide additional information
> concerning potential effects to ESA-listed species, recommend measures to minimize
> effects, and provide monitoring and reporting recommendations on a project-
> specific and species-specific basis.

> Our opinion is that the proposed action (including the subsequent program
> activities it will cause) has built in a sufficiently structured process to insure that the
> State's administration of section 404 of the CWA in assumed waters is not likely to
> cause an appreciable reduction in the likelihood of both the survival and recovery of
> any listed species by reducing the reproduction, numbers or distribution of that
> species. It is also our opinion that the proposed action has built in a sufficiently
> structured process to insure State's administration of section 404 of the CWA in
> assumed waters is not likely to result in destruction or adverse modification of
> critical habitat. Biological Opinion at 68.

EPA disagrees that less time and expertise will be involved in the analysis of project
impacts on vulnerable wildlife. The Biological Opinion makes clear that FWC and USFWS
(as well as FDEP and EPA) will have roles in determining the impacts of projects on listed
species and designated critical habitat. The Biological Opinion also recognizes that "FDEP
will incorporate as permit conditions all recommended impact avoidance and minimization
measures (protection measures) provided by the USFWS to avoid jeopardizing listed or
proposed species and/or adversely modifying designated or proposed critical habitat."
Therefore, FDEP will have the benefit of USFWS' expertise on listed species and
designated critical habitat impacts in the development of permit conditions.

EPA recognizes that the ESA describes "action area" to include those areas that also are
indirectly affected by a federal action. In a letter dated April 15, 2020, NMFS responded to
a request for input on a draft species list sent to it by FDEP, which was designated to serve
as the EPA's non-federal representative for purposes of conducting informal consultation
under Section 7 of the ESA. In the letter, NMFS concluded that ESA-listed species under
NMFS' jurisdiction do not occur in waters that are assumable by the state. Thus, EPA was
not required to consult with NMFS under ESA Section 7(a)(2). In addition, as set forth in a
December 16, 2020, memorandum to the record, EPA determined that the decision to
approve or disapprove Florida's request for assumption of a 404 program would have no
adverse effects to Essential Fish Habitat, pursuant to the Magnuson-Stevens Fishery
Conservation and Management Act (MSFCMA). Thus, EPA is not required to consult with

*EPA's Response to Comments on the State of Florida's Program Submission Requesting to Assume      a Clean Water Act Section 404 Program                                                     December 16, 2020*

NMFS under the MSFCMA. In accordance with 62-331.053, F.A.C., no permit shall be issued by the state when the project causes or contributes to violations of any applicable state water quality standard or to significant degradation of wetlands or other surface waters. Thus, where a species subject to jurisdiction under NMFS occurs in retained waters located downstream from permitted activities in state-assumed waters, upstream protections provided by the state-issued permits would ensure that all action areas, including downstream areas that are indirectly affected by the action, have been considered.

EPA acknowledges the commenters' concern that the FDEP submittal does not demonstrate that it can achieve the CWA's no-jeopardy mandate with respect to listed species. EPA disagrees with the commenters for the following reasons. The State 404 program rule at 62-331, F.A.C. prohibits issuance of a permit that is likely to jeopardize the continued existence of endangered or threatened species or result in the likely destruction or adverse modification of habitat designated as critical for these species. In addition, as stated above, the CWA Section 404(b)(1) Guidelines prohibit the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the likelihood of the destruction or adverse modification of designated critical habitat.

The program submission describes how the State will comply with the Section 404(b)(1) Guidelines, and EPA has determined that FDEP has demonstrated its ability to comply with the Section 404(b)(1) Guidelines. The Program Description states that the MOU between FWC, USFWS, and FDEP outlines coordination procedures for listed species reviews. Program Description, section (j) – Additional Information at 2. The draft MOU between FWC, USFWS, and FDEP was included in the appendix of the Program Description. FDEP will monitor adverse effect determinations on listed species and critical habitat by incorporating information into its permit tracking database, similar to the information collected by the Corps. This data collection will assist in facilitating compliance with permit conditions and can also be shared with USFWS. Failure to include the protection measures as permit conditions that are designed to avoid jeopardy or adverse modification of designated critical habitat would ultimately result in the State either denying the permit or the State informing the EPA that it will neither issue nor deny the permit, which could result in the EPA transferring the permit application to the Corps for processing in accordance with 40 C.F.R. § 233.50(j). The USFWS' Biological Opinion finds that this process is not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat.

As for reinitiation of consultation and triggers, the Biological Opinion addresses those concerns, specifically stating:

> For the purposes of this programmatic consultation, any exceedance of take for a State 404 permit action that has not been completed will be addressed as described in FDEP's term and condition number 9. Additionally, the listing of a new species or critical habitat shall not trigger reinitiation of consultation on this action (approval of Florida's assumption of the CWA 404 program). Since the State would

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 536 of 785
USCA Case #24-5101   Document #2102936      Filed: 02/26/2025   Page 114 of 153
*EPA's Responses to Comments on Florida's 404 Program Submission Requesting to Assume*
*a Clean Water Act Section 404 Program*                              December 16, 2020

administer the CWA 404 program, the USFWS has no obligation to conduct section 7 consultation on individual permits because the issuance of such a permit is not a Federal action. However, the State's regulations require that the State comply with the technical assistance process with USFWS for ESA listed species and critical habitat. Accordingly, any effects to newly listed species or their critical habitat would be sufficiently considered and addressed. Biological Opinion at 73.

EPA's approval of Florida's CWA Section 404 program does not transfer regulation of the ESA to the State. ESA Section 7 applies only to federal agency actions, not state actions. Regardless, ESA protections will remain, because as a result of the ESA consultation between EPA and USFWS on EPA's approval of Florida's CWA Section 404 program, FDEP and USFWS will coordinate on state-issued permits and FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed or proposed species and/or adversely modifying designated or proposed critical habitat.

EPA's approval of Florida's CWA Section 404 program does not alter the USFWS' authority under the Fish and Wildlife Coordination Act to provide assistance and cooperate with state and other agencies in the development, protection, rearing, and stocking of all species of wildlife, resources thereof, and their habitat. See 16 U.S. § 661(b). In addition, EPA has complied with ESA Section 7(a)(2) and has met its requirements to ensure no likely jeopardy to listed species or likely destruction or adverse modification to designated critical habitat by completing ESA consultation and receiving a "no jeopardy" Biological Opinion from the USFWS.

Finally, EPA's approval of Florida's CWA Section 404 program does mean that certain federal statutes will no longer apply to State-issued permits. Congress authorized the EPA Administrator to approve program transfers from the Corps to the states and tribes. Under CWA Section 404(h)(2), if the Administrator determines that a State that has submitted an application for a Section 404 program has the authority set forth in Section 404(h)(1), then the Administrator shall approve the program. The CWA does not provide the Administrator with the authority to consider whether federal laws will no longer apply or disapprove a state's program on that basis.

EPA acknowledges receipt of a comment that calls into question whether a programmatic consultation is appropriate given the wide variety of projects and impacts that are addressed through a Section 404 permitting program. As explained above, the ESA implementing regulations specifically authorize programmatic consultations, a process that has been specifically designed to address federal decisions involving more than individual projects and instead contemplate analyzing impacts from future similar activities. See 50 C.F.R. 402.02.

In addition, EPA received a "no jeopardy" Biological Opinion from USFWS on November 17, 2020. The Biological Opinion considered the listed species and designated critical habitat in the action area of EPA's approval and concluded that EPA's approval of Florida's CWA Section 404 program was not likely to jeopardize the continued existence of

listed species or result in the destruction or adverse modification of designated critical habitat. The Biological Opinion specifically considered the Florida panther, Everglades snail kite, and Florida bonneted bat. See Programmatic Biological Opinion for U.S. Environmental Protection Agency's Approval of FDEP's Assumption of the Administration of the Dredge and Fill Permitting Program under Section 404 of the Clean Water Act at 6.

Further, EPA disagrees with comments that the State will not be able to comply with the Section 404(b)(1) Guidelines, which prohibit the discharge of dredged or fill material if it continued jeopardizes the continued existence of listed species or results in the destruction or adverse modification of designated critical habitat. The State's process is designed to comply with the 404(b)(1) Guidelines. The State's rules and the USFWS Biological Opinion recognize this prohibition, and the Biological Opinion reaffirms that the State must follow 40 C.F.R. § 230.10(b)(3) in the issuance of permits.

Finally, EPA disagrees with comments suggesting that programmatic consultation could not yield an incidental take statement and could not cover the state-issued permits or that the Incidental Take Statement would be one-size fits all and provide a blanket take authorization. The USFWS' Biological Opinion finds that incidental take will be quantified and evaluated on a project-specific basis. The Biological Opinion relies on the technical assistance process between the State and Federal agencies to provide its no jeopardy conclusion and also to provide incidental take coverage. The State-issued permits will have limits on take. The Biological Opinion states:

> For proposed activities in which the State has permitting authority and for which incidental take of ESA-listed species is reasonably certain to occur, the amount and extent of incidental take anticipated from these proposed activities will be quantified and evaluated on a project-specific basis through the technical assistance process conducted between the USFWS and the State. Biological Opinion at 69.

EPA disagrees with the commenter who questioned whether an incidental take statement from a programmatic consultation could provide take protection for permits issued by FDEP. In *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49, 76-77 (2nd Cir. 2018), the Second Circuit held that a similar incidental take statement (one that did not specify a numerical cap on incidental take of species, allowed for the quantification of take at a the permit-level, and which applied to a broad array of state-issued permits) did comply with the ESA if the Biological Opinion explained why it was impracticable to express a numerical measure of take. Here, the Biological Opinion for EPA's approval of Florida's CWA Section 404 program provides sufficient explanation. The Biological Opinion explains that the "inability to anticipate the locations of future State 404 permit applications did not allow the Service to conduct site- and species-specific analyses to estimate the number of individuals that might be affected by the permitted activities." Biological Opinion at 69-70. The Biological Opinion goes on to explain that the State's program implementation, EPA's oversight of the State 404 program, and coordination of federal review of state permitting will provide project-specific information to USFWS. In

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 538 of 785
USCA Case #24-5101    Document #2102936         Filed: 02/26/2025    Page 116 of 153

*EPA Review of Comments on the State of Florida's Program Submission Requesting to Assume*
*a Clean Water Act Section 404 Program*                           *December 16, 2020*

addition, the Biological Opinion finds that USFWS will be able to evaluate projects and species conditions and provide technical assistance to the state to adjust permitting actions that may result in take. **Biological Opinion at 70.**

**Importantly, the Biological Opinion states:**

> If it is determined, through technical assistance on permit reviews with State that take of ESA-listed species is still expected to occur after implementation of recommended minimization measures, the amount or extent of incidental take will be quantified, at that time by the appropriate Field Office of the USFWS, in coordination with FDEP/FWC. FDEP/FWC and USFWS will review reports and track the levels of take estimated through the technical assistance process and exempted by this Incidental Take Statement. **Biological Opinion at 70.**

EPA disagrees with the commenter who alleged that the Florida Legislature provided no additional authority to State agencies to protect endangered and threatened species. Both the Section 404(b)(1) Guidelines and Florida's rules set forth at 62-331.053, F.A.C. prohibit the discharge of dredged or fill material if it jeopardizes the continued existence of listed species or results in the destruction or adverse modification of designated critical habitat. In Florida's General Counsel's Statement, Justin G. Wolfe, General Counsel for FDEP, states that Florida is seeking to assume the CWA Section 404 program pursuant to the authority granted in Section 373.4146, F.S.

One commenter asserted that FDEP's proposed technical assistance process is not modeled on the Section 7 consultation process that is required under the ESA. ESA Section 7 applies only to federal agency actions, not state actions. Regardless, as a result of the ESA consultation between EPA and USFWS on EPA's approval of Florida's CWA Section 404 program, FDEP and USFWS will coordinate on state-issued permits and FDEP will incorporate as permit conditions all recommended impact avoidance and minimization measures (protection measures) provided by the USFWS to avoid jeopardizing listed species and/or adversely modifying designated or proposed critical habitat. **Biological Opinion at 68.**

EPA disagrees with the commenter who alleged that there is no delineating of specific mandatory actions regarding the coordination that is anticipated to occur among FDEP, USFWS, and FWC. Florida's rules and Program Description (submitted with its package) provide sufficient details for the public to assess how the State plans to handle listed species issues. For example, the Program Description states: "If the Department determines a project has potential to impact listed species or their habitat, the Department will coordinate with FWS and/or FWC to provide recommendations for project design modifications or permit conditions that will avoid or minimize impacts to the listed species or their habitats." Program Description, section (b), at 5. The Program Description also states that the MOU between FWC, USFWS, and FDEP outlines coordination procedures for listed species reviews. Program Description, Section (j) – Additional Information at 2. The draft MOU between FWC, USFWS, and FDEP was included in the appendix of the Program Description. Thus, the public had sufficient information about how the State

planned to address issues pertaining to listed species and designated critical habitat in its
program and EPA has determined compliance with all statutory
and regulatory requirements necessary to assume the CWA Section 404 program. The
final, signed MOU was provided with the USFWS Biological Opinion and had no changes.

EPA disagrees with the commenter who stated that the FWC is constitutionally barred
from regulating water pollution. The characterization that FDEP's application
contemplates that FWC assumes a role in regulating water pollution once FDEP assumes
the State 404 permitting program is incorrect. Rather, as described in the MOU among
FWC, FWS, and FDEP, FWC proposes to provide preliminary effect assessments for
federally listed species and their critical habitat, as well as provide preliminary impact
avoidance and minimization measures that will become permit conditions during the FDEP
review of project applications. Florida affirms that FDEP has responsibility for
administering Florida's 404 program. Final General Counsel's Statement, signed by Justin
G. Wolfe, General Counsel for FDEP.

## O.  State conflict of interest

Commenters who expressed opposition to Florida's assumption said that Florida has many
powerful special interest groups that are more interested in making money than protecting or
preserving the environment. Commenters' list of special interests includes developers, builders,
water management districts, water management district boards, lobbyists, the State legislature,
and State officials, including current and past governors. Commenters cited Florida's history of
poor wetland protection and consistently expressed concerns that with a State-assumed program,
special interests will further destroy Florida's wetlands and waterways in the name of profit. A
commenter referenced wetland loses from various websites including the USDA and local
Florida websites.

Some commenters stated that Florida's assumption will allow powerful special interests to
increase development, fast track permits, weaken environmental protection, and exploit wetlands
for profit. Commenter said that influential mining and development interests will now develop
what is left of Florida's wetlands, and another commenter called Florida's assumption a "pay-to-
play" situation. One commenter said that developers are behind Florida's assumption, in order to
shorten the review process. A commenter cited the Urban Development Boundaries project in
South Florida as an example of special interests dictating the approach to wetland development.

A few commenters claimed that State governors, senators, and the State legislature are "in the
pocket" of developers, and one commenter said that Florida is run by developers. Other
commenters said that FDEP, the State, State employees, State authorities, State agencies, and
politicians are influenced by developers and special interests. One commenter said that
regulators in the State are susceptible to developers and their money, and another commenter
stated that politicians only look at the bottom line and are open to corruption. Some commenters
contended that Florida State officials, influenced by outside parties, will reduce wetlands. One
commenter stated that it is clear since the State's inception that Florida officials have proven
unable to stand up to development and protect the State's natural resources. A commenter stated

Case 1:21-cv-00119-RDM   Document 56-1   Filed 06/22/21   Page 540 of 785
USCA Case #24-5101   Document #2102936   Filed: 02/26/2025   Page 118 of 153
*EPA Response to Comments on Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                       December 16, 2020

that Florida has a history of back-room deals. Some commenters contend that Florida's assumption is a giveaway for developers to build and remove wetlands. Some commenters stated that political pressure will be put on the State to develop lands. Commenters also claimed that financial contributions to State campaigns could influence the implementation of Florida's program. Some commenters stated that the Florida government is only concerned about development and money, not environmental protection.

A commenter asserted that the Governor's Office and State Legislature have implemented and influenced the ERP program to the point that the FDEP/WMD staff see applicants as their "clients" and they hardly ever deny ERP permits authorizing the destruction of wetlands. The commenter said that WMDs' management bureaucracy is controlled by the Governing Boards (typically nine to 13 individuals) who are all political appointees of the sitting governor. The commenter said WMD Board members are typically developers, ranchers, big agricultural, and local politicians with little education in water resources. A commenter cited personal experience, contending that a particular Water Management District is corrupt and its former director is also a private consultant to real estate developers. A commenter said that if Florida assumed the Section 404 program, wetland protection would be under the whim of the governor and the political lobbyists that support the governor. Another commenter stated that Florida does not have a functioning water management system due to the governor. One commenter said that the State should appoint environmental and biological scientists to the State's governing boards and not developers and industrial experts.

A commenter stated that the last two administrations have significantly reduced scientific positions at FDEP and Water Management Districts, and in some cases replaced them with development-friendly individuals. Some commenters contended that Governor Rick Scott removed wetlands oversight by cutting 600 positions from the FDEP and packing the State governing boards with pro-development appointees, and the commenter contended that Governor DeSantis is going to do the same. A commenter stated that both the prior and current governor have stacked State governing boards with developers and pro-extraction individuals.

A commenter asserted that FDEP will not have the will or manpower to consider the environment. A commenter noted that the FDEP is an agency with appointees in charge, so it follows the governors' agendas. Another commenter added that assuming the Section 404 program is a way for the FDEP to court big business and developer interests. A commenter asserted that the CWA Section 404 program is susceptible to corruption by developers if the program is assumed by FDEP. A commenter said that the politically influenced FDEP will just fast-track permits. One commenter stated that FDEP is a permitting agency, not an environmental protection agency and actively looks for ways to help those seeking permits to be successful in obtaining those permits, which is inherently biased.

Many commenters opposing Florida's assumption expressed concerns that development interests would be prioritized over wetland protection by State agencies. Commenters emphasized that the FDEP is too close to local commercial interests and does not have the checks and balances needed when reviewing Section 404 permit applications from other State agencies and WMDs. Several commenters likened FDEP oversight to allowing the fox to guard the henhouse. Many

commenters stated that Florida's assumption is a "gift" to developers to build on and remove
wetlands, costing all citizens in the process. Commenters pointed to the State claim that Florida's
assumption will save time and money for developers and lower housing prices as cause for
concern and some commenters said it would open the door to more rampant development.
Commenters noted that real estate development pressures are always increasing in Florida, even
during the current economic slowdown. Several commenters said the State's priority should be to
preserve wetlands and not permit building.

A commenter stated that FDEP has become a rubber stamp for industry and businesses in
Florida, and in the past decade, elected officials and their appointees have proven they are
swayed by developers and industry. Another commenter agreed that special interests have
influenced development and that FDEP needs checks and balances in place based on the
destruction of wetlands for the last 20 years. A commenter stated that based on explicit
statements and the history of administration in the State, the purpose of Florida's assumption is
to let the State fast-track permitting and cater to special-interest developer groups. Another
commenter mentioned that Florida has a long and unfortunate history of allowing political,
developers, and other special interests to impact permitting and other environmental actions and
emphasized that Floridians cannot jeopardize the remaining wetlands by putting their fate in the
hands of an agency that is vulnerable to political and special interest influence.

Some commenters provided examples of concerns with FDEP's policies and management. A
commenter asserted that the FDEP requires developers to provide public notice only in obscure
publications as long as it is in the same county. A commenter asserted that FDEP used outdated
data to approve the Manatee Biologic Evaluation permit without considering impacts to the Sea
Grass Protection and Restoration Target Areas. A commenter cited other historical examples of
what were perceived to be FDEP's failings. A commenter asserted that Blue Cypress Springs and
Nestle's excessive withdrawal of water and incomplete standards for agricultural controls were
such an example. Another commenter pointed to the pollution of Biscayne Bay.

A commenter pointed out that water quality has declined with massive algae blooms and the
commenter blamed the decline on all levels of State and local government who are more
accessible to lobbying by land development and agricultural interests. Many commenters
asserted that history indicates that more wetlands and environmental resources will be lost if the
State takes over the Section 404 permitting program. A commenter cited the State's record of
poor environmental stewardship. Another commenter mentioned that State officials from the
State cabinet and the Legislature and their subordinates cannot be entrusted to serve the public
interest in environmental affairs and cited "non-constitutional" items such as fish-nets and pig
farms in the State constitution that show the favor of special interests.

Some commenters asserted that there will be no checks and balances if FDEP assumes Section
404 permitting. Some commenters stated that when reviewing Section 404 permit applications,
FDEP will not have the needed checks and balances from other State agencies and water
management districts. The commenters emphasized that the federal government plays a critical
role in balancing all variables in the permitting process.

One commenter stated that federal oversight is critical to ensure adequate protection of Florida waterways. The commenter contended that FDEP actively looks for ways to help those seeking permits to obtain permits and that FDEP's bias is inherent in the permit-issuing process; thus the commenter said that federal oversight is essential to strike a balance between the interests of the public versus interests of those seeking permits. A commenter contended that clear federal oversight and authority offers a critical layer of protection over Section 404 permitting, whereas FDEP's proposal limits those opportunities. The commenter cited Palm Beach County and the FL DOT's 2015 plan to widen State Road 7 as a situation in which federal agencies had multiple concerns and State agencies did not so the State agencies approved it. The commenter asserted that the State appellate court reversed the approval to force States agencies to review more carefully.

Some commenters stated that the federal agency is in a better position to make unbiased and uninfluenced decisions when it comes to protecting habitat of endangered wildlife and protecting freshwater sources. Many commenters urged the EPA to maintain federal protections and resources for Florida's wetlands and wildlife. One commenter said Florida needs strong federal protection that will not be pressured by developers. Some commenters said it is common knowledge that State officials are subject to pressures from State politicians while federal officials are not. A commenter was opposed to Florida's assumption out of concern that this transfer of authority from the federal government would likely result in a politicization of the permitting process.

A commenter stated that federal agencies have performed Section 404 permitting for decades in a way that protects the process from political and self-serving interests. Another commenter concurred, stating that the Corps will not be nearly as affected by pressure from the Florida legislature or the governor as would FDEP because the Corps is able to withstand politics and put the environment and water first. One commenter reiterated that Section 404 administration by the Corps is exposed to less political pressure and provides a necessary buffer between industry interests and review agencies. A commenter cited personal professional experience with both EPA and Corps and proclaimed that federal standards are high, and approval is predictable and stable, whereas State standards are choppy and political. A commenter asserted that State functions and standards do not strike a balance between protecting the environment and special interests. A commenter said that even though the Corps wants to straighten or dam waterways, at least they are not like the legislature, which they say is beholden to lobbyists. A commenter stated that even though Corps is not infallible, history indicates that they better serve as the objective arbiter of development. Similarly, another commenter asserted that as poor a record as federal officials have, State officials are even worse when it comes to sacrificing the State's environment to development interests.

A commenter noted that moving the program to the State removes the buffer that federal agencies use to act independently and wisely in the permitting process. One commenter pointed to the "amazing job" the federal government has done, whereas they asserted that the State will be pressured to make mistakes.

JA.2166

**EPA Response:**

EPA acknowledges commenter concerns about the potential for political influence on environmental resource decisions, including Section 404 permitting decisions in an assumed program. However, EPA disagrees with commenters who asserted that Florida would be unable to protect wetlands and other waters in a State-assumed 404 program. EPA disagrees that wetlands would be more susceptible to development in a State-assumed 404 program. EPA also disagrees that political influence will result in FDEP making CWA Section 404 permitting decisions that are not based on appropriate environmental reviews. An assumed program must be consistent with and no less stringent than the requirements of the CWA and regulations. EPA has reviewed Florida's permit review criteria and has determined that the State's program will result in the issuance of permits that comply with the CWA Section 404(b)(1) Guidelines. (33 U.S.C. 1344(h)(1)(A); 40 C.F.R. § 233.20(a)).

EPA acknowledges commenters who expressed concern about political motivations or monetary drivers that could fast-track development at the expense of the environment. However, EPA disagrees that FDEP will fast-track permits without appropriate environmental review. EPA notes that FDEP's proposed Section 404 program complies with the timelines and procedures that are required by federal law. Florida's State 404 Program Applicant's Handbook (pages 20-21) notes that:

> "Several procedures and rules for agency action are required by Section 404 of the CWA, but not by ERP, causing conflict between some State 404 Program and ERP program processes and timeframes.
>
> For example, when a project requires both an ERP and a State 404 Program permit, some portions of the ERP review are likely to be completed faster than the State 404 Program review because of public notice, EPA review requirements, or the need to coordinate with other state and federal agencies. This means that a project may be permittable under Chapter 62-330, F.A.C., (ERP) after the ERP review, but as a result of comments received during the 404 public notice or other aspects of the 404 review, the project may require modifications under the State 404 Program.
>
> It is the intent of the Agencies to process the State 404 Program and ERP authorizations concurrently as much as possible. For this reason, the applicant is given the choice, in the application form, to waive the timeframes for issuance pertaining to ERP review when the State 404 Program review may take longer to complete."

EPA acknowledges commenter concerns about the availability of staff, resources, and expertise to appropriately administer the State's 404 permitting program, including specific commenter concerns about FDEP staff cuts. EPA finds that FDEP has committed sufficient resources and staffing to address anticipated workload. See Response to Comments Section H (Funding and staffing) and Response to Comments Section I (Streamlining) for additional discussion.

*EPA Response to Comments on the State of Florida's Program Submission Requesting to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                                    *December 16, 2020*

**EPA recognizes that commenters may prefer federal administration of the CWA Section 404 program for a variety of stated reasons. However, Section 404(g)(1) of the CWA provides states and tribes the option of submitting to EPA a request to assume administration of a CWA Section 404 program in certain waters within state or tribal jurisdiction. EPA also appreciates the cooperative federalism framework which underpins the CWA and acknowledges that states are generally best suited to evaluate and manage their respective resources. EPA also disagrees that Florida's 404 program will be less environmentally protective than a program that is administered by the Corps. EPA has reviewed Florida's permit review criteria and determined that resulting permits will comply with the CWA Section 404(b)(1) Guidelines.**

**EPA also retains oversight authority of FDEP's CWA Section 404 program, including FDEP's appropriate exercise of control over activities required to be regulated under this part, such as permit issuance.**

## P.  Protection of historic and cultural resources

*NHPA Section 106 consultation*

One commenter agreed with EPA's determination that approval or disapproval of the State's Section 404 program assumption application is a federal undertaking triggering a programmatic Section 106 consultation under the NHPA.

Another commenter expressed appreciation to EPA for consulting with the Seminole Tribe of Florida pursuant to Section 106 on the development of a Programmatic Agreement (PA) for an assumed Section 404 program.

**EPA Response:**

**EPA acknowledges the statements from the commenters regarding consultation under Section 106 of the NHPA. The EPA engaged in consultation under Section 106 of the NHPA regarding the potential impacts of its decision to approve or disapprove Florida's Section 404 assumption request and decided to enter into a PA with the Advisory Council on Historic Preservation (ACHP), the Florida SHPO, and FDEP for its Section 106 compliance. The PA serves as a tool which sets forth a process to assure compliance with Section 106 of the NHPA in connection with EPA's program assumption decision, enhances coordination on the consideration of potential impacts on historic properties, seeks value-added outcomes from the Section 106 process, and provides a comprehensive process for resolution of disputes concerning effects determinations or resolution of adverse effects associated with State-issued 404 permits by utilizing the EPA's existing permit review framework under 40 C.F.R. § 233.50. FDEP and the SHPO also entered into an Operating Agreement (OA) on August 6, 2020, which sets forth a process to identify historic properties that may be impacted by Florida's issuance of Section 404 permits, and to develop recommendations for resolving adverse effects. The PA adopted the August 6, 2020 OA and its procedures and incorporated them into the PA.**

JA.2168

*EPA Response to Comments on Florida's 404 Program Submission Regarding to Assume Administration of*
*a Clean Water Act Section 404 Program*                                                    *December 16, 2020*

*Adequacy of protection of historic and cultural resources*

Some commenters stated that Florida assumption does not adequately protect historic or
culturally important places, including sites important to tribal nations. One commenter worried
that State assumption could lead to less time and expertise in the analysis of project impacts on
vulnerable wildlife, historic and cultural resources, including sites important to tribal nations.
Multiple commenters submitted a form letter stating that the assumption does not adequately
protect historic or culturally important places, including those of tribal significance. One
commenter expressed concern that it is unclear how State assumption will impact the level of
federal review needed to protect historic and cultural resources. Another commenter stated that
the change does not adequately protect historic or culturally important places.

**EPA Response:**

**EPA acknowledges, but disagrees with, the commenters' concerns. The PA sets forth the
procedural framework for compliance with Section 106 of the NHPA and should address
the concerns expressed by the commenters. The state reviewers are Secretary of Interior-
certified, and the PA and OA both establish and codify how historic and cultural resources
will be protected through a tribal consultation process and a dispute resolution process to
resolve disputes should they arise.**

*Operating Agreement between FDEP and the Florida State Historic Preservation Officer*

One commenter described an agreement between FDEP and the Florida SHPO, which will
ensure protection of historic and cultural resources through a consultation process called
"historic properties review." The commenter explained that the review assesses the potential
effects that a state Section 404 program permit application may have on historic properties and
ways to avoid, minimize, or mitigate adverse effects. The review includes consultation with
tribes, local governments, applicants, and the public and complements established procedures for
permit processing and public notice under the State Section 404 program.

One commenter provided assurance that historic and cultural resources in the state will be
protected if Florida assumes a Section 404 program. The commenter explained that FDEP has an
agreement with the SHPO that outlines the "historic properties review" which assesses potential
effects on historic properties from pending Section 404 permit applications. The commenter
pointed out that the State also has regulations to ensure all activities, including Section 404
permitting, require a "no effect" or "no adverse effect" determination by the SHPO before a
permit is authorized, and immediate ceasing of work and consultation if unanticipated
discoveries are made during construction. The commenter also explained that the collaborative
consultation process includes tribes, local governments, applicants, and the public, and is
designed to complement established procedures for permit processing and public notice under
the State 404 Program.

A commenter expressed concern that the OA does not currently reflect coordination with the
ACHP and recommends a PA be developed to clearly set forth in what circumstances EPA will
involve the ACHP. The commenter requested that the Seminole Tribe of Florida be a signatory

JA.2169

to any PA and that it be available to the Tribe for review before EPA decides on Florida's request to implement a Section 404 program.

A commenter provided specific comments and questions on the OA, requesting clarification on when, how, and with whom the state plans to consult with respect to tribal consultation. The questions centered on how the State consultation will differ from federal consultation, who will be consulted, and specific questions about the language used in the OA.

**EPA Response:**

**EPA agrees that the historic properties review set forth in the OA assesses the potential effects that a State Section 404 permit application may have on historic properties and ways to avoid, minimize, or mitigate adverse effects. EPA agrees that the OA does not reflect coordination with the ACHP, but that the PA, which adopts and incorporates the OA and its procedures for tribal consultation, review, and dispute resolution for historic properties, does provide for coordination with the ACHP. Disputes that cannot be resolved through the process outlined in the OA are elevated to the EPA for review. Consistent with the terms of the PA, the EPA will submit to the ACHP a copy of any proposed comments, objections, or recommendations that it develops with respect to permit applications that have the potential to impact historic properties or permit applications that are the subject of a historic properties dispute. Within 30 days of receipt, the ACHP may provide an advisory opinion which the EPA will consider, but need not follow, in finalizing its comments, objections, or recommendations with respect to the permit application. EPA also agrees with the commenter who noted that historic and cultural resources in the State will be protected if Florida assumes the CWA Section 404 program.**

**EPA considered the commenter's specific comments and questions on the OA. The OA and PA already address some of the commenter's comments (e.g., scope of Indian tribes consulted, consultation triggers, ACHP involvement). For other comments (e.g., forms of notice, expedited applications, confidentiality concerns, no-notice permits), EPA consulted with FDEP and Florida SHPO to develop its response. For more information, see EPA's administrative record regarding NHPA 106 compliance which includes a detailed response to commenter's questions and comments.**

**Q. Comments on consultation with tribes**

One commenter asserted that historic and cultural resources in the State will be protected if Florida assumes administration of a Section 404 program. The commenter explained that FDEP has an agreement with SHPO that outlines the "historic properties review," which assesses potential effects on historic properties from pending Section 404 permit applications. The commenter pointed out that the State also has regulations to ensure all activities, including Section 404 permitting, require a "no effect" or "no adverse effect" determination by the SHPO before a permit is authorized, and immediate ceasing of work and consultation if unanticipated discoveries are made during construction. The commenter also described a commitment from FDEP to work with Florida's tribes, and stated that the level of consultation described provides

greater participation in the review of applications than tribes currently have. The commented asserted that tribes also will have the ability to inform and add to any requests for additional information in the permit approval process and provide public comments during the comment period. The commenter also explained that the FDEP-SHPO Operating Agreement (OA) further provides the Tribes with the opportunity to offer effects determinations, participate in the resolution of adverse effects, and request federal review in the event of disagreements with FDEP and/or the SHPO.

Another commenter reiterated that FDEP is committed to working together with Florida's tribes, as demonstrated by the cooperative engagement with the Seminole Tribe of Florida and the Miccosukee Tribe of Indians of Florida.

Another commenter considered a fundamental flaw of the FDEP's proposal to be the risk that tribes will lose consultation rights and protections for impacts to adjacent lands.

One commenter expressed concern that the Muscogee (Creek) Nation was not consulted earlier in the rulemaking process. The commenter noted that the Muscogee (Creek) Nation did not know about the proposed Florida Assumption until a meeting with EPA on October 15, 2020. The commenter asserted that the Nation should have been consulted earlier in the process, similar to consultation with other Florida tribes. The commenter referenced Florida's State 404 Program Description (EPA-HQ-OW-2018-0640), which states, "[A]dditionally, the Department has been working with EPA, the SHPO, and Indian Tribes in Florida to ensure that the outcomes of the state's process for protection of historical and cultural resources are at least as protective as those under the federal process." The commenter requested meaningful consultation between the Muscogee (Creek) Nation and the EPA.

Another commenter expressed concern that the process for dispute resolution between EPA, FDEP, and the Seminole Tribe of Florida is still not clear regarding non-waivable categories, Indian country determinations, and effects to cultural resources and endangered species. The commenter explained that EPA has confirmed its commitment to communications on these categories and agreed to provide flexible coordination with the Seminole Tribe; however, the process has not been developed. The commenter requested that the coordination between EPA and the Seminole Tribe of Florida occur before a dispute can arise.

**EPA Response:**

**EPA agrees with those commenters that acknowledge Florida's procedures for ensuring protection of historic and cultural resources in the State 404 program, and understands the concerns associated with the importance of cultural resource protections. Importantly, the Tribes will not lose consultation rights as part of the assumption process as continuing tribal engagement is incorporated into Florida's program.**

**With respect to notification, the Florida SHPO and FDEP entered into an OA on August 6, 2020. EPA was not a party to the OA. EPA received a complete assumption package from Florida on August 20, 2020. EPA sent the Muscogee (Creek) Nation (Muscogee) a request to consult on September 2, 2020. That request included detailed information about the assumption process. The Muscogee was also invited to a webinar on the assumption process**

on September 15, 2020. The first webinar was held on September 22, 2020. On October 1, 2020 the Muscogee notified EPA that they wanted to participate in consultation. The Muscogee provided a list of possible dates that they were available on or about October 9, 2020. The first available date that the Muscogee offered was October 15, 2020. EPA scheduled consultation on October 15, 2020 and participated in a phone call with the Muscogee. In that call EPA requested that the Muscogee submit any issues that they wanted considered or addressed in the PA. The Muscogee submitted written comments on the Section 404 assumption process, and the OA between the FDEP and Florida SHPO. EPA considered those comments in revising the draft PA.

EPA acknowledges the commenter's concern regarding dispute resolution among EPA, FDEP, and the Seminole Tribe of Florida. The EPA has oversight authority over the state CWA 404 program and may review state 404 individual permit applications and draft general permits. Pursuant to Section 404(j) of the CWA and 40 C.F.R. § 233.50, the EPA may in its discretion comment upon, object to, make recommendations, or take no action with respect to a state 404 individual permit application, draft general permit, or a state's failure to accept the recommendations of another state or Indian tribe whose waters may be affected by the issuance of a permit. Any such objection shall be based on the EPA's determination that the proposed permit is: (1) the subject of an interstate dispute under 40 C.F.R. § 233.31(a); and/or (2) outside the requirements of the CWA, the regulations at 40 C.F.R. Part 233, or the CWA Section 404(b)(1) Guidelines. Pursuant to the 40 C.F.R. 233.51 and the FDEP/EPA MOA, FDEP must provide EPA the opportunity to review permit applications that have a reasonable potential to impact to endangered or threatened species or waters of an Indian tribe, and permit applications with impacts to historic properties.

The FDEP/EPA MOA states that in the event a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA. Such information shall be considered by EPA in exercising its CWA authority to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit.

Section III.C. of the OA and Section V of the PA set forth a process whereby EPA may in its discretion develop comments, objections, or recommendations with respect to permit applications that have the potential to impact historic properties or permit applications that are the subject of a historic properties dispute FDEP elevates to EPA pursuant to subsections III.C.2. and 3. of the OA. The EPA may consult with Indian tribes, where appropriate, in developing its develop comments, objections, or recommendations. The ACHP, within 30 days of receipt of the EPA's proposed comments, objections, or recommendations may provide an advisory opinion which EPA will consider, but need not follow. EPA will transmit any final comments, objections, or recommendations to FDEP for resolution in accordance with 40 C.F.R. § 233.50.

**R.  Comments outside the scope of this review**

Commenters expressed their general concern for preserving the Everglades, for preserving Florida's wetlands and rivers, and for protecting the cultural resources of the State. One commenter asserted that the Corps has delayed permitting for Everglades restoration projects.

Several commenters provided information on other topics, such as ownership and directions to a specific property in Collier County. Some commenters also provided comments that they had previously submitted to FDEP regarding FDEP's rule development.

**EPA Response:**

**EPA acknowledges receipt of comments submitted pursuant to FDEP's rule development process, as well as the receipt of other comments regarding the state's natural resources and geography, but notes that these are beyond the scope of this action and are not responsive to the request for comment.**



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104
**September 2, 2020**

Dr. Roy E. Crabtree, Regional Administrator
Directorate Office
NOAA Fisheries Service
Southeast Regional Office
263 13th Avenue South
St. Petersburg, Florida  33701

Subject:  Consultation on the EPA's Action on the State of Florida's Request to Assume Administration
of a Clean Water Act Section 404 Program

In the 1977 amendments to the Clean Water Act (CWA), Congress provided states the option of
assuming the Section 404 program for discharges of dredged or fill material in certain waters. On
August 20, 2020, the U.S. Environmental Protection Agency, Region 4 (EPA) received a complete
package from Governor DeSantis of Florida requesting to assume administration of a CWA Section 404
program. Pursuant to the CWA Section 404 and its implementing regulations (40 C.F.R. Part 233), the
EPA is the federal agency charged with approving or denying Florida's request. The EPA has 120 days
within which to complete this action (i.e., by December 17, 2020).

In its December 13, 2019, letter to the U.S. Department of Commerce and the Department of the
Interior, the EPA committed to voluntarily engage in informal consultation with the United States Fish
and Wildlife Service (USFWS) and the National Marine Fisheries Service (NMFS) under Section 7 of
the Endangered Species Act (ESA) and identified the Florida Department of Environmental Protection
(FDEP) as a non-federal representative for purposes of consultation. In its April 15, 2020, letter to
FDEP, NMFS concluded that ESA-listed species under NMFS' jurisdiction do not occur in waters that
are assumable by the state based on the ESA-listed species that were identified at that time as part of this
proposed assumption. The EPA has confirmed that this list has not changed. Based on NMFS'
determination, the EPA concludes that our decision to approve or disapprove FDEP's assumption of the
Section 404 program has no effect on NMFS' jurisdictional species. This should conclude consultation
on this action with NMFS.

If you have any questions regarding this matter, please do not hesitate to call me at (404) 562-9345 or
have a member of your staff contact Mr. Kelly Laycock of my staff at (404) 562-9262 or
404Assumption-FL@epa.gov.

Sincerely,

JEANEANNE GETTLE
Digitally signed by JEANEANNE
GETTLE
Date: 2020.09.02 15:00:06 -04'00'

Jeaneanne M. Gettle, Director
Water Division

JA.2174



**UNITED STATES DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
**NATIONAL MARINE FISHERIES SERVICE**
Southeast Regional Office
263 13ᵗʰ Avenue South
St. Petersburg, Florida 33701-5505
https://www.fisheries.noaa.gov/region/southeast

October 30, 2020                    F/SER4:DD

Jeaneanne M. Gettle, Director
Environmental Protection Agency
Region 4 – Water Division
61 Forsyth Street SW
Atlanta, GA 30303-3104

Sent via: 404Assumption-FL@epa.gov

Dear Ms. Gettle,

Staff of the Florida Department of Environmental Protection (FDEP) and the Environmental Protection Agency (EPA) met with National Marine Fisheries Service (NMFS) on several occasions over the past few years regarding the State of Florida pursuing assumption of the Clean Water Act Section 404 program. Discussions with NMFS included staff from our Protected Resources Division and Habitat Conservation Division regarding consultations required by Section 7 of the Endangered Species Act and the essential fish habitat (EFH) consultation requirements of Section 305(b)(2) of the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act), respectively.

By letter dated September 2, 2020, the EPA notified the NMFS Southeast Regional Administrator of their determination FDEP's assumption of the Section 404 program has no effect on endangered and threatened species under NMFS jurisdiction. On September 3, 2020, Mr. David Bernhart, the Assistant Regional Administrator for Protected Resources, provided a courtesy concurrence of this determination.

We note EPA did not make an effects determination regarding EFH and recognize consultation is not required if a federal agency determines their action will not have adverse impacts on EFH. Due to the significance of the action, and in accordance with Section 305(b)(4)(A) of the Magnuson-Stevens Act and 50 CFR 600.925(b), the Habitat Conservation Division reviewed the State of Florida's application and we are not requesting EPA initiate EFH consultation nor are we offering conservation recommendations.

Further EFH consultation on this action is not necessary unless future modifications are proposed and you believe the resulting action may result in adverse impacts to EFH. Please contact Mr. David Dale, the Southeast Region's EFH Coordinator, at 727-551-5736 or david.dale@noaa.gov if you have any questions or wish to discuss this finding.

Sincerely,

FAY.VIRGINIA.M.
1365817320
Digitally signed by
FAY.VIRGINIA.M.1365817320
Date: 2020.10.30 15:36:36
-04'00'

Virginia M. Fay
Assistant Regional Administrator
Habitat Conservation Division



JA.2175

cc: (via email)
EPA – Laycock
F/OHC – Stedman, Lundgren
F/SER4 – Swafford, Wilber
F/SER3 – Bernhart

JA.2176

# MEMORANDUM OF UNDERSTANDING
# BETWEEN THE
# FLORIDA FISH AND WILDLIFE CONSERVATION COMMISSION,
# THE UNITED STATES FISH AND WILDLIFE SERVICE AND
# THE FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION
# AUGUST 5, 2020

This Memorandum of Understanding ("Understanding", or "MOU") is entered into by and between the Florida Fish and Wildlife Conservation Commission ("FWC"), the United States Fish and Wildlife Service ("USFWS"), and the Florida Department of Environmental Protection ("FDEP"), to formally memorialize existing coordination and collaborative efforts and to establish future processes and procedures that will ensure that the State of Florida's assumption of the CWA 404 program, as well as other permitting programs executed under FDEP's authority, will 1) fulfill state rule requirements regarding fish and wildlife under Part IV of Chapter 373 Florida Statutes (F.S.), including Chapters 62-330, F.A.C., and 62-331, F.A.C., 2) be compliant with the State of Florida requirements under Article IV, Section 9 of the Florida Constitution, Chapter 253, F.S., Chapter 379, F.S., and Rules Relating to Threatened and Endangered Species under Chapter 68A-27, F.A.C., and 3) comply with the Endangered Species Act (ESA; 16 U.S.C. § 1531 et seq) and the Marine Mammal Protection Act (MMPA; 16 U.S.C. § 1361 et seq.).

## I.   PURPOSE

The purpose of this MOU between the FWC, the USFWS, and FDEP is to formalize the existing coordination between these agencies and establish additional coordination processes to ensure the conservation of Florida's federally and State-listed wildlife and their habitats. This MOU is to ensure that FDEP's permitting and lease programs under Part IV of Chapter 373, F.S., and Chapter 253, F.S., are consistent with all applicable requirements of the ESA, the MMPA, 16 U.S.C. § 1531-43, and are in keeping with the State of Florida requirements under Article IV, Section 9 of the Florida Constitution, Chapter 379, F.S., and Chapter 68A-27, F.A.C..

This MOU is focused on FDEP's implementation of the State of Florida's permitting programs under Part IV of Chapter 373, F.S. These programs include the Environmental Resource Permitting program (ERP Program), 62-330, F.A.C., and the anticipated State 404 Permitting Program (State 404 Program), 62-331, F.A.C., contingent upon the Environmental Protection Agency (EPA) approval of Florida's request for State assumption of Section 404 of the Clean Water Act (CWA) under 40 C.F.R. Part 233.

These permitting programs authorize FDEP to regulate proposed activities in surface waters and wetlands.  Alteration of wetlands and other surface waters may have a detrimental impact on the environment. Wetlands produce the basic food material used by many fish and other aquatic life and some also serve as nursery grounds for fish and rookery areas for birds. Many wildlife species, some of which are threatened or endangered, depend on wetlands to complete all or part of their life cycle. Dredging and filling can degrade water quality during and after construction and can impact aquatic invertebrates, fish, and wildlife in that area. It has been estimated that as much as 80 percent of our recreationally and commercially important fish species are dependent

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*     *Page 1*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2177

upon wetlands for at least some portion of their life cycle.

The purpose of this MOU is to:

- Improve the existing framework and develop new processes as needed for meeting responsibilities under the ERP Program, State 404 Program, Chapter 68A-27, F.A.C., Florida's Constitution, MMPA, and the ESA.
- Create a State and Federal Endangered and Threatened Species Technical Team to better assist FDEP's district, regional, and field offices to conserve and protect Florida's aquatic and terrestrial species and their habitats, natural resources and ecosystems through the State permitting processes.
- Develop a coordination process for the State 404 Program that will maximize efficiencies and consistency in order to successfully balance the permitting workload, while minimizing administrative processing for all involved parties. See Attachment 1 for a species coordination process flowchart.
- Develop a coordination plan that will include guidance on how to elevate any conflicts or disagreements between agencies.
- Ensure consistent internal coordination processes between regional offices of the USFWS, FWC, and FDEP Districts.
- Ensure the state permitting processes implemented by FDEP meet the requirements of the rules and statutes governing protection of state imperiled species.

  A.  Authorities

  1.  Environmental Resource Permitting

The State of Florida's ERP Program regulates activities involving the alteration of surface flows, including new activities in uplands that generate stormwater runoff, as well as dredging and filling in wetlands and other surface waters. Dredging and filling in the surface waters of Florida has been regulated since the early 1970s. Established under Chapter 403, F.S., the "dredge and fill permit" program protected surface waters from degradation caused by the loss of wetlands, and from pollution caused by construction activities.  This program was phased out in 1995, and replaced by the new environmental resource permit program under Part IV of Chapter 373, F.S. The ERP program provides a mechanism for protection for all fish and wildlife and their habitats, particularly federally and State-listed wildlife and plant species, and can provide protection measures in perpetuity.

The FWC is Florida's state wildlife agency established in the State Constitution to exercise the regulatory and executive powers of the state with respect to wild animal life and fresh water aquatic life.  The FWC has permitting authority over species identified in Chapter 68A-27, F.A.C., which include the species identified within FDEP's ERP program.  Permits issued by FDEP cannot authorize impacts, specifically take, of species identified in Chapter 68A-27, F.A.C. As such, the FDEP has historically coordinated protection and conservation of aquatic and terrestrial fish and wildlife species with the FWC.  FWC's permit commenting authority was codified upon the agency's creation in Section 20.331(10), F.S. The FWC provides a list of

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*                    *Page 2*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2178

potentially affected federally and State-listed species to FDEP during ERP application review. It also evaluates potential impacts to State-listed fish and wildlife for ERP Program project applications that are expected to affect species and habitat, and provides recommendations for permit conditions to the FDEP.

2.  State Lands

The state of Florida acquired title to sovereignty submerged lands on March 3, 1845, by virtue of statehood. Sovereignty submerged lands include all submerged lands, title to which is held by the Board of Trustees (Governor and Cabinet) of the Internal Improvement Trust Fund.  FDEP is Florida's lead agency for environmental management and stewardship, serving as staff to the Board of Trustees. As such, the FDEP's role includes acquiring lands for protection, and providing oversight for the management of activities on more than 12 million acres of public lands including lakes, rivers and islands. These public lands include sovereignty submerged lands, which include, but are not limited to, tidal lands, islands, sandbars, shallow banks, lands waterward of the ordinary or mean high water line, and those beneath navigable fresh water or beneath tidally influenced waters. These publicly owned lands are managed under Chapter 253, F.S., and the rules promulgated thereunder, to provide for areas of natural resource-based recreation, to ensure the survival of plant and animal species, and the conservation of finite and renewable natural resources. Section 18-21.004(2)(i), F.A.C. states: "Activities on sovereignty lands shall be designed to minimize or eliminate adverse impacts on fish and wildlife habitat, and other natural or cultural resources. Special attention and consideration shall be given to endangered and threatened species habitat.

3.  Section 404 of the Clean Water Act

The United States Army Corps of Engineers (USACE) currently regulates proposed activities through a federal permit review process, administering Section 404 of the CWA.  The USACE permitting program regulates the discharge of dredged or fill material into waters of the United States, including wetlands. Activities in waters of the United States regulated under this program include fill for development, water resource projects (such as dams and levees), infrastructure development (such as highways and airports), and mining projects. Section 404 requires a permit before dredged or fill material may be discharged into waters of the United States, unless the activity is exempt from Section 404 regulation (e.g., certain farming and forestry activities).  An individual permit is required for potentially significant impacts. Individual permit applications under USACE review are evaluated for public interest, as well as the environmental criteria set forth in the CWA Section 404(b)(1).

The USACE consults with the USFWS, the federal agency charged with wildlife protection, to ensure protection of federally listed fish, wildlife and plants. The USFWS evaluates impacts on federally listed fish, wildlife, and plant species for all federal projects and federally permitted projects expected to affect species and their critical habitat, including projects subject to the requirements of Section 404.

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*                    *Page 3*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2179

The State of Florida, through FDEP, is requesting assumption of this permitting authority.  If approved, this program will be referred to as the State 404 Program.

4.  Section 6 of the Endangered Species Act

Section 6(a) of the ESA directs the USFWS to "cooperate to the maximum extent practicable with the States" to further the conservation of federally threatened and endangered species. The purpose, processes, and procedures described in this MOU are consistent with this mandate. This MOU does not conflict with or limit the longstanding section 6(c) cooperative agreement between the USFWS and FWC, which has been annually renewed since its establishment in 1976.

B.  Background

In 2020, FDEP will be submitting its application to the EPA seeking to assume authority to administer Section 404 of the CWA for certain waters of the United States (assumption). If approved, the State 404 Program will be a separate permitting program from the ERP Program, with separate authorizations. Assumption of the permitting program is limited to "state-assumed" waters, which is not defined in the CWA but is described as all waters of the United States that are not under the jurisdiction remaining with the USACE (retained waters, such as those waters subject to section 10 of the Rivers and Harbors Act). Retained waters are defined in the State 404 Program Applicant's Handbook, as:

> "Retained Waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The Corps will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the Corps is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the Corps will retain jurisdiction to the landward boundary of the project for the purposes of that project only."

Based on a comparison of the last five years of USACE and FDEP reviewed applications, it is anticipated that the majority of future projects will require both a State 404 and an ERP authorization. It is the intent of FDEP to establish a State 404 Program coordination process for protection of federally listed species and designated critical habitat that is similar, and as protective as, the ESA's Section 7 interagency consultation process that currently exists between the USACE and the USFWS for federal Section 404 permits.  As part of the State of Florida's assumption of Section 404, FDEP will continue to utilize FWC's biologists and species

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*     *Page 4*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2180

specialists that are already involved in the review of both 404 applications and ERP applications. Currently, FWC already provides a list of federally and State-listed species to FDEP and the USACE as part of their review. FWC also provides comments and recommendations on State-listed species, provides technical assistance on federally listed species, and currently provides comments and recommendations on aquatic species such as manatees and sea turtles under the Florida Manatee Sanctuary Act and Florida's Marine Turtle Protection Act. FWC also regulates intentional and incidental take of State-listed species under Chapter 68A-27, F.A.C. exclusive of the ERP Program and the State 404 Program. Nothing in this MOU, the ERP Program, nor the State 404 Program supersede nor otherwise affect FWC's permitting programs or authorities. For State 404 Program application reviews, FWC proposes to provide preliminary effect assessments for federally listed species and their critical habitat, as well as provide preliminary impact avoidance and minimization measures that will become permit conditions during the FDEP review of project applications. These project-specific preliminary lists of affected federally listed species, assessment determinations, and proposed impact avoidance and minimization measures may be coordinated with the USFWS during technical assistance review and/or as part of the Public Notice process for concurrence. This will be in addition to FWC's role in reviewing the ERP Program applications for state listed species impacts, which will remain unchanged. The benefits of this MOU, and FWC's involvement with Part IV of Chapter 373, F.S. concern the authorizations as outlined in Section V of this MOU.

II.  COORDINATION FRAMEWORK

   A.  The Permit Application Review Process Framework

The current ERP species coordination process includes FWC's involvement upon initial receipt of the application, allowing FWC's review to begin early in the process and proceed during the ERP Request for Additional Information and Completeness phases. State 404 permit applications are proposed to be processed in a similar manner, where FWC and USFWS will receive applications from FDEP as soon as possible after receipt. Upon assumption of the Section 404 Program, coordination between the USFWS and FDEP related to the proposed action's effects on species will occur through the technical assistance process, which is anticipated to be outlined in the USFWS's biological opinion based on information included in the biological assessment submitted by EPA.  FWC and FDEP will jointly decide which agency will be the species coordination lead to coordinate the federally listed species review with the USFWS for each application. The State species coordination lead is responsible for making a preliminary determination for affected federally listed species, affected action area and critical habitats, and assessing whether, and what type of, adverse impacts to federally endangered or threatened species and their critical habitats is expected. The FDEP and FWC reviewers will work as a team. This coordination between reviewers will ensure that the preliminary information and impact/effect determinations for federally listed species that is to be sent to the USFWS represents all needed aspects of the State review. The designated State species lead will always include the other State agency's reviewer on all correspondence with the USFWS. Disagreements between agencies will be handled in accordance with Section IV of this MOU. Upon receipt of a permit application, the State species lead will coordinate with the USFWS and provide to DEP the preliminary assessment and additional information request within 20 days, so that FDEP may comply with its requirement to submit its request for additional information

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*     *Page 5*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2181

within 30 days of receipt of a permit application (Rule 62-331.052, F.A.C.)

After FDEP/FWC has all the necessary information needed in order to review the permit application, the State species lead for that project can provide preliminary effect determinations and protective measures to USFWS for review and comment. Comments from the USFWS will be incorporated into FDEP's review of the permit application, including the effects discussion and incorporation of draft permit conditions. Or, in the case where no species will be affected, this information will be officially documented, and the species coordination review will be considered completed. This technical assistance with the USFWS will be accomplished prior to the Public Notice, when possible. The Public Notice will include the types of anticipated impacts to endangered and threatened species as well as their critical habitat, and the proposed protection measures to offset those impacts. After the Public Notice, the State species lead will review any additional information and public concerns that were received and coordinate with the USFWS to address them as appropriate. If there are no additional concerns or modifications that would affect the species review, the conclusions and permit conditions by USFWS will be drafted as final correspondence for the file and recommended conditions incorporated into the permit.

During EPA's review of Florida's application for assumption, FDEP's Submerged Lands and Environmental Resources Coordination Program (SLERC) staff, with assistance from FWC and USFWS, if possible, will provide training to FDEP permit review staff on the species coordination process and performing assessments of effects that different types of projects pose to federally listed species. This will include the use of information and approaches found in section 7 consultation keys, Standard Local Operating Procedures for Endangered Species (SLOPES) and other species effects evaluation tools. These tools will be provided to FWC and FDEP in advance of these trainings and any discrepancies in the species information or use of these tools will be resolved. In addition, information and approaches for how to analyze species-specific data and assess potential effects to species that do not have such tools would be discussed. Additional tools will be adopted as they are developed by the USFWS.

The parties anticipate that FWC's species expertise and current engagement in the ERP review will create efficiencies during the transition from a Federal 404 program to the State 404 permit program, while also providing continuous protection to Florida's fish, wildlife, and plant species and their habitats. The FWC and USFWS staff will be providing expertise to FDEP staff regarding species issues, and the species coordination process will be a joint effort for each application. Over time, FDEP, FWC, and USFWS will become more proficient and knowledgeable about effects determinations for federally listed species during the State 404 Program permitting process.

B.  Agency Roles and Responsibilities

This MOU anticipates the following roles and responsibilities for each agency. However, after 404 assumption, a technical team (described in Section III below) should convene and formalize the details of coordination.

FWC
• Attend Technical Team meetings.

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*   *Page 6*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2182

• Participate in training efforts with FDEP and USFWS.
• Provide oversight during the permitting review process, when needed.
• Provide a list of potentially affected species and habitat during the review of permit applications, preliminary determinations of the project's potential effect on federally and State-listed species and habitat (particularly critical habitat) and provide preliminary recommendations for impact avoidance and minimization measures.
• Determine if the project meets any specified criteria identified in any pre-existing biological opinions, USFWS-approved species effect determination keys, or USFWS-issued incidental take permits for federally and State-listed species.
• In coordination with USFWS, develop appropriate, site specific habitat conservation or species conservation measures to be incorporated as permit conditions. When appropriate, the USFWS-approved species lists, and recommended impact avoidance and minimization measures may be finalized by FWC as official correspondence to FDEP.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews. This will provide support for the review of wildlife and habitat impacts when needed.
• Take the lead in resolution of issues regarding State-listed species, including State-listed species that are also designated federally as "at-risk", "candidate" or "proposed" species, as appropriate.
• Work directly with the applicant to resolve issues regarding permitting for take of State-listed species in accordance with FWC's Rules Relating to Threatened and Endangered Species.

USFWS
• Attend Technical Team meetings, when appropriate.
• Participate in training efforts with FDEP and FWC.
• Provide technical assistance during the permitting review process, where there may be effects to federally listed species, proposed species, petitioned species, or candidate species.
• Coordinate compliance with FWC to meet ESA requirements for relevant federally threatened and endangered ("T/E") species.
• Provide section 7 consultation keys, Standard Local Operating Procedures for Endangered Species (SLOPES) and other species effects evaluation tools used to evaluate effect determinations
• Provide technical assistance regarding effects on federally threatened or endangered species and measures to avoid or minimize adverse effects.
• In coordination with FWC, develop appropriate, site-specific habitat conservation or species management opportunities.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews upon request as related to ESA-listed species, proposed species, petitioned species, or candidate species. This will provide support for the review of wildlife and habitat impacts when needed.
• Take the lead in resolution of issues related to federally listed species.
• Incidental take for federally listed species will be handled in accordance with the Biological Assessment and Biological Opinion developed for this assumption.

FDEP

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*      *Page 7*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2183

• Attend Technical Team meetings when appropriate.
• Participate in training efforts with FWC and USFWS.
• Provide oversight during the permitting review process, when needed.
• Provide State 404 Program and ERP program related permit applications as soon as possible for review upon submittal.
• Provide any additional information that may assist in the review, including activity-specific information to FWC and USFWS. Incorporate any additional information requested by FWC and USFWS into the FDEP requests for additional information or completeness requests to the applicant.
• Participate in project-specific meetings, teleconferences and email conversations regarding wildlife and habitat reviews. This provides support for the review of species and habitat impacts when needed.
• Provide notification to FWC regarding timelines for the submittal of FWC questions and comments during the review of submitted applications.  When FWC is actively reviewing a permit, FDEP will not issue the permit without resolution of FWC's review.

## III. ENDANGERED AND THREATENED SPECIES TECHNICAL TEAM

This MOU's framework, processes, and procedures may be reviewed periodically after initiating an Endangered and Threatened Species Technical Team (Technical Team) comprised of FWC, USFWS and FDEP agency staff members. This Technical Team will meet to review the effectiveness of the coordination processes, procedures, training resources, and other areas related to State of Florida permitting under Part IV of Chapter 373 F.S. to ensure compliance with the ESA and State of Florida Rules Relating to Threatened and Endangered Species. Team members would include staff from FWC's Office of Conservation Planning Services (CPS), USFWS's Florida's Ecological Services Office, and FDEP's SLERC. FDEP SLERC's office will take the lead in setting up Technical Team meetings and training meetings. The Technical Team will also act as technical support to FDEP District offices during the permitting process should any issues arise regarding state or federally listed species or habitat conservation measures. Frequent and informal contact between agencies is encouraged regarding the general process, project-specific issues, or emerging issues.

### A.  Guidance/Training

FDEP, FWC and USFWS will hold cross-training sessions, and joint training sessions with district, regional and field staff of all agencies to facilitate mutual understanding and implementation of the MOU. Initially, the goal is completion of basic training to all relevant permit review personnel prior to the approval of assumption, with additional training resources and sessions to continue periodically as needed. The agencies may issue guidance individually or jointly to assist in carrying out this MOU.

### B.  Oversight Review

The Technical Team provides oversight and coordination for all aspects of this MOU. Its functions include, but are not limited to:

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*                    *Page 8*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2184

(1) Developing, maintaining, and updating training guidance;
(2) Addressing issues about process implementation to ensure compliance with ESA;
(3) Identifying and addressing workload issues;
(4) Incorporating/identifying improvements and revisions into the process;
(5) Convening interagency scientific/technical reviews, as appropriate;
(6) Reviewing and evaluating, at least on an annual basis, the MOU and its implementation;
(7) Facilitating reaching consensus on particular issues at any level upon requests by personnel at that level.

## IV. INTERAGENCY ELEVATION PROCESS

FDEP, FWC and USFWS intend to work cooperatively to achieve their mutually shared objectives of protecting the quality of waters of the United States and the species that depend on those waters. Collaboration among Technical Team members, agency district, regional, and field staff when resolving any potential conflicts or disagreements should be performed through a structured, time-sensitive process at the lowest possible level. During the review of State 404 permit applications and these elevation procedures, the following regulations will be followed: 40 CFR § 233.20; 40 CFR § 233.50; the 404(b)(1) Guidelines in 40 CFR § 230; 40 CFR § 230.10(b)(3) and 40 CFR § 230.30(c). The agencies will follow the procedures below to elevate any conflict or disagreement.

Any contentious issues, disagreements or conflicts between agencies, or between agencies and applicants, will be discussed with an attempt to resolve them at the lowest levels within the agencies without elevation (reviewers and their supervisors). If issues cannot be resolved at this level, reviewers and their supervisors will reach out to the Technical Team for assistance (Level 1). If there is no consensus resolution at that level, or if it is deemed prudent, the issues will be elevated to Level 2, which would include the USFWS State Supervisor, FDEP State 404 program Supervisor, FWC Conservation Planning Services Director, and EPA Florida State 404 program Supervisor). While anticipated to be very rare, issues can be elevated to Level 3 if needed, which would include the USFWS Regional Director, Atlanta; EPA Regional Administrator, Atlanta; FWC Executive Director and FDEP Secretary. The supervisory level staff may differ for each agency and may differ depending upon the issue in dispute or conflict that needs resolution. All agencies will be included in resolution discussions, even if the issue only involves two of the three partner agencies.

While decisions by all levels, including decisions to elevate, will be made by consensus to the greatest extent practicable, any one agency can initiate the elevation process or elevate to the next supervisor level. Agencies will jointly prepare a summary document that will contain a statement of facts and succinctly state each agency's position and recommendations for resolution. This summary document will be developed and shared when elevated to Level 2 or Level 3.  If needed, the summary documents may be updated when elevated to Level 3. The overall goal is to jointly develop implementable actions to avoid and/or minimize adverse impacts to listed species to ensure the impacts of any given project are not likely to result in take, or likely to jeopardize the continued existence of any species or adversely modify its critical habitat. With regard to conclusions about the potential effects of a project on ESA-listed species

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*          *Page 9*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2185

or the effectiveness of proposed protection measures, the final USFWS position is determinative. With regard to conclusions about the potential effects of a project on State listed species or the effectiveness of proposed protection measures, the final FWC position is determinative.

Elevation should be initiated so that all applicable deadlines will be met, considering subsequent levels of review. If FDEP is aware of a dispute, they will resolve the dispute prior to taking final action. This is to ensure consistency with applicable legal deadlines, and to allow the issue to be resolved through the elevation process When determined to be appropriate (e.g., where the results of the elevation would provide useful guidance to agency staff or transparency to the public), the decision on the elevation should be memorialized in writing, placed in the application's official file, and circulated among Agency staff to serve as guidance for future decisions.


## V.  BENEFITS OF THIS MEMORANDUM OF UNDERSTANDING

While there is statutory permit commenting authority for FWC in the ERP Program, no specific, written coordination procedures or agreements have been initiated between FWC and FDEP for the ERP Program. This MOU will improve communication and provide a mechanism to improve ERP processes, resolve emerging issues, and likely increase efficiency and consistency in the ERP Program review for endangered and threatened species.

Once assumed, the implementation of the State 404 Program will result in FWC reviewing potentially affected federally and State-listed species concurrently.  Since similar guilds of species have similar habitat needs or life-history traits, FWC's preliminary determinations of a project's potential adverse effects to species will be more holistic and more efficient than the current process. There is also some limited jurisdictional overlap between FWC and USFWS with some species, such as species that are State-listed and federally designated as "at risk", "candidate", and "proposed".  This MOU provides a mechanism for FWC and USFWS to more closely coordinate the review of potential adverse impacts to these types of species during State permit review.  In addition, on rare occasions there can be conflicting conservation needs of species located within the same action area of a project.  This MOU provides a mechanism for FDEP, FWC and USFWS to better resolve such issues.

This MOU formally memorializes partnerships that are mutually beneficial to all parties:

- Benefit to FDEP: The FWC and USFWS partnerships and involvement in both permitting processes ensures fulfillment of the ERP Program, State 404 Program, Chapter 253 F.S. and all other laws requiring protection of federally and State-listed species and their habitats. The FDEP/FWC partnership will ease the transition of the State 404 Program, providing faster and more accurate project reviews and effect determinations as compared to FDEP staff alone.

- Benefit to FWC: The FDEP partnership provides a mechanism for fulfillment of the requirements of Article IV, Section 9 of the Florida Constitution, and FWC's Chapter

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*    *Page 10*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2186

68A-27 of the Florida Administrative Code (F.A.C.).

- <u>Benefit to USFWS:</u> The FWC and FDEP partnerships increase collaboration on development projects that previously may have been reviewed and permitted separately but will now be reviewed by one permitting agency (FDEP) and one wildlife agency (FWC). FDEP and FWC may assist USFWS during the technical assistance process by providing preliminary reviews when possible, in order to ensure the fulfillment of ESA requirements.

## VI. OBLIGATION OF FUNDS, COMMITMENT OF RESOURCES

Nothing in this MOU shall be construed as obligating any of the parties to the expenditure of funds in excess of appropriations already authorized by law, or otherwise commit any of the agencies to actions for which it lacks authority. It is understood that the level of resources to be expended under this MOU will be consistent with the level of resources available to the agencies to support such efforts.

## VII. NATURE OF THE MEMORANDUM OF UNDERSTANDING

This Memorandum is intended only to improve the interagency coordination between FWC, USFWS and FDEP. It is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the State of Florida or the United States, its agencies or instrumentalities, its officers or employees, or any other person. FWC, USFWS, and the FDEP may jointly revise this document. No party to this MOU waives any administrative claims, positions, or interpretations it may have with respect to the applicability or the enforceability of the ESA or the CWA.

(1) Nothing in this MOU shall be construed to restrict in any way EPA's authority to fulfill its oversight and enforcement responsibilities under the CWA, nor shall it restrict the enforcement responsibilities of FDEP and FWC under Florida law or USFWS under Federal law.

(2) This MOU, and procedures established in conformance with it, shall be reviewed periodically by FDEP, FWC, and USFWS. Any party may request in writing an amendment or modification to the MOU.

(3) This MOU, and any amendments and modifications, shall remain in effect until the State 404 Program authorization is modified in a manner that would affect this MOU.

## VIII. EFFECTIVE DATE; TERMINATION

This Memorandum will become effective upon signature by each of the parties. If the State 404 Program is not yet approved, this Memorandum will only become effective for the ERP program and requirements under Chapter 253, F.S.. Once the application for assumption is approved by EPA, this Memorandum will become effective for both the ERP program and the State 404 Program. Any of the parties may withdraw from this MOU upon 60 days written notice to the other parties, provided that any coordination covered by the terms of this MOU that are pending at the time notice of withdrawal is identified by the parties, and those activities covered by this

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*          *Page 11*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2187

MOU that begin the process prior to and within the 60-day notice period, will continue to be covered by the terms of this MOU.

IX.  SIGNATURES

**Florida Department of Environmental Protection**

Date: 08/07/2020 _____          By: _____ _____

Noah Valenstein, Secretary

**Florida Fish and Wildlife Conservation Commission**

Date: ___8/5/2020_____          By: _____

Eric Sutton, Executive Director

**United States Fish and Wildlife Service**

Date: __11/16/2020_____          By: _____

Leopoldo Miranda-Castro, Regional Director

*Memorandum of Understanding Between the Florida Department of Environmental Protection,*                  *Page 12*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2188

Attachment 1: Species Coordination Process Flowchart



*Memorandum of Understanding Between the Florida Department of Environmental Protection,*      *Page 13*
*the Florida Fish and Wildlife Conservation Commission and the United States Fish and Wildlife Service*

JA.2189



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

DEC 1 3 2019

OFFICE OF WATER

Rear Admiral Timothy Gallaudet
Assistant Secretary of Commerce for Oceans and Atmosphere
U.S. Department of Commerce
1401 Constitution Avenue, NW, Room 51030
Washington, D.C. 20230

Rob Wallace
Assistant Secretary for Fish and Wildlife and Parks
Department of the Interior
1849 C Street, NW, MS-3160MIB
Washington, D.C. 20240

RADM Gallaudet and Mr. Wallace:

Earlier this week, I met with your representatives regarding the Florida Department of Environmental
Protection's (FDEP) request to assume administration of the Clean Water Act Section 404 permitting
program. I very much appreciate the support of your agencies on this effort. For your information, the
Environmental Protection Agency's Region 4 Regional Administrator has designated FDEP as the non-
Federal representative to conduct informal consultation for this effort, pursuant to 50 CFR § 402.08. The
Regional Administrator's letter to FDEP is enclosed for your awareness.

Sincerely,

David P. Ross
Assistant Administrator

cc: Noah Valenstein, Secretary, Florida Department of Environmental Protection

Enclosure

JA.2190



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET
ATLANTA, GEORGIA 30303-8960

December 12, 2019

The Honorable Noah Valenstein
Secretary
Florida Department of Environmental Protection
Marjory Stoneman Douglas Building
3900 Commonwealth Boulevard
Tallahassee, Florida 32399-3000

Dear Secretary Valenstein:

This letter responds to the Florida Department of Environmental Protection's (FDEP) requests that the
U.S. Environmental Protection Agency initiate an informal Endangered Species Act (ESA) Section 7
consultation with the U.S. Fish and Wildlife Service and the National Marine Fisheries Service (the
Services), and designate FDEP as a non-Federal representative for informal ESA consultation. In an
email to the EPA dated July 17, 2019, FDEP suggested that the EPA designate Florida as the non-
Federal representative for informal ESA Section 7 consultation to prepare a biological assessment on
FDEP's anticipated request to assume administration of a Clean Water Act (CWA) Section 404 program
in the State. In addition, during a call held between your staff and members of my staff on November 5,
2019, FDEP specifically requested that the EPA designate FDEP as the non-Federal representative for
this informal consultation.

The EPA has previously taken the position that EPA approval of a state's request to assume
administration of a CWA Section 404 program is nondiscretionary and consultation is not required; the
Agency is currently giving further consideration to that position. In the meantime, the EPA has decided
to voluntarily engage in informal consultation with the Services under ESA Section 7 and, pursuant to
50 CFR §402.08, designate FDEP as the non-Federal representative to conduct informal consultation to
prepare a biological assessment for this effort.

We appreciate Florida's interest in working with the EPA on these issues. If you have any further
questions, please feel free to contact me, or have a member of your staff contact Jeaneanne Gettle,
Director of the Water Division, at (404) 562-8979 or gettle.jeaneanne@epa.gov.

Sincerely,

Mary S. Walker
Regional Administrator

cc: Dr. Roy E. Crabtree, Regional Administrator
    NOAA Marine Fisheries Service, Southeast Regional Office

    Mr. Leopoldo Miranda, Regional Director
    U.S. Fish and Wildlife Service, Southeast Region

requirements, interventions, protests, service, and qualifying facilities filings can be found at: *http://www.ferc.gov/docs-filing/efiling/filing-req.pdf.* For other information, call (866) 208–3676 (toll free). For TTY, call (202) 502–8659.

Dated: May 15, 2020.

**Nathaniel J. Davis, Sr.,**
*Deputy Secretary.*

[FR Doc. 2020–10970 Filed 5–20–20; 8:45 am]

**BILLING CODE 6717–01–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OW–2020–0008; FRL–10008–96–OW]**

### Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice and request for comment.

**SUMMARY:** The Environmental Protection Agency (EPA) requests comment on whether the EPA should reconsider its current position that consultation under Endangered Species Act (ESA) section 7 is not required when the EPA approves a state or tribe's request to assume the Clean Water Act (CWA) section 404 dredged and fill permit program under the CWA. Comments in response to this document will be considered as the EPA reviews this position. If the EPA changes its current position, then the EPA would take the position that the Agency's decision as to whether to approve or disapprove a state's or tribe's request to assume the CWA section 404 permit program involves an exercise of discretion warranting consultation under ESA section 7. Section 7 consultation under the ESA would consequently apply to state and tribal requests to assume the CWA section 404 program and potentially subsequent program revisions, and the EPA would consult on its actions with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (hereafter referred to as ''the Services'') under the ESA as appropriate.

**DATES:** Comments may be submitted on or before July 6, 2020.

**ADDRESSES:** The EPA has established a docket for this action under Docket ID No. EPA–HQ–OW–OW–2020–0008. All documents in the docket are listed on the *https://www.regulations.gov*

website. Although listed in the index, some information may not be publicly available, *e.g.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, may not be placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available electronically through *https://www.regulations.gov.*

*Instructions:* All submissions received must include the Docket ID No. for this document. Comments received may be posted without change to *https://www.regulations.gov/,* including any personal information provided. Out of an abundance of caution for members of the public and our staff, the EPA Docket Center and Reading Room was closed to public visitors on March 31, 2020, to reduce the risk of transmitting COVID–19. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https://www.regulations.gov* or email, as there is a temporary suspension of mail delivery to the EPA, and no hand deliveries are currently accepted. For further information on the EPA Docket Center services and the current status, please visit us online at *https://www.epa.gov/dockets.*

**FOR FURTHER INFORMATION CONTACT:** Kathy Hurld, Oceans, Wetlands, and Communities Division, Office of Water (4504–T), Environmental Protection Agency, 1200 Pennsylvania Avenue NW, Washington, DC 20460; telephone number: 202–564–5700; email address: *404gESAconsultation@epa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. General Information
  A. Does this action apply to me?
  B. What should I consider as I prepare my comments?
II. Background
  A. CWA Section 404 Dredged and Fill Material Permit Program
  B. State and Tribal Assumption of CWA Section 404
  C. Consultation Under the ESA and State and Tribal Assumption Under CWA Section 404
III. Request for Comment

### I. General Information

*A. Does this action apply to me?*

States and tribes that have assumed or are considering assuming the administration of the CWA section 404 dredged or fill permitting program, as well as regulated entities and members of the public may be interested in

providing input on the issue described in this document.

*B. What should I consider as I prepare my comments?*

Submit your comments, identified by Docket ID No. EPA–HQ–OW–2020–0008, at *https://www.regulations.gov* (our preferred method), or the other methods identified in the **ADDRESSES** section. Once submitted, comments cannot be edited or removed from the docket. The EPA may publish any comment received to its public docket. Do not submit electronically any information you consider to be CBI or other information whose disclosure is restricted by statute. Multimedia submissions (audio, video, etc.) must be accompanied by a written comment. The written comment is considered the official comment and should include discussion of all points you wish to make. The EPA will generally not consider comments or comment contents located outside of the primary submission (*e.g.,* on the web, cloud, or other file sharing system). For additional submission methods, the full EPA public comment policy, information about CBI or multimedia submissions, and general guidance on making effective comments, please visit *https://www.epa.gov/dockets/commenting-epa-dockets.*

The EPA is temporarily suspending its Docket Center and Reading Room for public visitors to reduce the risk of transmitting COVID–19. Written comments submitted by mail are temporarily suspended and no hand deliveries will be accepted. Our Docket Center staff will continue to provide remote customer service via email, phone, and webform. We encourage the public to submit comments via *https://www.regulations.gov.* For further information and updates on EPA Docket Center services, please visit us online at *https://www.epa.gov/dockets.*

The EPA continues to carefully and continuously monitor information from the Centers for Disease Control and Prevention (CDC), local area health departments, and our federal partners so that we can respond rapidly as conditions change regarding COVID–19.

### II. Background

*A. CWA Section 404 Dredged and Fill Material Permit Program*

Section 404 of the CWA establishes a program to regulate the discharge of dredged or fill material into waters of the United States, which includes wetlands. Activities in waters of the United States regulated under this program include, for example, fill for

development, water resource projects (such as dams and levees), infrastructure development (such as highways and airports), natural resource extraction projects, and wetland restoration efforts. CWA section 404 requires a permit before dredged or fill material may be discharged into waters of the United States, unless the activity is exempt from regulation under CWA 404(f). The substantive and procedural requirements applicable to CWA section 404 are detailed in the EPA's regulations at 40 CFR parts 230 through 233 and the regulations of the U.S. Army Corps of Engineers at 33 CFR parts 323 through 338. Proposed discharges are regulated through a permit process implemented by the U.S. Army Corps of Engineers or authorized states and tribes.

## B. State and Tribal Assumption of CWA Section 404

In amendments to the CWA in 1977 and 1987, Congress gave states and tribes the ability to assume responsibility for part of the CWA section 404 permit program. The amendments require the EPA to approve or deny a state's or tribe's request to assume the permit program in lieu of the U.S. Army Corps of Engineers, to oversee operation of the assumed program, and to coordinate federal review of state or tribal permit actions. 33 U.S.C. 1344(g)–(i). To assume the CWA section 404 program, states or tribes must develop a dredged and fill material discharge permit program consistent with the requirements of the CWA and implementing regulations at 40 CFR part 233 and submit a request to assume the program to the EPA. States or tribes must have a program that is consistent with and no less stringent than the requirements of the CWA and implementing regulations. 40 CFR 233.1(d). The assumed program must include, but is not limited to, the following provisions laid out in the statute and program regulations: Regulation of discharges into all assumed waters within the state or tribe's jurisdiction; regulation of at least the same scope of activities as the CWA section 404 program; permitting procedures; permit issuance consistent with the environmental review criteria known as the CWA section 404(b)(1) Guidelines, applicable CWA section 303 water quality standards, and applicable CWA section 307 effluent standards and prohibitions; administrative and judicial review procedures; public notice and participation requirements; compliance and enforcement authorities as specified in the regulations; information collection requirements; and coordination procedures with Federal agencies and adjacent states and tribes. 40 CFR part 233, subparts C through F; *see* 33 U.S.C. 1344(h).

Section 404(h)(2) of the CWA states that if the Administrator of the EPA determines that a state or tribe that has submitted a program under section 404(g)(1) has the authority set forth in section 404(h)(1) of the CWA, then the Administrator "shall approve" the state or tribe's program request to transfer the section 404 permitting program. Under CWA section 404(h)(3), if the Administrator fails to make a determination with respect to any program request submitted by a state or tribe within 120 days after date of receipt of the request, the program shall be deemed approved.

## C. Consultation Under the ESA and State and Tribal Assumption Under CWA Section 404

The ESA section 7 directs each Federal agency to ensure, in consultation with the Services, that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of" listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. 1536(a)(2). If the Federal agency determines that an action will not affect listed species or designated critical habitat, ESA section 7 consultation is not required. In addition, the ESA regulations at 50 CFR 402.03 state that section 7 applies to "all actions in which there is discretionary Federal involvement or control."

In *National Association of Home Builders* v. *Defenders of Wildlife,* 551 U.S. 644 (2007), the United States Supreme Court held that because the transfer of CWA National Pollutant Discharge Elimination System (NPDES) permitting authority to a state "is not discretionary, but rather is mandated once a State has met the criteria set forth in section 402(b) of the CWA, it follows that a transfer of NPDES permitting authority does not trigger section 7(a)(2)'s consultation and no-jeopardy requirements." 551 U.S. at 673. The Supreme Court held that "[w]hile EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out section 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add an entirely separate prerequisite to the list. Nothing in the text of section 402(b) authorizes the EPA to consider the protection of threatened or endangered species as an end in itself when evaluating a transfer application." *Id.* at 671.

The EPA has previously taken the position that the Supreme Court's rationale in *National Association of Home Builders* applies to approval of a state's or tribe's dredged and fill permit programs under section 404(h) of the CWA. On December 6, 2010, the Environmental Council of the States (ECOS) and the Association of State Wetland Managers, Inc. (ASWM), sent a letter to the EPA asking whether the EPA must conduct an ESA section 7 consultation prior to approving or disapproving a state or tribe's section 404 program request. *See* Docket ID No. EPA–HQ–OW–2020–0008. The Agency responded to ECOS and ASWM in a December 27, 2010 letter ("Letter to ECOS and ASWM"), *see* Docket ID No. EPA–HQ–OW–2020–0008, stating that, as in the CWA section 402(b) context, when considering a state or tribal CWA section 404 program request, the EPA is only permitted to evaluate the specified criteria in CWA section 404(h) and does not have discretion to add requirements to the list in CWA section 404(h), including considerations of endangered and threatened species through ESA section 7 consultation with the Services.

The EPA stated in the 2010 letter that although there are some differences between CWA sections 402 and 404, the EPA's position was that the Supreme Court's reasoning in the *National Association of Home Builders* case applies to the EPA's approval of a CWA section 404(g) permitting program. Section 404(h)(2) of the CWA states that if the Administrator determines that a state program submitted under CWA section 404(g)(1) has the authority set forth in section 404(h)(1) of the CWA, then the Administrator "shall approve" the state's application to transfer the CWA section 404 permitting program. The 2010 letter thus concluded that this action is non-discretionary and ESA consultation is not required. The EPA further noted that although ESA section 7 consultation is not required, a number of important safeguards exist in the CWA and the EPA's regulations which work to ensure that concerns about listed species and designated critical habitat are addressed in approved CWA section 404(g) programs. State and tribal programs must issue permits that comply with the CWA section 404(b)(1) Guidelines (40 CFR 233.20(a)) which include the requirement that a permit may not be issued that "[j]eopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of . . . critical habitat . . . ." 40 CFR

230.10(b)(3). Additionally, permits which have "[d]ischarges with reasonable potential for affecting endangered or threatened species as determined by the Fish and Wildlife Service" must be sent to the EPA for review. The EPA shares these permits with the U.S. Army Corps of Engineers and the Services during this review.

In July 2019, the EPA received a request from the Florida Department of Environmental Protection (FDEP) asking the EPA to engage in an ESA section 7 consultation with the Services in connection with the EPA's initial review of a Florida's request to assume the CWA section 404 program. FDEP provided a white paper contending that ESA section 7 consultation is required in the CWA section 404 assumption context because of the unique statutory text and legislative history found in CWA section 404, which, in the FDEP's view, differ in critical respects from other state delegation programs administered by the EPA where ESA section 7 does not apply.

FDEP made a number of points in its white paper. *See* Docket ID No. EPA–HQ–OW–2020–0008. FDEP noted that, as a preliminary matter, the EPA's approval or disapproval of state assumption of the CWA section 404 program is an "action" for purposes of ESA section 7(a)(2). The Services' regulations governing ESA consultations expressly define "action" to include "the promulgation of regulations," 50 CFR 402.02, and the EPA's approval of state assumption is undertaken through rulemaking. FDEP then emphasized that the key question for ESA section 7 purposes is, as explained in *National Association of Home Builders,* whether the action is "discretionary" with the agency. To trigger Section 7 consultation, the statute must give the agency authority to "consider the protection of threatened or endangered species as an end in itself" in making the relevant decision. *National Association of Home Builders,* 551 U.S. at 671. In contrast to CWA section 402(b), FDEP noted that CWA sections 404(g)(2) and (3) expressly require that, when a state or tribe applies for assumption, the EPA must provide "the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service" an opportunity to comment on a state application for assumption of the CWA section 404 program. Relatedly, CWA section 404(h)(1) requires the EPA, in making a determination of whether to approve the state or tribal program, to "tak[e] into account any comments submitted by . . . the Secretary of the Interior, acting through the Director of [FWS]" under CWA section 404(g). The FWS is responsible for the implementation of the ESA and its consultation requirements. Thus, FDEP concluded that CWA section 404(g) requires the EPA to receive and consider input specifically focused on the protection of threatened and endangered species.

Second, FDEP noted that CWA section 404(h)(1) requires the EPA, in deciding whether to approve state or tribal assumption of the CWA section 404 program, to determine whether the state has authority "[t]o issue permits which, . . . apply, and assure compliance with, any applicable requirement of this section, including, but not limited to, the guidelines established under section (b)(1) of this section . . . ." The CWA section 404(b)(1) Guidelines, codified at 40 CFR part 230, provide that: "No discharge of dredged or fill material shall be permitted if it . . . [j]eopardizes the continued existence of species listed as endangered or threatened under the Endangered Species Act of 1973, as amended, or results in likelihood of the destruction or adverse modification of [critical] habitat." 40 CFR 230.10(b)(3) (emphasis added). By requiring the EPA to take into account the views of the Services and by incorporating consideration of "jeopardy" to species and "adverse modification" of critical habitat via the CWA section 404(b)(1) Guidelines, FDEP concluded that CWA sections 404(g) and (h) expressly require the EPA to determine whether the state or tribe has adequate authority to apply and assure compliance with the substantive requirements of the ESA. FDEP pointed out that neither requirement is part of the EPA's CWA section 402(b) delegation decision.

Unlike under CWA section 402(b), FDEP viewed the EPA as possessing discretion under CWA sections 404(g) and (h) to "consider the protection of threatened and endangered species as an end in itself," *National Association of Home Builders,* 551 U.S. at 671, in determining whether to approve a state's application to assume the CWA section 404 program. FDEP in its white paper cited excerpts from the legislative history and case law that it viewed as supporting its position that the EPA's decision as to whether to approve or disapprove state CWA section 404 programs is "discretionary" within the meaning of 40 CFR part 402.

### III. Request for Comment

The EPA is seeking public comment regarding whether to reconsider its position that it lacks discretionary involvement or control within the meaning of 50 CFR 402.03 when acting on a state or tribal application to administer the CWA section 404 program to trigger the requirements of section 7 of the ESA, based on the positions articulated in the FDEP white paper, as well as any other considerations that may be relevant to this issue, and consequently whether the EPA can and should engage in one-time ESA section 7 consultation with the Services in connection with the EPA's initial review of a state or tribal request to assume the CWA section 404 program.

To aid in its consideration of this issue, the EPA is taking comment as to whether, and on what basis, the EPA's approval of a state or tribe's program under CWA section 404(h) is a discretionary agency action for the purpose of ESA compliance. Specifically, the EPA seeks comment on whether the EPA should reconsider the position articulated in its 2010 Letter to ECOS and ASWM that in deciding whether to approve or disapprove a state's or tribe's CWA section 404 program, the EPA lacks discretion to consider the protection of threatened or endangered species, and therefore that this decision does not trigger ESA section 7 consultation. The EPA seeks comment on the question as to whether the Agency should, alternatively, adopt the position articulated in the FDEP white paper that the EPA's decision as to whether to approve or disapprove a state or tribe's CWA section 404 program provides the EPA with discretion warranting consultation under ESA section 7. The EPA requests commenters' views as to the legal viability of this potential interpretation as well as the programmatic implications of this interpretation, including its implications for existing state CWA section 404 programs and for permit applicants and permittees.

The EPA's docket for this document includes a number of background documents, including the 2010 Letter to ECOS and ASWM, the FDEP white paper, excerpts from the legislative history of CWA sections 404(g) and (h), and other documents to assist commenters as they consider the EPA's request for comment.

**David P. Ross,**
*Assistant Administrator, Office of Water.*
[FR Doc. 2020–10913 Filed 5–20–20; 8:45 am]
**BILLING CODE 6560–50–P**

**UNITED STATES DEPARTMENT OF COMMERCE**
National Oceanic and Atmospheric Administration
NATIONAL MARINE FISHERIES SERVICE
Silver Spring, MD 20910

April 15, 2020

Heather Mason, PWS
Environmental Administrator
Florida Department of Environmental Protection
Submerged Lands and Environmental Resources Coordination
2600 Blair Stone Road, MS 2500
Tallahassee, FL 32399-2400

RE:    National Marine Fisheries Service in the Clean Water Act Section 404 Assumption by the
       State of Florida

Dear Ms. Mason:

On November 22, 2019, the National Marine Fisheries Service (NMFS) received your request
for input on a draft species list for Florida's assumption of Clean Water Act Section 404
permitting from the U.S. Army Corps of Engineers (USACE). Through subsequent
communications with you and your staff, a review of state mapping products, NMFS'own
mapping analysis, and a review of state-provided documents about the assumption, we conclude
that Endangered Species Act (ESA)-listed species under NMFS' jurisdiction do not occur in
waters that are assumable by the state.

We specifically analyzed the possible spatial overlap of the assumption with waters used by
shortnose sturgeon, Atlantic sturgeon, smalltooth sawfish, and Gulf sturgeon. Based on that
analysis, shortnose sturgeon and Atlantic sturgeon occur in the St. Marys and St. Johns Rivers,
which are included on the USACE retained waters list. Smalltooth sawfish occur in waters
"subject to the ebb and flow of the tide" which will also remain under the USACE's jurisdiction,
per the draft State 404 Program Applicant's Handbook definition of "Retained Waters."
Therefore, the USACE will retain ESA Section 7 responsibility for proposed Section 404 actions
in the waterways where NMFS's trust resources are most likely to occur.

For Gulf sturgeon, which has shared jurisdiction between NMFS and the U.S. Fish and Wildlife
Service, the U.S. Fish and Wildlife Service is responsible for all consultations regarding Gulf
sturgeon and critical habitat in riverine habitat units (final rule designating critical habitat for the
Gulf sturgeon – 68 FR 13370). Rivers in Florida that include riverine critical habitat units (i.e.,
Escambia, Yellow, Choctawhatchee, Apalachicola, and Suwannee rivers) and river areas where
Gulf sturgeon are known to occur (e.g., lower Ochlockonee River) are all listed by the USACE
as retained waters.

Based on this determination we also assume that the Environmental Protection Agency will
make a "no effect" determination for NMFS' ESA-listed species that were originally identified
as part of this proposed assumption.



JA.2196

We appreciate all the information and assistance you provided in making this determination. If you have any questions, please contact Dr. Pat Shaw-Allen at (301) 427-8473, or by e-mail at pat.shaw-allen@noaa.gov or me at (301) 427-8495 or by e-mail at cathy.tortorici@noaa.gov.

Sincerely,

TORTORICI.CAT
HRYN.E.136582
6850

Digitally signed by
TORTORICI.CATHRYN.E.13
65826850
Date: 2020.04.15 13:25:25
-04'00'

Cathryn E. Tortorici
Chief, ESA Interagency Cooperation Division
Office of Protected Resources

cc:    Karen Myers, US Fish and Wildlife Service
       Robert Tawes, US Fish and Wildlife Service
       David Bernhart, NMFS, Southeast Regional Office

JA.2197



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
REGION 4
ATLANTA FEDERAL CENTER
61 FORSYTH STREET, SW
ATLANTA, GEORGIA  30303-3104

AUG 2 8 2020

Office of Governor Ron DeSantis
State of Florida
The Capitol
400 South Monroe St.
Tallahassee, Florida 32399-0001

Re:  Completeness Determination for State of Florida's Request to Assume Administration of a CWA
     Section 404 Program

Dear Governor DeSantis:

The Environmental Protection Agency Region 4 has concluded a completeness review of your request
for the State of Florida to assume administration of a Clean Water Act (CWA) Section 404 program.
The EPA received your request on August 20, 2020. All the program submission elements required by
40 C.F.R. § 233.10 were included as follows:

- Governor's Letter

- Program Description

- Statement from Justin G. Wolfe, General Counsel for the Florida Department of
  Environmental Protection (FDEP)

- Memorandum of Agreement with the EPA Region 4 Administrator

- Memorandum of Agreement with the Secretary of the Army

- Applicable State Statutes and Regulations

Our review indicates that the program submission is complete. The EPA has 120 days from receipt of
the complete program submission to approve or disapprove the program based on whether Florida's
program fulfills the requirements of the CWA, including its implementing regulations at 40 C.F.R. Part
233, taking into consideration all comments received. Please be advised that this program submission
completeness determination does not constitute an evaluation of the merits of the submission. If we find
that additional information is necessary to evaluate the submission, we will request the information.

We appreciate the significant effort by the Florida Department of Environmental Protection in
developing this programmatic submission and its coordination with the Secretary of the Army and
Region 4 in developing the Memorandums of Agreement that were enclosed with your letter.

If you have any questions, please do not hesitate to call me at (404) 562-8357 or have a member of your staff contact Ms. Jeaneanne M. Gettle, Director of the Water Division at (404) 562-9345.

Sincerely,

Mary S. Walker
Regional Administrator

cc:  The Honorable Noah Valenstein, Secretary, FDEP

Mr. John Truitt, Deputy Secretary for Regulatory Programs, FDEP