**ORAL ARGUMENT HAS NOT BEEN SCHEDULED**

No. 24-5101

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
*Plaintiff-Appellees / Cross-Appellants*,

v.

MICHAEL REGAN, ET AL.,
*Defendant-Appellants / Cross-Appellees*,

and

STATE OF FLORIDA, ET AL.,
*Intervenors-Defendants-Appellants / Cross-Appellees*.

Appeal from the United States District Court for the District of Columbia
No. 1:21-cv-0119 (Hon. Randolph D. Moss)

**ENVIRONMENTAL APPELLEES' BRIEF**

Tania Galloni
Christina I. Reichert
Earthjustice
4500 Biscayne Blvd, Ste. 201
Miami, FL 33137
Tel.: (305) 440-5432
tgalloni@earthjustice.org
creichert@earthjustice.org

Bonnie Malloy
Earthjustice
111 S. MLK Jr. Blvd.
Tallahassee, FL 32301
Tel.: (850) 681-0031
bmalloy@earthjustice.org

*Counsel for Plaintiff-Appellees / Cross-Appellants*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     Parties and Amici

Parties: Plaintiffs-Appellees / Cross-Appellants are the Center for Biological Diversity; Defenders of Wildlife; Sierra Club; Conservancy of Southwest Florida; Florida Wildlife Federation; Miami Waterkeeper; and St. Johns Riverkeeper (collectively, "Environmental Appellees").

Federal Appellants are Michael S. Regan, in his official capacity as Administrator for the Environmental Protection Agency ("EPA"); Radhika Fox, in her official capacity as Assistant Administrator for EPA's Office of Water; Jeffrey Prieto, in his official capacity as EPA's General Counsel; Lawrence Starfield, in his official capacity as EPA's Acting Assistant Administrator for the Office of Enforcement and Compliance Assurance; John Blevins, in his official capacity as EPA's Acting Administrator for Region 4; Leopoldo Miranda-Castro, in his official capacity as Regional Director for the Fish and Wildlife Service ("FWS"); Martha Williams, in her official capacity as Principal Deputy Director for FWS; Scott Spellmon, in his official capacity as Chief of Engineers and Commanding General of the Army Corps of Engineers ("Corps"); James Booth, in his official capacity as District Commander of the Jacksonville District for the Corps; EPA; FWS; and the Corps (collectively, "Federal Appellants").

Intervenors-Defendant-Appellants / Cross-Appellees are the State of Florida

and Florida Department of Environmental Protection (collectively, "Florida").

Limited Intervenors Before the District Court: Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd., Cameratta Companies, LLC, and Cam7-Sub, LLC, were granted leave to intervene below solely for the purpose of opposing Environmental Appellees' motion for a preliminary injunction.

Amici in Support of Appellants: Association of Florida Community Developers, Inc.; Associated Industries of Florida; Cameratta Companies LLC; CAM7-SUB, LLC; Florida Chamber of Commerce; Florida State Hispanic Chamber of Commerce; Florida Transportation Builders Association; G.L. Homes of Florida Corp.; Greenpoint Holdings; KB Home; Lennar Corp.; Pulte Group, Inc.; and Taylor Morrison Home Corp. have appeared as amici in the district court and Court of Appeals. Florida Home Builders Association; Leading Builders of America; and Mosaic Company have also appeared as amici in the Court of Appeals.

The State of Utah, joined by Alabama, Alaska, Arkansas, Idaho, Iowa, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia, and Wyoming, also submitted an amicus brief in support of Appellants.

### B.    Rulings Under Review

Federal Appellants and Florida ("Appellants") appeal the district court's February 15, 2024, order, as amended on April 12, 2024, ruling in favor of

Environmental Appellees on summary judgment on Claims 3, 4, 6, 10–13 (Endangered Species Act claims).  JA1218–19/Dkt. 164; JA1284–1381/Dkt. 182. That order was made final and appealable on April 12, 2024, when the district court directed entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b). JA1409/Dkt. 184.

Environmental Appellees filed a conditional cross-appeal of the court's April 12, 2024, dismissal of Claims 1, 2, and 5 (Clean Water Act and Administrative Procedure Act claims) as prudentially moot.  *Id.*

## C.    Related Cases

There are no related cases pending before this Court or the U.S. District Court for the District of Columbia.  However, a related case was filed by the Miccosukee Tribe of Indians of Florida in the U.S. District Court for the Southern District of Florida also challenging EPA's approval of Florida's 404 program.  That case was stayed and administratively closed in light of the district court's vacatur of EPA's approval of the program.  Order at 2–3, Miccosukee Tribe of Indians of Fla. v. EPA, No. 1:22-CV-22459 (S.D. Fla. July 28, 2023), Dkt. 50.

*/s/ Tania Galloni*
Tania Galloni

*Counsel for Environmental Appellees*

## RULE 26.1 DISCLOSURE STATEMENT

Environmental Appellees are Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper, not-for-profit membership organizations dedicated to environmental conservation, including the protection of threatened and endangered species and their habitats.  D.C. Cir. Rule 8(a)(4), 26.1(b).  Pursuant to Federal Rule of Appellate Procedure 26.1(a) and D.C. Cir. Rule 26.1(a), Environmental Appellees affirm that they are nongovernmental organizations with no parent or publicly held corporation that has an ownership interest in them.

*/s/ Tania Galloni*
Tania Galloni

*Counsel for Environmental Appellees*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

RULE 26.1 DISCLOSURE STATEMENT ............................................ iv

TABLE OF CONTENTS ........................................................... v

TABLE OF AUTHORITIES ...................................................... viii

GLOSSARY ....................................................................... xix

STATEMENT OF JURISDICTION ................................................. 1

STATEMENT OF ISSUES ......................................................... 1

STATUTES AND REGULATIONS ................................................. 2

STANDARD OF REVIEW ......................................................... 2

INTRODUCTION ................................................................. 3

STATEMENT OF THE CASE ...................................................... 6

    I.    Legal Framework ....................................................... 6

        A.   The Endangered Species Act ...................................... 6

        B.   The Clean Water Act ............................................. 8

    II.   Statement of the Facts ............................................... 10

        A.   Section 404 Assumption ......................................... 10

        B.   EPA's Decision to Consult ....................................... 11

        C.   Consultation on Florida's 404 Program Submission ............... 13

        D.   Public Comment Period .......................................... 15

        E.   FWS' Biological Opinion and Incidental Take Statement ......... 16

        F.   EPA's Decision .................................................. 17

    III.  Procedural History ................................................... 17

        A.   District Court Ruling on the ESA Claims .......................... 19

        B.   Florida's Motion for Final Judgment, Stay; Appeal ............... 22

SUMMARY OF THE ARGUMENT ................................................. 23

ARGUMENT ..................................................................................27

I. Environmental Appellees Have Standing. ...............................27

   A.   Environmental Appellees Have Standing. ......................27

   B.   Florida's Objections Misapprehend the Law and the Facts. ..............30

      1.   Federal Oversight Does Not Cure Procedural Harms. ...................31

      2.   Environmental Appellees Were Not Required to Await Irreparable Harm to Establish Standing. ..............33

   C.   Environmental Appellees' Challenge Was Ripe. ...............36

II. The Biological Opinion Violated the ESA. ...............................38

   A.   FWS Failed to Comply with the ESA's Analytical Requirements......39

      1.   FWS Did Not Analyze the Baseline of the Species.........................39

      2.   FWS Did Not Analyze Effects to Listed Species. ...........................41

      3.   FWS' No-Jeopardy Determination Was Arbitrary.........................42

   B.   FWS Had Ample Data to Conduct the ESA-Mandated Analyses.......43

   C.   The ESA Does Not Excuse Compliance Based on Claims of Uncertainty..........................46

   D.   The ESA Required FWS to Analyze Effects on Individual Species. ..48

      1.   The Ordinary Meaning of "Detail" Required FWS to Provide Analyses, Not Perfunctory Statements. .............48

      2.   The ESA's Plain Language Required Species-Specific Analysis. ..49

      3.   Applying the Plain Meaning of "Detail" Does Not Produce "Impracticable" Results.....................51

III. FWS Could Not Avoid Section 7 Duties At the Programmatic Level By Deferring Any Species Analysis to a Non-Statutory Technical Assistance Process at the Permit Level. ..............53

   A.   The ESA's Analytical Requirements Apply to Programmatic Consultations..........................53

   B.   The Technical Assistance Process Did Not Cure the ESA Violations. ..........................57

C.    The Technical Assistance Process Did Not Constitute A Mitigation Measure for EPA's Transfer Decision...................................................60

D.    Florida Mischaracterizes the District Court's Ruling.........................63

E.    *Cooling Water* is Distinguishable. .....................................................64

IV.    FWS Unlawfully Extended Broad Take Liability Exemption. ...........67

A.    FWS Set No Take Limits.....................................................................68

1.    FWS Had Ample Data to Set Take Limits. ....................................69

2.    The ESA's Plain Text Required a Take Limit................................70

3.    The Technical Assistance Process Did Not Cure the Failure to Set Take Limits. ...................................................................................72

B.    FWS Disavowed the Duty to Reinitiate...............................................74

C.    FWS Failed to Establish Meaningful Terms and Conditions...............75

V.    The District Court Read the ESA and Clean Water Act Harmoniously and Consistent with Cooperative Federalism.....................................77

A.    Florida Misapprehended the District Court's Decision. ......................78

B.    Florida's Claim That It Had No Other Option Fails............................80

VI.    EPA's Approval of Florida's Program Was Unlawful........................83

VII.    Vacatur Was Warranted........................................................................86

A.    The Agencies' Violations Could Not Be Justified on Remand...........86

B.    Florida Failed to Demonstrate Undue Disruption. ..............................88

C.    Environmental Appellees Demonstrated Harm. ...................................90

VIII.    In the Alternative, the Court Should Grant the Cross-Appeal............91

CONCLUSION ................................................................................................92

CERTIFICATE OF COMPLIANCE ..............................................................94

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*A.L. Pharma, Inc. v. Shalala*,
   62 F.3d 1484 (D.C. Cir. 1995)................................................................91

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
   988 F.2d 146 (D.C. Cir. 1993)........................................................86, 90

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014)........................................................86

*Am. Rivers v. FERC*,
   895 F.3d 32 (D.C. Cir. 2018).......................................41, 47, 49, 50

*Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*,
   659 F.3d 13 (D.C. Cir. 2011)........................................................2, 27

*Am. Wildlands v. Kempthorne*,
   530 F.3d 991 (D.C. Cir. 2008)........................................................43

*Appalachian Voices v. U.S. Dep't of Interior*,
   25 F.4th 259 (4th Cir. 2022) ........................................................38

*Bennett v. Spear*,
   520 U.S. 154 (1997)........................................................60

*Black Oak Energy, LLC v. FERC*,
   725 F.3d 230 (D.C. Cir. 2013)........................................................87

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)........................................................38

*In re Charter Commc'ns, Inc.*,
   691 F.3d 476 (2d Cir. 2012) ........................................................3

*City of Oberlin v. FERC*,
   937 F.3d 599 (D.C. Cir. 2019)........................................................90

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)........................................................35

viii

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1980) .......................................................55, 68, 79, 80

*Conserve Sw. Utah v. U.S. Dep't of Interior*,
No. 1:21-CV-01506, 2023 WL 7922785 (D.D.C. Nov. 16, 2023)....................88

*Cooling Water Intake Structure Coal. v. EPA*,
905 F.3d 49 (2d Cir. 2018) ...............................................................37, 64, 65, 66

*Crow Creek Sioux Tribe v. Brownlee*,
331 F.3d 912 (D.C. Cir. 2003)....................................................................31, 32

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) .............................................................................61

*Ctr. for Biological Diversity v. EPA*,
56 F.4th 55 (D.C. Cir. 2022)..............................................................................28

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017)......................................................................33, 34

*Ctr. for Biological Diversity v. FWS*,
807 F.3d 1031 (9th Cir. 2015) ...........................................................................66

*Ctr. for Biological Diversity v. Ross*,
480 F. Supp. 3d 236 (D.D.C. 2020)...................................................................87

*Ctr. for Biological Diversity v. Salazar*,
695 F.3d 893 (9th Cir. 2012) ...............................................................................8

*Defs. of Wildlife v. Babbitt*,
130 F. Supp. 2d 121 (D.D.C. 2001)...................................................................49

*Defs. of Wildlife v. U.S. Dep't of Interior*,
931 F.3d 339 (4th Cir. 2019) .............................................................................49

*Defs. of Wildlife v. U.S. Dep't of Navy*,
733 F.3d 1106 (11th Cir. 2013) .........................................................................56

*El Puente v. U.S. Army Corps of Eng'rs*,
100 F.4th 236 (D.C. Cir. 2024).........................................................................62

*EPA v. California*,
426 U.S. 200 (1976)..............................................................................8

*FDA v. All. for Hippocratic Med.*,
602 U.S. 367 (2024)............................................................................31

*Fed. Nat'l Mortg. Ass'n v. LeCrone*,
868 F.2d 190 (6th Cir. 1989) .............................................................38

*Fla. Audubon Soc'y v. Bentsen*,
94 F.3d 658 (D.C. Cir. 1996)..............................................................35

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015)............................................................35

*Forest Serv. Emps. For Env't Ethics v. U.S. Forest Serv.*,
726 F. Supp. 2d 1195 (D. Mo. 2010)................................... 42, 50, 51, 67, 68, 69

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002)........................................................2, 40

*Greenpeace v. NMFS*,
80 F. Supp. 2d 1137 (W.D. Wash. 2000) ..........................................47

*Growth Energy v. EPA*,
5 F.4th 1 (D.C. Cir. 2021)...................................................................37

*Hartman v. Duffey*,
19 F.3d 1459 (D.C. Cir. 1994)............................................................91

*Hodel v. Va. Surface Mining & Reclamation Ass'n*,
452 U.S. 264 (1981)............................................................................78

*Howard v. Pritzker*,
775 F.3d 430 (D.C. Cir. 2015)............................................................77

*Jeffries v. Barr*,
965 F.3d 843 (D.C. Cir. 2020).............................................................92

*Jicarilla Apache Nation v. U.S. Dep't of Interior*,
613 F.3d 1112 (D.C. Cir. 2010) .........................................................61

*Kifafi v. Hilton Hotels Ret. Plan*,
    701 F.3d 718 (D.C. Cir. 2012)..............................................................3

*Lloyd v. HOVENSA, LLC.*,
    369 F.3d 263 (3d Cir. 2004) ..............................................................51

*Loper Bright Enters. v. Raimondo*,
    144 S. Ct. 2244 (2024).......................................................................3

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..........................................................................28

*Miccosukee Tribe of Indians of Fla. v. United States*,
    566 F.3d 1257 (11th Cir. 2009) ........................................................46

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................44

*Nat'l Wildlife Fed'n v. Brownlee*,
    402 F. Supp. 2d 1 (D.D.C. 2005)........................................37, 55, 56

*Nat'l Wildlife Fed'n v. Norton*,
    332 F. Supp. 2d 170 (D.D.C. 2004)..................................................46

*New Jersey Cons. Found. v. FERC*,
    111 F.4th 42 (D.C. Cir. 2024)..........................................................86

*New York v. United States*,
    505 U.S. 144 (1992).........................................................................78

*North. Slope Borough v. Andrus*,
    642 F.2d 589 (D.C. Cir. 1980)....................................................55, 56

*NRDC v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007).......................................................87

*NRDC v. Evans*,
    279 F. Supp. 2d 1129 (N.D. Cal. 2003)......................................47, 69

*Oceana, Inc. v. Pritzker*,
    75 F. Supp. 3d 469 (D.D.C. 2014)...................................................74

*Oceana, Inc. v. Ross*,
  No. CV 15-0555, 2020 WL 5995125 (D.D.C. Oct. 9, 2020) ...............43, 49, 67

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
  896 F.3d 520 (D.C. Cir. 2018)..........................................................................91

*Oregon Nat. Res. Council v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) ........................................................................71

*Pacific Coast Fed'n of Fishermen's Ass'ns v. NMFS*,
  482 F. Supp. 2d 1248 (W.D. Wash. 2007) ......................................................48

*PETA v. U.S. Dep't of Agr. & Animal & Plant Health Inspection Serv.*,
  918 F.3d 151 (D.C. Cir. 2019).........................................................................60

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ..........................................................................68

*Sandpiper Residents Ass'n v. HUD*,
  106 F.4th 1134 (D.C. Cir. 2024)......................................................................50

*Sea-Land Serv., Inc. v. U.S. Dep't of Transp.*,
  137 F.3d 640 (D.C. Cir. 1998).........................................................................91

*Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*,
  992 F.3d 1071 (D.C. Cir. 2021).......................................................................83

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995)...........................................................................................64

*Sierra Club v. Jackson*,
  648 F.3d 848 (D.C. Cir. 2011).........................................................................57

*Sierra Club v. U.S. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018) .......................................................................8, 74

*Siesta Key Ass'n of Sarasota, Inc. v. City of Sarasota*,
  320 So. 3d 833 (Fla. 2d Dist. Ct. App. 2021)..................................................38

*Sw. Ctr. for Biological Diversity v. Babbitt*,
  215 F.3d 58 (D.C. Cir. 2000)...........................................................................46

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978).................................................................6

*U.S. ex rel. Totten v. Bombardier Corp.*,
   380 F.3d 488 (D.C. Cir. 2004).............................................83

*U.S. Sugar Corp. v. EPA*,
   844 F.3d 268 (D.C. Cir. 2016).............................................86

*Union of Concerned Scientists v. U.S. Dep't of Energy*,
   998 F.3d 926 (D.C. Cir. 2021).............................................35

*United States v. Wilson*,
   290 F.3d 347 (D.C. Cir. 2002).............................................52

*United Techs. Corp. v. U.S. Dep't of Defense*,
   601 F.3d 557 (D.C. Cir. 2010)...............................................2

*W. Watersheds Project v. Kraayenbrink*,
   538 F. Supp. 2d 1302 (D. Idaho 2008)................................54

*Waterkeeper Alliance, Inc. v. Regan*,
   41 F.4th 654 (D.C. Cir. 2022)..............................................32

*Weaver v. U.S. Info. Agency*,
   87 F.3d 1429 (D.C. Cir. 1996)..............................................52

*Wild Fish Conservancy v. Salazar*,
   628 F.3d 513 (9th Cir. 2010)................................................46

*WildEarth Guardians v. U.S. Army Corps of Eng'rs*,
   429 F. Supp. 3d 1224 (D.N.M. 2019)..................................46

*Wis. Cent. Ltd. v. United States*,
   585 U.S. 274 (2018)..............................................................49

**Federal Statutes**

5 U.S.C. § 706(2)(A).................................................................2

5 U.S.C. § 706(2)(C).................................................................2

5 U.S.C. § 706(2)(D).................................................................2

16 U.S.C. § 1531(a)(1) ................................................................. 6

16 U.S.C. § 1532(5)(A)(i) ............................................................ 50

16 U.S.C. § 1532(5)(A)(ii) ........................................................... 50

16 U.S.C. § 1532(6) ..................................................................... 50

16 U.S.C. § 1532(16) ................................................................... 50

16 U.S.C. § 1533(a)(1) ................................................................. 50

16 U.S.C. § 1533(b)(1)(A) ........................................................... 43

16 U.S.C. § 1536 ....................................................................... 6, 7

16 U.S.C. § 1536(20) ................................................................... 50

16 U.S.C. § 1536(a)(2) ........................... 7, 20, 21, 38, 39, 43, 50, 53, 84

16 U.S.C. § 1536(b)(1)(A) ...................................................... 38, 53

16 U.S.C. § 1536(b)(3)(A) .................................... 7, 39, 41, 48, 49

16 U.S.C. § 1536(b)(4) ...................................... 21, 33, 67, 68, 70

16 U.S.C. § 1536(b)(4)(i) .............................................................. 7

16 U.S.C. § 1536(b)(4)(iv) ........................................................... 75

16 U.S.C. § 1536(o)(2) ...................................................... 75, 76, 77

16 U.S.C. § 1539 ........................................................................... 7

28 U.S.C. § 1291 ........................................................................... 1

33 U.S.C. § 1251(a) ...................................................................... 8

33 U.S.C. § 1344(i) ....................................................................... 9

33 U.S.C. § 1344(2)(A) ................................................................. 9

33 U.S.C. § 1344(a) ...................................................................... 8

33 U.S.C. § 1344(g) ................................................................. 9, 10

33 U.S.C. § 1344(g)(1)....................................................................8

33 U.S.C. § 1344(h).........................................................................9

33 U.S.C. § 1344(h)(1)...................................................................13

33 U.S.C. § 1344(h)(1)(A)(i)............................................................9

33 U.S.C. § 1344(h)(3)......................................................................8

33 U.S.C. § 1344(h)(4)......................................................................8

33 U.S.C. § 1344(j)...........................................................................9

**Federal Regulations**

40 C.F.R. pt. 230..............................................................................9

40 C.F.R. pt. 233..............................................................................9

40 C.F.R. § 230.10(b)(3)...................................................................9

40 C.F.R. § 233.15(a).......................................................................13

40 C.F.R. § 233.15(c).......................................................................13

40 C.F.R. § 233.15(e).......................................................................15

40 C.F.R. § 233.15(h).........................................................................8

40 C.F.R. § 233.20(a).........................................................................9

40 C.F.R. § 233.50(a).........................................................................9

40 C.F.R. § 233.50(b).........................................................................9

40 C.F.R. § 233.50(f).........................................................................9

40 C.F.R. § 233.51(b)(2)....................................................................9

40 C.F.R. § 233.70...........................................................................10

40 C.F.R. § 233.71...........................................................................10

50 C.F.R. § 17.11(h).........................................................................50

50 C.F.R. § 17.22 ...................................................................................7

50 C.F.R. § 17.32 ...................................................................................7

50 C.F.R. § 402.02 ...........................................7, 39, 40, 52, 63, 84

50 C.F.R. § 402.14 .............................................................................6, 7

50 C.F.R. § 402.14(i)(1)(i) ...............................7, 21, 67, 68, 71, 74

50 C.F.R. § 402.14(i)(3) ........................................................................8

50 C.F.R. § 402.14(i)(4) ...................................................................8, 21

50 C.F.R. § 402.14(i)(5) ........................................................................8

50 C.F.R. § 402.14(i)(7) ......................................................................54

50 C.F.R § 402.14(c)(1)(A) ...............................................................61

50 C.F.R. § 402.14(c)(4) ................................................................7, 54

50 C.F.R § 402.14(g) .................................................................7, 54, 84

50 C.F.R. § 402.14(g)(1) .....................................................................39

50 C.F.R. § 402.14(g)(2) ................................................................39, 40

50 C.F.R. § 402.14(g)(3) .....................................................................39

50 C.F.R. § 402.14(g)(4) ................................................................39, 42

50 C.F.R. § 402.14(g)(7) .....................................................................68

50 C.F.R. § 402.14(g)(8) .....................................................................43

50 C.F.R. § 402.14(h) ...............................................................7, 54, 84

50 C.F.R. § 402.14(h)(1)(ii) .........................................................39, 40

50 C.F.R. § 402.14(h)(1)(iii) ..............................................................39

50 C.F.R. § 402.14(h)(1)(iv) ..............................................................39

50 C.F.R. § 402.16(a) ............................................................................8

50 C.F.R. § 402.16(a)(1) ...........................................................................74

50 C.F.R. § 402.16(a)(4) ...........................................................................74

**Federal Register**

80 Fed. Reg. 26,832-01 (May 11, 2015)..............................................54, 69

84 Fed. Reg. 44,976-01 (Aug. 27, 2019) ...................................................53

88 Fed. Reg. 55,276 (Aug. 14, 2023) .........................................................10

**State Regulations**

Fla. Admin. Code R. 62-331.51(4) (2020) .................................................63

Fla. Admin. Code R. 62-331.054(1) (2020) ...............................................63

**Other Authorities**

ESA Section 7 Consultation Handbook (1998),
    https://www.fws.gov/sites/default/files/documents/endangered-
    species-consultation-handbook.pdf ...............................................47, 69

*Florida Bonneted Bat*, FWS,
    https://ecos.fws.gov/ecp/species/8630?sId=8630 (last visited Oct.
    30, 2024) .............................................................................................42

H.R. Rep. No. 97-567 (1982)........................................................7, 75, 76

*Key Largo Woodrat*, FWS, https://ecos.fws.gov/ecp/species/3921 (last
    visited Oct. 30, 2024)..........................................................................42

Merriam-Webster, *Detail*, https://www.merriam-
    webster.com/dictionary/detail#dictionary-entry-2 (last visited Oct.
    30, 2024) .............................................................................................49

Merriam-Webster Dictionary, *Extent*, https://www.merriam-
    webster.com/dictionary/extent (last visited Oct. 30, 2024)................71

Merriam-Webster Dictionary, *Impact*, https://www.merriam-
    webster.com/dictionary/impact (last visited Oct. 30, 2024)...............71

Merriam-Webster Dictionary, *Specify*, https://www.merriam-
   webster.com/dictionary/specify (last visited Oct. 30, 2024) ..............................71

S. Rep. 93-307 (1973) ...........................................................................................50

S. Rep. No. 97-418 (1982) ...................................................................7, 67, 71, 75

*U.S. Interactive Map of State and Tribal Assumption under CWA
   Section 404*, EPA, https://www.epa.gov/cwa404g/us-interactive-
   map-state-and-tribal-assumption-under-cwa-section-404 (last
   visited Oct. 30, 2024) .........................................................................................10

# **GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| Appellants | Federal Appellants and Florida |
| Assumable Waters | Waters of the United States under the Clean Water Act over which states may assume Section 404 permitting authority pursuant to 33 U.S.C. § 1344(g)(1) |
| Corps | U.S. Army Corps of Engineers |
| Environmental Appellants | Plaintiffs-Appellees / Cross-Appellants Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper |
| ESA | Endangered Species Act |
| Federal Appellants | Defendant-Appellants / Cross-Appellees EPA, FWS, the Corps, and federal officials |
| Florida | Intervenors-Defendants-Appellants / Cross-Appellees State of Florida and Florida Department of Environmental Protection |
| FWS | U.S. Fish and Wildlife Service |
| NMFS | National Marine Fisheries Service |
| Retained Waters | Waters of the United States under the Clean Water Act over which the Corps retains Section 404 permitting authority after state assumption pursuant to 33 U.S.C. § 1344(g) |
| Wildlife Agencies | NMFS and FWS |

xix

## STATEMENT OF JURISDICTION

Environmental Appellees adopt Federal Appellants' statement of jurisdiction. Fed. Br. at 15. The Court also has jurisdiction over Environmental Appellees' conditional cross-appeal, which they timely filed on June 10, 2024. 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Whether the district court correctly determined that Environmental Appellees had standing to bring their ESA claims against Federal Appellants based on harms to their members' aesthetic, recreational, and other interests.

2.     Whether the district court correctly determined that FWS violated Section 7 of the ESA by: (a) failing to conduct the required analyses of species baselines, effects of the action on listed species, and potential jeopardy to listed species' survival; (b) extending broad liability coverage without assessing the anticipated take of any listed species, setting incidental take limits, establishing a trigger for reinitiation of consultation, or setting forth meaningful terms and conditions; and (c) deferring all species analyses to a "technical assistance" process at the state permitting level that itself did not require FWS to conduct ESA-mandated analyses or abide by ESA standards.

3.     Whether the district court correctly determined that EPA violated the ESA by relying on FWS' actions to approve Florida's program and failing to consult

1

with NMFS before approving the program.

4.    Whether the district court correctly determined that vacatur was the appropriate remedy for serious violations of the ESA that could not be cured on remand, especially given that restoring 404 authority to the Corps was inherent in Congress' design when a state program is found unlawful.

5.    Whether, if the Court reverses, the Court should remand to the district court for consideration of Environmental Appellees' Clean Water Act claims, which the district court dismissed as prudentially moot in light of the vacatur.

## STATUTES AND REGULATIONS

Except for the additional legal authorities contained in Environmental Appellees' Addendum, all applicable legal authorities appear in the Addendums to Appellants' Briefs.

## STANDARD OF REVIEW

The Court reviews the district court's determination on standing de novo and its underlying factual findings for clear error. *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d 13, 19 (D.C. Cir. 2011).

The Court reviews the district court's grant of summary judgment de novo, *Gerber v. Norton*, 294 F.3d 173, 178 (D.C. Cir. 2002), applying the APA's arbitrary and capricious standard, 5 U.S.C. § 706(2)(A), (C)–(D).  Courts "do not defer to [an] agency's conclusory or unsupported suppositions," *United Techs. Corp. v. U.S.*

*Dep't of Defense*, 601 F.3d 557, 562 (D.C. Cir. 2010), and must decide all questions of law, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024).

Dismissal for prudential mootness is reviewed for abuse of discretion. *See, e.g.*, *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012); *Kifafi v. Hilton Hotels Ret. Plan*, 701 F.3d 718, 724 n.3 (D.C. Cir. 2012).

## **INTRODUCTION**

Florida hosts some of the Nation's most iconic—and imperiled—wildlife, including the Florida panther and West Indian manatee.  These species persist today because of the Endangered Species Act, which affords them a suite of critical substantive and procedural protections to ward off the threat of extinction.

This case arises from Federal Appellants' effort, at Florida's urging, to trade away the ESA's rigorous protections for a non-statutory "technical assistance" process in conjunction with EPA's approval of Florida's request to assume permitting authority under Section 404 of the Clean Water Act.  Florida's chief objective was ensuring that its developers would be insulated from ESA liability for the incidental take of threatened and endangered species without having to undergo the rigorous analyses the ESA requires.

But Congress authorized take liability exemptions only through ESA Section 7 (consultation on federal actions) and Section 10 (incidental take permits for state actions).  Both require robust analyses before wildlife agencies may exempt

incidental take from ESA liability.

Seeking to "have it both ways," Florida asked EPA to engage in Section 7 programmatic consultation on EPA's consideration of Florida's 404 assumption application, while deferring any species analysis to a "technical assistance" process at the state permitting level, after assumption. FWS would still invoke its Section 7 authority at the programmatic level, however, to extend sweeping liability protection to future state permittees for incidental take, while relieving them of having to seek that authorization under Section 10.

And so, FWS produced a programmatic Biological Opinion that sidestepped all ESA-required analyses. It failed to establish baselines of protected species, describe effects of EPA's action on those species, or make species-specific jeopardy determinations. FWS' programmatic Incidental Take Statement failed to assess the anticipated take of any protected species, set incidental take limits, establish a trigger for reinitiation of consultation, or set forth meaningful terms and conditions, all of which the ESA requires. The "technical assistance" process did not cure these ESA violations because it did not require FWS to take any of these actions either.

Appellants claim that it was "impossible" for FWS to comply with Section 7's requirements at the programmatic level because the agency could not predict future state permitting activity. But the ESA does not require perfect foresight, only informed projections. And FWS had extensive data on which to base projections,

4

including on the few species that accounted for more than 90% of its prior 404 consultations in Florida.

Appellants also had other options to comply with the ESA. But nothing in the ESA authorized the path they chose. FWS was not entitled to make a blanket no-jeopardy determination or extend unlimited take liability exemptions based on no data and no analysis.

The district court vacated EPA's transfer of 404 authority to Florida because of these serious ESA violations, as well as EPA's failure to consult with NMFS before approving Florida's program, an error the Federal Appellants now concede. Although Florida asks the Court to reverse the vacatur, even Federal Appellants acknowledge that this would be disruptive now that the Corps has resumed 404 permitting in Florida's assumable waters.

Appellants and Amici suggest that states (other than Michigan and New Jersey) will not pursue 404 assumption unless their workaround to the ESA is approved. But courts have no authority to re-write a statute to advance a policy goal. And states have identified many other reasons for not assuming 404 permitting, including the cost and complexity of administering the program.

Environmental Appellees therefore respectfully request that the Court affirm the district court's judgment in all respects. Alternatively, they request that the Court grant their cross-appeal, maintain the vacatur, and remand to the district court for

consideration of their Clean Water Act claims, which the district court dismissed as prudentially moot in light of the vacatur.

## STATEMENT OF THE CASE

### I.    Legal Framework

#### A.    The Endangered Species Act

Congress enacted the ESA to address increasing threats of species extinction due to "economic growth and development untempered by adequate concern and conservation."  16 U.S.C. § 1531(a)(1).  Congress made a "conscious decision ... to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978).  Indeed, an "examination of the language, history, and structure [of the ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174.

To accomplish this goal, Section 7 requires that federal agencies consult with wildlife agencies (FWS and/or NMFS) whenever a federal action may affect threatened and endangered species to ensure the action will not jeopardize those species or destroy or adversely modify their critical habitat.  16 U.S.C. § 1536; 50 C.F.R. § 402.14 (2019).[1]  If the action is likely to adversely affect listed species, the wildlife agencies must use the best available data to produce a biological opinion

---

[1] This brief cites the ESA regulations in effect at the time of EPA's action.

6

"detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. § 402.14(g)–(h).

When an agency proposes a program, wildlife agencies may engage in "programmatic" Section 7 consultation to evaluate the impacts to species at the program level. 50 C.F.R §§ 402.02, 402.14(c)(4). Section 7's requirements apply equally to programmatic consultations, as do ESA regulations. *See id.* § 402.14.

Recognizing that otherwise lawful activity may harm species (called "incidental take"), Congress created two paths to exempt this take from liability under the ESA: Section 7 for federal actions and Section 10 for state or private actions. 16 U.S.C. §§ 1536, 1539; 50 C.F.R. §§ 402.14, 402.02, 17.22, 17.32. *See also* S. Rep. No. 97-418, at 24–25 (1982); H.R. Rep. No. 97-567, at 26 (1982). Both require wildlife agencies to use the best available data to conduct robust analyses before exempting incidental take from ESA liability. For Section 7, wildlife agencies must use the best available data to analyze species' baseline, effects, and potential for jeopardy. 16 U.S.C. § 1536(a)(2), (b)(3)(A); 50 C.F.R. §§ 402.14(g)–(h), 402.02.

When Section 7 consultation determines that incidental take of a species is reasonably certain to occur, the wildlife agency must quantify and limit that take, either numerically or using a surrogate that serves the same function as a numerical limit (e.g., a certain amount of habitat loss). 16 U.S.C. § 1536(b)(4)(i); 50 C.F.R.

§ 402.14(i)(1)(i).

An "incidental take statement" protects species by acting as a "trigger" when an unacceptable level of take has occurred, which then requires reinitiation of consultation, reevaluation of the action, and a determination of what additional protective measures may be required. 50 C.F.R. §§ 402.14(i)(3)–(5), 402.16(a); *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 910–11 (9th Cir. 2012); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 272 (4th Cir. 2018).

## B.    The Clean Water Act

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" after states had failed to control water pollution. 33 U.S.C. § 1251(a). *See EPA v. California*, 426 U.S. 200, 202–09 (1976).

Section 404 authorizes the Corps to permit discharges of dredge and fill material into waters of the United States including wetlands if certain requirements are met. 33 U.S.C. § 1344(a). If a Corps' 404 permitting action may affect listed species, the Corps must engage in permit-level ESA Section 7 consultation.

The Clean Water Act allows a state to apply to administer Section 404 within a subset of waters of the United States (i.e., "assumable waters"). *Id.* § 1344(g)(1). The Corps then retains 404 jurisdiction over the "non-assumable" waters of the United States ("retained waters"). *Id.* § 1344(h)(3)–(4); 40 C.F.R. § 233.15(h).

8

To transfer authority over assumable waters, EPA must determine that a state has met all Section 404 requirements.  33 U.S.C. § 1344(h).  Among these, EPA must determine that a state has adequate authority to issue permits that comply with the Section 404(b)(1) Guidelines, 40 C.F.R. pt. 230.  33 U.S.C. § 1344(g), (h)(1)(A)(i), (2)(A); 40 C.F.R. pt. 233.  The 404(b)(1) Guidelines prohibit any permit that would jeopardize an ESA-listed species or adversely modify or destroy critical habitat.  40 C.F.R. §§ 230.10(b)(3), 233.20(a).

After state assumption, EPA retains a duty to review proposed state permits with a reasonable potential for affecting listed species, *id.* § 233.51(b)(2), and to transmit copies of those applications to federal wildlife agencies for the opportunity to comment, 33 U.S.C. § 1344(j); 40 C.F.R. § 233.50(a)–(b).  If EPA objects to a proposed permit for failure to comply with the 404(b)(1) Guidelines, the state may not issue the permit without resolving those objections.  33 U.S.C. § 1344(j); 40 C.F.R. § 233.50(f).

If EPA finds that an approved state program is not complying with Section 404, it must withdraw program approval and restore 404 authority over assumable waters to the Corps.  33 U.S.C. § 1344(i).

## II.    Statement of the Facts

### A.    Section 404 Assumption

The Corps has administered Section 404 permitting throughout the United States for more than 50 years.  In 1977, Congress amended the Clean Water Act to authorize state and tribal assumption of the 404 program in assumable waters, as defined by statute.  *Id.* § 1344(g).  Since then, EPA has approved three state 404 programs: Michigan (1984), 40 C.F.R. § 233.70; New Jersey (1994), *id.* § 233.71; and Florida (2020), not codified.

While most states have taken on other federal permitting programs, states have articulated many reasons why they have not assumed Section 404.  These include the cost, uncertainty over the definition of waters of the United States and assumable waters, weak political will, and lackluster public support.  88 Fed. Reg. 55276, 55282 (Aug. 14, 2023).

EPA's interactive assumption map reflects that only nine states have reported recent assumption efforts, including just four of the nineteen states that joined an amicus in this case (Alaska, Kentucky, Montana, Virginia).  *See U.S. Interactive Map of State and Tribal Assumption under CWA Section 404*, EPA, https://www.epa.gov/cwa404g/us-interactive-map-state-and-tribal-assumption-

under-cwa-section-404 (last visited Oct. 30, 2024).[2]

EPA had long taken the position that the ESA did not require Section 7 consultation on EPA's consideration of state applications to administer Section 404. JA2530/EPA-HQ-OW-2018-0640-0690, at 2. State 404 permittees could avoid liability for incidental take by avoiding adverse impacts to listed species or seeking ESA Section 10 permits. JA2033/EPA-HQ-OW-2018-0640-0388-A7, at 2.

### B. EPA's Decision to Consult

Florida asked EPA to change its position on Section 7 consultation so that state permittees could obtain incidental take protection at the programmatic level and avoid Section 10. *Id.* Florida estimated that about 10% of state 404 permits would require incidental take coverage. *Id.*

But, in Florida's view, obtaining a take exemption through Section 10 was too "burdensome," "time consuming[,] and resource-intensive." JA2033–34/EPA-HQ-OW-2018-0640-0388-A7, at 2–3; JA2507/EPA-HQ-OW-2018-0640-0670; JA2517–23/EPA-HQ-OW-2018-0640-0670-A5. To avoid this, Florida proposed that EPA engage in a "one-time" Section 7 consultation that would result in a programmatic biological opinion and programmatic incidental take statement insulating EPA, the State, and state permittees from incidental take liability.

---

[2] The other states are Arizona, Delaware, Maryland, Minnesota, and Oregon.

JA2033–34/EPA-HQ-OW-2018-0640-0388-A7, at 2–3.

EPA then voluntarily initiated informal consultation on Florida's anticipated 404 application while giving "further consideration" to whether formal consultation was required. JA2531–32/FWS-000001. But Florida had already advised the Corps that EPA would engage in consultation that would result in a programmatic Biological Opinion. JA3040/CORPS004318; JA3042–43/CORPS004320–21. And FWS revealed that Florida's program would have a programmatic incidental take statement to cover "any incidental take for any state 404 permit," thereby relieving FWS of issuing any project-by-project incidental take statements. JA2546/FWS-000749. Instead, FWS would "merely" provide "technical assistance on the [state's] project by project reviews" and track incidental take. *Id.*

On May 21, 2020, EPA invited public comment on whether EPA's approval of a Section 404 program was subject to ESA Section 7 consultation. JA2193–95/EPA-HQ-OW-2018-0640-0637. Environmental Appellees agreed that Section 7 applied but rejected Florida's "one and done" approach as unlawful. *See, e.g.*, JA2015–31/EPA-HQ-OW-2018-0640-0388-A2.

On August 20, 2020, Florida submitted its assumption application to EPA. *See* JA1470/EPA-HQ-OW-2018-0640-0001, at 1. To demonstrate compliance with the 404(b)(1) Guideline prohibiting permits that would jeopardize ESA-listed species, Florida's application relied on a "technical assistance" process it said would

12

later be outlined in an "anticipated" biological opinion.  JA1560/EPA-HQ-OW-2018-0640-0016-A2, at 5.

On August 27, 2020, EPA publicly reversed course on Section 7 consultation for state 404 applications.  JA2497/EPA-HQ-OW-2018-0640-0660-A1, at 1.  EPA also articulated exactly *how* the wildlife agencies would perform their consultation duties: a one-time ESA Section 7 programmatic consultation resulting in a programmatic biological opinion and incidental take statement.  JA2502–03/EPA-HQ-OW-2018-0640-0660-A1, at 6–7.  EPA thus adopted Florida's proposal, which the State had described "as an efficient and legally defensible approach to resolving the lack of incidental take coverage for permittees and permitting agencies."  JA2500/EPA-HQ-OW-2018-0640-0660-A1, at 3.

### C.    Consultation on Florida's 404 Program Submission

On August 28, 2020, EPA determined that Florida's application was "complete" as of filing, triggering a 120-day decision clock.  JA2198/EPA-HQ-OW-2018-0640-0641, at 1.  This determination made EPA's decision due by December 18, 2020, about a month before any change in presidential administration unless EPA and Florida agreed to extend the timeline.  *See* 33 U.S.C. § 1344(h)(1); 40 C.F.R. § 233.15(a), (c).

On September 2, 2020, EPA initiated formal consultation with FWS by transmitting a Biological Evaluation which found that EPA's action was likely to

adversely affect certain species, including the Florida panther, Key deer, West Indian manatee, and Everglade snail kite. JA2203, JA2274, JA2452, JA2454, JA2456/EPA-HQ-OW-2018-0640-0649, at 4, 75, 253, 255, 257. The Biological Evaluation was largely cut and pasted from a Biological Assessment Florida had previously prepared for EPA. *E.g.*, *compare,* JA1781–90/EPA-HQ-OW-2018-0640-0387-A8, at 74–83, *with* JA2271–80/EPA-HQ-OW-2018-0640-0649, at 72–81. EPA did not engage in formal consultation with NMFS. JA2174/EPA-HQ-OW-2018-0640-0617.

EPA's Biological Evaluation depicted five years of the Corps' past Section 404 permitting actions, which it referred to as the "best available data." JA2271/EPA-HQ-OW-2018-0640-0649, at 72. Of these, approximately 7% involved formal ESA consultations. JA2262–64/EPA-HQ-OW-2018-0640-0649, at 63–65.

Although the Biological Evaluation listed 235 species, it noted that the species subject to Section 7 consultation totaled 141. JA2311/EPA-HQ-OW-2018-0640-0649, at 112. It further found that "just 15 species" accounted for 93.3% of all historic consultations in Florida. JA2263/EPA-HQ-OW-2018-0640-0649, at 64.

The Biological Evaluation also opined it was "reasonable" to expect that the Corps' past permitting data would approximate "the number and types of permitting activities" for the next five years. JA2271/EPA-HQ-OW-2018-0640-0649, at 72.

And although the "precise" locations of future permitting activities were "mostly" unknown, the Biological Evaluation stated that "applications tend to cluster in rapidly developing regions of the State." *Id. See* JA2269–70/EPA-HQ-OW-2018-0640-0649, at 70–71 (Figures 4-4 and 4-5 showing location and concentration of consultations in Florida over five years).[3]

But the Biological Evaluation, just like Florida's Biological Assessment before it, stated that these effects would be "addressed" at the permit level during a "technical assistance" process between Florida and FWS following state assumption.  JA2205/EPA-HQ-OW-2018-0640-0649, at 6.

### D.    Public Comment Period

On September 16, 2020, EPA initiated a public comment period on Florida's assumption application that concluded November 2, 2020.  JA1470/EPA-HQ-OW-2018-0640-0001, at 1. *See* 40 C.F.R. § 233.15(e).  Florida's application included an unexecuted Memorandum with FWS, but did not contain Florida's Biological Assessment or EPA's Biological Evaluation.   JA1556–68/EPA-HQ-OW-2018-0640-0016-A2.   Environmental Appellees, among others, opposed Florida's application, including for failure to adequately protect listed species.  JA1653–707/EPA-HQ-OW-2018-0640-0386-A1;   JA1592–600/EPA-HQ-OW-2018-0640-

---

[3] The Biological Evaluation cites "Figures 8 and 9" but no figures with those numbers appear in the document.

0051, at 1–9.

###### E.     FWS' Biological Opinion and Incidental Take Statement

On November 17, 2020, FWS issued the programmatic Biological Opinion and Incidental Take Statement.  JA2591–678/FWS-006028.  In the Biological Opinion, FWS affirmatively declined to conduct species-specific analyses.  JA2655/FWS-006092; JA2657–58/FWS-006094–95.  FWS deferred all species analyses to a "technical assistance" process at the state permitting level as outlined in the Biological Opinion.  *See, e.g.*, JA2656/FWS-006093; JA2667/FWS-006104; JA2669–70/FWS-006106–07.

The "technical assistance" process, however, did not require anything of FWS other than to receive and review certain state permit applications.  JA2617–21/FWS-006054–58; JA2627–28/FWS-006064–65; JA2669/FWS-006106.  It did not require FWS to make any ESA-required determinations—not as to baseline of the species, effects of a proposed permit, jeopardy, or incidental take.  It did not require FWS to follow the ESA's standards, such as using the best available data, or impose the ESA's guardrails.  And it did not require Florida to obtain any of these determinations from FWS before it could issue a permit.

Despite deferring all species-specific analysis to the "technical assistance" process, the Biological Opinion nevertheless concluded that EPA's approval was reasonably certain to result in the incidental take of protected species.  But FWS did

16

not articulate the amount or extent of any anticipated take and did not set any take limits for any species. JA2655/FWS-006092; JA2657–58/FWS-006094–95. FWS then used its Section 7 authority to issue a programmatic Incidental Take Statement extending liability coverage to EPA, the State, and state permittees. JA2670–74/FWS-006107–11.

### F.    EPA's Decision

On December 17, 2020, EPA approved Florida's application. JA2059–60/EPA-HQ-OW-2018-0640-0566. EPA relied on FWS' Biological Opinion to claim compliance with the ESA and to determine that Florida's program would comply with the 404(b)(1) Guideline prohibiting permits that would jeopardize ESA-listed species. JA2155–62/EPA-HQ-OW-2018-0640-0568, at 95–102.

On December 22, 2020, EPA published the approval and made it effective immediately. JA2057–58/EPA-HQ-OW-2018-0640-0564.

### III.   Procedural History

Environmental Appellees are seven conservation groups representing thousands of members in Florida and around the United States. They filed this action to protect the Nation's wetlands and the threatened and endangered species that rely on them. JA1–51/Dkt. 1.

The Amended Complaint alleged that: EPA's immediate effective date and failure to codify the program approval violated the APA (Counts 8 and 9); EPA and

17

FWS violated the ESA (Counts 3–6, 10–13); EPA's approval violated the Clean Water Act and APA (Counts 1 and 2); and the Corps' retained waters list violated the Rivers and Harbors Act (Count 7).  JA141–72/Dkt. 77 at 25–56.

As pertains to this appeal, the parties filed cross-motions for summary judgment on Counts 1–7 and 10–13.[4]  JA211–93/Dkt. 98; JA847–962/Dkt. 104; JA1036–62/Dkt. 123.  The district court held several hours of oral argument and authorized post-hearing briefing.  Doc. #2051487 at 1309–466 (Oct. 19, 2023, Hr'g Tr.).

While the matter was pending, Florida issued public notices for state 404 permit applications to authorize major development projects that would imperil the critically endangered Florida panther (with a remaining population of 120 to 230 adults) and the threatened Florida crested caracara (a bird of prey with scarce remaining habitat).  JA1079–89/Dkt. 135 at 11–21.  FWS estimated that these projects, alone, would destroy thousands of acres of essential habitat for the panther and the caracara, as well as injure or kill 3 panthers from habitat loss and 6 to 25 panthers at buildout and each and every year thereafter from vehicle strikes.  *Id.*

Center for Biological Diversity and Sierra Club moved the district court either to temporarily enjoin the permitting of these projects or to expedite its ruling on their

---

[4] The court had earlier disposed of Counts 8 and 9, which are not at issue on appeal.

ESA claims.  JA1069–112/Dkt. 135; JA1119–81/Dkt. 153.  The district court held a hearing that included all parties, including intervenor-developers, Minute Entry, Jan. 31, 2024, and ordered briefing on remedy, JA1372/Dkt. 182 at 89.

### A.    District Court Ruling on the ESA Claims

After having reviewed more than twenty briefs on the merits, studying a voluminous administrative record consisting of thousands of pages, hearing hours of oral argument on the merits of Environmental Appellees' ESA claims (twice), and considering additional briefing and evidence on remedy, the district court issued a memorandum opinion finding that EPA and FWS' actions violated the ESA.  *See* JA1318/Dkt. 182 at 35 n.8.

The district court found that FWS' Biological Opinion was "forthright" in disregarding the plain text of the ESA, which required species-specific analyses. JA1341/Dkt. 182 at 58.  FWS instead generally described effects on broad groups of species (e.g., wetland mammal "guild" consisted of six distinct species, JA2660/FWS-006097; JA2426–28/FWS-005836–38).  JA1342/Dkt. 182 at 59.  The court found that FWS was not "free to disregard" this mandate by deferring analysis to a "technical assistance" process that itself would not be subject to Section 7. JA1354/Dkt. 182 at 71.

The court recognized that Florida had asked the federal agencies to use FWS' Section 7 authority as a vehicle to grant broad incidental take liability exemption to

state permittees. JA1344/Dkt. 182 at 61. But Section 7 consultation was only available if FWS found that the agency action (EPA's approval of Florida's program) was likely to adversely affect listed species. Having made that finding, the court reasoned, FWS was required to produce a biological opinion detailing the action's effects on listed species to determine whether it was likely to jeopardize any listed species' continued existence. *Id.*

The court held that EPA and FWS could not on the one hand invoke Section 7 authority to extend incidental take coverage (in lieu of requiring state permittees to undergo Section 10's process) while disavowing any duty to undertake the Section 7 analyses Congress required to qualify for the liability exemption. *Id.* "Congress did not codify a third option." JA1345/Dkt. 182 at 62.

The district court rejected FWS' claim that it lacked sufficient information to perform the required analyses. Noting that Congress did not create exceptions to Section 7's requirements, the district court also observed that the ESA "does not require perfect foresight." JA1346/Dkt. 182 at 63. Instead, the ESA requires that wildlife agencies use the best available data. 16 U.S.C. § 1536(a)(2). And FWS had "reams of data from previous Section 7 consultations" at its disposal but did not meaningfully discuss or analyze them. JA1346–47/Dkt. 182 at 63–64.

The district court rejected the agencies' reliance on the "technical assistance" process as a proxy for ESA compliance. Among other things, the district court found

20

that nothing required FWS to abide by procedures outlined in the technical assistance process.  JA1348–49/Dkt. 182 at 65–66.  Nor could agency counsel point to anything in the record to show that FWS' compliance with the technical assistance process was legally enforceable.  JA1349/Dkt. 182 at 66.

The district court also observed that before issuing an incidental take statement, FWS had to determine that such take was "reasonably certain to occur." JA1355/Dkt. 182 at 72.  The incidental take statement is "crucial in a no-jeopardy" biological opinion because it ensures that the level of authorized take will not jeopardize any species.  *Id.*  And if, during the course of the approved action, the amount or extent of incidental take is exceeded—"in other words, if the effect on the species ... is greater than [FWS] anticipated and permitted"—then FWS "must reinitiate consultation immediately."  *Id.*; 50 C.F.R. § 402.14(i)(4).

But here, FWS failed to "specify" the impact to any species, 16 U.S.C. § 1536(b)(4), and set no measurable or clear standard by which authorized take of any species could be exceeded therefore requiring reinitiation, 50 C.F.R. § 402.14(i)(1)(i).  JA1356–58/Dkt. 182 at 73–75.  Indeed, FWS expressly disavowed any duty to reinitiate consultation should EPA's approval of Florida's 404 program result in excess take or otherwise jeopardize the continued existence of listed species.  JA1364/Dkt. 182 at 81.  The Incidental Take Statement thus failed to serve as a check on the Biological Opinion's conclusion that the incidental take FWS

21

anticipated will not jeopardize species, as the ESA requires. JA1357/Dkt. 182 at 74.

The district court found that EPA impermissibly relied on FWS' actions to approve Florida's program, given that FWS "entirely fail[ed] to address essential questions." JA1367–68/Dkt. 182 at 84–85. EPA's approval also unlawfully relied on a "no effect" determination as to NMFS species that disregarded indirect effects on marine species. JA1369–71/Dkt. 182 at 86–88.

Finally, the district court concluded that vacatur was warranted because the agencies' ESA violations were serious and incapable of being cured on remand. JA1372–79/Dkt. 182 at 89–96. Any disruption from restoring 404 authority in assumable waters to the Corps was "inherent" in Congress' design, because Section 404 requires EPA to withdraw approval of an unlawful state program. JA1376–77/Dkt. 182 at 93–94.

### B.    Florida's Motion for Final Judgment, Stay; Appeal

Florida then moved for a limited stay of the district court's ruling, JA1224–44/Dkt. 166, and for final judgment, JA1263–83/Dkt. 171. The district court issued an Amended Memorandum Opinion on Environmental Appellees' ESA claims. JA1284–381/Dkt. 182. The court then granted final judgment on the adjudicated claims, dismissed the Clean Water Act and APA claims without prejudice as prudentially moot, and retained jurisdiction over the Rivers and Harbors Act claim. JA1382, JA1408/Dkt. 183 at 1, 27.

The district court denied Florida's motion for a limited stay, JA1386–93/Dkt. 183 at 5–12, and for a stay pending appeal, JA1451–53, JA1464/Dkt. 190 at 1–3, 14. The court found that "the Corps is ready, willing, and able to administer" Section 404 in Florida's assumable waters—as the Corps did for decades before EPA's approval "and as it does in 47 other States."  JA1459–60/Dkt. 190 at 9–10 (quoting Doc. #2053051-8 at 29–32 (Apr. 4, 2024, Hr'g Tr.)).

Florida and the Federal Appellants appealed.  JA1410/Dkt. 185; JA1468–69/Dkt. 195.  Florida subsequently asked this Court for a stay pending appeal, Doc. #2051487, which the Court denied, Doc. #2055213.

Environmental Appellees filed a conditional cross-appeal of the dismissal of their Clean Water Act / APA claims as prudentially moot.  JA1465–67/Dkt. 193. The Court sua sponte consolidated the appeals and cross-appeal.  Doc. #2059481.

## SUMMARY OF THE ARGUMENT

Congress enacted the ESA to ensure the protection, survival, and recovery of threatened and endangered species.  To that end, the statute's plain language requires analysis of a proposed action's effects on protected species and imposes specific requirements before exempting incidental take from ESA liability.  At Florida's request, however, EPA and FWS sought to evade those requirements in order to secure take liability exemptions for state permittees without requiring the robust analyses and take limits Congress mandated.  Although Congress authorized state

23

assumption of the Clean Water Act's Section 404 program, it did not exempt state assumption from the ESA's requirements.

The district court's judgment setting aside EPA's approval of Florida's program, and FWS' Biological Opinion and Incidental Take Statement underlying that approval, should be affirmed in all respects.

First, Environmental Appellees had standing to pursue their ESA claims based on their members' aesthetic and recreational interests. Through more than a dozen declarations, they demonstrated concrete, procedural injuries which were redressable by vacatur of the Federal Appellants' actions.

Contrary to Appellants' arguments, federal oversight cannot defeat standing to challenge federal agencies' unlawful actions. Nor were Environmental Appellees required to await irreparable harm from a particular state-permitted project. State permit challenges would not have allowed Environmental Appellees to challenge the Federal Appellants' programmatic or individual actions because Federal Appellants cannot be sued in state court.

Second, the district court correctly determined that FWS violated the ESA by producing a programmatic Biological Opinion that failed to undertake any species-specific analyses. FWS' broad statements about groups of species did not satisfy the plain text of the ESA. FWS' determination that EPA's approval of Florida's 404 program would not result in jeopardy to any listed species was therefore unlawful.

24

FWS had ample data to perform the analyses the ESA requires. FWS had reams of data from its own prior consultations on the Corps' 404 permitting in Florida, which the agency conceded would be similar to Florida's permitting in an assumed 404 program. FWS could not evade its duties by claiming uncertainty or the inability to predict future state permitting activities because the ESA does not require perfect foresight. Instead, it required FWS to use the best data available to conduct its most informed analysis.

Third, the district court correctly determined that FWS could not avoid its ESA obligations at the programmatic level by deferring any species-specific analysis to a non-statutory technical assistance process that also did not meet ESA requirements at the permit level. By its terms, the technical assistance process did not require FWS to do anything other than receive and review state permit applications. It did not require FWS to use the best available science to analyze species-specific effects, make species determinations, propose protective measures, or set incidental take limits. And it did not require Florida to have input from FWS before it could issue permits. Appellants' scheme would have allowed FWS to violate the ESA by evading its duties at both the programmatic and permit levels.

Fourth, the district court correctly determined that the programmatic Incidental Take Statement was unlawful because it set no take limit as to any species and set no clear standard to determine when anticipated take has been exceeded so

25

as to require reinitiation of consultation.  In fact, the Incidental Take Statement expressly disavowed any duty to reinitiate Section 7 consultation.  It also failed to establish meaningful terms and conditions with which EPA, Florida, and state permittees would have to comply in order to receive incidental take liability exemption.  But Congress did not authorize FWS to extend broad incidental take liability exemption without meeting the ESA's requirements.

Fifth, the district court interpreted the ESA and Clean Water Act harmoniously and consistent with cooperative federalism.  EPA, FWS, and states interested in 404 assumption have options on how to comply with the ESA.  In this case, however, they chose a course of action that Congress did not authorize.

Sixth, the district court correctly determined that EPA's approval of Florida's program violated the ESA.  EPA unlawfully relied on the facially invalid Biological Opinion and Incidental Take Statement to approve Florida's application.  And, as the Federal Appellants now concede, EPA violated the ESA by failing to engage in consultation with NMFS for protected marine species under its jurisdiction.

Seventh, vacatur was warranted because the ESA violations were serious; the agencies could not simply cure them with more explanation on remand.  Any disruption from restoring permitting authority to the Corps was inherent in Congress' design of Section 404, which also required transfer of 404 authority back to the Corps when EPA determines that a state program is unlawful.

26

Finally, if the Court were to reverse the district court's judgment on Environmental Appellees' ESA claims, the Court should also reverse the district court's dismissal of their Clean Water Act and APA claims as prudentially moot, which the court based on its vacatur of EPA's approval of Florida's program. In that event, the Court should maintain the vacatur pending final judgment on the remaining challenges to the EPA's approval.

## **ARGUMENT**

## **I.    Environmental Appellees Have Standing.**

Environmental Appellees brought this action to protect the Nation's waters and the endangered species that rely on them after EPA transferred 404 permitting authority to Florida. JA223/Dkt. 98 at 13. Florida appeals the district court's standing determination,[5] but has not asserted that any of the court's underlying factual findings were clearly erroneous. *See Am. Soc. for Prevention of Cruelty to Animals v. Feld Ent., Inc.*, 659 F.3d at 19. The only question before the Court, then, is whether Environmental Appellees established standing as a matter of law.

### **A.    Environmental Appellees Were Harmed.**

To establish standing, Environmental Appellees had to show that at least one of their members (1) "suffered an 'injury in fact'"; (2) that is "fairly ... trace[able] to the challenged action"; and (3) that it is "'likely' ... that the injury will be 'redressed

---

[5] Federal Appellants have not disputed Environmental Appellees' standing.

by a favorable decision.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Ctr. for Biological Diversity v. EPA*, 56 F.4th 55, 66 (D.C. Cir. 2022) (articulating standard for associational standing based on members' interests).

Here, Environmental Appellees detailed their members' aesthetic and recreational interests in ESA-listed species, including the Florida panther and nesting sea turtles, through more than a dozen declarations. *See, e.g.*, JA294–416/Dkt. 98-1; JA417–30/Dkt. 98-3; JA431–43/Dkt. 98-4; JA444–62/Dkt. 98-5; JA510–42/Dkt. 98-7; JA543–643/Dkt. 98-10. They identified numerous exemplar projects subject to state 404 permitting that would adversely affect protected species and their interests in those species. JA294–96, JA309–22/Dkt. 98-1 at 1–3, 16–29; JA439–41/Dkt. 98-4 at 9–11; JA446–61/Dkt. 98-5 at 3–18; JA463–64, JA469–71/Dkt. 98-6 at 1–2, 7–9; JA510, JA513, JA518–23/Dkt. 98-7 at 1, 4, 9–14; JA543, JA545–56, JA566–67/Dkt. 98-10 at 1, 3–14, 24–25; JA968–67/Dkt. 104-1 at 6–7.[6]

Environmental Appellees established that their members suffered procedural injuries from ESA violations that were not cured by the technical assistance process. JA1323–27/Dkt. 182 at 40–44. They demonstrated "concrete interests in minimizing the loss of listed species" and that bypassing "core requirements of the

---

[6] Florida misleadingly claims Environmental Appellees only pointed to two out of "thousands" of projects Florida permitted. Fla. Br. at 38. But Environmental Appellees pointed to the biggest and most harmful projects before the State, including proposals to build entire towns.

ESA … pose[d] a material risk to [their] work and recreational interests." JA1324–25/Dkt. 182 at 41–42. They also suffered concrete injuries from state permittees not having to obtain liability exemption for take under Section 10, which provides greater species protections, and from likely losing the ability to bring Section 11 citizen suits to challenge excess take. JA1327–28/Dkt. 182 at 44–45.

As to causation and redressability, Environmental Appellees showed that FWS' "bypassing of its ESA obligations" led to EPA's approval of Florida's program and to FWS' authorization for taking listed species "without due attention to the risks posed to those species." JA1328/Dkt. 182 at 45. Vacatur of FWS' actions would mean that state permittees could only obtain authorization for take through Section 10 or Section 7, both of which are "demanding processes" which could, and likely would, result in greater protection for species, including take limits which could be enforced through ESA citizen suits if exceeded. JA1330/Dkt. 182 at 47.

The district court found it unlikely that EPA, the State, and permittees would "decide to proceed without protection from potential ESA liability," given that those who take "one or more listed species 'risk civil and criminal penalties.'" JA1331/Dkt. 182 at 48 (citation omitted).

Environmental Appellees similarly established standing for their claim that EPA violated the ESA by failing to consult with NMFS before approving Florida's

29

program, JA1332–33/Dkt. 182 at 49–50, a claim Federal Appellants now concede. Environmental Appellees demonstrated that their members had concrete interests in ESA-listed marine species in NMFS' jurisdiction, including smalltooth sawfish, and that EPA's failure to consult with NMFS created a substantial risk of harm to those species. *Id.*

As the district court found, EPA's failure to consult on the impacts to marine species "unquestionably connect" to EPA's decision to approve Florida's program. JA1333/Dkt. 182 at 50. And EPA could have reached a different conclusion or modified its approval of Florida's 404 program had it consulted with NMFS. JA1333–34/Dkt. 182 at 50–51.

Lastly, Environmental Appellees showed that setting aside EPA's program approval would redress their injuries by restoring 404 authority to the Corps, thereby requiring permit-by-permit Section 7 consultation as well as individual ITSs with enforceable take limits. JA1327–28/Dkt. 182 at 44–45; JA1331/Dkt. 182 at 48.

## B. Florida's Objections Misapprehend the Law and the Facts.

Florida disputes Environmental Appellees' standing by claiming that (1) subsequent permit-level oversight would cure any harms and/or (2) no cognizable harm arises until permitted projects have harmed species. But there is no permit-level action that can redress programmatic harms and no requirement to await irreparable harm before challenging unlawful programmatic actions.

30

### 1.    Federal Oversight Does Not Cure Procedural Harms.

Florida relies on *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912 (D.C. Cir. 2003), to argue that EPA's "enforcement and oversight authority" and FWS' participation in the technical assistance process would remedy any harm.  Fla. Br. at 36–37.  But *Crow Creek* involved the transfer of federal *lands*—and not "regulatory authority," *contra id.* at 36—from the Corps to a state.  There, the Tribe lacked standing because the land transfer "effect[ed] no legal change that would lessen the protection of the Tribe's cultural heritage under federal law," given that the Corps retained the same jurisdiction and undiluted enforcement power over cultural protection statutes as before.  *Crow Creek*, 331 F.3d at 917.  *Accord FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 388 (2024) (doctors opposed to abortion care failed to show injury from increased availability of mifepristone where federal conscience protections continued to apply unabated).

The same is not true here.  EPA's approval of Florida's program authorized Florida to administer its own 404 program "in lieu of the permitting program implemented by the Corps."  JA1583, JA1589/EPA-HQ-OW-2018-0640-0019, at 1, 7.  And it authorized a state program that was less protective than the federal program.  JA949–50/Dkt. 104 at 103–04 & n.67.

Florida's claim that the state program was equally if not more protective than what Congress requires "disregards the principle" that courts must not decide the

31

merits when assessing standing, and instead must "assume that on the merits the plaintiffs would be successful in their claims.'" JA104/Dkt. 73 at 50 (citing *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)).

Florida's reliance on *Waterkeeper Alliance, Inc. v. Regan*, 41 F.4th 654 (D.C. Cir. 2022), Fla. Br. at 37–38, also fails. There, the plaintiffs failed to show that requiring EPA to issue public participation guidelines would remedy harm from a state program with inadequate public participation opportunities, because there was no evidence that issuing guidelines would cause EPA to withdraw approval of the state program or that the state would have to "cease its injurious conduct." *Waterkeeper Alliance*, 41 F.4th at 660–61.[7]

Here, the district court rightly concluded that vacatur of EPA's approval of Florida's program would remedy Environmental Appellees' harms. Vacatur would restore 404 permitting authority in assumable waters to the Corps, which in turn would require permit-level Section 7 consultations and, where applicable, permit-level biological opinions and incidental take statements with enforceable limits.

---

[7] Florida's complaint that the district court did not address *Crow Creek* or *Waterkeeper Alliance* ignores that the State raised those cases in briefing claims the district court did not reach.

**2.    Environmental Appellees Were Not Required to Await Irreparable Harm to Establish Standing.**

Ignoring the nature of (and extensive caselaw on) standing for procedural harms, Florida claims that Environmental Appellees could only establish standing after showing harm to specific species from specific state-issued permits and only after the state-permitted project had proceeded and caused the harm.  Fla. Br. at 38.  Having set up this strawman, Florida then argues that because those future harms would come to pass after a lengthy chain of events, Environmental Appellees' injuries must be speculative.  *Id.*  But that is not, and has never been, the legal standard for standing when agencies fail to meet their Section 7 duties.

An agency's failure to meet its statutory consultation requirement is the "archetypal procedural injury."  *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017) (citation omitted).  The same standing analysis applies where, as here, plaintiffs "challenge[d] the failure of both the action agency (the EPA) and the consulting agency (the FWS) to comply with the ESA."  JA1324/Dkt. 182 at 41.

As the district court found, Environmental Appellees established their members' interest in "minimizing the loss of listed species" which was impaired by an unlawful state process less protective than federal law requires.  *Id.*  By issuing a programmatic Incidental Take Statement applicable to all ESA-listed species in Florida, FWS concluded that EPA's approval of Florida's program was "'reasonably certain' to result in some take of all 139 listed species in the State."  *Id.*; 16 U.S.C.

33

§ 1536(b)(4).    These findings alone were sufficient to show Environmental Appellees' injuries.

Moreover, contrary to Florida's suggestion, Fla. Br. at 38–39, Environmental Appellees identified specific, harmful permit applications that were before the Corps, transferred to the State after EPA approved Florida's program, and pending with the State when they filed suit. *See, e.g.*, JA309–10, JA312–15/Dkt. 98-1 at 16–17, 19–22; JA518–21/Dkt. 98-7 at 9–12.    They also identified their members' interests in, and risk of injury from, permit applications submitted to the State after assumption. JA294–96, JA309–23/Dkt. 98-1 at 1–3, 16–30; JA439–41/Dkt. 98-4 at 9–11; JA446–61/Dkt. 98-5 at 3–18; JA463–64, JA469–71/Dkt. 98-6 at 1–2, 7–9; JA510, JA513, JA518–23/Dkt. 98-7 at 1, 4, 9–14; JA543, JA545–56, JA566–67/Dkt. 98-10 at 1, 3–14, 24–25; JA968–67/Dkt. 104-1 at 6–7.    And they demonstrated risk of harm from projects that had been part of a planned Section 10 Habitat Conservation Plan which was effectively thwarted when landowners abandoned it in favor of the less stringent state permitting process. *See, e.g.*, JA418–29/Dkt. 98-3 at 2–13.

This was more than sufficient to establish standing. *Ctr. for Biological Diversity v. EPA*, 861 F.3d at 185.    That the district court also identified specific failures in the technical assistance process in practice does not detract from what the "even more fundamental[]" issue:    "that the technical assistance process is no

34

substitute for what Plaintiffs allege is missing here—namely, the ESA-required analysis of species and effects that the FWS must conduct before it can make a no-jeopardy finding and accord incidental take protection on the EPA, the State, and future state-permittees." JA1326/Dkt. 182 at 43.

Florida's reliance on *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), Fla. Br. at 37, is grossly misplaced. There, the plaintiffs lacked standing based on a fear of surveillance that was purely hypothetical and relied on a series of attenuated events that had not occurred. *Clapper*, 568 U.S. at 415–18. Here, Environmental Appellees were harmed by programmatic actions that had already occurred, resulting, by design, in the issuance of state permits authorizing wetlands destruction and the take of ESA-listed species.

The other cases on which Florida relies are similarly unavailing. *Cf. Union of Concerned Scientists v. U.S. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021) (standing speculative where based on future agency exercise of discretion in response to future requests for information); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914–15 (D.C. Cir. 2015) (plaintiff failed to show increased risk of foodborne illness from new rule); *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 669–70 (D.C. Cir. 1996) (risk of harm too attenuated where tax credit would have to prompt third parties to acquire ethanol facilities, produce ethanol in such quantities to increase demand, and then increase demand for agricultural products from which

ethanol is made).

Florida's number-of-dominoes theory fares no better. The record showed that (1) Florida intended to and did issue state 404 permits, JA300/Dkt. 98-1 at 7; (2) EPA was unlikely to transfer permit applications back to the Corps, JA804/Dkt. 102-1 at 12 (stating EPA has federalized less than 1% of permits); and (3) state permittees would clear wetlands, with about 7% of permits expected to result in incidental take, JA2654/FWS-006091.

### C. Environmental Appellees' Challenge Was Ripe.

Although Florida has not expressly raised ripeness on appeal, in a footnote, Federal Appellants contend for the first time that Environmental Appellees' challenge to the Incidental Take Statement's reinitiation trigger is not ripe. Fed. Br. at 58–59 n.7. The district court considered and rejected the notion that Environmental Appellees would have to await harm from specific projects to bring this programmatic challenge. JA1335–38/Dkt. 182 at 52–55.

First, the Incidental Take Statement "create[d] a legal right at odds with Plaintiffs' interests in preserving listed species," by creating an unlawful risk of take. JA1335/Dkt. 182 at 52. "FWS's action constitute[d] 'a definitive statement of [the] agency's position, has direct and immediate effect on the complaining parties, and has the status of law.'" *Id.* (citing *Ctr. for Biological Diversity v. FWS*, 450 F.3d 930, 940 (9th Cir. 2006) (claim challenging Incidental Take Statement was ripe for

36

review)). Second, prompt judicial review would not interfere with further administrative action, because FWS considered its Incidental Take Statement to be complete. JA1335–36/Dkt. 182 at 52–53. (And EPA considered its approval of Florida's program to be complete). Third, additional factual development was not required since Environmental Appellees' challenge was to FWS' statutory authority to take the challenged action. JA1336/Dkt. 182 at 53. Any challenge Environmental Appellees might pursue as to an individual permit would not undo the risk of harm caused by the Incidental Take Statement. *Id.*

Fundamentally, as the district court found, there is no permit-specific challenge that would allow Environmental Appellees to challenge FWS' programmatic Biological Opinion, Incidental Take Statement, and technical assistance process as a proxy for ESA compliance, or EPA's reliance on those agency actions to approve Florida's 404 program. *See, e.g., Nat'l Wildlife Fed'n v. Brownlee*, 402 F. Supp. 2d 1, 8–10 (D.D.C. 2005) (finding claims against agency's refusal to conduct programmatic Biological Opinion ripe despite agency's plans to evaluate individual actions later at the permit level); *Growth Energy v. EPA*, 5 F.4th 1, 30–31 (D.C. Cir. 2021) (no effect determination in facial challenge was arbitrary); *Cooling Water Intake Structure Coal. v. EPA*, 905 F.3d 49, 76–78 (2d Cir. 2018) (deciding facial challenge to programmatic Incidental Take Statement).

Florida's suggestion that "judicial challenges in state tribunals," Fla. Br. at 38,

would be available to address EPA's and FWS' failures fails because federal agencies are not subject to suit in state court. *Siesta Key Ass'n of Sarasota, Inc. v. City of Sarasota*, 320 So. 3d 833, 835 n.1 (Fla. 2d Dist. Ct. App. 2021) (state courts lack authority to review federal agency action absent waiver of sovereign immunity); *Chamber of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (Congress waived federal agency immunity for actions in federal court); *Fed. Nat'l Mortg. Ass'n v. LeCrone*, 868 F.2d 190, 193 (6th Cir. 1989) (waiver does not apply in state court).

## II.    The Biological Opinion Violated the ESA.

Having decided to engage in Section 7 programmatic consultation, Appellants were required to comply with its provisions, including analytical and substantive requirements. Section 7 does not distinguish between programmatic and permit-level consultation. 16 U.S.C. § 1536(a)(2), (b)(1)(A) (requiring compliance with ESA requirements when consulting on "any" federal agency action).

But FWS refused to conduct any of the ESA's mandated analyses in its Biological Opinion. Those analyses were necessary before FWS could lawfully reach its substantive determination that EPA's action was not likely to jeopardize any listed species. *See Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 278 (4th Cir. 2022) (jeopardy analysis "necessarily arbitrary" where FWS failed to properly analyze environmental context and effects to reach that conclusion).

FWS instead deferred all analyses to a non-statutory technical assistance

process at the state permitting level.  But the technical assistance process also did not require FWS to conduct any of the analyses the ESA requires.  This scheme therefore would have allowed FWS to avoid its ESA obligations at *both* the programmatic level *and* the permit level.  Congress did not authorize this end-run around the ESA.

## A.    FWS Failed to Comply with the ESA's Analytical Requirements.

The ESA required FWS to use the "best scientific and commercial data available" to "detail[] how the agency action affects the species or its critical habitat."    16 U.S.C. §§ 1536(a)(2), (b)(3)(A). This required (1) "a detailed discussion of the environmental baseline of listed species and their critical habitats"; (2) "a detailed discussion of the effects of the action on those species or critical habitats"; and (3) a determination of jeopardy based on FWS' consideration of the effects of the action on those species as added to their baseline.  50 C.F.R. §§ 402.14(g)(1)–(4),  (h)(1)(ii)–(iv),  402.02  (defining  baseline,  effects,  and jeopardy).  FWS here failed in all three respects.

## 1.    FWS Did Not Analyze the Baseline of the Species.

FWS began by giving short shrift to the baseline status of Florida's listed species.  Its ecological baseline loosely stated the current degraded state of Florida wetlands without analyzing how that degradation affected listed species and their habitats.    JA2651–52/FWS-006088–89.    The procedural baseline merely listed

39

existing federal and state wetlands permitting regulations without discussing listed species. JA2647–51/FWS-006084–88. And the environmental permitting baseline simply recited the number and type of prior ESA consultations, again without analyzing how that permitting activity affected listed species. JA2652–55/FWS-006089–92.

Federal Appellants claim that FWS' missing baseline analysis is accounted for in EPA's Biological Evaluation. Fed. Br. at 52. But the Biological Evaluation's appendix merely provided broad descriptions of individual listed species and not the required analysis of past and present impacts from federal, state, and private activities. JA2322–402/FWS-005732–812; 50 C.F.R. §§ 402.14(g)(2), (h)(1)(ii), 402.02 (defining baseline).

Moreover, the duty to analyze rests with the expert wildlife agency. But aside from some tables on historical data, FWS copied the Biological Evaluation's baseline section nearly word-for-word. *Compare* JA2252–70/FWS-005662–80, *with* JA2647–55/FWS-006084–92. The Biological Evaluation's baseline section, in turn, was a near carbon copy of a Biological Assessment Florida had prepared for EPA. *Compare* JA2252–70/FWS-005662–80, *with* JA1762–80/EPA-HQ-OW-2018-0640-0387-A8, at 55–73. FWS was not authorized to abdicate its ESA duties by allowing the regulated entity (i.e., Florida) to make findings that Congress required FWS to make. *See Gerber v. Norton*, 294 F.3d at 184–85 (applied as to

40

ESA Section 10).

Notably, neither EPA's nor FWS' administrative record contains the historical data which the agencies' documents purported to summarize. There is therefore no evidence that the agencies independently reviewed the data; they merely relied on Florida's summaries.

### 2.    FWS Did Not Analyze Effects to Listed Species.

Next, FWS failed to undertake "*any* species-specific analysis" of the effects of EPA's transfer decision. JA1341/Dkt. 182 at 58. But the ESA required FWS to detail the effects on "the species" and "its habitat." 16 U.S.C. § 1536(b)(3)(A). Even where the Biological Opinion named individual species, it offered "little analysis." JA1342/Dkt. 182 at 59. Instead, FWS provided a generic summary of "stressors" from dredge and fill activities at the 30,000-foot level. JA2658–59/FWS-006095–96 (e.g., "Biotic Stressors" alter competitive balances, predator/prey relationships, invasive species, and habitat).

The Biological Opinion listed general impacts for "broad categories" of species despite there being significant differences between the species' ranges, status, and potential impacts. JA2660–66/FWS-006097–103. *See Am. Rivers v. FERC*, 895 F.3d 32, 47 (D.C. Cir. 2018). As one example, FWS lumped together

the threatened Key Largo woodrat[8] with the endangered Florida bonneted bat[9] even though their habitats are on opposite sides of the State.  *See* JA2660/FWS-006097 ("tropical hardwood hammock/mangrove mammal" group); JA2451/FWS-005861–62.  Habitat loss is the predominant threat to the woodrat, while the bonneted bat is also affected by water quality changes.  JA2451–52/FWS-005861–62. Yet FWS addressed none of these differences.  Indeed, the woodrat is "especially vulnerable to extinction," but FWS paid no mind to the woodrat's particular vulnerability. JA2452/FWS-005862.

### 3.    FWS' No-Jeopardy Determination Was Arbitrary.

Because FWS did not analyze the baseline or effects of EPA's transfer decision, FWS had no substantive basis to conclude that EPA's action would not jeopardize any listed species nor adversely modify or destroy any critical habitat. JA2669–70/FWS-006106–07; 50 C.F.R. § 402.14(g)(4).  *See Forest Serv. Emps. For Env't Ethics v. U.S. Forest Serv.*, 726 F. Supp. 2d 1195, 1224–25 (D. Mo. 2010) (grouped species effects analysis at programmatic level was not sufficient to inform jeopardy as to any individual species or habitat).

---

[8] *Key Largo Woodrat*, FWS, https://ecos.fws.gov/ecp/species/3921 (last visited Oct. 30, 2024).

[9] *Florida Bonneted Bat*, FWS, https://ecos.fws.gov/ecp/species/8630?sId=8630 (last visited Oct. 30, 2024).

## B.   FWS Had Ample Data to Conduct the ESA-Mandated Analyses.

The ESA directed FWS to use the "best commercial and scientific data available" to perform the required analyses.   16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).  Contrary to the Appellants' suggestion, "[t]he ESA does not require perfect foresight."  JA1346/Dkt. 182 at 63.  *Accord Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998–99 (D.C. Cir. 2008) (interpreting analogous language in 16 U.S.C. § 1533(b)(1)(A)).  FWS' duty is to "mak[e] its best, most informed estimate as to what impact the proposed action will have on the species."  *Oceana, Inc. v. Ross*, No. CV 15-0555, 2020 WL 5995125, *9 (D.D.C. Oct. 9, 2020).  This it failed to do.

FWS had "reams of data" from its prior Section 7 consultations on the Corps' 404 permitting actions in Florida to make an informed estimate of the effects of EPA's transfer decision.  JA1346–47/Dkt. 182 at 63–64.  Indeed, FWS conceded in the Biological Opinion that Florida's future permitting activity would be similar to the Corps' prior permitting activity.  JA2659–60/FWS-006096–97.  And Florida has since suggested that FWS could now perform the requisite analyses using data from the state process.  Fla. Br. at 70.  And so even if the ESA permitted deferring its requirements to another process (which it does not), there is no merit to the claim that performing the required analyses during the programmatic consultation would have been impossible.

43

Specifically, the Biological Evaluation described historical data for 2014 to 2018 which showed that there were roughly seventy consultations in Florida per year.   JA2654/FWS-006091. With this information, FWS could have based an analysis of species effects given (1) development trends; (2) the types of projects for which 404 permits were sought; (3) impacts to species and their habitats from permitted activity; (4) levels of incidental take; and (5) mitigation and other protective measures undertaken.  JA1347/Dkt. 182 at 64; JA873/Dkt. 104 at 27.

FWS did not provide any explanation as to why it could not use this data to analyze the impacts of EPA's transfer decision on any listed species in Florida.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51–52 (1983).   Instead, FWS stated in conclusory fashion that the analysis was "not feasible, nor [was] it required" because the state program was "statewide" and would permit different activities.  JA2655/FWS-006092.

In fact, the record shows that FWS did not even try, because its administrative record contains none of FWS' prior consultations in Florida. It was therefore "difficult to believe" that FWS could not have used historical consultation data to conduct the required analyses at the outset.  JA1358/Dkt. 182 at 75.

Nor is it unusual for wildlife agencies to use historical consultation information to project future impacts for programmatic consultation.  *See* JA1346/Dkt. 182 at 63 (citing *U.S. Army Corps of Engineer's Jacksonville District's*

44

*Programmatic Biological Opinion* (Nov. 20, 2017), which covers the Corps' issuance of 10 categories of 404 permits in Florida and the Caribbean, *id.* at 1, and used historical consultation data to assess species-specific impacts, *id.* at 1, 17, 45); JA874–75/Dkt. 104 at 28–29.

Appellants try to paint a picture of impossibility by overstating what the analysis would involve. For example, Federal Appellants refer to 235 species in Florida, Fed. Br. at 41, while the Biological Evaluation states that the Section 7 analysis would apply to about 141, JA2203/FWS-005613, and the Biological Opinion analyzed 139, JA2646/FWS-006083. The record also showed that historically only a "small proportion" of listed species accounted for "the majority" of historical consultations. JA2654/FWS-006091. Indeed, just fifteen species accounted for 93.3% of the historical consultations listed. *Id.*

Historical consultations were also concentrated in areas of rapid growth and development, like Southwest Florida, which contains the last remaining occupied habitat for the Florida panther. JA2655/FWS-006092; JA2270/FWS-005680; JA2331/FWS-005741. And only 7% of historical consultations involved permit applications that were reasonably certain to result in incidental take. JA2654/FWS-006091.

Nor did the on-going nature of Florida's assumption relieve FWS of its duty. *Cf.* Fed. Br. at 40, 42. Where wildlife agencies have consulted on on-going agency

45

actions, they begin by conducting the mandated analyses with the best available data. *See, e.g.*, *WildEarth Guardians v. U.S. Army Corps of Eng'rs*, 429 F. Supp. 3d 1224, 1267–68 (D.N.M. 2019) (consulting on impacts of 20-year construction period plus 50-year functional life). *Cf. Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010) (rejecting biological opinion where series of short-term analyses could "mask the long-term impact"); *Nat'l Wildlife Fed'n v. Norton*, 332 F. Supp. 2d 170 (D.D.C. 2004) (same where multiple small projects could cumulatively have significant impacts on the Florida panther). The agencies then commit to reinitiate consultation as new information develops. *WildEarth Guardians*, 429 F. Supp. 3d at 1267–68. Appellants' suggestion that the Biological Opinion was a finite undertaking flies in the face of the ESA's requirements, which include the duty to reinitiate consultation where a biological opinion proves inadequate to protected ESA-listed species.

## C. The ESA Does Not Excuse Compliance Based on Claims of Uncertainty.

Appellants' reliance on the inability to predict future permitting activity, Fed. Br. at 40–42; Fla. Br. at 43, 62–63, is misplaced because FWS "cannot abdicate its responsibility to evaluate the impacts of an action on a species by labeling available information 'uncertain.'" *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1267 (11th Cir. 2009). Indeed, FWS must rely on the best available data even if it is "quite inconclusive." *Sw. Ctr. for Biological Diversity v. Babbitt*, 215

F.3d 58, 60 (D.C. Cir. 2000).   *Accord* USFWS & NMFS, ESA Section 7 Consultation                    Handbook               at               1-7               (1998), https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf [hereinafter "ESA Handbook"] (explaining that if data is incomplete, FWS must do the best it can with what it has).

Wildlife agencies have sought before to evade the ESA's requirements by claiming uncertainty based on the geographic or temporal scope of actions that cannot be perfectly predicted.  But these arguments have been roundly rejected.  *See, e.g.*, *Am. Rivers*, 895 F.3d at 36–39, 47 (biological opinion on 30-year power license for hydropower plant affecting river basin across 3 states and 30 listed species); *NRDC v. Evans*, 279 F. Supp. 2d 1129, 1137, 1179–80 (N.D. Cal. 2003) (programmatic biological opinion on rulemaking for Navy sonar activities "in as much as 75% of the world's oceans").

In *Greenpeace v. NMFS*, 80 F. Supp. 2d 1137, 1148–50 (W.D. Wash. 2000), NMFS claimed that it could not analyze impacts on listed species during a programmatic consultation on a fishery management plan because it lacked information about the distribution of future fishing efforts. *Id.*  NMFS conceded, however, that it could have developed this information with time. *Id.* at 1150. Similarly, here, FWS could have developed that information based on available data, JA2657–60/FWS-006094–97, and Florida has conceded that it could do so now

47

based on state data.

In *Pacific Coast Federation of Fishermen's Associations v. NMFS*, 482 F. Supp. 2d 1248, 1256, 1266–67 (W.D. Wash. 2007), FWS claimed that it could not conduct ESA-mandated analysis at the programmatic level due to "incomplete information as to the precise location and extent of future activities." But the court rejected FWS' "wholesale deferral of analysis to the project level," finding that in so doing the agency failed to satisfy its "burden to 'make certain' that the proposed action is not likely to jeopardize listed species or destroy or adversely modify critical habitat." *Id.* at 1267. The same is true here.

### D. The ESA Required FWS to Analyze Effects on Individual Species.

Appellants' alternate theory that the Biological Opinion *did* comply with the ESA's analytical requirements fails as a matter of law and fact. The ESA required FWS to "detail[] how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). But FWS failed to provide any detailed effects analysis relating to any protected species or its critical habitat.

### 1. The Ordinary Meaning of "Detail" Required FWS to Provide Analyses, Not Perfunctory Statements.

Appellants argue that the Biological Opinion's general statements were sufficient because the ESA does not specify what level of "detail" was required for FWS to "detail how the agency action affects the species or its critical habitat." Fed.

48

Br. at 53–54; Fla. Br. at 42–44.  But when a statute does not define a term, courts look to the term's plain meaning.  *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018).

The plain meaning of "detail" is "to report minutely and distinctly: to report with close attention to small elements."  Merriam-Webster, *Detail*, https://www.merriam-webster.com/dictionary/detail#dictionary-entry-2 (last visited Oct. 30, 2024).  Courts have also at least implicitly interpreted "detail" as requiring more than just lists, perfunctory statements, recitations, or anything short of analysis. *See, e.g.*, *Am. Rivers*, 895 F.3d at 47; *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 353 (4th Cir. 2019); *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121, 128 (D.D.C. 2001); *Oceana, Inc. v. Ross*, 2020 WL 5995125, at *20.

FWS' general, perfunctory statements in the Biological Opinion thus failed to satisfy the agency's duty to "detail how the agency action affects the species or its critical habitat."

## 2. The ESA's Plain Language Required Species-Specific Analysis.

Appellants also contend that "species-specific" analysis is not required because the ESA does not define the term "detail."  Fed. Br. at 52–53.  But this specious argument is belied by the plain text of the statute, which requires an analysis of effects on "*the* species" and "*its* habitat."  16 U.S.C. § 1536(b)(3)(A) (emphasis added).  Congress' use of "the definite article 'the' particularizes the subject which

it precedes.'" *Sandpiper Residents Ass'n v. HUD*, 106 F.4th 1134, 1144 (D.C. Cir. 2024) (citation omitted). Congress' subsequent use of the term "its" also confirms that "the species" refers to a singular protected species. Therefore, Congress plainly required FWS to detail the effects on specific ESA-listed species and critical habitat, not groups of species and habitat generally.

Indeed, the ESA deals exclusively with the survival and recovery of *individual species*. It defines "species" in the singular to include "any subspecies" and "any distinct population segment" of vertebrate fish or wildlife. 16 U.S.C. § 1532(16).[10] It mandates that FWS list individual species and subpopulations. *Id.* § 1533(a)(1); 50 C.F.R. § 17.11(h). And in the consultation context, the ESA requires FWS to determine jeopardy "[f]or every species that is listed as endangered or threatened." *Am. Rivers*, 895 F.3d at 45; 16 U.S.C. §§ 1536(a)(2), 1532(6), (20); S. Rep. 93-307, at 307–08 (1973) (federal agencies must ensure their actions do not jeopardize "any" listed species). Appellants point to nothing in the ESA to support a contrary interpretation.

FWS sought to use a similar group-level approach in *Forest Service Employees*, 726 F. Supp. 2d 1195, and the court rejected it. There, FWS consulted

---

[10] Congress similarly defined "critical habitat" as "the specific areas" within or outside "the geographical area occupied by *the* species at the time it is listed." 16 U.S.C. § 1532(5)(A)(i)-(ii) (emphasis added).

on the Forest Service's use of fire retardants across the entire National Forest System (covering over 192 million acres) that would create uncertain effects to over 400 listed species. *Id.* at 1202–03. FWS argued that it was appropriate to analyze effects only at the taxonomic group-level (e.g., mammals) because it "did the best it could considering the number of species involved." *Id.* at 1224. Relying on the plain text of the statute, the court rejected FWS' "superficial analysis" because the agency could not show how this grouped analysis could inform a jeopardy analysis as to any individual ESA-listed species or critical habitat. *Id.* at 1225.

The court explained that FWS could not "excuse the failure to comply with the law by arguing that compliance would be too hard." *Id.* at 1224. That principle is particularly apt here, where Florida specifically requested that EPA engage in programmatic Section 7 consultation. *See* JA1288, JA1309–10, JA1345/Dkt. 182 at 5, 26–27 & n.5, 62.

### 3. Applying the Plain Meaning of "Detail" Does Not Produce "Impracticable" Results.

Appellants urge the Court to interpret "detail" contrary to its plain meaning, claiming that the plain meaning would be "impracticable" for consultation on 404 assumption applications. Fed. Br. at 52–55. But courts are not empowered to disregard the plain meaning unless "failing to do so produces a nonsensical result that could not have been intended." *Lloyd v. HOVENSA, LLC.*, 369 F.3d 263, 270–71 (3d Cir. 2004).

51

Here, the plain meaning of "detail" is consistent with Congress' intent to protect individual species. It was not impracticable for FWS to comply in light of the wealth of data at its disposal. The Clean Water Act's 120-day time clock to adjudicate an assumption application was also no barrier, since the statute expressly authorized EPA and the State to extend the review period.

Without citing any authority, Appellants alternatively argue that the meaning of "detail" should vary depending on the relevancy of the details involved in a particular case. Fed. Br. at 53. But aside from providing no standard, this would create an absurd result where the term "detail" means one thing for most Section 7 consultations yet means something entirely different for others.

Appellants identify no statutory basis for interpreting "detail" differently at different times. While courts may attribute different meanings to the same word appearing in different parts of a statute in differing contexts, *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1437 (D.C. Cir. 1996), courts may not give different meanings to the same word based on circumstances "not otherwise recognized in the statute," *see United States v. Wilson*, 290 F.3d 347, 356 (D.C. Cir. 2002).

Florida argues that the level of "detail" required depends on the "effects of the action," which includes the effects of future activities that would not occur but for the agency action. Fla. Br. at 43; 50 C.F.R. § 402.02. But in defining "effects," the wildlife agencies sought to ensure that biological opinions would include a

"complete analysis of the effects of proposed actions."  84 Fed. Reg. 44976, 44977 (Aug. 27, 2019).  They did not "alter how [they] analyze the effects of a proposed action."  *Id.*  Instead, the agencies committed to "continue to review all relevant effects of a proposed action as [they] have in past decades."  *Id.*  They did not suggest that *less* detail is required where an agency action has more and broader effects.

### III.    FWS Could Not Avoid Section 7 Duties At the Programmatic Level By Deferring Any Species Analysis to a Non-Statutory Technical Assistance Process at the Permit Level.

FWS disavowed any duty to comply with the ESA's analytical requirements at the programmatic level, deferring to a technical assistance process at the permit level.  But that process did not require FWS to make ESA-required determinations either.  *See, e.g.*, JA1182–86/Dkt. 153-1; JA717/Dkt. 99 at 74; JA1311/Dkt. 182 at 28 (quoting FWS email advising EPA to "be careful of using words like consultation when you really mean coordination and technical assistance").  This arrangement violated the ESA by allowing FWS to avoid its Section 7 duties altogether.

### A.    The ESA's Analytical Requirements Apply to Programmatic Consultations.

Nothing in the ESA authorizes a programmatic consultation that avoids the requirements of Section 7.  To the contrary, the ESA's consultation requirements apply to "any" action taken by a federal agency.  16 U.S.C. § 1536(a)(2), (b)(1)(A).  The terms "programmatic" and "permit-level" do not appear anywhere in the statute.  Therefore, under the plain language of the ESA, Section 7 "consultation

53

requirements apply with equal strength, to site-specific and programmatic actions."
*See W. Watersheds Project v. Kraayenbrink*, 538 F. Supp. 2d 1302, 1324 (D. Idaho 2008), *aff'd in part, vacated in part, remanded*, 620 F.3d 1187 (9th Cir. 2010), *and aff'd in part, vacated in part, remanded*, 632 F.3d 472 (9th Cir. 2011).

ESA regulations also require the same analyses for programmatic and site-specific consultations. 50 C.F.R § 402.14(g), (h). Indeed, the regulations explicitly state that programmatic consultation "does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole." 50 C.F.R. § 402.14(c)(4). The wildlife agencies have considered the potential for uncertainty in programmatic consultation, including for state-delegated programs, but still have not exempted programmatic consultation from the ESA's analytical requirements. 80 Fed. Reg. 26832, 26833, 26838 (May 11, 2015).[11] Nor could they in light of the statute's plain language.

---

[11] The regulations authorize only one variation, not applicable here: that wildlife agencies need not issue a programmatic ITS for "framework programmatic actions," where incidental take will not occur until future actions subject to further Section 7 consultation are approved. 50 C.F.R. § 402.14(i)(7). Even then, the regulations require a "broad-scale examination" of "potential impacts on a listed species and its designated critical habitat" because future site-specific Section 7 consultations cannot "readily conduct[]" a cumulative impacts analysis of the programmatic action. 80 Fed. Reg. at 26836.

The overwhelming weight of authority also confirms that FWS was required to comply with the ESA's analytical requirements at the programmatic level. *See* JA256–57/Dkt. 98 at 46–47 & n.17; JA884–87/Dkt. 104 at 38–41 & n.19. For example, in *North Slope Borough v. Andrus*, 642 F.2d 589, 608–09 (D.C. Cir. 1980), this Court confirmed the general rule that the effects of an agency's programmatic action cannot only be entertained stage-by-stage. The Court recognized a limited exception for future lease sales that by statute were subject to checks and balances requiring that all ESA requirements be met at each future stage. *Id.* Here, however, FWS avoided Section 7's required analyses at the programmatic level and was not required to perform them at the permit level. *Contra* Fla. Br. at 42, 47, 60 (attempting to both distinguish and rely on *North Slope Borough v. Andrus*).

In *Conner v. Burford*, 848 F.2d 1441, 1453–56 (9th Cir. 1980), the Ninth Circuit relied on *North Slope* to confirm that the ESA requires full analysis at the programmatic level. *Conner* refused to create an exception for lease sales under a different statute that contained no system of checks and balances. *Id.*

Similarly, in *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d at 10, the court rejected the Corps' failure to conduct programmatic consultation by deferring to future site-specific Section 7 consultations. The court recognized that the ESA requires wildlife agencies to consider the effects of a programmatic action "as a whole" to avoid "piece-meal destruction" of listed species' habitat "through

failure to make a cumulative analysis of the program." *Id.*

Florida relies heavily on *Defenders of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106 (11th Cir. 2013), Fla. Br. at 41–42, 59, to support FWS' actions. But the reliance is misplaced. *Defenders of Wildlife*, 733 F.3d at 1118, involved programmatic consultation on the Navy's installation and operation of an underwater submarine warfare training range. NMFS prepared an "initial" biological opinion that analyzed the effects of *both* the installation and later operation of the range "as to each listed species." *Id.* at 1113, 1118–19. NMFS also decided that the agency would conduct a new Section 7 consultation before operation began. *Id.* at 1122. NMFS did not defer its analysis of the effects from later stages to later consultation. *Id.* at 1121–22. Moreover, NMFS did not issue a programmatic Incidental Take Statement because it would consider incidental take through future Section 7 consultations at the operation stage. *Id.* at 1123–24.

As the district court recognized, "[i]t was in that context that the Eleventh Circuit opined that it was permissible for the Navy and the NMFS to structure the consultative process in phases." JA1351/Dkt. 182 at 68. *Defenders of Wildlife* therefore supports Environmental Appellants' reading of the ESA and not Florida's.

Despite relying on both *Defenders* (and *North Slope*), Florida takes issue with the district court's consideration of those cases because they involved programmatic actions where future stages would be subject to ESA Section 7 consultation. Fla.

56

Br. at 50–51.  But this proves Environmental Appellees' point.  Those cases held that ESA-required analyses must occur at the programmatic level *even* when future Section 7 consultation will occur at the permit level.  It defies reason to suggest that ESA-mandated analyses are not required at the programmatic level where there is also no future Section 7 consultation at the permit level.

### B.    The Technical Assistance Process Did Not Cure the ESA Violations.

Even if FWS could have lawfully deferred its ESA duties to future site-specific permit reviews, FWS' actions here were still unlawful because the technical assistance process did not require FWS to conduct ESA-required analyses at the permit level either.

Contrary to Appellants' representation that the "technical assistance" process imposed binding substantive requirements on FWS, FWS was not required to provide technical assistance at all.  Other than receiving and reviewing permit applications, FWS' participation in the process was entirely voluntary.  JA2620–21/FWS-006057–58 (FWS "may" provide "technical assistance" or "comments").  *Accord* Fed. Br. at 25 (Federal Appellants describing the technical assistance process as giving FWS "opportunities to comment").  *See Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011) (normal inference is that "may" is "permissive" and "shall" is "mandatory").

Nor did the technical assistance process bind FWS to comply with the ESA's requirements and standards at the permit level. Nothing in the process required FWS to use the best available data to issue a written statement detailing the baseline status of affected species, JA2620–21/FWS-006057–58, or the effects of the permit on those species, JA2627/FWS-006064 (FWS "may or may not" comment on impacts). *Contra* Fed. Br. at 42 (claiming FWS will "evaluate the specific facts that arise for each individual permit"). And nothing in the process required FWS to set limits on authorized take.

Contrary to Federal Appellants' claims, Fed. Br. at 39, 42, 43, the technical assistance process did not require FWS to propose protective measures that would minimize harm to listed species or to respond to Florida's effects determinations. JA2617–18/FWS-006054–55; JA2620–21/FWS-006057–58 ("In some cases, depending on project," FWS "may or may not" suggest protective measures "as needed"); JA2617–18/FWS-006054–55; JA2627–28/FWS-006064–65; JA2669/FWS-006106 (Florida makes preliminary effects determinations and protective measures; on which FWS "may or may not" comment).

In fact, the process even authorized Florida to *override* FWS' determination that a permit would likely adversely affect listed species, which would end the technical assistance process altogether. JA2619/FWS-006056; JA2621/FWS-006058 (where FWS disagreed with Florida's preliminarily determination that a

58

permit application was not likely adversely affect listed species, Florida's determination would control unless Florida found that FWS' comments disconfirmed Florida's effect determination or led Florida to "reconsider its determination."). Thus, Florida was free to terminate the technical assistance process over the objection of the expert wildlife agency Congress entrusted to administer the ESA. JA2619/FWS-006056; JA2621/FWS-006058.

That FWS' effects determinations would be "determinative" under the technical assistance process, Fed. Br. at 25, meant little, since the technical assistance process (1) was only triggered if and when Florida determined that a state permit was likely to adversely affect a species, JA2619/FWS-006056; JA2621/FWS-006058; and (2) did not require FWS to make *any* determinations regarding a proposed permit, JA2617–18/FWS-006054–55; JA2627–28/FWS-006064–65; JA2669/FWS-006106.

Appellants argue that the "presumption of regularity" means that FWS would do what it said it would do in the Biological Opinion. Fed. Br. at 47–48. But this is of no moment, since all FWS said it would do was receive and review permit applications; all other potential actions were stated entirely as permissive, not mandatory. The Biological Opinion imposed no requirements on FWS to perform ESA-required analyses or make ESA-required determinations at the permit level. The presumption of regularity does not render a discretionary future commitment

mandatory.  *PETA v. U.S. Dep't of Agr. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 158–59 (D.C. Cir. 2019).  *Contra* Fed. Br. at 47–48.

Appellants rely on *Bennett v. Spear*, 520 U.S. 154 (1997), to argue the technical assistance process was binding.  Fed. Br. at 47.  But *Bennett*, 520 U.S. at 170, 178, merely stands for the proposition that an incidental take statement's terms and conditions are binding.  And so, even if the terms and conditions of the Incidental Take Statement here required FWS to engage in the technical assistance process— which they do not—nothing in that process required FWS to comply with the ESA's substantive and procedural requirements at the permit level.

## C.    The Technical Assistance Process Did Not Constitute A Mitigation Measure for EPA's Transfer Decision.

For the first time on appeal, Federal Appellants argue that FWS did not defer to the technical assistance process at all, but merely considered the process a mitigation feature built into the proposed action.  Fed. Br. at 42–45 (citing 50 C.F.R § 402.14(c)(1)(A)).  This argument all but concedes that FWS had no intention to perform ESA-mandated analyses—not at the programmatic level and not at the permit level—completely evading its statutorily-imposed duties.[12]

---

[12] This argument conflicts with the Biological Opinion's repeated deferral of species-specific analyses to the technical assistance process.  JA1344–45/Dkt. 182 at 61–62. *See, e.g.*, JA2656/FWS-006093 (stating that species-specific analyses "will be available and assessed through the technical assistance process"); JA2667/FWS-006104 (similar as to cumulative effects); JA2669/FWS-006106 (similar as to

The Court need not consider the argument, however, because it was not raised in the district court. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1117 (D.C. Cir. 2010) (the Court reviews "'only those arguments that were made in the district court, absent exceptional circumstances'" (quoting *Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009))). No Appellant argued below that the technical assistance process constituted a mitigation measure under 50 C.F.R § 402.14(c)(1)(A), or even cited that regulatory provision in their briefs.

The argument also fails as a matter of law. Mitigation measures must (1) constitute a "clear, definite commitment of resources"; (2) be "reasonably certain to occur"; (3) be enforceable; and (4) address the threats to the species. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743–48 (9th Cir. 2020) (citation omitted). And if an agency fails to carry out those mitigation measures, "it must re-initiate consultation." *Id.* at 743 (citation omitted).

Nothing in the technical assistance process here met the standard. The technical assistance process did not require FWS to analyze or mitigate threats to species. There was no clear mechanism to enforce FWS' making the determinations required by the ESA. FWS also affirmatively disavowed any duty to reinitiate programmatic consultation. The technical assistance process at most contemplated

---

finding no jeopardy); JA2670/FWS-006107 (similar as to incidental take).

re-opening an individual permit for state review, not ESA consultation.[13] *Cf. El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 255 (D.C. Cir. 2024) (monitoring plan detailed specific threshold and targets for implementing adaptive measures; NMFS would reinitiate if monitoring plan failed).

Even if the technical assistance process outlined in the Biological Opinion imposed requirements on FWS, it would still not have met the mitigation standard. The technical assistance process was not part of the EPA-approved Florida program, *contra* Fed. Br. at 49, because it was not submitted as part of Florida's application and was outlined in a Biological Opinion issued after public comment.

The district court's factual finding that the technical assistance process was a creature of the Biological Opinion was amply supported by the record. *See* JA1349/Dkt. 182 at 66. Although Florida's application referred to a technical assistance process, the application repeatedly stated that the process would be outlined in the future biological opinion. *See* JA1560/EPA-HQ-OW-2018-0640-0016-A2, at 5 (unexecuted Memorandum with FWS explicitly stating that technical assistance process will be "outlined" in anticipated biological opinion); JA1573/EPA-HQ-OW-2018-0640-0018 at 5 n.2 (EPA Memorandum stating that

---

[13] Although Florida's 404 regulations prohibited permits that would jeopardize species' continued existence, this did not ensure against other harm to species that violates the ESA.

technical assistance process would be described in "anticipated" biological opinion). Nor do Florida's regulations outline the technical assistance process. *See* Fla. Admin. Code R. 62-331.054(1) (2020) (Florida regulation generally stating a permit applicant must minimize impacts to listed species); *id.* 62-331.51(4) (2020) (Florida regulation requiring permit applicant to submit information for FWS to use in technical assistance process without outlining that process). Appellants themselves rely heavily on the Biological Opinion to describe the technical assistance process. *See* Fed. Br. at 24–28; Fla. Br. at 27–28.

### D.    Florida Mischaracterizes the District Court's Ruling.

Florida argues that the district court erred by ruling that all programmatic consultations require future site-specific consultations. Fla. Br. at 44–47. But the court made no such ruling.

Instead, the court examined the definition of "programmatic consultation" as well as specific definitions for both "framework programmatic actions" and "mixed programmatic actions." JA1299–300, 1352/Dkt. 182 at 16–17, 69; 50 C.F.R. § 402.02. Reviewing the regulation in light of the ESA's plain text, the district court drew the unremarkable conclusion that adequate Section 7 consultation on a programmatic action must occur "*at some point,*" either: (1) complete consultation at the outset; (2) partial consultation at the outset followed by Section 7 consultations at later phases; or (3) complete consultation solely at a later phase, if that is the phase

likely to adversely affect listed species. JA1350/Dkt. 182 at 67. Nor did the court's unremarkable conclusion rely on finding that there are only two types of programmatic consultations, as Florida suggests. *Contra* Fla. Br. at 46–47.

Florida's claim that agencies need not promulgate regulations addressing every conceivable question to satisfy their statutory obligations, *id.* at 48, is neither here nor there given that agencies must still comply with the statute. Florida's reliance on *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 96 (1995), is therefore unavailing. The absence of a regulation prohibiting FWS from deferring species analyses to a technical assistance process that does not bind FWS does not mean this arrangement was authorized by statute. Nothing in the ESA authorized FWS to avoid its Section 7 obligations altogether.

### E.    *Cooling Water* **is Distinguishable.**

Appellants rely heavily on *Cooling Water*, an outliner and factually distinguishable case that the district court thoroughly considered and found not persuasive. *Cooling Water*, 905 F.3d at 58, 65–70, involved EPA's promulgation of a technical standard pursuant to Section 316(b) of the Clean Water Act to reduce harm to aquatic species from cooling water intake structures. That rule would be implemented in NPDES permits under Section 402, a program that, unlike Section 404, had long been mostly delegated to the states. *Id.* And if the technical assistance process was not followed, the 316(b) biological opinion required reinitiation of

64

programmatic consultation.  *Id.* at 72 n.14; JA2783–84/FWS-006514–15.  *Cooling Water*'s technical assistance process therefore served as an extra check on a rule that, by design, would reduce incidental take of listed species and would be implemented through permits for a discrete universe of existing facilities.[14]  *Cooling Water* is fundamentally inapplicable to the facts of this case in two ways.  JA1348–50, 59–60/Dkt. 182 at 65–67, 76–77.

First, data from prior Section 7 consultations on NPDES permits largely did not exist because those programs had long ago been delegated to the states.  *See* JA892–93/Dkt. 104 at 46–47; JA2743/FWS-006474 (316(b) biological opinion explaining that most facilities had not previously been required to provide species information nor obtain incidental take coverage).  And there were no existing Section 316(b) regulations that had been implemented in federal or state NPDES permits.  *See Cooling Water*, 905 F.3d at 61–62.  There was therefore little, if any, data available to inform species analysis at the programmatic level.

Here, by contrast, FWS had ample data to inform the ESA-mandated effects analysis.  And no party has contested the district court's factual finding on this point to find *Cooling Water* distinguishable.  This fundamental factual distinction alone

---

[14] The court issued this decision after several prior attempts to regulate this harm to species, and the agency's ultimate solution was opposed by both environmental groups and industry.

was sufficient for the district court to find *Cooling Water* inapplicable.

Second, *Cooling Water* is also inapplicable because here the technical assistance process was not codified to impose any enforceable requirements on FWS.  In *Cooling Water*, EPA's technical assistance process was promulgated as part of the rulemaking action on which FWS consulted, thereby creating legally binding responsibilities for all parties.  *Id.* at 62–63, 72.  *See Ctr. for Biological Diversity v. FWS*, 807 F.3d 1031, 1046 (9th Cir. 2015) (conservation measures that were part of agency action must be implemented under terms of the consultation).

The technical assistance process here, however, was outlined in a biological opinion that was not part of EPA's rulemaking in approving Florida's program.  JA1349/Dkt. 182 at 66.  As shown above, it was also not made clearly enforceable, particularly against FWS.  *Id.*

Florida's argument that the court in *Cooling Water* relied on factors other than codification, Fla. Br. at 49–50, is belied by the court's decision.  The court plainly stated that it interpreted the 316(b) rule as requiring FWS' participation because it codified the technical assistance process, meaning it was part of the action on which FWS consulted.  *Cooling Water*, 905 F.3d at 72 (citing *Ctr. for Biological Diversity*, 807 F.3d at 1046 & n.12).

The district court also found that *Cooling Water*'s approval of a wholesale deferral of species analysis to a technical assistance process was "at odds with the

66

[ESA], regulations, and caselaw." JA1349–54/Dkt. 182 at 66–71. *Accord* JA246–59/Dkt. 98 at 36–49; JA882–88/Dkt. 104 at 36–42; JA1455–57/Dkt. 190 at 5–7. The district court may also be affirmed on that basis. But the Court need not reach the issue because of the fundamental factual differences between the two cases.

## IV.     FWS Unlawfully Extended Broad Take Liability Exemption.

The ESA requires FWS to specify the impact of incidental taking on listed species in terms of either a numerical take limit or a surrogate that sets a clear standard for determining when the level of anticipated take has been exceeded. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i).[15] By creating two, specific paths to exempt incidental take from ESA liability, Congress did "not intend[] to provide a liberal exemption from the taking prohibitions of the Act for a large class of activities." S. Rep. No. 97-418, at 24. Take limits are essential to Congress' design, "not because of their predictive value, but because they … serve as the last line of defense for the species." *Forest Serv. Emps.*, 726 F. Supp. 2d at 1231. *Accord Oceana Inc. v. Ross*, 2020 WL 5995125, *9.

---

[15] No party has argued that the technical assistance process constituted a surrogate take limit, nor could it meet the standard.

67

### A.     FWS Set No Take Limits.

After determining that take is reasonably certain to occur, FWS must issue an incidental take statement that "specifies the impact of such incidental taking on the species," 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7), as "the amount or extent" of such taking, 50 C.F.R. § 402.14(i)(1)(i). Here, FWS did not articulate the amount of take expected to occur as a result of EPA's transfer decision and did not set a numerical or surrogate incidental take limit for any ESA-listed species. JA2670–71/FWS-006107–08. *See* JA1357/Dkt. 182 at 74.

FWS was not authorized to avoid the ESA's requirements at the programmatic level on the basis of uncertainty. Courts have rejected the uncertainty rationale even where programmatic consultation would be followed by project-specific Section 7 consultation (and thus project-specific incidental take statements). *See, e.g.*, *Conner*, 848 F.2d at 1452–56 (rejecting lack of comprehensive biological opinion at the programmatic level based on uncertainty); *cf. San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 625–27 (9th Cir. 2014) (upholding programmatic incidental take statement that set take limits for the delta smelt in the country's largest federal and state water projects).

In *Forest Service Employees*, 726 F. Supp. 2d at 1231, for example, FWS claimed it could not set take limits because of "uncertainty over where and to what extent retardant will be used" across the National Forest system and sought to

68

"defer[] significant aspects of the required Section 7 analysis" to later, expedited emergency consultations. The court acknowledged the uncertainty but held that take limits were nonetheless required for the protection of species. *Id.* at 1231–32. *Contra* Fla. Br. at 51, 59. *See also NRDC v. Evans*, 279 F. Supp. 2d at 1137, 1181–84 (rejecting attempt to defer incidental take limits for naval activity covering up to 75% of the world's oceans to later authorizations in lieu of setting limits at programmatic level).

Wildlife agencies previously considered the uncertainties involved with programmatic consultations, but still did not create an exception to take limit requirements in those circumstances. 80 Fed. Reg. at 26833. And where the best available data does not support any anticipated level of incidental take, there can be no authorization of incidental take. ESA Handbook at 4-50 to 4-51.

Appellants here were not entitled to have their cake and eat it too: by claiming there would be incidental take so as to justify FWS' invoking its Section 7 authority to issue a broad liability exemption while disavowing any duty to limit that take.

### 1.    FWS Had Ample Data to Set Take Limits.

Federal Appellants argue it was impossible for FWS to create any incidental take limits for any listed species at the programmatic level. Fed. Br. at 55–56, 59–60. They argue that because ESA regulations do not speak to situations where FWS purportedly cannot identify a numerical or surrogate limit, *id.* at 57–58, FWS could

avoid complying with the requirements altogether.  But neither the ESA nor the regulations authorize wholesale noncompliance.

The ESA required FWS to use the best available data to make projections as to take that were protective of threatened and endangered species.  As with species analysis, Appellants' impossibility arguments fail in light of the ample data that was available to FWS.  JA1358–59/Dkt. 182 at 75–76.

Although Appellants argue that FWS could not set limits because they could not anticipate the locations of future permitting activity, Fed. Br. at 40–42, "FWS failed to explain why or how the location of future projects is inescapably tied to incidental take limits for all endangered or threatened species in the State." JA1358/Dkt. 182 at 75.  This is particularly notable given the very restricted ranges of many protected species in Florida, including the Florida panther.  *Id.*

## 2.    The ESA's Plain Text Required a Take Limit.

Where the ESA required FWS to specify the impact of incidental take on species, 16 U.S.C. § 1536(b)(4), Appellants suggest that the term "specify" was broad enough to allow FWS to rely on the technical assistance process rather than set limits.  Fed. Br. at 57–58.  In a similar vein, Florida similarly argues that FWS identified the "extent" of take by deferring to the technical assistance process.  Fla. Br. at 52–53.

But these arguments collapse under the plain meaning of the terms Congress and the wildlife agencies used.  To "specify" is "to name or state explicitly or in detail."    Merriam-Webster    Dictionary,    *Specify*,    https://www.merriam-webster.com/dictionary/specify (last visited Oct. 30, 2024).  "Impact" means "the force of impression of one thing on another: a significant or major effect."  Merriam-Webster Dictionary, *Impact*, https://www.merriam-webster.com/dictionary/impact (last visited Oct. 30, 2024).  FWS, however, did not project take for any species for any time period and therefore could not have named or stated explicitly or in detail the impact of that unspecified take on any species.

"Extent" means "the range," "the amount of space," "the distance," or "the point, degree, or limit to which something extends."  Merriam-Webster Dictionary, *Extent*, https://www.merriam-webster.com/dictionary/extent (last visited Oct. 30, 2024).  But FWS did not articulate any "extent" of take, including the point, degree, or limit to which authorized take of any species extended.

In fact, there is no statutory or regulatory authority under the ESA to substitute a process for a limit.  Only a limit, whether numerical or in the form of a surrogate that serves the same function as a numerical limit "sets a clear standard for determining when the level of anticipated take has been exceeded."  50 C.F.R § 402.14(i)(1)(i).  *See also Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1037 (9th Cir. 2007); S. Rep. No. 97-418, at 21 (limit must be articulated that provides

71

notice of the point at which incidental takings may violate the law and would require immediate reinitiation of consultation).

As the district court found, "in a case that has been briefed beyond the point of exhaustion, the parties have identified only one case—*Cooling Water*—in which a court has upheld a final Incidental Take Statement that lacked either a numerical take limit or a surrogate." JA1359/Dkt. 182 at 76. But as explained above, that case arose under fundamentally different facts (including as to the availability of data) and contravened the overwhelming weight of ESA authority.

### 3. The Technical Assistance Process Did Not Cure the Failure to Set Take Limits.

Nor did the technical assistance process cure FWS' failure to set take limits at the programmatic level. Since the technical assistance process operated at the permit level, at best it could only have resulted in permit by permit—rather than programmatic—take limits.

But contrary to Appellants' claims, the technical assistance process did not require FWS to set limits on incidental take at the permit level either. JA2671/FWS-006108. *Contra* Fed. Br. at 57 (FWS will specify permit-level take limits); Fla. Br. at 58 (Florida will specify permit-level take limits). Indeed, as shown above, the process did not require FWS to perform any of the ESA-required analyses, including as to take, that are necessary predicates for setting take limits.

72

Instead, the process stated only that "if" take was "expected to occur," FWS "in coordination with" Florida would "quantify" and "monitor" take for individual permits. JA2671/FWS-006108. But it did not require FWS to perform the ESA-mandated analyses to anticipate and limit that take and did not require FWS to ensure that Florida incorporated a take limit as a permit condition. *Id. Accord* JA1311/Dkt. 182 at 28 (quoting FWS staff email explaining "FWS will not be issuing any project-by-project [ITSs]" and "FWS will merely be providing technical assistance" and "tracking" incidental take). These deficiencies were borne out during Florida's implementation of the program. JA304–05/Dkt. 98-1 at 11–12.

Florida implausibly argues that the technical assistance process functioned as a numerical limit (even though it involved no numbers) because it "compel[led] the State to establish numerical take limits on a permit-by-permit basis under federal oversight." Fla. Br. at 58. But Congress required federal wildlife agencies, not states, to set take limits. And as explained above, nothing in the technical assistance process required FWS to set take limits.

Even if the technical assistance process did require FWS to impose take limits, the Incidental Take Statement's terms and conditions did not require state permittees to comply with take limits or even permit conditions to find safe harbor in the incidental take liability exemption. JA1327–28/Dkt. 182 at 44–45. Therefore, a permittee's exceedance of a take limit would not clearly constitute an enforceable

73

ESA violation. *Id.*

## B.    FWS Disavowed the Duty to Reinitiate.

An incidental take limit serves as both a safe haven for take liability and a trigger for reinitiation of consultation if the limit is exceeded. 50 C.F.R. §§ 402.14(i)(1)(i), 402.16(a)(1). But without any take limits, there was no amount of take of any species (including through habitat loss) that could exceed the limit. The Incidental Take Statement thus failed to provide a trigger for reinitiation of consultation based on exceeding authorized take. *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d at 272 ("clear standard" for exceedance of take "must be able to adequately trigger reinitiation of consultation" (citations and internal quotation marks omitted)); *Oceana, Inc. v. Pritzker*, 75 F. Supp. 3d 469, 494–98 (D.D.C. 2014) (same).

Instead, the technical assistance process provided only that *if* a take limit were imposed and exceeded at the permit level, then Florida would reopen the particular permit. *Compare* JA2674/FWS-006111, *with* 50 C.F.R. § 402.16(a)(1). But nothing in the technical assistance process or Biological Opinion provided a trigger for reinitiation of consultation with FWS even if permit-level incidental take limits were exceeded. Indeed, FWS disavowed any such duty. JA1361/Dkt. 182 at 78.[16]

---

[16] Contrary to 50 C.F.R. § 402.16(a)(4), FWS similarly disavowed any duty to reinitiate consultation even if new species in Florida were listed as endangered or

Florida argues the Incidental Take Statement contains an adequate reinitiation trigger because it states that reinitiation "could" occur where "effects that were not considered" come to light. Fla. Br. at 55; JA2656/FWS-006093. But this statement is "hopelessly noncommittal." JA1361/Dkt. 182 at 78. It also conflicts with the Incidental Take Statement, which provides that if "new information" showed greater impacts than FWS anticipated, Florida would be required only to reopen the particular permit at issue. *Id.*; JA2673–74/FWS-006110–11.

## C. FWS Failed to Establish Meaningful Terms and Conditions.

The ESA also requires an incidental take statement to "set[] forth the terms and conditions … that must be complied with" to benefit from the take liability exemption. 16 U.S.C. § 1536(b)(4)(iv). Any taking of species that complies with those terms and conditions is not prohibited. *Id.* § 1536(o)(2). *See* S. Rep. No. 97-418, at 21 (Congress intended FWS to create "mandatory and enforceable controls on the means and level of incidental takings that may be allowed with respect to agency action"); H.R. Rep. No. 97-567, at 26 (committee intended that incidental takings be allowed so long as specified terms and conditions "to minimize the impact of the taking are complied with").

---

threatened. JA1361/Dkt. 182 at 78.

Here, the Incidental Take Statement's terms and conditions did not impose any controls to minimize the impact of takings. Rather, they simply required EPA to comply with its pre-existing obligations under the Clean Water Act and required Florida to engage in the technical assistance process. JA2672–73/FWS-006109–10. No terms and conditions bound FWS or future state permittees. *Id.  Accord* JA1315/Dkt. 182 at 32.

Florida argues that the terms and conditions were sufficient because they bound *Florida* to incorporate protective measures as permit conditions, and that those permit conditions in turn bound state permittees. Fla. Br. at 56. But, as shown above, the technical assistance process did not require FWS to propose protective measures or set incidental take limits in the first place.

Additionally, the terms and conditions did not require state permittees to comply with permit conditions to receive the exemption for incidental take liability. JA2673/FWS-006110; 16 U.S.C. § 1536(o)(2).[17]  Therefore, even if FWS proposed protective measures to minimize take, and Florida incorporated those measures as permit conditions, Fla. Br. at 56, a state permittee would not have to comply with

---

[17] Before the district court, Florida relied on language outside of the terms and conditions to argue that permittees would indeed be liable under the ESA. But the ESA expressly exempts any take resulting from any action that complies the "terms and conditions" and not other parts of the incidental take statement. 16 U.S.C. § 1536(o)(2).

those permit conditions to be insulated from ESA liability under the Incidental Take

Statement's terms and conditions, 16 U.S.C. § 1536(o)(2).

## V. The District Court Read the ESA and Clean Water Act Harmoniously and Consistent with Cooperative Federalism.

"[W]hen two statutes are capable of coexistence, it is the duty of the courts,

absent a clearly expressed congressional intention to the contrary, to regard each as

effective." *Howard v. Pritzker*, 775 F.3d 430, 437 (D.C. Cir. 2015) (quoting *J.E.M.*

*Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 143–44 (2001) (internal

quotation marks omitted)).  Here, the Clean Water Act authorizes state assumption

of the 404 program only where states meet minimum federal standards, including

the 404(b)(1) Guideline that prohibits state permits from jeopardizing listed species.

The ESA prescribes requirements to ensure federal actions do not jeopardize listed

species and authorizes incidental take only where certain requirements are met.

There is no conflict between these statutes, which have co-existed for more than fifty

years, and the district court's ruling did not create one.

The clearest indication that there is no conflict is the fact that Michigan and

New Jersey have assumed the 404 program without any claim of statutory conflict,

not before or since the district court's ruling.  But Florida sought a non-statutory

option to secure incidental take liability exemption for state 404 permittees without

having to comply with the rigorous analyses the ESA requires.  Congress did not

authorize this work-around to the statutes it enacted.

77

The district court's reading of the statutes was therefore harmonious and did not infringe on cooperative federalism. *Contra* Fla. Br. at 60–61. The court's ruling properly gave effect to both statutes, which require that states seeking to assume Section 404 authority meet federal requirements and that federal agencies involved in program approval comply with federal law. *New York v. United States*, 505 U.S. 144, 167–68 (1992) (under cooperative federalism, states may choose to regulate activity according to federal standards or have federal agencies bear the expense of administering a federal regulatory program); *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289–92 (1981) (state may administer federal programs subject to compliance with federal law).

## A.    Florida Misapprehended the District Court's Decision.

Florida argues that the district court's ruling would render state assumption "extinct" by purportedly requiring "an upfront accounting of all species- and site-specific effects and numerical take limits." Fla. Br. at 61. But Florida misapprehends the district court's decision.

To begin, the district court observed that it was Florida and EPA who decided to pursue programmatic Section 7 consultation as a means for FWS to extend programmatic incidental take liability exemption to state permittees without their

78

having to obtain incidental take permits pursuant to Section 10. Appellants were not entitled to choose this path only to claim that complying with its requirements was impossible.

Moreover, as the district court explained, the ESA does not require perfect foresight. JA1346/Dkt. 182 at 63. Instead, it requires FWS to use the best available data to do the most informed analysis it can. Nor was it impossible for FWS to perform the analyses Section 7 requires. Florida has essentially conceded as much, by suggesting that FWS could *now* perform the analyses using species data from the state permitting process. Fla. Br. at 70.

Florida faults the district court's reliance on *Conner*, *id.* at 63–64, to say that FWS could have determined that dredge and fill activities in certain areas were incompatible with the continued existence of a species. JA1347/Dkt. 182 at 64. But Florida's claim that this would constitute unlawful "partial assumption," Fla. Br. at 63–64, fails to understand that such a finding would prohibit *any* permitting agency—whether the Corps or the state—from issuing 404 permits in those waters.

Florida also suggests that *Conner* is inapposite because, in that case, the wildlife agency could carve out particular areas from permitting because the government knew where future oil and gas activities would occur. Fla. Br. at 63. But there, as here, FWS claimed it lacked adequate information about specific locations. And there, as here, although the "precise location" of future activities was

79

unknown, FWS in fact had "extensive information about the behavior and habitat of the species" in relevant areas and could use that data to carve out particular areas to ensure species protection. *See Conner*, 848 F.2d at 1453.

### B. Florida's Claim That It Had No Other Option Fails.

Florida complains that no other options were viable for the State to assume 404 authority, Fla. Br. at 61–67, but several options were available which Appellants declined to pursue. For example, as the district court found, EPA and the wildlife agencies could have completed a Section 7 programmatic consultation with the requisite analyses and determinations. Alternatively, EPA could have invoked its oversight authority to engage in Section 7 consultations at the permit level where there may be adverse effects to species, JA2507–09/EPA-HQ-OW-2018-0640-0670-A3, at 1–3. Or Appellants could have developed a program that required FWS to use the best available data to undertake ESA analyses and determinations at the permit level and required state permittees to obtain take authorization either through Section 7 (for permits transferred to the Corps) or Section 10 (for state-issued permits). *See* JA1310, JA1379/Dkt. 182 at 27, 96.[18]

_____

[18] Florida's claim that it was the State, and not EPA, that documented other available options, Fla. Br. at 64 n.6, is neither here nor there. EPA has not disputed the provenance of the document. *See* JA209/Dkt. 95-2 at 34. But either way, this only means that both Florida and EPA have conceded that other options are available to states. JA1237/Dkt. 166 at 14; JA2524/EPA-HQ-OW-2018-0640-0686, at 1. And notably, after the district court ruled that Federal Appellants violated the ESA, Florida argued it could administer the 404 program following the New Jersey or

The district court properly declined to direct the parties to follow any particular course because these "are appropriately explored and crafted by the administrative agencies and the State—and not by the Court." JA1376/Dkt. 182 at 93. And as EPA (and Florida) have recognized, different states may prefer to structure their programs in different ways. JA2503/EPA-HQ-OW-2018-0640-0660-A1, at 7; JA2508–10/EPA-HQ-OW-2018-0640-0670-A3, at 1–3.

For example, in the case of New Jersey, FWS initially found it could not concur in EPA's finding that, as structured, the state program would not likely adversely affect listed species. JA2690/FWS-006155. FWS ultimately concluded that key built-in protections would ensure otherwise, JA1306–07/Dkt. 182 at 23–24 & n.4, obviating the need for formal consultation. It was these key protections that allowed resolution through informal consultation, rather than the "sparsity" of ESA-listed species as Florida claims. *Contra* Fla. Br. at 64–65.

First, New Jersey's program relied on "several layers of mandated FWS review and determinations." JA1306/Dkt. 182 at 23 n.4; JA2684–85/FWS-006149–50. This included making determinations based on the best information available to

---

Michigan approach instead. JA1237/Dkt. 166 at 14. Environmental Appellees disputed that the district court could allow Florida to switch to another model after the fact, especially without having conducted a lawfully sufficient programmatic consultation. To the contrary, a new proposal by Florida would have to be developed, reviewed by the relevant federal agencies, and subject to public comment before it could be approved.

assess impacts to protected species from proposed activities. JA2685/FWS-006150. Second, it required EPA to transfer a permit to the Corps if, after review by EPA and FWS, New Jersey disagreed with EPA's determinations regarding jeopardy and incidental take. JA1306/Dkt. 182 at 23 (citing JA2692/FWS-006157).[19] Third, it required EPA to object to any permit that was likely to adversely affect listed species and to transfer that permit to the Corps if New Jersey failed to satisfy EPA's objection or deny the permit. JA1306–07/Dkt. 182 at 23–24 n.4 (citing JA2686–87/FWS-006151–52). Fourth, FWS did not grant a programmatic exemption from incidental take liability. Instead, permittees were required to seek permit-level authorization for incidental take through Section 10 (for state-issued permits) or Section 7 consultation (for permits EPA transferred to the Corps). JA1307/Dkt. 182 at 24 (citing JA2691–92/FWS-006156–57).[20]

---

[19] Where the district court cited the administrative record using a docket entry, Environmental Appellees cite the joint appendix followed by the administrative record citation.

[20] Contrary to Florida's representation, the district court did not opine that "the New Jersey model" would hinder progress in a state like Florida. *See* Fla. Br. at 65. Rather, the court relied on Appellants' representations to observe that Florida's request for a stay, which would allow it to continue issuing 404 permits but without incidental take protection, would likely be unattractive to developers because of the risk of civil and criminal ESA penalties, as compared to restoring authority to the Corps, through which permit-level Section 7 incidental take statements are available. JA1389–90/Dkt. 183 at 8–9.

Next, Florida claims that permit-level Section 10 authorization would not work because under the ESA that process is "voluntary." Fla. Br. at 66–67. But New Jersey's program required applicants to seek Section 10 authorization for a state permit resulting in incidental take. JA1307/Dkt. 182 at 24 (citing JA2691–92/FWS-006156–57).

Florida's real complaint is as the district court found: the State wanted to secure exemptions for incidental take liability without permittees having to comply with Section 7 or Section 10 at the permit level and without complete Section 7 consultation at the programmatic level. *See* JA1309–10, JA1313–14, JA1350/Dkt. 182 at 26–27, 30–31, 67. But the fact that Florida's attempted workaround is unlawful does not mean Florida could not have pursued other (lawful) options.

## VI.    EPA's Approval of Florida's Program Was Unlawful.

Because FWS' Biological Opinion and Incidental Take Statement were facially flawed, it was unlawful for EPA to rely on them to approve Florida's 404 assumption application. *Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021). Federal Appellants now concede that EPA could not rely on an unlawful Biological Opinion and Incidental Take Statement. Fed. Br. at 40 n.4. Florida does not address the issue and has therefore waived it. *See U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 497 (D.C. Cir. 2004).

83

The district court also properly determined that EPA violated Section 7 of the ESA by failing to consult with NMFS before approving Florida's program. JA1369–71/Dkt. 182 at 86–88. EPA has now conceded the claim, Fed. Br. at 60–61, but Florida continues to claim error, Fla. Br. at 67–69.

EPA's determination that there would be no effect on NMFS species was arbitrary because EPA only considered potential impacts to NMFS species *in* assumable waters, and not downstream. JA2174/EPA-HQ-OW-2018-0640-0617, at 1; JA2175/EPA-HQ-OW-2018-0640-0618, at 1; JA2320/EPA-HQ-OW-2018-0640-0649, at 121. But the ESA required consideration of impacts to species in the "action area," which includes "all areas to be affected directly or *indirectly* … and not merely the immediate area involved in the action." 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(g)–(h) (emphasis added).

Florida argues that NMFS' determination and EPA's Response to Comments sufficiently considered indirect effects to NMFS species. Fla. Br. at 67–69. But neither discussed effects (indirect or otherwise) to NMFS species. NMFS merely stated that its jurisdictional species occur in *non*-assumable waters and then summarily "assume[d]" that EPA would make a no effect determination based on that information alone. JA2196/EPA-HQ-OW-2018-0640-0638, at 1. EPA's Response to Comments relied on NMFS' determination and punted any analysis or protection of NMFS species to future state permit review. JA2155/EPA-HQ-OW-

84

2018-0640-0568, at 95.

Florida's reliance on EPA's Biological Evaluation, Fla. Br. at 68–69, is similarly unavailing because it adopted the same faulty premise as EPA's no effect determination.  JA2202/EPA-HQ-OW-2018-0640-0649, at 3.  That the Biological Evaluation acknowledged potential effects to marine species "downstream," Fla. Br. at 68, only further demonstrates the arbitrariness of EPA's no effect finding.[21]  As the district court held, EPA was required to provide a reasoned basis for excluding non-assumable waters from its consideration, especially given that record evidence suggested potential impacts there.  *See* JA1370/Dkt. 182 at 87.

Florida's claim that the district court "second-guessed" agency scientific judgment, Fla. Br. at 67, also fails, particularly in light of Federal Appellants' concession.  The district court accepted at face value the agencies' findings that the agency found there would be no effect on NMFS species in assumed waters.  JA1369–70/Dkt. 182 at 86–87.  But the court found as a matter of law that EPA was required to look at impacts to NMFS species beyond assumed waters.  *Id.*

---

[21] Florida's citations to the Biological Evaluation for potential effects to marine species downstream and for stressors and effects on marine species fail to support these propositions.

## VII.   Vacatur Was Warranted.

Vacatur is the "normal remedy" for unlawful agency action.  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  Here, the district court correctly ruled that vacatur was the appropriate remedy in light of the seriousness of the ESA violations and after weighing claims of potential disruption.  *See* JA1372–80/Dkt. 182 at 89–97; *Allied-Signal, Inc. v. USNRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).

Neither the record nor the law support Florida's assertions that the district court misapprehended the law, that vacatur is causing undue disruption, or that Environmental Appellees failed to show harm.  Fla. Br. at 69–73.  Even Federal Appellants agree that vacatur should remain intact to avoid regulatory flip-flopping pending final resolution on the merits.  Fed. Br. at 34, 62–63.

### A.    The Agencies' Violations Could Not Be Justified on Remand.

Florida's argument that remand is the ordinary remedy, Fla. Br. at 69, fails where, as here, the deficiencies in the agency's action are serious—meaning that the agency could not simply justify the same decision on remand.[22]  *New Jersey Cons.*

---

[22] Florida recites only half of the holding in *U.S. Sugar Corporation v. EPA*, 844 F.3d 268 (D.C. Cir. 2016).  Fla. Br. at 70.  The complete holding provides that remand without vacatur is appropriate where a rule's defects are curable *and* where vacatur would reduce environmental protections.  *U.S. Sugar*, 844 F.3d at 270 (citations omitted).

*Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024) (vacatur appropriate where deficiencies went to core of agency's finding and were unlikely to be cured with more explanation).

The agency flaws in this case could not "be cured merely by further explanation or changes to the technical assistance process on remand."  JA1375–78/Dkt. 182 at 92–95.  *Accord* JA1212–13/Dkt. 161 at 12–13.  Indeed, the Biological Opinion and Incidental Take Statement would have needed "wholesale revision," including but not limited to species-level impact analysis, take limitations, and meaningful terms and conditions for exemption from incidental take liability.[23]  *See NRDC v. EPA*, 489 F.3d 1250, 1261–62 (D.C. Cir. 2007) (vacatur appropriate when rules could not "survive[] remand in anything approaching recognizable form" and would need "wholesale revision"); *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 245 (D.D.C. 2020) (errors that are "not statutorily authorized" cannot be cured on remand with additional explanation).

The same is true of EPA's reliance on the Biological Opinion and Incidental Take Statement (and its no effect determination as to NMFS species) to approve Florida's program as compliant with the ESA and the Clean Water Act's Section

---

[23] Accordingly *Black Oak Energy, LLC v. FERC*, 725 F.3d 230 (D.C. Cir. 2013), is inapposite.  Fla. Br. at 70.  There, the Court remanded without vacatur because, unlike here, it was "plausible" the agency could provide further explanation and reach the same result.  *Black Oak*, 725 F.3d at 244.

404(b)(1) Guidelines.  JA1377–78/Dkt. 182 at 94–95.

Florida's argument that the agencies could re-do the Biological Opinion based on state 404 permitting data and EPA's Biological Evaluation on NMFS species misses the point.  Fla. Br. at 70.  EPA was required to complete Section 7 *before* approving Florida's program.  These would also be new, different agency actions, further confirming that vacatur was appropriate because no amount of explanation could justify the original agency actions.  JA1375–78/Dkt. 182 at 92–95.

Nor does *Conserve Southwest Utah v. U.S. Department of Interior*, No. 1:21-CV-01506, 2023 WL 7922785 (D.D.C. Nov. 16, 2023); Fla. Br. at 70, support Florida's claim that remand would have been the appropriate remedy here.  There, all parties requested remand without vacatur, the defendants conceded error, and the defendants committed to correcting the legal deficiencies.  *Conserve Sw. Utah*, 2023 WL 7922785 at *6–7.  Those circumstances are not present here.

### B.    Florida Failed to Demonstrate Undue Disruption.

Florida claims that vacatur would result in "disastrous consequences," Doc. 2074991 at 71.  But the district court and this Court collectively reviewed similar claims four times and found them insufficient to avoid vacatur or to stay vacatur pending appeal, respectively.  *See* JA1375–78/Dkt. 182 at 92–95; JA1391–93/Dkt. 183 at 10–12; JA1459–62/Dkt. 190 at 9–12; Doc. #2055213.

Importantly, as the district court observed, disruption is inherent in Congress' design of Section 404, which requires transfer of authority back to the Corps when EPA withdraws approval of unlawful state programs. JA1304, JA1376–77/Dkt. 182 at 21, 93–94. The district court also observed that the "real question is the extent to which vacatur could lead to further administrative flipflopping and confusion" until this matter is resolved. JA1379/Dkt. 182 at 96. Restoring authority to the Corps ensured the lawful, clear, and consistent administration of Section 404 in assumable waters until this matter is conclusively resolved.

Florida's argument that the State was better equipped to implement the 404 program than the Corps, Fla. Br. at 72, is irrelevant given the unlawfulness of the State's program. Florida's claim that it had an abundance of staff to administer the program, Doc. #2053051 at 32, also fails to acknowledge the "serious" problems EPA identified with the State's implementation of the program, *see* Fed. Br. at 29–31; JA1435/Dkt. 189 at 25 & nn. 10–11.

Florida's complaints about the Corps' administration of the program are unsupported and insufficient to defeat vacatur. The Corps administered the entirety of the 404 program in Florida for decades before state assumption, continued to administer 404 in retained waters after assumption, and has now resumed administering the program in assumable waters, which is indisputably lawful. *See* Doc. #2053051 at 31–32.

## C.    Environmental Appellees Demonstrated Harm.

Moving beyond the *Allied-Signal* factors, Florida avers that Environmental Appellees were insufficiently harmed to warrant vacatur, Fla. Br. at 71.  But even if this were a factor in the vacatur analysis—which it is not—this claim too is belied by the record.

Environmental Appellees' standing declarations identified many exemplar permits of concern throughout the litigation in which their members had specific aesthetic, recreational, and other interests.  And, as the Motion for Preliminary Injunction showed, there were particular permits that were so consequential that their issuance, alone, could have authorized the take of dozens of Florida panthers each year, raising the specter of jeopardy.  JA1101–02/Dkt. 135 at 33–34; JA1146–47/Dkt. 153 at 28–29.

Florida suggests that harm from any particular project can be avoided through advocacy with the agencies or in state courts.  Fla. Br. at 72.  But as explained above, advocacy cannot correct legal errors in the state program, and state courts have no authority over federal agencies or their programmatic actions.

Florida relies on a series of inapposite cases, Fla. Br. at 70–72, where courts remanded not just because of concerns over disruption or lack of harm to the plaintiff, but also because the agency could provide adequate explanation on remand to support its action.  *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019)

(finding it plausible agency could supply the required explanations); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (same); *Oglala Sioux Tribe v. USNRC*, 896 F.3d 520, 538 (D.C. Cir. 2018) (same; no construction until NEPA compliance so no harm to Tribe when leaving license in effect).  As explained above, none of these factors supported remand here.

Florida's claim that "no one" has explained how the Corps' program is more protective of ESA-listed species than Florida's ignores that Congress specified in the ESA how protection of endangered and threatened species is to be accomplished. Fla. Br. at 71.  The crux of this case is federal agencies' failures to follow those strictures.

### VIII.  In the Alternative, the Court Should Grant the Cross-Appeal.

Having vacated EPA's approval of Florida's program based on serious violations of the ESA, the district court declined to reach Environmental Appellees' Clean Water Act claims and dismissed them as prudentially moot.  JA1397–99, JA1408/Dkt. 183 at 16–18, 27.  Environmental Appellees timely cross-appealed the dismissal of these claims.  JA1465–67/Dkt. 193.  The cross-appeal is conditional, meaning that it need only be reached if the Court were to reverse the district court's judgment below.  *Sea-Land Serv., Inc. v. U.S. Dep't of Transp.*, 137 F.3d 640, 649 (D.C. Cir. 1998); *Hartman v. Duffey*, 19 F.3d 1459, 1465 (D.C. Cir. 1994).

Here, the district court's prudential mootness ruling was expressly and entirely based on its vacatur of EPA's approval of Florida's program. JA1399–402/Dkt. 183 at 18–21. Therefore, if the Court finds that the district court erred in vacating EPA's approval of Florida's program, then the court necessarily abused its discretion in dismissing Environmental Appellees' APA and Clean Water Act claims as prudentially moot on that basis. *Jeffries v. Barr*, 965 F.3d 843, 855 (D.C. Cir. 2020) ("[a] district court's error of law is 'by definition' an abuse of discretion").

## CONCLUSION

For the reasons set forth above, the Court should affirm the district court's rulings on Counts 3, 4, 6, 10–13, remedy, and judgment. In the event the Court reverses, the Court should reverse and remand the district court's dismissal of Counts 1, 2, and 5, for consideration of those claims and maintain vacatur of EPA's transfer decision pending final judgment.

Dated: March 12, 2025                 Respectfully submitted,

                                      */s/ Tania Galloni*
                                      Tania Galloni
                                      Christina I. Reichert
                                      Earthjustice
                                      4500 Biscayne Blvd., Ste. 201
                                      Miami, FL 33137
                                      Email: tgalloni@earthjustice.org
                                      Email: creichert@earthjustice.org
                                      Telephone: (305) 440-5432

                                      Bonnie Malloy
                                      Earthjustice

92

111 South Martin Luther King Jr. Blvd.
Tallahassee, FL 32301
Email: bmalloy@earthjustice.org
Telephone: (850) 681-0031

## <u>CERTIFICATE OF COMPLIANCE</u>

In accordance with Fed. R. App. P. 32(g), Circuit Rule 32(e), and the Court's October 29, 2024, Order, Doc. #2082482, I certify that this Brief complies with the type-volume limitation because Environmental Appellees' Brief contains 20,625 words, excluding the parts of the brief exempted by Rule 32(f).

I further certify that this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this Brief is written in Times New Roman 14-point font using Microsoft Word.

Dated: March 12, 2025

*/s/ Tania Galloni*
Tania Galloni

*Counsel for Environmental Appellees*
