ORAL ARGUMENT NOT YET SCHEDULED

No. 24-5101 (c/w Nos. 24-5156 and 24-5159)

# In the United States Court of Appeals for the District of Columbia Circuit

---

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,
*Appellees/Cross-Appellants*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Appellants/Cross-Appellees*

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION,
*Appellants/Cross-Appellees*

---

On Appeal from the U.S. District Court for the District of Columbia
No. 1:21-CV-0119, District Judge Randolph D. Moss

---

**FINAL OPENING BRIEF OF APPELLANTS STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION**

---

Jeffrey DeSousa
ACTING SOLICITOR GENERAL

Christopher J. Baum
SENIOR DEPUTY SOLICITOR GENERAL

Office of the Attorney General of Florida
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300
jeffrey.desousa@myfloridalegal.com

Aaron M. Streett
Anthony J. Lucisano
Beau Carter
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855
aaron.streett@bakerbotts.com

Jeffrey H. Wood
BAKER BOTTS LLP
700 K Street NW
Washington, D.C. 20001
(202) 639-7732
jeff.wood@bakerbotts.com

*Counsel for Florida Appellants*

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## A.     Parties and Amici

Intervenor-Defendant-Appellants: State of Florida and Florida Department of Environmental Protection.

Federal Defendants: Michael S. Regan, in his official capacity as Administrator for the U.S. Environmental Protection Agency (EPA); Bruno Pigott, in his official capacity as Acting Assistant Administrator for the Office of Water of the EPA; Jeffrey Prieto, in his official capacity as General Counsel for the EPA; David Uhlmann, in his official capacity as Assistant Administrator for the Office of Enforcement and Compliance Assurance for the EPA; Jeaneanne Gettle, in his official capacity as Acting Administrator for Region 4 of the EPA; Michael Oetker, in his official capacity as Regional Director for the U.S. Fish and Wildlife Service (FWS); Martha Williams, in her official capacity as Director for the FWS; Lieutenant General Scott Spellmon, in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers; Colonel Brandon Bowman, in his official capacity as District Commander of the Jacksonville District for the Corps; U.S. Environmental Protection Agency; U.S. Army Corps of Engineers; and U.S. Fish and Wildlife Service.

i

Plaintiff-Appellees: Center for Biological Diversity; Defenders of Wildlife; the Sierra Club; the Conservancy of Southwest Florida; Florida Wildlife Federation; Miami Waterkeeper; and St. Johns Riverkeeper.

Amici Before this Court: Amici before this Court are the Florida Chamber of Commerce; the Association of Florida Community Developers, Inc.; the Mosaic Company; the Florida Home Builders Association; the Florida Transportation Builders' Association; the Leading Builders of America; the Associated Industries of Florida; the Lennar Corporation; G.L. Homes of Florida Corp.; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison Home Corp; and Florida State Hispanic Chamber of Commerce.

Additional Parties Before the District Court: Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd.

Additional Amici Before the District Court: Cameratta Companies LLC and CAM7-SUB, LLC.

**B.    Ruling Under Review**

The State of Florida and the Florida Department of Environmental Protection seek review of the district court's February 15, 2024 order, as amended on April 12, 2024, vacating federal approval of Florida's permit program under Section 404 of the Clean Water Act and the accompanying Programmatic Biological Opinion and Incidental Take Statement.  That vacatur order was made final and appealable on

April 12, 2024, when the district court entered a final judgment pursuant to Federal Rule of Civil Procedure 54(b).

**C.     Related Cases**

*Miccosukee Tribe of Indians of Florida v. U.S. EPA, et al.*, No. 1:22-CV-22459 (S.D. Fla.).


/s/ *Aaron M. Streett*
Aaron M. Streett
BAKER BOTTS LLP
910 Louisiana Street
Houston, Texas 77002
(713) 229-1855

Dated: March 12, 2025

# TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings, and Related Cases .................................................i

Table of Contents .................................................................................................iv

Table of Authorities ............................................................................................ vii

Glossary............................................................................................................. xiii

Jurisdictional Statement ........................................................................................1

Statement of Issues................................................................................................1

Statutes and Regulations ........................................................................................2

Introduction ..........................................................................................................2

Statement of the Case.............................................................................................5

I.      Section 404 state-assumption and Section 7 consultation provide a cohesive framework for resolving this case. ...................................................5

      A.      The Clean Water Act prescribes cooperative federalism via state assumption of Section 404 permitting.....................................................5

      B.      The Endangered Species Act provides a process for the Services to evaluate impacts from federal "actions" in "biological opinions" that also allow for "incidental take." ...................................7

      C.      In *Cooling Water*, the Second Circuit approves programmatic consultation for state-administered programs. ...................................10

II.     Fish & Wildlife issues a programmatic BiOp and incidental-take statement supporting EPA's approval of Florida's Section 404 program..............................................................................................11

III.    The district court vacates EPA's entire approval of the Section 404 program.................................................................................................15

Summary of Argument ...................................................................17

Standard of Review.......................................................................18

Argument.......................................................................................19

I.    The Court should vacate the judgment and dismiss for lack of standing. ................................................................................19

    A.    Standing poses a high hurdle when it depends on how regulated entities will act under federal oversight. ...............................19

    B.    Plaintiffs failed to demonstrate a cognizable procedural injury. ........21

II.    The district court erred by granting summary judgment on Plaintiffs' ESA claims attacking the BiOp and incidental-take statement.....................26

    A.    Fish & Wildlife's programmatic BiOp was lawful. ............................26

        1.    The BiOp complies with the ESA's text and regulations. ........26

        2.    The district court could not counter *Cooling Water*'s approval of a materially identical programmatic BiOp. ...........34

    B.    Fish & Wildlife's programmatic incidental-take statement did not violate the ESA...........................................................................38

        1.    The incidental-take statement complies with the ESA's text and regulations. .................................................................38

        2.    The district court could not counter *Cooling Water*'s approval of a similar programmatic incidental-take statement. ................................................................................43

    C.    The opinion below threatens cooperative federalism by placing Section 404 assumption out of step with the ESA. ............................46

        1.    The district court should have harmonized the ESA and CWA schemes—not set them on a collision course.................46

        2.    The district court's other suggestions for ESA compliance fall flat. .............................................................................47

III.    The district court erred by second-guessing EPA's findings on marine species.......................................................................................53

IV.     The district court erred by vacating the Florida Section 404 program in
        its entirety. ...................................................................................................55

Conclusion .........................................................................................................59

Certificate of Compliance ..................................................................................60

Certificate of Service ..........................................................................................60

TABLE OF AUTHORITIES*

**Page(s)**

**Cases**

*A.L. Pharma, Inc. v. Shalala*,
    62 F.3d 1484 (D.C. Cir. 1995) ............................................................. 58

*Allied-Signal, Inc. v. Nuclear Reg. Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) .............................................................. 56

*Arkansas v. Oklahoma*,
    503 U.S. 91 (1992) ................................................................................ 2

*Black Oak Energy, LLC v. FERC*,
    725 F.3d 230 (D.C. Cir. 2013) .............................................................. 56

*Calcutt v. Fed. Deposit Ins. Corp.*,
    598 U.S. 623 (2023) .............................................................................. 55

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017) .................................................................. 18

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
    698 F.3d 1101 (9th Cir. 2012) ................................................... 39, 43, 44

*Ctr. for Biological Diversity v. EPA*,
    861 F.3d 174 (D.C. Cir. 2017) .............................................................. 21

*Ctr. for L. & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005) ............................................................ 21

*City of Clarksville v. FERC*,
    888 F.3d 477 (D.C. Cir. 2018) .............................................................. 26

*City of Oberlin v. FERC*,
    937 F.3d 599 (D.C. Cir. 2019) .............................................................. 57

---

* Authorities upon which we chiefly rely are marked with asterisks.

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)................................................................20, 23

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ..............................................37, 48, 49

*Conserve Sw. Utah v. Dep't of Interior*,
    No. 1:21-cv-01506-ABJ, 2023 WL 7922785 (D.D.C. Nov. 16,
    2023) ....................................................................................56

*Cooling Water Intake Structure Coalition v. EPA*,
    905 F.3d 49 (2d Cir. 2018) ................................. 4, 10, 11, 34, 35, 36, 40, 43, 49

*Crow Creek Sioux Tribe v. Brownlee*,
    331 F.3d 912 (D.C. Cir. 2003)..................................................22

*Davis v. FEC*,
    554 U.S. 724 (2008)...............................................................25

*Defs. of Wildlife v. Dep't of Navy*,
    733 F.3d 1106 (11th Cir. 2013) ......................................27, 28, 34, 37

*El Puente v. Army Corps of Eng'rs*,
    100 F.4th 236 (D.C. Cir. 2024).................................................33

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018)...............................................................46

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024)...........................................................20, 23

*Fla. Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) (en banc)........................................24

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015)..............................................20, 25

*Forest Service Emps. for Envtl. Ethics v. U.S. Forest Service*,
    726 F. Supp. 2d 1195 (D. Mont. 2010)......................................37, 45

*Jicarilla Apache Nation v. Dep't of Interior*,
    613 F.3d 1112 (D.C. Cir. 2010).................................................19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................... 19

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
  551 U.S. 644 (2007) ..................................................................................... 7

*Nat'l Wildlife Fed'n v. Brownlee*,
  402 F. Supp. 2d 1 (D.D.C. 2005) ............................................................... 37

*N. Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) ................................................... 28, 33, 46, 47

*Oglala Sioux Tribe v. Nuclear Reg. Comm'n*,
  896 F.3d 520 (D.C. Cir. 2018) ................................................................... 58

*Or. Nat. Res. Council v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) ............................................................ 39, 43, 44

*Pub. Citizen, Inc. v. NHTSA*,
  489 F.3d 1279 (D.C. Cir. 2007) ................................................................. 24

*Sackett v. EPA*,
  598 U.S. 651 (2023) ..................................................................................... 47

*Shafer & Freeman Lakes Envtl. Conservation Corp. v. FERC*,
  992 F.3d 1071 (D.C. Cir. 2021) ................................................................. 58

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995) ....................................................................................... 34

*Sierra Club v. FERC*,
  827 F.3d 59 (D.C. Cir. 2016) ................................................................ 19, 20

*Standing Rock Sioux Tribe v. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021) ............................................................ 19, 55

*Texas v. United States*,
  798 F.3d 1108 (D.C. Cir. 2015) ................................................................. 55

*Union of Concerned Scientists v. Dep't of Energy*,
  998 F.3d 926 (D.C. Cir. 2021) ................................................................... 20

*U.S. Sugar Corp. v. EPA*,
844 F.3d 268 (D.C. Cir. 2016)............................................................56

*\*Waterkeeper All., Inc. v. Regan*,
41 F.4th 654 (D.C. Cir. 2022)...........................................19, 20, 23

*Weyerhaeuser Co. v. Fish & Wildlife Serv.*,
586 U.S. 9 (2018)..............................................................................27

*Wheaton Coll. v. Sebelius*,
703 F.3d 551 (D.C. Cir. 2012)..........................................................20

**Federal Statutes**

16 U.S.C. § 1531(b)-(c) ............................................................................7

16 U.S.C. § 1531(c)(2)..........................................................................7, 46

16 U.S.C. § 1532(19) .................................................................................7

16 U.S.C. § 1536(a)(2)..........................................7, 8, 27, 29, 39

16 U.S.C. § 1536(b)(3)(A).................................26, 28, 30, 36

16 U.S.C. § 1536(b)(4)..........................................................................8, 9

16 U.S.C. § 1536(b)(4)(C) ........................................................................52

16 U.S.C. § 1536(b)(4)(C)(i) ....................................................................38

16 U.S.C. § 1536(b)(4)(C)(ii) ...................................................................42

16 U.S.C. § 1538(a)(1)(B) ..........................................................................7

16 U.S.C. § 1539(a) ..................................................................................52

16 U.S.C. § 1539(a)(1)(B)....................................................................7, 52

33 U.S.C. § 1251(b) .............................................................................5, 46

33 U.S.C. § 1344(g)-(j) ..............................................................................5

33 U.S.C. § 1344(g)(1)................................................................................6

33 U.S.C. § 1344(h)(1)................................................................................5

x

33 U.S.C. § 1344(h)(1)(A)(i) ................................................6

33 U.S.C. § 1344(h)(3) ......................................................5

33 U.S.C. § 1344(h)(4) ......................................................6

33 U.S.C. § 1344(i) ..........................................................7

33 U.S.C. § 1344(j) ...................................................6, 22, 42

33 U.S.C. § 1344(n) ........................................................22

**State Constitution and Statutes**

Fla. Const. Art. II, § 7(a) ...................................................2

Fla. Stat. § 373.016 .......................................................11

Fla. Stat. § 403.021(2) .....................................................11

**Federal Regulations**

40 C.F.R. § 230.10(b)(3) ....................................................6

40 C.F.R. § 233, Subpart F ..................................................6

40 C.F.R. § 233.1(b) ....................................................50, 51

40 C.F.R. §§ 233.10-.14 ....................................................12

40 C.F.R. § 233.15(g) ........................................................5

40 C.F.R. § 233.50(b) ........................................................6

40 C.F.R. § 233.50(f)-(j) .....................................................6

50 C.F.R. § 402.01(b) ........................................................7

50 C.F.R. § 402.02 ........................................7, 10, 28, 29, 31, 32

50 C.F.R. § 402.03 ..........................................................7

50 C.F.R. § 402.14(c) ......................................................**35**

50 C.F.R. § 402.14(c)(4) ....................................................10

50 C.F.R. § 402.14(f) ........................................................................29

50 C.F.R. § 402.14(g) ......................................................................26

50 C.F.R. § 402.14(h)(2) ....................................................................8

50 C.F.R. § 402.14(i)(1)(i) ..........................................................38, 44

50 C.F.R. § 402.14(i)(5) ...................................................................40

50 C.F.R. § 402.14(i)(6) ...................................................................45

50 C.F.R. § 402.14(i)(7) ...................................................................31

50 C.F.R. § 402.16 ...........................................................................41

50 C.F.R. § 402.16(a) .......................................................................40

## Other Authorities

80 Fed. Reg. 26,832 (May 11, 2015) .............................10, 31, 32, 33, 36

85 Fed. Reg. 57,853 (Sept. 16, 2020) ...............................................12

85 Fed. Reg. 83,553 (Dec. 22, 2020) ................................................15

H.R. Rep. No. 95-830 (1977), 1977 U.S.C.C.A.N. 4424 .........................5

H.R. Rep. No. 97-567 (1982), 1982 U.S.C.C.A.N. 2807 ...................39, 40

**GLOSSARY**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BiOp | Biological Opinion |
| CWA | Clean Water Act |
| Corps | U.S. Army Corps of Engineers |
| EPA | United States Environmental Protection Agency |
| ESA | Endangered Species Act |
| Federal Defendants | EPA, Fish & Wildlife, the Corps, and other named federal officials |
| Florida | State of Florida and Florida Department of Environmental Protection |
| FDEP | Florida Department of Environmental Protection |
| Fish & Wildlife | United States Fish and Wildlife Service |
| Marine Fisheries | National Marine Fisheries Service |
| Plaintiffs | Center for Biological Diversity, Defenders of Wildlife, the Sierra Club, the Conservancy of Southwest Florida, Florida Wildlife Federation, Miami Waterkeeper, and St. Johns Riverkeeper |
| Section 7 | Section 7 of the ESA, 16 U.S.C. § 1536 |
| Section 10 | Section 10 of the ESA, 16 U.S.C. § 1539 |
| Section 404 | Section 404 of the CWA, 33 U.S.C. § 1344 |
| Services | Fish & Wildlife and Marine Fisheries |

xiii

## JURISDICTIONAL STATEMENT

Plaintiffs brought claims under the Administrative Procedure Act, Endangered Species Act, and Clean Water Act, invoking jurisdiction under 28 U.S.C. §§ 1331 and 1361.  The district court lacked jurisdiction because Plaintiffs lack Article III standing.  This Court has appellate jurisdiction under 28 U.S.C. § 1291 because the district court entered partial final judgment under Rule 54(b) as to Counts 1-6 and 8-13 of Plaintiffs' Amended Complaint, Dkt.184, and Florida timely appealed, Dkt.185.

## STATEMENT OF ISSUES

1.    Whether Plaintiffs' purported harms, which rely on a series of hypothetical future failures by both Florida and federal agencies to properly administer a joint federal-state program, are "so clearly impending" to establish Article III standing.

2.    Whether the district court erred in holding that Fish & Wildlife's programmatic BiOp and incidental-take statement and EPA's reliance on those documents were unlawful.

3.    Whether the district court erred in rejecting the scientific finding by EPA and Marine Fisheries that approval of Florida's Section 404 program for non-marine waters would have "no effect" on listed marine species.

4.    Whether the district court erred by vacating Florida's entire Section 404

program and inflicting substantial disruption on Florida and its residents, where any alleged deficiencies could be cured.

**STATUTES AND REGULATIONS**

The Addendum to this brief contains the relevant statutes and regulations.

**INTRODUCTION**

As one of the most ecologically diverse States in the Union, Florida teems with lakes, streams, and wetlands containing innumerable species of fish and wildlife. To "conserve and protect [these] natural resources and scenic beauty," Florida's Constitution requires the State to make "adequate provision … for the conservation and protection of natural resources." Fla. Const. Art. II, § 7(a). From its world-famous Everglades to the Panhandle, Florida's wetlands are a treasured and protected resource. Accordingly, Florida has long required state-issued permits for dredging (excavating from) and filling (depositing in) wetlands or waters in the State.

Enter the federal Clean Water Act ("CWA"), which creates a wetlands permit program under Section 404 for dredging and filling the Nation's surface waters. In the spirit of cooperative federalism, the CWA "anticipates a partnership between the States and the Federal Government, animated by a shared objective: 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (quoting 33 U.S.C. § 1251(a)).

2

Congress thus envisioned that States would run Section 404 programs with approval and oversight from the federal government.

To that end, Florida built its own Section 404 program. It met all environmental-protection requirements while also reducing inefficiencies associated with separate (yet overlapping) federal and state wetlands-permit programs. EPA approved the program in 2020, and Florida processed thousands of permit applications over the ensuing three years under EPA oversight.

The path to EPA's approval required consultation with federal agencies over the program's effect on listed species and critical habitats under Section 7 of the Endangered Species Act ("ESA"). This case is about that consultation.

Because the Section 7 "action" here involved approval of a comprehensive permitting program, the federal agencies engaged in a "programmatic" consultation, as they had done in other similar contexts. The agencies surveyed Florida's species landscape and evaluated whether Florida's new program—with close federal coordination—would prevent effects that are likely to jeopardize species' continued existence or adversely modify critical habitat. A key feature of the program is a binding "technical-assistance process" whereby federal and state agencies collaborate during the permitting process to evaluate each project's effects on listed species. The Services' programmatic consultation—which accounted for future permitting protections—mirrored one the federal government has used and defended

3

over the last three administrations and that the Second Circuit approved in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2018).

The district court nevertheless concluded that EPA, Fish & Wildlife, Florida, and the Second Circuit have misunderstood the ESA all along. It held that the federal agencies needed to front-load the species-review process by divining where and when dredging and filling might occur across the State, guess how those hypothetical activities would affect over 130 listed species, and estimate those effects at a permit- and species-specific level *before* EPA could approve the program within the statutory 120-day approval deadline. How the agencies would complete such a Herculean task is a mystery, but the result is clear: State-run wetlands permit programs become extinct, along with the cooperative-federalism principles they embody.

In vacating Florida's program, the district court's opinion veers from Article III jurisprudence by finding Plaintiffs had standing to assert conjectural, attenuated harms that presuppose a failure of federal oversight. It engrafts rigid, atextual constraints on the Section 7 consultation process. And it second-guesses agencies on scientific determinations deserving deference, bucking settled law.

This Court should reverse the judgment vacating Florida's program approval, lest Congress's promise of cooperative federalism in this context be rendered illusory.

**STATEMENT OF THE CASE**

**I.    Section 404 state-assumption and Section 7 consultation provide a cohesive framework for resolving this case.**

**A.    The Clean Water Act prescribes cooperative federalism via state assumption of Section 404 permitting.**

By default, the EPA and Army Corps of Engineers administer the CWA Section 402 program for pollutant discharges and Section 404 program for dredging and filling of wetlands, respectively.  33 U.S.C. §§ 1342(a)(2), 1344(a).[1]  But the CWA declares that "[i]t is the policy of Congress that the *States* ... implement the[se] permit programs."  *Id.* § 1251(b) (emphasis added).  Hence, Congress amended the CWA in 1977 to establish a process for States seeking EPA's approval to administer "State [404] program[s] ... established under State law" to "function[] in lieu of the Federal program," H.R. Rep. No. 95-830, at 104 (1977), 1977 U.S.C.C.A.N. 4424, 4479; 33 U.S.C. § 1344(g)-(j), as it had done earlier for the 402 program, 33 U.S.C. § 1342(b)-(d).

EPA has just 120 days upon receiving a State's complete assumption application to "approve or disapprove" the State's program, after evaluating certain statutory criteria.  40 C.F.R. § 233.15(g); 33 U.S.C. § 1344(h)(1).  If EPA does not act within that period, the assumption request is "deemed approved."  33 U.S.C. § 1344(h)(3).

---

[1] Unless otherwise indicated, statutory and regulatory citations in this brief are to provisions in place when EPA approved Florida's Section 404 program.

Upon EPA's approval, the Corps must "transfer" pending permit "applications for … activities" that fall under the new State program. *Id.* § 1344(h)(4). Section 404 assumptions extend only to non-tidal waters (known as "assumed waters"), while tidal waters and their adjacent wetlands (known as "retained waters") remain under the Corps' permitting authority. *Id.* § 1344(g)(1).

Even for assumed waters, however, federal oversight persists on a permit-by-permit and program-level basis. *Id.* § 1344(h); 40 C.F.R. § 233, Subpart F. EPA must review "permits proposed to be issued by such State" and solicit comments from other federal agencies—including the Services, which administer the ESA—in deciding whether to "comment, object or to require permit conditions" vis-à-vis each application. 33 U.S.C. § 1344(j); 40 C.F.R. § 233.50(b). EPA must "assure compliance with" the "guidelines established under subsection (b)(1)." 33 U.S.C. § 1344(h)(1)(A)(i). These "404(b)(1) Guidelines" prohibit, among other things, actions that "[j]eopardize[] the continued existence of [listed] species" or "result[] in likelihood of the destruction or adverse modification of [designated critical] habitat." 40 C.F.R. § 230.10(b)(3).

If EPA objects to a permit because it would violate these guidelines, the State must deny the permit or adopt EPA's changes; otherwise, authority to issue that permit reverts to the Corps (colloquially referred to as "federalizing" a permit). 33 U.S.C. § 1344(j); 40 C.F.R. § 233.50(f)-(j). EPA may also seek to withdraw

approval of the entire State program if it determines the State "is not administering" the program "in accordance with" the CWA.  33 U.S.C. § 1344(i).

### B. The Endangered Species Act provides a process for the Services to evaluate impacts from federal "actions" in "biological opinions" that also allow for "incidental take."

The ESA, enacted in 1973, seeks to "conserve" listed species and their habitats.  16 U.S.C. § 1531(b)-(c).  Fish & Wildlife administers the ESA for all listed species except for certain marine species within the purview of Marine Fisheries.  50 C.F.R. § 402.01(b).  The ESA—like the CWA—requires "federal agencies [to] *cooperate with [s]tate and local agencies* to resolve *water resource issues* in concert with conservation of endangered species."   16 U.S.C. § 1531(c)(2) (emphases added).

ESA Section 9 generally prohibits the "take" of protected species—that is, actions that "harass," "harm," or similarly affect such species.  *Id.* §§ 1532(19), 1538(a)(1)(B).  But a take that is "incidental" to—*i.e.*, "not the purpose of," 50 C.F.R. § 402.02—lawful activity can become exempt under the processes laid out in Sections 7 or 10.  16 U.S.C. §§ 1536(a)(2), 1539(a)(1)(B).

Section 7 applies to federal "agency actions," so long as the "actions [are ones] in which there is discretionary Federal involvement or control."   16 U.S.C. § 1536(a)(2) (first quote); 50 C.F.R. § 402.03 (second quote); *see Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 671-73 (2007).  Once triggered,

7

Section 7(a)(2) requires the "action agency" to "consult[]" with the relevant Services to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize" listed species or critical habitat.   16 U.S.C. § 1536(a)(2). Congress established that consultation process in a 1982 ESA amendment, Pub. L. 97-304, and the Services added details through regulations found at 50 C.F.R. Part 402.   Federal Defendants' opening brief describes the ESA procedures for consultation, which requires preparation of a Biological Opinion (or "BiOp") for actions likely to adversely affect listed species or critical habitat.

Importantly, if the BiOp determines the proposed action is likely to "jeopardize the continued existence of" listed species or adversely modify critical habitat, the Services "shall include reasonable and prudent alternatives" to the proposed action or indicate that "there are [none]."  50 C.F.R. § 402.14(h)(2).  If the BiOp finds no jeopardy but concludes that incidental take is reasonably certain, the Services "shall provide" an incidental-take statement specifying, among other things, the impact of incidental take on the species, measures necessary to minimize that impact, and terms and conditions to implement such measures.   16 U.S.C. § 1536(b)(4).  Section 7(o) broadly provides that "any taking that is in compliance with the terms and conditions specified in" an incidental-take statement "shall not be considered to be a prohibited taking of the species concerned."  *Id.* § 1536(o)(2). This protection applies not just to "the Federal Agency" itself, but also to the non-

federal "applicant concerned, if any." *Id.* § 1536(b)(4).  The formal-consultation process flows like this:



Dkt.112-1 at 259, JA.2011.

C.    In *Cooling Water*, the Second Circuit approves programmatic consultation for state-administered programs.

Because "agency action" triggering Section 7 includes "programs," and because the "effects" of programs can be far-ranging and shaped by future events, the Services provide for the use of "programmatic consultation[s]."  50 C.F.R. §§ 402.02, 402.14(c)(4); *see infra* 31-32 (discussing the three types of programmatic consultations).  Such consultations result in "broad-scale examination of a program's potential impacts" rather than seriatim consultations for each particular decision carried out under the program.  80 Fed. Reg. 26,832, 26,836 (May 11, 2015).

The Services use programmatic Section 7 consultations to approve programs involving future state-issued permits.  The most prominent example concerns EPA's 2014 nationwide program setting standards for "cooling water intake structures"—*i.e.*, structures that draw water into power plants and manufacturing facilities, threatening species within those waters.  *Cooling Water*, 905 F.3d at 58-59.  Forty-seven States issue permits for such structures under delegated Section 402 authority. *Id.*  Given the program's breadth and the fact that "individual [state] permits" would not receive separate Section 7 consultations "because the issuance of such a permit is not a federal action," EPA and the Services engaged in a program-level consultation.  *Id.* at 73 n.15.

The Services issued a "programmatic" no-jeopardy BiOp and incidental-take statement covering program participants—*i.e.*, the States and individual permit

10

recipients. *Id.* at 62-63. "Critical to the Services' no-jeopardy conclusion[s]" was a binding "technical assistance process" built into EPA's program, which "g[ave] the Services a meaningful opportunity to review permit applications and to recommend control measures and requirements for monitoring and reporting." *Id.* at 71-73, 77.[2]

EPA's consultation drew challenges from environmental petitioners (including certain Plaintiffs here). *Id.* at 63-64 & n.7. As discussed below, the Second Circuit unanimously rejected those "challenges to the Services' 'programmatic' approach" and expressly approved the Services' reliance on "the protections of the technical assistance process." *Id.* at 71-78; *infra* 34-36, 43-44.

## II.     Fish & Wildlife issues a programmatic BiOp and incidental-take statement supporting EPA's approval of Florida's Section 404 program.

The "public policy of [Florida is] to conserve the waters of the state," Fla. Stat. § 403.021(2), and "to provide for the management of water and related land resources," *id.* § 373.016(3)(a). Consistent with that policy, Florida sought to become the third State (after New Jersey and Michigan) to assume its own Section 404 permit program. Beginning in 2018, Florida developed its Section 404 program application by enacting statutes, promulgating regulations, obtaining legislative appropriations, entering cooperative agreements with federal agencies, and hiring

---

[2] In 1996, Fish & Wildlife used a similar programmatic BiOp and incidental-take statement approach for the Interior Department's program governing state-issued surface-mining permits. *See* Dkt.42-3 at 1-15, *Nat'l Parks Conservation Ass'n v. Kempthorne*, No. 1:09-CV-00115-BJR (D.D.C. July 17, 2013).

and training staff to administer the program. Dkt.112-3 at 21-22, JA.2219-20 (timeline of key events).

Florida, EPA, and Fish & Wildlife cooperated throughout the application process on species-related concerns:

- In December 2019, EPA began informal consultation with the Services on Florida's Section 404 program. Dkt.56-1 at 669-71, JA.2190-92.

- In July 2020, Florida submitted a Biological Assessment for EPA's review. *Id.* at 66-364, JA.1709-2007.

- In August 2020, Florida filed a complete application with EPA, satisfying all elements of 40 C.F.R. §§ 233.10-.14. Dkt.52 at 82-143, JA.1494-1555; Dkt.56-1 at 684-85, JA.2198-99. EPA solicited public comments on Florida's application. Dkt.56-1 at 437-549, JA.2061-2173; 85 Fed. Reg. 57,853, 57,853 (Sept. 16, 2020).

- In September 2020, EPA submitted its Biological Evaluation to Fish & Wildlife and initiated formal consultation. Dkt.112-3 at 2-298, JA.2200-2496.

- In November 2020, Fish & Wildlife issued a final Programmatic BiOp that independently analyzed and "formally adopt[ed]" the Biological Evaluation. Dkt.56-1 at 702-03, JA.2607-08.

The BiOp included a detailed discussion of the listed species and critical habitats in Florida, adopting the Biological Evaluation's assessment of 235 specific species and "the baseline for 404 permitting in Florida and its past and ongoing effects on ESA-listed and considered species." Dkt.56-1 at 742-50, JA.2647-55; Dkt.112-3 at 54-73, 124-204, JA.2252-71, JA.2322-2402. The BiOp also detailed the "effects of the action," including its "cumulative effects," and adopted the

12

Biological Evaluation's assessment of "major stressors associated with the proposed action" and "effects of the action" for specific ESA-listed species. Dkt.56-1 at 750-61, JA.2655-66; Dkt.112-3 at 73-88, 227-78, JA.2271-86, JA.2425-84.

At the same time, the BiOp recognized that approving Florida's program would lead to "a broad array of activities conducted over several geographic areas and long periods of time," creating "substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities." Dkt.56-1 at 739, JA.2644. That made "[a] detailed analysis of potential effects in the future ... not possible, because ... the exact locations, amounts, and types of impacts are not yet known" on a site- and species-specific basis. *Id.* at 753, JA.2658.

The agencies, therefore, structured the consultation as a "programmatic consultation" modeled after *Cooling Water*. That allowed Fish & Wildlife to assess "whether and to what degree [Florida]'s program, regulations, processes and procedures insure that EPA's approval and [Florida]'s subsequent assumption and implementation of the 404 program is not likely to jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of critical habitat." *Id.* at 703, JA.2608.

Specifically, Fish & Wildlife's BiOp relied heavily on a technical-assistance process—evidenced by agreements between Florida, Fish & Wildlife, and EPA—requiring that:

13

- Florida's program "utilize[] the [Fish & Wildlife]-approved permitting guidance that is currently used by the [Corps], to ensure consistency with CWA and ESA requirements";

- Fish & Wildlife receive *all* Florida 404 permit applications for a species- and site-specific review on a "project-by-project" basis; and

- Florida "incorporate as permit conditions all recommended impact avoidance and minimization measures ... provided by [Fish & Wildlife]" through the technical-assistance process, as all such federal recommendations would be "determinative."

*Id.* at 716, 764, JA.2621, JA.2669. This technical-assistance process would "afford[] [Fish & Wildlife] the opportunity to appropriately evaluate project effects on a project-specific and species-specific basis" and impose appropriate "measures [that] will ensure that each permit will minimize adverse effects and thereby avoid jeopardy to ESA-listed species." *Id.* at 766, JA.2671. In light of that "sufficiently structured process," the BiOp determined that Florida's program was not likely to jeopardize listed species or adversely modify critical habitat. *Id.* at 764, JA.2669. But the opinion was careful to note that, if any of the "key assumptions" about how the technical-assistance process would function "prove[d] incorrect," it could "trigger re-initiation of ESA section 7 consultation." *Id.* at 751, JA.2656.

Because implementation of Florida's permit program would be "reasonably certain" to result in incidental take, the BiOp also included an incidental-take statement. *Id.* at 765, JA.2670. Again, however, the "large scale and broad scope of the proposed action" meant that "the best scientific and commercial data available

14

[we]re not sufficient to enable [Fish & Wildlife] to accurately estimate the specific amount of incidental take" at the time of the BiOp. *Id.* at 766, JA.2671. Instead, "the amount or extent of incidental take w[ould] be quantified" by Fish & Wildlife through the technical-assistance process on a "project-specific and site-specific basis," with the "levels of take" under the program tracked by Fish & Wildlife on an ongoing basis. *Id.*

In December 2020, EPA approved Florida's program. Dkt.56-1 at 435-36, JA.2059-60; 85 Fed. Reg. 83,553 (Dec. 22, 2020). Over the next three years, Florida processed thousands of permit applications, issued over 700 individual permits, and denied over 300 applications, all under continuous, permit-by-permit federal oversight. Doc. #2051487 at Ex. P ¶ 15. Florida also routinely revised permits and accepted Fish & Wildlife's proposed mitigation recommendations, consistent with the technical-assistance process. *Id.* ¶¶ 48-58.

## III. The district court vacates EPA's entire approval of the Section 404 program.

Plaintiffs sued Federal Defendants, challenging EPA's approval of Florida's program and the Section 7 consultation that supported it. Dkt.1. Florida intervened to defend its program, Dkt.4, and Plaintiffs eventually filed their Amended Complaint, bringing claims under the APA, CWA, ESA, and Rivers and Harbors Act, Dkt.77. During the ensuing litigation, the district court issued rulings resolving 12 of Plaintiffs' 13 claims.

Most relevant here, the district court granted summary judgment for Plaintiffs on their ESA claims. Dkt.182 at 7, JA.1290. It rejected Florida's challenge to Plaintiffs' standing, concluding that Plaintiffs had suffered a "procedural injury." *Id.* at 38-51, JA.1321-34. On the merits, the district court concluded that the agencies acted unlawfully because (1) Fish & Wildlife's programmatic BiOp failed to "engage in the detailed, species-specific analysis necessary" to satisfy Section 7, (2) the incidental-take statement did not adequately quantify take or otherwise satisfy Section 7, and (3) EPA failed to consult with Marine Fisheries. *Id.* at 61, 70, JA.1344, JA.1353. The district court expressly rejected the Second Circuit's unanimous decision in *Cooling Water*. Dkt.182 at 67, JA.1350. And it vacated EPA's entire approval of Florida's program, while inviting Florida to seek a limited stay of that vacatur. *Id.* at 89-97, JA.1372-80.

The district court then amended its summary-judgment opinion, issuing the same substantive relief on Plaintiffs' ESA claims but correcting factual and legal mistakes about Michigan's and New Jersey's Section 404 programs in relation to Florida's program. Dkt.182; Dkt.183 at 9 n.2, JA.1390.[3]

Finally, the district court denied Florida's motion for a limited stay of vacatur but granted Florida's motion for entry of a partial final judgment under Rule 54(b)

---

[3] Unless indicated otherwise, the "opinion" discussed in this brief will refer to this amended summary-judgment opinion, issued on April 12, 2024.

on all but one of Plaintiffs' claims.  Dkt.183.  The district court dismissed as "prudentially moot" Plaintiffs' claims involving "EPA's decision-making process leading up to its decision to approve Florida's Section 404 assumption application," but left pending Plaintiffs' claim under the Rivers and Harbors Act challenging the Corps' retained-waters list.  *Id.* at 1, 18, 21, JA.1382, JA.1399, JA.1402.

Florida timely appealed.  Dkt.185.

## SUMMARY OF ARGUMENT

Plaintiffs' claims are non-justiciable because they have not established actual or imminent injury from EPA's approval of Florida's Section 404 program.  While Florida has "primary" responsibility for administering Section 404 permits in assumed waters, substantial federal oversight remains on a permit-by-permit and programmatic basis.  Plaintiffs are no worse off.  Their purported "harms" require pessimistic guesswork about Florida's program and federal oversight.

On the merits, the district court's erroneous rejection of programmatic consultation in this cooperative federal-state context infected its whole analysis. *Cooling Water* correctly held that a programmatic consultation—identical to the one here—is appropriate where a federal action authorizes state permitting under close federal oversight.  That result is consistent with Section 7's flexible text and longstanding regulation and practice.  Nonetheless, the district court invalidated a BiOp conditioned on a technical-assistance process that is *more* protective than the

Corps' default Section 404 oversight.  It cast aside an incidental-take statement properly adapted to program-wide approval.  And it erected a rigid requirement of upfront, species-specific analysis that precludes EPA from approving *any* Section 404 program in a species-rich state like Florida.  The judgment below flouts the ESA's text, regulations, and Congress's promise of cooperative federalism.

The district court erred further by second-guessing EPA's decision not to formally consult with Marine Fisheries.  Contrary to the district court's view, the administrative record shows that EPA did, in fact, consider indirect impacts to listed marine species occurring beyond assumed waters.  EPA reasonably concluded that approval of Florida's program would have "no effect" on that relatively small set of marine species—a conclusion supported by Marine Fisheries.  Formal consultation for marine species was, therefore, not required.

Finally, even if the federal agencies' programmatic consultation were deficient in any respect, remand—not the district court's disruptive vacatur of an entire three-year-old state program—would be the appropriate remedy.

## STANDARD OF REVIEW

The Court evaluates standing *de novo*. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017).

The Court reviews a summary judgment involving the validity of agency action "*de novo*, applying the familiar APA standard, which requires [the Court] to

set aside agency action that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Jicarilla Apache Nation v. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010) (quoting 5 U.S.C. § 706(2)(A)). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Court reviews the district court's vacatur determination for abuse of discretion. *Standing Rock Sioux Tribe v. Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021).

## ARGUMENT

## I.    The Court should vacate the judgment and dismiss for lack of standing.

For standing, Plaintiffs had to establish—with evidence—that, at the time of the complaint, EPA's approval of Florida's 404 program caused Plaintiffs harm that this Court can redress. They failed to clear that bar.

### A.    Standing poses a high hurdle when it depends on how regulated entities will act under federal oversight.

Associational standing, as advanced here, requires that at least one of Plaintiffs' members (1) has suffered an "injury-in-fact" that is (2) "fairly traceable to the challenged action" and (3) a favorable decision will "likely" redress that injury. *Sierra Club v. FERC*, 827 F.3d 59, 65 (D.C. Cir. 2016) (citation omitted). Standing is a "claim-specific inquiry," *Waterkeeper All., Inc. v. Regan*, 41 F.4th 654,

660 (D.C. Cir. 2022), based on the facts that existed "at the time of filing," *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012).

The "injury" must be "'concrete and particularized and actual or imminent, not conjectural or hypothetical." *Sierra Club*, 827 F.3d at 65 (internal quotation marks omitted). Where the injury alleged has not yet occurred, the injury must be "*certainly impending*" to confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). The bar is even higher where the injury alleged is an increased risk of harm, for the plaintiff must show "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015).

The causation element similarly asks whether "it [is] likely that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff[.]" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 385 n.2 (2024) ("*AHM*"). Causation is "substantially more difficult to establish" when it "hinge[s] on the response of the regulated (or regulable) third party to the government action or inaction." *Waterkeeper All.*, 41 F.4th at 660 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). This Court "has been reluctant to find standing based on predictions of how agencies will exercise discretion in future proceedings." *Union of Concerned Scientists v. Dep't of Energy*, 998 F.3d 926, 930 (D.C. Cir. 2021).

**B.    Plaintiffs failed to demonstrate a cognizable procedural injury.**

For alleged "procedural" injuries, although the immediacy and redressability requirements are somewhat relaxed, *Ctr. for L. & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005), the injury-in-fact requirement remains "a hard floor of Article III jurisdiction that cannot be altered by statute," *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 183 (D.C. Cir. 2017).   The causation requirement remains demanding, too: "Establishing causation in the context of a procedural injury requires a showing of two causal links: 'one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury.'"   *Id.* at 184 (citation omitted).

The district court accepted Plaintiffs' proposed procedural injuries, concluding that they had an interest in "minimizing the loss of listed species in [Florida]" and that EPA's alleged failure to lawfully consult under Section 7 harmed those interests.  Dkt.182 at 39-42, JA.1322-25.[4]   That conclusion ignores federal oversight of Florida's program, relies on a tenuous causal chain, and rests on an improper and disconnected showing of harm.

---

[4] Despite relying on a standing theory based on purported "informational injur[ies]" in one of its earlier opinions, Dkt.73 at 21, JA.75, the district court correctly declined to rely on these injuries in entering summary judgment, Dkt.182 at 40 n.9, JA.1323.

1.    In *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912 (D.C. Cir. 2003), this Court held that plaintiffs lacked standing when they alleged that a *transfer* of regulatory authority from federal to state actors injured them, despite the federal government maintaining enforcement and oversight authority.  There, the Corps transferred lands to South Dakota.  *Id.* at 913.  A tribe argued the transfer made it less likely that federal agencies would effectively enforce federal cultural-protection statutes on the transferred lands.  *Id.*  But the statute requiring the land transfer explicitly provided that federal cultural-protection statutes would remain applicable. *Id*. at 917.  This Court held that any claimed injury was too "speculative and hypothetical" to establish standing.  *Id.* at 918.  Where a statute provides that the federal government "will have an ongoing and undiluted enforcement role," concerns about reduced enforcement were simply "unsupported conjecture" that do not satisfy Article III.  *Id.* at 917.

Florida invoked *Crow Creek* below, Dkt.102 at 38, JA.778; Dkt.107 at 17-19, JA.1022-24, but the district court never addressed it.  That was error because, just as in *Crow Creek*, federal agencies maintain an "ongoing and undiluted enforcement role" in Florida's Section 404 program—not just at the program level, but also on a permit-by-permit basis.   331 F.3d at 917; *see* 33 U.S.C. § 1344(j), (n).  Such oversight runs on several tracks, through:

- EPA's obligation to oversee implementation of state programs and withdraw approval of non-compliant programs;

- EPA's permit-specific obligation to ensure permits do not jeopardize listed species;

- the binding technical-assistance process that ensures permits meet federal standards and protect species; and

- Fish & Wildlife's permit-by-permit review and recommendations on species impacts and take limits, which are "determinative" on Florida.

*Supra* 11-15. This extensive overlay of federal involvement on a program-wide and permit-specific basis reveals Plaintiffs' asserted injuries are merely unsupported conjecture, which cannot establish an Article III injury. *See AHM*, 602 U.S. at 390 ("[T]he broad and comprehensive conscience protections guaranteed by federal law" "break[] any chain of causation between FDA's [actions] and any asserted conscience injuries to the doctors.").

2.  Standing cannot rest on hypothetical, too-tenuous causal chains. *Clapper*, 568 U.S. at 409. Article III's "causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs"—and "attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *AHM*, 602 U.S. at 383. In *Waterkeeper*, which the district court also ignored, plaintiffs challenged EPA's approval of Oklahoma's coal-ash permit program, complaining that the program would allow permittees to violate federal standards. 41 F.4th at 659. This Court *sua sponte* dismissed for lack of standing, concluding

23

that the "causal chain" between the claim and the injury was too tenuous. *Id.* at 659-60, 663 (cataloguing four necessary conditions between claim and injury).

Plaintiffs here likewise must—but cannot—establish a "substantial probability," *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1297 n.3 (D.C. Cir. 2007), that a number of dominoes will fall to connect EPA's approval of Florida's program to their purported injuries: (1) Florida proposes to issue a 404 permit that would harm Plaintiffs, so Plaintiffs submit comments; (2) EPA cannot convince Florida to resolve the issue; (3) EPA neither objects to nor federalizes the permit; (4) Florida issues the permit without addressing the public's or EPA's concerns; (5) Plaintiffs file and lose both administrative and judicial challenges in state tribunals; and (6) the project proceeds and *actually* harms Plaintiffs' cognizable interests. *See* Dkt.107 at 16-17, JA.1021-22; Dkt.127-2 at 3, JA.1068 (graphic depiction of this causal chain). Keep in mind: Plaintiffs must do all that without even knowing *where* a given project will take place, or when, or how. *Cf. Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) (en banc) ("The greater number of uncertain links in a causal chain, the less likely it is that the entire chain will hold true.").

3.     Attempting to address this attenuation, Plaintiffs identified *two* permits—out of the thousands processed by Florida over three-plus years—in which Florida purportedly failed to incorporate the federal agency's objections. *See* Dkt.182 at 42-43, JA.1325-26.     Reliance on those examples violates *another*

24

axiomatic Article III requirement:   Standing "focuse[s] on whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (emphasis added).  The district court erred by skirting this principle and accepting Plaintiffs' view that "the technical assistance process *has proven inadequate*."  Dkt.182 at 42-43, JA.1325-26 (emphasis added).

Timing aside, Plaintiffs' anecdotal critiques of select permits are not attributable to the purported procedural violations in this case—*i.e.*, the *manner* in which Fish & Wildlife's Section 7 consultation was structured.  After all, Fish & Wildlife's no-jeopardy finding (and EPA's approval) was made contingent on the technical-assistance process and Florida's agreement with Fish & Wildlife that all federal recommendations would be "determinative."  *Supra* 13-14.  An allegation that Florida deviated from that process in isolated instances *after the lawsuit was filed* cannot substitute for proof that the *processes* governing Fish & Wildlife's consultation or the terms of Florida's program approval "*both* (i) … *substantially* increased [the] risk of harm and (ii) [created] a *substantial* probability of harm with that increase taken into account." *Food & Water Watch*, 808 F.3d at 914.  Plaintiffs fail to draw that connection, so their tenuous theory must fail.

## II.    The district court erred by granting summary judgment on Plaintiffs' ESA claims attacking the BiOp and incidental-take statement.

### A.    Fish & Wildlife's programmatic BiOp was lawful.

The district court's effort to recast the flexible Section 7 process into a rigid, one-way avenue finds no foothold in the statutory and regulatory text.  Nor does that approach square with *Cooling Water* or the ESA authority the district court invoked.

### 1.    The BiOp complies with the ESA's text and regulations.

"In addressing a question of statutory interpretation, we begin with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018).  A BiOp must "detail[] how the agency action affects the species or its critical habitat," 16 U.S.C. § 1536(b)(3)(A), and take account of the "environmental baseline" for listed species, along with the "effects" and "cumulative effects" on those species resulting from the action, 50 C.F.R. § 402.14(g).  The dispute below hinged on *how exactly* Fish & Wildlife must go about conducting that analysis on a "species-specific" basis—a term that appears 34 times in the district court's opinion yet *never* in the ESA or its implementing regulations.

The district court's bottom-line conclusion was that "even if the BiOp adequately addressed the environmental *baseline*,[5] there is no dispute that it fails

---

[5] Fish & Wildlife *did* engage in a species-specific analysis of the environmental baseline.  *Compare* Dkt.56-1 at 742-61, JA.2647-66; Dkt.112-3 at 54-73, 124-204, JA.2252-71, JA.2322-2402; *supra* 12-13, *with* Dkt.182 at 31, 58, JA.1314, JA.1341

to consider any species-specific effects or the cumulative effects of the EPA's action." Dkt.182 at 60, JA.1343. In the district court's view, the BiOp's program-level evaluation of the technical-assistance process did not satisfy Section 7, no matter how "arguably similar" it was to the process the district court envisioned. *Id.* at 62, JA.1345.

That was wrong on multiple levels. The district court misconstrued the plain text and context of the ESA. It misunderstood the type of programmatic consultation the agencies undertook here. And it inverted the presumption that agencies may operate within flexible statutory text.

a.    The ESA's provisions and implementing regulations "cannot be construed in a vacuum" and must instead be read in their "statutory context." *Weyerhaeuser Co. v. Fish & Wildlife Serv.*, 586 U.S. 9, 20 (2018). Doing so debunks the view that a BiOp must granularly delineate—at the outset—all species-specific effects from a programmatic action.

Start with Section 7(a)(2)'s basic command that consultation must "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize" listed species. 16 U.S.C. § 1536(a)(2). That language is purposefully broad, as Congress did "not require that consultation under the act take place in any

---

(district court erroneously stating that Fish & Wildlife "failed to undertake *any* species-specific analysis").

particular manner" and instead gave leeway to "*the agencies* to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate." *Defs. of Wildlife v. Dep't of Navy*, 733 F.3d 1106, 1121 (11th Cir. 2013) (emphasis added). Fish & Wildlife applied its expertise to that question and reasonably determined that a one-time, programmatic consultation and ongoing technical-assistance process is appropriate for insuring no jeopardy from programmatic actions approving countless future *state* activities that are not themselves subject to separate Section 7 consultations. *Supra* 13-14.

A BiOp simply must "detail[] how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). But neither the ESA nor its regulations dictate the level of granularity with which innumerable permutations of future effects must be detailed—much less preclude Fish & Wildlife from analyzing the effects of a program through the lens of a mandatory technical-assistance process designed to minimize impacts on a project-specific basis. That is so for three textual reasons.

First, the breadth of the federal "action" necessarily drives the appropriate level of detail for an effects analysis. *See N. Slope Borough v. Andrus*, 642 F.2d 589, 608 (D.C. Cir. 1980) (observing that consultation "would naturally differ depending on the scope of 'agency action' to which ESA 'consultation' will refer"). The Services defined an "action" broadly to encompass "all activities or *programs*

28

*of any kind.*"  50 C.F.R. § 402.02 (emphasis added).  The relevant "action" here is EPA's approval of the entire Florida permit program.  Nothing in the statute suggests that, in analyzing the effects of that "action" on listed species, Fish & Wildlife was required to undertake a granular analysis of the species effects of each state permit that might be approved in the future. That would be an impossible task.

Second, the level of specificity necessarily depends on "the best scientific and commercial data *available*."  16 U.S.C. § 1536(a)(2) (emphasis added); 50 C.F.R. § 402.14(f).  For many consultations, adequate scientific data will exist to outline species- and site-specific effects in the manner the district court posited (take, for example, the Corps' construction of a new dam).  But as Fish & Wildlife reasonably concluded here, the same granularity of information is simply not *available* for a program approval like this one, as the nature and location of future permit actions are inherently uncertain.  Dkt.56-1 at 753, JA.2658.

Third, the level of detail required for a Section 7 analysis necessarily depends on the "effects of the action," which is broadly defined to include, among other things, "consequences of *other activities* that are caused by the proposed action but that are not part of the action."  50 C.F.R. § 402.02 (emphasis added).  This includes "effects" that "may occur later in time." *Id.* In this way, the ESA regulations recognize that Section 7 consultations must be adaptable to a range of attenuated effects.

Accordingly, Fish & Wildlife can flexibly structure a BiOp so long as it details "how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). That is precisely what the BiOp did here when it exhaustively identified all relevant listed species, assessed the baseline situation, acknowledged the "stressors" from Section 404 permits on a species-specific basis, chronicled the mechanics of the technical-assistance process, and concluded that "the proposed action ... has built in a sufficiently structured process to insure that the State's administration of section 404 ... is not likely to cause an appreciable reduction in the likelihood of both the survival and recovery of any listed species." Dkt.56-1 at 752-65, JA.2657-70; Dkt.112-3 at 228-78, JA.2272-86. Fish & Wildlife did not "avoid its obligation to engage in meaningful Section 7 consultation by deferring detailed, species-specific analysis for another day," as the district court erroneously held. Dkt.182 at 69, JA.1352. Rather, Fish & Wildlife conducted a meaningful Section 7 effects analysis at the *program level*, consistent with the scientific information available and based on safeguards built into the program itself.

b. In rejecting the Services' programmatic approach, the district court did not rely on any statutory text precluding it, but instead posited that the Services had somehow misapprehended their own regulatory definitions of the different kinds of programmatic consultations. Dkt.182 at 16-17, 69, JA.1299-1300, JA.1352. There

are three such categories of approaches to structuring programmatic consultations,

depending on the nature of the program involved:

| Type of Programmatic Consultation | Nature of Action | Incidental Take Authorization |
|---|---|---|
| **"Framework Programmatic Actions"** | "[A]pproves a framework for the development of future action(s)" involving federal discretion that themselves trigger "further section 7 consultation." 50 C.F.R. § 402.02. | Services do "not ... provide an incidental take statement at the program level and [instead] address take during subsequent steps when specific actions are authorized under the program and subsequent consultation occurs." 80 Fed. Reg. at 26,836. |
| **"Mixed Programmatic Actions"** | Approves both future federal actions triggering future Section 7 consultations and "action(s) that will not be subject to further section 7 consultation." 50 C.F.R. § 402.02. | An "incidental take statement is required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation." 50 C.F.R. § 402.14(i)(7). |
| **"Other types of programmatic actions"** | "[O]ther types of programmatic actions not falling within the [above] definitions provided in the rule." 80 Fed. Reg. at 26,835. | "[I]ncidental take statements will be formulated by the Services to accompany biological opinions where incidental take is reasonably certain to occur and the proposed Federal action is compliant with the requirements of section 7(a)(2)." 80 Fed. Reg. at 26,835. |

The programmatic action here falls into the third bucket—"other types of programmatic actions"—*not* the first two buckets.

Nevertheless, the district court looked only to the definitions of "framework" and "mixed programmatic actions." Because those definitions refer to "further section 7 consultation," the district court jumped to the conclusion that *every* programmatic action must be subject to further consultations. *Id.* That inferential leap conflicts with the definition of "mixed programmatic actions," which itself confirms that certain federal actions can "approve[] action(s) that will *not be subject to further section 7 consultation*." 50 C.F.R. § 402.02 (emphasis added). Indeed, the Services explicitly listed a "Federal program[] in which subsequent approval for actions proceeding under the program are delegated to the States" as "[a]n example of [an] action[]" with effects that do not require "any further Federal authorization or section 7 consultation." 80 Fed. Reg. at 26,838.

More fundamentally, the district court mistakenly assumed that "framework programmatic actions" and "mixed programmatic actions" are Fish & Wildlife's *exclusive* means of programmatic consultation. Dkt.182 at 16-17, 69, JA.1299-1300, JA.1352. Neither the ESA nor its regulations say that, and the Services expressly repudiated such exclusivity in the very rulemaking that created the definitions at issue, explaining that there will be "other types of programmatic actions *not falling*

*within the definitions* provided in the rule." 80 Fed. Reg. at 26,835 (emphasis added). This is one such action.

c.    Rather than analyze whether the BiOp transgressed the text of Section 7, the district court fixated on a different question—whether the ESA or its regulations *explicitly delineate* the type of programmatic BiOp and technical-assistance process employed here. Finding no express description, the district court denigrated the technical-assistance process as "non-statutory" and thus legally invalid. *E.g.*, Dkt.182 at 7, 52, 57, JA.1290, JA.1335, JA.1340. That was error.

This Court held decades ago that a BiOp may permissibly rely on a checks-and-balances process outside of Section 7. In *Andrus*, the safeguards came from another statute, the Outer Continental Shelf Land Act ("OCSLA"). 642 F.2d at 609. The Court held that "satisfaction of the ESA mandate that no endangered life be jeopardized *must be measured in view of the full contingent* of OCSLA checks and balances and all mitigating measures adopted in pursuance thereof," including those that "ma[de] ESA requirements *more likely* to be satisfied." *Id.* (emphases added); *see also El Puente v. Army Corps of Eng'rs*, 100 F.4th 236, 255 (D.C. Cir. 2024) (holding that BiOp permissibly relied on a "turbidity-monitoring plan," the "contours" of which were defined by the Services as part of the consultation). The BiOp's reliance upon the technical-assistance process here was similarly proper.

33

More broadly, the "Supreme Court has recognized on numerous occasions that 'the formulation of procedures was basically to be left within the discretion of the agencies to which Congress has confided the responsibility for substantive judgments.'" *Defs. of Wildlife*, 733 F.3d at 1121-22 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978)). And there is no rule that an agency must "promulgate regulations ... address[ing] every conceivable question" when satisfying a broad statutory objective. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 96 (1995). Hence, the district court erroneously invalidated the BiOp by invoking the lack of a codified regulation specifying this particular type of programmatic consultation.

### 2.    The district court could not counter *Cooling Water*'s approval of a materially identical programmatic BiOp.

The district court's decision conflicts with *Cooling Water*, in which the Second Circuit upheld a programmatic BiOp that served as the model for the one here. *Cooling Water* surveyed "the ESA and its implementing regulations" and rejected the district court's rigid species-specific mandate, concluding that "[n]othing in the ESA requires that the Services assess every future 'phase' of an agency action on a site-specific or species-specific basis." 905 F.3d at 73. In doing so, the Second Circuit clarified that state-administered permits issued by "State Directors" implementing EPA's rule—just like Florida's actions under its Section 404 program—were not a "phase" of the federal action triggering additional Section

34

7 consultations, meaning that the program-level BiOp "discharged [the Services'] duty to assess 'the effects of the action as a whole.'" *Id.* at 73 & n.15 (quoting 50 C.F.R. § 402.14(c)).

Moreover, *Cooling Water* expressly approved reliance on a technical-assistance process that would "defer consideration of thermal impacts to the site-specific permitting process," given the Services' scientific "conclusion ... that a categorical assessment of thermal impacts was infeasible" on the front end. *Id.* at 74. Whether the technical-assistance process was "the equivalent of section 7 consultation," the Second Circuit explained, was irrelevant because "the Services have no obligation to conduct section 7 consultation or its 'equivalent' on individual [state] permits because the issuance of such a permit is not a federal action." *Id.* at 73 n.15.

The district court initially tried to obscure its departure from *Cooling Water* by "distinguish[ing] [the case] on its facts," noting that the *Cooling Water* action was a "final rule"—as opposed to assumption approval—as though that formality alone meant the technical-assistance process in *Cooling Water* imposed "legally binding responsibilities for all parties." Dkt.182 at 65, JA.1348. In reality, the Second Circuit deemed it dispositive that the Services (a) "conditioned their no-jeopardy finding on compliance with certain procedures" nearly identical to those here, and (b) "represented to th[e] Court ... that they have a 'commitment' to those

35

procedures," just as Fish & Wildlife did here. *Compare* 905 F.3d at 72, *with* Dkt.56-1 at 763-68, JA.2668-73; Dkt.156 at 95-96, JA.1189-90.

Without a colorable distinction, the district court ultimately renounced *Cooling Water*, labeling it "at odds with the statute, regulations, and caselaw." Dkt.182 at 67, JA.1350. Not so, as explained above. *Supra* 26-33. Nor does the other caselaw cited by the district court—none of which deals with programmatic consultation for federal approval of a state program—undermine the agency action here.

The district court first inferred from *Defenders* and *Andrus* that the consultation here was improper because it "deferr[ed] detailed, species-specific analysis for another day." Dkt.182 at 69, JA.1352. But as the district court conceded, those cases "address[ed] a distinct question" because they involved "*federal* agencies conducting *federal* actions that proceed in tiers or stages" and thus could "engage in Section 7 consultation at each tier," whereas the state-permit actions under Florida's program would not trigger further Section 7 consultations. *Id.* at 71, JA.1354. That makes a critical textual difference because the consultation requirement is tied to the federal "agency action" at issue. 16 U.S.C. § 1536(b)(3)(A); *see* 80 Fed. Reg. at 26,838 (listing a "Federal program[] in which subsequent approval actions proceeding under the program are delegated to the States" as "[a]n example of [an] action[]" with effects that do not require "any further

Federal authorization or section 7 consultation"). Those cases thus cannot dictate the method for a programmatic consultation regarding state-program approval. *Contra* Dkt.182 at 80, JA.1363.

The district court compounded this error by citing *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988), which dealt with an "agenc[y] compartmentaliz[ing] the analysis of actions and thereby avoid[ing] discussing the entire scope of the action." *Defs. of Wildlife*, 733 F.3d at 1121 (discussing *Conner*). Fish & Wildlife, by contrast, analyzed the entire scope of EPA's program approval, considering the effects of that action based on the information available and the ongoing, binding technical-assistance process. *Supra* 11-15.

No less inapposite are *National Wildlife Federation v. Brownlee*, 402 F. Supp. 2d 1, 10 & n.15 (D.D.C. 2005), and *Forest Service Employees for Environmental Ethics v. U.S. Forest Service*, 726 F. Supp. 2d 1195 (D. Mont. 2010). In *Brownlee*, the Corps issued nationwide permits but "ha[d] not consulted"—period—"with [Fish & Wildlife] on the four challenged" permits. 402 F. Supp. 2d at 10. And in *Forest Service*, the challenged BiOp contained only a "non-binding 'conservation recommendation'" and was not accompanied by *any* incidental-take statement. 726 F. Supp. 2d at 1203. Both cases lack key components of the BiOp and its binding technical-assistance process at issue here.

37

**B.    Fish & Wildlife's programmatic incidental-take statement did not violate the ESA.**

The district court's criticisms of the incidental-take statement similarly stem from the programmatic nature of Fish & Wildlife's consultation, so they fail for similar reasons.

**1.    The incidental-take statement complies with the ESA's text and regulations.**

The district court identified three supposed flaws in the incidental-take statement. First, it held the incidental-take statement failed to set a specific-enough "take limit." Dkt.182 at 73, JA.1356. Second, it held that the incidental-take statement lacked a sufficient reinitiation trigger. *Id.* at 77-78, JA.1360-61. And third, it held that the incidental-take statement's terms and conditions were insufficiently binding on state permittees. *Id.* at 32, 44, JA.1315, JA.1327. Each holding was erroneous.

a. An incidental-take statement must identify "the impact of [the] incidental taking on the species," 16 U.S.C. § 1536(b)(4)(C)(i), which the regulations define to require "specif[ying] the impact of incidental taking as the amount *or extent* of such taking," 50 C.F.R. § 402.14(i)(1)(i) (emphasis added). The incidental-take statement here did that by relying on the technical-assistance process—and the site- and species-specific take quantification it would entail—and concluding that the program would "*minimize incidental take* and detrimental effects associated with

38

activities regulated by the State 404 program" and "thereby avoid jeopardy to ESA-listed species."  Dkt.56-1 at 766, JA.2671 (emphasis added).

Despite this description of the "extent" of expected take, the district court balked at the incidental-take statement's failure to include *numerical* limits up front for particular species.  But the ESA imposes no such requirement.  Indeed, Congress recognized from the outset that—while "the impact should be specified in terms of a numerical limitation" "*where possible*"—that does not mean "in every instance" that Fish & Wildlife should "interpret the word 'impact' to be a precise number." H.R. Rep. No. 97-567, at 27 (1982), 1982 U.S.C.C.A.N. 2807, 2827 (emphasis added).  Take one example: Courts have blessed the use of a surrogate in setting non-numerical take limits.  *See Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 698 F.3d 1101, 1126-27 (9th Cir. 2012) (allowing "habitat characteristics" to be used "as a proxy for a numerical limit"); *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007) (allowing "various components of the ecological landscape" to "be used as a surrogate" in place of a numerical limit).

Just like the BiOp's ability to assess species-specific effects, *supra* 28-30, Fish & Wildlife's ability to numerically quantify take is dictated by the breadth of the "action" and "effects" at issue and constrained by the "best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).  While Fish & Wildlife may be able to numerically quantify take in the mine run of cases, such that omitting a

"numerical cap ... normally violates the ESA," *Cooling Water*, 905 F.3d at 77, EPA's program approval here involved an "instance" where it was not "possible for [Fish & Wildlife] to specify a number," H.R. Rep. No. 97-567, at 27; *Cooling Water*, 905 F.3d at 76-77 (relying on technical-assistance process—rather than a numerical limit—to approve the incidental-take statement).  Fish & Wildlife surveyed the extraordinary temporal and geographic scope of Florida's program before concluding that "the best scientific and commercial data available [was] not sufficient to enable [it] to accurately estimate the specific amount of incidental take" at the time of the BiOp.  Dkt.56-1 at 766, JA.2671.

b.    Regulations provide that "[i]f during the course of the action the amount or extent of incidental taking ... is exceeded, the Federal agency must reinitiate consultation immediately."  50 C.F.R. § 402.14(i)(5); *see also id.* § 402.16(a) (four scenarios when reinitiation is "required").  The district court held that the incidental-take statement here violated that requirement by failing to include an adequate reinitiation trigger.  Dkt.182 at 73, 78, JA.1356, JA.1361.

This critique rehashes the district court's attack on the lack of a numerical take limit—*i.e.*, that Fish & Wildlife supposedly "omitted any limit on incidental take, *which functions to trigger reinitiation* of consultation."  *Id.* at 44, JA.1327 (emphasis added).  If an incidental-take statement need not numerically quantify a take limit

for Section 404 program approval, then it necessarily follows that reinitiation need not be tethered to a numerical limit.

More importantly, the suggestion that the incidental-take statement lacks *any* take-related reinitiation trigger is inaccurate. Because the BiOp and incidental-take statement assessed impacts based on "key assumptions" associated with the *program* and its procedural safeguards, the BiOp included an explicit reinitiation trigger at the *program* level: "If these assumptions prove incorrect or warrant changes during implementation of the State 404 Program, it could … trigger re-initiation of ESA section 7 consultation if it results in effects that were not considered herein pursuant to 50 C.F.R. [§] 402.16." Dkt.56-1 at 751, JA.2656.

Individualized species- and site-specific take limits would be imposed through Florida's operation of its Section 404 program in coordination with Fish & Wildlife, which would monitor, assess, and redress take exceedances and account for the listing of new, affected species, if any. *Id.* at 765-69, JA.2670-74. Under those circumstances, Fish & Wildlife reasonably concluded that federal reinitiation should be measured by whether that program-level machinery functioned as expected, rather than on the permit-by-permit level, where "the State would administer the CWA 404 program." *Id.* at 769, JA.2674. Nothing in the statutory or regulatory text demanded a different approach.

41

c.      Lastly, the district court dismissed the incidental-take statement's terms and conditions as insufficiently binding on State permittees. Dkt.182 at 44-45, JA.1327-28.   That conclusion misunderstands how the incidental-take statement operates.   The terms and conditions bind *Florida* in administering its program and require it to "incorporate as *permit conditions* all recommended impact avoidance and minimization measures" imposed by Fish & Wildlife through the technical-assistance process.   Dkt.56-1 at 766-67, JA.2671-71 (emphasis added).   Those conditions are therefore, quite literally, binding on the State permittees.   And if Florida or the permittee violates them, EPA and Fish & Wildlife, which are informed of each permit, are fully authorized to take appropriate legal action.   *See id.*; 33 U.S.C. § 1344(j) (EPA's power to federalize noncompliant permit); Dkt.112-2 at 354-66, JA.2177-89 (memorandum of understanding detailing federal agencies' responsibilities); Dkt.102-1 at 12, JA.804 (detailing EPA's continuous oversight over Florida's program).

The ESA mandates only that a BiOp authorizing incidental take "specif[y] those reasonable and prudent measures" that Fish & Wildlife "considers necessary or appropriate to minimize [the] impact" of the taking.   16 U.S.C. § 1536(b)(4)(C)(ii).   The Services' regulations add little specificity to that broad language.   The ESA's text and regulations therefore supply no basis for the district court's attack on the BiOp's terms and conditions.

42

> **2.    The district court could not counter *Cooling Water*'s approval of a similar programmatic incidental-take statement.**

Once again, *Cooling Water* rejected these attacks.  It held that "an [incidental-take statement] is adequate if it 'explain[s] why it was impracticable to express a numerical measure of take.'"  *Cooling Water*, 905 F.3d at 77 (second alteration in original) (quoting *Ctr. for Biological Diversity*, 698 F.3d at 1126-27).  As here, the *Cooling Water* incidental-take statement satisfied that test because it "explain[ed] that the 'paucity of information' ... prevented the Services from quantifying anticipated take at this juncture, and it contemplates that the Services' field offices will quantify incidental take at individual [locations] as part of the technical assistance process."  *Id.*

*Cooling Water* also rejected a similar attack on the incidental-take statement's terms and conditions.  *Id.*  It held that "[t]he ESA does not mandate any particular form or content for reasonable and prudent measures" and concluded the incidental-take statement was "adequate" because it, like the incidental-take statement here, "include[d] various administrative conditions, like a detailed annual reporting requirement, and several substantive implementing conditions."  *Id.*  Thus, the Services' "reliance on the binding technical assistance process was a 'meaningful ... attempt to minimize incidental takings associated with the project.'"  *Id.* (alteration in original) (quoting *Allen*, 476 F.3d at 1039 n.7).

Because the district court had no distinction for *Cooling Water*'s persuasive holdings, *supra* 35-36, it erroneously cast the Second Circuit's decision as an outlier. Dkt.182 at 77, JA.1360. But it identified *zero* cases invalidating a programmatic incidental-take statement under similar circumstances.

For instance, the district court pointed to the Ninth Circuit's repeated approval of non-numerical surrogates for take limits, as if that somehow *precluded* Fish & Wildlife's reliance on something other than a surrogate to quantify the extent of take. *Id.* at 76-77, JA.1359-60. But neither *Center for Biological Diversity* nor *Allen* invoked Fish & Wildlife's regulation authorizing use of a surrogate (indeed, *Allen* predated the 2009 addition of that language)—much less cast that regulatory provision as signaling surrogates were the *exclusive* type of non-numerical take limits, as the district court did here. *Allen*, 476 F.3d at 1038; *Center for Biological Diversity*, 698 F.3d at 1127; Dkt.182 at 3, 73-74, JA.1286, JA.1356-57; 50 C.F.R. § 402.14(i)(1)(i). Instead, both decisions relied on *Congress's* intent in adding Section 7 to the ESA in 1982, explaining that a surrogate may be used if it is "able to perform the *functions* of a numerical limitation." *Allen*, 476 F.3d at 1038 (emphasis added). The technical-assistance process here, which compels the State to establish numerical take limits on a permit-by-permit basis under federal oversight, satisfies that functional test.

The district court again misapprehended the stage-by-stage consultation in *Defenders*, treating the Services' deferral there of a formal incidental-take statement as though it meant Fish & Wildlife erred by issuing an upfront incidental-take statement here. Dkt.182 at 77, JA.1360. But, unlike in *Defenders*, there is no later "stage" of *federal* action to which to defer Section 7 consultation and an incidental-take statement here; the federal action is limited to the program approval, thus necessitating a programmatic BiOp and incidental-take statement at the outset. *See* 50 C.F.R. § 402.14(i)(6).

Finally, *Forest Service* did not "reject[] a similar scheme." *Contra* Dkt.182 at 79, JA.1362. There, the Services *failed* to "include[] an incidental take statement" and instead relied on an "emergency consultation" process that would be performed by the action agency. 726 F. Supp. 2d at 1229. Even then, the court found "some merit" to the suggestion "that the unpredictable location and severity of wildfire makes it impossible for the agencies to specify the impact of incidental taking on the species," and only invalidated the BiOp because of the lack of "effectiveness of emergency consultation," which vested "ultimate discretion" with the action agency to determine whether and how to protect species. *Id.* at 1227-32. This case is the opposite: (1) The BiOp included an incidental-take statement, and (2) the technical-assistance process rendered Fish & Wildlife's conclusions "determinative." Dkt.56-1 at 716, 725-26, JA.2621, JA.2630-31.

**C.** **The opinion below threatens cooperative federalism by placing Section 404 assumption out of step with the ESA.**

Despite the CWA's and ESA's express, reciprocal commitments to cooperative federalism in the context of species protection and State assumption of dredge-and-fill permitting, 16 U.S.C. § 1531(c)(2); 33 U.S.C. § 1251(b), the district court's opinion mentions *neither* of those provisions.  Instead, the opinion below thrusts the CWA and ESA into conflict and effectively nullifies a State's prerogative to administer a Section 404 program.

**1.** **The district court should have harmonized the ESA and CWA schemes—not set them on a collision course.**

"When confronted with two Acts of Congress allegedly touching on the same topic, th[e] Court" must "strive to give effect to both." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (internal quotation marks omitted).  This Court followed that rubric in *Andrus* when reconciling Section 7 with OCSLA.  642 F.2d at 607-10.  It held that Fish & Wildlife "complied in essence with [the] ESA" when issuing a BiOp focused on the "lease stage" of a multi-stage OCSLA project, taking care to "meld[]" the two statutes into a cohesive framework because they were not "irreconcilable." *Id.* at 607-08.  Doing so was necessary to avoid turning the framework "into one overwhelming statutory obstacle" and making ESA compliance impossible. *Id.* at 609.

46

These reconciliation principles are even more important here, as Section 404 involves "regulation of land and water use," which "lies at the core of traditional state authority." *Sackett v. EPA*, 598 U.S. 651, 679 (2023). For Section 7 to "impinge on this authority" of States to assume primary Section 404 permitting responsibility, Congress must have "enact[ed] exceedingly clear language" saying so. *Id.* at 679-80.

The district court blew by these conflict-avoidance principles. Indeed, it construed Section 7 to require an upfront accounting of all species- and site-specific effects and numerical take limits—something Fish & Wildlife determined was *scientifically impossible* for Section 404 program approval and the unknowable permitting decisions it triggers. Dkt.56-1 at 753, 766, JA.2658, JA.2671. The opinion below thus creates precisely the sort of "overwhelming statutory obstacle" this Court avoided in *Andrus*. 642 F.2d at 609. Absent reversal, States with significant water resources and a multitude of listed species (like Florida) will be effectively denied the opportunity for Section 404 assumption that Congress promised them.

### 2. The district court's other suggestions for ESA compliance fall flat.

The district court tried to walk back the CWA-ESA conflict it created with token suggestions for how Federal Defendants *could* have supposedly complied with the ESA. First, it suggested that Fish & Wildlife had additional information to

47

conduct a more searching consultation.  And second, it suggested that EPA and Fish & Wildlife could have structured the consultation or program approval differently. Neither argument withstands scrutiny.

a.    The district court pointed to "reams of data from previous Section 7 consultations" in Florida to which Fish & Wildlife purportedly "did not give ... meaningful consideration" and could have used to determine "whether post-[assumption] activities in particular areas were fundamentally incompatible with the continued existence of the species."  Dkt.182 at 63-64, JA.1346-47 (alterations in original) (quoting *Conner*, 848 F.2d at 1454).  Further, the district court found it "difficult to believe that [Fish & Wildlife] lacked information sufficient to permit it to quantify numerical take for *any* species given the wealth of previous permit and ESA consultation data at their disposal."  *Id.* at 75, JA.1358.

Tellingly, however, the district court never says these additional, partial analyses—a one-off numeric take limit here, or identification of an unpermittable area there—would have *satisfied* its interpretation of Section 7.  That is because the district court held categorically that Section 7 requires a species-specific-effects and numeric-take-limits analysis at the outset for *all* the consequences of the program— no matter the completeness of available information about those future effects. Dkt.182 at 64, 92, JA.1347, JA.1375.  Saying that the agencies could have done more towards satisfying that test does not detract from its impossibility, when even

the additional efforts would have fallen short of the statute's requirements in the court's view.

In any event, Fish & Wildlife *did* rely upon past permitting data in assessing the environmental baseline and the Section 404 program, Dkt.56-1 at 742-61, JA.2647-66; Dkt.112-3 at 54-73, 124-226, JA.2252-71, JA.2322-2424, before concluding that existing data did not allow for a granular species-specific-effects analysis or numeric take limits at the time of the BiOp, Dkt.56-1 at 753, 766, JA.2658, JA.2671. While the district court found it "difficult to believe" that Fish & Wildlife could not have done more, Dkt.182 at 75, JA.1358, the programmatic BiOp's conclusion that "a categorical assessment of ... impacts was infeasible *reflects a scientific determination deserving deference*," as *Cooling Water* held in rejecting a near-identical exercise in second-guessing a programmatic consultation. 905 F.3d at 74 (internal quotation marks omitted & emphasis added).

Finally, the district court's citation to *Conner* to suggest Fish & Wildlife could have ruled out state permitting in "particular areas" is doubly misguided. Dkt.182 at 63-64, JA.1346-47. For one thing, the federal government in *Conner* had already issued leases, so the agencies knew—unlike here—the areas where oil-and-gas activities would occur. 848 F.2d at 1453-54. For another, *Conner* involved federal leasing decisions for which the federal government could "exclu[de] [certain] areas" from what was leased. *Id.* Section 404 assumption does not work that way, as

49

"[p]artial State programs are *not approvable* under section 404," and "a State program must regulate *all discharges* of dredged or fill material into waters regulated by the State under Section 404(g)-(1)." 40 C.F.R. § 233.1(b) (emphases added). Consistent with that command, EPA approved Florida's program for all assumable waters within Florida, contingent on a technical-assistance process to protect against any concern that a permit in a "particular area[]" could be "fundamentally incompatible with the continued existence of [a certain] species." Dkt.182 at 63-64, JA.1346-47.

b.    The district court alluded to three "other options" that were supposedly "available" to comply with the ESA. *Id.* at 27, JA.1310. Setting aside that the district court erroneously described these "other options" as ones that "EPA acknowledged" in "EPA['s] response to comments," *id.*,[6] they simply do not square with the governing legal framework and undisputed facts.

*New Jersey model.* The district court identified "the New Jersey model"— *i.e.*, a State program that is not expected to impact listed species—as an example of a Section 404 assumption that could "'completely avoid[] impacts' to protected species." *Id.* But New Jersey's Section 404 assumption occurred without *any* formal consultation (*i.e.*, no BiOp whatsoever), depended on the unique sparsity of listed

---

[6] The district court misattributed to EPA a summary prepared by Florida responding to public comments. Dkt.112-3 at 368, JA.2524. Florida merely noted that "[s]ome public comments suggested" those three options. *Id.*

species in New Jersey, and was accompanied by Fish & Wildlife's warning that "future consultations on state assumptions will be conducted as *programmatic formal consultations*." Dkt.112-5 at 159-69, JA.2690-2700 (emphasis added). No one plausibly suggested below that a species- and habitat-rich state like Florida could have proceeded down that "informal consultation" path. In fact, the district court seemed to agree that "the New Jersey model" "would likely hinder—rather than grease—the wheels of progress in a state like Florida given the amount of species and wetlands." Dkt.183 at 8, JA.1389. This leaves Florida to wonder exactly what Section 404 program might be available for it to assume.

*Federalizing "may affect" permits.* Similarly illusory was the district court's suggestion that EPA could simply "federalize" all permit applications that "may adversely impact listed species"—rather than just those in which the State rejects the Services' requirements—resulting in a State processing only Section 404 permit applications without possible species effect. Dkt.182 at 27, JA.1310. When Florida requested a limited stay of the district court's vacatur asking for precisely that sort of modified program as an exercise of the district court's remedial discretion, Federal Defendants strenuously objected that such an approach was "practically and legally unworkable" and would constitute a prohibited "partial assumption." Dkt.165 at 3, JA.1222; 40 C.F.R. § 233.1(b). And the district court relied on those

51

objections and *denied* Florida's requested limited stay, Dkt.183 at 4, JA.1385, thus confirming that this "other option" is illusory.

***Section 10 protection only.***  Finally, the district court observed that Florida could "require state permittees to engage in Section 10 review."  Dkt.182 at 27, JA.1310.  Yet Section 10 of the ESA merely creates a *voluntary* permit scheme that grants private parties "permits for the taking of endangered species *when no other Federal action is involved*." 128 Cong. Reg. 26,188 (Sept. 30, 1982) (emphasis added); 16 U.S.C. § 1539(a).  The Services "may" issue such permits, known as incidental-take permits, "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity," if the applicant satisfies various conditions.  16 U.S.C. § 1539(a)(1)(B).

The district court's observation is a non sequitur.  Fish & Wildlife *did* instruct Florida to pursue Section 10 protection if it could not abide by the conditions in the incidental-take statement, Dkt.56-1 at 766, JA.2671, but that availability of the voluntary Section 10 process did not obviate the statutory mandate that Fish & Wildlife issue an incidental-take statement under the Section 7 process, *supra* 8. And while the district court disagreed that the *contents* of the incidental-take statement were adequate, no one disputes that a sufficient incidental-take statement would extend protection to State permittees under the plain text of Section 7.  16 U.S.C. § 1536(b)(4)(C); Dkt.182 at 18, JA.1301.  Thus, the district court's

invocation of Section 10 was no answer to the structural soundness of the Section 7 consultation performed here and, in turn, no answer to the profound federalism concerns posed by the district court's invalidation of that process.

\* \* \*

Because Fish & Wildlife's consultation was consistent with Section 7, the district court erred by granting summary judgment on Plaintiffs' ESA claims challenging that process. Dkt.182 at 81, JA.1364. And because Plaintiffs' claim that EPA relied on an invalid BiOp and incidental-take statement rested on that same mistaken premise, the district court erred in granting summary judgment to Plaintiffs on that ESA claim as well. *Id.* at 85, JA.1368.

## III.    The district court erred by second-guessing EPA's findings on marine species.

While EPA formally consulted with Fish & Wildlife concerning protected species in *assumable* (*i.e.*, non-tidal) waters, EPA reasonably concluded that Florida's program would have "no effect" on the much shorter list of protected marine species occurring *beyond* assumable waters. Dkt.112-2 at 351, JA.2174; Dkt.56-1 at 441, JA.2065. Marine Fisheries also assumed "no effect" here. Dkt.112-2 at 370-71, JA.2196-97. However, the district court erroneously second-guessed that scientific judgment, finding that the agencies "only" considered impacts to listed species occurring "in the assumable waters" without also considering "indirect"

effects to marine species occurring "beyond the assumable waters." Dkt.182 at 87, JA.1370.

In reality, EPA considered direct impacts to listed species that may occur in assumable waters *and* indirect impacts to listed *marine* species occurring beyond those waters. Dkt.112-2 at 370-71, JA.2196-97. EPA and Marine Fisheries, in cooperation with Florida, reviewed species "mapping" data, "possible spatial overlap" of assumed waters with waters used by relevant listed marine species like the shortnose sturgeon, and the Services' "shared jurisdiction" over the Gulf sturgeon. *Id.* Further, EPA's Biological Evaluation—issued before EPA approved Florida's program—recognized that only "[r]elatively small areas of marine habitat" are "within assumed waters," Dkt.112-3 at 64, JA.2262, but EPA also considered potential effects of Florida's program on listed marine species in downstream areas, *id.* at 7, JA.2205. The Biological Evaluation describes the status of relevant listed marine species, *id.* at 152-54, JA.2350-52, and addresses "stressors" and "effects" of the action on marine species and how Florida's program would avoid such impacts, *id.* at 39, JA.2237. Notably, the "Florida 404 Handbook" (which Florida adopted as a regulation) explains that Marine Fisheries "will be provided an opportunity to review all applications for projects with reasonable potential for affecting endangered or threatened species," Dkt.52 at 23-24, JA.1486-87, and it requires Florida to accept "any requirements" set by Marine Fisheries, *id.* at 87,

JA.1499.  In EPA's Response to Comments, EPA references the various "upstream" and "downstream" impacts in "all action areas."  Dkt.56-1 at 531-34, JA.2155-58.

Thus, even absent the agencies' sensible perspective that approval of a State program applicable *only* to assumable waters would have "no effect" on listed marine species occurring beyond those waters, EPA considered the issues that the district court found to be missing, rendering EPA's "no effect" finding far from arbitrary.  The district court's summary judgment on this claim should be reversed.

## IV. The district court erred by vacating the Florida Section 404 program in its entirety.

Because the district court "misapprehended the underlying substantive law" for the reasons given above, *Texas v. United States*, 798 F.3d 1108, 1113 (D.C. Cir. 2015), it necessarily abused its discretion in vacating EPA's approval of the Florida program, *Standing Rock Sioux Tribe*, 985 F.3d at 1051.

Alternatively, even *if* the agencies somehow erred in this case, it "is a well-established maxim of administrative law that [i]f the record before the agency does not support the agency action, [or] if the agency has not considered all relevant factors, … the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."  *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 628-29 (2023) (citation omitted) (alterations in original).  Assessing the proper remedy depends on (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) the "disruptive

consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. Nuclear Reg. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (citation omitted). The district court misapplied both factors in vacating a comprehensive State program that had been in place for over three years with enormous State reliance interests.

First, courts have "frequently remanded without vacating when a rule's defects are curable." *U.S. Sugar Corp. v. EPA*, 844 F.3d 268, 270 (D.C. Cir. 2016). If, for example, the Court finds that the BiOp was deficient because Fish & Wildlife should have more closely assessed prior consultation information or because the incidental-take statement should have set cumulative take limits, *supra* 45, those errors are classically redressable on remand without vacatur. *See Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (remand without vacatur appropriate where it was "plausible" agency could "redress its failure of explanation on remand while reaching the same result"); *Conserve Sw. Utah v. Dep't of Interior*, No. 1:21-cv-01506-ABJ, 2023 WL 7922785 (D.D.C. Nov. 16, 2023) (remanding BiOp without vacating it).

Indeed, with the benefit of over three years of program implementation and thousands of pages of documented species-impacts assessments from the technical-assistance process for hundreds of permits, a Herculean task pre-2020 may not be so now. As for the Marine Fisheries-based claims, the agencies had *already initiated* consultation "out of an abundance of caution," Dkt.182 at 87-88, JA.1370-71, with

56

EPA providing Marine Fisheries with a biological evaluation in 2023 finding no adverse effects to marine species, so there was no need to vacate on those claims.

Second, disastrous consequences flow from the district court's vacatur. Relying on Section 404's promise of cooperative federalism, Florida poured significant resources over the last six years into creating its program and processing thousands of permit applications. The district court upended that scheme based on a mistaken belief that federal law required more, which is a classic example of a court "throwing the baby out with the bathwater." *See City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019) (remanding without vacatur where permitted pipeline was "currently operational" and thus vacatur "would be quite disruptive"); *see* Dkt.166-1, JA.1245-49 (summarizing the extraordinary disruptions resulting from the district court's vacatur); Doc. #2051487 at 1468-96 (same).

And based on what harm? Of the thousands of permit applications Florida processed, Plaintiffs have identified only a few they find problematic. *Supra* 24-25. That hardly demonstrates that leaving Florida's program in place during remand to the agencies will result in harm. Indeed, neither Plaintiffs nor the district court ever explained how thrusting Section 404 permitting back into the Corps' hands would be *more* protective of species, when the Corps' permit program does not require the level of federal-state species coordination imposed by the technical-assistance process. *See* Dkt.149-3 at 2-3, JA.1114-15 (table comparing Florida's and Corps'

programs); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995) (remand without vacatur when "nothing in the record suggests that significant harm would result from allowing the approval to remain in effect pending the agency's further explanation"); *Oglala Sioux Tribe v. Nuclear Reg. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018) (remanding without vacatur because of potential disruptive consequences and lack of harm from leaving license "in effect for now"). To the extent Plaintiffs have concerns about particular permit applications, Plaintiffs may notify EPA and the other agencies, and if dissatisfied, pursue remedies in Florida state administrative and judicial forums.

Finally, the Corps' vague, post-vacatur assurances that it is doing the best it can to restart its Section 404 program do not move the needle. Doc. #2052135 at 3. The Corps' resources dedicated to processing permits in Florida do not compare to those Florida has dedicated to its program. Doc. #2054085 at 9-10. All the while, the staffing and infrastructure set up for Florida's program—and the regulated community—suffer the consequences of the district court's ruling, as delays have now pervaded Section 404 permitting in the State. *See id.*; *Shafer & Freeman Lakes Envtl. Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021) (remanding without vacatur because of the "conflicting regulatory obligations" that "vacatur would leave [the regulated party] betwixt and between").

## CONCLUSION

The Court should vacate the judgment below for lack of standing or reverse the summary judgment vacating EPA's approval and render summary judgment in favor of Florida and Federal Defendants. Alternatively, if the Court disagrees with any element of the agency action, it should reverse the vacatur and instruct the district court to remand for Federal Defendants to cure that error.

Dated: March 12, 2025                     Respectfully submitted,

                                          */s/ Aaron M. Streett*

                                          Aaron M. Streett
                                          Anthony J. Lucisano
Jeffrey DeSousa                           Beau Carter
ACTING SOLICITOR GENERAL                  BAKER BOTTS LLP
Christopher J. Baum                       910 Louisiana Street
SENIOR DEPUTY SOLICITOR GENERAL           Houston, Texas 77002
Office of the Attorney General of Florida (713) 229-1855
PL-01, The Capitol                        aaron.streett@bakerbotts.com
Tallahassee, Florida 32399                anthony.lucisano@bakerbotts.com
(850) 414-3300                            beau.carter@bakerbotts.com
jeffrey.desousa@myfloridalegal.com
christopher.baum@myfloridalegal.com       Jeffrey H. Wood
                                          BAKER BOTTS LLP
                                          700 K Street NW
                                          Washington, D.C. 20001
                                          (202) 639-7732
                                          jeff.wood@bakerbotts.com

*Counsel for the State of Florida*
*and the Florida Department of Environmental Protection*

59

## CERTIFICATE OF COMPLIANCE

1.      This final brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This final brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Times New Roman font.

*/s/ Aaron M. Streett*
Aaron M. Streett

## CERTIFICATE OF SERVICE

I certify that on March 12, 2025, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

*/s/ Aaron M. Streett*
Aaron M. Streett