NOT YET SCHEDULED FOR ORAL ARGUMENT

No. 24-5101

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees/Plaintiffs-Appellants*,

v.

MICHAEL REGAN, et al.,
*Defendants-Appellants/Defendants-Appellees*,

and

STATE OF FLORIDA, et al.,
*Intervenors-Defendants-Appellants/ Intervenors-Defendants-Appellees.*

———————————————

Appeal from the United States District Court for the District of Columbia
No. 1:21-cv-00119 (Hon. Randolph D. Moss)

———————————————

**FINAL BRIEF FOR FEDERAL APPELLANTS**

———————————————

Of Counsel:

CHASE RAINES
SIMMA KUPCHAN
ALEXIS WADE
*Attorneys*
Environmental Protection Agency

HELEN SPEIGHTS
*Attorney*
U.S. Department of the Interior

KATHERINE WAINWRIGHT
ERICA ZILIOLI
*Attorneys*
U.S. Army Corps of Engineers

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

JOAN PEPIN
MICHAEL EITEL
ANDREW COGHLAN
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.     Parties and Amici**

Plaintiffs-Appellees are the Center for Biological Diversity; Defenders of Wildlife; Sierra Club; Conservancy of Southwest Florida; Florida Wildlife Federation; Miami Waterkeeper; and St. Johns Riverkeeper.

Federal Defendants-Appellants are Lee M. Zeldin, in his official capacity as Administrator for the U.S. Environmental Protection Agency (EPA); Benita Best-Wong, in her official capacity as Deputy Assistant Administrator performing delegated duties as the Assistant Administrator of the Office of Water; James (Jim) Payne, in his official capacity as Deputy General Counsel performing delegated duties as the General Counsel ; Jeffrey A. Hall, in his official capacity as Principal Deputy Assistant Administrator performing the duties of the Assistant Administrator for EPA's Office of Enforcement and Compliance Assurance; Kevin J. McOmber, in his official capacity as Regional Administrator for Region 4 of the EPA; Michael Oetker, in his official capacity as Regional Director for the U.S. Fish and Wildlife Service (FWS); Paul Souza in his official capacity as Regional Director of Region 8, exercising the delegated authority of the Director of the FWS; Lieutenant General William H. Graham, Jr., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers

(Corps); Colonel Brandon Bowman, in his official capacity as District Commander of the Jacksonville District for the Corps; EPA; Corps; and FWS.[*]

Intervenor-Defendant-Appellants are the State of Florida and Florida Department of Environmental Protection.

Amici before this Court are the Florida Chamber of Commerce; the Association of Florida Community Developers, Inc.; the Mosaic Company; the Florida Home Builders Association; the Florida Transportation Builders' Association; the Leading Builders of America; the Associated Industries of Florida; the Lennar Corporation; G.L. Homes of Florida Corp.; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison Home Corp; Florida State Hispanic Chamber of Commerce.

Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd., was an additional party before the district court. Additional amici before the district court were Cameratta Companies LLC and CAM7-SUB, LLC.

## B.    Rulings Under Review

The State of Florida, the Florida Department of Environmental Protection, and Federal Defendants appeal the district court's February 15, 2024 order, as amended on April 12, 2024. That order was made final and appealable on April 12,

---

[*] The successors in office of named public officials are automatically substituted as parties. *See* Fed. R. App. P. 43(c)(2).

2024, when the district court entered a final judgment under Federal Rule of Civil Procedure 54(b).

## C.     Related Cases

None.

/s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for the United States

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
 CASES ........................................................................................i

TABLE OF CONTENTS..............................................................iv

TABLE OF AUTHORITIES ........................................................vi

GLOSSARY ................................................................................vi

INTRODUCTION ........................................................................1

STATEMENT OF JURISDICTION.............................................4

STATEMENT OF THE ISSUES..................................................4

PERTINENT STATUTES AND REGULATIONS .......................5

STATEMENT OF THE CASE......................................................5

 A.     Statutory and regulatory background ......................5

 B.     Factual background .................................................10

 C.     Proceedings below...................................................20

SUMMARY OF ARGUMENT ....................................................23

STANDARD OF REVIEW .........................................................27

ARGUMENT ..............................................................................28

I.     EPA's consultation with the Fish and Wildlife Service
       complied with law....................................................28

 A.     The action here had effects that were unknown and
        unknowable. ...........................................................29

B.    Taking into account the unknowns, FWS reasonably relied on safeguards built into Florida's program to determine whether it was likely that the program would jeopardize listed species or harm critical habitat. ...............................31

C.    FWS's biological opinion and incidental take statement were sufficiently detailed to satisfy the ESA. .....................................38

II.    The agencies no longer dispute that EPA was required to consult with NMFS....................................................................................49

CONCLUSION .......................................................................................................52

CERTIFICATE OF COMPLIANCE .......................................................................54

# TABLE OF AUTHORITIES[†]

## Cases

*Allied-Signal v. Nuclear Regulatory Comm'n*,
    988 F.2d 146 (D.C. Cir. 1993) ................................................................51

*Arab v. Blinken*,
    600 F. Supp. 3d 59 (D.D.C. 2022) .......................................................18

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*,
    462 U.S. 87 (1983) ...............................................................................27

*Bennett v. Spear*,
    520 U.S. 154 (1997) .............................................................................36

*Cooling Water Intake Structure Coalition v. EPA*,
    905 F.3d 49 (2d Cir. 2018) .......................................... 12, 21, 34, 35, 36, 44, 46

*El Puente v. U.S. Army Corps of Eng'rs*,
    100 F.4th 236 (D.C. Cir. 2024) ............................................................32

*EPA v. EME Homer City Generation, L.P.*,
    572 U.S. 489 (2014) .............................................................................42

*Miccosukee Tribe of Indians of Florida v. EPA*,
    S.D. Fl. No. 1:22-cv-22459 ..................................................................20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) ...............................................................................27

*NASDAQ Stock Market, LLC v. SEC*,
    961 F.3d 421 (D.C. Cir. 2020) .............................................................42

*Nat'l Archives & Records Admin. v. Favish*,
    541 U.S. 157 (2004) .............................................................................37

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007) .......................................................................... 6, 11

---

[†]Authorities upon which we chiefly rely are marked with asterisks.

*Nat'l Parks Conservation Ass'n v. Semonite*,
  925 F.3d 500 (D.C. Cir. 2019) ...................................................................51

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.*,
  918 F.3d 151 (D.C. Cir. 2019) ...................................................................37

*Rocky Mountain Wild v. Dallas*,
  98 F.4th 1263 (10th Cir. 2024) ...................................................................8

*Sackett v. EPA*,
  598 U.S. 651 (2023) ...................................................................18

*Union Neighbors United, Inc. v. Jewell*,
  831 F.3d 564 (D.C. Cir. 2016) ...................................................................27

**Statutes**

5 U.S.C. § 706(2)(A) ...................................................................27

16 U.S.C. § 1531(b) ...................................................................5

16 U.S.C. § 1532(19) ...................................................................5

16 U.S.C. § 1533(d) ...................................................................6

16 U.S.C. § 1536 ...................................................................34

16 U.S.C. § 1536(a)(2) ................................................... 6, 7, 39, 48

16 U.S.C. § 1536(a)(3) ...................................................................6

16 U.S.C. § 1536(a)(4) ...................................................................6

16 U.S.C. § 1536(b)(3)(A) ................................................... 6, 39, 41, 42

16 U.S.C. § 1536(b)(4)(C) ................................................... 7, 44, 46

16 U.S.C. § 1536(b)(4)(C)(i) ...................................................................39

16 U.S.C. § 1536(b)(4)(C)(iv) ...................................................................7

16 U.S.C. § 1536(c) ...................................................................6

16 U.S.C. § 1536(o)(2) ...................................................................7

16 U.S.C. § 1538(a)(1)(B) ..................................................................6

16 U.S.C. § 1539(a)(2) ......................................................................8

16 U.S.C. § 1540(a)(1) ......................................................................6

16 U.S.C. § 1540(b) ..........................................................................6

16 U.S.C. § 1540(g) ..........................................................................6

28 U.S.C. § 1291 ...............................................................................4

28 U.S.C. § 1331 ...............................................................................4

33 U.S.C. § 1251(b) .....................................................................9, 43

33 U.S.C. § 1311(a) ..........................................................................8

33 U.S.C. § 1342(b) ........................................................................11

33 U.S.C. § 1344 ...............................................................................9

33 U.S.C. § 1344(a) ..........................................................................8

33 U.S.C. § 1344(g) .....................................................................9, 43

33 U.S.C. § 1344(g)(1) ......................................................................9

33 U.S.C. § 1344(h)(2)(A) ...........................................................9, 43

33 U.S.C. § 1362(6) ..........................................................................8

33 U.S.C. § 1362(7) ..........................................................................8

33 U.S.C. § 1362(12) ........................................................................8

## Regulations

40 C.F.R. § 230.10(b)(3) ....................................................8, 9, 16, 38

40 C.F.R. § 233.15 ............................................................................9

40 C.F.R. § 233.23(a) ................................................................10, 38

40 C.F.R. § 233.50 ..........................................................................10

40 C.F.R. § 233.50(a) ................................................................................15

40 C.F.R. § 233.50(b) ................................................................................15

40 C.F.R. § 233.50(e) ................................................................................19

40 C.F.R. § 233.50(f) .......................................................................... 16, 33

40 C.F.R. § 233.51 ....................................................................................15

40 C.F.R. § 233.53 ....................................................................................20

40 C.F.R. § 233.70 ....................................................................................10

40 C.F.R. § 233.71 ....................................................................................10

50 C.F.R. § 17.22(b)(1) ...............................................................................8

50 C.F.R. § 402.01(b) ..................................................................................5

50 C.F.R. § 402.02 ................................................................ 6, 7, 22, 30, 50

50 C.F.R. § 402.03 ......................................................................................6

50 C.F.R. § 402.13(c) ..................................................................................6

50 C.F.R. § 402.14(a) ................................................................................39

50 C.F.R. § 402.14(b) ............................................................................ 6, 39

50 C.F.R. § 402.14(c)(1)(A) ......................................................................34

50 C.F.R. § 402.14(g) ..................................................................................7

50 C.F.R. § 402.14(g)(8) ...........................................................................36

50 C.F.R. § 402.14(h) ........................................................................... 7, 21

50 C.F.R. § 402.14(h)(1)(iv) ........................................................................7

50 C.F.R. § 402.14(i) ...................................................................................8

50 C.F.R. § 402.14(i)(1)(i) ................................................................ 7, 22, 47

50 C.F.R. § 402.14(i)(5) ............................................................................47

50 C.F.R. § 402.16(a) ............................................................................. 8, 47

85 Fed. Reg. 30,953 (May 21, 2020) ..................................................... 12, 36

85 Fed. Reg. 57,853 (Sept. 16, 2020) ......................................................10

85 Fed. Reg. 83,553 (Dec. 22, 2020) .......................................................18

Florida Administrative Code § 62-331.051–.053 .....................................13

Florida Administrative Code § 62-331.053(3)(a)(4) .................................38

Florida Administrative Code § 62-331.054 ..............................................38

## Rules

Fed. Rule App. Proc. 4(a)(1)(B) .................................................................4

Federal Rule of Civil Procedure 54(b) .................................................. 4, 22

# GLOSSARY

APA        Administrative Procedure Act

CWA       Clean Water Act

EPA        Environmental Protection Agency

ESA        Endangered Species Act

FWS        Fish and Wildlife Service

NMFS      National Marine Fisheries Service

**INTRODUCTION**

In 2020, the Environmental Protection Agency (EPA) approved Florida's application to assume authority for issuing dredge and fill permits under Section 404 of the Clean Water Act (CWA). EPA consulted with the Fish and Wildlife Service (FWS) under Section 7 of the Endangered Species Act (ESA) regarding impacts to endangered and threatened species and their critical habitats from EPA's approval of Florida's assumption of permitting authority.

Since EPA approved Florida's application in 2020, there have been many problems with Florida's implementation of the CWA 404 program. Before the district court's ruling, EPA had been considering how to address those implementation issues. But the post-assumption implementation of Florida's program is not at issue in this appeal. This appeal is only about whether FWS and EPA complied with the ESA in 2020 when FWS evaluated, and EPA approved, Florida's assumption of Section 404 permitting authority.

As to that question, when a state assumes Section 404 permitting authority, it becomes responsible for issuing all dredge and fill permits in certain waterbodies across the state, permanently—unless and until the state voluntarily transfers permitting authority back to the federal government or EPA withdraws its approval of the state's permitting program. Given the statutorily required breadth of Florida's program, which would cover waterbodies throughout the state and many

1

different types of permitted activities, potentially in perpetuity, neither EPA nor FWS could have known at the time of consultation the species- or location-specific impacts of the permits Florida might ultimately issue as a result of EPA's approval of its assumption application.

In light of these inherent unknowns, Florida agreed to employ a process called "technical assistance," an approach that has been employed in other, similar situations where species- and location-specific impacts cannot be known at the time of consultation. Florida agreed to submit all proposed permits to FWS, and FWS agreed to evaluate their impacts on a permit-by-permit basis and develop protective conditions that Florida *must* incorporate into permits. The technical-assistance process is built into Florida's program, codified in state regulations, and memorialized in a memorandum of understanding between Florida and FWS.

Relying on the technical assistance process, as well as EPA's ongoing federal oversight of state-assumed permitting programs, FWS concluded that EPA's approval of Florida's application to assume 404 permitting authority—not any one individual permit—was not likely to jeopardize any protected species under FWS's jurisdiction or destroy critical habitat. FWS did conclude, however, that *some* incidental take of listed species was reasonably certain to occur. Accordingly, FWS issued a biological opinion and incidental take statement, as required by ESA Section 7. Any incidental take resulting from lawful permits

2

issued in compliance with the technical assistance process and other terms and conditions in the incidental take statement will not give rise to ESA liability.

Plaintiffs, a coalition of environmental organizations, brought suit to challenge EPA's approval of Florida's program and FWS's biological opinion and incidental take statement. The district court held that FWS's reliance on the technical assistance process and FWS's failure to identify and set specific caps on take from future permits in the biological opinion and incidental take statement themselves violated the ESA and implementing regulations. The district court also held that EPA erred by failing to consult with the National Marine Fisheries Service (NMFS) at all regarding potential impacts on species under NMFS's jurisdiction. Applying the *Allied-Signal* analysis, the district court vacated EPA's approval of Florida's program, as well as FWS's biological opinion and incidental take statement.

On appeal, the federal government no longer contests that EPA should have consulted with NMFS before approving the program. With regard to EPA's consultation with FWS, however, the district court erred in holding that FWS could not rely on integral features of the proposed Florida 404 program—including technical-assistance requirements intended to avoid and minimize effects on protected species—when determining whether Florida's assumption of the program was likely to jeopardize protected species or harm their critical habitats.

3

FWS's jeopardy determination and resulting incidental take statement were reasonable on this record and met all statutory requirements. The district court erred in concluding otherwise.

The Court should reverse the district court's judgment that declared EPA's consultation with FWS unlawful. This Court should then remand to the district court to determine in the first instance the appropriate remedy in light of the error regarding consultation about NMFS species, and any other errors identified by that court.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under federal laws. JA1–51, JA117–75. The district court's April 12, 2024, judgment was final as to Plaintiffs' ESA claims under Federal Rule of Civil Procedure 54(b). JA1382–1409. This Court has jurisdiction under 28 U.S.C. § 1291. The United States timely filed its notice of appeal on June 11, 2024. JA1468; *see also* Fed. Rule App. Proc. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in holding that EPA's consultation with FWS violated the ESA. Specifically:

a.    Whether FWS appropriately relied on procedural requirements built into Florida's program when determining that EPA's approval of the program was not likely to jeopardize protected species or harm their critical habitat; and

b.    Whether FWS's biological opinion and incidental take statement (and EPA's reliance thereupon) were reasonable and supported by the record.

2.    Whether the district court erred in holding that EPA violated the ESA when it approved Florida's assumption without first consulting with NMFS about potential effects to species under NMFS's jurisdiction.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are in the Addendum following this brief.

## STATEMENT OF THE CASE

### A.    Statutory and regulatory background

#### 1.    Endangered Species Act

Congress enacted the ESA to conserve endangered and threatened species and their habitats. 16 U.S.C. § 1531(b). Species are "listed" as endangered or threatened under the ESA. *See* 16 U.S.C. § 1533. FWS and NMFS (the Services) both administer the ESA and have jurisdiction over different listed species. 50 C.F.R. § 402.01(b). The ESA prohibits taking—e.g., harming or harassing—endangered species and certain threatened species. 16 U.S.C. §§ 1532(19),

1533(d), 1538(a)(1)(B). The Services can assess civil penalties against violators of the ESA, 16 U.S.C. § 1540(a)(1), and the ESA also authorizes criminal penalties, 16 U.S.C. § 1540(b). Citizens can also bring suits to enforce the ESA. 16 U.S.C. § 1540(g).

Under Section 7 of the ESA, federal agencies must consult with the Services to ensure that their discretionary actions are not likely to jeopardize listed species or harm their critical habitat. 16 U.S.C. § 1536(a)(2)–(4); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 667 (2007); *see also* 50 C.F.R. § 402.03. During the consultation process, the agency proposing to do the action (called the action agency) prepares a document, called a biological assessment or biological evaluation, identifying any listed species or critical habitat likely to be affected by the action. 16 U.S.C. § 1536(c), 50 C.F.R. § 402.02. The Services' implementing regulations require the action agency to consider all areas that may be affected "directly or indirectly" by the federal action, not merely the immediate area involved in the action. 50 C.F.R. § 402.02. If the action is likely to adversely affect listed species or critical habitat, the Services then produce a biological opinion that details how the action affects listed species or critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.13(c); 50 C.F.R. § 402.14(b). The implementing regulations require the biological opinion to evaluate information including the current status of listed species and the proposed action's effects. 50

6

C.F.R. § 402.14(g)–(h). The Services must also opine on whether the action is likely to jeopardize listed species or harm critical habitat. 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14(h)(1)(iv).

Some lawful activities that do not jeopardize listed species may nevertheless cause "incidental take," which is defined as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant." 50 C.F.R. § 402.02. If the Services conclude that a proposed action is likely to cause some incidental take but will not jeopardize species, they must provide an incidental take statement that specifies the "impact" of the taking on the species. 16 U.S.C. § 1536(b)(4)(C). The incidental take statement must also set forth mandatory terms and conditions. 16 U.S.C. § 1536(b)(4)(C)(iv). Any take that occurs in compliance with the terms and conditions in an incidental take statement is not prohibited. 16 U.S.C. § 1536(o)(2). Implementing regulations provide that the incidental take statement will specify "the amount or extent" of the taking. 50 C.F.R. § 402.14(i)(1)(i). The regulations further provide that, where discretionary federal involvement or control over the action has been retained, the action agency must reinitiate consultation if the take amount in the incidental take statement is exceeded, if new information reveals effects to listed species or critical habitat that the Services had not previously considered, or if there are newly listed

species or critical habitat in the affected area. 50 C.F.R. § 402.16(a); 50 C.F.R. § 402.14(i).

Private activities that have no nexus to a federal action subject to Section 7 may also cause incidental take. ESA Section 10 provides the mechanism for private parties seeking authorization for incidental take not authorized under Section 7. Under Section 10, the Services may permit incidental take if the applicant submits a detailed conservation plan. 16 U.S.C. § 1539(a)(2); *see also* 50 C.F.R. § 17.22(b)(1) (listing application requirements). Section 10 contains additional requirements, such as submitting the detailed conservation plan and soliciting public comment, not included in Section 7. *Rocky Mountain Wild v. Dallas*, 98 F.4th 1263, 1300 (10th Cir. 2024).

## 2.    Clean Water Act

The CWA prohibits "the discharge of any pollutant" without a permit into the "waters of the United States." 33 U.S.C. §§ 1311(a), 1362(6), 1362(7), 1362(12). Section 404 of the CWA authorizes the Army Corps of Engineers to issue permits for discharges of "dredged or fill material" into waters of the United States. 33 U.S.C. § 1344(a). The Corps must ensure that 404 permits comply with statutorily mandated regulations known as the "Section 404(b)(1) Guidelines." 40 C.F.R. § 230.10(b)(3). The 404(b)(1) Guidelines specify that no permit may issue that "jeopardizes the continued existence of species listed as endangered or

8

threatened under the [ESA], or results in likelihood of the destruction or adverse modification of" critical habitat. *Id.* § 230.10(b)(3).

It is "the policy of Congress" that states implement the permit program under Section 404. 33 U.S.C. § 1251(b). States can assume authority for issuing 404 permits in navigable waters "other than those waters which are presently used or are susceptible to use" for interstate or foreign commerce. 33 U.S.C. § 1344(g). This restriction means that states cannot assume authority for all 404 permits within their boundaries. The waters for which states can issue 404 permits are "assumed waters," while the "other" waters are "retained waters" for which the Corps exercises 404 permitting authority even after state assumption.

To assume 404 permitting authority, a state must apply to EPA. The application must describe the state's proposed 404 permitting program and include a statement from the state's attorney general (or the state permitting agency's legal counsel) that the state's laws provide adequate authority to carry out the program. 33 U.S.C. § 1344(g)(1). After soliciting public comment, EPA "shall approve" a state's 404 assumption application if EPA determines that the state has authority to issue permits that comply with 33 U.S.C. § 1344 and the 404(b)(1) Guidelines. 33 U.S.C. § 1344(h)(2)(A); 40 C.F.R. § 233.15.

Any state that assumes 404 permitting authority must establish conditions for permits that "assure compliance with all applicable statutory and regulatory

requirements," including the 404(b)(1) Guidelines. 40 C.F.R. § 233.23(a). EPA's regulations further provide an opportunity for EPA to review and object to state permits before they issue. 40 C.F.R. § 233.50.

Before Florida, only two states had assumed 404 permitting authority: Michigan in 1984 and New Jersey in 1994. 40 C.F.R. §§ 233.70, 233.71. EPA approved those two programs without engaging in formal ESA consultation resulting in biological opinions or incidental take statements. No one challenged those program approvals (on ESA grounds or any other ground).

## B.     Factual background

### 1.     Florida applied to EPA to assume 404 permitting authority.

In 2018, Florida passed a law giving the Florida Department of Environmental Protection authority to adopt rules to assume and implement 404 permitting. JA2602. Florida then began developing regulations, memoranda of agreement with EPA and the Corps, and other materials for its 404 assumption application. JA2602. In August 2020, Florida applied to EPA to assume 404 permitting authority. *Florida's Request to Assume Administration of a CWA Section 404 Program*, 85 Fed. Reg. 57,853 (Sept. 16, 2020).

### 2.    EPA determined that granting a 404 assumption application was discretionary.

At the time Florida began developing its 404 assumption application, EPA's view was that the ESA's Section 7 consultation requirements did not apply to decisions to grant state applications to assume 404 permitting authority. JA2529–30. EPA's position was based on the 2007 Supreme Court decision *National Association of Home Builders v. Defenders of Wildlife*, which held that EPA's determination whether to transfer permitting authority to a state under a different provision of the CWA, Section 402, was non-discretionary and, thus, Section 7 consultation was not required. 551 U.S. 644, 661 (2007). Similar to Section 404, Section 402 of the CWA mandates that the EPA "shall approve" a state's transfer application unless the state cannot satisfy the requirements listed in the statute. 33 U.S.C. § 1342(b).

In 2019, Florida urged EPA to change position and conclude that 404 assumption decisions were discretionary. JA2034. Florida argued that potential ESA liability was a "significant unresolved obstacle" for states that wanted to assume 404 permitting authority because permittees must avoid adverse impacts to listed species or obtain an ESA Section 10 permit, which "can take years to complete in contrast to the Section 7 process and is more burdensome." JA2033.

Florida urged that the "most efficient and streamlined" approach to resolving the ESA liability issue would be a "*one-time* ESA Section 7 *programmatic*

*consultation* in connection with EPA's initial review of a state application to assume the Section 404 program." JA2033. Florida proposed that EPA consult with FWS. As part of the consultation, FWS would evaluate Florida's 404 program requirements, including requirements to coordinate with FWS to ensure any state 404 permits would not be likely to jeopardize listed species or harm their critical habitat. At the end of the consultation, FWS could issue a biological opinion and incidental take statement covering any take associated with Florida's lawfully issued permits. Florida modeled its proposal for ESA consultation after the approach that the Second Circuit upheld in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018). JA2041–44.

In May 2020, EPA solicited public comment on whether its approval of a state's 404 permitting program was non-discretionary for purposes of ESA Section 7. *Request for Comment on Whether EPA's Approval of a CWA Section 404 Program Is Non-Discretionary for Purposes of ESA Section 7 Consultation*, 85 Fed. Reg. 30,953 (May 21, 2020). In August 2020, EPA concluded that approval was discretionary and therefore Section 7 consultation was required whenever approving a state 404 assumption request that may affect listed species or critical habitat. JA2497. EPA said that a one-time Section 7 programmatic consultation

based on procedural requirements could extend ESA liability protection to individual permittees, reduce costs, and avoid Section 10 requirements. JA2504.[1]

### 3. EPA consulted with FWS, and FWS committed to coordinate with Florida about impacts to listed species.

EPA formally consulted with FWS on Florida's 404 assumption application, and FWS issued the final biological opinion in November 2020. The biological opinion relied on the process built into Florida's program requiring Florida to coordinate with FWS to avoid, minimize, and mitigate impacts to listed species or critical habitat on a permit-by-permit basis. That process is detailed in provisions of Florida's Administrative Code that comprised, in part, the State's 404 assumption application to EPA. *See, e.g.*, F.A.C. 62-331.051–.053.

The Florida Department of Environmental Protection, the Florida Fish and Wildlife Conservation Commission, and FWS also memorialized this process in a memorandum of understanding to coordinate regarding species protection for state 404 permits. JA2609. As outlined in the memorandum, FWS committed to assessing specific impacts from individual permits by providing technical assistance to Florida. JA2621. FWS would provide Florida with technical

---

[1] No party argued below that EPA erred in treating the decision to approve a 404 assumption application as a discretionary action subject to Section 7. This brief accordingly assumes for purposes of argument that EPA correctly determined that Section 7 applies, without prejudice to the agencies' ability to revisit whether that is the best reading of the statute in a future proceeding.

information regarding species biology; potential effects of proposed permits on species, including the quantification of take that is reasonably certain to occur; other actions in the project area that may affect listed species; and measures to avoid or minimize those effects to ensure that the proposed permit would not be likely to jeopardize species or harm critical habitat. JA2621.

FWS would have three opportunities to comment on 404 applications received by Florida. First, when Florida received applications, it would send them to FWS. JA2612. If FWS did not respond within 20 days, then the lack of response would mean FWS had no comment at that time in the process. JA2619. Second, FWS could submit comments in response to Florida's public notices of permits. JA2614–15. Third, FWS could submit comments to EPA so long as it submitted its comments within specified timelines outside of the public notice-and-comment process. JA2614.

Importantly, the agreed-upon process also included mandatory requirements for individual 404 permits. FWS would specify permit conditions or other measures to protect listed species and critical habitat, and Florida's regulations required it to either incorporate those conditions into the permits or deny the permits. JA2617. FWS's conclusions regarding species impacts would be "determinative." JA2621. If FWS "concludes that a permit application is likely to jeopardize or adversely modify designated critical habitat and no protection

measures are available to reduce the risk to an acceptable level," then Florida must deny the permit. JA2673.

FWS concluded in the biological opinion that this technical assistance process would ensure that EPA's approval of Florida's assumption request would not jeopardize species or harm critical habitat. JA2669–70. In particular, FWS concluded that the mandatory procedures would prohibit Florida from issuing any permits that would jeopardize listed species or harm critical habitat, ensure incidental take is minimized, require Florida and FWS to quantify and monitor take associated with each permit, and require Florida and FWS to annually review the amount of incidental take. JA2621, JA2673.

The biological opinion also relied on EPA's regulations governing federal oversight of state-assumed 404 permitting programs. JA2613. Under EPA's regulations, a state must give EPA the opportunity to review and submit objections to proposed state permits, except for any categories of permits waived under the relevant memorandum of understanding between EPA and the state. 40 C.F.R. § 233.50(a)–(b); *see also id.* § 233.51. Here, Florida and EPA entered into a memorandum of agreement whereby EPA retained authority to review eight categories of permits, including any "[d]ischarges with reasonable potential for affecting endangered or threatened species as determined by []FWS." JA1573. Per the memorandum, "a project has a reasonable potential for affecting endangered or

threatened species . . . if it has been determined during the technical assistance process . . . that the project may affect federally listed species or their critical habitat." JA1573. When EPA objects to a permit or offers a condition to be imposed on the permit, the state may not issue the permit unless it takes the steps required by EPA to resolve the objection. 40 C.F.R. § 233.50(f); *see also* 40 C.F.R. § 230.10(b)(3) (prohibiting permits that jeopardize listed species or harm critical habitat). Thus, EPA's regulations allow it to veto permits that would jeopardize listed species—just as the biological opinion, technical assistance memorandum of understanding, and accompanying state regulations allow FWS to veto permits that would jeopardize listed species.

Consistent with the ESA, FWS also issued an incidental take statement for future incidental take from Florida's program that would not jeopardize listed species or harm their critical habitat. JA2670–73. The incidental take statement provided that EPA and Florida would be exempt from ESA liability for any take incidental to activities authorized by state-issued permits so long as all parties complied with the technical assistance process and Florida included FWS's protection measures as mandatory conditions in permits. JA2672. To the extent Florida's permittees lawfully comply with their state-issued permits by implementing all mandatory permit conditions, they would also benefit from the incidental take statement's exemption from liability. JA2671.

16

The incidental take statement did not estimate the amount of incidental take that might occur from permitted activities because it was not possible for FWS to know what permits would issue and where throughout the life of the program, let alone specific amounts of take resulting from those permits. JA2670–71. Instead, FWS committed to quantify and track anticipated take amounts of listed species on a project-by-project (i.e., permit-by-permit) basis. JA2621. Florida also committed that if new information (such as newly listed species or modifications to permitted activities) showed that impacts to listed species would be greater or different than anticipated at the time the permit issued, then Florida would reopen permits and coordinate with FWS regarding the appropriate response, such as imposing additional requirements. JA2673.

### 4. EPA concluded 404 assumption in Florida would not affect listed species under NMFS' jurisdiction.

In September 2020, EPA informed NMFS that its decision to approve or disapprove Florida's 404 application would have "no effect on NMFS' jurisdictional species." JA2174. EPA made that determination because listed species under NMFS's jurisdiction do not live in waters for which Florida could assume 404 permitting authority. JA2320. Certain NMFS species do exist in waters for which the Corps retained 404 permitting authority. JA2320.

In December 2021, in response to a notice of intent to sue from Plaintiffs, EPA told Plaintiffs that it would prepare a biological evaluation regarding whether

17

approving Florida's 404 application would affect NMFS species and that EPA would, if appropriate, initiate consultation with NMFS. JA2505. In July 2023, EPA transmitted a biological evaluation to NMFS, along with a request to initiate consultation, and notified the district court. JA1033. EPA's July 2023 submittal to NMFS concluded that, taking into account potential indirect effects, Florida's 404 program may affect three NMFS species, specifically Atlantic sturgeon, Shortnose sturgeon, and smalltooth sawfish, even though those species do not live in assumed waters. *ESA Biological Evaluation for CWA Section 404 Assumption by the State of Florida*, § 8.3, PDF p. 83 (July 2023) ([https://perma.cc/E9AX-662T](https://perma.cc/E9AX-662T)).[2]

### 5.     EPA approved Florida's 404 application.

EPA approval of Florida's 404 assumption application went into effect on December 22, 2020. *EPA's Approval of Florida's CWA Section 404 Assumption Request*, 85 Fed. Reg. 83,553 (Dec. 22, 2020).

### 6.     After EPA's approval, problems arose with Florida's implementation of its program.

While not germane to the issues presented in this appeal, there have been serious post-assumption problems with Florida's implementation of its 404 permitting program. For example, before the Supreme Court issued *Sackett v. EPA*,

---

[2] "The Court may take judicial notice of information posted on official public websites of government agencies." *Arab v. Blinken*, 600 F. Supp. 3d 59, 63 n.1 (D.D.C. 2022).

598 U.S. 651 (2023), Florida was relying on a regulatory definition of "waters of the United States" that was vacated in 2021, and Florida "fail[ed] to acknowledge intervening changes in binding federal law." JA701. Florida's reliance on the outdated definition was "problematic." JA701.

Florida's implementation of its 404 program was also lacking in several other respects. For example, Florida did not follow required protocols for delineating wetlands, which meant that it was not accurately assessing whether waterbodies were waters of the United States for which a 404 permit was required. Ltr. from EPA to Fla. Dep't of Env't Prot., Enclosure at 1–2 (Nov. 16, 2023) (https://perma.cc/WKQ8-RLVB). In addition, Florida did not conduct sufficient permit compliance inspections and the penalties it assessed against violators were inadequate. *CWA Section 404 Compliance Evaluation and Enforcement Program Review Report*, at 10–12 (Feb. 2024) (https://perma.cc/8VFH-JVDN).

EPA can object to 404 permits that do not comply with the CWA or the 404(b)(1) guidelines, 40 C.F.R. § 233.50(e), and it had objected to 39 of Florida's proposed permits as of April 2023. Ltr. From EPA to Fl. Dep't of Enviro. Protection, at 2 (May 24, 2023) (https://perma.cc/9NXJ-6LZU). Importantly though, none of these objections were based on the technical assistance process or protecting listed species and their critical habitat. Aside from objecting to proposed individual permits, EPA can also initiate proceedings to withdraw Florida's

19

program altogether. 40 C.F.R. § 233.53. EPA has not initiated proceedings to address the shortcomings in Florida's implementation of the program.

## C.     Proceedings below

A coalition of environmental groups (Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper, and Florida Wildlife Federation) filed suit in January 2021. JA1–51. They challenged EPA's approval of Florida's application, FWS's biological opinion, and FWS's incidental take statement. They raised ESA, CWA, and Administrative Procedure Act (APA) claims. JA1–51, JA117–75. Plaintiffs also alleged that the Corps' list of waters for which it would retain jurisdiction was unlawful. JA1–51.[3]

The district court granted Florida's unopposed motion to intervene to defend the challenged federal actions. Minute Order (Feb. 1, 2021).

On cross motions for summary judgment, the district court held that FWS's biological opinion was unlawful, and that EPA had "impermissibly relied" on the flawed opinion in approving Florida's application. JA1367. According to the district court, a biological opinion must include a "detailed discussion of the environmental baseline of the listed species and critical habitat" and a "detailed

---

[3] The Miccosukee Tribe also filed suit challenging EPA's approval of Florida's 404 assumption application and alleging that EPA violated its tribal sovereignty. *Miccosukee Tribe of Indians of Florida v. EPA*, S.D. Fl. No. 1:22-cv-22459. That case is currently stayed because of the district court's vacatur in this case.

discussion of the effects of the action on listed species or critical habitat," but this biological opinion did not do so. JA1340 (quoting 50 C.F.R. § 402.14(h)).

The district court rejected the United States' argument that FWS could not do species-specific analysis because FWS lacked sufficient information to anticipate the effects of every future 404 permit action in Florida. JA1346. The court said that FWS could have given "meaningful consideration" to data from previous consultations in Florida. JA1347.

The district court also rejected defendants' reliance on the Second Circuit's *Cooling Water Intake* decision. It emphasized that the technical assistance procedures at issue in *Cooling Water Intake* were enforceable because the underlying agency decision was a regulation issued after notice-and-comment rulemaking, whereas here, EPA's approval of Florida's program was not codified in a regulation. JA1348–49. In addition, the court said that *Cooling Water Intake* "stands alone as the only case concerning, much less approving, a programmatic biological opinion and incidental take statement of this sort" and "is at odds with the statute, regulations, and caselaw." JA1349–50.

The district court then held that FWS's incidental take statement was unlawful. JA1356. The incidental take statement "sets no numerical take limit" and "provides no 'clear standard for determining when the level of anticipated take has been exceeded'"—both of which the district court concluded were necessary

21

features of an incidental take statement. JA1357 (quoting 50 C.F.R.

§ 402.14(i)(1)(i)). In addition, the incidental take statement had "no program-level

reinitiation trigger." JA1361, JA1363.

The district court also concluded that EPA's 2020 determination that 404

assumption in Florida would have no effect on listed species under NMFS's

jurisdiction was arbitrary and capricious. JA1370. EPA focused on whether listed

NMFS species "occur" in assumable waters, but it did not consider the potential

for indirect effects. JA1370. This narrow focus violated the requirement that EPA

must consider all areas that may be affected directly or indirectly by the federal

action. JA1370 (citing 50 C.F.R. § 402.02).

The district court vacated the biological opinion, the incidental take

statement, and EPA's approval of Florida's 404 application. JA1377, JA1379. The

district court did not address the CWA claims. JA1290.

Florida moved for entry of a final judgment. JA1263–81. The district court

dismissed the CWA claims as moot, entered final judgment under Federal Rule of

Civil Procedure 54(b), and kept pending Plaintiffs' claim regarding the Corps'

retained waters list. JA1393; JA1409.

All parties appealed the Rule 54(b) judgment. Florida moved for a stay

pending appeal. Both the district court and this Court denied a stay.

## SUMMARY OF ARGUMENT

The scope of the federal government's appeal is limited. We maintain that FWS and EPA complied with the ESA when FWS evaluated and EPA approved Florida's application to assume 404 permitting authority in 2020. The district court's contrary holding should be reversed. But the federal government concedes on appeal that EPA erred by failing to consult with NMFS before it approved Florida's application. In light of that conceded error, and the disruptive impact of a Section 404 jurisdictional ping-pong, the appropriate course is to remand to the district court to consider the proper remedy based on the disposition of all of Plaintiffs' claims against EPA, FWS, and the Corps.

1.     a. FWS's consultation on EPA's approval of Florida's 404 permitting application involved substantial uncertainty. EPA's action had myriad unknown, unknowable effects at the time EPA had to make its decision. Given the nature of state assumption of 404 permitting authority under the CWA, any predictions EPA could make about when and where permits will issue throughout the life of a state's program, potentially in perpetuity, would be guesswork. In this case, permits issued by Florida could affect any and all assumed waters in Florida, plus any other areas that might be indirectly affected by Florida's issuance of 404 permits in assumed waters. Any 404 permits could involve different activities, such as mining or building roads. Different activities can have different effects on

23

different species, and different effects call for different types of regulatory responses from the state permitting authority. It simply was not possible for FWS to predict and analyze the specific impacts that would occur on all listed species from 404 permitting in all assumed waters in Florida.

b. When faced with such uncertainty, ESA consultation must rely on current, available information to understand future effects. The agencies modeled their approach here—technical assistance—on one that EPA and the Services have used in similar circumstances where future activities and their effects to listed species and critical habitat are unknown (indeed unknowable) at the time of consultation. This process entails close coordination among all involved agencies to ensure that they are using the best available information to identify effects to listed species and critical habitat and adopting site-specific avoidance, minimization, and mitigation measures.

Here, FWS reasonably relied on the technical assistance process, which was built into Florida's program, to conclude that Florida's assumption of permitting authority—not any one individual permit—would not jeopardize listed species or harm critical habitat in the future. The safeguards in Florida's program included not just Florida's prohibition on issuing permits that would jeopardize federally listed species, which is also prohibited by the CWA Section 404(b)(1) guidelines, but also a mandatory technical assistance process under which FWS must review

all permits for their effects on listed species. FWS must provide protective measures to avoid or minimize take, Florida must include all FWS measures as mandatory conditions in permits, and no permit may issue over federal objections.

FWS evaluated Florida's program as proposed—including these built-in safeguards. The federal ESA regulations provide that FWS must consider measures that are part of an action and intended to offset effects of the action. It did so here. The district court erred in questioning whether FWS and Florida would actually implement the technical assistance process they agreed to in their memorandum of agreement and which is required by the biological opinion and incidental take statement, simply because the process was not contained in a federal regulation adopted after notice-and-comment rulemaking. The court's skepticism is inconsistent with the presumption of regularity afforded to agencies and overlooks that Florida state regulations make the technical assistance process mandatory.

c. FWS's biological opinion and incidental take statement had sufficient detail to satisfy the ESA's requirements. In the biological opinion, FWS described how the action would affect listed species and critical habitat. It described the types of activities for which Florida could issue permits, the potential impacts of those activities, and the areas in which Florida could issue permits. It evaluated potential effects on "guilds" of species, meaning groups of species with similar traits or habitat needs. This guild-based approach was reasonable because FWS

determined that similar species are likely to experience the same impacts. In the CWA, Congress encouraged state assumption of 404 permitting authority. It would be unreasonable to interpret the ESA in a manner—requiring more detail than the agencies can possibly know when evaluating a state assumption application—that precludes state assumption.

FWS's incidental take statement was also sufficiently detailed. The ESA requires FWS to issue an incidental take statement when it determines that incidental take is reasonably certain to occur and that such take will not jeopardize listed species or harm their critical habitat. Here, while recognizing that some incidental take was reasonably certain to occur, FWS could not estimate the number of individual listed species that might be taken. So, instead, it decided to quantify and evaluate incidental take on a project-specific basis through the technical assistance process. FWS ensured compliance with the technical assistance process through the terms and conditions in the incidental take statement and by relying on its memorandum of agreement with Florida, EPA's authority to review and object to permits that may jeopardize listed species, and Florida's regulations that require state-issued permits to contain mitigation measures to protect listed species and prohibit Florida from issuing permits that may jeopardize listed species.

2.     When it was considering Florida's 404 application, EPA concluded that Florida's program would not impact listed species under NMFS's jurisdiction. The United States now acknowledges that EPA's original determination that Florida's 404 assumption would not affect NMFS species was erroneous. The Court should remand to the district court to determine the appropriate remedy—vacatur or remand without vacatur—for EPA's now-conceded error of failure to consult with NMFS, and any other errors or the district court might find with EPA's action.

## STANDARD OF REVIEW

The Court reviews ESA claims under the APA. *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 574 (D.C. Cir. 2016). Under the APA, a court may set aside an agency action if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This scope of review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). When examining "scientific determination[s], . . . a reviewing court must generally be at its most deferential." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

27

## ARGUMENT

## I.    EPA's consultation with the Fish and Wildlife Service complied with law.

FWS and EPA confronted a situation here where the action, i.e., approval of a state 404 assumption application, would have future effects that the agencies did not—and could not—predict in advance. ESA consultation may nonetheless proceed and indeed must be able to proceed if the federal government is ever to act in the face of uncertainty. Here, FWS reasonably relied on the technical assistance process that was modeled after an approach used and upheld elsewhere and built into Florida's program to determine that EPA's approval of Florida's program was unlikely to jeopardize listed species or destroy critical habitat. Under this process, FWS must review permit applications and provide measures to avoid and minimize impacts, and Florida is required to include those measures as mandatory conditions in permits. FWS also relied on EPA's ongoing oversight of Florida's program, which is required by federal regulation. FWS's reliance on those protections to determine whether EPA's approval of a program so structured was likely to jeopardize species was not arbitrary or capricious. And FWS's biological opinion and incidental take statement contained sufficient detail to comply with the ESA, given FWS's inability to know the specific permits that Florida would issue after it

28

assumed permitting authority. For these reasons, FWS's biological opinion and incidental take statement are lawful.[4]

### A.    The action here had effects that were unknown and unknowable.

Under the CWA, when a state assumes 404 permitting authority, it becomes responsible for issuing all future dredge and fill permits in all assumed waters in the state. The potential location and scope of activities that ultimately may be permitted by the state five, ten, or fifty years after assumption is not—and cannot be—known at the time that EPA's approval decision must be made. After all, what permits a state will issue depends on what permits applicants will seek. And what permits applicants will seek can turn on many factors, from individuals' own circumstances to broader economic fluctuations, real estate market conditions, technological developments, sociological trends, and more. *See* JA2312–13.

Moreover, the impossibility of knowing what permits will be sought and where is only part of the challenge. To forecast what specific effects those hypothetical permits would have on listed species also would require regulators to predict how species' populations and habitats would change years into the future.

---

[4] For purposes of this brief, the lawfulness of EPA's reliance on the biological opinion and incidental take statement turns on the lawfulness of FWS's actions. The government does not contend in this case that EPA should have been permitted to rely on those documents, if the documents themselves were inadequate.

To put these unknowns into perspective, the relevant action area in this case covered all state-assumed waters in Florida plus any other areas, including terrestrial areas, that may be affected, directly or indirectly, by Florida's issuance of 404 permits. JA2639; *see also* 50 C.F.R. § 402.02 (defining "action area" as "all areas to be affected directly or indirectly by the Federal action"). EPA identified 235 species that occur in the action area and may be affected by 404 permitting in Florida. JA2646. Of the 235 species, 139 are listed as threatened or endangered and the remainder are species that have been proposed for listing or may be considered for ESA listing in the future. JA2646. And the types of permits that Florida might issue could cover activities such as residential developments, agriculture, roads, marinas, dams, or mining. JA2632. All those different activities can have different potential effects, such as encouraging invasive plants or fragmenting habitat. JA2658–59. And there are different potential responses to prevent or mitigate different effects. For example, some impacts can be avoided or minimized through best management practices during construction, such as silt fences. JA2627. In other circumstances, permit conditions, such as restricting work to specific seasons or prohibiting refueling equipment within 100 feet of wetlands, might be required. JA2625, JA2627. And in other circumstances, such as when wetlands are destroyed, it may be necessary to require permittees to establish, restore, or preserve other wetlands. JA2627.

Because Florida's 404 program "would regulate a broad array of activities conducted over several geographic areas and long periods of time, there [wa]s substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activities." JA2644. It was "not possible" for FWS to do a "detailed analysis of potential effects in the future" because "the exact locations, amounts, and types of impacts [we]re not yet known." JA2658.

**B.    Taking into account the unknowns, FWS reasonably relied on safeguards built into Florida's program to determine whether it was likely that the program would jeopardize listed species or harm critical habitat.**

Technical assistance is a mechanism that ensures that unknown future effects to listed species will be avoided, minimized, and mitigated. It is a process by which FWS will evaluate the specific facts that arise for each individual permit, determine the appropriate measures to protect listed species, and require a permitting body to implement those measures. Because this process is built into Florida's program, FWS can reasonably evaluate the likely effects on listed species and critical habitat when confronted with an agency action featuring unknown impacts on numerous species over a geographically dispersed area.

To put technical assistance into its broader context, the Services regularly and appropriately find that mitigation features built into a proposed action will avoid jeopardy. For example, this Court recently upheld a determination that agency action was not likely to adversely affect listed species where the agency

committed in the proposed action to crafting a monitoring plan that would "include adaptive management measures" to be specified later if certain events occurred. *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 255 (D.C. Cir. 2024). This Court should likewise uphold the use of the technical assistance process to ensure against jeopardy.

Here, notwithstanding the many unknowns regarding what particular permits Florida would ultimately issue, FWS was able to reasonably answer the question before it: *whether EPA's approval of Florida's assumption of CWA 404 permitting authority*—not any one individual permit—was likely to jeopardize listed species or harm critical habitat. FWS did so by relying on the features of the program that were memorialized in memoranda of agreement (between Florida and FWS and between Florida and EPA) and codified in state regulations. As discussed, those mandatory features require Florida to send all permit applications to FWS, require FWS to provide protective measures to protect listed species and critical habitat, require Florida to include all FWS measures as mandatory permit conditions, and ensure that no permits may issue over federal objections. JA2669–70.

The biological opinion demonstrates that FWS grounded its no-jeopardy conclusion in the safeguards built into Florida's program. For example, FWS said that Florida had "built in a sufficiently structured process to insure" that Florida's issuance of 404 permits was "not likely to cause an appreciable reduction in the

likelihood of both the survival and recovery of any listed species" and was "not likely to result in destruction or adverse modification of critical habitat." JA2669–70; *see also* JA2667 (explaining that the biological opinion "assesses whether, and to what degree, [the Florida Department of Environmental Protection] has structured its 404 program to establish processes . . . that address[] adverse effects to listed species and their critical habitats"). That process allows FWS to review each application to determine measures to avoid or minimize impacts to listed species and critical habitat, and Florida must include those measures as mandatory permit conditions. JA2606–07, JA2609. It also allows FWS to incorporate new information, such as newly listed species, in reviewing future permits. JA2646. In addition to the technical assistance process, the biological opinion also explicitly relied on the oversight authority exercised by EPA under the CWA regulations, which includes the opportunity for EPA to object to any permit that has reasonable potential for affecting endangered or threatened species as determined by FWS. JA2614; *see* pp. 15–16, *supra*. And if Florida does not resolve the objections, then the permit cannot issue. 40 C.F.R. § 233.50(f).

The district court nevertheless dismissed the technical assistance process as an attempt to circumvent the statutorily required Section 7 procedures, but that is wrong; the technical assistance process is a *feature of the proposed action*, which FWS *must* consider when carrying out its duties under Section 7. JA1345. FWS's

role during consultation is to determine whether the proposed action is likely to jeopardize listed species or harm critical habitat. *See* 16 U.S.C. § 1536. In making that determination, FWS evaluates the action as proposed, including any species protections built into the proposed action. *See* 50 C.F.R. § 402.14(c)(1)(A) (requiring the action agency to provide FWS with "[a] description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the action"). It would have been arbitrary and capricious for FWS to disregard the mandatory technical assistance features incorporated into Florida's program when evaluating the effects of EPA's approval of Florida's program. And, as described above, the technical assistance process was the only aspect of the action that FWS could reliably evaluate where future impacts to specific species and their critical habitat are indeterminate and unknowable.

The Second Circuit upheld reliance on a comparable technical assistance process in *Cooling Water Intake*. There, the Services jointly produced a biological opinion relying on a technical assistance process like the one at issue here and concluding that an EPA regulation was not likely to jeopardize listed species. 905 F.3d at 58. The regulation detailed requirements for structures that intake large volumes of cooling water for power plants or manufacturing facilities. The force of the inflowing water can kill billions of aquatic organisms. *Id.* These structures require a National Pollutant Discharge Elimination System permit under the CWA,

34

and 47 states have their own National Pollutant Discharge Elimination System

permitting programs—which means that for most cooling water intake permits,

there will be only a state permit, not a federal permit subject to Section 7

consultation. *Id.* at 60 n.2. The Services determined that the regulation would not

jeopardize listed species because of their ability to examine site-specific impacts

and impose conditions at the state permitting stage via the technical assistance

process, notwithstanding that the impacts of particular permits implementing that

regulation were yet unknown. *Id.* at 71–72.

The Second Circuit upheld that approach. *Id.* at 71. The Second Circuit held

that "[n]othing in the ESA requires that the Services assess every future 'phase' of

an agency action on a site-specific or species-specific basis." *Id.* at 73. The

Services were entitled to deference in their expert conclusion that "a categorical

assessment" of impacts "was infeasible," and the Second Circuit concluded that

they "did not violate their statutory obligations when they decided to solicit more

data (during the permitting process) in order to assess [] impacts on a site-specific

basis." *Id.* at 74. The agencies "complie[d] with the ESA" when they concluded

that impacts should be assessed in the future on a "site-specific basis." *Id.* at 76.

The district court declined to follow the Second Circuit. Inter alia, it

questioned whether FWS, EPA, and Florida would follow the technical assistance

process here because there was no federal notice-and-comment rulemaking

whereas, in *Cooling Water Intake*, the technical assistance process had been adopted as a binding federal regulation. JA1348 (emphasizing that the *Cooling Water Intake* technical assistance process requirements "were codified as part of the rulemaking, creating legally binding responsibilities for all parties" whereas the technical assistance process here "was adopted without the benefit of a notice and comment rulemaking").[5] The district court's skepticism was unwarranted.

The Supreme Court has explained that a "Biological Opinion and accompanying Incidental Take Statement alter the legal regime to which the action agency is subject, authorizing it to take the endangered species if (but only if) it complies with the prescribed conditions." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). Further, the ESA regulations specify that "[m]easures included in the proposed action . . . that are intended to avoid, minimize, or offset the effects of an action . . . do not require any additional demonstration of binding plans." 50 C.F.R. § 402.14(g)(8).

The Services regularly issue biological opinions without engaging in rulemaking and they act in accordance with those opinions—as do the agencies and applicants subject to them. Commitments that agencies make in those

---

[5] It bears noting that EPA did seek public comment on whether to subject Florida's assumption application to Section 7, notwithstanding that it did not codify its ultimate conclusion and subsequent approval decision in a regulation. *See* 85 Fed Reg. at 30,953.

biological opinions are entitled to a presumption of regularity. *Cf. People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. & Animal & Plant Health Inspection Serv.*, 918 F.3d 151, 157 (D.C. Cir. 2019) (A "presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (quoting *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 174 (2004))).

Here, the biological opinion itself repeatedly says that FWS must provide measures to avoid or minimize effects to listed species, that Florida must include FWS's conditions in permits, and that FWS's conclusions regarding the conditions necessary to protect listed species and critical habitat are "determinative." JA2629–30; *see also* JA2631 ("With regard to conclusions about the potential effects of a project on ESA-listed species, their critical habitats, or the effectiveness of proposed protection measures, the final []FWS position is determinative."). If Florida does not include FWS's conditions in permits, then any subsequent incidental take will not be exempt from ESA liability. JA2630. The biological opinion alone, including the consequence to Florida of being subject to ESA liability for failure to comply, was a reasonable basis for FWS to rely on Florida's and the federal agencies' adherence to those procedures.

But the record here contains additional evidence of binding commitments. As noted, FWS and Florida entered into a memorandum of agreement memorializing the technical assistance process. JA2177–89. And EPA entered into a memorandum of agreement with Florida retaining its authority to review (and, if necessary, object to) permits with reasonable potential to affect ESA listed species. JA1573. Florida's regulations also make the technical assistance process mandatory, provide that no permit may issue if it jeopardizes listed species or harms critical habitat, and declare compliance with FWS conditions proposed through the technical assistance process as "determinative" for assessing compliance with that no-jeopardy requirement. F.A.C. 62-331.053(3)(a)(4); F.A.C. 62-331.054(1); *see also* 40 C.F.R. § 233.23(a); *id.* § 230.10(b)(3) (prohibiting any state that assumes Section 404 permitting authority from issuing a permit that jeopardizes listed species).

In sum, FWS reasonably relied on the technical assistance safeguards built into Florida's program to determine that EPA's approval of Florida's application would not jeopardize listed species or harm critical habitat. The district court's contrary holding was in error.

### C.    FWS's biological opinion and incidental take statement were sufficiently detailed to satisfy the ESA.

The only question remaining regarding the adequacy of FWS's biological opinion and incidental take statement is whether the documents themselves were

38

sufficiently detailed to satisfy the ESA. They were, in light of the inherent unknowns facing the agencies. As discussed above, Section 7 requires that federal agencies "shall" consult with the Services to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). If the action is likely to adversely affect listed species, at the conclusion of consultation, FWS must issue a biological opinion "detailing how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A), 50 C.F.R. § 402.14(a)–(b). FWS must also include an incidental take statement that "specifies the impact" of the taking if it determines that some take will occur. 16 U.S.C. § 1536(b)(4)(C)(i). FWS satisfied those requirements here, and the Court should uphold the biological opinion and incidental take statement under the APA's arbitrary-and-capricious standard of review.

## 1.    FWS "detail[ed] how the agency action affects" listed species and critical habitat.

The biological opinion reviewed Florida's program and described the various ways that unknown future permits could affect listed species and critical habitat—while acknowledging that the specific impacts of any individual permit were not knowable at this time. JA2657–66. It described the types of activities for which Florida could issue 404 permits, the potential impacts of those activities, and the areas in which Florida could issue permits. JA2632–44, JA2657–66.

In performing this analysis, FWS began by briefly describing baseline ecological conditions in different regions of Florida, along with the historical regulatory frameworks affecting species. JA2647–54. FWS then evaluated potential effects on guilds of species, such as mammals, birds, reptiles, or insects, with similar habitat needs or other traits. JA2659–66. FWS described how dredge and fill activities could impact each of these different guilds. For example, for mammals, FWS noted that 404 permits could fragment or degrade habitat or create suitable conditions for competitors, such as rats, or non-native predators, such as cats and dogs. JA2660. For birds, FWS noted that changes in hydrology could cause high nitrogen levels in marshes, which could cause emergent vegetation to become overabundant and choke habitat. JA2662. In addition, changes in hydrology could flood nesting areas. JA2662. FWS noted that 404 permits could directly kill individual crustaceans and plants. JA2665–66. Mollusks would be especially vulnerable to changes in water quality, such as excessive sedimentation, or invasive species, such as Asiatic Clams, which are spread by dredge and fill activities. JA2665–66. The biological opinion also summarized the categories of cumulative effects that species may experience from other human activities in Florida, acknowledging that "[m]any of these activities are expected to continue within the range of various federally protected wildlife, fish, and plant species, and could contribute to cumulative effects to the species within the action area."

40

JA2667. "Species with small population sizes, endemic locations, or slow reproductive rates will generally be more susceptible to cumulative effects." JA2667.

FWS also adopted the extensive analysis in EPA's biological evaluation. JA2646. That biological evaluation describes the environmental baseline of wetlands in Florida and the implications for listed species. JA2252–59. It also contains tables of listed species and different types of stressors (biotic, physical, chemical) to those species from dredge and fill permits, and a section describing the cumulative effects of non-federal activities that are reasonably certain to occur in the action area. JA2425–76.

The district court criticized FWS's guild-based approach, saying that "an analysis at the guild-level fails" the "statutory and regulatory demand to assess the environmental baseline, effects, and cumulative effects at the species-level" and asserting that the ESA "demands far more specific and detailed analysis." JA1341–42. The district court's reading of the ESA was erroneous.

Nothing in the ESA's text prohibits a guild-based approach. As noted, the statute provides that the biological opinion must "detail[] how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). It does not say that the agency must include a separate and redundant detailing of the impacts for each species in a multi-species consultation, when the agency rationally

41

determines that similar species are likely to experience the same impacts—particularly where underlying record documents include a species-by-species breakdown. Here, the biological opinion and EPA's antecedent biological evaluation disclose every species potentially impacted by the action and what stressors each may face, group the species by guilds, and describe the impacts that each guild can be expected to face. And the groupings that FWS used here, based on similar habitat needs, were entirely reasonable. JA2659.

Nor does the ESA support the district court's demand for a more granular accounting of likely effects than the biological opinion contained. While it is undisputed that FWS is obliged to "detail" how the agency action affects each species, 16 U.S.C. § 1536(b)(3)(A), the statute is silent as to what level of "detail" is required, and it would defy accepted principles of statutory interpretation to read that word in a way that gives the agency an impracticable task. *E.g.*, *NASDAQ Stock Market, LLC v. SEC*, 961 F.3d 421, 429 (D.C. Cir. 2020) (rejecting construction that would impose "nonsensical and likely impossible" requirements); *see also EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 515 (2014) (rejecting reading that required an approach that "could scarcely be satisfied in practice"). Moreover, the level of "detail" required should be interpreted in light of the relevancy of the details. Here, FWS exercised its expert judgment to conclude that guild-level effects were appropriate to analyze, given that species-specific

42

effects were so uncertain. While "detail" is not defined in the statute, it cannot mean that additional detail is always required, even when it does not contribute to additional accuracy. FWS's determination was reasonable—particularly under the APA's arbitrary-and-capricious standard of review.

Here, Congress in the CWA not only permitted but encouraged states to apply for authority to issue 404 permits. 33 U.S.C. §§ 1251(b), 1344(g). And it further chose to require EPA to make a one-time decision whether to approve a state's assumption of that authority in perpetuity. *Id.* § 1344(h)(2)(A). For the reasons previously discussed, neither FWS nor EPA can know at the time the CWA requires EPA to act when and where future applicants will seek a permit, for what purpose, near what protected species, etc.[6] A reading of the ESA that nevertheless requires the agencies to account for those details would therefore require the impracticable. What the agencies *do* know at the time EPA must act is the information that the biological opinion contains: the kinds of permits that may be sought, the full range of species that *could* be affected depending on where and

---

[6] The district court thus erred by insinuating that FWS declined to provide more detail in the biological opinion because it believed that "the technical assistance process . . . will (as a matter of process) preclude any adverse effects on listed species." JA1344. FWS recognized that adverse effects (short of jeopardy) were likely to occur, even with the technical assistance process in place. *E.g.,* JA2667 ("The action is likely to adversely affect the species and critical habitats listed in this [biological opinion]."). It did not provide more detail because more detail did not exist.

when the permits are sought, and the types of effects that the various kinds of permits could theoretically have on those species. The ESA requires no more. *See Cooling Water Intake*, 905 F.3d at 74 (deferring to the Services' expert conclusion that "a categorical assessment" of impacts "was infeasible," and holding that the Services "did not violate their statutory obligations when they decided to solicit more data (during the permitting process) in order to assess [] impacts on a site-specific basis").

### 2.    FWS issued a sufficient incidental take statement.

FWS's incidental take statement also complied with the ESA. The ESA *requires* FWS to issue an incidental take statement when incidental take is reasonably certain to occur and when such take is not likely to jeopardize listed species or harm critical habitat. An incidental take statement must "specif[y] the impact of such incidental taking on the species," "specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact," and "set[] forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with" to implement those measures. 16 U.S.C. § 1536(b)(4)(C).

In many cases, incidental take statements comply with those requirements by quantifying the number of individual animals that can be taken (or selecting a surrogate) and setting out particular mitigation measures that will be implemented.

Here, however, FWS's incidental take statement reasonably explained that its "inability to anticipate the locations of future State 404 permit applications did not allow the Service to conduct site- and species-specific analyses to estimate the number of individuals that might be affected by the permitted activities." JA2670. Rather than speculating about the total number of individuals that might be taken over the lifetime of Florida's permitting regime, FWS "specified" that the level of take allowable would be decided on a permit-by-permit basis via the technical assistance process. Specifically, "the amount and extent of incidental take . . . will be quantified and evaluated on a project-specific basis through the technical assistance process conducted between the []FWS and the State." JA2670.

FWS further specified as measures necessary and appropriate to avoid and minimize the impact of incidental take that Florida and FWS would adhere to the technical assistance process set forth in the memorandum of understanding and that EPA would use its CWA 404 oversight authority to minimize impacts to listed species. JA2671–72. FWS explained that, through the technical assistance process, "appropriate measures to minimize incidental take . . . will be developed by the []FWS, and that these measures will ensure that each permit will minimize adverse effects and thereby avoid jeopardy to ESA-listed species and avoid destruction or adverse modification of critical habitat." JA2671.

To ensure compliance, FWS set out a list of terms and conditions that must be satisfied for incidental take immunity to apply, including that Florida "shall" participate in the technical assistance process, "shall forward" all applications to FWS for review, and "shall incorporate as permit conditions all recommended impact avoidance and minimization measures" proposed by FWS. JA2672–73. FWS will specify take limits for individual permits and the terms and conditions create a mechanism for responding if those limits are exceeded. JA2670, JA2673. If new information showed greater impacts than FWS anticipated in setting limits for individual permits or if the amount of take for individual permits is exceeded, then Florida must reopen the permits and coordinate with FWS to assess, for example, whether additional minimization measures are necessary. JA2673.

In *Cooling Water Intake*, the Second Circuit upheld a similar incidental take statement. The Second Circuit explained that, "[g]iven the Services' commitment to the technical assistance process, their justification for not immediately quantifying take is adequate." 905 F.3d at 77. This Court should reach the same conclusion here. In enacting Section 7, Congress could have stated, for example, that an incidental take statement must "impose a numerical cap on the total take to be allowed." Instead, it provided only that the statement will "specif[y] the impact of such incidental taking on the species," without setting a required form or level of detail. 16 U.S.C. § 1536(b)(4)(C). Under some statutory regimes (like the CWA

46

404 assumption provisions), it may be that the most FWS can "specif[y]" about likely incidental take at the time an agency must act is that the impact will be capped at levels that will be determined and memorialized in a binding future process. Recognizing as much is not creating a "third option" in addition to Sections 7 and 10, "whereby incidental take liability might flow from an alternative set of arguably similar procedures," as the district court opined. JA1345. Instead, it is simply declining to infer that Congress meant to create impracticable tasks.

To be sure, the Services' regulations state that an incidental take statement should either quantify "the amount or extent" of take or use a surrogate for take that "sets a clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). But the regulation does not speak to what the agency must do when neither the amount of anticipated take nor any surrogate is knowable at the time the statement must issue—and that was the situation here.[7]

---

[7] The regulations also state that, where discretionary Federal agency involvement or control over the action has been retained, consultation must be reinitiated if the take limit in the incidental take statement is exceeded or if new information reveals effects that the Services had not previously considered. 50 C.F.R. § 402.16(a); 50 C.F.R. § 402.14(i)(5). The incidental take statement here listed the regulatory reinitiation factors but noted that reinitiation would not be triggered if an individual permit's take limit was exceeded or if a new species was listed under the ESA. JA2674. Instead, exceedances of individual permit limitations would require Florida to reopen the permit and coordinate with FWS, as set forth in the incidental

The district court was also off-base in criticizing FWS for not using data from previous consultations to develop quantitative limits on incidental take, saying for example that for the Florida panther "it is not difficult to imagine a cumulative take limit per year for the entire State (or for particular regions of the State." JA1346, JA1358. Even setting aside the 234 other relevant species in Florida, the task that the court imagines is not as straightforward as setting forth an annual cap. The impact of Florida's permitting authority will be felt decades in the future when the status of the panther population (as well as other listed species) may be very different than today. It was reasonable for FWS to rely on the technical assistance process so that it could assess impacts on a permit-by-permit basis—using the best scientific data available at that time—regardless of how far in the future Florida permittees seek those permits. *See* 16 U.S.C. § 1536(a)(2) (requiring the Services to use "the best scientific and commercial data available").

The question is not whether the district court would have approached the consultation differently; rather, the question is whether FWS's decision to rely on

---

take statement's terms and conditions. JA2674. And any effects to newly listed species would be considered through the technical assistance process as appropriate. JA2674.

    The district court said that this reinitiation notice was insufficient because EPA and FWS would "*not* reinitiate formal consultation, (1) even if the take limits set in the state-issued permits (with input from the FWS) are exceeded and (2) even if new species found in Florida are listed as endangered or threatened." JA1361. But until a plaintiff comes forward to argue that the conditions for reinitiation have been triggered and the agencies refuse to reinitiate consultation, this issue is not ripe.

the built-in safeguards of the technical assistance process was rational under the APA. For the reasons discussed, it was—especially given the imprecisions inherent in the district court's alternate approach of speculating what caps might be necessary or appropriate years into the future. Having reasonably chosen to rely on the technical assistance features of the proposed action, FWS "specified the impact" of the incidental take as completely as the limits of its knowledge allowed. The ESA does not require more.

## II. The agencies no longer dispute that EPA was required to consult with NMFS.

For the foregoing reasons, this Court should reverse the district court's holdings that FWS's biological opinion and incidental take statement violated the ESA and that EPA violated the ESA in relying on those documents. However, the federal government does not request that all aspects of the district court's decision be reversed, because it no longer contests that the EPA violated the ESA in failing to consult with NMFS.

When it was considering Florida's 404 application, EPA determined that no NMFS species occurred in potential assumed waters and so it concluded that Florida's program would not impact NMFS species. EPA accordingly did not consult with NMFS. JA2174. But on further review (and while this litigation was pending), EPA determined that it had not fully considered indirect effects when it made that determination. Under ESA regulations, the action agency must consider

"all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. So the regulations required EPA to consider, not only whether NMFS species were present in assumed waters, but also whether actions occurring in assumed waters could indirectly affect NMFS species in retained waters. For example, assumed waters can flow into retained waters where NMFS species exist, and actions in assumed waters could indirectly affect those species by increasing sedimentation or degrading water quality in retained waters. *See ESA Biological Evaluation for CWA Section 404 Assumption by the State of Florida*, App'x C at pp. 97–98 (July 2023) (https://perma.cc/E9AX-662T).

While the district court litigation was pending, EPA concluded that Florida's 404 program may affect three listed NMFS species, specifically Atlantic sturgeon, Shortnose sturgeon, and smalltooth sawfish. *Id.* § 8.3 PDF p. 83. In light of EPA's reconsideration of that issue, the United States now acknowledges that assumption may affect some NMFS species, and that EPA's initial assessment did not sufficiently analyze indirect effects to NMFS species downstream of assumed waters, even though the regulations require agencies to consider direct and indirect effects. *See* 50 C.F.R. § 402.02.

\*      \*      \*

50

The district court did not consider the appropriate remedy for this failure-to-consult error, in isolation. *See* JA1372. If this Court agrees with the federal government's arguments on appeal that the district court correctly disposed of the NMFS-consultation claim but erred in disposing of the FWS-consultation claim, the remedy analysis under *Allied-Signal v. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993), must be redone. The court of original jurisdiction is best positioned to conduct the *Allied-Signal* analysis afresh, in light of all the equities and current circumstances. *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 502 (D.C. Cir. 2019) (holding that district court "is best positioned to order additional briefing, gather evidence, make factual findings, and determine the remedies necessary").

Meanwhile, "the Corps is open for business today; it has unquestionable legal authority to act; it has substantial experience processing Section 404 permit applications; it can, if appropriate, trigger the Section 7 consultative process; and, where appropriate, that process will lead to issuance by FWS of incidental take statements and any corresponding liability protection." JA1393 (cleaned up). The same consideration that cautions against vacatur in the first instance—"the disruption that might result from an interim change, which may itself be changed at a later date," JA1376 (cleaned up)—cautions against a "vacatur of vacatur" by this Court in advance of remand proceedings in the district court. In this circumstance,

51

where Plaintiffs' success on their full complement of claims remains uncertain, but the disruptive consequences of CWA Section 404 jurisdictional ping-pong are clear, the appropriate course is for the district court's vacatur of EPA's assumption to remain in place for the limited duration of district court proceedings on remand.

## CONCLUSION

For the foregoing reasons, the Court should reverse as to the FWS consultation, affirm as to the NMFS consultation, and remand to the district court to determine the appropriate remedy.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ *Rebecca Jaffe*
ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

</div>

Of Counsel:

| | |
|---|---|
| CHASE RAINES | JOAN PEPIN |
| SIMMA KUPCHAN | MICHAEL EITEL |
| ALEXIS WADE | ANDREW COGHLAN |
| *Attorneys* | REBECCA JAFFE |
| Environmental Protection Agency | *Attorneys* |

CHASE RAINES
SIMMA KUPCHAN
ALEXIS WADE
*Attorneys*
Environmental Protection Agency

HELEN SPEIGHTS
*Attorney*
U.S. Department of the Interior

KATHERINE WAINWRIGHT
ERICA ZILIOLI
*Attorneys*
U.S. Army Corps of Engineers

JOAN PEPIN
MICHAEL EITEL
ANDREW COGHLAN
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

March 12, 2025
DJ 90-5-1-4-21866

**CERTIFICATE OF COMPLIANCE**

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 11,720 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

                                   /s/ *Rebecca Jaffe*
                                   REBECCA JAFFE

                                   Counsel for the United States