**DECIDED MARCH 27, 2026**

No. 24-5101, 24-5156, 24-5159 (Consolidated)

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

CENTER FOR BIOLOGICAL DIVERSITY, et al.,
*Plaintiffs-Appellees/Plaintiffs-Appellants*,

v.

LEE M. ZELDIN, et al.,
*Defendants-Appellants/Defendants-Appellees*,

and

STATE OF FLORIDA, et al.,
*Intervenors-Defendants-Appellants/ Intervenors-Defendants-Appellees.*

Appeal from the United States District Court for the District of Columbia
No. 1:21-cv-00119 (Hon. Randolph D. Moss)

**FEDERAL APPELLANTS' PETITION FOR PANEL REHEARING
OR REHEARING EN BANC**

Of Counsel:

ALEXIS WADE
ELEANOR GARRETSON
*Attorneys*
Environmental Protection Agency

HELEN SPEIGHTS
*Attorney*
U.S. Department of the Interior

KATHERINE WAINWRIGHT
ERICA ZILIOLI
*Attorneys*
U.S. Army Corps of Engineers

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*

MICHAEL EITEL
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-0402
rebecca.jaffe@usdoj.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES ....................................................................... iii

GLOSSARY...........................................................................................vi

INTRODUCTION .....................................................................................1

STATEMENT OF THE CASE....................................................................3

    A.    The ESA ....................................................................................3

    B.    The CWA ...................................................................................4

    C.    *Cooling Water* ..........................................................................5

    D.    EPA's ESA consultation with FWS....................................................6

    E.    Litigation ..................................................................................8

ARGUMENT ..........................................................................................8

I.    The panel's decision creates a circuit split, lacks a coherent majority, and is already having significant adverse consequences. ....................................................................................8

II.    The panel's divided ruling erroneously rejected the technical assistance process under the ESA...................................................11

    A.    The BiOp properly relied on the technical assistance process to justify a no-jeopardy determination. ................................11

    B.    The ITS properly relied on the technical assistance process. ...................................................................................15

CONCLUSION......................................................................................18

CERTIFICATE OF COMPLIANCE..............................................................20

ADDENDUM .......................................................................................21

# TABLE OF AUTHORITIES[*]

## Cases

*CBD v. BLM*,
698 F.3d 1101 (9th Cir. 2012) ...............................................................................16

*CBD v. OSMRE*,
2026 WL 1506550 (D.D.C. May 29, 2026)............................................. 3, 10, 11

*\*Cooling Water Intake Structure Coalition v. EPA*,
905 F.3d 49 (2d Cir. 2018)........................................ 1, 5, 12, 16, 17, 18

*Marks v. United States*,
430 U.S. 188 (1977)...............................................................................................9

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998)..............................................................................................15

*Or. Nat. Res. Council v. Allen*,
476 F.3d 1031 (9th Cir. 2007) .............................................................................17

## Statutes

16 U.S.C. § 1533(d) ...............................................................................................3

16 U.S.C. § 1536(a)(2).................................................................................... 3, 16

16 U.S.C. § 1536(a)(2)-(4)......................................................................................3

16 U.S.C. § 1536(b)(3)(A).......................................................................................3

---

[*] Authorities on which we chiefly rely are marked with asterisks.

16 U.S.C. § 1536(b)(4)..................................................................................14

16 U.S.C. § 1536(b)(4)(C) ..................................................... 4, 16, 18

16 U.S.C. § 1536(b)(4)(C)(ii) ..................................................... 4, 18

16 U.S.C. § 1536(o)...................................................................................4

16 U.S.C. § 1538(a)(1)(B) .......................................................................3

33 U.S.C. § 1251(b) ...........................................................................2, 4

33 U.S.C. § 1344(a) ..................................................................................4

33 U.S.C. § 1344(g) ..................................................................................4

33 U.S.C. § 1344(h) ..................................................................................4

33 U.S.C. § 1344(h)(3)..............................................................................5

**Regulations**

40 C.F.R. § 230.10(b)(3)...........................................................................7

40 C.F.R. § 233.50(a)-(b)..........................................................................6

40 C.F.R. § 233.50(f) ......................................................................... 7, 13

50 C.F.R. § 402.01(b) ...............................................................................3

50 C.F.R. § 402.14(g)-(h) ..............................................................3

50 C.F.R. § 402.14(h)(4)(i)(1)(i) ...................................................3

50 C.F.R. § 402.14(i)(1)(i).............................................................4

50 C.F.R. § 402.14(i)(1)(ii)..........................................................17

50 C.F.R. § 402.16(a).....................................................................4

## Other

*Removing Regulatory Barriers to Affordable Home Construction*,
  Exec. Order No. 14,394, 91 Fed. Reg. 13,207 (Mar. 13, 2026) ..........................10

# GLOSSARY

| | |
|---|---|
| BiOp | Biological Opinion |
| CWA | Clean Water Act |
| EPA | Environmental Protection Agency |
| ESA | Endangered Species Act |
| FWS | Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| OSMRE | Office of Surface Mining, Reclamation, and Enforcement |

**INTRODUCTION**

In 2020, the Environmental Protection Agency (EPA) approved Florida's application to assume authority for issuing permits under Clean Water Act (CWA) Section 404.  EPA consulted with the Fish and Wildlife Service (FWS) under Section 7 of the Endangered Species Act (ESA) regarding impacts to endangered and threatened species from EPA's approval of Florida's application to assume permitting authority.  When a state assumes permitting authority, it becomes responsible for issuing all 404 permits in certain waterbodies across the state. Neither EPA nor FWS could have known the species- or location-specific impacts of the permits Florida might ultimately issue—in perpetuity—as a result of EPA's approval.

Because of these unknowns, Florida, EPA, and FWS relied on "technical assistance," a process the Second Circuit upheld in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018), and which other agencies have applied in different statutory contexts.  Under the technical assistance process, Florida would submit all proposed permits to FWS, which would evaluate potential impacts on a permit-by-permit basis and develop protective conditions that Florida *must* incorporate into permits.  Relying on technical assistance, FWS issued a biological opinion (BiOp) concluding—in accordance with *Cooling Water*—that EPA's approval of Florida's application to assume 404 permitting authority would

1

not cause jeopardy.  Given that conclusion, FWS issued an incidental take statement (ITS) exempting Florida, EPA, and state permittees from ESA liability for future take of listed species incidental to activities authorized by state-issued 404 permits if all parties complied with the technical assistance process and any permit conditions.

A divided panel held that FWS's BiOp violated the ESA, with Judge Pan rejecting *Cooling Water* as "unpersuasive," despite Judge Henderson's partial dissent emphasizing that *Cooling Water* was "correctly decided."  Op. 34, 71.[1] The panel unanimously held that FWS's ITS was unlawful even though *Cooling Water* upheld a nearly identical ITS.  The panel erred.  Federal agencies may comply with the ESA by relying on a technical assistance process involving future site- and species-specific coordination.

In addition to creating a circuit split, the panel's opinion raises exceptionally important issues.  Congress wanted states to manage 404 permitting, 33 U.S.C. § 1251(b), yet "this was only the third successful federal-to-state handoff in the half-century life of the permitting program," Op. 54 (Henderson, J., dissenting). Without technical assistance, "it is unclear how any state ... can ever clear the regulatory hurdles."  *Id.* at 95.  In addition, technical assistance is necessary for other programmatic or cooperative federalism consultations.  The D.C. district

---

[1] Citations to the decision are to the PDF page numbers.

court recently relied on the panel's opinion to vacate the technical-assistance-based BiOp and ITS for 24 state-managed coal mining programs. *CBD v. OSMRE*, 2026 WL 1506550 (D.D.C. May 29, 2026). The United States has appealed *OSMRE* and will seek initial en banc hearing in *OSMRE* so the Court can consider, along with this case, the breadth of the negative impacts from the panel's decision.

**STATEMENT OF THE CASE**

### A.    The ESA

The ESA prohibits taking endangered species and certain threatened species. 16 U.S.C. §§ 1538(a)(1)(B), 1533(d). FWS and the National Marine Fisheries Service (the Services) administer the ESA. 50 C.F.R. § 402.01(b). Federal agencies must consult with the Services to ensure that actions that they authorize, fund, or carry out will not jeopardize listed species or destroy critical habitat. 16 U.S.C. § 1536(a)(2)-(4). The Services must "use the best scientific and commercial data available." *Id.* § 1536(a)(2).

The Services produce a BiOp that "detail[s]" how the action affects listed species and whether the action is likely to jeopardize listed species or destroy critical habitat. *Id.* § 1536(b)(3)(A). The BiOp must evaluate the environmental baseline, the action's effects, and cumulative effects and explain whether adding the effects and cumulative effects to the baseline will cause jeopardy or destroy critical habitat. 50 C.F.R. § 402.14(g)-(h).

If the Services conclude in the BiOp that the agency action and incidental take will not cause jeopardy or destroy critical habitat, then they must provide an ITS that "specifies the impact of such incidental taking," 16 U.S.C. § 1536(b)(4)(C), including "the amount or extent" of the taking, 50 C.F.R. § 402.14(i)(1)(i).  Consultation must be reinitiated if the take amount in the ITS is exceeded.  *Id.* § 402.16(a).  The ITS must also specify "reasonable and prudent measures" that are "necessary or appropriate to minimize" incidental take.  16 U.S.C. § 1536(b)(4)(C)(ii).  Any take that occurs in compliance with an ITS's terms is exempt from ESA liability.  *Id.* § 1536(o).

**B.     The CWA**

CWA Section 404 authorizes the Army Corps to issue permits for discharges of "dredged or fill material" into waters of the United States.  33 U.S.C. § 1344(a). States may assume authority for issuing 404 permits in navigable waters "other than those waters which are presently used, or are susceptible to use" for interstate or foreign commerce.  *Id.* § 1344(g).  To assume 404 permitting authority, states must apply to EPA.  EPA "shall approve" state 404 assumption applications if states satisfy specified criteria.  *Id.* § 1344(h).

It is "the policy of Congress" that states manage 404 permitting.  *Id.* § 1251(b).  If EPA "fails to make a determination" regarding a state's 404 assumption application within 120 days, the state's 404 program "shall be deemed

4

approved." *Id.* § 1344(h)(3). "The presumption is in favor of transferability." Op. 58 (Henderson, J., dissenting).

### C.   *Cooling Water*

In *Cooling Water*, the Second Circuit upheld the Services' reliance on technical assistance in evaluating a nationwide regulation for cooling water intake structures. 905 F.3d at 58. These structures require a CWA Section 402 permit and, because 47 states have their own 402 permitting programs, most cooling water intake structures would have state 402 permits, not federal permits subject to Section 7 consultation. *Id.* at 59 n.2. Because the regulation applied nationwide, the Services had a "paucity of information" about specific facilities and they could not evaluate specific impacts or estimate a "precise amount of incidental take." *Id.* at 63, 77. So they relied on the technical assistance process and planned to examine site-specific impacts, impose protective conditions, and quantify take at the permitting stage. *Id.* at 71–72.

The Second Circuit upheld the Services' technical-assistance-based BiOp and ITS, holding that "[n]othing in the ESA requires that the Services assess every future 'phase' of an agency action on a site-specific or species-specific basis." *Id.* at 73. "[T]he Services did not violate their statutory obligations when they decided to solicit more data (during the permitting process) in order to assess [] impacts on a site-specific basis." *Id.* at 74.

**D.    EPA's ESA consultation with FWS**

In 2020, Florida applied to EPA to assume 404 permitting authority.  EPA consulted with FWS on Florida's application.  Because Florida could not know all the permits it might issue, Florida proposed to use technical assistance based on the approach upheld in *Cooling Water.*  JA2041-44.  Florida built the technical assistance process into its proposed permitting program, promulgating regulations requiring it to coordinate with FWS to avoid, minimize, and mitigate impacts to listed species and critical habitat on a permit-by-permit basis.  JA2612-13.  Florida and FWS also memorialized this process in a technical assistance memorandum of understanding.  JA2609.

The agreed-upon process included mandatory requirements.  FWS would review applications and specify conditions to protect listed species, and Florida had to incorporate those conditions into permits or deny the permits.  JA2617.  FWS's conclusions regarding species impacts were "determinative."  JA2621.  If FWS concluded that a proposed permit was likely to cause jeopardy or destroy critical habitat and no protective measures could reduce the risk, then Florida had to deny the permit.  JA2673.

EPA also oversees state 404 programs.  JA2613.  EPA must have the opportunity to review and object to proposed permits, 40 C.F.R. § 233.50(a)-(b), including permits identified during the technical assistance process as having

"reasonable potential for affecting endangered or threatened species." JA1573. If EPA objected to a permit, Florida could not issue the permit without resolving the objection. 40 C.F.R. § 233.50(f). And EPA could object to permits that would cause jeopardy. *Id.* § 230.10(b)(3).

In the BiOp, FWS concluded that the technical assistance process would minimize incidental take and prohibit Florida from issuing any permits that would jeopardize listed species or destroy critical habitat. JA2621, JA2673.

FWS also issued an ITS for future incidental take from state-issued permits. JA2670-73. The ITS exempted EPA and Florida from ESA liability so long as Florida included FWS's protective measures as mandatory conditions in permits. JA2672. If Florida's permittees complied with their state-issued permits, including FWS's protective measures, they would also be exempt from ESA liability. JA2671. The ITS did not estimate the amount of incidental take that might occur because it was impossible for FWS to know what permits would be issued and where, let alone how much take would occur. JA2670-71. Instead, FWS committed to track anticipated take amounts on a permit-by-permit basis. JA2621. If new information showed that impacts would be different than anticipated at permit issuance, then Florida would reopen permits and coordinate with FWS regarding the appropriate response. JA2673.

### E.    Litigation

Plaintiffs challenged EPA's approval of Florida's application, FWS's BiOp, and FWS's ITS.  The district court granted Plaintiffs summary judgment on their ESA claims and vacated the BiOp, the ITS, and EPA's approval of Florida's application.  A divided panel affirmed.  The majority held the BiOp unlawful, and the entire panel held the ITS unlawful.  Judge Henderson partially dissented, explaining that FWS can "rely on structural safeguards in Florida's program to reach a no-jeopardy determination without conducting an analysis of potential harm to each individual species."  Op. 67.[2]

### ARGUMENT

### I.    The panel's decision creates a circuit split, lacks a coherent majority, and is already having significant adverse consequences.

The panel's decision creates a split with the Second Circuit's *Cooling Water* decision.  Each panel member acknowledged the conflict.  *E.g.*, Op. 35, 51, 71.  Judge Pan rejected *Cooling Water*, saying that it was "unpersuasive."  Op. 34.  Judge Wilkins disagreed with *Cooling Water*'s reasoning about the ITS.  Op. 51-52.  Judge Henderson dissented from the majority's ruling invalidating the BiOp and wrote that *Cooling Water* is "not distinguishable" and was "correctly decided."

---

[2] The United States agreed that EPA should have consulted with the National Marine Fisheries Service.  U.S. Br. 50.  That error can be remedied on remand.

Op. 69, 71. So there is a clear, acknowledged split between the Second Circuit upholding technical assistance in *Cooling Water* and the majority rejecting it here.

The panel's decision is badly fractured and lacks any coherent majority reasoning regarding the BiOp. *Cf. Marks v. United States*, 430 U.S. 188, 193 (1977). Judge Pan said the BiOp was deficient because the technical assistance process is not as protective as ESA procedures. Judge Wilkins concurred in Judge Pan's judgment, but not in her analysis. He said the BiOp was unlawful because its no-jeopardy finding depended on the deficient ITS. Judge Henderson disagreed with her colleagues regarding the BiOp. She said the BiOp satisfies the ESA and FWS's no-jeopardy determination was valid "in light of future structural safeguards." Op. 84. A decision by the en banc court would provide clarity on the requirements for programmatic consultations and technical assistance going forward.

The panel's fractured decision already promises to have exceptionally important consequences for cooperative federalism. First, as Judge Henderson noted, Judge Pan's opinion would impose "arduous environmental review" under the ESA as a "roadblock" to state assumption of 404 permitting authority, contrary to Congress's intent under the Clean Water Act. Op. 54. Because of the panel's decision to vacate the BiOp, "it is unclear how any state, particularly one as ecologically diverse as Florida, can ever clear the regulatory hurdles." Op. 95

(Henderson, J., dissenting). Nineteen states filed an amicus brief arguing that the vacatur of Florida's program "seriously damage[d] our system of cooperative federalism" and "hinder[ed] the ability of other States to pursue 404 assumption." States' Amicus 2, 9.  Also, the President recently prioritized state 404 assumption for promoting affordable housing. *Removing Regulatory Barriers to Affordable Home Construction*, Exec. Order No. 14,394, 91 Fed. Reg. 13,207 (Mar. 13, 2026) (directing agencies to review and revise "Federal standards for assumption of [404] permitting by States").

But that is not all.  The D.C. district court recently relied on the panel's decision to vacate a technical-assistance-based BiOp and ITS for 24 state-managed coal mining programs. *OSMRE*, 2026 WL 1506550.  Under the Surface Mining Control and Reclamation Act, states can obtain authority to issue permits for surface mining operations, like the cooperative federalism system Congress created for state assumption of CWA 404 permitting.  The Office of Surface Mining Reclamation and Enforcement (OSMRE) has adopted regulations governing this cooperative federalism scheme and maintains oversight authority.  FWS issued a programmatic BiOp relying on technical assistance to conclude that OSMRE's implementation of its regulations was not likely to jeopardize species or destroy critical habitat.  FWS also issued an ITS stating that incidental take would be quantified on a project-specific basis.  Environmental groups sued, and after the

panel's decision issued, the district court vacated the BiOp and ITS because the panel's decision "control[led]."  2026 WL 1506550 at *13.  As the government explained in declarations supporting its motion to stay that ruling, the vacatur in *OSMRE* risks national security and energy reliability.

**II.     The panel's divided ruling erroneously rejected the technical assistance process under the ESA.**

Aside from creating a circuit split, the panel's decision was also incorrect. Judges Pan and Wilkins erred in rejecting the BiOp, and the entire panel erred in rejecting the ITS.

**A.     The BiOp properly relied on the technical assistance process to justify a no-jeopardy determination.**

The BiOp properly concluded that EPA's approval of Florida's 404 assumption application was not likely to jeopardize listed species based on structural safeguards built into the permitting program, most notably, technical assistance. The BiOp properly analyzed the effects of the action by comparing the technical assistance process that would occur if Florida assumed permitting authority to the Section 7 procedures that would occur if the Corps retained permitting authority.  And then the BiOp properly relied on technical assistance for its no-jeopardy determination.

As Judge Henderson explained, the question here is "can FWS rely on structural safeguards in Florida's program to reach a no-jeopardy determination

without conducting an analysis of potential harm to each individual species and habitat?" Op. 67. The answer is "it plainly can." *Id.* As FWS explained, "the endangered species coordination processes required in the State's operation of the State 404 program ... are as protective as the section 7 interagency consultation processes that occur in the operation of the [Army Corps'] 404 Program." JA2657. FWS reasonably concluded that Florida's assumption of permitting authority would not cause jeopardy because of the built-in procedural safeguards in Florida's program.

"The protections of the technical assistance process more than justif[ied] FWS's no-jeopardy determination." Op. 86 (Henderson, J, dissenting). The Second Circuit in *Cooling Water* held that the Services were "authorized ... to defer consideration of [] impacts to the site-specific permitting process." 905 F.3d at 74. Here, just like in *Cooling Water*, FWS "rel[ied] on the protections of the technical assistance process" and "defer[red] consideration of [] impacts to the site-specific permitting process." *Id.* at 74-75.

Judge Pan, and Judge Pan alone, disagreed with this. She believed the BiOp violated regulations (the requirements to discuss an action's effects and to add the effects and cumulative effects to the environmental baseline to determine whether the action is likely to cause jeopardy) and the statutory requirement to use the best science available. Op. 32. Judge Pan erred. "A BiOp often includes a species-by-

species analysis but that need not always be so.  Context is key and the context here sometimes supports analysis at the guild level." Op. 89 (Henderson, J., dissenting); *see also* Op. 72-77 (Henderson, J., explaining why FWS's guild-level analysis was reasonable), 80-83 (Henderson, J., explaining how FWS appropriately considered the action's effects).

In criticizing FWS for deferring the site- and species-specific analysis to the permitting stage, Op. 32-33, Judge Pan ignored the "comprehensive" structural safeguards built into the technical assistance process, Op. 86 (Henderson, J., dissenting).  Under the technical assistance process, FWS "would offer technical assistance to Florida to identify risks to listed species ... and propose mitigation measures for those risks," and "would undertake that identify-and-mitigate process for *each* permit Florida issued." Op. 63 (Henderson, J., dissenting).  Florida then had to incorporate FWS's proposed measures as mandatory permit conditions or deny the permit. *Id*.  EPA also had authority to review permits.  JA1573.  And if EPA objected to a permit, Florida could not issue the permit without resolving the objection.  40 C.F.R. § 233.50(f).

"With two federal agencies superintending Florida's CWA program for ESA compliance, FWS concluded that Florida's § 404 assumption was not likely to jeopardize listed species." Op. 64 (Henderson, J., dissenting).  FWS was "free to point to the procedural safeguards that attach to future permits—the technical

assistance process that guarantees eventual site- and species-specific assessments—as a basis for its no jeopardy finding." *Id.* at 69.

Judge Wilkins said the BiOp failed because it relied on the deficient ITS. Op. 46-47. He was wrong. A BiOp does not depend on an ITS for its jeopardy analysis. To the contrary, an ITS is produced "after" Section 7 consultation *if* FWS concludes in the BiOp that take incidental to the action will not cause jeopardy or destroy critical habitat. 16 U.S.C. § 1536(b)(4).

Finally, the panel majority erred in vacating the BiOp and EPA's approval of Florida's application. Op. 42-43. As Judge Henderson explained, "[t]he BiOp properly reached a no-jeopardy determination and the ITS had no bearing on the EPA's transfer decision." Op. 91. Instead of the tremendously disruptive remedy of vacating Florida's 404 program—contrary to Congress' wishes that states administer 404 permitting—the panel should have allowed Florida to continue administering its program "[w]hile FWS corrects the ITS," particularly because only a "narrow sliver" of state 404 permits are "likely to result in incidental take." *Id.*

Indeed, Judge Pan called the BiOp's deficiencies "serious" because, in her view, FWS made "inaccurate assumptions about the efficacy of the technical assistance process." Op. 43. But FWS was evaluating a permitting *program*, not site-specific permits. At the programmatic stage, FWS's assumptions about the

14

efficacy of the binding technical assistance process were rational. Vacatur of the *program* should not be premised on speculation about the technical assistance process's future effectiveness in the context of individual permits. *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998) ([T]he disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of—even repetitive—post-implementation litigation.").

**B. The ITS properly relied on the technical assistance process.**

The panel was also wrong about the ITS. The opinion concluded that the ITS violated ESA regulations because it did not quantify the amount or extent of take, identify reasonable and prudent measures to minimize the impact of take, or specify any obligation to reinitiate consultation. Op. 37-38.

Given the inherent unknowns here, the panel erred in rejecting FWS's ITS, which followed *Cooling Water*. FWS explained that "because of the large scale and broad scope of the proposed action, the best scientific and commercial data available are not sufficient to enable the []FWS to accurately estimate the specific amount of incidental take." JA2671. Through the technical assistance process, FWS would ensure that "each permit will minimize adverse effects and thereby avoid jeopardy to ESA-listed species." JA2671. FWS explained that "the amount and extent of incidental take ... will be quantified and evaluated on a project-specific basis." JA2670.

*Cooling Water* upheld this approach. "[A]lthough an ITS that contains no numerical cap ... normally violates the ESA, such an ITS is adequate if it explains why it was impracticable to express a numerical measure of take." *Cooling Water*, 905 F.3d at 77 (cleaned up).

Here, FWS ensured that any incidental take would not cause jeopardy, which is the purpose of ESA Section 7 consultation. The ESA mandates that federal agencies "shall, in consultation with [the Services], insure" that their actions are not likely to cause jeopardy or destroy critical habitat. 16 U.S.C. § 1536(a)(2). That is what FWS did; it ensured that jeopardy would not result from EPA's approval of Florida's application to assume 404 permitting authority.

It makes no difference that the ITS lacked a specific limit. Courts have long acknowledged that ITSs may specify the impact of taking by using a "proxy" or "surrogate," so long as FWS explained why numeric measures were impracticable. *CBD v. BLM*, 698 F.3d 1101, 1127 (9th Cir. 2012); *accord* 50 C.F.R. § 402.14(h)(4)(i)(1)(i) ("A surrogate ... may be used to express the amount or extent of anticipated take."). Here, FWS relied on a procedural proxy, explaining that "the amount or extent of incidental take of listed species will be quantified during the technical assistance process." JA2671. Numeric thresholds are not the *exclusive* means to "specif[y] the impact" of incidental take. 16 U.S.C.

§ 1536(b)(4)(C). FWS's "reliance on the binding technical assistance process" was reasonable and should be upheld. *Cooling Water*, 905 F.3d at 77.

The panel also held that the ITS "fail[ed] to identify specific 'reasonable and prudent measures' to minimize the impact of incidental take." Op. 38 (quoting 50 C.F.R. § 402.14(i)(1)(ii)). But the technical assistance process itself represents a set of "reasonable and prudent measures" to "minimize" the impact of any incidental take. 50 C.F.R. § 402.14(i)(1)(ii). Through the technical assistance process, "appropriate measures to minimize incidental take ... will be developed by the []FWS, and that these measures will ensure that each permit will minimize adverse effects and thereby avoid jeopardy." JA2671.

These measures were like those in *Cooling Water*, where the Services specified "that the EPA must exercise its oversight authority under the CWA in connection with the Rule's technical assistance process." 905 F.3d at 77. *Cooling Water* concluded that the Services' "reliance on the binding technical assistance process was a 'meaningful ... attempt to minimize incidental takings associated with the project.'" *Id.* (quoting *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1039 n.7 (9th Cir. 2007)). As the Second Circuit correctly explained, "[t]he ESA does not mandate any particular form or content for reasonable and prudent measures, requiring only that the Services identify measures that they 'consider[]

17

necessary or appropriate' to minimize the impact of incidental take." *Id.* (quoting 16 U.S.C. § 1536(b)(4)(C)(ii)).

Finally, the panel held that the ITS lacked a valid trigger for reinitiating consultation. Op. 38. But the ITS mandated that if the amount of incidental take that FWS anticipated for individual permits were exceeded or if new information showed that impacts to listed species would be different than anticipated, then Florida must reopen permits and coordinate with FWS regarding the appropriate response. JA2673.

Judge Henderson dissented from the majority's rejection of the BiOp, but she joined the opinion declaring the ITS unlawful. Op. 6 n.1. That opinion was erroneous. The technical assistance approach in the BiOp is the same as the technical assistance approach in the ITS. Moreover, the ESA mandates that FWS "shall provide" an ITS when it determines that the proposed action is not likely to cause jeopardy but is likely to cause incidental take. 16 U.S.C. § 1536(b)(4)(C). The ITS flowed from the BiOp and, under the ESA, FWS had to issue an ITS.

*** 

The panel's fragmented decision conflicts with *Cooling Water*, is erroneous, and has dire consequences for cooperative federalism.

## CONCLUSION

This Court should grant rehearing.

August 7, 2026

Respectfully submitted,

/s/ *Rebecca Jaffe*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
BRIAN C. TOTH
MICHAEL EITEL
REBECCA JAFFE
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-0258
rebecca.jaffe@usdoj.gov

Of Counsel:

ALEXIS WADE
ELEANOR GARRETSON
*Attorneys*
Environmental Protection Agency

HELEN SPEIGHTS
*Attorney*
U.S. Department of the Interior

KATHERINE WAINWRIGHT
ERICA ZILIOLI
*Attorneys*
U.S. Army Corps of Engineers

DJ 90-5-1-4-21866

# CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Federal Rule of Appellate Procedure 40(d)(3)(A) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 3,896 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for the United States

**ADDENDUM**

*Center for Biological Diversity v. Zeldin*, No. 24-5101 (D.C. Cir. Mar. 27, 2026) ................................................................................. 1a

Certificate as to Parties, Rulings, and Related Cases ............................................. 97a

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 5, 2025                    Decided March 27, 2026

No. 24-5101

CENTER FOR BIOLOGICAL DIVERSITY, ET AL.,
APPELLEES/CROSS-APPELLANTS

v.

LEE M. ZELDIN, IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR
FOR THE U.S. ENVIRONMENTAL PROTECTION AGENCY, ET AL.,
APPELLANTS/CROSS-APPELLEES

STATE OF FLORIDA AND FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
APPELLANTS/CROSS-APPELLEES

———

Consolidated with 24-5156, 24-5159

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:21-cv-00119)

———

*Rebecca Jaffe*, Attorney, U.S. Department of Justice, argued the cause for federal appellants/cross-appellees. With her on the briefs were *Adam R.F. Gustafson*, Acting Assistant Attorney General, *Joan Pepin*, *Michael Eitel*, and *Andrew*

**1a**

2

*Coghlan*, Attorneys, and *Erica Zilioli*, Attorney, U.S. Army Corps of Engineers.

*Aaron M. Streett* argued the cause for appellants/cross-appellees the State of Florida and Florida Department of Environmental Protection.  With him on the briefs were *Jeffrey DeSousa*, Acting Solicitor General, Office of the Attorney General for the State of Florida, *Christopher J. Baum*, Senior Deputy Solicitor General, *Anthony J. Lucisano*, and *Jeffrey H. Wood*.  *Christopher B. Carter* entered an appearance.

*Sean Reyes*, Attorney General, Office of the Attorney General for the State of Utah, and *Stanford E. Purser*, Solicitor General, were on the brief for *amici curiae* the State of Utah, et al. in support of appellants/cross-appellees.

*Mohammad O. Jazil* and *Edward M. Wenger* were on the brief for *amici curiae* Florida Chamber of Commerce, et al. in support of appellant/cross-appellee the State of Florida.

*Christina I. Reichert* argued the cause for plaintiff appellees/cross-appellants.  With her on the briefs were *Tania Galloni* and *Bonnie Malloy*.

*George Abney* was on the brief for *amicus curiae* the Miccosukee Tribe of Indians of Florida in support of appellees/cross-appellants.

Before: HENDERSON, WILKINS, and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* WILKINS.

**2a**

3

Opinion concurring in part and dissenting in part filed by *Circuit Judge* HENDERSON.

PAN, *Circuit Judge*:  Imagine that the owner of a trucking company is required to register his trucks with the Department of Motor Vehicles.  To do so, each truck must pass a safety inspection.  The owner finds it burdensome to bring each vehicle to the DMV for its own evaluation, so he meets with the DMV manager and the vehicle inspector about a novel plan.  He says to the manager and inspector, "I don't have all my trucks here today.  But I promise to do all the safety inspections myself to make sure that the trucks are compliant with all the regulations.  I'll consult with the vehicle inspector if I have any questions.  Could you please certify that all my trucks have passed inspection and issue the registrations?"  The vehicle inspector agrees that the truck owner's plan should be sufficient and recommends that the manager approve it.  The DMV manager thinks about it and says to the inspector, "Well, if you believe it's good enough that he *promises* that the trucks will comply with the safety regulations, and if he says that he'll ask you for help if he has any questions about it, then that's all right with me.  Go ahead and certify that all his trucks have passed inspection, I'll issue the registrations, and let's get those trucks on the road!"  The problem, of course, is that the truck owner may or may not ensure that his trucks comply with the safety regulations.  And the vehicle inspector no longer has any obligation to make sure that the trucks are safe.

That is similar to what happened in this case.  Florida asked the U.S. Environmental Protection Agency (EPA) to give it authority to issue certain permits under the Clean Water Act (CWA) that would allow permit holders to discharge pollutants into waters in Florida.  Florida promised that when it granted those permits, it would make sure that any species that are protected under the Endangered Species Act (ESA) would not

**3a**

4

be jeopardized. Florida also promised to monitor certain harms to the protected species — called "incidental takings" — that might occur under its permitting program and to ensure that such incidental takings would comply with certain provisions of the ESA. Furthermore, Florida promised to consult with the U.S. Fish and Wildlife Service (FWS) about the effects of the permits on protected species. The EPA and the FWS agreed to support Florida's proposal. The FWS found that Florida's permitting plan complied with the ESA, and the EPA then relied on that finding to approve the permitting plan. As a result, Florida and its permit recipients were essentially excused from meeting additional ESA requirements.

Just like in the hypothetical situation at the DMV, the EPA (like the "DMV manager") and the FWS (like the "vehicle inspector") certified that Florida (the "owner") complied with the ESA. They did so without ensuring that Florida's permittees (the "trucks") satisfied or ever would satisfy the ESA's "safety regulations" — either at the time of the program's approval, or at the time that individual permits would be issued. The FWS thus abdicated its responsibility to enforce the ESA: The agency essentially delegated that job to Florida without ensuring that Florida would protect endangered and threatened species in the manner specified by the ESA. Meanwhile, the EPA relied on the FWS's representations about the program's compliance with the ESA to approve Florida's permitting scheme. Thus, the EPA and the FWS enabled Florida and the recipients of its permits to evade the ESA's exacting procedures for protecting listed species.

A coalition of environmental groups challenged Florida's permitting plan in the district court, arguing that the FWS and the EPA violated the ESA and the Administrative Procedure Act (APA) when they each approved Florida's proposal. The environmental groups argued that the FWS failed to comply

**4a**

5

with the ESA because it did not take necessary steps before finding that Florida's permitting program would not jeopardize protected species and before concluding that Florida's plan would provide adequate protection against incidental takings. They also argued that the EPA acted unlawfully by (1) approving the permitting program in reliance on the FWS's inadequate conclusions, and (2) failing to consult with the National Marine Fisheries Service (NMFS), as required by the ESA.

The district court agreed. It vacated the Biological Opinion (BiOp) and Incidental Take Statement (ITS) that FWS had prepared to support its approval of Florida's permitting scheme, and it held that the EPA's failure to consult with the NMFS was arbitrary, capricious, and otherwise contrary to law. The district court vacated the EPA's approval of Florida's application to issue permits under the CWA because the EPA's approval was based on the flawed BiOp and ITS.

Florida and the Florida Department of Environmental Protection (collectively, "Florida"), and the involved federal agencies — the EPA, the FWS, the Army Corps of Engineers (the "Corps"), and some of their leaders (collectively, the "Federal Appellants") — appeal the judgment of the district court. They claim that the BiOp and the ITS relied upon by the FWS complied with the requirements of the ESA and that the EPA acted reasonably when it relied on the FWS's conclusions to approve Florida's permitting program. Florida also argues that the environmental groups lack standing to challenge the agency actions at issue and that the EPA was not required to consult with the NMFS.

We hold that (1) the environmental groups have standing and their claims are ripe, *see infra* Part II; (2) the BiOp must be set aside because it did not comply with the ESA and the EPA violated the ESA by relying on the deficient BiOp, *see infra*

**5a**

6

Part III.B.1; *see also* Opinion of Wilkins, J., concurring in part and concurring in the judgment; (3) the ITS must be set aside because it did not comply with the ESA, *see infra* Part III.B.2, and the EPA violated the ESA by relying on the deficient ITS, *id.*; *see also* Opinion of Wilkins, J.; and (4) the EPA erred in failing to engage in a mandatory, formal consultation with the NMFS, *see infra* Part III.B.3.  We further conclude that the EPA's approval of Florida's permitting application must be vacated at least because that approval relied on the problematic ITS, which is fundamental to the permitting program, and because the EPA approved the application without the benefit of consultation with the NMFS.  *See infra* Part IV; *see also* Opinion of Wilkins, J.[1]

## I.

### A. Statutory Background

### 1. The Clean Water Act

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  To that end, Section 404 of the CWA prohibits "the discharge of any pollutant" without a permit into the "waters of the United States."  *Id.* §§ 1311(a), 1362(6), 1362(7), 1362(12).  The Corps ordinarily issues Section 404 permits and ensures that they comply with regulations.  *See id.* § 1344(a), (d); 40 C.F.R. § 230.10(b)(3).  But a state may apply to the EPA to assume the Corps's permitting authority for a subset of waters within the state.  33

---

[1]    Judge Henderson joins Parts II, III.B.2, and III.B.3 of this opinion, other than the holding in Part III.B.3 that the EPA violated the ESA by relying on the deficient ITS, and dissents from parts III.B.1 and IV.  Judge Wilkins joins Parts II, III.B.2, and III.B.3, and concurs in the judgment as to Parts III.B.1 and IV.

7

U.S.C. § 1344(g)(1). To do so, the applying state must develop a permitting program that is consistent with the requirements of the CWA and its implementing regulations. *See* 40 C.F.R. § 233.1(d)–(e). After soliciting public comments, the EPA "shall approve" the state's application if it determines that the application complies with the CWA and its regulations. *See* 33 U.S.C. § 1344(g), (h)(1)(A)(i), (h)(2)(A); 40 C.F.R. § 233.15.

### 2. The Endangered Species Act

States, individuals, and federal agencies must ensure that their actions comply with the Endangered Species Act. Congress enacted the ESA to promote "the conservation of . . . endangered species and threatened species," and the "ecosystems upon which [those] species depend." 16 U.S.C. § 1531(b). The Act provides that a species can be "listed" as either "endangered" or "threatened." *See id.* § 1533. An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A threatened species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20). Endangered species and threatened species receive important protections under the ESA. *See id.* §§ 1538(a)(1) (listing prohibited acts for endangered species), 1533(d) (authorizing protective regulations for threatened species).

As relevant here, the ESA prohibits the "taking" of a listed species by individuals, states, and federal agencies. 16 U.S.C. §§ 1538(a)(1)(B), 1532(19), 1533(d). "Taking" has an expansive meaning — it encompasses actions that "harass" or "harm" a protected species. *Id.* § 1532(19). "Harm" includes "significant habitat modification or degradation" that "actually kills or injures wildlife by significantly impairing essential

**7a**

8

behavioral patterns" like "breeding, feeding, or sheltering." 50 C.F.R. § 17.3. Violations of the prohibition against takings may result in a range of civil and criminal penalties. 16 U.S.C. § 1540(a)(1)–(2), (b). But the ESA recognizes that some takings are "incidental" to lawful activities — that is, they "result from, but are not for the purpose of, carrying out an otherwise lawful activity." 50 C.F.R. § 402.02. Incidental takings that do not jeopardize protected species or adversely modify or destroy their critical habitat can be exempted from the civil and criminal penalties that otherwise would apply under the ESA. *See* 16 U.S.C. § 1539(a)(1)(B).

The ESA is administered by the FWS and the NMFS. 50 C.F.R § 402.01(b). The NMFS administers the ESA for protected marine and anadromous species (ones that migrate between freshwater and saltwater); and the FWS administers the ESA with respect to all other protected species. *See id.* We refer to the FWS and NMFS collectively as "the Services."

### a. Biological Opinion

Under the statute and implementing regulations, an agency must determine "at the earliest possible time" whether any contemplated agency action "may affect" listed species or critical habitat; and if so, the agency must enter a "formal consultation" with the Services under Section 7 of the ESA. 50 C.F.R. § 402.14(a), (c); *see also* 16 U.S.C. § 1536.

The first step of a Section 7 consultation requires the Services to prepare a written BiOp that evaluates whether the planned agency action is "not likely to jeopardize the continued existence" of a protected species or result in the "destruction or adverse modification" of its critical habitat. 16 U.S.C. § 1536(a)(2)–(4); *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 652 (2007). The process of preparing a

**8a**

9

BiOp is a rigorous endeavor. To prepare a BiOp, the Services must:

> (1) Review all relevant information provided by the [action] agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the [action] agency and the applicant.
>
> (2) Evaluate the current status and environmental baseline of the listed species or critical habitat.
>
> (3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.
>
> (4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.14(g). The Services also must "[f]ormulate a statement concerning incidental take, if such take is reasonably certain to occur." *Id.* § 402.14(g)(7).

We refer to the third BiOp requirement as the "effects analysis." *See* 50 C.F.R. § 402.14(g)(3). An effects analysis encompasses two types of effects. First, the "effects of the action" include "all consequences to listed species . . . that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action." *Id.*

**9a**

10

§ 402.02.  "Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action."  *Id.*  Second, the "cumulative effects" on the listed species include "those effects of future State or private activities, *not* involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  *Id.* (emphasis added).

Once the Services complete the effects analysis, the next step — which culminates in the Services issuing a "jeopardy" or "no jeopardy" determination — is mandatory.  50 C.F.R. § 402.14(g)(4), (h)(iv).  The Services must "[add] the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate [its] opinion as to whether the action is likely to jeopardize the continued existence of listed species."  *Id.* § 402.14(g)(4).  In other words, the Services must determine whether the planned action "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  *Id.* § 402.02.  The Services must summarize the information on which their jeopardy determination is based and "detail how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h).

In the event of a "jeopardy" determination, the consulting agency "shall suggest those reasonable and prudent alternatives which [it] believes would not violate [Section 7(a)(2)] and can be taken by [the action agency]."  16 U.S.C. § 1536(b)(3)(A); *see also* 50 C.F.R. § 402.14(h)(3), (g)(5).  "Following the issuance of a 'jeopardy' opinion, the [action] agency must either terminate the action, implement the proposed alternative, or seek an exemption from the Cabinet-level Endangered

**10a**

11

Species Committee pursuant to 16 U.S.C. § 1536(e)." *Nat'l Ass'n of Home Builders*, 551 U.S. at 652. Importantly, in "formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures," the Services are required to "use the best scientific and commercial data available." 50 C.F.R. § 402.14(g)(8); *see also* 16 U.S.C. § 1536(a)(2) ("In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.").

### b. Incidental Take Statement

If a Service makes a no-jeopardy determination but concludes that incidental take is nonetheless "reasonably certain to occur," 50 C.F.R. § 402.14(g)(7); *id.* § 402.02, it proceeds to the second step of the Section 7 consultation process: The Service must provide an ITS. *Id.*; *see also id.* § 402.14(i); 16 U.S.C. § 1536(b)(4).

An ITS must:

> (i) specif[y] the impact of such incidental taking on the species;
>
> (ii) specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact;
>
> (iii) in the case of marine mammals, specif[y] those measures that are necessary to comply with [incidental-take procedures specific to marine mammals]; and
>
> (iv) set[] forth the terms and conditions (including, but not limited to, reporting

**11a**

12

> requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

16 U.S.C. § 1536(b)(4). The implementing regulation defines "impact" to mean "the amount or extent of such incidental taking on the species." 50 C.F.R. § 402.14(i)(1)(i).

Further, the action agency or applicant must "monitor the impacts of incidental take" and "report the progress of the action and its impact on the species to the Service as specified in the [ITS]." 50 C.F.R. § 402.14(i)(4). The action agency "must reinitiate consultation *immediately*" if the "amount or extent of incidental taking" specified in the ITS, as required by the regulations, "is exceeded." *Id.* § 402.14(i)(5) (emphasis added); *id.* § 402.16(a). Additional consultation is required in other situations, such as "if a new species is listed or critical habitat designated that might be affected by the identified action." *Id.* § 402.16(a)(4).

Ultimately, if the Services provide a no-jeopardy determination and issue an ITS, then the ITS offers a safe harbor to those who participate in the planned agency action: Parties that comply with the terms and conditions specified in the ITS are exempted from civil and criminal liability under the ESA for any incidental takings, and they need not seek any other authorization or permit under the ESA. *See* 16 U.S.C. § 1536(o)(2) ("Any taking that is in compliance with the terms and conditions specified in [the ITS] shall not be considered to be a prohibited taking of the species concerned."); 50 C.F.R. § 402.14(i)(6) ("Any taking that is subject to [an ITS] and that is in compliance with the terms and conditions of that statement is not a prohibited taking under the Act, and no other authorization or permit under the Act is required.").

**12a**

13

### c. Programmatic Consultation

Section 7 consultation may focus on a single agency action or on "an agency's multiple actions on a program, region, or other basis." 50 C.F.R. § 402.02. The latter is known as a "programmatic consultation," which allows the Services to consult on the effects of programmatic actions, such as "[m]ultiple similar, frequently occurring, or routine actions," and proposed frameworks "for future proposed actions." *Id.* Regulations recognize that such "multiple actions" might not be ready for full Section 7 consultation at the outset and may need to defer the required Section 7 analysis until a later time. *See, e.g., id.* § 402.14(i)(7). Accordingly, the regulations provide that "any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate." *Id.* But importantly, neither the statute nor any applicable regulation provides that "programmatic" consultations allow the Services to avoid the rigorous requirements of Section 7 consultation entirely. *See id.*

### d. Section 10 Consultation

Section 10 of the ESA establishes a different procedure for private parties, states, and other nonfederal actors to deal with the problem of incidental takings. *See* 16 U.S.C. § 1539(a); 50 C.F.R. § 402.14(i)(5). Under Section 10, a nonfederal actor may obtain a permit from the Services that allows incidental takings to occur without subjecting the actor to liability under the ESA. 16 U.S.C. § 1539(a)(1)(B). To obtain such a permit, the applicant must undergo a Section 10 consultation process. The Section 10 applicant must submit a conservation plan that describes the impacts of potential incidental takings, the steps the applicant will take to minimize and mitigate those impacts,

**13a**

14

alternatives to the planned activity, why the applicant is not taking those alternatives, and any other measures that the Services "may require as being necessary or appropriate." *Id.* § 1539(a)(2)(A). The Services must publish notice of the Section 10 permit application in the Federal Register and provide opportunity for public comment. *Id.* § 1539(c), (a)(2)(B). And the Services must make certain findings before they can issue a permit that allows incidental takings, including that the takings "will not appreciably reduce the likelihood of the survival and recovery of the species in the wild," and that "the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking." *Id.* § 1539(a)(2)(B).

### B. Factual Background

Florida is home to hundreds of endangered and threatened species, including the Florida panther, nesting sea turtles, the West Indian manatee, the Audubon's crested caracara, and the bonneted bat. The presence of such species throughout the state is a potential barrier to development because many construction projects affect protected species and therefore cannot proceed without meeting the rigorous requirements of the ESA.

Florida sought to issue permits under Section 404 of the Clean Water Act that would allow permittees associated with building and mining projects to discharge dredged or fill material into U.S. waters. The Section 404 permit recipients normally would have to obtain an additional permit from the FWS and NMFS under Section 10 of the ESA if they wished to avoid liability for incidental takings resulting from the planned discharges. Florida considered that extra step "burdensome," "time consuming[,] and resource-intensive," and therefore devised a plan to eliminate it. J.A. 2033 (Florida

**14a**

15

White Paper, *Streamlined Approach to Address Endangered Species Act Incidental Take Coverage*). Specifically, Florida proposed to "streamline" the ESA's permitting process and to obtain broad, up-front ESA liability protection for all its future CWA permittees. Under the "streamlined" approach, the EPA would engage in a "programmatic" Section 7 consultation with the FWS concerning the EPA's approval of Florida's Section 404 permitting application. The one-time Section 7 consultation would produce a "programmatic" no-jeopardy determination and a "programmatic" ITS that would provide take-liability protection to all future state Section 404 permittees. J.A. 2034–35.

Florida envisioned that the "programmatic" BiOp and ITS issued pursuant to the Section 7 consultation would defer species-specific analyses and the formulation of take limitations to a "technical assistance process." J.A. 2043–47. In other words, the Section 7 analysis would not occur when the EPA reviewed Section 404 permitting applications but instead would be deferred until Florida started approving individual permits. At that point, the evaluation of individual permit applications would be conducted by Florida — not the FWS — pursuant to a "technical assistance process" that was less rigorous than a Section 7 consultation but would nonetheless "provide project applicants the needed liability protection from claims arising under the ESA even though the activity is authorized pursuant to a state permit." J.A. 2509 (Florida White Paper, *Potential Endangered Species Act Compromise*). By getting the EPA and the FWS to approve the "technical assistance process" during a "programmatic" Section 7 consultation at the outset, Florida could save its Section 404 permittees the trouble of undergoing individualized Section 10 scrutiny on each permit while still guaranteeing them liability protection for incidental takings, based on the Section 7 approval of the overall program. *See*

**15a**

16

*Ctr. for Biological Diversity v. Regan (CBD v. Regan)*, 734 F. Supp. 3d 1, 24 (D.D.C. 2024).  Florida's proposed plan was modeled on a similar "programmatic consultation" that was blessed by the Second Circuit's decision in *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49 (2d Cir. 2018).

Florida asserted that its plan was necessary because without it, the permittees "must avoid entirely adverse impacts to listed species or otherwise seek an incidental take permit under ESA Section 10 separate and apart from the Section 404 permit process, which can take years to complete in contrast to the [programmatic] Section 7 process and is more burdensome for all involved."  J.A. 2033.  According to Florida, "around ten percent of the Section 404 permits . . . would require some form of incidental take coverage, including for 'many large real estate, mining, agriculture, and utility industry projects with significant economic benefits to the State.'"  *Id*.

The EPA had previously determined that Section 7 consultation was inappropriate in the context of approving state Section 404 applications.  But the EPA considered Florida's proposal and agreed that Section 7 consultation would make things easier for Florida.  The EPA thus sought public comment on whether Section 7 consultation was required for its approval of state applications to assume Section 404 permitting authority.  In response to public comments, the EPA stated that, in its view, Section 10 consultation by individual Section 404 permittees was not "realistically feasible for states with an abundance of ESA listed species like Florida."  J.A. 2524.  In its final decision, the EPA further stated that the "streamlined permitting process" that the BiOp and ITS contemplated "would reduce costs and duplication of effort by state . . . and federal authorities and facilitate more effective and efficient state . . . CWA Section 404 programs."  J.A. 2504.  The EPA ultimately changed its prior position and decided that the

16a

17

Section 7 consultation process does apply to the EPA's consideration of a state's Section 404 permitting application. *Id.*[2]

Before Florida submitted its Section 404 application to the EPA, it collaborated with the FWS to design the "technical assistance process" that would be incorporated into Florida's proposed permitting program. *See CBD v. Regan*, 734 F. Supp. 3d at 25–26 (citing ECF No. 112-5 at 170) (referring to FWS employee's memorialization of a February 2020 meeting that occurred between the FWS, the EPA, and Florida, where participants discussed features of the technical assistance process). The FWS emphasized that the technical assistance process would not involve additional Section 7 consultations

---

[2] The EPA's Section 7 consultation with the FWS was the key to Florida's plan to "streamline" environmental requirements. *See* J.A. 2033. Although the EPA decided that Section 7 applies to its approval of Section 404 permitting applications, it is unclear whether that conclusion was correct. Section 7 applies only when agencies take discretionary action, *see Nat'l Ass'n of Home Builders*, 551 U.S. at 663–64, but the approval of a state's Section 404 application arguably is not discretionary because the EPA "*shall* approve the program" if it determines that the state has complied with the relevant statutory and regulatory requirements. 33 U.S.C. § 1344(h)(2) (emphasis added). This issue is potentially dispositive, but no party argues that the Section 7 consultation was improper. We therefore assume without deciding that the EPA properly consulted with the FWS about Florida's Section 404 application. *See McFadden v. United States*, 576 U.S. 186, 192 n.2 (2015) ("Because we need not decide in this case whether that [statutory] interpretation is correct, we assume for the sake of argument that it is."); *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 957 (D.C. Cir. 2024) (noting that we generally "adopt the framing of the dispute that is advanced by the parties because in our adversarial system of adjudication, we follow the principle of party presentation" (cleaned up)).

18

when Florida issued the Section 404 permits. An FWS employee advised Florida and the EPA to "be careful of using words like consultation when you really mean coordination and technical assistance." *Id.* And in April 2020, an FWS employee communicated to Florida:

> After assumption [of Section 404 permitting authority], FWS will not be issuing any project-by-project incidental take statements [under Section 7] for State 404 permits because the State 404 BiOp will have a programmatic incidental take statement that will cover any incidental take for any state 404 permit. FWS will merely be providing technical assistance on the project by project reviews to [Florida] and/or permit applicants and tracking on a project-by-project basis any incidental take that is anticipated to occur as the result of [Florida] issuing any particular 404 permit.

J.A. 2546.

In August 2020, Florida formally applied to the EPA to assume Section 404 permitting authority. *See* 33 U.S.C. § 1344(g)(1). Florida's Section 404 application included a draft Memorandum of Understanding (MOU), which explained that "[u]pon assumption of the Section 404 Program, coordination between the [FWS] and [Florida] related to the proposed action's effects on species will occur through the technical assistance process, which is anticipated to be outlined in the [FWS's] biological opinion." J.A. 1560. The MOU also noted that the BiOp would be "based on information included in the biological assessment" — a document that Florida prepared for the EPA, which the EPA then sent to the FWS. *Id.*

18a

19

In September 2020, the EPA submitted a request for a formal consultation with the FWS under Section 7 concerning the EPA's consideration of Florida's Section 404 application. In November 2020, the FWS concluded its consultation and published its Programmatic BiOp, comprising its BiOp and ITS. Specifically, the FWS determined that the EPA's approval of Florida's Section 404 permitting application would not jeopardize protected species or harm critical habitats; and it included a programmatic ITS that conferred on Florida's permittees liability protection for incidental takings.

In making its no-jeopardy determination, the FWS stated that it was "not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp." J.A. 2655. Because of the "lack of information and uncertainties surrounding the location, timing, frequency, and intensity" of permit actions, the FWS based its "effects analysis" on "a number of key assumptions." J.A. 2656. Most significant were its assumptions about the "technical assistance process." J.A. 2669.

Under the technical assistance process, Florida would have the authority to approve the Section 404 permit applications. Permit applicants would be required to include a description of the proposed activity, the "specific areas" affected by the activity, a description of protected species and habitats in the area and ways in which they might be affected, analysis of any cumulative effects, and other "relevant information," including, "[w]hen needed, proposed project designs and . . . conservation measures that would avoid and minimize the expected impacts to listed species and their habitats." J.A. 2617. Based on that information, Florida (and not the FWS) would decide whether protected species or habitats would be adversely affected if the permit were granted.

**19a**

20

The FWS would play a largely advisory role, with the *option* of overriding Florida's effects determination and requiring the permittees to take additional protective measures. The FWS would "[r]eceive" and "[r]eview" "all the 404 permit applications," which would be "sent by [Florida]." J.A. 2621. The FWS could then participate in the approval process if it chose to do so. If the FWS declined to make comments, its silence would not indicate "concurr[ence] with any effect determinations made by [Florida]." *Id.* But if the FWS decided to weigh in and found that an application "may cause an adverse effect to [a] species," then that decision "would be determinative," and the project would be required to "include additional protective measures or Florida [would] reject the permit." J.A. 2620, 2631. The EPA also could object to a permit's approval based on the FWS's analysis, and the permit could not be issued until Florida resolved the EPA's objections. *See* 40 C.F.R. § 233.50(f).[3] In addition, the FWS could, if it wished, "provide [Florida] with technical information . . . and recommended measures that would avoid or minimize effects." J.A. 2621; *see also* J.A. 2669 (explaining that the FWS would "*be provided an opportunity* to review all State 404 permit applications," provide technical assistance "with respect to avoiding and minimizing effects on ESA-listed species and their critical habitats," and make "monitoring and reporting recommendations" (emphasis added)).

The FWS reasoned that the "assum[ed]" coordination between the FWS and Florida in the technical assistance

---

[3] The FWS also was tasked with determining whether each permit application "ha[d] the required information needed to assess" whether "issuing the permit is likely to jeopardize" protected species or their habitats, and the FWS agreed to notify Florida if it believed that information was missing. J.A. 2621. If the FWS "ha[d] information that would disconfirm [Florida's] effect determination," the FWS would provide it to Florida. *Id.*

**20a**

21

program was "as protective as the section 7 interagency consultation process." J.A. 2657. Relying on that supposed efficacy, the FWS concluded that the EPA's approval of Florida's program was not "likely to jeopardize the continued existence of [protected] species" or "destroy or adversely modify designated critical habitat." J.A. 2669. It concluded that Florida's program was "sufficiently structured" to avoid jeopardy to ESA-listed species. J.A. 2655; *see also* J.A. 2656–57 ("[S]ite-specific and species-specific information will be . . . assessed through the technical assistance process.").

The FWS then proceeded to determine whether incidental takings were "reasonably certain" to occur due to the permitting program. 50 C.F.R. § 402.14(g)(7). The FWS concluded that some incidental take was "reasonably certain," and thus issued a "programmatic" ITS. J.A. 2670.

Although the implementing regulation requires the FWS to estimate the take amount resulting from Florida's permitting program, 50 C.F.R. § 402.14(i), the FWS did not do so in its ITS. According to the FWS, it could not make such an estimate because it was "not possible for FWS to know what permits would issue and where throughout the life of the program, let alone specific amounts of take resulting from those permits." J.A. 2670–71. Instead, the FWS stated that Florida would estimate incidental-take amounts on a permit-by-permit basis and that the FWS would track anticipated take amounts of listed species on a permit-by-permit basis.

Typically, the estimated take amount for the agency action under review functions as a trigger for the action agency to reinitiate a Section 7 consultation. 50 C.F.R. § 402.14(i)(5). But the ITS provided that Florida (not the EPA) would reinitiate consultation with the FWS if Florida found that its own permit-level incidental-take estimates were exceeded.

**21a**

22

The ITS also required Florida to take the initiative to reopen permits and to "coordinate" with the FWS if new information, such as the listing of a new protected species, showed that impacts to listed species would be greater or different from what Florida had anticipated at the time that an individual permit issued. J.A. 2673. The ITS made clear that any renewed consultations contemplated by the ITS would not be the same as the reinitiated Section 7 consultations required under applicable regulations. A reinitiated Section 7 consultation would revisit whether the overall permitting program complied with the ESA, but the ITS explained that Florida's issuance of Section 404 permits was not a federal action subject to Section 7 review. The ITS further provided that compliance with its terms would confer ESA liability protection for incidental takings of protected species that occurred as a result of Section 404 permitted activity. The ITS required Florida to participate in the technical assistance program described above.

In sum, at the end of the Section 7 consultation, Florida received (1) EPA approval of its application to issue permits to discharge pollutants into certain waters in Florida under Section 404 of the CWA; (2) a finding by the FWS that Florida's permitting program would not jeopardize listed species or their habitats, as long as Florida engaged in the "technical assistance process" for individual permits; and (3) liability protection for individual permittees, conditioned on compliance with the provisions of the ITS, which required Florida to participate in the technical assistance program.

**22a**

23

## C. District Court Proceedings

In January 2021, a coalition of environmental groups filed suit against the EPA, the Corps, the FWS, the NMFS, and various federal officials.[4]  The plaintiffs challenged the EPA's approval of Florida's Section 404 permitting application and the Programmatic BiOp, including the BiOp and ITS, prepared by the FWS.  In relevant part, the plaintiffs raised claims under the ESA and the APA, arguing that the agencies violated the statutory and regulatory requirements of the ESA.  The district court granted Florida's unopposed motion to intervene to defend the challenged federal actions.

The district court granted summary judgment to the plaintiffs and concluded that the actions of the EPA and the FWS were unlawful.  The court held that the FWS's BiOp and ITS must be set aside because both the no-jeopardy conclusion and the ITS failed to comply with applicable standards under the ESA.  The court also concluded that the EPA impermissibly relied on the BiOp and the ITS in approving Florida's Section 404 application.

The district court held that the FWS was not "free to disregard" Section 7's requirements by basing its no-jeopardy conclusion on later analysis performed in a "technical assistance" process that itself would not be subject to Section 7's requirements. *CBD v. Regan*, 734 F. Supp. 3d at 49.  The district court also concluded that the FWS's ITS was faulty, because it omitted the "essential term" of a take limit and did not provide a "clear standard for when the level of anticipated take has been exceeded."  *Id.* at 52.  The district court noted

---

[4]    These environmental organizations were the Center for Biological Diversity, Defenders of Wildlife, Sierra Club, Conservancy of Southwest Florida, Miami Waterkeeper, St. Johns Riverkeeper, and Florida Wildlife Federation.

24

that the ITS unlawfully provided that federal agencies would "*not* reinitiate formal consultation" even if the EPA's approval of Florida's Section 404 program resulted in excess take or otherwise jeopardized the continued existence of listed species. *Id.* at 54 (emphasis in original). Moreover, the district court rejected the FWS's argument that it lacked sufficient information to perform the required analyses under Section 7, explaining that the statute does not create exceptions for uncertainty or "require perfect foresight" of the FWS. *Id.* at 46. The district court noted that the ESA requires that wildlife agencies use the best available data, 16 U.S.C. § 1536(a)(2), and that the FWS had "reams of data from previous Section 7 consultations" in Florida. *CBD v. Regan*, 734 F. Supp. 3d at 46.

Additionally, the district court held that the EPA impermissibly relied on the FWS's actions to approve Florida's program, given that the FWS "entirely fail[ed] to address essential questions." *CBD v. Regan*, 734 F. Supp. 3d at 57. The EPA also unlawfully concluded that it did not need to formally consult with the NMFS under Section 7 regarding its proposed approval of Florida's permitting program.

Thus, the district court vacated the EPA's approval of Florida's permitting program and the FWS's BiOp and ITS. The court held that vacatur was warranted because the agencies' ESA violations were serious and incapable of being cured by additional explanation on remand. And although the defendants complained that vacatur would result in a "prolonged delay" in issuing Section 404 permits, the court held that setting aside unlawful agency action almost always results in some disruption and the type of disruption that the defendants invoked was inherent in the Section 404 approval process. *CBD v. Regan*, 734 F. Supp. 3d at 63.

**24a**

25

The Federal Appellants and Florida appeal. We have jurisdiction under 28 U.S.C. § 1291.

**II.**

Before turning to the merits, we consider two arguments challenging justiciability: (1) Florida argues that Appellees lack standing to challenge the FWS's and the EPA's actions in approving its permitting program; and (2) the Federal Appellants argue that Appellees' challenge to the Incidental Take Statement is not ripe. We disagree.

**A. Standing**

We begin with standing. The "irreducible constitutional minimum of standing" requires that plaintiffs demonstrate, for each claim, that they have (1) "suffered an injury in fact," (2) that is "fairly . . . trace[able] to the challenged action of the defendant," and (3) that it is "likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). An organization may assert "associational standing" to sue on behalf of its members. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). Associational standing requires that:

> (1) at least one member of the association has standing to sue in her own right (based on a showing of harm, causation, and redressability), (2) the interests the association seeks to protect by suing on its members' behalf are germane to its purpose, and (3) neither the asserted claim nor the relief requested requires individual members to participate in the litigation.

**25a**

26

*Ctr. for Biological Diversity v. EPA (CBD 2022)*, 56 F.4th 55, 66 (D.C. Cir. 2022) (citing *Hunt*, 432 U.S. at 343).

Florida contests only the first element of associational standing:  It contends that Appellees have not suffered an injury in fact.[5]  But Appellees establish that they have standing to sue because the FWS and the EPA caused classic procedural injuries to their members by failing to take steps required by regulations.  Appellees also demonstrate that those procedural injuries caused their members substantive injuries, which can be redressed by requiring the agencies to follow the steps that they omitted.

An agency's failure to meet its statutory consultation requirement is the "archetypal procedural injury."  *Ctr. for Biological Diversity v. EPA (CBD 2017)*, 861 F.3d 174, 182 (D.C. Cir. 2017); *see also CBD 2022*, 56 F.4th at 67 ("A claim of failure to fulfill the statutory consultation obligation under the ESA is at least in significant part a claim of procedural injury." (citing *Nat'l Ass'n of Home Builders*, 551 U.S. at 667)).  Here, Appellees allege that the FWS failed to comply with procedural steps required in a Section 7 consultation and that the EPA failed to consult with the NMFS.

When plaintiffs allege procedural injuries to support standing, we also require an adequate "connection between the alleged procedural injury and a substantive injury that would otherwise confer Article III standing."  *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15 (D.C. Cir. 2011) (cleaned up).

---

[5]    We are satisfied that Appellees also meet the second and third requirements of associational standing.  Their missions "include the protection of . . . diverse species and habitats, including listed species in Florida," and neither the claims asserted nor the relief sought requires the participation of individual members.  *CBD 2022*, 56 F.4th at 66.

27

To establish that connection, a plaintiff must show "[1] a causal connection between the government action that supposedly required the disregarded procedure and [2] some reasonably increased risk of injury to its particularized interest." *Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996). And the plaintiff also must demonstrate that "a revisitation of the [procedural requirement] would redress [the alleged] injury because the [agency] *could* reach a different conclusion." *CBD 2017*, 861 F.3d at 185 (emphasis added).

Appellees have satisfied all those requirements. They demonstrate that their members had an aesthetic and recreational interest in minimizing the loss of protected species, including the Florida panther and nesting sea turtles. And they connect the agencies' alleged procedural failures to a substantive injury to their interest: The FWS's "bypassing of its ESA obligations" and the EPA's failure to consult with the NMFS allegedly caused the EPA's approval of Florida's permitting program, which authorized incidental takings of listed species "without due attention to the risks posed to those species." J.A. 1328. The FWS conceded that the EPA's approval of Florida's program was "'reasonably certain' to result in some take of all 139 listed species in the State." J.A. 2670 (quoting 16 U.S.C. § 1536(b)(4)). Moreover, were it not for the alleged procedural violations, the FWS may not have made its no-jeopardy determination and issued the accompanying ITS, and the EPA may not have approved Florida's permitting program.

Florida's arguments to the contrary are not persuasive. First, Florida claims that Appellees cannot establish causation because the EPA and the FWS will prevent any potential harm through federal oversight. But in evaluating standing, we "assume on the merits the [Appellees] would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235

**27a**

28

(D.C. Cir. 2003). We therefore must accept Appellees' allegation that federal oversight will be insufficient because the approved technical assistance process is less protective than the procedures required by the ESA.

Florida also errs in suggesting that Appellees must wait until Florida issues permits to projects and those projects actually harm protected species before bringing their complaint. We require plaintiffs to demonstrate only a "substantial probability" that the government's procedural failures will cause injury to their concrete interest. *CBD 2017*, 861 F.3d at 184. Here, the alleged procedural failures create a "substantial probability" of harm to endangered species and habitats because they resulted in the approval of a permitting program that relaxes the ESA's statutory protections.

### B. Ripeness

The Federal Appellants argue Appellees' challenge to the Incidental Take Statement is not ripe. They contend that Appellees may challenge the ITS only after the FWS unlawfully fails to reinitiate consultation as required by the ITS, with respect to individual Florida permits. We disagree.

"The ripeness inquiry encompasses both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021). Whether a challenge to agency action is "fit for judicial decision" depends both upon whether it "involve[s] final agency action" and whether "judicial intervention would . . . inappropriately interfere with further administrative action." *Id.* (cleaned up) Here, the issuances of the BiOp and ITS, which together constitute the Programmatic BiOp, are final agency actions. Those issuances marked the completion of the Section 7 consultation, which led to the approval of Florida's Section 404

28a

29

application. No further agency action must occur to allow Florida's Section 404 permittees to avoid liability under the ESA for incidental takings. Thus, the ITS "constitute[d] a definitive statement of [the] agency's position, has direct and immediate effect on the complaining parties, and has the status of law." *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017). And judicial review would not "inappropriately interfere with future administrative action." *Bellion Spirits*, 7 F.4th at 1209. The parties give us no reason to believe that we are "prematurely meddling with an agency policy decision that is currently undergoing change." *Great Lakes Gas Transmission Ltd. P'ship v. FERC*, 984 F.2d 426, 432 (D.C. Cir. 1993). Further, withholding our consideration would injure Appellees and their interests. The ITS creates legal rights that make it easier for permittees to take protected species that Appellees are interested in preserving.

### III.

### A. Standard of Review

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). We review a "Service's ESA findings under the APA" because the ESA does not specify a standard of review. *See Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 574 (D.C. Cir. 2016); *see also Gerber v. Norton*, 294 F.3d 173, 178 & n.4 (D.C. Cir. 2002).

Under the APA, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). And a reviewing court must set aside agency action undertaken "without observance of procedure required by law." *Id.* § 706(2)(D). The question of whether agency action is

**29a**

30

arbitrary and capricious is a legal one generally made on the administrative record and resolved on summary judgment. *See, e.g.*, *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1277, 1282 (D.C. Cir. 2005). This court reviews such a determination *de novo*. *Child.'s Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 769 (D.C. Cir. 2019).

It is well settled that an agency must "adhere to its own regulations," *Brock v. Cathedral Bluffs Shale Oil Co.*, 796 F.2d 533, 536 (D.C. Cir. 1986), and "an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations," *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (cleaned up). Moreover, an agency action that "violates [a statute] is 'not in accordance with law' within the meaning of [the APA]." *Chrysler Corp. v. Brown*, 441 U.S. 281, 318 (1979).

**B. Analysis**

In this case, the state of Florida, the EPA, and the FWS collaborated to develop and implement an innovative approach to complying with certain mandatory requirements of the ESA that are designed to protect endangered and threatened species. With the explicit goal of "streamlining" the ESA's procedures and making them less "burdensome," Florida proposed a state-run permitting program under Section 404 of the CWA, under which permit recipients could discharge pollutants into Florida waters while also avoiding liability for incidental takings of protected species under the ESA. Florida proposed that the requirements of the ESA be deferred to a "technical assistance process" that would be administered by Florida, with optional input from the FWS. The key to Florida's proposal was securing ESA approval of the overall Section 404 permitting program up front — through a "programmatic consultation" under Section 7 of the ESA — which would obviate the need

**30a**

31

for individual permittees to seek further approval under the ESA for incidental takings associated with the activity approved by their Section 404 permits.

The question before the court is whether the EPA and the FWS's Section 7 approval of Florida's permitting program — including the agencies' reliance on the technical assistance process and a programmatic ITS — comported with the requirements of the ESA.

In Judge Pan's view, the FWS's BiOp, including its no-jeopardy determination, was erroneous and must be set aside, and the EPA violated the ESA by relying on the deficient BiOp to approve Florida's permitting program. *See infra* Part III.B.1. Judge Wilkins agrees that the BiOp must be set aside, though he reaches that conclusion for a different reason, and he agrees that the EPA violated the ESA by relying on the deficient BiOp. *See* Opinion of Wilkins, J.  Judge Henderson dissents from those conclusions. *See* Opinion of Henderson, J., concurring in part and dissenting in part.  The court unanimously holds that the FWS violated Section 7 regulations when it issued a programmatic ITS that weakened the protections of Section 7 while conferring protection from take liability on Florida and its Section 404 permit recipients, *see infra* Part III.B.2; and a divided court holds that the EPA violated the ESA by relying on that ITS to approve Florida's permitting program, *see id.*; Opinion of Henderson, J.  The court unanimously holds that the EPA erred in failing to consult with the NMFS under Section 7. *See infra* Part III.B.3.  The court further holds that the agency's errors require vacatur of the EPA's approval of Florida's Section 404 application. *See infra* Part IV; Opinion of Wilkins, J.

**31a**

32

## 1. Biological Opinion

As previously explained, in a Section 7 consultation, the Services are required to take several actions before making a no-jeopardy determination. *See* 50 C.F.R. § 402.14(g). Among those requirements, the Services "shall include" a "detailed discussion of the effects of the action on listed species or critical habitat" in the BiOp, *id.* § 402.14(h), and must "[a]dd the effects of the action and cumulative effects to the environmental baseline" to determine "whether the action is likely to jeopardize the continued existence of listed species," *id.* § 402.14(g). Furthermore, the Services must "use the best scientific and commercial data available" in making those assessments. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(g)(8). Those actions did not happen here.

It is undisputed that the FWS did not evaluate how the approval of Florida's permitting program would affect listed species or critical habitat. Instead, the FWS stated in the BiOp that it was "not feasible, nor [was] it required, to conduct a meaningful site-specific and species-specific effects analysis in this BiOp," because the consultation was "on a programmatic action." J.A. 2655. The BiOp reasoned that Florida's program was "sufficiently structured" to avoid jeopardy to ESA-listed species, *id.*, and opined that the "technical assistance process" that was "built in[to]" the program would be "as protective" as the requirements of Section 7 of the ESA, J.A. 2657; *see also* J.A. 2656 ("[S]ite-specific and species-specific information will be . . . assessed through the technical assistance process."). Based on those findings, the FWS concluded that Florida's permitting program was not "likely to jeopardize the continued existence of [protected] species" or "destroy or adversely modify designated critical habitat." J.A. 2669.

**32a**

33

But the FWS's reasoning was demonstrably incorrect. The technical assistance program was not "as protective" as the Section 7 consultation process. In fact, the technical assistance process was specifically designed to be "streamlined" and less "burdensome," and therefore omitted the precise analytical steps that must be taken before a Service may issue a no-jeopardy determination under Section 7. Those steps include evaluating the program's effects and then adding the effects to the environmental baseline to assess whether any listed species or critical habitat will be jeopardized. 50 C.F.R. § 402.14(g). By contrast, the technical assistance process requires only that Florida share permit applications with the FWS, which has the *option* of weighing in to overturn *Florida's* effects determinations. The FWS also may, but is not required to, "provide [Florida] with technical information . . . and recommended measures that would avoid or minimize effects." J.A. 2621. And Florida and the FWS need not "use the best scientific and commercial data available" in evaluating each Section 404 permit, as the FWS would be required to do in carrying out a proper Section 7 consultation. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(g)(8). The technical assistance program is therefore far less demanding than what is required under Section 7.[6]

---

[6] Appellees also contend that the FWS did not, as required, analyze the environmental baseline of species because it did not evaluate the conditions of individual protected species that live in Florida at a sufficiently specific level of detail. *See* 50 C.F.R. § 402.14(g), (h)(ii) (requiring the BiOp to include a "detailed discussion of the environmental baseline and critical habitat"). The district court agreed, concluding that the FWS failed to undertake "*any* species-specific analysis" in assessing the environmental baseline. *CBD v. Regan*, 734 F. Supp. 3d at 42 (emphasis in original). That may not be entirely accurate — in assessing the

34

To be clear, the Services may engage in "programmatic" consultations. *See, e.g.*, 50 C.F.R. § 402.14(i)(7). But undertaking a programmatic consultation does not excuse the Services from performing an effects analysis that is consistent with Section 7's requirements. *See id.* § 402.14(g); *see also N. Slope Borough v. Andrus*, 642 F.2d 589, 608–09 (D.C. Cir. 1980) (holding that analysis under the Outer Continental Shelf Lands Act could replace a "[m]andatory stage-by-stage review" process under the ESA because that substitution "ma[de] ESA requirements more likely to be satisfied both in an ultimate and a proximate sense"). Indeed, ESA regulations that govern "programmatic" consultations make clear that such consultations may delay but may not avoid the requirements of Section 7 regulations. *See, e.g.*, 50 C.F.R. § 402.14(g) (creating no exception to Service responsibilities for programmatic consultations), (i)(7) (contemplating that "incidental take statement[s]" for framework programmatic actions are not required at the programmatic level because incidental takings "will be addressed in subsequent section 7 consultation, as appropriate" and requiring ITSs only for "those program actions that are . . . not subject to further section 7 consultation").

Appellants' reliance on the Second Circuit's decision in *Cooling Water Intake Structure Coalition*, 905 F.3d at 49, to reach a contrary conclusion is unpersuasive. Florida modeled its permitting program on the one approved in *Cooling Water*,

environmental baseline, the FWS apparently adopted analysis from the EPA that performed a species-level baseline analysis. But because we conclude that the BiOp's no-jeopardy conclusion fails to perform the necessary effects analysis, we need not address the environmental baseline evaluation. *See Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 793 (D.C. Cir. 2019) ("This court can affirm a district court's judgment on any basis supported by the record.").

35

and Appellants concede that *Cooling Water* "stands alone as the only case concerning, much less approving, a programmatic biological opinion and incidental take statement of this sort." *CBD v. Regan*, 734 F. Supp. 3d at 47. But *Cooling Water* does not bind us, *see Brink v. Continental Ins. Co.*, 787 F.3d 1120, 1125–26 (D.C. Cir. 2015) ("We [are] not . . . bound to follow the decisions of other circuits."); and its reasoning is at odds with applicable regulations and our own precedents, *see* 50 C.F.R. § 402.14(g), (i)(7); *N. Slope*, 642 F.2d at 609.[7] A technical assistance process that sets standards less protective than those prescribed by the ESA cannot displace the ESA itself.

Neither the ESA nor its implementing regulations permit the FWS to dilute the requirements of Section 7, yet that is precisely what the FWS sought to do. The BiOp's no-jeopardy determination was thus unlawful: It was arbitrary and capricious because it violated applicable regulations, *see Nat'l Env't Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009, and it was developed "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (D). The EPA's reliance on the

---

[7] The term "programmatic consultation" is undergirded by the definition of "[f]ramework programmatic action," which means "a framework for the development of future action(s) that are . . . carried out at a later time," where "any take of a listed species [will] not occur unless and until those future action(s) are . . . carried out and *subject to further section 7 consultation.*" 50 C.F.R. § 402.02 (emphasis added); *see also id.* ("Mixed programmatic action means, for purposes of an incidental take statement, a Federal action that approves action(s) that [1] will not be subject to further section 7 consultation, and also approves [2] a framework for the development of future action(s) [for which . . .] any take of a listed species [will be . . . ] *subject to further section 7 consultation.*" (emphasis added)).

36

unlawful BiOp to approve Florida's permitting application was unlawful for the same consequential reasons. *Id.*

Our dissenting colleague would deem the BiOp consistent with statutory and regulatory requirements. In her view, "the parties' dispute boils down to a simple question: can the FWS rely on structural safeguards in Florida's program to reach a no-jeopardy determination without conducting an analysis of potential harm to each individual species and habitat?" Opinion of Henderson, J., at 14. In her view, the FWS "plainly can." *Id.* at 14. And here, she says, the technical assistance process is sufficient because it "guarantees eventual site- and species-specific assessments." *Id.* at 16; *see also id.* at 32. But even if structural safeguards in the form of deferred site- and species-specific assessments might be sufficient in some circumstances, that is not the case here. What the dissent fails to acknowledge is that the deferred assessments contemplated by the technical assistance process plainly will not meet Section 7's exacting requirements — indeed, the technical assistance process was specifically designed to be "streamlined" and less "burdensome" than Section 7. At bottom, such a watered-down procedure does not comport with agency regulations on programmatic approvals, which expressly subject deferred actions to "further section 7 consultation." 50 C.F.R. § 402.02.

### 2. Incidental Take Statement

Section 7 of the ESA and its implementing regulations envision a multistep, iterative process for monitoring and protecting against excessive incidental takings. When evaluating a contemplated agency action, the Services are directed to estimate the incidental-take amount that is deemed acceptable and to include measures in the ITS to minimize the effect of incidental take. *See* 50 C.F.R. § 402.14(i)(1)(i) (The

**36a**

37

ITS must "[s]pecif[y] the impact of incidental taking as the amount or extent of such taking."); *id.* § 402.14(i)(1)(ii) (The ITS must "[s]pecif[y] those reasonable and prudent measures that the [FWS] considers necessary or appropriate to minimize such impact of incidental taking on the species."). The Services normally monitor the levels of incidental take by requiring the consulting agency to "report the progress of the action and its impact on the species." *Id.* § 402.14(i)(4). And if the actual incidental takings exceed the estimated incidental-take amount, the agency must reinitiate consultation with the Services "immediately." *See id.* §§ 402.14(i)(5), 402.16. Thus, the initial estimate of "the amount or extent" of incidental take is an important feature of any ITS because that take amount triggers immediate reinitiation of consultation between the Services and the action agency under Section 7. *See Am. Rivers v. FERC*, 895 F.3d 32, 48–49 (D.C. Cir. 2018) (stressing the need for a trigger to reinitiate formal consultation). The Services also must engage in reinitiated agency consultations when "a new species is listed or critical habitat designated that may be affected by the action." 50 C.F.R. § 402.16.

Here, the ITS violates several applicable regulations. First, the ITS does not quantify "the amount or extent" of incidental take of ESA-listed species, due to an asserted "inability to anticipate the locations of future State 404 permit applications," which "did not allow the [FWS] to conduct site- and species-specified analyses to estimate the number of individuals that might be affected by the permitted activities." J.A. 2670. Instead, the ITS provides that "the amount and extent of incidental take anticipated from the[] proposed activities will be quantified and evaluated on a project-specific basis through the technical assistance process conducted between the [FWS] and [Florida]." *Id.*

**37a**

38

Second, the ITS fails to identify specific "reasonable and prudent measures" to minimize the impact of incidental take. 50 C.F.R. § 402.14(i)(1)(ii).  Rather, it (1) generally instructs the EPA, Florida, and other agencies to minimize impacts on protected species, and (2) "*assume[s]* that through technical assistance with the State, appropriate measures to minimize incidental take and detrimental effects associated with activities regulated by the State 404 program will be developed by the [FWS], and that these measures will ensure that each permit will minimize adverse effects and thereby avoid jeopardy to ESA-listed species and avoid destruction or adverse modification of critical habitat."  J.A. 2671 (emphasis added).

Third, the ITS relieves the FWS of any mandatory duty to participate in reinitiated Section 7 consultations.  Applicable regulations require the reinitiation of agency consultation if expected take levels are exceeded, 50 C.F.R. § 402.14(i)(5), or if a new species or habitat is deemed protected, *id.* § 402.16. But the ITS addresses excessive-take levels through the technical assistance process, which falls short of a renewed Section 7 consultation.  *See* J.A. 2671 (If incidental take occurs after "implementation of recommended minimization measures," the FWS will "quantify" the amount or extent of the take, and then "review reports and track the levels of the estimated take through the technical assistance process."). Moreover, the ITS explicitly states that "the listing of a new species or critical habitat *shall not trigger reinitiation* of consultation on this action (approval of Florida's assumption of the CWA 404 program)."  J.A. 2674 (emphasis added). Indeed, the FWS contends it would have "no obligation" to conduct further Section 7 consultations "because [Florida's] issuance of . . . a permit is not a Federal Action."  *Id.*

**38a**

39

The FWS defends its failure to set an estimated incidental-take amount, in violation of the applicable regulation, by arguing only that it was unable to make that determination because it did not know the geographic locations that would be affected by Florida's permits. But that assertion of impossibility is dubious. The FWS surely could have attempted to make the required estimate: The ESA mandates only that the FWS use the "best available information." 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(g)(8). As the district court pointed out, the FWS had "reams" of information about protected Florida species at its disposal, gleaned from numerous BiOps that it had previously prepared. *CBD v. Regan*, 734 F. Supp. 3d at 54. Indeed, as the district court suggested, "[i]f there are about 150 panthers left in Florida . . . it is not difficult to imagine a cumulative take limit per year for the entire State (or for particular regions of the State)." *Id.* at 52. Moreover, if the FWS faced difficulty estimating an incidental-take amount when preparing the ITS, the FWS could have deferred the required analysis to a subsequent Section 7 consultation. *See* 50 C.F.R. § 402.14(i)(7) (noting that an "incidental take statement" may not be required at the programmatic level when "any incidental take . . . will be addressed in subsequent section 7 consultation").

The FWS's rationale for skirting mandatory reinitiation of Section 7 consultations when expected take levels are exceeded, 50 C.F.R. § 402.14(i)(5), and upon the listing of a new species or the designation of a new critical habitat, *id.* § 402.16(a)(4), is equally unavailing. The FWS contends that it has no obligation to engage in further Section 7 consultations — such as when expected take levels are exceeded — because Florida's subsequent permitting decisions are not federal actions. That argument, though, does not justify end-running Section 7 and instead suggests that programs like this one are a poor fit for Section 7 consultation. *See supra* n.2.

**39a**

40

Under the FWS's reasoning, Florida would obtain the benefits of a Section 7 consultation (*i.e.*, a programmatic ITS that provides permittees with incidental-take liability protection), without the attendant costs (*i.e.*, continued monitoring, with the possibility of reinitiated Section 7 consultations, to protect listed species or critical habitats).

Because the ITS openly violates applicable regulations regarding take amounts and the reinitiation of consultation, it is arbitrary and capricious. *See Nat'l Env't Dev. Ass'n's Clean Air Project*, 752 F.3d at 1009. It also violates the APA because the FWS developed the ITS "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). And the EPA violated the ESA and APA by relying on the deficient ITS to approve Florida's permitting-program application. *Id.*

### 3. Consultation with the NMFS

The EPA also erred by failing to formally consult with the NMFS under Section 7. The EPA decided that it need not consult with the NMFS because it believed Florida's permitting application would not affect protected species under the NMFS's jurisdiction. That decision was erroneous because the EPA neglected to assess the downstream or indirect effects of the permitting program in all areas to be affected directly or indirectly by the program. *See* 50 C.F.R. § 402.02 (defining "action area" and "effects of the action").

As previously discussed, whenever an agency's discretionary action "may affect" a listed species in a contemplated "action area," the agency must consult with the NMFS, the FWS, or both, if the affected species are within the relevant Service's jurisdiction. *See* 16 U.S.C. § 1536. The agency must first coordinate with the Services to determine whether the proposed agency action would have any impacts on listed species, such that formal consultation under Section 7

**40a**

41

is required.  50 C.F.R. § 402.14(b)(1).  The agency may forgo formal consultation with a Service if it determines, "with the written concurrence of the [relevant Service], that the action is not likely to adversely affect listed species or critical habitat" under the Service's jurisdiction.  *Id.*; *see also id.* § 402.13(c).  The "action area" is defined as "all areas to be affected directly or indirectly by Federal action and not merely the immediate area involved in the action."  *Id.* § 402.02.  Moreover, the "effects of an action" are not temporally or geographically limited, and "may occur later in time and may include consequences occurring outside the immediate area involved in the action."  *Id.*

Here, the NMFS provided an advisory letter to the EPA, which stated that "[protected] species under NMFS'[s] jurisdiction do not occur in waters that are assumable by [Florida]."  J.A. 2196.  Based on the advisory letter, the EPA informed the NMFS that it would "conclude consultation [with the NMFS] on this action."  J.A. 2174.  But importantly, neither the NMFS nor the EPA recognized that the advisory letter was insufficient in its scope:  It focused on the "immediate area involved in the action" instead of "all areas to be affected directly or indirectly."  50 C.F.R. § 402.02 (definition of "action area").  In fact, the required effects analysis had to encompass "all consequences to listed species or critical habitat that are caused by the proposed action, including . . . effects [that] may occur later in time and may include consequences occurring outside the immediate area involved in the action."  *Id.* (definition of effects of the action).

The EPA's failure to consult with the NMFS was likely significant.  The record suggests that Florida's program might indirectly affect listed species under the NMFS's jurisdiction.  For example, the BiOp notes that "freshwater eventually makes its way to the nearly 2,000 miles of Florida coastline and

**41a**

42

marine ecosystem," suggesting that discharge into Florida's freshwaters might eventually affect marine species like the Gulf sturgeon, Atlantic sturgeon, and shortnose sturgeon, all of which are under the NMFS's jurisdiction.  J.A. 2643.

Consequently, the EPA's determination that it need not consult with the NMFS was arbitrary, capricious, and contrary to law.

**IV.**

When an agency's action is unlawful, "vacatur is the normal remedy."  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014).  That is because Congress has directed us to "hold unlawful and set aside agency action" that is "not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Our precedents "permit a court to remand without vacating the agency's action in limited circumstances," but doing so is an "exceptional remedy."  *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518–19 (D.C. Cir. 2020) (citing *Allina Health Servs.*, 746 F.3d at 1110).  To determine whether remand without vacatur is warranted, we consider the factors set forth in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, namely: (1) the "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)," and (2) the "disruptive consequences of an interim change that may itself be changed."  988 F.2d 146, 150–51 (D.C. Cir. 1993) (cleaned up).  The second factor "is weighty only insofar as the agency may be able to rehabilitate its rationale."  *Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (citation omitted).

As explained above, we hold that four agency actions violate the ESA and the APA — *i.e.*, the BiOp, the ITS, the EPA's failure to consult with the NMFS, and the EPA's approval of Florida's permitting program.  Each of those

**42a**

43

unlawful agency actions requires the normal remedy of vacatur.

First, the deficiencies of each action are serious and the EPA cannot sufficiently explain its actions on remand. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021) (The inquiry is "whether the agency could, with further explanation, justify" its procedural failures.).  The FWS based its BiOp's no-jeopardy determination on a flawed effects analysis and inaccurate assumptions about the efficacy of the technical assistance process.  Moreover, the flawed ITS would allow Florida's Section 404 permittees to claim exemptions from take liability, without requiring those permittees to meet applicable requirements under either Section 7 or Section 10 of the ESA. In addition, the EPA erroneously determined that consultation with the NMFS was not required under Section 7.  All of those errors fatally undermine the EPA's approval of the permitting program, and that decision cannot be salvaged with additional explanation. *See N.J. Conservation Found. v. FERC*, 111 F.4th 42, 64 (D.C. Cir. 2024) (vacatur appropriate where deficiencies went to the core of an agency's findings and were unlikely to be cured with more explanation); *Standing Rock*, 985 F.3d at 1052 (vacatur appropriate where procedural violations "lead us to doubt that the ultimate action will be approved"); *Env't Def. Fund v. FERC*, 2 F.4th 953, 976 (D.C. Cir. 2021) (vacatur appropriate where agency action was informed by deficient proceedings).

Second, vacatur would not likely cause undue "disruptive consequences" from "an interim change that may itself be changed." *Allied-Signal*, 988 F.2d at 150–51.  It is not at all clear that Appellants will be able to reinstate the contemplated permitting program consistent with the requirements of the ESA.  Moreover, it is not unduly disruptive for Section 404

**43a**

44

permitting authority to revert to the Corps, which was responsible for issuing such permits before Florida implemented the program under review. And finally, our vacatur of each agency action is prospective and should not call into question previously issued Section 404 permits.

Our dissenting colleague would not vacate the EPA's approval of Florida's permitting program because, in her view, the BiOp permissibly defers FWS site- and species-specific assessments and the ITS "had no bearing on the EPA's transfer decision." *See* Opinion of Henderson, J., at 39. But even assuming that she is correct about the BiOp, the concededly deficient ITS independently requires vacatur because it was an important aspect of the EPA's approval process. *See* J.A. 2670; *see also* 50 C.F.R. § 402.14(g), (i)(1) (ITS must be formulated during the formal consultation process and "with the biological opinion"). Without a valid procedure for dealing with incidental takings, the EPA could not have approved Florida's permitting program consistent with the ESA and its regulations. *See, e.g.*, 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14. Moreover, the dissent's remedy analysis overlooks the EPA's concededly erroneous failure to consult with the NMFS. Because the mandated consultation did not occur, there is no way to discern whether the NMFS would have issued a BiOp with a "no jeopardy" determination that would have allowed the EPA to approve Florida's novel permitting program. Those serious deficiencies cannot be addressed with further explanation on remand, and it is unclear whether the program's approval can be rehabilitated. Thus, the normal remedy of vacatur is warranted.

\*   \*   \*

**44a**

45

For the foregoing reasons, we affirm the judgment of the district court.[8]

*So ordered.*

---

[8]    Appellees conditionally cross-appealed the district court's dismissal of their CWA claims.   Because the cross-appeal is conditional and we need only reach it if we reverse the district court's judgment, we dismiss the cross-appeal as moot.  *See Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 649 (D.C. Cir. 1998).

**45a**

WILKINS, *Circuit Judge*, concurring in part and concurring in the judgment:

I concur in the judgment affirming the District Court. I join Sections II, III.B.2, and III.B.3, and concur in the judgment as to Sections III.B.1 and IV of the Majority Opinion. Specifically, I agree that the Court should affirm the District Court's grant of summary judgment to Environmental Appellees as to Counts 4 and 10–11 of the Complaint.

Counts 4 and 10 of the Amended Complaint alleged that the Biological Opinion ("BiOp") as a whole, including the Incidental Take Statement ("ITS"), violated the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA") because, among other things, the ITS did not specify the amount and extent of incidental take of listed species "and fail[ed] to specify a take-based trigger for reinitiating consultation[.]" J.A. 39, 155, 168. For the reasons stated in Sections III.B.2 and III.B.3 of the Majority Opinion, and as further explained below, the plaintiffs were entitled to summary judgment on those counts.

Count 11 alleged that the Environmental Protection Agency ("EPA") arbitrarily and capriciously failed to consult with the National Marine and Fisheries Service ("NMFS") because EPA failed to consider that Florida's Section 404 program would have an indirect effect on species within NMFS's jurisdiction. J.A. 170–71. Since EPA has now conceded that the District Court properly granted summary judgment in favor of Environmental Appellees as to Count 11 because Florida's 404 program may affect three ESA-listed species in NMFS's jurisdiction: the (1) Atlantic sturgeon, (2) Shortnose sturgeon; and (3) Smalltooth sawfish, I would affirm the District Court as to Count 11. *See* EPA Opening Br. 50.

I also agree that the Court should affirm the vacatur of the Incidental Take Statement as deficient, which results in vacatur

2

of the Biological Opinion because its no jeopardy finding is dependent upon the deficient ITS.  I also agree that the Court should affirm the vacatur of the EPA's approval of Florida's Section 404 program, *see* 33 U.S.C. §§1344(g)–(h), because such approval was dependent upon the now-vacated Biological Opinion.  To avoid undue disruption, I would not disturb any of the permits that have already been granted under the program.

## I.

I write separately because my view of the statutory scheme differs a bit from my colleagues.

## A.

I begin with the framework that applies to our analysis of the ESA challenge to this programmatic action, which is guided by *National Association of Home Builders*.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007).

In *National Association of Home Builders*, the Court held that the Clean Water Act ("CWA") and the ESA must be construed in manner that gives effect to both statutes' specific mandates if possible.  551 U.S. at 662–63.  As the Court explained, Section 7(a)(2) of the ESA can co-exist with Section 402 of the CWA and "[t]he transfer of permitting authority to state authorities—who will exercise that authority under continuing federal oversight to ensure compliance with relevant mandates of the [ESA] and other federal environmental protection statutes—was proper."  *Id.* at 649–50, 673.  Because implied repeals are disfavored, *National Association of Home Builders* teaches that we have an obligation to interpret Section 404 of CWA in the same manner, so that we give effect to all provisions of the ESA and

**47a**

3

Section 404, if at all possible.  This perspective was explicitly stated by Congress in the ESA.  *See* 16 USC § 1531(c)(2) ("It is further declared to be the policy of Congress that Federal agencies shall cooperate with State and local agencies to resolve water resource issues in concert with conservation of endangered species.").  Thus, we have a duty to construe the ESA harmoniously with Section 404 wherever we can do so without nullifying any provision of the ESA.[1]

**B.**

Here, the way Florida and the federal agencies attempted to implement Section 404 nullified two very clear and specific requirements of the ESA.

First, the ESA requires that a BiOp includes an ITS when the U.S. Fish and Wildlife Service ("FWS" or "Service") concludes that the action will result in take of such a protected species.  The ITS must "specif[y] the impact of such incidental taking on the species," 16 U.S.C. § 1536(b)(4)(i), and "the amount or extent" of such taking.  50 C.F.R. § 402.14(i)(1)(i). Second, ESA regulations mandate that the parties must monitor the impact of the action on protected species, and if the amount of take exceeds the limit set forth in the ITS, "the Federal agency must reinitiate consultation immediately."  *See* 50 C.F.R. §§ 402.14(i)(4)–(5). The Florida/EPA Agreement does not comply with either of these ESA requirements.

---

[1] I do not think that the framing of the issues in Judge Pan's opening hypothetical is quite apt.  *See* Majority Op. at 3.  Because Florida will not be the party applying for permits, it is not fair to equate the sovereign's role in a Section 404 program with that of a regulated party, such as a truck owner seeking to pass inspection from the Department of Motor Vehicles.

4

The ITS in the present case did not include any take limits at all. Instead, the ITS stated "the amount and extent of incidental take anticipated from these proposed activities will be quantified and evaluated on a project-specific basis through the technical assistance process conducted between the USFWS and the State." J.A. 2670. The ITS justified the absence of any take limits because the "inability to anticipate the locations of future state 404 permit applications did not allow the Service to conduct site- and species-specific analyses to estimate the number of individuals that might be affected by the permitted activities." *Id.* As the District Court found, without a clear and enforceable incidental take limit, the ITS violates the ESA. *See Am. Rivers v. FERC*, 895 F.3d 32, 48–49 (D.C. Cir. 2018) (holding that the requirement to reinitiate consultation if "the amount or extent of incidental take is exceeded" did not provide enough guidance, rendering biological opinion unlawful); *see also Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1041 (9th Cir. 2007) ("The salient point here, however, is that no matter what kind of limitation on take the FWS chooses to place in the Incidental Take Statement, it cannot be so indeterminate as to prevent the Take Statement from contributing to the monitoring of incidental take by eliminating its trigger function."). Neither the statute nor the regulations allow the action agency to state that take limits will be determined at a later time, and then deem Section 7 consultations finished.

To make matters worse, the ITS states that even if a later-specified take limit is exceeded, the federal agencies were not required to reinitiate consultation. *See* J.A. 2674.[2] Thus, even

---

[2] Indeed, the federal agencies effectively conceded this point, Fed. Appellant Br. 47–48 & n.7, but they say in a footnote that the issue is not ripe, *id.* The federal agencies cite no authority

5

though the ESA regulations mandate that when a take limit is exceeded, "the Federal agency must reinitiate consultation immediately," *see* 50 C.F.R. §§ 402.14(i)(5), the EPA is not required to do so here. Instead, Florida is required to re-open the permit and coordinate further protective measures with the FWS as part of the technical assistance process, but there is no reinitiation of Section 7 consultation. This is wrong. The Section 404 program cannot be implemented in a way that impliedly repeals this bedrock requirement of the ESA. Rather, the ITS was required to state, in some measurable manner, how to determine when the program was allowing too much take and to mandate the re-initiation of consultation if the take limit were ever exceeded. This is critical, because the take immunity expires when re-initiation of consultation begins, since the BiOp is no longer valid. *See Center for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1115 (9th Cir. 2012).

The federal agencies do not dispute that the absence of concrete take limits in the ITS conflicts with ESA regulations, but they assert that "the regulation does not speak to what the agency must do when neither the amount of anticipated take nor any surrogate is knowable at the time the statement must issue[.]" *See* Fed. Appellant Br. 47. Not so. The ESA regulations include a provision for issuing BiOps in incremental steps, which requires further Section 7 consultation when an additional step is needed to determine an incidental take limit. *See* 50 C.F.R. § 402.14(k). The regulations also include an "expedited consultation" provision, which can be used to quickly complete further consultation needed to specify a take limit for a specific permit. See 50

---

in support of that proposition, and I do not find their one-sentence conclusory argument persuasive.

6

C.F.R. § 402.14(l).  *See also* U.S. Fish & Wildlife Service and National Marine Fisheries Service, Endangered Species Consultation Handbook, pp. 5-6 to 59 (1998) (describing streamlined consultation procedures for programmatic actions and incremental step consultations).  The BiOp does not explain why neither of these regulations could be employed here.  Neither do Florida or the federal agencies.  For its part, Florida argues that a rulemaking proceeding relating to incidental take statements for programmatic actions contemplated "other types" of programmatic actions that do not fit within the definitions provided in the regulations.  *See* Fla. Appellant Br. 32–33 (citing 80 Fed. Reg. 26832, 26835 (May 11, 2015)).  But that language does not help them, because the rulemaking did not purport to exempt any such "other type" of programmatic consultations from ESA regulations.

Florida and the federal agencies ask us to follow *Cooling Water Intake Structure Coalition v. EPA*, 905 F.3d 49, 77 (2d Cir. 2018), where the court rejected an ESA challenge to an ITS that, like here, did not include take limits and instead relied upon a subsequent "technical assistance" process to set them. The Second Circuit held that the "justification for not immediately qualifying take [wa]s adequate," given the lack of information at the programmatic consultation stage about specific future sites and how particular species might be affected.  *Id*.  I do not find this reasoning persuasive, given that the court never addressed the conflict with the explicit mandate in the ESA regulation that the ITS "will provide . . . a statement concerning incidental take that . . .[s]pecifies the impact of incidental taking *as the amount or extent of such taking*."  50 C.F.R. § 402.14 (i)(1)(i) (emphasis added).  The court cited cases and legislative history for the proposition that Congress anticipated that a numerical take limit would not always be practicable, but those authorities merely support using a surrogate (such as members of another species or a habitat

**51a**

7

element like food, cover or water quality) to quantify take when it is impracticable to quantify the protected species. *See Cooling Water*, 905 F.3d at 77. None of those authorities countenanced failing to set a take limit in the ITS *at all*. Indeed, one of the cases relied upon by *Cooling Water* invalidated an ITS because the FWS had removed the take limit in its revised BiOp so that "no number of dead or vanished [protected species] . . . will trigger re-consultation." *See Miccosukee Tribe of Indians of Fla. v. U.S. Fish and Wildlife Service*, 566 F.3d 1257, 1275 (11th Cir. 2009) (cited in *Cooling Water*, 905 F.3d at 77). Furthermore, *Cooling Water*'s reasoning cannot be squared with longstanding agency procedure that "a programmatic consultation will not substitute for an individual project consultation, unless the programmatic analysis lays out the species-specific standards within which all individual activities will be conducted." Endangered Species Consultation Handbook, p. E-17.

In short, Florida and the federal agencies wanted to create take immunity even though the ITS did not specify any clearly identifiable take limits, conclude the required Section 7 consultation, and not bind themselves to reinitiate Section 7 consultation if any later-imposed take limits were exceeded. That is not how the ESA statutory and regulatory scheme works.

One other incongruity of the ITS results from the fact that, if Florida's position is correct, none of the federal agency action occurring during the technical assistance process would ever require Section 7 consultation because the permits are issued by the state, rather than the federal government. *See* Fla. Appellant Br. 34–35 (arguing that when Florida administers the Section 404 permits, this is "not a 'phase' of the federal action triggering additional Section 7 consultations[.]"). Recall that the technical assistance process can involve a federal agency

**52a**

8

deciding whether to object to a permit or to express a take limit using a number or a surrogate, actions that appear to be inherently discretionary. *See Arkansas v. Oklahoma*, 503 U.S. 91,99 (1992) (describing the EPA's power to veto a state permit as an act "in its discretion"); *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1123, 1125–26 (9th Cir. 1998) (where U.S. Bureau of Reclamation had authority to renew water contracts on "mutually agreeable" terms, the federal agency had discretion within the meaning of the ESA). Given that Section 7 consultation "applies to every discretionary agency action—regardless of the expense or burden its application might impose," *see Nat'l Ass'n of Home Builders*, 551 U.S. at 671 (emphasis removed) (citing *TVA v. Hill*, 437 U.S. 153 (1978)), I do not see how the entirety of the technical assistance process falls outside of Section 7's consultation requirements. *See id.* at 672, n.11 (observing that following the transfer of permitting authority to the state under Section 402 of the CWA, "EPA will retain . . . the power to object to proposed permits," and "the fact that the EPA may exercise discretionary oversight authority . . . may trigger Section 7(a)(2)'s consultation and no-jeopardy obligations[.]"). This seems to be another way in which this use of federal "technical assistance" to implement Section 404 of the CWA impliedly repeals provisions of ESA Section 7, which it cannot lawfully do.

Because these errors require vacatur of the BiOp, the ITS and EPA's approval of Florida's Section 404 program, we can affirm the District Court on this basis, and we have no need to reach the remaining issues. For this reason, and because my view of the remaining issues differs slightly from my colleagues, I will leave it there.

**53a**

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in part and dissenting in part: In 2020, after years of effort, the Environmental Protection Agency (EPA) transferred Clean Water Act (CWA) permitting authority from the Army Corps of Engineers to the State of Florida. Despite a statutory preference for state control of CWA permitting, this was only the third successful federal-to-state handoff in the half-century life of the permitting program. The reasons for states' reluctance are many but at least one roadblock is arduous environmental review. Even after a state clears the CWA's procedural hurdles, it must meet other federal laws and regulations that can trip up even the most punctilious actor. Nevertheless, Florida picked up the baton. For years, it built an administrative apparatus, enacted legislation, promulgated regulations, hired and trained personnel and worked hand-in-hand with partner federal agencies to satisfy the environmental laws. Its effort finally bore fruit when, in December 2020, the EPA handed it control of the CWA program in Florida. But "no sooner do agencies approve new [action] than they find themselves under a tidal wave of litigation from environmental groups." *Appalachian Voices v. FERC*, 139 F.4th 903, 916–17 (D.C. Cir. 2025) (Henderson, J., concurring).

Within weeks of the EPA's transfer, environmental groups sued to stop Florida's CWA assumption. On summary judgment, the district court vacated the EPA's transfer due to alleged procedural violations of the Endangered Species Act (ESA), violations that, on my reading, appear nowhere in the statute. Nor can they be found in any agency regulation.

What follows is a technical, in-the-weeds discussion of various overlapping environmental laws. But at a macro level, the issue is remarkably simple. The ESA requires federal agencies to assess the impact of any "final action" on endangered species. Because the relevant "action" is Florida's ongoing assumption of CWA permitting, the relevant federal agencies could not reliably predict or quantify the effects of the

**54a**

2

transfer on endangered species.  To comply with both laws, the CWA and the ESA, the Government required Florida to consult with it on each permit Florida plans to issue.[1]    These consultations entailed built-in conditions to mitigate any potential harm an individual permit might cause to a protected species.  Based on these structural safeguards, the Government concluded that its action—CWA transfer to Florida—was unlikely to jeopardize endangered species.   The central question is whether the Government can rely on future permit-by-permit consultation to measure harm to endangered species or whether, at the time of transfer, it has to divine the full impact of permitting across the entire state of Florida for all time.

Remarkably, the district court held the latter, breaking from statutory text, context and the holding of a sister circuit.  As detailed *infra*, I believe the Congress has not required federal agencies to make remote, perhaps improbable, predictions in conducting their ESA review.  And courts should stop short of demanding that they try to do so.  Accordingly, I respectfully dissent in part.

## I.   BACKGROUND

### A.  Statutory and Regulatory Background

In the 1960s and 70s, a national push for greater environmental protection led to a slew of environmental laws. In 1966, the Congress enacted the Endangered Species Preservation Act, which directed the Secretary of the Interior to create a list of threatened and endangered species and to

---

[1] I use "the Government" to refer collectively to the relevant federal agencies: the EPA, the Services and the Army Corps of Engineers.  The remaining Appellants are officers of these agencies respectively.

3

purchase land important for conservation.  Pub. L. No. 89-669, 80 Stat. 926 (1966).  A companion statute, the Endangered Species Conservation Act, prohibited the import of most endangered species.  Pub. L. No. 91-135, 83 Stat. 275 (1969).  These measures proved inadequate and, in 1973, the Congress enacted the Endangered Species Act, which made it the policy of all federal agencies to conserve and protect endangered and threatened species.  Pub. L. No. 93-205, § 2, 87 Stat. 884 (1973), codified as amended at 16 U.S.C. § 1531(c).  Like its forebears, the ESA creates a list of "endangered" and "threatened" species subject to legal protection.[2]  When a species is listed, the Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) (collectively, the Services) must designate a critical habitat "to the maximum extent prudent and determinable" and "develop and implement plans . . . for the conservation and survival" of that species.[3]  16 U.S.C. § 1533(f); *see* 50 C.F.R. § 402.01(b) (tasking FWS and NMFS with administering the Act).

Under § 7 of the ESA, every federal agency must consult the Services if any action it authorizes, funds or carries out may affect a listed species or critical habitat to ensure that the action does not jeopardize the continued existence of the species or its

---

[2] An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range."  16 U.S.C. § 1532(6).  A threatened species is one "which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  *Id.* § 1532(20).

[3] The Secretary of Commerce is responsible for marine species and administers the ESA through the NMFS.  The Secretary of Interior is responsible for terrestrial species and administers the ESA through the FWS.  16 U.S.C. § 1532(15); 50 C.F.R. §§ 17.11, 402.01(b).

4

habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Consultation requires the agency to prepare a Biological Assessment, which identifies any protected species or habitats likely to be affected by the proposed agency action. 16 U.S.C. § 1536(c).[4] The Services then prepare a Biological Opinion (BiOp) detailing how the species or critical habitat may be affected. *Id.* § 1536(b)(3). If the Services determine that the agency's action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify a critical habitat, the Services must propose reasonable and prudent mitigation measures. *Id.* § 1536 (a)(2), (b)(3); *see* 50 C.F.R § 402.14(g)(4), (h)(3) (detailing the process). The agency, for its part, must either terminate the action, adopt the Services' proposal or seek an exemption. *Weyerhaeuser Co. v. FWS*, 586 U.S. 9, 15 (2018). The regulations implementing § 7 apply to "all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03.

Under § 9 of the ESA, no individual, private entity or government may "take" a protected species, subject to civil and criminal penalties. 16 U.S.C. §§ 1538(a)(1), 1540(a)–(b); *see also id.* § 1532(13). To "take" a species is to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" it or to attempt to do so. *Id.* § 1532(19). But if a taking is incidental to an otherwise lawful activity, the Services may exempt the activity, subject to a conservation plan. *Id.* § 1539(a)(2); 50 C.F.R. § 402.02. If the Services conclude that an action is not likely to jeopardize a listed species or habitat but that "incidental take" is reasonably likely to occur, they must prepare an Incidental Take Statement (ITS), which authorizes

---

[4] If the Biological Assessment leads the agency to conclude that its proposed action is not likely to adversely affect a listed species or habitat, it can avoid formal consultation with the Services. 50 C.F.R. § 402.14(b)(1).

**57a**

5

the taking subject to applicable conditions. 16 U.S.C. § 1536(b)(4), (o)(2). Only federal agencies can obtain exemption from ESA take requirements through § 7 consultations; states and private individuals must apply for an individual permit under § 10, which authorizes "any taking otherwise prohibited by" the ESA. *Id.* § 1539(a)(1)(B).

Around the time the ESA became law, the Congress also enacted the Clean Water Act (CWA) to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits "the discharge of any pollutant" into the waters of the United States absent a permit. *Id.* §§ 1311(a), 1362(7). Section 404 authorizes the Army Corps of Engineers to issue permits "for the discharge of dredged or fill material" into the waters of the United States.[5] *Id.* § 1344(a). If a permit affects a protected species, the Corps must engage in a § 7 consultation under the ESA.

The CWA codifies a congressional preference for "the states . . . [to] implement the [CWA's] permit programs." *Id.* § 1251(b). To that end, states and tribal governments may apply to the EPA to assume permitting authority over certain waters—those not "presently used, or . . . susceptible to use . . . as a means to transport interstate or foreign commerce shoreward," *id.* § 1344(g)(1), colloquially known as "assumed waters." Permitting for "interstate" waterways—also known as "retained waters"—is retained by the federal agencies even after a state assumes § 404 permitting authority. The presumption is in favor of transferability. *See id.* § 1344(h)(3)

---

[5] Dredging is the excavation of material from waters of the United States and filling is the depositing of material into waters of the United States. 33 C.F.R. § 323.2(c)–(f).

6

(deeming any application not acted on within 120 days approved).

Before the EPA approves a transfer of authority, however, it must conclude that a state can satisfy all § 404 requirements. *Id.* § 1344(h)(1)–(2). One requirement prohibits any discharge that "[j]eopardizes the continued existence of [ESA] species . . . or results in likelihood of the destruction or adverse modification of a [critical] habitat." 40 C.F.R. § 230.10(b)(3). Post-transfer, a state must continue to notify the EPA of any permit it approves and the EPA may object to or require that additional conditions attach to an assumed-waters permit. 33 U.S.C. § 1344(j).

To sum up, whenever a federal agency authorizes, funds or carries out any action, it must assess whether that action may affect endangered or threatened species or their habitats. To do so, the agency consults with the Services—the Fish and Wildlife Service and the National Marine Fisheries Service— under § 7 of the Endangered Species Act. As part of the consultation, the Services prepare a Biological Opinion that details whether the agency action is likely to jeopardize the continued existence of a protected species or habitat. If the answer is no, the agency action may proceed; if the answer is yes, it generally cannot absent an exemption. Even if the Services make a no-jeopardy determination, they must separately assess whether the proposed action will result in incidental take, *i.e.*, cause injury to a protected species or its habitat. If so, the Services then prepare an Incidental Take Statement under § 7(o)(2) that exempts the action from take liability under § 9. Individuals and states must go through a separate process under § 10 to obtain a take exemption.

Dredging or filling (removing or adding) materials into waters of the United States also requires a § 404 CWA permit.

7

Permitting is managed by the Army Corps of Engineers but it can authorize a state to manage permitting for non-interstate waters of the United States.  Before a state assumes § 404 permitting, it must demonstrate its own compliance with several environmental laws and regulations.  And, as described below, the EPA has determined that a CWA § 404 transfer is a federal action requiring ESA review.

## B.   Factual Background

In August 2020, Florida applied to the EPA to assume CWA § 404 permitting authority.  *See* Florida's Request to Assume Administration of a Clean Water Act Section 404 Program, 85 Fed. Reg. 57,853 (Sept. 16, 2020).  But Florida feared that once it assumed § 404 responsibilities, it and its permittees would risk ESA liability for any incidental take of an endangered or threatened species.  Unlike a federal agency, Florida could not consult the Services to obtain a § 7 ITS.  To avoid incidental take liability, it would be forced to obtain a permit-by-permit exemption under § 10, a process that was "burdensome" and could "take years."  J.A. 2033.  So Florida proposed a novel solution: the EPA could issue a "one-time ESA Section 7 *programmatic consultation* in connection with EPA's initial review of a state application to assume the Section 404 program."[6]  *Id.*  Florida's plan works like this:

---

[6] As defined by the Services, a programmatic consultation is:

A consultation addressing an agency's multiple actions on a program, region or other basis [about] the effects of programmatic actions such as:
1.   Multiple similar, frequently occurring, or routine actions expected to be implemented in particular geographic areas; and

8

Section 7 requires a federal agency to consult the Services to determine if agency action is likely to jeopardize a listed species or critical habitat. 16 U.S.C. § 1536(a)(4). The EPA's approval of Florida's § 404 assumption constitutes agency action that would affect listed species and therefore triggers § 7 consultation. 50 C.F.R. § 402.14(a). At the end of that consultation, the Services could issue a "programmatic" BiOp and ITS that pulls every subsequent Florida permit under the § 7(o)(2) liability exemption. Under this plan, an individual permittee would not need to go through the cumbersome § 10 process to obtain a one-off exemption for incidental take. Instead, the Services would preemptively exempt all future permits from incidental take liability, subject to protections prescribed by the Services.

Florida's request faced an immediate roadblock: the EPA's then-prevailing view was that a § 404 transfer of permitting authority did not require § 7 consultation. Section 402 of the CWA contains a similar permitting program subject to state assumption once qualifying conditions are met. Applying *Chevron* deference, the Supreme Court upheld the EPA's conclusion that a § 402 transfer does not require § 7 consultation. The Court explained that two features of § 402— its "mandatory" command that the EPA "shall approve" a transfer and its "exclusive" list of qualifying conditions to approve a transfer—meant that approval is non-discretionary and thus agency regulations could reasonably exempt § 402 approvals from § 7 ESA consultation. *Nat'l Ass'n of Home Builders (NAHB) v. Defs. of Wildlife*, 551 U.S. 644, 661–64 (2007). Section 404 similarly requires that the EPA "shall

---

2. A proposed program, plan, policy, or regulation providing a framework for future proposed action

50 C.F.R. § 402.02.

9

approve" a transfer once a list of qualifying criteria is satisfied. 33 U.S.C. § 1344(h)(1)–(2). The EPA had therefore concluded that its § 404 duties are likewise ministerial and not subject to ESA § 7.[7]

Florida urged the EPA to revisit its position, arguing that the text, legislative history and unique characteristics of § 404 made it discretionary in contradistinction to § 402. In May 2020, the EPA initiated a 45-day public-comment period on the issue. *See* Request for Comment on Whether EPA's Approval of a Clean Water Act Section 404 Program Is Non-Discretionary for Purposes of Endangered Species Act Section 7 Consultation, 85 Fed. Reg. 30,953 (May 21, 2020). After reviewing the comments, the EPA concluded that "*NAHB* . . . does not control . . . CWA Section 404" and, accordingly, deemed § 404 a discretionary function. J.A. 2501. It then approved Florida's proposal that the Services issue a programmatic BiOp and ITS.

In September 2020, the EPA submitted its Biological Evaluation to FWS and requested ESA § 7 consultation. The

---

[7] *NAHB* did not *a fortiori* control the EPA's duties under § 404. Not only is § 404 a separate—albeit similar—provision from the one the Court construed in *NAHB*, but its holding also depended upon the now-defunct *Chevron* framework. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). In *NAHB*, the Court reviewed the Services' regulation harmonizing the ESA and the CWA by rendering § 7 applicable only to those "actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03. Four justices thought the regulation conflicted with the plain text of § 7. *See NAHB*, 551 U.S. at 673–74 (Stevens, J., dissenting). The five-justice majority held that the regulation was a reasonable interpretation of the ESA under *Chevron* and that, because § 402 transfers were not discretionary, the regulations permissibly exempted transfers from § 7 of the ESA. *Id.* at 673.

10

EPA did not conduct consultations with NMFS because it concluded that no species within NMFS's jurisdiction lived in assumed waters.[8]  In November 2020, FWS issued its BiOp, which concluded that the EPA's approval of Florida's permitting application was not likely to jeopardize any protected species or critical habitat.  Due to "substantial uncertainty about the number, location, timing, frequency, and intensity of regulated activity," J.A. 2644, FWS could not provide a "detailed analysis of potential effects."  J.A. 2658.  Instead, FWS summarized the types of activities that Florida might permit and the areas where permits could be issued.  It then assessed the effect of these activities on "guilds" of species, *i.e.*, groups of species, including mammals and birds, with similar traits and habitats.

FWS's no-jeopardy determination rested on a myriad of structural safeguards.  Pursuant to a memorandum of understanding (MOU) between FWS and Florida, FWS would offer technical assistance to Florida to identify risks to listed species and habitats and propose mitigation measures for those risks.  FWS would undertake that identify-and-mitigate process for *each* permit Florida issued.  After FWS's review, Florida would have two, and only two, choices: either incorporate FWS's proposed measures as terms and conditions of the permit or deny the permit.  Florida also amended its administrative code to require coordination with FWS on a permit-by-permit basis.  *See* Fla. Admin. Code R. 62-331.051–53.

---

[8] The EPA subsequently revisited its position.  In July 2023, it requested consultation with NMFS after concluding that the indirect effects of Florida's assumption of authority could affect three NMFS species.  *See ESA Biological Evaluation for CWA Section 404 Assumption by the State of Florida*, § 8.3, p. 83–84 (July 2023) [https://perma.cc/E9AX-662T].

11

Pursuant to regulation, the EPA retains the right to review and submit objections to state CWA permits unless review is waived. *See* 40 C.F.R. §§ 233.50(a)–(b), 233.51. The EPA's memorandum of agreement (MOA) with Florida waives federal review except for eight categories, one of which includes "[d]ischarges with reasonable potential for affecting endangered or threatened species as determined by []FWS." J.A. 1573; *see* 40 C.F.R. § 230.10(b)(3) (prohibiting such discharges). Like FWS, the EPA can compel Florida to incorporate the EPA's prophylactic measures as a condition of issuing a permit. 40 C.F.R. § 233.50(f). With two federal agencies superintending Florida's CWA program for ESA compliance, FWS concluded that Florida's § 404 assumption was not likely to jeopardize listed species or critical habitats.

FWS also issued an ITS that exempted the EPA, Florida and future permittees from ESA liability for any incidental take pursuant to a state-issued permit. Like the BiOp, the ITS concluded that it was infeasible to measure anticipated future take across the life of the permitting program; accordingly, FWS indicated that it would track future take on a permit-by-permit basis and Florida offered to reopen permits if actual impact on affected species deviated from projections.

With the programmatic BiOp and ITS in hand, the EPA approved Florida's § 404 application on December 17, 2020, effective five days later. *See* EPA's Approval of Florida's CWA Section 404 Assumption Request, 85 Fed. Reg. 83,553 (Dec. 22, 2020). The EPA's approval was only the third approval of a state's assumption of § 404 authority, following Michigan in 1984 and New Jersey in 1994. *See* 40 C.F.R. § 233.70–71.

**64a**

12

### C.  Procedural Background

Within weeks of the EPA's decision, a collection of environmental groups sued to challenge the EPA's approval of Florida's application, FWS's BiOp and ITS and the Corps' list of retained waters.  On summary judgment, the district court concluded that FWS's BiOp and ITS "were facially and legally flawed" and that the "EPA unreasonably relied on those documents in approving Florida's assumption application." *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 58 (D.D.C.), *judgment entered*, 729 F. Supp. 3d 37 (D.D.C. 2024).

As to the BiOp, the court fashioned a bespoke rule: that is, a BiOp cannot assess species at the guild level.  It reasoned that the BiOp impermissibly deferred resolution of an essential question—the impact on individual species—to the technical assistance process, which "does not occur until after the federal action [CWA transfer] is complete and . . . lacks a trigger for reinitiating consultation." *Id.*  The court noted that a condition precedent of § 7 consultation is a finding that agency action— the EPA's § 404 approval—is likely to adversely affect listed species or critical habitats. *Id.* at 44.  Having made that finding, FWS could not then decide not to conduct a species-specific analysis. *Id.*

As to the ITS, the court explained that it lacked a "numerical take limit" or "clear standard for determining when the level of anticipated take has been exceeded." *Id.* at 52 (quoting 50 C.F.R. § 402.14(i)(1)(i)).  As with the § 7 consultation, FWS could not issue an ITS unless it determined "that incidental 'take is reasonably certain to occur.'" *Id.* at 50 (quoting 50 C.F.R. § 402.14(g)(7)).  Yet FWS specified no species impact. *Id.*  The coup de grâce for the EPA was its failure to consult with NMFS.  The court held that the EPA's failure was arbitrary and capricious because the EPA did not

**65a**

13

consider indirect effects on listed species in contravention of agency regulations. *Id.* at 59–60 (citing 50 C.F.R. § 402.02). Based on these purported defects, the court vacated the BiOp, the ITS and the EPA's approval of Florida's application. *Id.* at 63–64.

## II.  ANALYSIS

I believe appellees' challenges to the Biological Opinion are wrong in fact and law.  Legally, the ESA violations they identify are absent from the plain text of the Act.  Factually, the BiOp checks all the statutory and regulatory boxes and its bottom-line conclusion is neither arbitrary nor capricious.[9]

As a roadmap to the reader, § II.A.1 walks through a nearly identical BiOp and permitting scheme that was upheld by the Second Circuit and that served as the template for FWS and Florida here.  Section II.A.2 explains why the granular species-specific analysis insisted on by the district court—and pressed by appellees—has no statutory hook.  Section II.A.3 explains that the BiOp is not contrary to law and § II.A.4 endorses the BiOp's bottom-line conclusion.  Because I agree with my colleagues that the ITS is defective, § II.B discusses what, in my view, should be the appropriate remedy.  Finally, § II.C underscores the dangers of judge-made, atextual rules that, in my view, conflict with principles of federalism.

### A.   The Biological Opinion

Section 7 of the ESA requires federal agencies to consult the Services to ensure that their action "is not likely to

---

[9] I agree with the majority that the ITS does not comply with the ESA and its implementing regulations and that the EPA, as it now concedes, erred in failing to consult with NMFS.  My dissent is therefore limited to the BiOp and the EPA's resulting § 404 transfer.

14

jeopardize the continued existence of any endangered species or threatened species" or to destroy or adversely modify a critical habitat. 16 U.S.C. § 1536(a)(2). Once an agency concludes that its action "may adversely affect a listed species, it must engage in a formal consultation." *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1064 (D.C. Cir. 2003) (citing 50 C.F.R. § 402.14). When consulted, the Services prepare a BiOp that "detail[s] how the agency action affects the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). As the name implies, a Biological Opinion must give the Services' bottom-line opinion as to whether the proposed action is or is not likely to jeopardize listed species or their critical habitat. *Id.*

The EPA asked FWS to render a programmatic § 7 consultation: one in which FWS assessed "multiple similar . . . actions" and a "proposed program, plan, policy, or regulation providing a framework for future proposed actions." 50 C.F.R. § 402.02. FWS therefore properly focused its inquiry on whether Florida's "program, regulation, processes, and procedures insure that EPA's approval and [Florida's] subsequent assumption and implementation of the 404 program is not likely to" jeopardize listed species and their habitats. J.A. 2608. The parties exchange endless volleys aimed at whether FWS's BiOp—and the EPA's reliance thereon—was proper. But at bottom, the parties' dispute boils down to a simple question: can FWS rely on structural safeguards in Florida's program to reach a no-jeopardy determination without conducting an analysis of potential harm to each individual species and habitat? In my view, it plainly can.

### 1. *Cooling Water*

Although ESA § 7 directs federal agencies to avoid jeopardizing listed species and critical habitat, the statute is silent on how agencies meet that obligation. *See Gifford*

**67a**

15

*Pinchot Task Force v. FWS*, 378 F.3d 1059, 1067 (9th Cir. 2004) ("[T]he ESA does not prescribe how the jeopardy prong is to be determined"). It is therefore "for the agencies to determine how best to structure consultation to fulfill Section 7(a)(2)'s mandate." *Defs. of Wildlife v. Dep't of the Navy*, 733 F.3d 1106, 1121 (11th Cir. 2013). Given the rarity of state-controlled § 404 permitting, Florida chose to model its program on a comparable scheme upheld by the Second Circuit in *Cooling Water Intake Structure Coalition. v. EPA*, 905 F.3d 49 (2d Cir. 2018).

*Cooling Water* involved a nearly identical CWA permitting scheme under the previously-discussed neighboring provision, § 402. There, the EPA promulgated a new regulation governing the requirements for cooling water intake structures. *Id.* at 58. The rule was to be implemented through state-issued CWA permits. Because cooling water intake structures can kill many aquatic species each year, the EPA sought ESA § 7 consultation with the Services, which then prepared a BiOp approving the rule change. *Id.* There, as here, the Services relied on a programmatic approach because it was infeasible to analyze the innumerable permits that a state might issue in the future. *Id.* at 71. There, as here, the Services reached a no-jeopardy determination based on a technical assistance process that allowed the relevant federal agencies to review individual state permit applications and supplement them with necessary safeguards to shield at-risk species. *Id.* at 72, 74. And there, as here, environmental groups claimed that the Services violated the ESA "by deferring analysis of the [agency action's] impact on jeopardy to the permit-specific review stage." *Id.* at 73.

The Second Circuit swept their challenge aside. As it noted, the environmentalists' claims were "really challenges to the Services' 'programmatic' approach to the biological

**68a**

16

opinion," an approach that it correctly deemed consistent with the statute. *Id.* at 71. The court explained that nothing in the ESA requires a BiOp to assess every future phase—*i.e.*, future permits—of an agency action on a site- or species-specific basis. *Id.* at 73 (citing *Defs. of Wildlife*, 733 F.3d at 1121). Instead, the Services were free to point to the procedural safeguards that attach to future permits—the technical assistance process that guarantees eventual site- and species-specific assessments—as a basis for its no jeopardy finding. *Id.* Appellees seek to distinguish *Cooling Water* on two grounds. Neither suffices.

### a. *Cooling Water* is Not Distinguishable

*First*, Appellees contend that there was "little, if any data available [in *Cooling Water*] to inform species analysis at the programmatic level" but, here, FWS has "ample data." Red Br. 65; *see also Regan*, 734 F. Supp. 3d at 46 (asserting that FWS possessed "reams of data from previous Section 7 consultations"). That contention misunderstands *Cooling Water*. The salient question is not what data FWS possessed; it is how FWS was required to use that data. In Appellees' view, FWS should have used available data from federally issued § 404 permits to conduct a species-by-species analysis. In no uncertain terms, *Cooling Water* rejected that approach. *See Cooling Water*, 905 F.3d at 75 (holding that FWS could "defer[] evaluation of [the agency action]'s effects on the species" rather than analyze then-available data).

*Second*, Appellees argue that, unlike in *Cooling Water*, the technical assistance process here is "not codified" and therefore not "legally binding." Red. Br. 66; *see also Regan*, 734 F Supp. 3d at 47 (expressing a similar concern that the technical assistance procedure appears in the BiOp, not in the Federal Register). But how FWS and the EPA choose to memorialize

**69a**

17

their technical assistance program is of no moment. FWS signed a binding MOU with Florida memorializing the "processes and procedures that [govern] . . . Florida's assumption of the CWA 404 program," including the technical assistance process. J.A. 1556. The EPA likewise entered an MOA with Florida that fixed those procedures in contract. And Florida amended its administrative code to codify both agencies' requirements. *See* Fla. Admin. Code R. 62-331.051–.053.

The Government's and Florida's adherence to these agreements is "entitled to the presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *accord FDA v. Wages & White Lion Invs., L.L.C.*, 145 S. Ct. 898, 922 (2025) (rejecting the argument that an agency might secretly act contrary to its public pronouncements, relying on the presumption of regularity); *El Puente v. Army Corps of Eng'rs*, 100 F.4th 236, 255–56 (D.C. Cir. 2024) (relying on NMFS's "promise" that it would diligently act under a comparable monitoring plan to uphold its determination that agency action was unlikely to affect endangered species).

Indeed, Appellees' (and the district court's) concern was squarely addressed and rejected by *Cooling Water*. There the challengers similarly bemoaned that there was "no formal assurance" that the Services would hew to the technical assistance program. *Cooling Water*, 905 F.3d at 72 (citation omitted). The Second Circuit disagreed. The court (i) cited a Ninth Circuit decision treating comparable memoranda as enforceable, (ii) quoted a Services ESA Handbook echoing that implementation of such agreements is required and (iii) explained that the procedures were mandatory because the Services conditioned their no-jeopardy finding on compliance

18

and represented to the court their commitment to the procedures. *Id.* In my view, the same result should obtain here.

### b.  *Cooling Water* was Correctly Decided

Notwithstanding the district court's attempt to distinguish *Cooling Water*, *see Regan*, 734 F Supp. 3d at 47, its conclusion was that *Cooling Water* was wrongly decided, *see id.* at 48 ("*Cooling Water* is at odds with the statute, regulations, and caselaw").  According to the district court, the "critical misstep" in the Second Circuit's reasoning was conflating two distinct concepts.  *Id.  Cooling Water* explained—and the district court accepted—that a BiOp "need not 'assess every future' species-specific effect" at the outset.  *Id.* (quoting *Cooling Water*, 905 F.3d at 73).  But, the district court explained, "a phased approach to consultation" is permissible only if "complete and adequate" § 7 consultation "occur[s] *at some point*."  *Id.* (citation modified).  That is, a programmatic approach allows the Services either to conduct a species-specific BiOp at the outset of the consultation or to conduct a future § 7 consultation; nevertheless, the Services cannot rely on a non-§ 7 process—like technical assistance—to satisfy the species-specific analysis the court thought critical.  *Id.*

Yet the district court committed the very mistake it ascribed to *Cooling Water*: it disregarded the statute and its regulations.  No party disputes that the Services must comply with § 7.  The Government's contention was and is that it did comply and, having satisfied its § 7 obligations—in part based on future implementation of procedural safeguards—it did not need to reengage in § 7 consultations for each future action.  Neither regulation nor statute says otherwise.

First, the regulations.  The district court construed the Services' "programmatic consultation" regulations to exclude categorically future state involvement.  *Id.* at 49.  This was so,

**71a**

19

the court explained, because the "phrase is defined in the regulations" as "'a consultation addressing an agency's multiple actions,' 50 C.F.R. § 402.02—not a single agency action followed by state-licensing decisions . . . that . . . do not constitute federal action subject to Section 7 consultation." *Id.* That is wrong twice over.  Factually, there are several agency actions here: the EPA's transfer of permitting authority and the EPA's and FWS's subsequent reviews of individual state permits.  Legally, the court's concerns were misguided.  It insisted that any follow-on technical assistance was deficient because it would not be subject to another round of § 7 consultations.  But the regulations expressly recognize that programmatic actions sometimes involve scenarios in which future "action(s) will not be subject to further section 7 consultation."  50 C.F.R. § 402.02.  If the Services reached a proper programmatic determination on the front end, nothing requires FWS to retrace a path to § 7 on the back end.

Next, the statute.  The district court believed that a programmatic consultation cannot "defer[] detailed, species-specific analysis" to the technical assistance process.  *Regan*, 734 F Supp. 3d at 49; *see also id.* at 42 ("[A]nalysis at the guild-level fails the statutory and regulatory demand to assess the . . . effects at the species-level").  Put another way, the court read the ESA to mandate a detailed, species-specific analysis as part of § 7 consultation.  But nothing in the statute commands such a granular assessment for § 7 consultations generally and so none can be grafted onto a programmatic consultation.  *Cooling Water*'s holding flows naturally from the ESA's text and implementing regulations.

## 2.   A Guild-Based Approach is Consistent with the ESA

To assess the environmental impact of the EPA's transfer of permitting authority, FWS's BiOp used a guild-based

**72a**

20

approach.  A guild is "a group of organisms that use the same ecological resources in the same way."  *Guild (n.)*, additional sense, Oxford Eng. Dictionary, https://doi.org/10.1093/ OED/7855507680  [https://perma.cc/4RGX-ZTK2].      But Appellees' argument—and the district court's reasoning—is that FWS must instead, on a species-by-species basis, detail the effects of the EPA's transfer.  The ESA contains no such mandate.

Start with the text.  Section 7 requires a Biological Opinion "detailing how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).  Appellees latch on to two statutory phrases—"detailing" and "the species or its critical habitat"—that they claim bar analysis at the guild level.  From this textual pinhead, they attempt to poke a fatal hole in FWS's BiOp.  Their attempt fails.

The statute does not otherwise define "detailing" so it carries its "ordinary or natural meaning."  *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 594 U.S. 382, 388 (2021).  Dictionaries contemporaneous with the ESA's enactment define the phrase as (i) "to report minutely and distinctly: specify," *Detail (vt)*, sense 1, Webster's New Collegiate Dictionary (1973), and (ii) "to relate in particulars" or "enumerate, specify," *Detail (v)*, senses 1 & 2, Webster's Third New Int'l Dictionary of the Eng. Language Unabridged (1976).  As these definitions manifest here, "detailing" has a dual meaning: both a description of the act of recording and the specificity with which that record should be made.  At a minimum, then, BiOps must explain the Services' understanding of how agency action will affect listed species and habitats in a manner that is not "too vague, too general and too conclusory."  *Silva v. Lynn*, 482 F.2d 1282, 1284 (1st Cir. 1973) (quoting *Env't Def. Fund, Inc. v. Froehlke*, 473 F.2d 346, 348 (8th Cir. 1972)) (explaining the requirements of the

**73a**

21

National Environmental Policy Act (NEPA)'s similarly phrased "detailed statement" requirement).  Put another way, the BiOp must explain "its course of inquiry, its analysis, and its reasoning" in a manner that "permits the court to ascertain whether the agency has made a good faith effort" to comply with the statute. *Id.* (quoting *Ely v. Velde*, 451 F.2d 1130, 1139 (4th Cir. 1971)).

Precisely "[h]ow much information is enough . . . . is not a question to which" the ESA provides an answer. *Alaska v. Andrus*, 580 F.2d 465, 473 (D.C. Cir. 1978) (describing NEPA's similar language), *vacated in part on other grounds sub nom. W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978). "Detail" is a word of degree lacking any checklist or bright-line rule.  And so, although "the meaning of 'detailed' is a question of law . . . . what details need to be included in any given [BiOp] . . . . involves primarily issues of fact" to which we owe robust "judicial deference." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1512 (2025) (citation omitted). Sometimes, a species-by-species analysis may prove necessary to weigh the effects of the agency action.  But in other circumstances, a guild-based grouping is sufficient.[10]  The question is not one of statutory interpretation so much as the application of arbitrary and capricious review, according to which we owe an "extreme degree of deference" to the agency's scientific expertise. *City of Waukesha v. EPA*, 320 F.3d 228, 247 (D.C. Cir. 2003) (citation omitted); *see also Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) (emphasizing that courts must be at their "most deferential" when reviewing an agency's "scientific determination").

---

[10] For example, if a proposed agency action uniformly affects similarly situated species or habitats, the Services can "detail" the effects at the guild level.

**74a**

22

The surrounding statutory context confirms as much. The Services' jeopardy determination is to be driven by "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The Congress thus understood that as available inputs might fluctuate, so might the specificity of outputs. That does not mean, as Appellees contend, that the meaning of "detail" will "vary" to mean "different[] [things] at different times." Red Br. 52. The meaning of "detailing" is fixed—but that fixed meaning is a standard whose application varies depending on the facts. Nothing in the ordinary meaning of "detailing" compels the level of analysis that Appellees seek to impose. Instead, their "contentions boil down to questioning the degree of detail rather than the lack of it." *Sierra Club v. Morton*, 510 F.2d 813, 825 (5th Cir. 1975).

Appellees find no more support in the remainder of the text. They emphasize that § 7 speaks to "'*the* species' and '*its* habitat,'" purportedly making plain that the Congress intended individualized assessments. Red Br. 49–50. That conclusion does not follow. A focus on harm to individualized species is also consistent with an approach that groups species facing similar risks. In other words, the agency must consider *all* listed species and propose "reasonable and prudent alternatives" if agency action jeopardizes the continued existence of *any* listed species. 16 U.S.C. §§ 1536(a)(2), (b)(3)(A). But in "detailing how the agency action affects" listed species, *id.* § 1536(b)(3)(A), agencies can group together species that are affected in a comparable manner.[11]

---

[11] Indeed, the statute does not logically cohere under the Appellees' reading that "the species" and "its habitat" can mean only the singular. A BiOp may describe how agency action affects potentially hundreds of species or one species across multiple habitats. These phrases must therefore sometimes carry a plural

23

Finally, Appellees tout—and the district court relied on—a non-binding and out-of-circuit district court decision that, they claim, rejected a guild-level analysis. *See* Red Br. 50–51 (citing *Forest Serv. Emps. for Env't Ethics v. Forest Serv.*, 726 F. Supp. 2d 1195 (D. Mont. 2010)); *Regan*, 734 F Supp. 3d at 46, 55 (similarly relying on *Forest Service Employees*). There, FWS used a similar guild-level approach to a programmatic BiOp. *See Forest Serv. Emps.*, 726 F. Supp. 2d at 1202, 1204. FWS argued that its approach was necessary based on the number of affected species (387) and the scope of the affected area (192 million acres). *Id.* at 1224. The court nevertheless deemed the BiOp inadequate, explaining that convenience could not excuse compliance. *Id.* From *Forest Service Employees*, Appellees derive the mistaken proposition that BiOps *must* include species-specific analyses. That misreads the district court's holding.

In *Forest Service Employees*, FWS applied a process it termed a "coarse filter" to prepare its BiOp. The filter worked like this: FWS grouped 387 species into guilds, then applied a four-step risk profile to assess whether each species was likely to be jeopardized by the Forest Service's action. *Id.* at 1204. FWS (i) assumed that well-distributed, population-dense species were at low risk of jeopardy; (ii) considered the likelihood that some species would be exposed to the agency action; (iii) asked whether exposure was likely to result in take; and (iv) assessed whether the amount of take would likely jeopardize a species' continued existence. *Id.* Coarse filtering removed more than half of the species from FWS's list. *Id.* The remainder were then subject to more detailed analysis. The failure in FWS's approach was not its guild-level grouping but its neglect of the effects on critical habitats. As the court

---

meaning—as the Dictionary Act sensibly commands. *See* 1 U.S.C. § 1 (instructing that singular words import the plural and vice versa).

24

noted, "[n]one of the four [coarse filter] prongs deals with the value of critical habitat for recovery." *Id.* at 1224. There were several species for which critical habitat analysis was "nonexistent." *Id.* The failure to consider critical habitats—not the guild-level approach of the BiOp—is what proved fatal.

Indeed, the court went on to reject precisely the argument Appellees try to extract: "Defendants *correctly* point out that the law does not impose an artificial obligation to include a section expressly discussing recovery for every species." *Id.* at 1225 (citation modified). In other words, *Forest Service Employees* agreed that FWS could group like-species together—it simply could not use that grouping to excuse a failure to assess differences in critical habitats. Insofar as the case can be read to stand for anything more, it offers no controlling or persuasive reason to impose atextual species-specific requirements on FWS.

The district court's insistence that FWS tick off each and every species with its own separate analysis is simply a judge-made requirement that obfuscates the critical inquiry: whether FWS assessed how the relevant action under review will affect species and habitats and reached a bottom-line conclusion that is neither arbitrary nor capricious.

### 3.    The BiOp Satisfies ESA Procedures

FWS's statutory obligation is remarkably succinct: it need only "detail[] how" the EPA's transfer of § 404 authority "affects [listed] species or [their] critical habitat." 16 U.S.C. § 1536(b)(3)(A). By regulation, the Biological Opinion must include a (1) a "summary of the information on which the opinion is based;" (2) a "detailed discussion of the environmental baseline;" (3) a "detailed discussion of the effects of the action on listed species or critical habitat;" and (4) FWS's opinion on whether the action is likely "to

**77a**

25

jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(h).  No party disputes that the BiOp includes the requisite first step summary; the remaining three factors—and the failure of Appellees' contrary to law challenge—are discussed in turn.

### a.   The Environmental Baseline

A BiOp must discuss the environmental baseline in detail. *Id.*  The environmental baseline is the condition of the species or habitat before the proposed action, including "the past and present impacts of all Federal, State, or private actions . . . in the action area."  *Id.* § 402.02.  The district court did not pass on the correctness of FWS's baseline assessment, *see Regan*, 734 F. Supp. 3d at 43–44, but Appellees argue that the BiOp gave short shrift to this step in the process.[12]

Appellees do not dispute that the BiOp adequately documented past and present actions and the condition of Florida's habitats.  Instead, they argue that FWS did not explain how both affect listed species.  The BiOp itself does not discuss the condition of any species but that is because the BiOp incorporates by reference the EPA's Biological Evaluation. The Biological Evaluation contains an eighty-page table of all listed species in the affected area and their known environmental stressors  along with further information on the critical habitats and their historic degradation.

Appellees complain that the baseline assessment does not meticulously describe how past and present activities affect each of the 235 documented species but they raise this point in

---

[12] Appellees preserved the argument for review.  They argued below that the baseline was inadequate—the district court simply declined to reach the issue given the other defects it identified.

26

a single sentence. *See POM Wonderful, LLC v. FTC*, 777 F.3d 478, 499 (D.C. Cir. 2015) (noting that arguments made "in conclusory fashion and without visible support" may be deemed forfeited) (citation omitted). Appellees' primary complaint is that FWS simply "copied [the EPA's] Biological Evaluation's baseline section" and the EPA, in turn, lifted significant portions of its assessment from "a Biological Assessment Florida had prepared for EPA." Red Br. 40. FWS's efficiency-based process should be lauded—not lambasted.

Environmental review is arduous, often involving hundreds if not thousands of pages of analysis. *See Appalachian Voices*, 139 F.4th at 918 n.1, 922–23 (Henderson, J., concurring). For that reason, agencies often incorporate by reference the work of another agency. *See, e.g.*, *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1214 (9th Cir. 2004) (noting an environmental statement incorporated external data by reference); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 445 n.6 (4th Cir. 1996) ("A federal agency may adopt an [environmental statement] prepared by another federal agency"); *Christian Broad. Network, Inc. v. Copyright Royalty Tribunal*, 720 F.2d 1295, 1306 (D.C. Cir. 1983) ("[A]n agency may explain itself by incorporating by reference parts of the record"). The purpose of a BiOp "is not to generate paperwork . . . but to foster excellent action." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768–69 (2004). As judges are acutely aware, excellent results can—and often are—achieved by incorporating the work of others. *See generally* today's opinions; *compare* Alexander Hamilton, Final Version of An Opinion on the Constitutionality of an Act to Establish a Bank (Feb. 23, 1791), *reprinted in* 8 *The Papers of Alexander Hamilton*, 97, 97–134 (Harold C. Syrett. ed., 1965), *with McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 332–34 (1819) (parroting Hamilton's reasoning).

**79a**

27

Of course, incorporation cannot be used as a backdoor for wholesale abdication of an agency's statutory duties. But FWS did not "delegate its responsibility" to reach an independent opinion. *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002). The environmental baseline is simply a factual compilation of the *status quo ante*. FWS rendered an independent no-jeopardy determination based on its assessed risks to species; it simply relied, in part, on the data of the EPA (and Florida) to capture baseline conditions. Nothing in the ESA requires FWS to gather that information independently. *See Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000). To the contrary, FWS must rely on the "the best . . . data available" whatever the data's origin. 16 U.S.C. § 1536(a)(2).

**b.    Effects of the Action**

A BiOp must also include "[a] detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h). The effects of the action are broadly defined by regulation to include "the consequences of other activities that are caused by the proposed action," even if "outside the immediate area involved in the action." 50 C.F.R. § 402.02. Again, Appellees fault FWS for taking a guild-based approach rather than conducting a species-specific analysis. And again, their argument fails under the regulation for the reasons it failed under the functionally identical statutory text: the granularity Appellees demand is nowhere in law.

Appellees next fault FWS for assessing the effects of dredge-and-fill activities on guilds "at the 30,000-foot level." Red Br. 41. Their altimeter might ring true but they use the wrong sight line.

FWS was charged with measuring the effects of "*the action*" on listed species and habitats. 50 C.F.R. § 402.14(h)

28

(emphasis added).  The relevant action is not any individual dredge or fill.  Indeed, it is not any *current* action that may affect a species or habitat.  Instead, FWS must compare one speculative future to another: a world in which the Army Corps retains § 404 authority and a world in which Florida assumes control.  As it explained, "uncertainties surrounding the location, timing, frequency, and intensity of State 404 permit actions" necessarily rendered FWS's task an exercise of informed conjecture.  J.A. 2656.  Nevertheless, FWS gave a more than adequate account of the discernible effects of the EPA's transfer.  Based on the best available evidence, FWS determined that transfer "is not expected to increase or decrease the future number of CWA section 404 regulated activities."  J.A. 2657.  FWS further determined that the technical assistance process it designed would be "as protective" of listed species and critical habitat "as the section 7 interagency consultation processes that occur in the operation of [the Corps'] 404 Program."  *Id.*  Accordingly, FWS used historic § 7 data to guide its approach.

FWS first identified 235 species that could be affected by Florida's assumption of § 404 permitting.  It then explained the types of activities that could lead to dredge or fill permits, including agriculture, commercial development and mining, among others.  It delineated between the retained and assumed waters of the United States and described the habitats contained therein.  It also categorized different types of effects on listed species, which FWS termed "stressors."  It then discussed how these stressors would affect guilds of species at the "macro" level, explaining that the approach taken was "intentionally broad" because "[i]mpact analysis on the species level" was contained in a separate table.  J.A. 2660–66; *see* J.A. 2426–76 (individualizing the species).

29

Appellees contend that FWS's approach cloaked meaningful differences within guilds. Their argument is belied by the record. Take mammals. FWS divided the "mammals" guild—consisting of just twenty-two animals—into seven different subgroups based on their environment: wetland/marsh, forest/grasslands/swamps, tropical hardwood hammock/mangrove, caves, pine rockland, beach/scrub dune and aquatic. It then assessed the anticipated effects of the EPA's transfer on each subgroup based on potential dredge and fill activities in their shared habitats. FWS's approach was meticulous. It concluded that seventeen mammals were likely to be adversely affected by the action but the remaining five were not. Even within subgroups, FWS reached differing outcomes for individual species. For example, FWS concluded that the Red Wolf was not likely to be adversely affected but the Florida Panther was, despite both occupying the "forests/grasslands/swamps" subgroup. Similar fine-tuned distinctions are found throughout the BiOp.[13]

As evidence to the contrary, Appellees highlight that "FWS lumped together the threatened key largo woodrat with the endangered Florida bonneted bat" when "[h]abitat loss is the predominant threat to the woodrat, while the bonneted bat is also affected by water quality changes." Red Br. 41–42. This is precisely the sort of "flyspeck[ing]" of an agency's ESA determinations that we have repeatedly rejected. *El Puente*, 100 F.4th at 246 (quoting *Sierra Club v. DOE*, 867 F.3d 189, 196 (D.C. Cir. 2017)); *accord City of Waukesha v. EPA*, 320

---

[13] Although FWS analyzed individual species to assess whether they were likely to be affected by the EPA's action, its no-jeopardy determination looked exclusively at species guilds because the protections of the technical assistance process protected each species in a similar manner. As explained *supra* II.A.2., an exclusively guild-based assessment is consistent with the EPA if groups of species will be similarly affected (or protected).

30

F.3d 228, 247 (D.C. Cir. 2003) (per curiam) (noting the "extreme degree of deference" we accord to an agency "evaluating scientific data within its technical expertise") (citation omitted). But even accepting Appellees' proffered evidence, they are hoist on their own petard. FWS identified three listed mammals inhabiting the "tropical hardwood hammock/mangrove" habitat. Two of these mammals—the Florida Bonneted Bat and the Key Largo Woodrat—were both listed as likely to be affected but for differing reasons. The third—the Key Largo Cotton Mouse—was deemed unlikely to be affected by the EPA's transfer due to the species' restricted range. Appellees' own evidence, apparently unintentionally, manifests the fastidious approach FWS took in the Biological Opinion.

### c.    FWS's Opinion

Finally, FWS was required to include its opinion on whether the EPA's transfer of § 404 authority is likely "to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(h). Appellees contend that FWS violated that final step because it "did not analyze the baseline or effects" and therefore lacked "a substantive basis to" reach its no-jeopardy determination. Red Br. 42. As explained above, FWS analyzed both the baseline and the effects. There is no dispute that FWS offered an opinion; Appellees simply disagree with it. That is an issue subject to arbitrary and capricious review, which is addressed next.

### 4.    The BiOp's Substantive Determination is not Arbitrary or Capricious

Appellees have a tough row to hoe. To prevail, they must show that the BiOp "is not a product of reasoned decisionmaking"—"a heavy burden, since *State Farm* entails a

**83a**

31

very deferential scope of review that forbids a court from substituting its judgment for that of the agency." *Van Hollen, Jr. v. FEC*, 811 F.3d 486, 495 (D.C. Cir. 2016) (citation modified). That principle is no less true when an agency deals with unavoidable uncertainty, as "[v]irtually every decision must be made under some uncertainty; the question is whether [FWS's] response, *given uncertainty*, is supported by substantial evidence and not arbitrary and capricious." *Dept of Interior v. FERC*, 952 F.2d 538, 546 (D.C. Cir. 1992). If data is uncertain, the Court must "proceed with particular caution, avoiding all temptation to direct the agency between rational alternatives." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008) (citation omitted).

Appellees spill lots of ink explaining that programmatic consultation cannot be used as an end-run around § 7. But no one says it can. The question is whether FWS properly reached a no-jeopardy determination in light of future structural safeguards.

On the merits, FWS reasonably reached a no-jeopardy determination. As FWS emphasized from the outset, "substantial uncertainty" attached to any good-faith effort to predict how Florida's assumption of permitting authority would affect individual listed species and habitats. J.A. 2644. Rather than engage in rote speculation about future Floridian permits—or simply assume away the problem wholesale—FWS sensibly crafted a mechanism for follow-on review to ensure ESA protections permit-by-permit. And based on that permit-by-permit review, FWS reasonably concluded that it was *not* "more likely than not" that the EPA's transfer would "jeopardize a species." *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 595 (D.C. Cir. 2023).

32

Appellees insist that uncertainty does not authorize FWS to defer to a later date a species-by-species assessment of the harms emanating from transfer. They argue that FWS should have given its best account of projected harms, "even if [the data] is 'quite inconclusive.'" Red Br. 46–47 (quoting *Babbitt*, 215 F.3d at 60). But *Babbitt* simply rejected the argument that the Services are required to independently generate better data if the data is inconclusive. *Babbitt*, 215 F.3d at 60–61. It did not hold that agencies possessing only inconclusive data must nevertheless project the consequences of their action *ad infinitum*. To the contrary, if we required perfect foresight of the "relevant environmental effects" "before action may be taken, . . . it is doubtful that any project could ever be initiated." *Andrus*, 580 F.2d at 473 (quoting *Jicarilla Apache Tribe of Indians v. Morton*, 471 F.2d 1275, 1280 (9th Cir. 1973)); *see also Me. Lobstermen's Ass'n*, 70 F.4th at 596 ("To say uncertainty is a reason to veto a federal action is to say that many valuable activities must cease, even if the risk of jeopardy is not 'likely'"); *cf.* Hamilton, *supra* ("If the abuses of a beneficial thing are to determine its condemnation, there is scarcely a source of public prosperity, which will not speedily be closed"). There is sometimes "no substitute for reviewing the actual results of a regulatory action." *Elec. Consumers Res. Council v. FERC*, 407 F.3d 1232, 1238 (D.C. Cir. 2005) (citation omitted). That does not mean that FWS may forego ESA assessment before the relevant agency action is complete. It simply means that FWS's conclusion must utilize the tools at hand. Here, FWS properly accounted for post-action safeguards built into Florida's permitting scheme.

Our Court has repeatedly relied on an agency's future oversight as a basis for present-day approval. *See Blumenthal v. FERC*, 552 F.3d 875, 882 (D.C. Cir. 2009) ("FERC reasonably relied on its continuing oversight of the market"); *Elec. Consumers Res. Council*, 407 F.3d at 1239 ("[T]he

**85a**

33

deference the court affords the Commission is based on the understanding that the Commission will monitor its experiment and review it accordingly"). That principle applies with added vigor in the environmental context. *See, e.g.*, *El Puente*, 100 F.4th at 255 (upholding ESA no-jeopardy determination based on "the agencies' reliance on a [future] monitoring plan and a promise to take action"); *Theodore Roosevelt Conservation P'Ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010) (upholding "adaptable mitigation measures . . . in light of the inherent uncertainty of environmental impacts").

The protections of the technical assistance process more than justify FWS's no-jeopardy determination. Indeed, as shown below, the protections are comprehensive:



J.A. 1568.

**86a**

34

First, Florida modeled its § 404 scheme on FWS-approved permitting guidance used by the Army Corps of Engineers in its CWA program. Second, Florida designated state officials to participate in a technical team that, alongside FWS, managed the species coordination process and assisted in the federal-to-state handover. Third, the relevant state agencies' staffs were trained on species-review procedures, using training material jointly developed by Florida and FWS. These first three safeguards operated before any federal handover of permitting authority. Fourth, all § 404 applications submitted to Florida were forwarded to FWS for independent review. Fifth, FWS offered mitigation measures necessary to avoid jeopardizing protected species or habitats and Florida was required to either accept these measures or deny the permit. Sixth, even when Florida successfully runs this regulatory gauntlet, the EPA retains independent oversight to veto any permit that provides insufficient protection to listed species or critical habitats. Together, these procedures make any differences in net environmental impact between state- and federal-led permitting processes highly unlikely and more than satisfy "our narrowly defined duty" to police FWS's compliance with "minimal standards of rationality." *Ethyl Corp. v. EPA*, 541 F.2d 1, 36, (D.C. Cir. 1976) (en banc).

Precedent proves the point. In *Salazar*, our Court upheld a species mitigation procedure comparable to the one at issue.[14] There, the Bureau of Land Management (BLM) reviewed a single project that would form the genesis for "approximately 2000 new natural gas wells . . . over the span of 30 to 50 years." *Salazar*, 616 F.3d at 505. As with FWS here, BLM could not

---

[14] *Salazar* involved review of an Environmental Impact Statement under NEPA but its disposition applies here. The relevant agency was obligated to conserve and improve the condition of a protected species and its habitat and the contemplated action affected both. *Salazar*, 616 F.3d at 505.

35

feasibly measure the innumerable downstream consequences so it adopted an oversight plan to monitor and mitigate adverse impacts to wildlife on an application-by-application basis. *Id.* at 506. BLM "outlined the basic conditions of approval for drilling applications" but "left many specific . . . decisions for a case-by-case determination." *Id.*; *see also id.* at 516 (acknowledging that BLM's program was "flexible," could be "modif[ied]" and that "exact application of mitigation measures" would be fleshed out "on a site-specific basis" only). We not only deemed these protections adequate; we called the plan "a responsible decision in light of the inherent uncertainty of environmental impacts." *Id.* at 517.

Appellees urge that our analysis should disregard the technical assistance process. They assert that FWS insufficiently committed itself to the technical assistance process. This is so, in their view, because the BiOp states that FWS "may" provide assistance and "may or may not" suggest measures "as needed." That argument has no purchase. FWS's commitment is "entirely voluntar[y]" only if one reads the BiOp with a blinkered eye. Red Br. 57. FWS was emphatic: it "*will* participate in [the] State 404 program," it "*will* collaborate on developing . . . training material," Florida "*shall* . . . forward" § 404 applications to FWS after which the state "*will* incorporate as permit conditions all recommend[ations] . . . provided by the []FWS." J.A. 2668–69, 2672 (emphasis added). The "mays" that Appellees emphasize are no more than a recognition that not every § 404 permit will affect a listed species or critical habit and thus FWS "may or may not" need to impose additional restrictions. And, as noted *supra* II.A.1.a, the Government's adherence to these protections is entitled to the presumption of regularity.

Appellees insist that the presumption carries no weight because it "does not render a discretionary future commitment

**88a**

36

mandatory." Red Br. 59–60. As previously discussed, FWS has no license to shirk its ESA duties and "[w]e generally presume that government agencies comply with the law." *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1261 (10th Cir. 2019); *accord FCC v. Schreiber*, 381 U.S. 279, 296 (1965) (same). The Court has relied on less binding commitments than the one here to sustain agency action. *See El Puente*, 100 F.4th at 255 ("a promise" from NMFS); *Salazar*, 616 F.3d at 516 (BLM's commitment "to strive for" performance goals); *Wheaton Coll. v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) (per curiam) (the "word" of the government at oral argument); *see also Cooling Water*, 905 F.3d at 72 (same).

\*   \*   \*

Environmental review is already one of the most arduous hills for federal agencies to climb. We should not erect additional barriers beyond those prescribed by law. *See Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 557–58 (1978). A BiOp often includes a species-by-species analysis but that need not always be so. Context is key and the context here sometimes supports analysis at the guild level. FWS took a sensible approach to a novel challenge. It made the requisite findings under the ESA and reasonably concluded that listed species and critical habitat are not at jeopardy because FWS would directly monitor Florida's permitting scheme to impose protections as needed. That approach is fully consistent with the statute and is not arbitrary and capricious. Nor is the EPA's reliance on FWS's BiOp arbitrary and capricious. I believe the district court erred by holding to the contrary.

## B. Remedy

Remedies are often an afterthought in APA litigation. After all, in plain terms the statute states that a reviewing court

**89a**

37

"shall . . . hold unlawful and set aside agency action, findings, and conclusions . . . not in accordance with law."  5 U.S.C. § 706(2).  There is thus often little for a court to do but vacate the underlying rule or action once it is invalidated.  But three discrete agency actions are at play here: the ITS, the BiOp and the EPA's decision to transfer § 404 permitting authority to Florida.  As noted *supra*, I join the majority's invalidation of the ITS.  On the other hand, I believe the BiOp is procedurally and substantively sound.  That leaves the question of § 404 authority and the court's remand with vacatur.

Even when an agency errs, the APA requires us to take "due account . . . of the rule of prejudicial error."  5 U.S.C. § 706.  As the Attorney General's seminal 1947 manual on the APA explains, the prejudicial error rule codified the well-developed doctrine of "harmless error," under which a court may "disregard[]" "errors which have no substantial bearing on the ultimate rights of the parties."  U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 110 (1947); *see also Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 690 (D.C. Cir. 2023) ("Error is harmless when it clearly had no bearing on the procedure used or the substance of decision reached") (citation modified).  I believe the BiOp properly concluded that transferring § 404 authority to Florida is not likely to jeopardize listed species or destroy or adversely modify critical habitat.  That finding was key.  Nothing in the EPA's bottom-line decision to transfer § 404 authority hinged on the flawed ITS.  The ITS simply extends incidental take liability to Florida and individual permittees when a permit will result in incidental take.

The district court thought it uncertain "whether the EPA would have approved—or Florida would have asked the EPA to approve—an assumption application that did not provide

38

incidental take protection to Florida permittees through the programmatic ITS." *Regan*, 734 F. Supp. 3d at 64. That conclusion is belied by the record. As the district court acknowledged, "a large percentage of the permits at issue will have no effect on listed species." *Id.* at 63–64. Even that concession is an understatement. The record indicated that somewhere between 90 to 98.6% of Florida's CWA permits do not require incidental take coverage. *Id.* Both the EPA and Florida vigorously contest the decision to vacate the EPA's transfer. The EPA has defended its actions across two administrations and would likely reapprove Florida's application if presented with the question afresh. And Appellees can show no prejudice if Florida retains § 404 authority because vacatur of the ITS—but not the EPA's § 404 transfer—would cure any injury that could be traced to FWS's error.

Additionally, our precedent at times permits us to remand to an agency without vacating its action under the two-part framework set out in *Allied-Signal, Inc. v. Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993). That framework looks to "the seriousness of the [action's] deficiencies" and the likely "disruptive consequences of vacating." *Id.* at 150–51. I believe the "seriousness of the [transfer decision's] deficiencies" is *de minimis*. *Allied-Signal*, 988 F.2d at 150. The BiOp properly reached a no-jeopardy determination and the ITS had no bearing on the EPA's transfer decision. While FWS corrects the ITS, Florida could seek an incidental take exemption under § 10 or simply decline to issue a CWA permit in the narrow sliver of actions likely to result in incidental take. When "nothing in the record suggests that significant harm would result from allowing the approval to remain in effect pending the agency's further explanation," vacatur can be—and here, is—too virulent a cure for the alleged infraction. *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995).

**91a**

39

The "disruptive consequences of an interim change that may itself be changed," however, are manifold. *Allied-Signal*, 988 F.2d at 150–51 (citation omitted). Florida has been administering § 404 permits for over three years and investing resources in the program for twice as long. Floridians have reasonably relied on a state administrative apparatus that is now made inoperative. State administrators hired and trained to process CWA permits will likely be idled until the EPA re-dots its § 7 i's and crosses its § 9 t's. Numerous local businesses have already warned of the immense on-the-ground costs of the district court's ruling. I see no reason to perpetuate those costs. We have previously remanded without vacatur in analogous circumstances. *See, e.g.*, *City of Oberlin v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019) (remanding without vacatur because a pipeline was "currently operational" and vacatur "would be quite disruptive"); *Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 538 (D.C. Cir. 2018) (remanding without vacatur even given "serious[] . . . deficiencies" in the agency's reasoning because a party "reasonably relied on the [agency]'s ruling" and faced financial burdens from vacatur but challengers would "not suffer harm" from keeping the approved action in place); *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (remanding without vacatur to avoid "significant transaction costs" from "the whole cycle . . . repeat[ing] itself"). I believe the same result should obtain here.

## C.   ESA In Context

Today's case involves only the third successful federal-to-state handoff of § 404 permitting authority in the more than half-century existence of the program. And now my colleagues scuttle that years-in-the-making success, notwithstanding the Congress's expressed desire for "the states . . . [to] implement the [CWA's] permit programs." 33 U.S.C. § 1251(b).

**92a**

40

Expansive interpretations of the ESA—divorced from its text—have negated reasonable agency action,[15] become the

---

[15] The most infamous example involved an injunction against construction of a multiyear, multimillion dollar dam backed by both the Congress and the Executive to protect a species that later evidence would reveal was simply invented to halt development. *See Tennessee Valley Authority (TVA) v. Hill*, 437 U.S. 153, 157, 163–64, 172–73 (1978); Jason Nark, *How a Mistaken Identity Halted a Dam's Construction*, N.Y. Times, Jan. 4, 2025, at A13. Although the Congress swiftly repudiated *TVA*'s notion that the ESA should be enforced "whatever the cost," *id.* at 184; *see* ESA Amendments of 1978, Pub. L. No. 95-632, §§ 2, 3, 11, 92 Stat. 3751, 3753, 3764, 3766 (1978), it presaged a judicial approach that has emphasized the ESA's broad purpose over its far more sparing text.

For example, one court held that the Services must protect a species any time it no longer occupies a geographic range that it once historically did—regardless of any threat of extinction— leading to the confusing result that almost every North American species could be considered threatened or endangered. *See Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1145 (9th Cir. 2001). Another held that any activity causing some *de minimis* impact on listed species constitutes unlawful take. *See Defs. of Wildlife v. EPA*, 882 F.2d 1294, 1300–01 (8th Cir. 1989). A third placed such stringent requirements on when the Forest Services must reinitiate § 7 consultation that it effectively stopped hundreds of projects meant to *preserve* endangered species. *See Cottonwood Env't L. Ctr. v. Forest Serv.*, 789 F.3d 1075, 1084–88 (9th Cir. 2015). Meanwhile, several circuits concluded that the ESA categorically resolves the balance of the equities and the public interest in favor of injunctive relief, *see Strahan v. Coxe*, 127 F.3d 155, 160 (1st Cir. 1997) (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1510 (9th Cir. 1994)), and that any ESA violation is almost *per se* irreparable, *see Thomas v. Peterson*, 753 F.2d 754, 764 (9th Cir. 1985), a*brogated as recognized in Cottonwood Env't L. Ctr.*, 789 F.3d at 1090–91.

41

bête noire of landowners across America[16] and threatened cooperative federalism.

---

[16] For example, the Services used the now discredited *Chevron* framework to expand the meaning of "take" beyond centuries of common law understanding to reach the actions of private landowners who adversely modify a species' habitat—even inadvertently. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*, 515 U.S. 687, 692–95 (1995). The cost to landowners is staggering: once their property is listed as a critical habitat, it is subject to severe land-use restrictions, a thicket of procedural requirements, litigation risk and a dramatic diminution in value. *See, e.g.*, *Christy v. Hodel*, 857 F.2d 1324, 1327–28 (9th Cir. 1988) (upholding thousands of dollars in fines against a farmer for defending his livestock from a bear mauling his grazing flock); Megan Seymour, Biological Opinion for the Issuance of a Section 10(a)(1)(B) Incidental Take Permit 2–7 (2003) [https://perma.cc/6EQG-RMFZ] (property owner forced to relinquish a third of its property and $50,000 in in-kind services as a condition to build a residence because of the presence of a protected water snake).

The cost extends far beyond mere dollars and cents: landowners risk criminal prosecution for ordinary uses of their property. *See* Kimberly L. Mayhew, Comment, United States v. Wang-Lin Company*: The Kangaroo Rat and Criminal Prosecution Under the Endangered Species Act*, 6 San Joaquin Agric. L. Rev. 193, 194–96 (1996) (discussing the prosecution of a farmer for inadvertently modifying the habitat of the Tipton kangaroo rat while preparing his farmland for planting); *United States v. Nguyen*, 916 F.2d 1016, 1017–20 (5th Cir. 1990) (upholding the conviction of a fisherman who inadvertently snagged a protected turtle in a shrimp net without proof of knowledge that he knew what the creature was or that it was protected); *United States v. McKittrick*, 142 F.3d 1170, 1176–77 (9th Cir. 1998) (similarly concluding that a defendant could be criminally convicted for killing a protected species notwithstanding he thought it was a different and unprotected animal).

42

Both the CWA and the ESA evince the Congress's desire that the states play a leading role. *See* 33 U.S.C. § 1251(b) ("It is the policy of Congress that the States . . . implement the [CWA's] permit programs"); 16 U.S.C. §§ 1535(a), (c) (requiring the Services to "cooperate to the maximum extent practicable with the States" and creating a program for cooperative state-federal ESA agreements). Yet it is unclear how any state, particularly one as ecologically diverse as Florida, can ever clear the regulatory hurdles kept in place by today's holding. Recall, only two states have ever assumed § 404 authority: Michigan in 1984 and New Jersey in 1994. *See* 40 C.F.R. §§ 233.70–71. Michigan's program underwent no ESA analysis under the Government's then-prevailing understanding of the law. The district court pointed to the "New Jersey model" as evidence that its interpretation did not set the CWA and the ESA at irreconcilable variance. *Regan*, 734 F.Supp.3d at 62–63; *see id.* at 22–23. But I believe New Jersey makes my point.

New Jersey spent years in negotiations with the EPA to take over § 404 permitting. Although the EPA favored transfer, New Jersey's application was opposed by FWS and a collection of environmental groups on ESA grounds. *See* Susan Lockwood, *Assumption, New Jersey Style*, Nat'l Wetlands Newsletter (Env't L. Inst. 1994), at 6–7 [https://perma.cc/6JW9-2CP8]. After much ESA wrangling, New Jersey entered into a Memorandum of Agreement (MOA) with the EPA and FWS, pursuant to which the state agreed to identify any CWA permit that might affect a listed species. *See* Memorandum of Agreement Among the U.S. Fish and Wildlife Service, U.S. Environmental Protection Agency, and New Jersey Department of Environmental Protection and Energy 3–4 (1993) [https://perma.cc/ELC7-DUR7]. Per the MOA, FWS then screens the identified permit and decides whether it should be approved, denied or amended. *Id.* at 4. The Government

43

retains final authority over whether a CWA permit can issue. *Id.* at 6. In other words, New Jersey provides the precise model that Florida adopted and that the majority now rejects.

When confronted with "two statutes [that] cover, in whole or in part, the same matter," our obligation is to "give effect to both." *Frost v. Wenie*, 157 U.S. 46, 58 (1895). As numerous Amici states have warned, the district court's approach places "onerous burdens on the states and federal agencies" and "severely hinders the ability of other States to pursue 404 assumption." State Br. 9. Their warning is sound: a program that the Congress crafted for the states' lead will remain in federal hands—and over the Government's opposition. ESA review has become a procedural morass divorced from the text. The species-specific requirement is another "atextual legal rule[]" that "distort[s] the underlying statutory text, impose[s] unnecessary burdens on litigants, and cause[s] confusion for courts." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 313 (2025) (Thomas, J., concurring).

\* \* \*

Because I believe the ESA contains no species-specific requirement, FWS's BiOp properly reached a no-jeopardy conclusion and the EPA's § 404 transfer is sound, I respectfully dissent regarding these issues.

**96a**

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.   Parties and Amici

Plaintiffs-Appellees are the Center for Biological Diversity; Defenders of Wildlife; Sierra Club; Conservancy of Southwest Florida; Florida Wildlife Federation; Miami Waterkeeper; and St. Johns Riverkeeper.

Federal Defendants-Appellants are Lee M. Zeldin, in his official capacity as Administrator for the U.S. Environmental Protection Agency (EPA); Jessica Kramer, in her official capacity as the Assistant Administrator of the EPA Office of Water; Sean Donahue, in his official capacity as the EPA General Counsel; Jeffrey A. Hall, in his official capacity as the Assistant Administrator for EPA's Office of Enforcement and Compliance Assurance; Kevin J. McOmber, in his official capacity as Regional Administrator for Region 4 of the EPA; Michael Oetker, in his official capacity as Regional Director for the U.S. Fish and Wildlife Service (FWS); Brian Nesvik in his official capacity as Director of the FWS; Lieutenant General William H. Graham, Jr., in his official capacity as Chief of Engineers and Commanding General of the U.S. Army Corps of Engineers (Corps); Colonel Brandon Bowman, in his official capacity as District Commander of the Jacksonville District for the Corps; EPA; Corps; and FWS.[*]

---

[*] The successors in office of named public officials are automatically substituted as parties.  *See* Fed. R. App. P. 43(c)(2).

**97a**

Intervenor-Defendant-Appellants are the State of Florida and Florida Department of Environmental Protection.

Amici before this Court are: the Florida Chamber of Commerce; the Association of Florida Community Developers, Inc.; the Mosaic Company; the Florida Home Builders Association; the Florida Transportation Builders' Association; the Leading Builders of America; the Associated Industries of Florida; the Lennar Corporation; G.L. Homes of Florida Corp.; Greenpoint Holdings; KB Home; Pulte Group; Taylor Morrison Home Corp; Florida State Hispanic Chamber of Commerce; and the States of Utah, Alabama, Alaska, Arkansas, Idaho, Iowa, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia, and Wyoming.

Tarpon Blue Silver King I, LLC, doing business as Collier Enterprises, Ltd., was an additional party before the district court.  Additional amici before the district court were Cameratta Companies LLC and CAM7-SUB, LLC.

## B.    Rulings Under Review

Federal Appellants seek rehearing of a decision issued by a panel of this Court on March 27, 2026.

The State of Florida, the Florida Department of Environmental Protection, and Federal Defendants appealed the district court's February 15, 2024 order, as

amended on April 12, 2024. That order was made final and appealable on April 12, 2024, when the district court entered a final judgment under Federal Rule of Civil Procedure 54(b).

## C. Related Cases

This case is related to *Center for Biological Diversity v. OSMRE*, 2026 WL 1506550 (D.D.C. May 29, 2026) (D.C. Cir. No. 26-5268), because the Center for Biological Diversity is a plaintiff in both cases, the U.S. Fish and Wildlife Service is a defendant in both cases, and both cases involve Administrative Procedure Act claims under the Endangered Species Act challenging a biological opinion and incidental take statement that rely on technical assistance.

/s/ *Rebecca Jaffe*
REBECCA JAFFE

Counsel for the United States

**99a**